## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| The Mosaic Company,<br><br>                                 Plaintiff,<br><br>                                 v.<br><br>UNITED STATES,<br><br>                             Defendant. | Court No. 21-00116 |

## COMPLAINT

Plaintiff The Mosaic Company ("Mosaic"), by and through its attorneys, alleges and states as follows:

## ADMINISTRATIVE DETERMINATION TO BE REVIEWED

1.    Plaintiff brings this Complaint to contest certain aspects of the final affirmative determination issued by the U.S. Department of Commerce ("Commerce") in the countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco.  The final determination was published in the Federal Register on February 16, 2021.  Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 9482 (Int'l Trade Admin. Feb. 16, 2021) ("Final Determination"), and accompanying Issues and Decision Mem. ("Final IDM").  The countervailing duty order on phosphate fertilizers from the Kingdom of Morocco was signed on April 1, 2021, and published in the Federal Register on April 7, 2021.  Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders, 86 Fed. Reg. 18,037 (Int'l Trade Admin. Apr. 7, 2021) (the "CVD Order").

Court No. 21-00116

## JURISDICTION

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action was commenced under sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended.  19 U.S.C. § 1516a(a)(2)(A)(i)(II), (B)(i).

## STANDING

3.      Plaintiff is a U.S. producer of the domestic like product and therefore an interested party within the meaning of 19 U.S.C. § 1516a(f)(3) and 19 U.S.C. § 1677(9)(C). Mosaic participated as the Petitioner in Commerce's countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco, including by filing case and rebuttal briefs, and has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF ACTION

4.      Plaintiff commenced this action by filing a Summons on March 18, 2021, within 30 days after publication of the Final Determination in the Federal Register.  Plaintiff filed an Amended Summons on April 12, 2021, within 30 days after publication of the CVD Order in the Federal Register.  Plaintiff is filing this Complaint within 30 days after filing the Amended Summons, in accordance with the Court's order of April 12, 2021.  See Order, ECF No. 9 (Apr. 12, 2021).  Accordingly, this action is timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A) and Rules 3(a)(2) and 6(a) of this Court.

## HISTORY OF THE ADMINISTRATIVE PROCEEDING

5.      Plaintiff filed a petition with Commerce and the U.S. International Trade Commission on June 26, 2020, alleging that the Government of the Kingdom of Morocco provides countervailable subsidies to a producer of phosphate fertilizers, and that such imports

Court No. 21-00116

are materially injuring, or threatening material injury to, the domestic phosphate fertilizer industry.  Commerce initiated a countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco on July 16, 2020.  Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: Initiation of Countervailing Duty Investigations, 85 Fed. Reg. 44,505 (Int'l Trade Admin. July 23, 2020).  Commerce investigated several alleged subsidy programs, including the following:  (1) Provision of Phosphate Mining Rights for Less Than Adequate Remuneration ("LTAR"); (2) Value-Added Tax (VAT) Reform-VAT Refunds; (3) VAT Exemptions for Capital Goods, Machinery and Equipment; and (4) Provision of Phosphogypsum Waste Disposal.  See Initiation Checklist at 12-16 (July 16, 2020).

6.     With respect to the Provision of Phosphogypsum Waste Disposal program, Commerce stated in the Initiation Checklist that "while we are initiating on the basis of revenue foregone pursuant to section 771(5)(D)(ii) of the Act, we note that the petitioner alleges that the provision of phosphogypsum waste disposal can be considered a service provided by the GOM for LTAR.  While evidence on the record at this time provides sufficient support to initiate this program under the revenue foregone provisions of the statute only, evidence on the record also indicates that such waste disposal services are potentially available in Morocco.  If during the course of this investigation, we discover that this program should be also considered as services performed for LTAR pursuant to section 771(5)(D)(iii) and section 771(5)(E)(iv) of the Act, we will examine such a practice." Id. at 16.

7.     Following initiation, Commerce selected OCP S.A. ("OCP"), the only known producer of phosphate fertilizers in Morocco, as the sole mandatory respondent.  See Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative Countervailing Duty Determination, 85 Fed. Reg. 76,522 (Int'l Trade Admin. Nov. 30, 2020) ("Preliminary

Court No. 21-00116

Determination"), and accompanying Decision Mem. ("Prelim. DM") at 2.  On July 28, 2020,

Commerce issued its initial questionnaire to the Government of Morocco ("GOM") and

instructed the GOM to forward the questionnaire to OCP.  See Prelim. DM at 2.  The GOM and

OCP submitted responses to the initial questionnaire on September 17, 2020.  See id.

8.     Commerce issued its Preliminary Determination on November 30, 2020.  With

respect to the Provision of Phosphate Mining Rights for LTAR program, Commerce

preliminarily determined that the GOM confers a financial contribution on OCP in the form of

the provision of a good by granting it exclusive rights to extract ore from government-owned

phosphate reserves; that OCP received a benefit under this program during the POI; and that the

subsidy is de jure specific to OCP.  See id. at 11-12.

9.     To assess the adequacy of remuneration and thereby calculate the amount of

benefit under this program, Commerce applied the hierarchy for selecting a benchmark under 19

C.F.R. §  351.511(a)(2).  Commerce preliminarily determined that there were no suitable "tier 1"

in-country prices for phosphate ore mining rights in Morocco, because the GOM is the sole

provider of phosphate mining rights.  Id. at 12.  Commerce also preliminarily determined there

were no appropriate "tier 2" world market prices for phosphate ore mining rights that would have

been available to purchasers in Morocco.  Id.  Commerce therefore conducted a "tier 3" analysis

under 19 C.F.R. § 351.511(a)(2)(iii).  Id.

10.     Section 351.511(a)(2)(iii) of Commerce's regulations provides that, under a "tier

3" analysis of the adequacy of remuneration, Commerce is to examine whether the government

price is "consistent with market principles."  Because there were no appropriate benchmarks

available for phosphate mining rights per se or the phosphate ore extracted pursuant to those

mining rights, Commerce measured the benefit using a world market price benchmark for

4

**Court No. 21-00116**

phosphate rock.  Prelim. DM at 12.  Specifically, Commerce compared the actual per-unit cost

buildup that OCP reported for its beneficiated phosphate rock,[1] inclusive of production costs,

taxes, and transportation costs, to an average of world market prices for phosphate rock

Commerce determined to be comparable to OCP's rock.  Id.

  11. Commerce derived a world market benchmark price using 2019 prices for

phosphate rock published in the following sources: CRU, Argus Phosphates, Fertecon, and

Profercy Phosphates Limited.  Mem. from Robert Palmer & Samuel Glickstein, Int'l Trade

Compliance Analysts, through Kathleen Marksberry, Program Manager, to File, re: Preliminary

Determination Calculations for OCP S.A. (Nov. 24, 2020) ("OCP Prelim. Calculations Mem.")

at 3.  Commerce stated that it limited its analysis to these data sources because they listed either

the phosphorous pentoxide ("$P_2O_5$") content or Bone Phosphate of Lime ("BPL") content for

phosphate rock, such that Commerce was "able to extract from these data sources prices which

correspond to phosphate rock which has a BPL or $P_2O_5$ content which corresponds to the range

of BPL or $P_2O_5$ content reported by OCP."  Id.  The selected prices from industry publications

correspond to phosphate rock with BPL levels ranging from as low as 60% BPL (for Egypt, 60-

68% BPL, as reported by CRU) to as high as 72% (for Jordan, 66-72% BPL, as reported by

CRU).  OCP Prelim. Calculations Mem., Attachment I, Calculations Worksheet:  Phosphate

Rock Benchmark.  Commerce included prices for Egyptian phosphate rock despite evidence that

it is of low quality in terms of its $P_2O_5$ or BPL content, and that it is further compromised by the

presence of unwanted carbonate or iron content.  See Letter from Wilmer Cutler Pickering Hale

and Dorr LLP to the Department, *Phosphate Fertilizers from Morocco: Submission of Factual

Information to Rebut, Clarify, or Correct* (Nov. 16, 2020), Exhibit 1.

---

[1] Beneficiation refers to the process of removing impurities such as sand, clay, and other carbonates from phosphate ore.

12.     Commerce calculated a simple average of the selected price data to arrive at a per-unit phosphate rock benchmark price of $66.96 (or MAD 643.93) per metric ton.  OCP Prelim. Calculations Mem. at 8.  Commerce did not add freight, import duties, and VAT to the benchmark per-unit prices, despite the fact that OCP's per-unit cost buildup was calculated on a "Delivered Plant" basis, inclusive of transport costs.  See id., Attachment I, Calculations Worksheet: Phosphate Rock Benchmark.

13.     To calculate benefit, Commerce multiplied the difference between its calculated per-unit cost buildup and the benchmark per-unit price of phosphate rock by the total amount of phosphate rock mined and beneficiated by OCP during the POI.  Prelim. DM at 12.  Dividing this amount by the combined sales of OCP and its cross-owned affiliates yielded a subsidy rate of 12.66 percent *ad valorem*.  Id. at 13.

14.     Commerce preliminarily found that the Value-Added Tax (VAT) Reform-VAT Refunds program is not countervailable.  See id. at 14.  As Commerce described in the Prelim. DM, the GOM reported that under Morocco's VAT regime, companies pay VAT on their purchases (input VAT) and collect VAT on the goods they sell (output VAT).  Id. at 14 (citing the Government of Morocco's Initial Questionnaire Response ("GOM IQR") at VII-2, Exhibit VII-1).  The amount of input VAT paid is deducted from the amount of output VAT collected, resulting in either VAT due to the GOM or, if a company paid a greater amount of input VAT than the output VAT collected, accumulated credits that can be used in the following month or collected as a refund from the GOM.  Id. at 14-15.

15.     The GOM reported that by 2018, there were hundreds of Moroccan companies with substantial VAT credits that the GOM could not settle.  Id. at 15.  In order to eliminate these VAT arrears, the GOM entered into financing agreements with Moroccan banks to settle the

Court No. 21-00116

GOM's VAT debt.  Id. at 15.  The GOM entered into a dedicated financing agreement with eight

Moroccan banks to finance the MAD 20.5 billion in VAT credit reimbursements owed to OCP

and its affiliates.  Id.  The GOM remitted the MAD 20.5 billion to OCP on October 25, 2018.  Id.

at 16.  OCP also entered into contracts known as the "factoring agreements" with the eight banks

to pay interest on the GOM's financing of its MAD 20.5 billion VAT refund.  Id.

16.     Commerce found that OCP did not receive a benefit under this program during

the POI, within the meaning of 19 C.F.R. § 351.510, because "{f}or OCP, the credits

accumulated under Morocco's VAT regime are based on the amount of taxes paid by OCP on its

input purchases, and there are no additional credits granted" and "the actual amount of VAT

OCP received via the factoring is less than the amount of VAT OCP actually paid, because OCP

had to pay interest."  Id. at 16.  Commerce therefore concluded that "OCP received no benefit,

given that OCP is not better off with the program."  Id.

17.     Commerce preliminarily found that more information was necessary to assess the

alleged countervailability of the VAT Exemptions for Capital Goods, Machinery and Equipment

program.  Id.  On January 6, 2021, Commerce issued a Post-Preliminary Determination

Memorandum in which it found that "VAT exemptions under Morocco's VAT regime are not

countervailable, as there is not a financial contribution or benefit to OCP."  Mem. from James

Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, to

Joseph A. Laroski Jr., Deputy Assistant Secretary for Policy and Negotiations, re: Post-

Preliminary Determination of Countervailing Duty Investigation: Phosphate Fertilizers from the

Kingdom of Morocco (Jan. 6, 2021) at 8.

18.     Commerce also preliminarily found that the Provision of Phosphogypsum Waste

Disposal program was not countervailable because it was not used during the period of

Court No. 21-00116

investigation ("POI").  See id. at 17.  Commerce cited the GOM's initial questionnaire response at pages IX-1-2 and Exhibit IX-1, as well as OCP's initial questionnaire response at page 138, but provided no explanation for its preliminary finding that OCP did not use this program during the POI.  Id.

19.    Mosaic, OCP, and the GOM filed case briefs and rebuttal briefs on January 13, 2021 and January 19, 2021, respectively.  See Final IDM at 3.  Mosaic argued in its case brief that Commerce correctly concluded that OCP receives countervailable subsidies under the Phosphate Mining Rights for LTAR program but erred in calculating the benefit of this program. See Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Sec'y of Commerce, re: Phosphate Fertilizers from Morocco: Petitioner's Case Brief (Jan. 13, 2021) ("Petitioner's Case Br.") at 3-20.  In particular, Mosaic argued that Commerce erred in including Egyptian phosphate rock prices in the world market benchmark price, because evidence on the record demonstrates that Egyptian rock is of low quality, as measured by its BPL or $P_2O_5$ content, and not reasonably comparable to OCP's phosphate rock.  Id. at 8-9.  Mosaic argued further that the world market benchmark price should be adjusted for freight, import duties, and VAT in order to arrive at a "delivered" price that is comparable to OCP's reported phosphate rock costs, which are inclusive of transportation costs.  Id. at 10-12.

20.    With respect to the Value-Added Tax (VAT) Reform-VAT Refunds program, Mosaic argued that Commerce erred in preliminarily finding the MAD 20.5 billion payment from the GOM to OCP was not countervailable.  Id. at 56-62.  Mosaic explained that the record evidence demonstrates that there was no authority under Moroccan law for the *ultra vires* agreement the GOM entered into with the consortium of Moroccan banks to refund MAD 20.5

**Court No. 21-00116**

billion in VAT payments to OCP, and that OCP failed to demonstrate it was entitled to the MAD 20.5 billion refund under Moroccan law.  Id. at 56-60.

21.     With respect to the VAT Exemptions for Capital Goods, Machinery and Equipment program, Mosaic argued that Commerce erred in failing to countervail the VAT exemptions that OCP received under this program.  Id. at 63-68.  Mosaic explained that, under this program, VAT exemptions for imported capital goods, machinery, and equipment are contingent, such that the exempted VAT becomes due if certain conditions related to investment projects are not met.  Id. at 64.  Under Commerce's established practice, including in *Concrete Reinforcing Bar from the Republic of Turkey* ("*Rebar from Turkey*"), VAT exemptions that are contingent upon satisfaction of commitments made in investment agreements constitute countervailable subsidies in the form of contingent-liability interest-free loans that convert into grants in the amount of the VAT exemption once the contingencies no longer apply.  Id. at 66-67.

22.     With respect to the Provision of Phosphogypsum Waste Disposal program, Mosaic argued in its case brief that Commerce erred in preliminarily finding that the program was not countervailable because OCP did not use the program during the POI and that Commerce should find this program to be countervailable either on the basis of revenue foregone or as a provision of services for LTAR.  Id. at 69-72.  Mosaic explained that both the GOM and OCP confirmed that OCP dumps phosphogypsum waste in Moroccan coastal waters, and that the GOM is not enforcing the provisions of Moroccan law that prohibit such dumping, and the record evidence demonstrates that this program provides a financial contribution that confers a benefit on and is specific to OCP.  See id.

Court No. 21-00116

23.     Commerce published the Final Determination in the Federal Register on February

16, 2021.  Final Determination, 86 Fed. Reg. 9482.  In its Final Determination, Commerce

rejected Mosaic's arguments that it should exclude Egyptian prices from the world market

benchmark price for phosphate rock and that it should adjust the world market benchmark price

for international freight, customs duties, and VAT.  Final IDM at 19-20.  Commerce stated that

"{t}he petitioner asserts that because Egyptian rock is low quality, Egyptian rock prices are

lower than other rock prices on the record," but "Commerce's benchmark price is an average

comprised of prices both above and below the average price" and its "practice is not to exclude

particular benchmark prices just because they are low or high."  Id. at 19.  Further, Commerce

found that its regulations "do not require it to add delivery charges and import duties to a

comparison price in a Tier 3 analysis," that "Commerce has excluded international delivery

charges from cost build-ups for the provision of natural resources under Tier 3 analyses in past

proceedings," and that "it would not be appropriate to add ocean freight, import charges, and the

VAT that OCP would have to pay if it imported the rock … because OCP did not import

phosphate rock."  Id. at 20.

24.     Commerce also rejected Mosaic's arguments that the Moroccan dirham ("MAD")

20.5 billion VAT refund to OCP is countervailable.  Id. at 78-80.  Commerce disagreed with

Mosaic's contention that the GOM acted in an *ultra vires* manner when it made the payment to

OCP, stating: "The petitioner does not identify any evidence that there is a legal limitation on the

method through which the GOM may pay its debts or that there is any law prohibiting it from

borrowing money from financial institutions to pay its debts."  See id. at 79.  Commerce also

disagreed that OCP failed to demonstrate it was entitled to the MAD 20.5 billion refund, stating:

"The record contains all the reimbursement claims that served as the basis for the MAD 20.5

**Court No. 21-00116**

billion in refunds and OCP provided a detailed chart demonstrating how those numbers

reconciled to the total refunds under the factoring agreements." Id. at 80.

25.  Commerce also rejected Mosaic's arguments that VAT exemptions obtained by

OCP for imported capital goods, machinery, and equipment should be countervailed.  Id. at 81-

82.  According to Commerce, "the VAT exemptions obtained by OCP on its input purchases

reduce the credits it accumulated, and there are no additional credits granted; therefore it does

not receive a benefit under 19 CFR 351.510(a)."  Id.  Commerce also found that *Rebar from*

*Turkey* was not informative, because Commerce had "reexamined the Turkish VAT system in

more recent cases," and found the VAT system in Turkey does not confer a benefit.  Id. at 82.

Commerce did not address Mosaic's arguments regarding the investment-contingent nature of

the program.

26.  Finally, Commerce rejected Mosaic's arguments that it erred in preliminarily

finding the Provision of Phosphogypsum Waste Disposal program was not countervailable

because OCP did not use the program during the POI.  Id. at 84-85.  Commerce stated that it

initiated an investigation of this program under the revenue foregone provisions of the statute

only, and "there is no support for a finding of financial contribution within the meaning of

section 771(5)(D)(iii) of the Act," *i.e.*, as a provision of services for LTAR.  Id. at 85.

Commerce stated further with respect to the program as a potential subsidy in the form of

revenue foregone that "{t}he GOM explains that it has not yet issued the decree to establish

laws, regulations, or policies to enforce the limits on liquid discharges because the process of

conducting technical studies and consultations with all relevant ministries and with the private

sector has not yet concluded," and therefore it continued to find that OCP did not use this

program.  Id.

Court No. 21-00116

## STATEMENT OF CLAIMS

### Count 1

27.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 26.

28.     Commerce improperly declined to exclude Egyptian prices from its calculation of a Tier 3 benchmark price for phosphate rock.  Commerce's finding that Egyptian prices should not be excluded because Egyptian phosphate rock is reasonably comparable to OCP's phosphate rock in terms of BPL content is unsupported by substantial evidence and otherwise not in accordance with law.

### Count 2

29.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 26.

30.     Commerce improperly declined to adjust the world market benchmark price for phosphate rock to include international freight, customs duties, and VAT.  Its refusal to make these adjustments was unsupported by substantial evidence and not in accordance with law.

### Count 3

31.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 26.

32.     Commerce improperly determined that the MAD 20.5 billion VAT refund did not confer a benefit to OCP.  Commerce's finding that OCP was entitled to the MAD 20.5 billion VAT refund under Moroccan law is unsupported by substantial evidence and otherwise not in accordance with law.

### Count 4

33.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 26.

34.     Commerce improperly determined that the VAT exemptions that OCP obtained for imported capital goods, machinery, and equipment did not confer a benefit to OCP.

Court No. 21-00116

Commerce's determination is unsupported by substantial evidence, is contrary to its prior practice regarding investment-contingent VAT exemption programs, and is otherwise not in accordance with law.

### Count 5

35.     Plaintiff hereby realleges and incorporates by reference paragraphs 1 through 26.

36.     Commerce improperly determined not to countervail the Provision of Phosphogypsum Waste Disposal program based on findings that there was no financial contribution when considered as the provision of services for LTAR and that there was no use of the program by OCP when considered as revenue foregone.  Commerce's findings and determination are unsupported by substantial evidence or otherwise not in accordance with law.

### <u>REQUEST FOR JUDGMENT AND RELIEF</u>

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests that the Court:

1)      Hold that certain aspects of Commerce's final determination in the countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco are not supported by substantial evidence and otherwise not in accordance with law; and

2)      Remand the final determination to Commerce for disposition in accordance with the Court's final opinion; and

3)      Grant such other relief as the Court may deem just and proper.

**Court No. 21-00116**

Respectfully submitted,

/s/ Stephanie E. Hartmann
Patrick J. McLain
Stephanie E. Hartmann
WILMER, CUTLER PICKERING
  HALE and DORR, LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6564
stephanie.hartmann@wilmerhale.com

Date:  May 12, 2021

## UNITED STATES COURT OF INTERNATIONAL TRADE

*The Mosaic Company v. United States*, Ct. No. 21-00116

### Certificate of Service

I, Stephanie E. Hartmann, hereby certify that on May 12, 2021, I caused the attached Complaint to be served by certified or registered mail, return receipt requested, on the following parties and counsel:

Attorney-in-Charge
International Trade Field Office
Commercial Litigation Branch
Civil Division
**U.S. Department of Justice**
26 Federal Plaza
Room 346, Third Floor
New York, NY 10278

Supervising Attorney
Commercial Litigation Branch
Civil Division
**U.S. Department of Justice**
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

General Counsel
Attn: Office of the Chief Counsel for Trade
Enforcement & Compliance
**U.S. Department of Commerce**
1401 Constitution Ave. NW
Washington, DC 20230

Larbi Bouattaf
**Embassy of Morocco**
3508 International Drive NW
Washington, D.C. 20008
bouattaf@maec.gov.ma

Jamieson L. Greer
**J.R. Simplot Company**
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006-4706

William R. Isasi
**OCP S.A.**
Covington & Burling
One City Center
850 Tenth Street, NW
Washington, DC 20001

Jonathan Zielinski, Esq.
**Government of Morocco**
Cassidy Levy Kent (USA) LLP
900 19th Street, NW
Suite 400
Washington, DC 20006

Melissa M. Brewer
**International Raw Materials Ltd.**
Kelley Drye & Warren LLP
3050 K Street, NW
Washington, DC 20007-5108

Kenneth G. Weigel
**Koch Fertilizer, LLC**
Alston & Bird, LLP
950 F St., NW
Washington, DC 20004

H. Deen Kaplan
**Gavilon Fertilizer, LLC**
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004

/s/ Stephanie E. Hartmann
Stephanie E. Hartmann
WILMER CUTLER PICKERING HALE
  and DORR LLP
1875 Pennsylvania Ave. NW
Washington, DC 20006
(202) 663-6564
stephanie.hartmann@wilmerhale.com