# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE MOSAIC COMPANY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> OCP S.A., et al., <br><br> Defendant-Intervenors. | **Before: Timothy C. Stanceu, Judge** <br><br> **Consol. Case No. 21-00116** |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD OF OCP S.A.

Pursuant to U.S. Court of International Trade ("CIT") Rule 56.2, Consolidated Plaintiff and Defendant-Intervenor OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers from the Kingdom of Morocco ("Morocco") respectfully moves for judgment on the agency record on the issues raised in its Complaint challenging the decision by the U.S. Department of Commerce ("Commerce") to initiate a countervailing duty ("CVD") investigation of phosphate fertilizers from Morocco, its final determination in that investigation, and its subsequent publication of the CVD Order. *See Phosphate Fertilizers from Morocco and the Russian Federation: CVD Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021); *Phosphate Fertilizers from Morocco: Final Affirmative CVD Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021); *Phosphate Fertilizers from Morocco and the Russian Federation: Initiation of CVD Investigations*, 85 Fed. Reg. 44,505 (July 23, 2020).

As described in the accompanying memorandum, Commerce's determinations were unsupported by substantial evidence on the record or otherwise not in accordance with law. Accordingly, OCP respectfully requests that the Court hold Commerce's initiation determination unlawful, declare the resulting investigation void *ab initio*, vacate the resulting CVD order, and remand to Commerce to dismiss the Petition and terminate the CVD proceeding; in the alternative, OCP requests that the Court remand the final determination to Commerce for disposition consistent with any orders and opinions of the Court, and grant such other or further relief as the Court deems just and proper.

Respectfully submitted,

Dated:  October 15, 2021

/s/ William R. Isasi
William R. Isasi
Alexander D. Chinoy
Micaela McMurrough
Elisa S. Solomon
Rishi R. Gupta
Cynthia C. Galvez
Jordan B. Bakst

Covington & Burling LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

*Counsel to OCP S.A.*

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE MOSAIC COMPANY, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>  and<br><br>OCP S.A., et al.,<br><br>      Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)  **Before: Timothy C. Stanceu, Judge**<br>)<br>)  **Consol. Case No. 21-00116**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of OCP

S.A., and all other papers and proceedings herein, it is hereby

**ORDERED** that OCP S.A.'s motion is **GRANTED**; and it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce")

initiating the countervailing duty investigation of phosphate fertilizers from the Kingdom of

Morocco, *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:*

*Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 44,505 (July 23, 2020), is

unsupported by substantial evidence and otherwise not in accordance with law, and that

Commerce's subsequent investigation is void *ab initio*; and it is further

**ORDERED** that the resulting countervailing duty order on phosphate fertilizers from the

Kingdom of Morocco, *Phosphate Fertilizers from the Kingdom of Morocco and the Russian*

*Federation:  Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021), is vacated; and it is further

      **ORDERED** that the matter is remanded to Commerce to dismiss the Petition and terminate the countervailing duty proceeding on phosphate fertilizers from the Kingdom of Morocco.

_____<br>
Judge Timothy C. Stanceu

Dated: _____<br>
New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| THE MOSAIC COMPANY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Before: Timothy C. Stanceu, Judge** |
| v. | ) | |
| | ) | **Consol. Case No. 21-00116** |
| UNITED STATES, | ) | |
| | ) | **NON-CONFIDENTIAL VERSION** |
| Defendant, | ) | |
| | ) | **Business Proprietary Information** |
| | ) | **removed from pages 15-17, 24, 27-** |
| and | ) | **29, 41, 45-48, 50, 51, 54, 55, 58, and** |
| | ) | **60** |
| OCP S.A., et al., | ) | |
| | ) | |
| Defendant-Intervenors.) | ) | |

### MEMORANDUM IN SUPPORT OF CONSOLIDATED PLAINTIFF AND DEFENDANT-INTERVENOR OCP S.A.'s RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

William R. Isasi
Alexander D. Chinoy
Micaela McMurrough
Elisa S. Solomon
Rishi R. Gupta
Cynthia C. Galvez
Jordan B. Bakst

Covington & Burling LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

*Counsel to OCP S.A.*

Dated:  October 15, 2021

**NON-CONFIDENTIAL VERSION**

## TABLE OF CONTENTS

RULE 56.2(C) STATEMENT ................................................................................ 1

I.     Administrative Determination Under Review. ................................................ 1

II.    Issues Presented. ........................................................................................... 2

STATEMENT OF THE FACTS ........................................................................... 3

I.     The Petition and Initiation. ............................................................................ 3

II.    CVD Investigation. ....................................................................................... 3

III.   Commerce's Preliminary and Post-Preliminary Determinations....................... 4

IV.   Commerce's Final Determination and CVD Order. ........................................ 6

SUMMARY OF THE ARGUMENT ..................................................................... 7

I.     Commerce's Initiation of the CVD Investigation Was Unlawful Because Its
Industry Support Determination Was Not in Accordance with Law and Was Not
Supported by Substantial Evidence. ............................................................... 7

II.    Commerce Erroneously Determined OCP Received a Benefit from the Provision
of Mining Rights. ......................................................................................... 8

III.   Commerce Unlawfully Sought Information on "Other Assistance." ............... 10

IV.   Commerce Erred in Finding the GOM's Reductions in Tax Fines and Penalties to
Be *De Facto* Specific. .................................................................................. 11

V.    Commerce Erred as a Matter of Law in Initiating an Investigation into
Phosphogypsum Byproduct Disposal. ........................................................... 12

STANDARD OF REVIEW .................................................................................. 13

ARGUMENT ....................................................................................................... 14

I.     Commerce's Industry Support Determination Was Not Supported by Substantial
Evidence and Was Not In Accordance With Law. ........................................... 14

     A.    In Refusing to Consider the Opposition of Certain Domestic Parties,
Commerce Acted Contrary to Law and Reached a Determination
Unsupported by Substantial Evidence. ................................................. 15

     B.    Commerce's Industry Support Determination Failed to Account for
Phosphate Fertilizer Produced Through Bulk Blending and Was Therefore
Contrary to Law and Unsupported by Substantial Evidence. ................... 19

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

C.      Commerce Acted Contrary to Law When It Failed to Poll the Industry or
        Rely on Other Evidence to Determine Industry Support. ..................................... 31

D.      The Appropriate Remedy for Commerce's Unlawful Industry Support
        Determination Is to Hold the Investigation Void *Ab Initio*, Vacate the
        CVD Order, and Remand to Commerce to Dismiss the Petition and
        Terminate the CVD Proceeding. ........................................................................... 33

II.     Commerce's Finding that a Benefit was Conferred for Mining Rights Is
        Unsupported by Substantial Evidence on the Record and Otherwise Not in
        Accordance with Law. ................................................................................................. 38

A.      Commerce's Exclusion of HQ, Support, and Debt Costs, from the COP
        Buildup Was Contrary to Law and Unsupported by Substantial Evidence. ......... 39

B.      Commerce's Calculation of an Amount for Profit Is Unsupported by
        Substantial Evidence on the Record and Otherwise Not in Accordance
        with Law. .............................................................................................................. 51

C.      Commerce's Inclusion of OCP's Own Prices in the Benchmark Price for
        Phosphate Rock Resulted in a Circular Comparison that Did Not Properly
        Measure the Adequacy of Remuneration for Mining Rights. ............................... 61

III.    Commerce Unlawfully Investigated "Other Assistance." ................................................. 64

A.      Commerce's "Other Assistance" Question Was Contrary to Law. ....................... 64

B.      The Court Should Vacate Commerce's Determinations that Certain
        Programs Investigated Based on the Other Assistance Question Were
        Countervailable. .................................................................................................... 70

IV.     Commerce's Determination that the Reductions in Tax Fines and Penalties Was
        *De Facto* Specific Was Unsupported by Substantial Evidence and Otherwise Not
        in Accordance With Law. ............................................................................................. 70

A.      Commerce Used a Flawed Ratio for Evaluating Specificity. ............................... 72

B.      Commerce Failed to Adequately Explain its Specificity Finding. ....................... 75

C.      Commerce's Specificity Determination Was Contrary to Law. ........................... 76

V.      Commerce Unlawfully Initiated an Investigation into OCP's Disposal of
        Phosphogypsum Byproduct. ........................................................................................ 77

A.      Commerce Should Not Have Initiated Under a Revenue Forgone Theory. ......... 78

B.      Commerce Abused its Discretion by Failing to Reject Mosaic's Factual
        Information Relating to Phosphogypsum Byproduct Disposal for LTAR. .......... 82

**Consol. Ct. No. 21-00116**                    **NON-CONFIDENTIAL VERSION**

CONCLUSION............................................................................................................. 83

NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Ala. Aircraft Indus., Inc.-Birmingham v. United States,*
      586 F.3d 1372 (Fed. Cir. 2009) ...................................................................83

*Allegheny Ludlum Corp. v. United States,*
      25 C.I.T. 816 (2001) ........................................................................... 66, 67

*Am. Lamb Co. v. United States,*
      785 F.2d 994 (Fed. Cir. 1986) ...................................................................67

*Am. Silicon Techs. v. United States,*
      334 F.3d 1033 (Fed. Cir. 2003) ..................................................................40

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
      287 F. Supp. 3d 1361 (CIT 2018) ......................................................... 60, 61

*Ashcroft v. Iqbal,*
      556 U.S. 662 (2009) ..................................................................................78

*Auer v. Robbins,*
      519 U.S. 452 (1997) ..................................................................................43

*BedRoc Ltd. v. United States,*
      541 U.S. 176 (2004) ..................................................................................43

*Bell Atl. Corp. v. Twombly,*
      550 U.S. 544 (2007) ..................................................................................78

*Brother Indus. (USA), Inc. v. United States,*
      801 F. Supp. 751 (CIT 1992) ............................................................... 22, 23

*Canadian Solar Inc. v. United States,*
      No. 18-00184, 2020 WL 6129754 (CIT Oct. 19, 2020) ..............................30

*Carter v. Sullivan,*
      909 F.2d 1201 (8th Cir. 1990) ...................................................................83

*Changzhou Trina Solar Energy Co. v. United States,*
      195 F. Supp. 3d 1334 (CIT 2016) ......................................................... 68, 69

*Changzhou Trina Solar Energy Co. v. United States,*
      352 F. Supp. 3d 1316 (CIT 2018) ...............................................................78

NON-CONFIDENTIAL VERSION

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v.*
*United States*,
   No. 19-00122, 2021 WL 3662423 (CIT Aug. 18, 2021) ...................................... 34

*Consol. Edison Co. of N.Y. v. NLRB*,
   305 U.S. 197 (1938) ............................................................................................... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (U.S. 2020) ............................................................................ 25, 36

*Eurodif S.A. v. United States*,
   423 F.3d 1275 (Fed. Cir. 2005) ............................................................................ 22

*Eurodif S.A. v. United States*,
   411 F.3d 1355 (Fed. Cir. 2005) ............................................................................ 22

*Fujitsu Ltd. v. United States*,
   23 C.I.T. 46 (1999) ............................................................................................... 17

*Fuyao Glass Indus. Grp. Co. v. United States*,
   27 C.I.T. 1892 (2003) ........................................................................................... 61

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) .............................................................................. 29

*Gerber Food (Yunnan) Co. v. United States*,
   491 F. Supp. 2d 1326 (CIT 2007) ........................................................................ 50

*Greater Mo. Med. Pro-Care Providers v. Perez*,
   812 F.3d 1132 (8th Cir. 2015) ............................................................................. 34

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
   498 F. Supp. 3d 1345 (CIT 2021) ........................................................................ 38

*Icon Health & Fitness, Inc. v. Strava, Inc.*,
   849 F.3d 1034 (Fed. Cir. 2017) ............................................................................ 30

*Intercargo Ins. Co. v. United States*,
   83 F.3d 391 (Fed. Cir. 1996) ............................................................................... 34

*Jubail Energy Servs. Co. v. United States*,
   125 F. Supp. 3d 1352 (CIT 2015) .................................................................. 33, 34

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (U.S. 2019) ................................................................................. 43

*KYD, Inc. v. United States*,
   779 F. Supp. 2d 1361 (Fed. Cir. 2011) .......................................................... 38, 39

*LMI-LA Metalli Indus., S.p.A. v. United States,*
  912 F.2d 455 (Fed. Cir. 1990) ........................................................29

*Lotus Suites, Inc. v. NLRB,*
  32 F.3d 588 (D.C. Cir. 1994) ........................................................34

*M S Int'l, Inc. v. United States,*
  425 F. Supp. 3d 1332 (CIT 2020) ....................................................1

*M S Int'l, Inc., v. United States,*
  No. 20-00127, 2021 WL 4622506 (CIT Oct. 7, 2021) ..........................22

*Merck & Co. v. Hi-Tech Pharmacal Co.,*
  482 F.3d 1317 (Fed. Cir. 2007) ......................................................32

*Mid Continent Steel & Wire, Inc. v. United States,*
  219 F. Supp. 3d 1326 (CIT 2017) ...................................................41

*Mitsubishi Heavy Indus., Ltd. v. United States,*
  986 F. Supp. 1428 (CIT 1997) .......................................................17

*Motor Vehicle Mfrs. Ass'n of U.S, Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .........................................................13, 76, 83

*NEXTEEL Co. v. United States,*
  392 F. Supp. 3d 1276 (CIT 2019) ...................................................59

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ......................................................76

*NMB Sing. Ltd. v. United States,*
  557 F.3d 1316 (Fed. Cir. 2009) ......................................................76

*NTN Bearing Corp. of Am. v. United States,*
  972 F.2d 1355 (Fed. Cir. 1992) ......................................................13

*NTN Bearing Corp. of Am. v. United States,*
  757 F. Supp. 1425 (CIT 1991) ...............................................13, 16, 17

*Nucor Corp. v. United States,*
  371 F. App'x 83 (Fed. Cir. 2010) ...................................................25

*PT Pindo Deli Pulp v. United States,*
  36 C.I.T. 394 (2012) ..................................................................35

*RZBC Grp. Shareholding Co. v. United States,*
  100 F. Supp. 3d 1288 (CIT 2015) ...................................................78

**NON-CONFIDENTIAL VERSION**

*Save Domestic Oil, Inc. v. United States*,
    116 F. Supp. 2d. 1324 (2000) ................................................36

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)........................................................13, 44

*SKF USA Inc. v. United States*,
    254 F.3d 1022 (Fed. Cir. 2001).......................................35

*SolarWorld Ams., Inc. v. United States*,
    910 F.3d 1216 (Fed. Cir. 2018).....................................13, 19

*SolarWorld Ams., Inc. v. United States*,
    125 F. Supp. 3d 1318 (CIT 2015) .................................78

*Splane v. West*,
    216 F.3d 1058 (Fed. Cir. 2000).....................................34

*Stupp Corp. v. United States*,
    5 F.4th 1341 (Fed. Cir. 2021) ........................................59

*Suramericana de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994)..........................................37

*Suramericana de Aleaciones Laminadas, C.A. v. United States*,
    966 F.2d 660 (Fed. Cir. 1992).......................................37

*Suramericana de Aleaciones Laminadas, C.A. v. United States*,
    746 F. Supp. 139 (CIT 1990).........................................37

*Thai Plastic Bags Indus. Co. v. United States*,
    949 F. Supp. 2d 1298 (CIT 2013) ...............................43

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
    31 C.I.T. 2040 (2007) ......................................................37

*U.S. Steel Corp. v. United States*,
    425 F. App'x 900 (Fed. Cir. 2011) ...............................62

*U.S. Steel Corp. v. United States*,
    33 C.I.T. 1935 (2009) ......................................................62

*Ventas, Inc. v. United States*,
    381 F.3d 1156 (Fed. Cir. 2004)......................................18

*Yama Ribbons and Bows Co. v. United States*,
    865 F. Supp. 2d 1294 (CIT 2012) ...............................13

Consol. Ct. No. 21-00116                     NON-CONFIDENTIAL VERSION

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
  716 F.3d 1370 (Fed. Cir. 2013)..................................................................29, 30

**Statutes**

19 U.S.C. § 1516a..........................................................................................1, 13

19 U.S.C. § 1671a............................................................................... *passim*

19 U.S.C. § 1671b.................................................................................68

19 U.S.C. § 1673a.................................................................................35

19 U.S.C. § 1673d.................................................................................33

19 U.S.C. § 1677............................................................................... *passim*

19 U.S.C. § 1677b..........................................................................42, 43

19 U.S.C. § 1677d............................................................................... *passim*

19 U.S.C. § 3512.................................................................................33

**Regulations**

19 C.F.R. § 351.301......................................................................82, 83

19 C.F.R. § 351.502......................................................................72, 80

19 C.F.R. § 351.511.................................................................................39

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*,
  62 Fed. Reg. 27,296 (May 19, 1997) ..........................................................80

*Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary
  Results of CVD Administrative Review.*
  73 Fed. Reg. 1578 (Jan. 9, 2008) ..........................................................44

*Certain Hot-Rolled Carbon Steel Flat Products from India: Final Results of CVD
  Administrative Review*,
  73 Fed. Reg. 40,295 (July 14, 2008).........................................................52, 53, 56

*Certain Lined Paper Products from India: Notice of Final Results of the First AD
  Administrative Review*,
  74 Fed. Reg. 17,149 (Apr. 14, 2009) ..........................................................41

**NON-CONFIDENTIAL VERSION**

*Certain Pasta from Italy: Final Results of the Eleventh (2006) CVD*
*Administrative Review,*
74 Fed. Reg. 5922 (Feb. 3, 2009) ........................................................80

*Certain Pasta from Italy: Notice of Final Results of the Sixth Administrative*
*Review of the Antidumping Duty Order and Determination Not to Revoke in*
*Part,*
69 Fed. Reg. 6255 (Feb. 10, 2004) ......................................................57

*Certain Quartz Surface Products from the People's Republic of China: Final*
*Affirmative Determination of Sales at Less Than Fair Value, and Final*
*Affirmative Determination of Critical Circumstances,*
84 Fed. Reg. 23,767 (May 23, 2019) ...................................................22

*Certain Softwood Lumber Products from Canada: Final Affirmative CVD*
*Determination, and Final Negative Determination of Critical Circumstances,*
82 Fed. Reg. 51,814 (Nov. 8, 2017)......................................................44

*Certain Softwood Lumber Products from Canada:  Notice of Preliminary Results*
*of CVD Administrative Review*
70 Fed. Reg. 33,088 (June 7, 2005) ......................................................44

*Certain Softwood Lumber Products from Canada:  Notice of Final Results of AD*
*Administrative Review and Notice of Final Results of AD Changed*
*Circumstances Review,*
69 Fed. Reg. 75,921 (Dec. 13, 2004) ....................................................41

*Certain Softwood Lumber Products from Canada:  Notice of Final Results of*
*CVD Administrative Review,*
70 Fed. Reg. 73,448 (Dec. 12, 2005) ..............................................53, 56

*Certain Uncoated Groundwood Paper from Canada:  Final Affirmative CVD*
*Determination,*
83 Fed. Reg. 39,414 (Aug. 9, 2018)................................................52, 74

*Certain Uncoated Paper from Indonesia:  Final Results of CVD Administrative*
*Review; 2015-2016,*
83 Fed. Reg. 52,383 (Oct. 17, 2018)...............................................55, 56

*Certain Uncoated Paper from Indonesia: Preliminary Results of CVD*
*Administrative Review; 2015-2016,*
83 Fed. Reg. 15,370 (Apr. 10, 2018) ....................................................53

*Coated Free Sheet Paper from Indonesia:  Final Affirmative CVD Determination,*
72 Fed. Reg. 60,642 (Oct. 25, 2007)...............................................44, 45

Consol. Ct. No. 21-00116                                          NON-CONFIDENTIAL VERSION

*Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative*
   *CVD Determination and Final Negative Critical Circumstances*
   *Determination,*
   81 Fed. Reg. 49,935 (July 29, 2016)................................................................53, 56

*Common Alloy Aluminum Sheet from the People's Republic of China:  Initiation*
   *of Less-Than-Fair-Value and CVD Investigations,*
   82 Fed. Reg. 57,214 (Dec. 4, 2017)..........................................................................67

*Fresh Garlic from the People's Republic of China: Final Results and Partial*
   *Rescission of the 22nd Antidumping Duty Administrative Review and Final*
   *Result and Rescission, in Part, of the New Shipper Reviews; 2015-2016,*
   83 Fed. Reg. 27,949 (June 15, 2018) ........................................................................23

*Phosphate Fertilizers from Morocco and the Russian Federation:  CVD Orders,*
   86 Fed. Reg. 18,037 (Apr. 7, 2021) ...............................................................1, 7, 21

*Phosphate Fertilizers from Morocco:  Final Affirmative CVD Determination,*
   86 Fed. Reg. 9482 (Feb. 16, 2021) .................................................................. *passim*

*Phosphate Fertilizers from the Kingdom of Morocco:  Preliminary Affirmative*
   *CVD Determination,* 85 Fed. Reg. 76,522 (Nov. 30, 2020) ............................4, 5, 40

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:*
   *Initiation of CVD Investigations,*
   85 Fed. Reg. 44,505 (July 23, 2020).............................................................1, 3, 21

*Silicon Metal from Australia, Brazil, and Kazakhstan:  Initiation of CVD*
   *Investigations,*
   82 Fed. Reg. 16,356 (Apr. 4, 2017) .........................................................................68

*Silicon Metal from Australia:  Final Affirmative CVD Determination,*
   83 Fed. Reg. 9834 (Mar. 8, 2018)..............................................................................68

*Stainless Steel Sheet and Strip in Coils from Taiwan:  Final Results and Partial*
   *Rescission of Antidumping Duty Administrative Review,*
   69 Fed. Reg. 5960 (Feb. 9, 2004) ............................................................................57

*Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Affirmative*
   *CVD Determination Final Affirmative Critical Circumstances Determination,*
   79 Fed. Reg. 54,963 (Sep. 15, 2014) .......................................................................81

*Steel Concrete Reinforcing Bar from the Republic of Turkey:  Final Results of*
   *Partial Rescission of CVD Administrative Review; 2014,*
   82 Fed. Reg. 26,907 (June 12, 2017).................................................................75, 81

*Supercalendered Paper from Canada:  Final Results of CVD Expedited Review,*
   82 Fed. Reg. 18,896 (Apr. 24, 2017) .................................................................74, 75

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
    No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ........................................ *passim*

OCP S.A. ("OCP"), in its role as a Consolidated Plaintiff in the above-captioned

consolidated action, respectfully submits this Memorandum of Points and Authorities in Support

of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules

of the Court.

## RULE 56.2(C) STATEMENT

## I.      Administrative Determination Under Review.

This action challenges Commerce's threshold decision to initiate the countervailing duty

("CVD") investigation of phosphate fertilizers from the Kingdom of Morocco ("Morocco").

*Phosphate Fertilizers from Morocco and the Russian Federation: Initiation of CVD*

*Investigations*, 85 Fed. Reg. 44,505 (July 23, 2020) ("*Initiation Notice*") (P.R. 59); *see also M S*

*Int'l, Inc. v. United States*, 425 F. Supp. 3d 1332, 1335 (CIT 2020) (a party may challenge an

industry support determination under 19 U.S.C. § 1516a(a)(2)(B)(iii)).[1]

Also included are challenges pursuant to the Tariff Act of 1930, as amended (the "Act" or

"the Statute"), to several aspects of Commerce's final determination in the CVD investigation

and resulting CVD order.  *See Phosphate Fertilizers from the Kingdom of Morocco:  Final*

*Affirmative CVD Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ("*Final Determination*")

(P.R. 480), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 473);

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:  CVD*, 86 Fed.

Reg. 18,037 (Apr. 7, 2021) ("*CVD Order*") (P.R. 492).

---

[1] In this brief, documents contained in the public administrative record are identified by name
and date, followed by "P.R." and the corresponding administrative record number.  Documents
contained in the confidential administrative record are identified by name and date, followed by
"C.R." and the corresponding administrative record number.

Consol. Ct. No. 21-00116                     NON-CONFIDENTIAL VERSION

## II.   Issues Presented.

1.  **Did Commerce unlawfully initiate a CVD investigation based on a petition that was not filed by or on behalf of the industry producing the domestic like product?**  Yes.  First, Commerce unlawfully refused to consider opposition to the Petition from domestic parties.  Second, Commerce relied on the petitioner's assertion that it represented the majority of the domestic like product in support of the Petition, despite substantial record evidence that the Petition failed to account for significant production of domestic like product.

2.  **Did Commerce err when it found that OCP received a benefit from the GOM's purported provision of phosphate mining rights for less than adequate remuneration ("LTAR") using calculations that overstated the benefit?**  Yes, Commerce erred in its calculation of the purported benefit because it incorrectly (1) excluded a large portion of selling, general, and administrative ("SG&A") expenses incurred for the production of phosphate rock when it calculated OCP's cost of production ("COP") for phosphate rock, (2) used a profit rate not specific to the production of phosphate rock, and (3) used a circular price comparison when, in measuring the adequacy of remuneration for mining rights, it used a world benchmark price for phosphate rock that was substantially influenced by the same mining rights under investigation.

3.  **Did Commerce unlawfully request information from OCP on other forms of governmental assistance not alleged in the Petition without first meeting the required evidentiary threshold for Commerce to expand the potential programs under investigation?**  Yes, Commerce unlawfully requested information from OCP concerning "other forms of assistance" it received from the Government of Morocco ("GOM"), without any evidence that such assistance appeared to be a countervailable subsidy as required under the law, and then expanded the investigation to include five additional alleged countervailable subsidies.

4.  **Was Commerce's *de facto* specificity finding relating to the GOM's reductions in tax fines and penalties unsupported by substantial evidence and contrary to law?**  Yes, Commerce's specificity analysis overstated the extent to which actual recipients of these reductions were "limited in number," failed to adequately explain or support its *de facto* specificity finding, and conducted a specificity analysis contrary to law.

5.  **Did Commerce err as a matter of law in initiating an investigation into phosphogypsum byproduct disposal as revenue foregone when the Petition failed plausibly to allege each of the elements of a countervailable subsidy?**  Yes, because the Petition failed plausibly to allege, and could not plausibly allege, each of the three elements of a countervailable subsidy—a financial contribution, benefit, and specificity—Commerce lacked a lawful basis to initiate an investigation on this alleged program.  Additionally, Commerce abused its discretion by failing to reject nearly 100 pages of information that Mosaic placed on the record concerning an allegation that the GOM provided phosphogypsum byproduct disposal for LTAR,

after Commerce determined that it would not initiate an investigation of this allegation.

## STATEMENT OF THE FACTS

**I.      The Petition and Initiation.**

On June 26, 2020, Plaintiff and Consolidated Defendant-Intervenor, The Mosaic Company ("Mosaic"), filed a petition alleging that imports of phosphate fertilizers from Morocco benefitted from several countervailable subsidies and that such imports injure the domestic industry.  *See* Petition, Vol. II (June 26, 2021) at II-1 (P.R. 6).

While the Petition alleged industry support by domestic U.S. producers of phosphate fertilizers, other domestic parties submitted comments opposing the Petition prior to Commerce's initiation of the CVD investigation.  OCP, a producer and exporter of phosphate fertilizers from Morocco, also provided Commerce with information demonstrating that the Petition failed to establish sufficient industry support, and as a result, that Commerce was required by statute to either poll the domestic industry or rely on other information to determine industry support.  OCP's Pre-Initiation Cmts. (July 13, 2020) at 4–10 (P.R. 38; C.R. 11).  In response, Commerce declined to poll the domestic industry or rely on other information to determine industry support, and instead initiated the underlying CVD investigation based on a determination that the Petitioner itself produced the majority of the domestic like product and thus provided sufficient industry support for the Petition on its own. *See Initiation Notice*, 85 Fed. Reg. 44,505 (P.R. 59).

**II.     CVD Investigation.**

On July 28, 2020, Commerce issued an initial questionnaire seeking information from the GOM and OCP.  The questionnaire sought information beyond the programs on which Commerce initiated an investigation, asking for information on any "other forms of assistance"

provided to OCP by the GOM that had not been alleged in the Petition (the "other assistance

question"). *See* Commerce's Initial CVD Questionnaire, Section III (July 28, 2020) at 46 (P.R.

61). OCP explained that Commerce exceeded its statutory authority in making this request but

reluctantly supplied the information to avoid harsh penalties OCP would face for declining to

respond, namely, a determination based on "adverse facts available" ("AFA"). *See* OCP's Initial

Questionnaire Resp. (Sept. 17, 2020) ("OCP's IQR") at 146 (P.R. 130; C.R. 39). Based on the

information OCP provided in response to the "other assistance question," Mosaic filed new

subsidy allegations and, on November 3, 2020, Commerce initiated an investigation into five

additional, potential subsidy programs beyond those initially alleged in the Petition. *See*

Commerce's New Subsidy Allegations Mem. (Oct. 19, 2020) at 1–7 (P.R. 332). In response to

this initial questionnaire and an October 13, 2020 supplemental questionnaire from Commerce,

OCP submitted complete responses including substantial information related to the individual

costs incurred by OCP for the production of phosphate rock. *Id.*; OCP's Suppl. Questionnaire

("SQR") Resp. Part 3 (Nov. 6, 2020) at 1–13, Apps. MIN2-1–MIN2-3, MIN2-6–MIN2-7 (P.R.

354; C.R. 232).

## III.    Commerce's Preliminary and Post-Preliminary Determinations.

On November 30, 2020, Commerce published a notice of its preliminary determination.

*Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Affirmative CVD*

*Determination*, 85 Fed. Reg. 76,522 (Nov. 30, 2020) ("*Preliminary Determination*") (P.R. 404),

and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 386).

In the *Preliminary Determination*, Commerce found that the GOM's grant to OCP of the

right to extract phosphate ore constituted a countervailable subsidy on the theory that the GOM

provided mining rights for less than adequate remuneration ("LTAR"). PDM at 11 (P.R. 386).

In response to the *Preliminary Determination*, OCP challenged Commerce's evaluation of the

adequacy of remuneration in its benefit analysis.  Specifically, OCP identified several errors in the agency's calculation of OCP's "cost . . . of production" buildup ("COP buildup") for phosphate rock (the underlying good conveyed by the phosphate mining rights) and comparison to a benchmark price for phosphate rock.  *Id.* at 12 (P.R. 386).

On January 6, 2021, Commerce issued a post-preliminary determination in which for the first time it addressed several of Mosaic's new subsidy allegations derived from information submitted in response to the improper "other assistance question" described above.  *See* Post-Preliminary Determination (Jan. 6, 2021) at 1–2 (P.R. 441; C.R. 296).  Commerce found, *inter alia,* that one of these allegations—that GOM reduced fines and penalties that OCP owed related to corporate taxes—was a subsidy that was *de facto* specific, based on the total number of corporate tax filers in Morocco (many of which were incapable of benefiting from such reductions).  *Id.* at 4 (P.R. 441; C.R. 296).

In lieu of on-site verification, Commerce issued a verification questionnaire to OCP, and, after reviewing OCP's 400+ page response, Commerce made no finding that OCP's questionnaire responses were deficient and ultimately found OCP's submissions reliable.  Commerce's SQR in Lieu of On-Site Verification (Dec. 17, 2020) at 1–2 & Attach. (P.R. 412; C.R. 278); *see, e.g.*, OCP's Resp. to Questionnaire in Lieu of On-Site Verification (Dec. 30, 2020) ("OCP's Verification Response") at 1–41 (P.R. 436; C.R. 289–90);  IDM at 24–25 (P.R. 473) (accepting the "reliability" of OCP's cost reporting).

IV.     **Commerce's Final Determination and CVD Order.**

Following briefing,[2] on February 16, 2021, Commerce issued its *Final Determination* in

which it calculated an overall subsidy rate of 19.97% for OCP.  *Final Determination*, 86 Fed.

Reg. at 9483 (P.R. 480).  With regard to mining rights for LTAR, Commerce continued to find

that the GOM provided OCP with a countervailable subsidy, a determination based on a

comparison between OCP's COP buildup for phosphate rock and a benchmark price for

phosphate rock.  IDM at 5, 30–32 (P.R. 473).  Regarding the reductions in tax fines and

penalties, Commerce continued to find that the GOM's reductions in tax fines and penalties were

*de facto* specific in relation to all corporate tax filers in Morocco, despite OCP's argument that

not all corporate tax filers owed penalties or fines, and were therefore incapable of receiving

such reductions.  *See* IDM at 75 (P.R. 473).

On February 16, 2021, OCP submitted ministerial error comments in which OCP

explained that Commerce failed to use cost of goods sold ("COGS") in its profit rate

denominator for mining rights contrary to its stated intent to do so.  OCP's Ministerial Error

Cmts. (Feb. 16, 2021) at 3–7 (P.R. 479; C.R. 309).  OCP also explained that, because COGS

necessarily excludes SG&A expenses such as HQ and support, if Commerce was going to

exclude HQ and support costs from the denominator, it should have excluded HQ and support

costs from the numerator of the profit ratio to ensure that the ratio was analytically sound, *i.e.*, a

numerator and denominator constructed on the same basis.  *Id.* at 7–9 (P.R. 479; C.R. 309).

Commerce admitted that it made an "inadvertent error" in characterizing the "operating

expenses" line item in the profit and loss statement as "COGS" but inexplicably found that the

---

[2] In January 2021, interested parties, including OCP, timely submitted case and rebuttal briefs.
*See* OCP's Case Brief (Jan. 13, 2021) (P.R. 450; C.R. 301); OCP's Case Brief Errata (Jan. 14,
2021) (P.R. 451; C.R. 302); OCP's Rebuttal Brief (Jan. 14, 2021) (P.R. 453; C.R. 304).

failure to adopt a consistent approach to the calculation of both the numerator and denominator

"does not affect our calculations."  *See* Commerce's Ministerial Error Mem. (Mar. 15, 2021) at 4

(P.R. 485; C.R. 310).

On March 31, 2021, the ITC found that the domestic industry was materially injured by

reason of imports of phosphate fertilizers from Morocco (a determination that OCP has

separately challenged in contemporaneously pending Court No. 21-00219).  *CVD Order*, 86 Fed.

Reg. at 18,037 (P.R. 492).  Accordingly, Commerce published notice of a CVD order covering

such imports on April 7, 2021.  *Id.* (P.R. 492).

## SUMMARY OF THE ARGUMENT

**I.      Commerce's Initiation of the CVD Investigation Was Unlawful Because Its Industry Support Determination Was Not in Accordance with Law and Was Not Supported by Substantial Evidence.**

When Commerce initiates a CVD investigation based on a petition, it must first

determine whether the petition establishes sufficient support from the domestic industry.  Where

the petition does not establish that support, Commerce is *required* by statute to poll the industry

or rely on other information in order to evaluate industry support.  Here, Commerce ignored this

procedural safeguard, intended to prevent investigations requested by a single party whose

interests may not align with the larger domestic industry, and violated its statutory obligations

when it initiated the underlying CVD investigation based on the determination that the Petition

established sufficient domestic industry support.  That determination was fundamentally flawed

in at least two respects.

*First,* Commerce refused to consider the pre-initiation opposition filed by domestic

parties.  *Second,* Commerce erroneously relied on the industry support calculation in the Petition,

which failed to include any production of the domestic like product by bulk blenders despite

evidence that bulk blenders were responsible for substantial production of domestic like product

during the Period of Investigation ("POI").  Because the Petition failed to establish the requisite

industry support, Commerce was required by statute to poll the industry or rely on other

information, which the agency failed to do.  Thus, Commerce's initiation of the investigation

was contrary to law.

    As a legal and practical matter, Commerce cannot now correct its industry support

determination on remand:  Congress intended that determination to be made based solely on the

views of the domestic industry expressed at a precise moment in time, *i.e.*, immediately *after* a

petition is filed and *before* Commerce conducts an investigation.  Significantly, Commerce is

legally prohibited from reconsidering its industry support determination.  Moreover, there is no

practical way for Commerce to assess accurately today what position members of the domestic

industry would have taken at the time the Petition was filed.  Thus, the Court should hold

Commerce's initiation determination unlawful, declare the resulting investigation void *ab initio*,

vacate the resulting CVD order, and remand to Commerce to dismiss the Petition and terminate

the CVD proceeding.

    In the event that the Court does not void the CVD investigation in its entirety despite the

fatal errors in the initiation determination, the Court should at a minimum remand the *Final

Determination* to Commerce because of several significant errors in the agency's subsequent

determinations, described below.

## II.    Commerce Erroneously Determined OCP Received a Benefit from the Provision of Mining Rights.

    Commerce evaluated the adequacy of remuneration for OCP's mining rights by analyzing

the underlying good conveyed via those rights, phosphate rock.  Specifically, Commerce

constructed a government price for phosphate rock based on a buildup of OCP's total cost of

production or "COP" for phosphate rock, including extraction taxes paid to the GOM and

amount for profit (a "COP buildup"), and compared that price to a world benchmark price for

phosphate rock.  The COP buildup calculated by Commerce, the world benchmark price to

which it was compared, and the resulting analysis of mining rights were all severely flawed for

the following reasons.

*First*, Commerce's COP buildup erroneously excluded *all* of OCP's headquarters

("HQ"), support, and debt costs, even though the record clearly demonstrated that a portion of

those costs were incurred to produce phosphate rock.  Not only does common sense dictate that a

portion of these sorts of costs which are understood to be SG&A expenses are incurred for the

production of a good, but under the law, Commerce does not have discretion to exclude these

expenses from its calculation of a COP—the Statute *requires* inclusion of SG&A expenses.

Thus, Commerce's failure to include *any* HQ, support, and debt costs in the COP buildup for

phosphate rock was unsupported by the record evidence, in violation of the law, and resulted in a

COP buildup that substantially undervalued OCP's total costs, improperly driving up the CVD

margin.

*Second*, in incorporating an amount for profit into its COP buildup, Commerce should,

consistent with its practice, have used a profit rate specific to the production of the good derived

from the mining rights, phosphate rock.  Instead, Commerce constructed a company-wide profit

rate for OCP that reflected profit rates from wholly unrelated business activities.  As a result, the

profit rate used was well below an accurate profit rate for phosphate rock production, resulting in

artificially low COP buildup for phosphate rock, thereby (and once again), driving up the CVD

margin.  Based on its practice, Commerce should have used the surrogate profit rate data from

Jordan Phosphates Mines Inc. ("JPMC"), a rate specific to phosphate rock production.

Alternatively, even if Commerce was correct to calculate a broader corporate profit rate for OCP

that encompassed wholly unrelated business activities (and it was not), its calculation of that profit rate was mathematically flawed because it was internally inconsistent, resulting in an artificially low profit rate that drove up the CVD margin.

*Third*, Commerce's comparison of the COP buildup to a world benchmark price for phosphate rock was impermissibly circular, which the CIT has found results in a "meaningless" analysis. Included in the benchmark were prices for North African phosphate rock that included OCP's own prices for phosphate rock produced pursuant to the mining rights under investigation. As a result, the benchmark price was substantially influenced by the very activity that Commerce was evaluating through the use of the benchmark price, resulting in a circular and meaningless comparison.

Given the numerous legal and mathematical errors made by Commerce, if the Court does not vacate the CVD order, it should remand to Commerce with the instruction to correct its analysis and make a new and accurate determination regarding the adequacy of remuneration for mining rights.

## III.   Commerce Unlawfully Sought Information on "Other Assistance."

In its initial questionnaire, Commerce unlawfully asked OCP disclose any and all "other forms of assistance" it received from the GOM despite lacking any evidence or allegation that OCP received such assistance. Under the law, before Commerce may investigate a potential countervailable subsidy not alleged in a Petition, Commerce must determine that a practice "appears to be a countervailable subsidy." *See* 19 U.S.C. § 1677d. The requirement that a potential subsidy "appears" to be countervailable is an evidentiary standard that, once met, permits Commerce to exercise its investigatory powers. Commerce disregarded these procedural safeguards by reversing the statutory mandate and improperly conducted an investigation into all "other assistance" received by OCP *before* developing any evidentiary basis for doing so. In

plain terms, Commerce conducted an extra-statutory fishing expedition and then compounded its

error by relying on this unlawfully obtained information to initiate an investigation of five

additional programs not alleged in the Petition, of which the agency ultimately countervailed

three.  Because Commerce acted outside of its authority by seeking information about these

potential programs, the Court should void *ab initio* Commerce's investigation of them and vacate

Commerce's determination to countervail three of them.

## IV.   Commerce Erred in Finding the GOM's Reductions in Tax Fines and Penalties to Be *De Facto* Specific.

Commerce erred in finding the GOM's reductions in tax fines and penalties *de facto*

specific, and in turn countervailing these reductions.  As an initial matter, Commerce's

investigation into these reductions was unlawful, as *but for* the unlawful "other assistance"

question discussed above, the agency would not have initiated an investigation of this purported

subsidy in the first place.  Additionally, in conducting its specificity analysis and assessing

whether recipients of these reductions were "limited in number," Commerce erroneously

compared the number of recipients of reductions in tax fines and penalties to *all* corporate

taxpayers, rather than only those taxpayers capable of receiving the alleged subsidy, *i.e.*,

taxpayers actually charged with fines or penalties.  As a result, the agency distorted the

specificity analysis by making this program artificially seem more "limited" than it was—by

significantly understating the percentage of those receiving the alleged subsidy (and thus

concluding that the actual recipients of these reductions were "limited in number").  Commerce's

specificity finding was further flawed by the agency's failure to explain how its distorted

specificity analysis actually demonstrated that these reductions were *de facto* specific.

Moreover, Commerce's analysis failed to take into account the economic diversification of the

granting authority or length of time during which the subsidy program has been in operation, as

required by the statute.  As such, the Court should remand Commerce's determination for the agency to reconsider its *de facto* specificity analysis and decision to countervail the GOM's reductions of tax fines and penalties.

**V.     Commerce Erred as a Matter of Law in Initiating an Investigation into Phosphogypsum Byproduct Disposal.**

The Petition put forth two theories that the GOM allegedly provided OCP with countervailable subsidies related to phosphogypsum byproduct disposal—(1) the GOM allegedly provided OCP with disposal services for LTAR, and (2) the GOM allegedly failed to collect fees and fines for exceeding the limits of certain environmental laws relating to discharges, *i.e.*, by foregoing revenue.  Although the Petition failed plausibly to allege a subsidy under either theory, Commerce determined it would initiate an investigation under the revenue foregone theory.  This initiation was unlawful, as the Petition was devoid of any evidence whatsoever that such fees or fines existed under Moroccan law or that OCP received any benefit in connection with such fees or fines.  Additionally, the Petition lacked any plausible allegation that the purported failure to collect fees and fines in connection to phosphogypsum byproduct disposal was *de facto* specific. Because Commerce lacked any legal basis to investigate this purported program, the Court should hold unlawful Commerce's initiation decision as to this alleged program.

In addition, although Commerce correctly decided *not* to initiate an investigation of byproduct disposal services for LTAR, months after that decision Mosaic submitted nearly 100 pages of benchmarking information to measure the adequacy of remuneration for this uninitiated allegation.  Mosaic's submission of benchmarking information did not comply with Commerce's regulations because it was unrelated to a program under investigation.  However, Commerce refused to reject this information, which constituted an abuse of discretion.  Accordingly, the Court should remand to Commerce to reject Mosaic's incorrectly filed information for measuring

the adequacy of remuneration for byproduct disposal services from the record and direct

Commerce not to consider such information in the course of any remand.

## STANDARD OF REVIEW

The Court will hold unlawful a Commerce determination that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i); *see NTN Bearing Corp. of Am. v. United States*, 757 F. Supp. 1425, 1427–

33 (CIT 1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (applying the substantial evidence standard

in reviewing initiation and final determinations).  "To be in accordance with law, the agency's

decision must be authorized by the statute, and consistent with the agency's regulations."  *See

Yama Ribbons and Bows Co. v. United States*, 865 F. Supp. 2d 1294, 1297 (CIT 2012).

Substantial evidence "is more than a mere scintilla" and means "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. of

N.Y. v. NLRB*, 305 U.S. 197, 229–30 (1938).  Additionally, the agency's rationale must establish

"a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n

of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Consideration of the

substantial evidence standard "look{s} to the record as a whole, including evidence that supports

as well as evidence that *fairly detracts* from the substantiality of the evidence."  *SolarWorld

Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) (emphasis added).  Finally,

Commerce's decision must be judged on the reasoning articulated by the agency, and a

reviewing court "may not supply a reasoned basis for the agency's action that the agency itself

has not given."  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

# ARGUMENT

## I.    Commerce's Industry Support Determination Was Not Supported by Substantial Evidence and Was Not In Accordance With Law.

Commerce violated the law by initiating the investigation in response to a petition filed by a single U.S. phosphate fertilizer producer, Mosaic, without a valid demonstration that a sufficient portion of the domestic industry supported that petition.  Specifically, the Statute provides that Commerce has the authority to initiate an investigation only if the petition has been filed "on behalf of an industry."  19 U.S.C. § 1671a(b)(1).  This procedural safeguard prevents Commerce from initiating an investigation based on a petition that is supported by a sole petitioner that represents only a small segment of the domestic industry.  What the law prohibits is exactly what Commerce did in the underlying investigation.  Based solely on Mosaic's support for the Petition, Commerce initiated the investigation notwithstanding that the evidence demonstrated that Mosaic's assertion in the Petition of sufficient industry support was fatally flawed.

Here Commerce did not abide by this procedural safeguard for initiation because: (1) while "domestic producers or workers" opposed the Petition, Commerce refused to consider their views when making its industry support determination; and (2) even though NPK was explicitly included in the Petition's product scope, Commerce ignored the fact that the Petitioner's industry support calculation did not include domestic production of NPK by bulk blenders.  Notwithstanding that the Petition failed to establish sufficient industry support as a result of these two serious issues, Commerce refused to poll the industry or rely on other information to determine industry support, as the law requires.  Instead, Commerce adopted the Petition's industry support calculation to improperly initiate the investigation.  *See* Initiation Checklist (July 17, 2020) at 3 and Att. II, pp. 7–15 (P.R. 56; C.R. 22).  Commerce's refusal to

Business Proprietary Information
Has Been Deleted   **NON-CONFIDENTIAL VERSION**

consider the opposition of interested parties and its failure to account for relevant production in

its industry support calculation were both contrary to law and not supported by substantial

evidence; and each of these serious errors is an independent basis on which the Court must hold

Commerce's industry support determination, and the resulting initiation of the investigation, to

be unlawful.

A.     **In Refusing to Consider the Opposition of Certain Domestic Parties,
       Commerce Acted Contrary to Law and Reached a Determination
       Unsupported by Substantial Evidence.**

Shortly after Mosaic filed the Petition on June 26, 2020, certain domestic parties, namely

[                    ], notified Commerce of their opposition to the Petition, expressing their concerns

with the Petition's purported industry support.  *See, e.g.*, [


                    ].  By statute, Commerce was required to consider these views in

determining whether the Petition established sufficient industry support.  Acting contrary to law,

Commerce refused to do so.

The law requires Commerce to consider the views of "domestic producers and workers"

who express either support for, or opposition to, the petition when evaluating industry support.

*See* 19 U.S.C. § 1671a(c)(4)(A)(ii).  For purposes of evaluating whether a petition has the

requisite industry support, the law defines "domestic producers and workers" to include

[                    ].  *See* 19 U.S.C. § 1671a(c)(5) (defining "domestic producers or workers" as "those

interested parties who are eligible to file a petition under subsection (b)(1)); *id.* § 1671a(b)(1)

("A countervailing duty proceeding shall be initiated whenever an interested party described in

subparagraph (C) . . .  of section 1677(9) . . . files a petition with the administering authority, on

Consol. Ct. No. 21-00116                                NON-CONFIDENTIAL VERSION

behalf of an industry . . . ."); *id.* § 1677(9)(C) (defining an interested party as "a manufacturer,

producer, or wholesaler in the United States of a domestic like product.").

Despite the statutory provision requiring Commerce to consider the views of these

domestic parties in the industry support calculation, the agency unlawfully refused to do so here.

Commerce instead determined that it would not consider their opposition in evaluating industry

support because these parties had not provided "any data on the volume of their [      ] of the

domestic like product," and therefore, Commerce "lack{ed} the necessary information to

determine that the petition does not meet the industry support requirements."  Initiation Checklist

at Att. II, p. 11 (P.R. 56; C.R. 22).  This determination was fatally flawed in multiple respects.

As an initial matter, Commerce's industry support analysis demonstrates that Commerce

fundamentally misunderstood its statutory obligation.  The Statute unambiguously instructs that

Commerce must first determine whether a petition has established adequate industry support

*before* initiating an investigation.  19 U.S.C. § 1671a(c)(1)(A)(ii), (c)(4)(E).  Here, Commerce

purported *not* to have evidence sufficient to evaluate whether the opposition filed by certain

domestic parties demonstrated that the Petition failed to establish the requisite industry support,

and so the agency *presumed* there was adequate industry support.  Initiation Checklist at 3, Att.

II, p. 11 (P.R. 56; C.R. 22).  But under the law it is incumbent on Commerce to evaluate whether

the Petition has sufficient industry support and, in doing so, reach a determination supported by

substantial evidence.

Where a domestic party actively challenges a petitioner's assertion of domestic industry

support, Commerce is required to consider this opposition and cannot ignore domestic opposition

based on purported evidentiary deficiencies.  *See NTN Bearing*, 757 F. Supp. at 1429 ("When

opponents of the petition surface, . . . the ITA {*i.e.*, Commerce} must investigate the depth of

Consol. Ct. No. 21-00116                              **NON-CONFIDENTIAL VERSION**

industry support for the petition."); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 986

F. Supp. 1428, 1431 (CIT 1997) ("Before the URAA took {e}ffect, Commerce could presume

industry support unless a petition was actively opposed . . . {n}ow, Commerce may not operate

on the basis of the presumption . . . ."); *Fujitsu Ltd. v. United States*, 23 C.I.T. 46, 48 (1999)

(same).  Here, Commerce refused to consider the opposition of domestic parties to the Petition,

opted not to seek information to evaluate the impact of this opposition on the industry support

calculation, and presumed that the Petition established adequate industry support.  Commerce's

duty to evaluate industry support for the Petition, including considering any opposition by the

domestic industry, is not discretionary because the Statute is unambiguous.

Indeed, when evidence demonstrates that the Petition has failed to establish sufficient

industry support, as was the case here, the law mandates a clearly defined process for resolving

that issue—Commerce must poll the industry, or rely on other information as needed.  *See*

19 U.S.C. § 1671a(c)(4)(D).  When Commerce engages in this additional process, the Act

permits Commerce to double the time period for initiation from 20 days to 40 days.  19 U.S.C.

§ 1671a(c)(1)(B).  Inexplicably, Commerce did not invoke this process or extend its deadline for

initiation, but instead refused to consider the opposition on the record, all on the basis of

purported deficiencies in the record.  *See* Initiation Checklist at 3, Att. II, pp. 9–15 (P.R. 56; C.R.

22).  By concluding that it could not "account for" the [            ] opposition to the Petition,

Commerce effectively disregarded its own duty to investigate.

The law provides Commerce with very limited bases on which it may disregard the

position of members of the domestic industry, 19 U.S.C. § 1671a(c)(4)(B)(i)–(ii), and lack of

[      ] data is not one of these bases.  Consistent with the cannon of statutory interpretation

*expressio unius est exclusio alterius*, Commerce was statutorily barred from creating an

17

NON-CONFIDENTIAL VERSION

exception not enumerated in the statute.  *See Ventas, Inc. v. United States*, 381 F.3d 1156, 1161

(Fed. Cir. 2004) ("Where Congress includes certain exceptions in a statute, the maxim *expressio*

*unius est exclusio alterius* presumes that those are the only exceptions Congress intended.").

    Commerce's initiation determination—which effectively modified the law by inserting a

never-before-articulated requirement that domestic parties opposing a petition must submit

supporting data at the time they register their opposition—is especially troubling in light of the

short window of time that non-petitioning domestic parties have to register their positions on a

petition.  While Mosaic had unlimited time to prepare the Petition, non-petitioning domestic

parties had less than three weeks to learn about the Petition (the existence of which the

government has a policy of *not* publicizing prior to initiation),[3] analyze its allegations, decide on

a course of action, familiarize themselves with Commerce procedures, and register their

opposition to the Petition with Commerce prior to the agency making an initiation determination.

*See* 19 U.S.C. § 1671a(c)(1)(A).  Given this disadvantage in timing, it is understandable why the

law does not impose an evidentiary requirement on domestic parties when they register their

opposition to a petition.  Instead, the obligation was on Commerce to request any data from

parties it needed to make its industry support determination and there is no indication on the

record that Commerce fulfilled this statutory obligation.

    In addition to acting contrary to the law, Commerce's determination to refuse to consider

the opposition of domestic parties was not supported by substantial evidence.  An agency's

decision is supported by substantial record evidence only if the agency considers the record

---

[3] Both Commerce and the U.S. International Trade Commission have a policy of not publicizing
the existence of a petition before the initiation of an investigation. *See* Statement of
Administrative Action, H.R. Rep. No. 103-316 (1994) at 861, *reprinted in* 1994 U.S.C.C.A.N.
4040, 4192 ("SAA").

evidence as a whole including both the evidence that supports and detracts from its position. *See SolarWorld*, 910 F.3d at 1222. Here, Commerce refused to consider the opposition of domestic parties that detracted from its industry support determination; that refusal renders Commerce's decision unsupported by substantial evidence.

> **B.     Commerce's Industry Support Determination Failed to Account for Phosphate Fertilizer Produced Through Bulk Blending and Was Therefore Contrary to Law and Unsupported by Substantial Evidence.**

Before Commerce may initiate a CVD investigation based on a petition, it must determine whether the petition has support from a sufficient portion of the domestic producers and workers who produce the domestic like product. A critical aspect of this determination is Commerce's identification of the total production of domestic like product. Here— notwithstanding the Petition's explicit inclusion of NPK in the scope of the investigation (and therefore as a domestic like product), and the Petition's failure to account for NPK produced by domestic bulk blenders in its calculation of total production of the domestic like product— Commerce incorrectly relied on this erroneous calculation to determine that the producers and workers who supported the Petition accounted for more than 50 percent of the total production of the domestic like product, satisfying the industry support requirement. In doing so, Commerce also ignored significant record evidence that the Petition's self-serving estimate of the total production of domestic like product materially underestimated production in the United States, making it appear as though the Petition had adequate industry support when it did not. Commerce's refusal to account for NPK bulk blended production in its industry support determination and failure to remedy the material deficiencies in the Petition's estimate of total production of the domestic like product resulted in a determination that was not supported by substantial evidence and otherwise contrary to law.

    1.    <u>Bulk blended NPK produced domestically should have been included in the calculation of total domestic production.</u>

Correctly identifying the domestic like product and its total production are key predicates to Commerce's industry support determination.  The domestic like product is defined by statute as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title."  19 U.S.C. § 1677(10).  Here, it is uncontested that Commerce found the domestic like product to be coextensive with the scope of the investigation, meaning that the products expressly covered by the scope constituted the domestic like products.  *See* Initiation Checklist at Att. II, p. 12 ("{W}e find that there is a single domestic like product, coextensive with the scope.") (P.R. 56; C.R. 22); *see also id.* at Att. II, pp. 6–7 (P.R. 56; C.R. 22).

The scope of the investigation covered "phosphate fertilizers in all physical forms" as well as "other fertilizer formulations incorporating phosphorous and non-phosphorous plant nutrient components."[4]  The scope language explicitly includes, as an example of other fertilizer

---

[4] The scope language provides, in relevant part, that the merchandise covered is:

> {P}hosphate fertilizers in all physical forms (*i.e.*, solid or liquid form), with or without coating or additives such as anti-caking agents.
> . . .
>
> The covered merchandise also includes other fertilizer formulations incorporating phosphorous and non-phosphorous plant nutrient components, *whether chemically bonded, granulated* (*e.g.*, when multiple components are incorporated into granules through, *e.g.*, a slurry process), *or compounded* (*e.g.*, when multiple components are compacted together under high pressure), including nitrogen, phosphate, sulfur (NPS) fertilizers, *nitrogen, phosphorous, potassium (NPK) fertilizers*, nitric phosphate (also known as nitrophosphate) fertilizers, ammoniated superphosphate fertilizers, and proprietary formulations thereof that may or may not include other nonphosphorous plant nutrient components. . . .
>
> Phosphate fertilizers that are otherwise subject to these orders are included when commingled (*i.e.,* mixed or blended) with phosphate fertilizers from sources not

formulations, "nitrogen, phosphorous, potassium (NPK) fertilizers . . . that may or may not include other nonphosphorous plant nutrient components{.}" *See Initiation Notice*, 85 Fed. Reg. at 44,509 (P.R. 59).  Bulk blending is one of several well-recognized methods to produce NPK fertilizers.  *See* OCP Pre-Initiation Cmts. at Ex. 1, p. 7 (P.R. 38; C.R. 11); *id.* at Ex. 2, p. 17 (P.R. 38; C.R. 11).

Despite the inclusion of NPK fertilizers in the scope language, Commerce decided that bulk blenders producing fertilizers such as NPK should not be included in the domestic industry, stating:

> {W}ith regard to the bulk blenders identified by OCP, the record does not contain information indicating that any are producers of phosphate fertilizers.  Further, in the Argus NPK Analytics Report cited in the OCP Submission, it states that "blending is more a technique than a finished product," and therefore bulk blending activities do not warrant inclusion in the industry support calculation.

Initiation Checklist at Att. II, pp. 14–15 (internal citations omitted) (P.R. 56; C.R. 22).  In light of record evidence establishing that blending activities are meaningful and significant production activities, Commerce's determination that bulk blenders were not producers of the domestic like product is unsupported by the record evidence and contrary to the agency's practice, which establishes a very low bar to qualify as a domestic producer.

Commerce's practice in determining whether a firm is a *producer* of domestic like product, as confirmed by the CIT and Federal Circuit, involves an analysis of whether the firm has a stake in the domestic industry in question, which Commerce evaluates based on the firm's

---

subject to these orders. Phosphate fertilizers that are otherwise subject to these orders are included when commingled with substances other than phosphate fertilizers subject to these orders (*e.g.,* granules containing only non-phosphate fertilizers such as potash or urea). Only the subject component of such commingled products is covered by the scope of these orders.

*See CVD Order*, 86 Fed. Reg. at 18,038–39 (emphasis added) (P.R. 492).

production activities occurring in the United States.  *See Eurodif S.A. v. United States*, 411 F.3d

1355, 1360–61 (Fed. Cir. 2005), *aff'd on reh'g*, 423 F.3d 1275 (Fed. Cir. 2005) (confirming

Commerce's broad definition of a producer as "a company 'perform{ing} some important or

substantial manufacturing operation{}'" of the domestic like product).  Commerce looks to

factors such as the capital investment involved, the technical expertise of the process, and

employment levels and courts have affirmed the agency's evaluation of these types of factors.

*See, e.g.*, *M S Int'l, Inc., v. United States*, No. 20-00127, 2021 WL 4622506, at *5–6 (CIT Oct. 7,

2021) (affirming Commerce's evaluation of "sufficient production-related activities" test, which

examined seven production factors); *Brother Indus. (USA), Inc. v. United States*, 801 F. Supp.

751, 755 (CIT 1992) (reviewing Commerce's consideration of production activities) (internal

quotation omitted); IDM accompanying *Certain Quartz Surface Products from the People's

Republic of China:  Final Affirmative Determination of Sales at Less Than Fair Value, and Final

Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23,767 (May 23, 2019) at 17

(cmt. 1) (evaluating "the level of complexity and capital investment, employment, training and

technical expertise, production processes, and type of equipment"); *AD Manual* (2015) at II-36

(describing evaluation of domestic production factors).

　　　Although Commerce does not evaluate what constitutes production in the same way in

every investigation, Commerce consistently evaluates record evidence to determine whether the

capital investment and technical expertise constitute production.  *Brother Indus.*, 801 F. Supp. at

755; *id.* at 758.  In *Brother Indus.*, the court noted that the "ITA has discretion to utilize any

methodology reasonably suited to fulfilling the statutory goals" but found that the agency did not

exercise that discretion appropriately in light of record evidence about the extent of U.S.

production activities.  801 F. Supp. at 755; *id.* at 758 (instructing Commerce to consider "the

nature of production in the United States").  Here, Commerce made no such evaluation of the domestic production activities by bulk blenders when it concluded that bulk blenders were not domestic producers.  *See* Initiation Checklist at Att. II, pp. 14–15 (P.R. 56; C.R. 22).

Commerce's failure to consider bulk blenders producers is particularly at odds with Commerce precedent, in which there is "no threshold level or amount of domestic activity or production necessary to qualify as a 'producer.'"  Indeed, in some instances, a company with no production whatsoever may qualify as a producer.  *See* Mem. from Chien-Min Yang to Edward C. Yang, *Whether the Members of the NMGGC Are U.S. Domestic Producers of Fresh Garlic*, at 3 (June 3, 2016) (ACCESS Barcode 3475532-01); *see also Fresh Garlic from the People's Republic of China:  Final Results and Partial Rescission of the 22nd Antidumping Duty Administrative Review and Final Result and Rescission, in Part, of the New Shipper Reviews; 2015–2016*, 83 Fed. Reg. 27,949 (June 15, 2018) ("The term 'producer' is not defined in the Act, and Commerce has consistently explained that the Act does not contemplate a minimum threshold amount of production or manufacture for a party to be considered a domestic producer.").

The record information before Commerce demonstrated conclusively that NPK fertilizer produced through bulk blending not only constituted "production of the domestic like product," but that this method is in fact a "favored" method of producing NPK in the United States.  *See* OCP's Pre-Initiation Cmts. at Ex. 2, p. 17 (P.R. 38; C.R. 11).  This record information includes:

- Bulk blending is one of several well-recognized methods to produce NPK fertilizers.  *See* OCP's Pre-Initiation Cmts. at Ex. 2, p. 17 (P.R. 38; C.R. 11); *see also id.* at 7–8, Ex. 1, p. 7 (P.R. 38; C.R. 11).

- Starting in a similar manner to other NPK production processes, bulk blending production starts with the sourcing of raw materials.  *Id.* at Ex. 2, pp. 20–22, 143 (P.R. 38; C.R. 11).  Raw materials of the same size are sourced to minimize "segregation," which is the separation of particles of different sizes or physical properties that

**Consol. Ct. No. 21-00116**                                      **NON-CONFIDENTIAL VERSION**

potentially results in the disproportionate distribution of fertilizers across a field and waste. *Id.* at Ex. 2, p. 2 (P.R. 38; C.R. 11). Raw materials may consist of products such as urea, DAP, and MOP. *Id.* at Ex. 2, p. 22 (P.R. 38; C.R. 11); *see also* Petition, Vol. I, at Ex. I-20, p. 5 (P.R. 3; C.R. 3).

- Activities undertaken to produce bulk blended NPK are significant and meaningful. Far from being developed through simple mixing or a "technique," bulk blended NPK is produced through a precise, methodical, and sophisticated process that involves physical mixing of carefully sized ingredients through a mechanical process that results in a fertilizer that meets a specific nutrient ratio concentration. NPK fertilizers are produced to varying formulations to suit each soil and crop and at grades tailored for specific local conditions. *See* OCP's Pre-Initiation Cmts. at Ex. 2, p. 21 (P.R. 38; C.R. 11); *see also id.* at Ex. 1, p. 7 (P.R. 38; C.R. 11).

- The entities that engage in bulk blending must purchase, among other machinery, capital equipment including a shaft mixer, a bucket elevator, truck loader, and conveyer equipment, *id.* at 8, Ex. 4 (P.R. 38; C.R. 11), for an up-front investment of around $3.5 million for a plant with a 120,000 ton capacity. *Id.* at Ex. 8, p. 4 (P.R. 39; C.R. 12).

- Bulk blending plants also require devoted production employees. *See id.* at Ex. 8, p. 4 (P.R. 39; C.R. 12).

This evidence concerning production activities, based on hundreds of pages of evidence that OCP placed on the record prior to initiation, demonstrates that bulk blending constitutes meaningful production, and that bulk blenders are therefore producers. *See generally id.* at Exs. 1–2, 4–8, 20 (P.R. 38–40; C.R. 11–13). No information submitted by Mosaic demonstrates otherwise. *See generally* Mosaic Response to Comments on Industry Support (July 15, 2020) (P.R. 46; C.R. 18). In addition, the Petition itself identifies products that can be produced by bulk blending. *See* Petition, Vol. I, at [          ], Ex. I-5 (listing Nutrien and Meherrin as producers of NPK, and Simplot as a producer of NPS) (P.R. 3; C.R. 3); OCP's Pre-Initiation Cmts. at Ex. 2, p. 150 (identifying that NPK and NPS can be produced by bulk blending) (P.R. 38; C.R. 11); *see also id.* at 8 n.17 (P.R. 38; C.R. 11).

Commerce did not evaluate *any* of this record information nor did the agency consider any of its usual criteria to support its determination that bulk blending did not constitute domestic production. By failing to discuss this material and contrary evidence, Commerce

rendered a decision that is plainly inconsistent with the substantial evidence standard.  *See Nucor Corp. v. United States*, 371 F. App'x 83, 87 (Fed. Cir. 2010) ("Commerce thus pointed to no substantial evidentiary support for its decision . . . to disregard the extensive contrary evidence{.}"); *see also Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (U.S. 2020) ("When an agency changes course, . . . {i}t would be arbitrary and capricious to ignore such matters.") (internal citation omitted).

Moreover, Commerce misconstrued the one piece of record evidence cited to support its incorrect assertion that blending was not a production process but rather a "technique"—an Argus NPK Analytics Report.  *See* Initiation Checklist at Att. II, p. 15 (P.R. 56; C.R. 22).  The report did not refer to bulk blending as a "technique" to distinguish it from production processes but rather to suggest that, for certain statistical reporting purposes, blended NPK is difficult to isolate from NPK produced through other methods.  *See* OCP Pre-Initiation Comments at Ex. 2, p. 34 (P.R. 38; C.R. 11).  Indeed, this very same source expressly refers to bulk blending as a "production" method.  *See, e.g.*, OCP's Pre-Initiation Cmts. at Ex. 2, p. 17 ("The *production routes* we cover are . . . bulk blending." (emphasis added)) (P.R. 38; C.R. 11).  Commerce cannot rely solely on misconstrued facts in order to claim that substantial evidence exists in support of its position—"facts" that are not as the agency describes are not evidence at all, let alone substantial evidence.

Given that NPK is expressly covered by the scope, and thus constitutes domestic like product that is produced through bulk blending, and given that such blending involves significant production activity, the agency was required under the relevant law and its practice to include bulk blending production within its calculation of total production of the domestic like product.

In failing to do so, Commerce rendered a finding that was not supported by substantial evidence and otherwise not in accordance with law.

> 2.  <u>Record evidence established that the quantity of domestically produced NPK omitted from the industry support determination was significant and resulted in a manifestly incorrect industry support determination.</u>

By failing to account for bulk blended NPK, the Petition's estimate of the total production of domestic like product materially underestimated total production in the United States.  As a result, Commerce's determination that the Petition had industry support from a sufficient portion of the industry producing the domestic like product was unsupported by substantial evidence and otherwise not in accordance with law.

For a petition to establish that it has adequate industry support, it must correctly identify total production of the domestic like product, which is a crucial aspect of the Statute's industry support thresholds.  The Statute directs that a petition is considered to be filed on behalf of an industry if:

> (i) the domestic producers or workers who support the petition account for at least 25 percent *of the total production of the domestic like product*, and
>
> (ii) the domestic producers or workers who support the petition account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for or opposition to the petition.

19 U.S.C. § 1671a(c)(4)(A) (emphasis added).  To determine whether a petition meets these thresholds, the Statute directs Commerce to determine whether the petition on its face establishes support from domestic producers or workers accounting for more than 50 percent *of the total production of the domestic like product*.  19 U.S.C. § 1671a(c)(4)(D).  If Commerce determines that this threshold is met, it finds that all the industry support thresholds are met and the petition has adequate industry support.  *See* Initiation Checklist at 3, Att. II, pp. 14–15.

**Consol. Ct. No. 21-00116**                                        **NON-CONFIDENTIAL VERSION**

In support of its decision that it need not account for bulk blended NPK production in the calculation of total production of the domestic like product, Commerce incorrectly determined that the Petition's calculation of total production of the domestic like product already accounted for all phosphate fertilizer produced in the United States.  Specifically, Commerce asserted that:

> {I}t is not appropriate to include bulk blenders in the domestic industry because the industry support calculation properly accounts for all phosphate fertilizers produced in the United States.  Thus, it necessarily includes the phosphate fertilizers produced in the United States that may be comingled or mechanically mixed or blended into a bulk blend that contains phosphate fertilizers.  As a result, it is not appropriate to collect data from companies that perform such blending techniques and doing so could result in double-counting.  Further, Commerce finds that the petitioner provided sufficient information to establish all known producers of the domestic like product . . .

Initiation Checklist at Att. II, pp. 14–15 (internal footnotes omitted) (P.R. 56; C.R. 22). However, this determination was contradicted by overwhelming record evidence demonstrating that a significant quantity of NPK production was not included in the calculation of total production of the domestic like product and, as a result, the Petition had drastically underestimated total production.

The flaws in the Petition's calculation of total production of the domestic like product are not surprising given that the Petition offered sparse evidence concerning volume of production. Mosaic's own total production equaled only [          ] short tons, which it asserted accounted for more than 50 percent of the total production of the domestic like product.  *See* OCP's Pre-Initiation Cmts. at Ex. 10 (P.R. 38; C.R. 11).  The Petition based this assertion on an estimate of the total production of the domestic like product, including several categories of domestic like product that Mosaic does not itself manufacture, including NPK.

Because Mosaic lacked production data for NPK fertilizer, and other categories of domestic like product, the Petition provided an estimate of production for those categories

Business Proprietary Information
Has Been Deleted   **NON-CONFIDENTIAL VERSION**

prepared by a Mosaic employee who purported to have the "personal knowledge and experience"

to provide this estimate despite working for a company that does not produce NPK fertilizer. *See*

Petition, Vol. I, at Ex. I-5 (providing estimates of TSP, NPS, and NPK); *id.* at Ex. I-7, ¶ 4

(employee declaration) ("Because TFI {*i.e.*, The Fertilizer Institute} does not report production

data for other types of phosphate fertilizers-including TSP, NPS, and NPK, which are produced

by Mosaic, Nutrien, Simplot, and Meherrin—I prepared estimates of total U.S. production for

these types of phosphate fertilizers based on my own personal knowledge and experience."); 

Mosaic SQR (July 6, 2020) at Ex. GEN-SUPP-QR-11, ¶ 8 (stating that Mosaic's NPK estimates

were estimated [

                                                          ] (emphasis added)) (P.R. 24; C.R. 9).[5]

    Devoid of any reasoned methodology, Mosaic's estimate was [                              ]

short tons of NPK fertilizer. *See* Petition, Vol. I, at Exs. I-5, I-7 (P.R. 3; C.R. 3); Mosaic SQR at

Ex. GEN-SUPP-QR-11 (P.R. 24; C.R. 9).  Mosaic's estimate of *total* annual U.S. production of

the domestic like product, adopted by Commerce without scrutiny, was [                          ]

short tons. *See* Petition, Vol. I, at Ex. I-5 (P.R. 3; C.R. 3).  However, OCP put evidence on the

record demonstrating that total U.S. production for bulk blended NPK fertilizer *alone* was

approximately 20 million metric tons.[6]  *See* OCP's Pre-Initiation Cmts. at Ex. 2, p. 144 (P.R. 38;

---

[5]*See also* Petition, Vol. I, at I-22 n.97 (Mosaic only produces "a combination of
DAP/MAP/Microessentials at its plants") (citing *id.* at Ex. I-8 (same)) (P.R. 3; C.R. 3); *id.* at Ex.
I-5 (showing that the source for Mosaic's U.S. production estimate for NPK is "Mosaic estimate
of Nutrien and Meherrin production," that the source of Mosaic's U.S. production estimate for
TSP is "Mosaic estimate of Simplot production.") (P.R. 3; C.R. 3); *id.* at Ex. I-6 (showing that
the source for reported "U.S. NPK Capacity" was entirely "Mosaic Estimates") (P.R. 3; C.R. 3);
*id.* at Ex. I-26 (showing that U.S. producer trade data exhibit, with respect to NPK, was based on
"Mosaic estimates") (P.R. 4; C.R. 4).

[6] OCP notes that 1 metric ton equals 1.10231 short tons.  As a result, 20 million metric tons is
equal to 22,046,226 short tons.

Business Proprietary Information
Has Been Deleted **NON-CONFIDENTIAL VERSION**

C.R. 11); *id.* at 10 (P.R. 38; C.R. 11).  Neither estimate of [                ] short tons of total U.S.

production of the domestic like product nor [        ] short tons of NPK production come close

to "properly account{ing}" for 20 million metric tons of bulk blended NPK fertilizer, which was

substantiated by the record evidence.  Mosaic's total production of [                ] short tons is

only, approximately, [        ]% of the 20 million metric tons of bulk blended NPK fertilizer

produced in the United States, [                ] the 50% threshold established in 19 U.S.C.

§ 1671a(c)(4)(D).  Bulk blended NPK represented such a large percentage of total production of

the domestic like product that the Petition's omission of it from the industry support calculation

resulted in an evaluation of industry support that was manifestly incorrect.

In response to OCP's challenge that the Petition failed to include bulk blended production

in its estimate of total domestic production, Commerce asserted that collecting data from bulk

blenders "could result in double-counting."  *See* Initiation Checklist at Att. II, p. 14 (P.R. 56;

C.R. 22).  However, Commerce's defense of this omission based on concerns of theoretical

double-counting was pure speculation, cites to no record evidence, and ignores the substantial

record evidence demonstrating that Mosaic's calculation for total U.S. production significantly

underestimated that production.  Mere speculation, especially when faced with contradictory

evidence, is inconsistent with the substantial evidence standard.  *Gerald Metals, Inc. v. United

States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *LMI-LA Metalli Indus., S.p.A. v. United States*, 912

F.2d 455, 460 (Fed. Cir. 1990).  Moreover, Commerce offered no explanation for its position.

Such unexplained assertions also fail the substantial evidence standard of review.  *See Yangzhou

Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); ("Commerce

may not "explain the absence of evidence by invoking procedural difficulties that were at least in

part a creature of its own making."); *Canadian Solar Inc. v. United States*, No. 18-00184, 2020

WL 6129754, at *4 (CIT Oct. 19, 2020); *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d

1034, 1048 (Fed. Cir. 2017).

       In any event, concerns about theoretical double-counting cannot justify the omission of

all U.S. produced bulk blended NPK from the industry support calculation.  To the extent

Commerce is justifying its exclusion of bulk blended NPK on the grounds that the raw materials

incorporated into bulk blended NPK are domestic like product that is already accounted for, this

determination was not supported by substantial evidence.  Although Mosaic produces *some* of

the raw materials that could be incorporated into NPK bulk blends, namely DAP, there is no

record evidence that the DAP produced by Mosaic was incorporated into bulk blended NPK

produced domestically.  *See* Petition, Vol. I, at Ex. I-6 (P.R. 3; C.R. 3); OCP's Pre-Initiation

Cmts. at Ex. 2, p. 22 (P.R. 38; C.R. 11).  Additionally, bulk blended NPK can also be made with

domestic like product raw materials that Mosaic *does not* produce, for example, TSP.  Petition,

Vol. I, at Exs. I-6, I-11, p. I-34 (P.R. 3; C.R. 3).[7]  There is absolutely no information on the

record from a company that produces TSP domestically.  The only record information

concerning the quantity of TSP produced in the United States during the relevant time period is a

similarly unsubstantiated estimate by a Mosaic employee who estimated total NPK.  Mosaic

SQR at Ex. GEN-SUPP-QR-11 (P.R. 24; C.R. 9).  In sum, there is no record evidence supporting

the position that the raw materials incorporated into bulk blended NPK are domestic like product

already accounted for in Commerce's industry support calculation.

---

[7] *See also Phosphate Fertilizers from Morocco and Russia*, Inv. Nos. 701-TA-650-651 (Final),
USITC Pub. 5105 at I-9 ("TSP is a high-analysis, single nutrient phosphorus fertilizer of
phosphate rock mineral and phosphoric acid chemical (0-46-0) finding use in direct application
and NPK bulk blends.").

### C.      Commerce Acted Contrary to Law When It Failed to Poll the Industry or Rely on Other Evidence to Determine Industry Support.

Where the petition fails to establish industry support for an investigation, as was the case here, Commerce is legally required to look outside of the petition to determine whether the industry support threshold has been met.  The Statute at 19 U.S.C. § 1671a(c)(4)(D) provides the steps Commerce is required to take when a Petition fails to establish the requisite industry support:

> (D) POLLING THE INDUSTRY.—If the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the administering authority shall—
>
> (i) poll the industry or rely on other information in order to determine if there is support for the petition as required by subparagraph (A), or

19 U.SC. § 1671a(c)(4)(D) (emphasis added).  To support these required steps, the law also provides that Commerce may double the time period for initiation from 20 to 40 days when Commerce needs to poll the industry.  *See* 19 U.S.C. § 1671a(c)(1)(B).  If after taking these steps, the evidence does not establish that a sufficient portion of the domestic industry supports the petition, Commerce must dismiss the petition and terminate the proceeding.  *See* 19 U.SC. § 1671a(c)(3).  These requirements demonstrate Congress's clear intent that Commerce only initiate an investigation in response to a petition where the agency determines the petition has sufficient evidence of industry support.

Here, OCP and other interested parties identified significant issues in the Petition's industry support calculation and specifically urged Commerce to invoke the polling process or rely on other information to evaluate industry support.  *See* OCP's Pre-Initiation Cmts. at 3 (P.R. 38; C.R. 11); *see also* Int'l Raw Materials Letter at 2 (P.R. 37); American Plant Food Letter at 2 (P.R. 47).  Commerce declined, incorrectly determining that polling was unnecessary because the Petition established sufficient industry support.  *See* Initiation Checklist at 3, Att. II, pp. 10, 14–

NON-CONFIDENTIAL VERSION

15 (P.R. 56; C.R. 22).  As discussed in the immediately preceding sections, Commerce only

reached this incorrect determination by impermissibly refusing to consider the opposition of

domestic parties and by ignoring significant production of the domestic like product, *i.e.,* bulk

blended NPK.  Thus, the Petition failed to establish sufficient industry support, and Commerce

acted contrary to the law when it concluded that it need not invoke the polling process or rely on

other information to determine industry support.

The statutory language is mandatory.  Commerce "shall" poll the industry or rely on

other information in order to determine industry support when the petition fails to establish

sufficient industry support.  19 U.S.C. § 1671a(c)(4)(D); *see also Merck & Co. v. Hi-Tech

Pharmacal Co*., 482 F.3d 1317, 1322 (Fed. Cir. 2007) ("Use of the word 'shall' in a statute

generally denotes the imperative.").  These procedures represented a significant change from

prior law under which Commerce could presume industry support for a CVD petition.[8]  *Compare*

19 U.S.C. 1671a(b)(1) (1988) (directing that Commerce commence a CVD investigation

"whenever an interested . . . files a petition . . . on behalf of an industry, which alleges the

elements necessary. . . "), *with* 19 U.S.C. § 1671a(c)(4)(A) (2018) (reflecting 1994 amendment's

introduction of specific thresholds Commerce must evaluate before determining a petition has

industry support), *and* 19 U.S.C. § 1671a(c)(4)(D) (2018) (reflecting 1994 amendment's

introduction of requirement that Commerce "poll the industry or rely on other information" to

evaluate industry support if the petition does not establish the 50% threshold).  Legislative

history from the Uruguay Rounds Agreement Act passed in 1994, which introduced this

---

[8] Such mandatory language is not surprising given that these industry support requirements,
including the polling procedures, were deliberately enacted to bring the United States into
compliance with its international obligations.  *See* WTO Agreement on Subsidies and
Countervailing Measures, Art. 11.4.

provision, confirms that Commerce "will poll or otherwise determine whether the industry

supports the petition" when a petition fails to establish the requisite industry support.  Uruguay

Round Agreements Act ("URAA"), SAA at 862, 1994 U.S.C.C.A.N. at 4193; 19 U.S.C.

§ 3512(d) (the SAA is the "authoritative expression by the United States concerning the

interpretation and application" of the 1994 amendment).

In the circumstances here, where the Petition failed to establish sufficient industry

support, Commerce's failure to take the additional step of polling or relying on other

information, as mandated in § 1671a(c)(4)(D), was a clear violation of the law.

> **D.     The Appropriate Remedy for Commerce's Unlawful Industry Support
> Determination Is to Hold the Investigation Void *Ab Initio*, Vacate the CVD
> Order, and Remand to Commerce to Dismiss the Petition and Terminate the
> CVD Proceeding.**

Commerce acted outside of its authority in initiating a CVD investigation in response to

Mosaic's petition without first determining that the Petition established sufficient industry

support as required under the law.  In particular, Commerce failed to evaluate all available record

information related to industry support, including ample contrary record evidence showing that

the Petition did *not* establish sufficient industry support.  The initiation and resulting

investigation were therefore conducted outside of Commerce's authority, and the appropriate

remedy is for the Court to declare the investigation void *ab initio*, vacate the order, and remand

to Commerce for the agency to dismiss the petition and terminate the CVD proceeding.  In

addition, the Court should order that any cash deposits paid on the entries subject to Commerce's

unlawful CVD determination be refunded in full.  *See* 19 U.S.C. § 1673d(c)(3); *Jubail Energy

Servs. Co. v. United States*, 125 F. Supp. 3d 1352, 1356 (CIT 2015) (describing Commerce's

instruction to Customs and Border Protection to refund cash deposits when an investigation does not result in the issuance of an order).

It is well-established in administrative law that where an agency acts outside of its statutory authority in initiating an investigation, reviewing courts will vacate the results of that investigation.  *See, e.g.*, *Greater Mo. Med. Pro-Care Providers v. Perez*, 812 F.3d 1132 (8th Cir. 2015) (vacating an agency order against an employer for back wages because an investigation was improperly initiated under its statutory authority); *Lotus Suites, Inc. v. NLRB*, 32 F.3d 588 (D.C. Cir. 1994) (setting aside an order from the National Labor Relations Board because the agency initiated an investigation that lacked the factual predicate required under the statue). Likewise, precedent in the CIT and Federal Circuit demonstrate that an agency action will be vacated where it is the result of "substantial procedural or substantive" errors.  *See Intercargo Ins. Co. v. United States*, 83 F.3d 391, 394 (Fed. Cir. 1996); *see also Splane v. West*, 216 F.3d 1058, 1070 (Fed. Cir. 2000) (vacating a decision of the Board of Veterans' Appeals that the court found was "not in accordance with law and {was} therefore in excess of statutory authority"); *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, No. 19-00122, 2021 WL 3662423, at *19 n.39 (CIT Aug. 18, 2021) ("{T}he court finds it appropriate to vacate the Final Results  . . . a lack of statutory authority—cannot be cured on remand").

Here, the Court should vacate the results of Commerce's unlawful investigation because it lacked the authority to conduct the investigation.  Vacating the CVD order is a necessary result because Commerce cannot—from either a legal or practical perspective—remedy its flawed industry support determination on remand.  Since a 1994 amendment to the Statute, Commerce is prohibited from reconsidering its industry support determination following initiation of the

investigation.[9]  *See* 19 U.S.C. § 1671a(c)(4)(E); SAA at 863–64, 1994 U.S.C.C.A.N. at 4194

(providing that Congress intended industry support determinations to be based only on

information submitted prior to initiation).  Congress' prohibition on Commerce revisiting its

industry support determination makes practical sense because that support is intended to be

evaluated at a precise moment in time—when the Petition is filed.  *See* SAA at 862, 1994

U.S.C.C.A.N. at 4192 ("question of industry support will be resolved conclusively at the outset

of a proceeding{.}")  There is no practical manner in which Commerce can go back in time and

seek additional information or poll the industry to determine if, back when the Petition was filed,

members of the industry would have supported the Petition.  Domestic producers and workers

change over time, as do their positions, and it would be impossible to know now, after a full

investigation and the issuance of a CVD order, what position producers and workers would have

had when the Petition was filed.

    With no option to "correct" the flawed industry support determination, Commerce has no

choice but to dismiss the petition; a remand to the agency to reconsider the industry support

determination would be futile.  *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed.

Cir. 2001) ("If there is . . . an issue as to whether the agency is either compelled or forbidden by

the governing statute to reach a different result—a reviewing court again has considerable

discretion" on whether to grant a remand).  The Supreme Court has recently explained that a

remand to an agency is appropriate for an agency to "elaborat{e} on {its} original reasons" for a

---

[9] Although Commerce is prohibited from reconsidering industry support after initiation, 19
U.S.C. §§ 1673a(c)(4)(E), 1671a(c)(4)(E), this does not "limit the court's ability to review
Commerce's industry support determination." *PT Pindo Deli Pulp v. United States*, 36 C.I.T.
394, 408 (2012) (citing SAA at 863, 1994 U.S.C.C.A.N. at 4194).  In order to make such judicial
review meaningful, the Court must be able to grant effective relief where the agency acts
inconsistent with law.

decision, but not to offer an "impermissible 'post hoc rationalization.'" *Regents of the Univ. of Cal.*, 140 S. Ct. at 1908. Although the agency can "'deal with the problem afresh' by taking new agency action", that new agency action "must comply with the procedural requirements for the new agency action." *Id.* As the Supreme Court noted, "{t}he rule requiring a new decision before considering new reasons is not merely a formality. It serves important administrative law values by promoting agency accountability to the public, instilling confidence that the reasons given are not simply convenient litigating positions, and facilitating orderly review." *Id.* at 1896.

Here the flaw in Commerce's decision is that, due to its inaction, it lacked the necessary information concerning the views of the domestic industry at the time period immediately after the Petition was filed to determine whether the Petition had sufficient support from the domestic industry, and no elaboration on Commerce's original reasons could remedy this lack of information. Furthermore, while Commerce has the authority to consider industry support for a *new* petition in a new CVD proceeding, it lacks authority to reconsider industry support in this CVD proceeding. As a result, a remand would not be appropriate.

Since the 1994 amendment requiring specific statutory thresholds for industry support, the CIT has not expressly dealt with the appropriate remedy where Commerce issues an unlawful determination that a Petition had sufficient industry support.[10] However, several CIT opinions have made clear that an investigation must have an adequate industry support determination to

---

[10] There is one opinion that considered the circumstances where Commerce determined *not to initiate* an investigation after polling the domestic industry and finding a lack of industry support. The Court remanded the decision to Commerce to reconsider, among other things, the agency's evaluation of the interests of domestic workers and whether to disregard the views of domestic parties that also imported subject merchandise. *See Save Domestic Oil, Inc. v. United States,* 116 F. Supp. 2d. 1324, 1340 (2000). Because Commerce had already polled the industry in the challenged investigation in *Save Domestic Oil,* the Court did not address whether its remand was consistent with 19 U.S.C. § 1671a(c)(4)(E). OCP respectfully submits that this legal provision is unambiguous and Commerce cannot collect additional record information concerning industry support on remand.

move forward.  *See, e.g.*, *Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*, 31 C.I.T. 2040, 2042 (2007).

Prior to the 1994 amendment, the Federal Circuit reviewed a decision in which the CIT found Commerce had improperly initiated a CVD investigation because the petition lacked sufficient industry support.  *See Suramericana de Aleaciones Laminadas, C.A. v. United States,* 746 F. Supp. 139, 141 (CIT 1990), *rev'd sub nom.*, 966 F.2d 660 (Fed. Cir. 1992), *aff'd*, 44 F.3d 978 (Fed. Cir. 1994).  In a strikingly similar case involving a single domestic producer seeking to subvert the Statute to its own competitive advantage, the CIT held that the statutory requirement that a petition be filed on behalf of the domestic industry is enforced by vacating a CVD order issued pursuant to an investigation initiated in violation of that requirement.  *See id.* at 140 ("The petitioner's . . . *clearly was acting alone and not on behalf of a domestic industry* in filing its petition.  The petition therefore was improper and the ensuing investigation is a nullity; consequently, the agency determinations resulting therefrom must be vacated." (emphasis added)).  Although the Federal Circuit reversed this decision for reasons related to Commerce's discretion under the Statute, that discretion was eliminated in the 1994 amendment.  More importantly, the appellate court did not question the propriety of vacatur as the appropriate remedy.  As a result of the amendments introduced in 1994— including the very legal provisions on which this challenge to industry support is based—Commerce must now operate under strict and clear instructions on determining industry support for a petition.  *Compare* 19 U.S.C. § 1671a (1982), *with* 19 U.S.C. § 1671a (2019).

As a result, the remedy is clear:  where Commerce exceeds its authority by initiating an investigation on the basis of an unlawful industry support determination, the Court should declare the improperly initiated investigation void *ab initio*, vacate the order, and remand to

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

Commerce to dismiss the petition and terminate the CVD proceeding.  The law is clear that

termination is required when there is no showing of industry support for a petition.  *See* 19

U.S.C. § 1671a(c)(3).

## II.    Commerce's Finding that a Benefit was Conferred for Mining Rights Is Unsupported by Substantial Evidence on the Record and Otherwise Not in Accordance with Law.

In evaluating whether OCP paid the GOM "adequate remuneration" for the right to mine

phosphate ore, Commerce followed a process that was inconsistent with:  the law, Commerce

practice, the record evidence, basic economic principles, and even common sense.  Specifically,

- **Commerce unlawfully excluded certain SG&A expenses from OCP's COP buildup for phosphate rock**.  The law provides that SG&A expenses should be included in a COP buildup, and the record evidence amply demonstrated that OCP incurred such costs in the production of phosphate rock, but Commerce failed to include them in the COP buildup.  *See infra* Section II.A.

- **Commerce calculated an inaccurate amount for profit in the COP buildup.** Commerce ignored its practice and used a profit rate in the COP buildup that was not specific to phosphate rock production rather than using the phosphate-specific profit rate on the record.  *See infra* Section II.B.1.

- **Commerce's calculation of the profit rate used in the COP buildup was incorrect and internally inconsistent.**  Commerce's profit rate calculation was incorrect as it contained significant errors in both the denominator and numerator. *See infra* Section II.B.2.

- **Commerce calculated an erroneous world benchmark price for phosphate rock.**  Commerce wrongly included North African prices (consisting of OCP's own prices) in its calculation of the world benchmark price, which created a circular comparison that failed to accurately measure the adequacy of remuneration for mining rights.  *See infra* Section II.C.

Because CVD actions are "remedial rather than punitive in nature," Commerce has a duty "to

determine rates *as accurately as possible.*"  *Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v.*

*United States*, 498 F. Supp. 3d 1345, 1353 (CIT 2021) (emphasis added); *see KYD, Inc. v. United*

*States*, 779 F. Supp. 2d 1361, 1380–81 (Fed. Cir. 2011).  By ignoring the law, agency practice,

NON-CONFIDENTIAL VERSION

evidence, and basic economic principles, Commerce failed to determine the mining rights CVD

rate accurately, let alone "as accurately as possible."  OCP now asks the Court to remand this

matter with the direction that Commerce correct the numerous and manifest deficiencies in its

determination.

> **A.      Commerce's Exclusion of HQ, Support, and Debt Costs, from the COP
> Buildup Was Contrary to Law and Unsupported by Substantial Evidence.**

In this investigation, Commerce centered its benefit calculation and the resulting CVD

rate for mining rights on a COP buildup that was supposed to capture the cost of production for

OCP to produce phosphate rock.  Basic economic principles hold that when a company

producing a good incurs SG&A expenses, a portion of those expenses will be attributable to its

production activities, and the record evidence demonstrated that OCP did in fact incur SG&A

expenses in the production of phosphate rock.  The law also confirms that these expenses must

be included in the COP buildup because the law expressly defines "cost of production" to

include SG&A expenses.  Notwithstanding these basic economic principles, record evidence, and

an unambiguous legal provision, Commerce inexplicably and incorrectly excluded a large

category of SG&A expenses from the COP buildup for phosphate rock, which had the effect of

artificially increasing the CVD rate determined on the basis of the erroneously-calculated COP.

Thus, the Court should remand the calculation of the COP buildup to Commerce so it can

properly include all SG&A expenses incurred in the production of phosphate rock in that

calculation.

Commerce measured the adequacy of remuneration for mining rights using its

hierarchical "three-tier methodology" codified in 19 C.F.R. § 351.511(a)(2) through which it

must first identify or calculate a benchmark price for mining rights.  Because Commerce

determined that there were no market-determined prices for mining rights available in Morocco

(under Tier 1), and there was no world market price for such mining rights (under Tier 2),

Commerce purported to assess under Tier 3 "whether the government price {charged to OCP for

mining rights was} consistent with market principles."  PDM at 12 (P.R. 386).  Relying on its

practice in other mining rights CVD proceedings, Commerce based this assessment on a price

comparison of the underlying good conveyed via the mining rights—in this case, phosphate rock.

*Id.* (P.R. 386).

Specifically, Commerce constructed a so-called "government price" for phosphate rock

and compared it to a world benchmark price for phosphate rock.  Commerce stated that, in doing

so, it was making an "apples-to-apples" comparison.  IDM at 20, 30 (P.R. 473).  The constructed

government price theoretically was based on OCP's total costs to produce phosphate rock—the

"cost of production buildup" or "COP buildup"—and purported to include all of OCP's costs to

mine phosphate ore and produce phosphate rock, including (among other things) extraction taxes

for mining, and an amount for profit.  *See* PDM at 12 (P.R. 386); IDM at 27 (P.R. 473)

(including profit).

In fact, without any rational basis, Commerce omitted from its COP buildup significant

categories of OCP's mining and production costs, thereby grossly understating OCP's cost to

produce phosphate rock.  Under Commerce's usual practice, a COP calculation (which

Commerce claimed to be performing here, PDM at 12 (P.R. 386); IDM at 23 (P.R. 473)) requires

the inclusion of that portion of SG&A expenses incurred for the production of the good.  *See Am.*

*Silicon Techs. v. United States*, 334 F.3d 1033, 1037–39 (Fed. Cir. 2003) (holding Commerce

reasonably calculated "general expenses" in a COP by determining the finance costs of producer

based on the consolidated financial statements of a parent); *Cinsa, S.A. de C.V. v. United States*,

966 F. Supp. 1230, 1239 (CIT 1997) (explaining the COP "necessarily involves the cost of

Business Proprietary Information
Has Been Deleted    **NON-CONFIDENTIAL VERSION**

borrowed capital used in its manufacture in the form of interest expense");[11] *Certain Lined Paper*

*Products from India:  Notice of Final Results of the First AD Administrative Review*, 74 Fed.

Reg. 17,149 (Apr. 14, 2009), and accompanying IDM at 8 (discussing expenses similar to OCP's

HQ and support costs should be included in a COP calculation); *Notice of Final Results of AD*

*Administrative Review and Notice of Final Results of AD Changed Circumstances Review:*

*Certain Softwood Lumber Products from Canada*, 69 Fed. Reg. 75,921 (Dec. 13, 2004), and

accompanying IDM at 97 (treating corporate HQ costs as SG&A in a COP calculation).[12]

Indeed, companies regularly incur SG&A expenses in connection with the production of goods,

and the exclusion of these expenses would understate the total production costs.  In a CVD

proceeding where that cost buildup will substitute as a government price to be compared to a

benchmark price, the inclusion of these expenses is necessary to ensure Commerce's goal of

achieving an apples-to-apples comparison.  Commerce, therefore, must ensure that it includes in

its calculations all SG&A expenses incurred for the production of the good that is the subject of

the benchmark comparison in its COP buildup.

   Notwithstanding this requirement, Commerce improperly *excluded all* HQ, support, and

debt costs for OCP's COP buildup.  These categories included costs such as [

          ] salaries, accounting costs, and advertising costs that are understood to be SG&A

expenses.  *See* OCP's Verification Response at 6–7 (P.R. 436; C.R. 289).  It defies logic to

conclude that OCP, a single company that operates several mining sites that are used to produce

---

[11] *See also* SAA at 835, 1994 U.S.C.C.A.N. at 4172 ("Commerce will consider the production
cost information available to the producer and whether such information could reasonably be
used to compute a representative measure of the materials, labor and other costs, *including
financing costs*, incurred to produce the subject merchandise, or the foreign like product."
(emphasis added)).

[12] *See also Mid Continent Steel & Wire, Inc. v. United States*, 219 F. Supp. 3d 1326, 1346 n.28
(CIT 2017) (defining SG&A expenses).

phosphate rock, incurs no HQ-level SG&A expenses in that production.  Moreover, as discussed

below, it would be contrary to the law, Commerce practice, and the record evidence to exclude

these expenses from OCP's COP buildup for phosphate rock.

> 1. Commerce lacks discretion under the Statute to exclude the portion of SG&A expenses incurred for the production of phosphate rock from the COP buildup.

Inclusion of SG&A expenses in a cost buildup is not merely a matter of common sense;

the statute *requires* that Commerce include these expenses.  The Statute explicitly calls for the

inclusion of "an amount for selling, general, and administrative expenses" in calculating COP.

19 U.S.C. § 1677b(b)(3)(B).  In particular, COP "shall be an amount equal to the sum of":

(1) "the cost of materials and of fabrication or other processing," (2) "*an amount for selling,*

*general, and administrative expenses*," and (3) "the cost of all containers and coverings . . . , and

all other expenses incidental to placing the foreign like product in condition packed ready for

shipment."  *Id.* (emphasis added).[13]

In making its determination here, Commerce erroneously suggested that it was not bound

to include OCP's SG&A expenses because the agency was not required "to conduct cost analysis

as if we are conducting an AD proceeding."  IDM at 23 (P.R. 473).  This statement directly

contradicts the plain language of the Statute.  Section 1677b(b)(3) is not limited to AD

proceedings.  In fact, the text of the Statute unambiguously defines the calculation of COP "{f}or

purposes of *this part*," 19 U.S.C. § 1677b(b)(3) (emphasis added), where "this part" includes

*both* AD and CVD proceedings.  This provision falls under Title 19, Chapter 4, Subtitle IV, *Part*

---

[13] SAA at 835, 1994 U.S.C.C.A.N. at 4172 ("Commerce will consider the production cost information available to the producer and whether such information could reasonably be used to compute a representative measure of the materials, labor and other costs, *including financing costs*, incurred to produce the subject merchandise or the foreign like product." (emphasis added)).

*IV*, which is entitled "General Provisions," and Part IV includes several notable provisions

relating to CVD proceedings, including the definition of a countervailable subsidy and how to

measure a benefit using adequacy of remuneration, which is at issue in this case.  *Id.* § 1677(5),

(5A).  Congress purposefully did not use the broader "this part" formulation elsewhere in the

Statute where it intended the guidance to be read more narrowly.  *See id.* § 1677b(b)(2) (limiting

applicability to "this subsection"); *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004) ("The

preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a

statute what it means and means in a statute what it says there.'" (brackets omitted)).  Thus,

§ 1677b(b)(3) applies equally to CVD proceedings where Commerce calculates COP as to AD

proceedings, and Commerce's reasoning to the contrary must be rejected.

     Commerce acted contrary to the Statute by excluding OCP's HQ, support, and debt costs

incurred for mining and the production of phosphate rock from the COP buildup.  The Statute

unambiguously prescribes how Commerce is to calculate COP, and SG&A expenses *must be*

*included*.  19 U.S.C. § 1677b(b)(3)(B); *see Thai Plastic Bags Indus. Co. v. United States*, 949 F.

Supp. 2d 1298, 1300 n.4 (CIT 2013) (recognizing that the Statute requires inclusion of SG&A

expenses in a COP buildup).  To the extent Commerce interprets its regulation as affording

discretion to exclude these costs from a COP calculation, that interpretation is not "within the

bounds of reasonable interpretation" because it contravenes the express terms of § 1677b(b)(3),

and the Court must therefore reject it.  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (U.S. 2019); *see*

*Auer v. Robbins*, 519 U.S. 452, 463 (1997) (recognizing that an agency's regulations must be

subject "to the limits imposed by the statute").

     Commerce's practice with respect to similar COP buildups in other CVD proceedings

confirm that the portion of HQ, support, and debt costs incurred for mining and the production of

phosphate rock should be included in a COP buildup as required by the Statute.  In *Softwood*

*Lumber from Canada*, Commerce conducted a Tier 3 analysis and found that similar costs should

be part of the benchmark analysis because respondents incurred these costs in producing the

relevant good.  *Certain Softwood Lumber Products from Canada:  Final Affirmative CVD*

*Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg.

51,814 (Nov. 8, 2017), and accompanying IDM at 9–10, 71, 73; *see also Notice of Preliminary*

*Results of CVD Administrative Review:  Certain Softwood Lumber Products from Canada*, 70

Fed. Reg. 33,088, 33,110 (June 7, 2005) (unchanged in final) (similar).  Commerce reached a

similar result in *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of*

*Preliminary Results of CVD Administrative Review*.  *See* 73 Fed. Reg. 1578, 1591–92 (Jan. 9,

2008) (unchanged in final) (including costs such as depreciation, overhead, and royalties in a

respondent's COP buildup).

   In an attempt to defend its exclusion of the portion of HQ, support, and debt costs

incurred for mining and phosphate rock production, Commerce cited to *Coated Free Sheet Paper*

*from Indonesia* to argue that it makes "a distinction between the cost adjustments at Tier 3 . . .

and the cost of goods sold (COGS)."  IDM at 24 & n.163 (P.R. 473).[14]  Commerce's reliance on

*Coated Free Sheet Paper from Indonesia* is misplaced: the production costs included in the COP

buildup there were *inclusive* of SG&A expenses.  Specifically, Commerce found that it did not

need to adjust the COP buildup because the reported production costs were "inclusive of

---

[14] The cited portion of the memorandum does not address COGS, and therefore fails to support
Commerce's claimed explanation for its decision.  IDM at 24 n.163 (P.R. 473) (citing *Coated*
*Free Sheet Paper from Indonesia:  Final Affirmative CVD Determination*, 72 Fed. Reg. 60,642
(Oct. 25, 2007), and accompanying IDM ("*CFS Paper from Indonesia* IDM") at Comment 14
(discussing whether to adjust the benchmark price for movement expenses)); *see Chenery*, 332
U.S. at 196.

Business Proprietary Information
Has Been Deleted     **NON-CONFIDENTIAL VERSION**

overhead costs (*i.e.*, administrative costs)."  *CFS Paper from Indonesia* IDM at 80.  In OCP's

COP buildup, the record evidence shows that the production costs *included only a* [

          ] *of the overhead/administrative costs* incurred for the mining and production of

phosphate rock.  Specifically, the production costs included only mining site-specific overhead

expenses, which were minor in comparison to the HQ, support, and debt costs incurred for

mining and the production of phosphate rock.  OCP's Verification Response at 6–7 (P.R. 436;

C.R. 289); OCP's Suppl. Questionnaire Resp. Part 3 ("OCP's SQR Pt. 3") at Apps. MIN2-3,

MIN2-6 (P.R. 354; C.R. 232) (showing distinct calculations for mining site-specific overhead at

OCP's two mines in Gantour and Khouribga compared to HQ and support costs).  Thus,

Commerce was incorrect to rely on *Coated Free Sheet Paper from Indonesia* to argue that this

case supported the exclusion of all HQ, support, and debt costs from OCP's COP buildup.

In sum, when conducting a Tier 3 analysis based on a COP buildup, both the Statute and

Commerce's practice require the agency to include in the cost buildup all SG&A expenses

incurred for the production of the good that is the subject of the benchmark comparison.

Commerce failed to do so in evaluating mining rights.

    2.    <u>Commerce ignored significant record evidence when disallowing HQ,
    support, and debt costs from the COP buildup for mining rights.</u>

In response to Commerce's initial, supplemental, and verification questionnaires, OCP

provided substantial evidence—approximately 550 pages—relating to the costs it incurred for

mining and producing phosphate rock.  This information included narrative explanations,

detailed worksheets that identified each cost (including HQ, support, and debt costs), a

reconciliation of these costs to OCP's financial statements, and screenshots of OCP's accounting

software to show where these costs were booked.  *See, e.g.*, OCP's SQR Pt. 3 at 1–13, Apps.

MIN2-1–MIN2-3, MIN2-6–MIN2-7 (P.R. 354; C.R. 232); OCP's Verification Response at 1–41,

Business Proprietary Information
Has Been Deleted      NON-CONFIDENTIAL VERSION

Apps. VE-MIN-1, VE-MIN-4 (P.R. 436; C.R. 289).  While Commerce acknowledges that "OCP itemized the expenses that constitute its HQ/support costs and cost of debt," and while Commerce *sought no additional information from OCP on this issue*, the agency nevertheless justified its failure to include such costs by stating that it lacked sufficient information on how these costs pertained to OCP's mining operations to produce phosphate rock.  IDM at 24 (P.R. 473).  As discussed below, Commerce's justification is false; OCP provided robust evidence demonstrating a portion of HQ, support, and debt costs were incurred for phosphate rock production.  Thus, Commerce's determination to exclude all HQ, support, and debt costs was unsupported by substantial evidence on the record and otherwise not in accordance with law.

The record is well-developed with respect to OCP's HQ, support, and debt costs, and demonstrates that these costs were incurred for mining and the production of phosphate rock. OCP's HQ and support costs include:  (1) purchases of services (*e.g.*, IT services, catering, accounting, and facility management), (2) external costs (*e.g.*, telecommunications, consulting and advertising, bank fees, and insurance), (3) personnel costs (*e.g.*, salaries and overtime), and (4) amortization of equipment used by the entire company (*e.g.*, IT equipment).  OCP's Verification Response at 6–7 (P.R. 436; C.R. 289).  Because such HQ and support costs "exist to support the production operations" of OCP, "some of those costs are properly associated with the mining activities that are detailed in the value chain processes, but are recorded in HQ/Support in the accounting system."  *Id.* at 6 (P.R. 436; C.R. 289).  Moreover, OCP showed how the costs booked under HQ and support were incurred for mining activities to produce phosphate rock. *See* OCP's Case Br. at 25–28 & nn. 74–82 (P.R. 450; C.R. 301).[15]  Indeed, as previously noted,

---

[15] For example, OCP demonstrated that salaries for certain personnel, including [          ] who perform roles directly related to mining operations, are booked to HQ and support costs even though the work is performed at the mines.  OCP's Case Br. at 25–26 &

Business Proprietary Information
Has Been Deleted   **NON-CONFIDENTIAL VERSION**

OCP is single company that engages in significant mining activities to produce phosphate rock

and thus, common sense dictates that it would incur SG&A at the HQ level in furtherance of

these production activities.

Accordingly, in order to calculate a COP buildup for mining and phosphate rock

production, as requested by Commerce, OCP allocated a portion of the total HQ and support

costs across its mining operations in Gantour and Khouribga to produce phosphate rock and

another portion to its chemicals operations.  OCP SQR Pt. 3 at 7–8, Apps. MIN-3, MIN2-7 (P.R.

354; C.R. 232).  From total HQ and support costs of MAD [            ], OCP allocated MAD

[           ] to its mining operations associated with Gantour and Khouribga.[16]  *See* OCP's

Verification Response at 39–42 (P.R. 436; C.R. 289); OCP SQR Pt. 3 at 8, Apps. MIN2-3,

MIN2-7 (P.R. 354; C.R. 232).  OCP provided detailed information about how it allocated these

costs and Commerce at no time questioned the allocation method used.

With respect to debt costs, OCP's debt costs cover "primarily interest expense" and

reflect costs associated with updating of equipment and the expansion of operations for mining

activities.  OCP's Verification Questionnaire at 7 (P.R. 436; C.R. 289).  In its submissions, OCP

---

nn. 74–75 (P.R. 450; C.R. 301); *see* OCP's Verification Response at 29, App. VE-MIN-4 (P.R.
436; C.R. 289).  Similarly, a number of OCP departments whose costs are booked under HQ and
support perform activities related to mining rights.  OCP's Case Br. at 26–27 & nn. 76–82 (P.R.
450; C.R. 301); *see* OCP's Verification Response at 6–7 (P.R. 436; C.R. 289) (listing the OCP
departments to which the HQ and support costs pertain, including [
]); *see, e.g.*,  OCP's NSA QR (Nov. 27, 2020) at 8, Apps. RAIL-5–RAIL-6 (P.R. 402; C.R.
274) (showing [
]);
OCP's IQR at App. BONDPURCH-6 at Part VII.V (P.R. 137; C.R. 48) (providing under
"Research and Development Policy" that [
]).

[16] The total HQ and support costs of MAD [           ] represents the sum of various line
items taken from OCP's trial balance.  OCP's Verification Response at 40–41 (P.R. 436; C.R.
289).

**Consol. Ct. No. 21-00116**                                    **NON-CONFIDENTIAL VERSION**

showed Commerce that the debt costs booked in its trial balance to capital investment projects

were incurred for mining and transport activities, such as the creation of a slurry pipeline, rock

storage facilities, and washing stations, all of which are necessary for the production of

phosphate rock.  *See* OCP's Case Br. at 28 & n.83 (P.R. 450; C.R. 301).[17]  OCP, therefore,

allocated a portion of the total cost of debt to its mining operations.  From a total debt cost of

MAD [                      ], OCP allocated MAD [                    ] to its mining activities for the

production of phosphate rock at Gantour and Khoribga.[18]  *See* OCP's Verification Response at

43–44 (P.R. 436; C.R. 289); OCP SQR Pt. 3 at 8, Apps. MIN-3, MIN2-7 (P.R. 354; C.R. 232).

     In addition, the record evidence demonstrates that OCP's allocation of HQ, support, and

debt costs was reasonable.  For HQ and support costs, OCP allocated total costs booked in these

cost centers to each OCP site (Safi, Jorf, Gantour, and Khouribga) based on each site's relative

proportion of total operating costs (excluding raw materials, freight, and amortization).  OCP

SQR Pt. 3 at 8, App. MIN2-7 (P.R. 354; C.R. 232).  For debt costs, OCP allocated costs to each

site based on the unit's share of total 2009–2019 capital expenditures.  *Id.* (P.R. 354; C.R. 232).

As part of its Verification Response, OCP demonstrated that all allocated costs, including HQ,

---

[17] *See, e.g.*, OCP SQR Response Part 1, at 16, 17 (Nov. 3, 2020) ("OCP SQR Pt. 1") (P.R. 254; C.R. 149) (describing loan used by OCP for [
                                                                                     ]);
*id.* at App. LOAN2-1 (P.R. 254; C.R. 154) (identifying loans for OCP's [                           ]
and [                        ]); OCP's IQR at App. BONDPURCH-1 at 2 (P.R. 134; C.R. 45)
(describing purpose of an international bond offering by OCP as raising funds for OCP to, *inter
alia*, "complet{e} two slurry pipelines" to transport rock, "increas{e} the mining capacity of
Khouribga and Ben Guerir"; and to "expand{} storage facilities and water-related infrastructure"
at Jorf), App. BONDPURCH-6 at Part IX.II (P.R. 137; C.R. 48) (describing under "Industrial
Investment Program" investments in washing stations and mining capacity increases), Apps.
GUAR-13–GUAR-14 (P.R. 138; C.R. 50) (identifying loans for [
                              ] projects).

[18] The total cost of debt reported of MAD [                    ] is the sum of the following accounts in
OCP's trial balance:  [                                              ], [
                                            ], and [                                              ].
OCP's Verification Response at 22–23.

NON-CONFIDENTIAL VERSION

support, and debt costs, trace directly back to OCP's general ledger and financials. *See, e.g.*,

OCP's Verification Response at 40–41 (P.R. 436; C.R. 289).  Commerce at no time questioned

the allocation methodologies used.  Thus, the record evidence demonstrates that OCP allocated

its HQ, support, and debt costs in a reasonable manner and Commerce had no basis to reject

OCP's allocation methodology.

 Commerce's findings to the contrary are not supported by the record.  *First*, Commerce

brushed past the voluminous record evidence demonstrating that a portion of OCP's HQ,

support, and debt costs were incurred for mining and phosphate rock production, and announced

that it would not include *any* HQ and support costs because "the record does not contain

sufficient evidence that would allow us to segregate and remove those costs which are

considered unrelated to mining operations."  IDM at 24 (P.R. 473).  This is not only patently

false, it is a complete abdication of Commerce's responsibility to include all the costs associated

with the production of the good that is the subject of the benchmark comparison in the COP

buildup.

 It was *Commerce* that decided to use this Tier 3 COP buildup methodology to measure

the adequacy of remuneration, and it was *Commerce's* responsibility to request whatever data it

needed to ensure that its analysis was as accurate as possible.  As described above, OCP

responded fully to Commerce's questions and provided a well-documented and reasonable

allocation methodology for determining which HQ, support, and debt costs were incurred for

mining and phosphate rock production.  Commerce even verified that information and attested to

the veracity of OCP's books and records, and never indicated a need for additional information.

IDM at 24– 25 (P.R. 473) (accepting the "reliability" of OCP's cost reporting).  Under these

circumstances, the law does not permit Commerce now to reject reliance on OCP's information.

Business Proprietary Information
                                       Has Been Deleted     **NON-CONFIDENTIAL VERSION**

*See Gerber Food (Yunnan) Co. v. United States*, 491 F. Supp. 2d 1326, 1337 (CIT 2007)

(providing that Commerce "may not disregard information necessary to a determination . . . if a

party demonstrates that it acted to the best of its ability in providing that information and that the

information was timely submitted, verifiable, sufficiently complete to serve as a reliable basis for

reaching the applicable determination, and usable without undue difficulties").

OCP respectfully submits that the record on the HQ, support, and debt costs that were

incurred for the production of phosphate rock is complete; however, if Commerce determined it

needed additional information, it had a duty to ask.  Commerce cannot simply declare at the final

second that the allocation methodology provided by OCP cannot be used and therefore exclude a

large category of costs from the COP build up, with the effect of driving up the CVD margin.

This approach is a dereliction of Commerce's duty to calculate CVD margins as accurately as

possible.

*Second*, with respect to OCP's debt costs, Commerce incorrectly found that OCP's

Verification Response indicated that OCP's debt costs relate to general corporate purposes rather

than mining operations.  *See* IDM at 24 (P.R. 473).  This conclusion, based on a single, cherry-

picked sentence, taken out of context, in OCP's Verification Response, demonstrates that

Commerce misapprehended the record evidence relating to OCP's debt costs.  While OCP stated

that a line item called "{i}nterest on loans ([                    ])," which is a component of

OCP's debt costs, "represents interest paid on various debts . . . that are broadly applicable or

fund general corporate purposes," OCP also explained in the same response that its "cost of debt

(primarily interest expense) is a part of the costs of an ongoing operation, especially one that is

capital intensive" and that these costs are incurred for, *inter alia,* "purchases of capital equipment

for mining activities."  OCP's Verification Response at 7–8, 19 (P.R. 436; C.R. 289).  As

provided in n.17, OCP then identified for Commerce the evidence that showed how a portion of

OCP's debt costs, including the interest paid on loans, related to different investment projects

incurred for phosphate mining and the production of phosphate rock.  *See also* OCP's Case Br. at

28 (P.R. 450; C.R. 301).  Commerce cannot simply ignore this record evidence demonstrating

that a portion of debt costs were incurred for mining and the production of phosphate rock.

OCP's debt costs at issue here equaled MAD [                    ], of which OCP allocated

only MAD [              ] to mining activities and the production of phosphate rock based on

each mining site's share of total 2009–2019 capital expenditures.  *See* OCP SQR Pt. 3 at App.

MIN2-7 (P.R. 354; C.R. 232); OCP's Verification Response at 7–8, 23–24 (P.R. 436; C.R. 289).

The record evidence is clear that this allocation of a *portion* of OCP's debt costs was reasonable

and thus should have been included in the COP buildup for phosphate rock production.

In conclusion, the law, the record here, basic economic principles, and common sense

dictate that when a company producing a good incurs SG&A expenses, a portion of those

expenses will be attributable to its cost of production.  OCP incurred HQ, support, and debt costs

in the production of phosphate rock and reasonably identified those costs for Commerce.  This

Court should remand the mining rights determination back to Commerce so it can include these

costs in its COP buildup for phosphate rock.

### B.     Commerce's Calculation of an Amount for Profit Is Unsupported by Substantial Evidence on the Record and Otherwise Not in Accordance with Law.

While Commerce's *Final Determination* correctly incorporated a profit rate into the COP

buildup calculation, Commerce used the wrong rate, which grossly understated the appropriate

profit level.  Specifically, in calculating a COP buildup for the production of phosphate rock,

Commerce used OCP's general corporate profit rate rather than a profit rate that was specific to

the production of phosphate rock.  This error had the effect of driving *down* the COP buildup and

driving *up* the resulting CVD margin.  The Court should remand Commerce's COP buildup

calculation so that the agency can calculate an amount for profit based on a profit rate that is

specific to the production of phosphate rock.  In the alternative, if the Court disagrees and finds it

permissible for Commerce to calculate an amount for profit based on OCP's general corporate

rate, the Court should remand that calculation to Commerce to correct obvious errors.

> 1.   Commerce erred by failing to use a profit rate specific to mining and
>      phosphate rock production in OCP's COP buildup.

When constructing a Tier 3 COP buildup, Commerce's practice is to make an apples-to-

apples comparison between the COP buildup and benchmark prices, and Commerce stated that it

intended to follow this practice in the present case.  IDM at 30 (P.R. 473) ("Commerce's practice

is to make an 'apples-to-apples' comparison between the benchmark and the good being

compared to determine whether a benefit exists."); *Certain Uncoated Groundwood Paper from*

*Canada:  Final Affirmative CVD Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018), and

accompanying IDM at 142 (similar) ("Uncoated Groundwood Paper IDM"); *Certain Hot-Rolled*

*Carbon Steel Flat Products from India:  Final Results of CVD Administrative Review*, 73 Fed.

Reg. 40,295 (July 14, 2008), and accompanying IDM ("*HRS from India* IDM") at 73 (similar).

Because the benchmark price includes an amount for profit, Commerce agreed that it was

required to include profit in its COP buildup for phosphate rock.  IDM at 27 (P.R. 473) (noting

that an amount for profit must be included in the COP buildup because the benchmark prices are

inclusive of profit).

Commerce routinely incorporates an amount for profit into the COP buildup by

multiplying the calculated COP by a profit rate and adding that amount to the COP buildup to

determine a total cost inclusive of profit.  IDM at 27 (P.R. 473).  In determining what profit rate

to use in a COP buildup, Commerce's practice is to select a profit rate that is specific to the

production of the good that is the subject of the COP buildup (*i.e.*, in this case phosphate rock).

*HRS from India* IDM at 18–20 (Section I.A.8–9), Comment 29 & n.18; *Notice of Final Results of CVD Administrative Review:  Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,448 (Dec. 12, 2005), and accompanying IDM ("*Softwood Lumber from Canada 2003–2004* IDM") at Comment 52; *see CVD Investigation of Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative CVD Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (July 29, 2016) ("*CRS from Russia* IDM"), and accompanying Issues and Decision Memorandum at 31, 102 (constructing a Tier 3 COP buildup for coal and incorporating a profit rate from an Indian coal company); *Certain Uncoated Paper from Indonesia:  Preliminary Results of CVD Administrative Review; 2015–2016*, 83 Fed. Reg. 15,370 (Apr. 10, 2018), and accompanying IDM at 12 (adjusting the benchmark price for profits associated with harvesting timber).  Moreover, when the investigated producer is integrated such that it not only produces the good on which the COP buildup is based, but also other (*e.g.*, downstream) products, as is OCP, Commerce has rejected reliance on the integrated producer's overall profit rate.  *See HRS from India* IDM at 18–20 (Section I.A.8–9), Comment 29 & n.18*.*  Instead, in these circumstances Commerce uses a surrogate profit rate based on the production of only the good that is the subject of the COP buildup.  *Id.*  In this way, Commerce ensures that its COP buildup is for the good that will be compared to the benchmark price in its Tier 3 analysis.  In calculating a profit rate for OCP's COP buildup, Commerce flouted this practice and instead relied on the calculation of a profit rate that was general and in no way specific to phosphate rock production.

Business Proprietary Information
Has Been Deleted   **NON-CONFIDENTIAL VERSION**

It is uncontested that OCP's integrated production activities included more than mining and the production of phosphate rock.[19]  Thus, the revenue and expenses presented in OCP's financial statements on which Commerce's profit calculation was based were not limited to the production of phosphate rock.  Moreover, the underlying data necessary to calculate a profit rate in OCP's standard accounting records were *not* further broken down by business unit.  OCP's Case Br. at 40–41 (P.R. 450; C.R. 301); *see* OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 39).  As a result, OCP explained to Commerce that a profit rate specific to phosphate rock could not be calculated using OCP's financial statements.  OCP's Case Br. at 40–41 (P.R. 450; C.R. 301).  Instead, OCP explained that, consistent with its practice, Commerce should use as a surrogate profit rate specific to phosphate rock.  *Id.* at 39–40 (P.R. 450; C.R. 301).

Acting contrary to its practice, Commerce refused to use a surrogate profit rate specific to phosphate rock and instead calculated a general profit rate based on OCP's general corporate data for use in the COP buildup.  *See* IDM at 27 (P.R. 473).  The record evidence demonstrated that the "income before taxes" and "operating expenses" line items in OCP's Profit and Loss ("P&L") Statement from which Commerce derived this profit rate included costs *unrelated* to phosphate rock production (*e.g.*, by including costs related to OCP's chemicals operations).[20]

---

[19] OCP also produced [                                                                                      ].  OCP's IQR at 5, App. GEN-2 (P.R. 130; C.R. 39–40).

[20] On the P&L Statement, "income before taxes" equals the sum of "operating income," "financial income," and "non-current income," which correspond to the line items "EBIT," "Financial Profit/Loss," and "Non Current Profit/Loss" in OCP's reconciliation worksheet.  *Compare* OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 41) (P&L Statement), *with* OCP's Suppl. Questionnaire Resp. Part 3 ("OCP's SQR Pt. 3") at App. MIN2-6 (P.R. 354; C.R. 232).  The reconciliation worksheet breaks out these line items across OCP's various business activities (*e.g.,* chemicals and mining), thereby demonstrating that these line items include costs unrelated to mining.  OCP's SQR Pt. 3 at App. MIN2-6 (P.R. 354; C.R. 232).  Similarly, the "operating expenses" line item on the P&L Statement is the sum of the following items on OCP's reconciliation worksheet, which shows that these costs include costs associated with chemicals and mining:  [

Business Proprietary Information
Has Been Deleted   **NON-CONFIDENTIAL VERSION**

Thus, the resulting profit rate was grossly over-inclusive and calculated contrary to both Commerce's practice and its stated goal in this investigation to "ascertain profits *associated with producing phosphate rock*." *Id.* at 27 (P.R. 473).

In contrast to the general OCP corporate profit rate used by Commerce, the JPMC profit rate on the record was properly limited to the production of phosphate rock.  While JPMC is an integrated producer of phosphate rock, fertilizer, phosphoric acid, and aluminum fluoride, its financial statements segment revenues and profits by business units, including breaking out the "{p}hosphate unit," which extracts, mines, and sells phosphate rock to international and local markets.  OCP's New Factual Info. (Nov. 4, 2020) ("NFI") at Ex. 22 at 119–20 (P.R. 339; C. R. 213).  Thus, unlike OCP's financial statements, JPMC's financial statements allowed Commerce to calculate a profit rate specific to phosphate rock production, *i.e.*, a profit rate specific to JPMC's phosphate unit.

By failing to use the JPMC phosphate unit profit rate in its calculations, Commerce failed to construct a COP buildup limited to phosphate rock, thereby introducing distortions into its benefit calculation and ultimately failing to fulfill its obligation to calculate the CVD margin as accurately as possible.  *Içdaş*, 498 F. Supp. 3d at 1352.  Moreover, Commerce acted inconsistently with its practice, which is to rely regularly on surrogate profit rates in COP buildups.  *See, e.g.*, *Certain Uncoated Paper from Indonesia:  Final Results of CVD Administrative Review; 2015–2016*, 83 Fed. Reg. 52,383 (Oct. 17, 2018), and accompanying IDM at Comment 7; *CRS from Russia* IDM at 31; *See HRS from India* IDM at 18–20 (Section I.A.8–9), Comment 29 & n.18.

---

].  *Compare* OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 41) (P&L Statement), *with* OCP's SQR Pt. 3 at App. MIN2-6 (P.R. 354; C.R. 232).

Commerce incorrectly argued in the *Final Determination* that its decision to calculate a profit rate based on OCP's general corporate data was supported by its decision in *Cold-Rolled Steel from Russia* where it purportedly used only surrogate data to calculate profit because the necessary data from the investigated producer were not available.  IDM at 27 (P.R. 473).  No language in that determination supports Commerce's interpretation of *Cold-Rolled Steel from Russia*; Commerce never stated that it was using the surrogate profit rate because the investigated producer's data were not available.  Instead, as discussed above, when constructing a COP buildup, Commerce's practice is to use profit data that are more specific to the good that is the subject of the COP buildup and to which the benchmark price will be compared.  *See HRS from India* IDM at 18–20 (Section I.A.8–9), Comment 29 & n.18; *Softwood Lumber from Canada 2003–2004* IDM at Comment 52.

Accordingly, the Court should remand the COP buildup for Commerce to use the JPMC phosphate unit profit rate to calculate the profit amount to include in the COP buildup for phosphate rock.  Commerce's selected, non-specific profit rate is inaccurate because it includes business activities unrelated to the production of phosphate rock, and thereby severely understates the profit for phosphate rock production leading in turn to an overstated benefit when the artificially low COP buildup (including profit) is compared to the benchmark price.

        2.     <u>Even if the Court agrees with Commerce's decision to reject the surrogate profit information, Commerce's calculation of the profit rate is erroneous and should be remanded.</u>

If the Court agrees with OCP that Commerce should have used the JPMC phosphate unit profit rate, it need not reach the profit rate calculation issues stemming from Commerce's use of OCP's general corporate profit rate discussed below.  However, if the Court determines that it was permissible for Commerce to calculate the profit rate based on OCP's general corporate

NON-CONFIDENTIAL VERSION

data, there were still errors in both the denominator and numerator of Commerce's profit ratio

calculation that must be corrected on remand.

a)      <u>Error in the Profit Ratio Denominator.</u>

Commerce improperly *included* HQ and support costs in the denominator of the profit

ratio in contradiction of its position that these very same expenses should be *excluded* in the cost

buildup to which the profit rate would be applied.  More specifically, in the *Final Determination*

Commerce purported to take OCP's "'income before taxes' (profit before tax) and divid{ed} it

by its 'operating expense' (COGS)."  IDM at 27 (P.R. 473).  Commerce then multiplied the

"profit rate by OCP's total phosphate rock production costs" exclusive of HQ, support, and debt

costs, and added the resulting amount to OCP's COP buildup exclusive of HQ, support, and debt

costs "to create a total cost inclusive of profit."  *Id.* (P.R. 473); *see* Final Calculation

Memorandum (Feb. 8, 2021) at 2 (P.R. 475; C.R. 307).  The inconsistency in this treatment of

HQ, support and debt costs was manifest error.

OCP filed ministerial error comments pointing out that, despite its stated intent to use

OCP's COGS in the denominator, Commerce did not do so.  OCP's Ministerial Error Comments

at 2, 3–7 (P.R. 479; C.R. 309).  COGS does not include SG&A expenses like HQ and support

costs under Commerce's practice and basic principles of accounting.[21]  Instead, Commerce used

---

[21] Indeed, Commerce has recognized that cost of manufacturing ("COM") is closely tied to COGS, with neither including SG&A expenses.  *See, e.g.*, *Stainless Steel Sheet and Strip in Coils from Taiwan:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 69 Fed. Reg. 5960 (Feb. 9, 2004), and accompanying Issues and Decision Memorandum at Comment 23 (decreasing COGS by value of packing expenses because G&A packing costs are excluded from the cost of manufacturing); *Notice of Final Results of the Sixth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy and Determination Not to Revoke in Part*, 69 Fed. Reg. 6255 (Feb. 10, 2004), and accompanying IDM at Comment 23 (recognizing that COGS "is calculated in the same manner as the COM," which includes "direct materials costs").

57

Business Proprietary Information
Has Been Deleted        **NON-CONFIDENTIAL VERSION**

OCP's *operating expenses* that record evidence demonstrated *included* HQ and support costs in the denominator in the profit ratio calculation (which Commerce had previously refused to include in the COP buildup used in the calculation of profit). *Compare* OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 39) (P&L Statement), *with* OCP's SQR Pt. 3 at App. MIN2-6 (P.R. 354; C.R. 232). Thus, Commerce failed to follow its stated intent and use OCP's COGS in the denominator of the profit calculation. OCP's Ministerial Error Comments at 2, 3–7 (P.R. 479; C.R. 309).[22] In response to OCP's raising this ministerial error, Commerce admitted that it "ma{de} a mistake . . . by inadvertently equating 'operating expenses' . . . to 'COGS.'" Ministerial Error Memorandum at 4 (P.R. 485; C.R. 310). Commerce nevertheless did not find that it made a ministerial error, claiming instead that it "correctly used OCP's 'operating expenses'" and ignoring that it had justified its entire approach by referring to its use of COGS in another case. *Id.* (P.R. 485; C.R. 310).

Commerce's error resulted in an unreasonable and understated profit calculation with OCP's "operating expenses" as the denominator (*i.e.*, a value *inclusive* of SG&A expenses like HQ and support) applied to OCP's COP buildup (*i.e.,* a value that *specifically excluded* HQ, support, and debt).[23] Although Commerce has discretion to employ different methodologies under the Statute, the method chosen must be internally consistent; Commerce may not simply pick and choose from different methodologies *within the same calculation.* Commerce's selected methodology must be reasonable, and the agency must provide a cogent explanation for

---

[22] Commerce used the operating expense total of MAD [                    ] from OCP's 2019 P&L Statement, despite OCP having further broken out the expenses comprising operating expenses. *Compare* OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 41) (P&L Statement), *with* OCP's SQR Pt. 3 at App. MIN2-6 (P.R. 354; C.R. 232); *see also* Final Calculation Mem. at Attach. I "OCP Mining Costs" & "Profit Calculations" (P.R. 476; C.R. 308).

[23] Commerce could have avoided this manifest analytical inconsistency by simply including HQ, support, and debt expenses in its mining rights COP buildup for OCP. *See* Section II.A *supra*.

why it has exercised its discretion in a given manner.  *See Stupp Corp. v. United States*, 5 F.4th

1341, 1354 (Fed. Cir. 2021); *NEXTEEL Co. v. United States*, 392 F. Supp. 3d 1276, 1293 (CIT

2019).

It is internally inconsistent and unreasonable for Commerce to use a larger denominator

in the profit rate calculation that *includes* SG&A expenses like HQ and support costs, and then

apply that ratio to costs which *exclude* those same HQ and support costs.  Either these SG&A

expenses are relevant to the COP buildup (as the statue requires, in which case they are also

relevant to the profit ratio calculation), or they are not (in which case they are also irrelevant to

the profit ratio calculation for that same COP buildup).  Here, Commerce arbitrarily chose the

worst of both worlds for OCP, excluding the costs for some purposes and including them for

others, always with the effect of an increased CVD margin.

The application of a ratio with a larger denominator to a smaller pool of costs results in a

severely understated total amount of profit.  By undervaluing the profit component of OCP's

COP buildup, the COP buildup to which the benchmark price is compared is lower, resulting in a

larger benefit (and therefore, a larger CVD margin).  Thus, if the Court disagrees with OCP and

determines it is permissible for Commerce to exclude HQ, support, and debt costs from OCP's

COP buildup (discussed in Section II.A *supra*), the Court should still remand Commerce's

calculated denominator in the profit rate calculation to correct the internal inconsistency in the

calculation that resulted in a significantly undervalued amount for profit.[24]

---

[24] At the very least, the Court should remand to Commerce to explain why in the *Final Determination* it stated an intention to use COGS in the denominator and even cited to a case, *Cold-Rolled Steel from Russia*, in which it used COGS in the denominator, but then decided in the ministerial error memorandum that it intended to use a different value, operating expenses, which unlike COGS is inclusive of SG&A costs like HQ and support.  *See* IDM at 27 (P.R. 473) (citing *Cold-Rolled Steel from Russia* IDM at 23–31)  (where Commerce used COGS in the denominator of the profit ratio calculation); *see also* Ministerial Error Mem. at 4 (P.R. 485; C.R.

**Consol. Ct. No. 21-00116**                                    **NON-CONFIDENTIAL VERSION**

                    b)      Error in the Profit Ratio Numerator.

Commerce's profit rate calculation also failed to achieve an apples-to-apples comparison

internally because the numerator is not on the same basis as the denominator, which was limited

to *operating* expenses.  This error also requires a remand if the Court determines it is permissible

for Commerce to continue to calculate a profit rate based on OCP's general corporate data.

Commerce's profit rate calculation divided OCP's income over expenses.  IDM at 27

(P.R. 473).  In its Ministerial Error Memorandum, Commerce clarified that the denominator of

its profit rate calculation was limited to "operating expenses" listed as a line item on OCP's 2019

unconsolidated Profit and Loss Statement.  Ministerial Error Memorandum at 4 (P.R. 485; C.R.

310).  The same Profit and Loss statement included a line item "operating income."  OCP's IQR

at App. GEN-4(a)(iii) (P.R. 130; C.R. 39) (P&L Statement) (capitalization modified).  However,

Commerce did not use this line item in the profit rate calculation.  Instead, Commerce used the

"income before taxes" line of OCP's Profit and Loss Statement, which included not only

"operating income" but also "financial income" and "non-current income."  *Id.* (P.R. 130; C.R.

39) (capitalization modified); *see* IDM at 27 (P.R. 473).[25]  Thus, Commerce's profit rate

calculation involved a numerator that was on a different basis from the denominator.

The CIT has remanded similarly errant calculations.  *See, e.g.*, *An Giang Fisheries Imp.*

*& Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1372 (CIT 2018) (remanding for

further explanation where a ratio "overstated" the numerator "when compared to Commerce's

_____

310) (changing course and now stating that Commerce intended to use operating expenses in the
denominator).

[25] "Income before tax" equals MAD [                    ], and is the sum of "operating income"
(MAD [                  ]), "financial income" (MAD [                    ]), and "non-current
income" (MAD [                  ]).  OCP's IQR at App. GEN-4(a)(iii) (P.R. 130; C.R. 39)
(P&L Statement) (capitalization modified).

adjusted denominator" that was on a different basis); *Fuyao Glass Indus. Grp. Co. v. United States*, 27 C.I.T. 1892, 1917–18 (2003) (remanding due to Commerce's incongruous treatment of the purchase of traded goods in the numerator and denominator of a ratio).  Accordingly, the Court should remand because Commerce's calculated profit rate is contrary to law and unsupported by the record.

### C.   Commerce's Inclusion of OCP's Own Prices in the Benchmark Price for Phosphate Rock Resulted in a Circular Comparison that Did Not Properly Measure the Adequacy of Remuneration for Mining Rights.

Commerce further erred by constructing a benchmark price for phosphate rock that relied on a circular price comparison in which Commerce compared OCP's COP buildup to a world benchmark price that was based, in part, on OCP's own prices of phosphate rock.  This resulted in a comparison that did not accurately measure the adequacy of remuneration for mining rights. The Court should remand Commerce's mining rights determination to remove OCP's prices from the world benchmark price calculation.

Commerce's benefit calculation for mining rights compared a world benchmark price for phosphate rock to a constructed government price for phosphate rock based on OCP's COP build up for mining and phosphate rock production.  The world benchmark price included a number of prices for phosphate rock from a number of countries including prices from North Africa.  The record demonstrated that the North Africa prices included OCP prices.  *See* Petition, Vol. II, at Ex. II-26, p. 10 (P.R. 7; C.R. 7–8) (stating that the North Africa price is "{d}efined by sales to Europe, India and Brazil *from OCP*/GCT" (emphasis added)).  Moreover, the record demonstrated that OCP is the "largest global producer of phosphate rock," such that it represents a significant share of any North African export prices.  OCP's NFI at Ex. 30, p. 2 (P.R. 345; C.R. 222); *see id.* Ex. 18, p. 65 (P.R. 337; C.R. 226) (Table for "PhosRock 69-72 BPL (32–33% P2O5" "Exports") (showing that in 2019 Morocco accounted for 2,672 kT of exports of

phosphate rock with bone phosphate of lime ("BPL") levels matching the BPL of the rock used

to calculate the North African benchmark price employed by Commerce, whereas Tunisia

accounted for 0 kT of the same).  Thus, the record demonstrated that one group of prices that

Commerce included in the benchmark price calculation was substantially influenced by OCP's

own prices for phosphate rock.

OCP produces and sells phosphate rock based on the mining rights that are the subject of

the LTAR analysis for mining rights.  Thus, one group of prices that Commerce included in its

benchmark price calculation was substantially influenced by the very activity that Commerce is

evaluating against this benchmark.  As such the comparison is circular and does not accurately

measure the adequacy of remuneration for mining rights.

Commerce has repeatedly recognized in LTAR analyses that it must ensure that the

potential subsidy it is evaluating is not influencing the benchmark price because such a

comparison would be circular and thus "meaningless."  For example, *U.S. Steel Corp. v. United

States*, involved Commerce's calculation of a benchmark price to evaluate the adequacy of

remuneration for purchases from a government provider, the National Mineral Development

Corporation ("NMDC").  *See* 33 C.I.T. 1935, 1936 (2009), *aff'd* 425 F. App'x 900 (Fed. Cir.

2011).  The record contained import prices from Hamersley, Australia and government prices

from the NMDC, and Commerce refused to include the NMDC prices in the benchmark price.

*Id.* at 1945.  The CIT agreed with Commerce's decision because "the comparison of NMDC to

NMDC prices would be a *meaningless* measure of the adequacy of remuneration."  *Id.*

(emphasis added).

Similarly, in *Softwood Lumber from Canada*, Commerce selected a benchmark to

calculate whether two companies had received more than adequate remuneration for electricity

they provided to a governmental entity.  *See Softwood Lumber from Canada* IDM at Comment

51.  Commerce rejected reliance on winning bids accepted by the same governmental entity for

the provision of electricity as a benchmark, finding that benchmark "would be inconsistent with

the statute and {Commerce's} regulations because the benchmark used to measure the benefit

from an investigated program cannot be from the program investigated" and criticized "the

comparison" as "*circular* insofar as it would result in *a comparison of an alleged subsidy with

itself.*"  *Id.* (emphases added).

The underlying principle to be gleaned from these cases is that the benchmark against

which Commerce measures the adequacy of remuneration must not be influenced by the very

activity it is investigating.  Here, that is exactly what Commerce allowed because one group of

prices that Commerce included in its benchmark price calculation (*i.e.*, the North Africa prices

that were dominated by OCP prices) was substantially influenced by the very activity that

Commerce was evaluating against this benchmark (*i.e.*, the GOM provision of mining rights).

When OCP pointed out the circularity that was inherent in Commerce's LTAR analysis,

Commerce defended the inclusion of the North Africa prices by explaining that this group of

prices included not just OCP's prices but *also* prices from a Tunisian company called GCT.

IDM at 19 (P.R. 473).  At most, however, the inclusion of the GCT prices suggests that the

inherent circularity might be less acute, not that the comparison avoided circularity.  In any

event, the record shows that OCP is the "largest global producer of phosphate rock," such that it

represents a significant share of any North African prices.  OCP's NFI at Ex. 30, p. 2 (P.R. 345;

C.R. 222).  As a result, the inclusion of GCT's prices in the North Africa price would reduce the

circularity in the comparison very little, if at all.

Commerce also defended its decision by claiming that the inclusion of OCP's price was appropriate because it was a market-based price.  IDM at 19 (P.R. 473).  Commerce's response simply misses the point.  OCP was not arguing that its prices should be excluded from the benchmark calculation because they were, or were not, market-based.  The problem with their inclusion resulted from the circularity of the comparison—one group of prices that Commerce included in its benchmark price calculation (*i.e.*, the North Africa prices that were dominated by OCP prices) was substantially influenced by the very activity that Commerce was evaluating against this benchmark (*i.e.*, the provision of mining rights by the GOM).  Regardless of whether OCP's prices included in the North Africa price were market based, a circularity in the comparison exists that renders Commerce's LTAR analysis, in the words of the CIT, "meaningless."

## III.   Commerce Unlawfully Investigated "Other Assistance."

Commerce's request in its initial questionnaire that OCP to disclose any and all "other forms of assistance" it received from the GOM during the POI was contrary to law, as Commerce lacked any predicate evidence or allegation that OCP received such assistance. Because Commerce acted in excess of its authority by engaging in an extra-statutory fishing expedition for facts regarding hypothetical assistance programs, which had not been shown (nor even alleged) to exist, the Court should void *ab initio* Commerce's improperly initiated investigation of five programs based on unlawfully obtained information, and vacate Commerce's determination to countervail three of them.

### A.   Commerce's "Other Assistance" Question Was Contrary to Law.

Congress established the basis on which Commerce may investigate potential subsidies that are not alleged in a petition but discovered during an investigation.  Section 1677d directs

NON-CONFIDENTIAL VERSION

Commerce to investigate a potential countervailable subsidy not alleged in a petition if during a

CVD investigation the agency discovers a practice "that appears to be a countervailable

subsidy."  The requirement that a potential subsidy "appears to be a countervailable subsidy" is

an evidentiary standard set by Congress that serves as a threshold predicate to the exercise of

Commerce's investigatory powers.  Without the "appearance of a countervailable subsidy,"

Commerce has no power to investigate.

In its initial questionnaire, Commerce asked OCP whether the GOM provided to OCP,

directly or indirectly, any "*other forms of assistance*" during the relevant period.[26]  *See*

Commerce's Initial CVD Questionnaire, Section III, at 46 (P.R. 61) (emphasis added).  In the

*Final Determination*, Commerce explained the reason for asking this question as follows: "*in

order to determine whether any such assistance appeared to be countervailable* (*i.e.*, the

elements necessary for the imposition of countervailing duties are present) and attributable to

subject merchandise."  *See* IDM at 12 (P.R. 473) (emphasis added).  Commerce's explanation of

its reason for asking the question is an admission that the agency sought to invoke investigatory

powers without the legally required evidentiary foundation.  In other words, Commerce

impermissibly used the question to solicit a response that would allow it to *search for* the

"appearance of a countervailable subsidy."

---

[26] In full, Commerce asked:

> Does the GOM (or entities owned directly, in whole or in part, by the GOM or any
> provincial or local government) provide, directly or indirectly, any *other forms of
> assistance* to your company during {the} POI and entire the {sic} AUL period? If
> so, please describe such assistance in detail, including the amounts, date of receipt,
> purpose and terms, and answer all questions in the **Standard Questions Appendix**,
> as well as other appropriate appendices attached to this questionnaire.

*See* Commerce's Initial CVD Questionnaire, Section III, at 46 (P.R. 61).

NON-CONFIDENTIAL VERSION

This approach turns the law on its head, is contrary to Congress's stated intent, and

negates the legal requirement that Commerce must have an evidentiary foundation prior to

investigating a practice that might be a countervailable subsidy.  Under the law, Commerce must

have the "appearance" of a countervailable subsidy *before* seeking information on unspecified

programs for which no allegation has been made.  Commerce itself has acknowledged that it may

not "go{} on 'fishing expeditions,' investigating any and all government practices that might

affect {} respondents," and that its investigatory powers are limited by the evidentiary standards

established by statute.  *See* Final Results of Remand Redetermination Pursuant to Court Remand

at Issue 2, *Allegheny Ludlum Corp. v. United States*, No. 99-06-00362 (CIT June 7, 2000)

(discussion under "Whether Commerce Should Have Investigated the 1984 Equity Infusion into

Sidmar as a 'Countervailable Subsidy Practice Discovered During Investigation or Review'"),

*aff'd*, 25 C.I.T. 16, 821–23, 825 (2001).

Nonetheless, Commerce engaged in precisely such a fishing expedition when it issued the

"other assistance" question, which, importantly, was unrelated to any practices then known to

Commerce; Commerce effectively admits that the "other assistance" question did not relate to

anything that appeared to be a countervailable subsidy to Commerce at the time it asked the

question.  Instead, Commerce utilized the information that surfaced in response to the question

to, after-the-fact, justify its decision to investigate other assistance.  The law does not permit

Commerce to engage in such a baseless venture.  Section 1677d contains the evidentiary

standard that must be met *before* Commerce can investigate a potential countervailable subsidy

not alleged in a Petition.  *See Allegheny*, 25 C.I.T. at 824 ("Commerce must review the record

evidence to determine whether {a} business practice 'appears' to be a countervailable subsidy"

in deciding whether to fully investigate a potential subsidy.).

In addition, the overall structure of the Act confirms that Congress intended Commerce to investigate only potential countervailable subsidies for which it has some evidentiary support *prior to* that investigation.  For example, Congress requires Commerce to evaluate the evidentiary adequacy of allegations in a petition before initiating an investigation of those allegations and, in the absence of adequate evidence, terminate the petition.  *See* 19 U.S.C. § 1671a(b)(1), (c)(1)(a).[27]  Moreover, as the CIT has recognized, CVD investigations are "costly and time consuming," and thus should "warrant a sufficient factual basis for their initiation."  *See Allegheny*, 25 C.I.T. at 824.  Congress did not intend for Commerce to initiate an investigation and impose the associated burdens on respondents, international markets, and United States' foreign policy without a sufficient evidentiary foundation.  *See id.* at 823–34 ("{T}he notion that allegations in a petition found unsupportable because of overwhelming contradictory evidence should nonetheless result in a full investigation and potential imposition of provisional remedies is directly contrary to Congress' intent . . . of eliminating 'unnecessary and costly investigations' and the 'impediment to trade' that would reside in an unwarranted imposition of provisional remedies." (quoting *Am. Lamb Co. v. United States*, 785 F.2d 994, 1004 (Fed. Cir. 1986)).[28]

Furthermore, the fact that the law provides that Commerce will be positioned to issue a preliminary CVD determination just slightly over two months from the date on which it initiates

---

[27] Even in the very rare instances in which Commerce self-initiates an investigation, the initiation must be based on evidence and not the whim of the agency.  *See* 19 U.S.C. § 1671a(a); *Common Alloy Aluminum Sheet from the People's Republic of China:  Initiation of Less-Than-Fair-Value and CVD Investigations*, 82 Fed. Reg. 57,214 (Dec. 4, 2017), and accompanying Supporting Mem. for the Initiation of CVD Investigation (demonstrating that Commerce must make certain evidential findings before self-initiating an investigation).

[28] Although *American Lamb* involved a review of the "reasonable indication" standard applicable to the ITC, the *Allegheny* Court explicitly stated that the logic underlying *American Lamb* applied in the context of reviewing Commerce's decision not to initiate a CVD investigation. *See* 25 C.I.T. at 823–24.

an investigation demonstrates that Congress did not intend for Commerce to review every possible form of assistance a respondent may have received from its government.  *See* 19 U.S.C. § 1671b(b).  Ultimately, Congress accounted for these consideration by including § 1677d and thereby ensuring that Commerce's investigatory powers would only be invoked where there is a sufficient evidentiary basis.

By requiring evidence of the "appearance" of a subsidy in § 1677d, Congress also insured that a loophole would not be created whereby Commerce could initiate an investigation on a single alleged subsidy (or even a set of alleged subsidies), and then use unchecked investigatory powers to exponentially expand the investigation without any evidentiary basis.  But this is exactly what Commerce did with its other assistance question, both in this case, and in other administrative proceedings where it includes the other assistance question.[29]  Such an effort to bypass the congressionally imposed limits and exercise unfettered investigatory power is contrary to § 1677d and the structure of the law, and OCP respectfully submits must be invalidated by the Court.[30]

Commerce defends itself by citing to *Changzhou Trina Solar Energy Co. v. United States* to claim that it is within Commerce's "broad discretion" to determine the information that is

---

[29] For example, in *Silicon Metal from Australia*, Commerce appears to have initiated a CVD investigation on four programs on the basis of information obtained through an "other assistance" question.  See Silicon Metal from Australia:  Final Affirmative CVD Determination, 83 Fed. Reg. 9834 (Mar. 8, 2018), and accompanying IDM; *Silicon Metal from Australia, Brazil, and Kazakhstan: Initiation of CVD Investigations*, 82 Fed. Reg. 16,356 (Apr. 4, 2017); Letter from Jonathan T. Stoel to the Honorable Wilbur L. Ross, Jr., Silicon Metal from Australia: Section III Questionnaire Response, (May 15, 2017) at 38–58.

[30] Ultimately, OCP was forced to identify twenty additional items in response to Commerce's other assistance question, of which Commerce proceeded to investigate five.  *See* OCP's IQR at 146–57 (P.R. 130; C.R. 39);  IDM at 5–6 (P.R. 473).  Had OCP not disclosed this assistance, it ran the risk of Commerce using AFA.  *See, e.g.*, *Trina Solar*, 195 F. Supp. 3d at 1346–47 (upholding Commerce's use of AFA for programs not disclosed in response to an "other assistance" question).

relevant to Commerce's investigation and request that information, *see* Final IDM at 13 (P.R. 473) (citing 195 F. Supp. 3d 1334, 1346 (CIT 2016)); however, Commerce misapprehends the Court's decision in *Trina Solar*, which in fact supports OCP's position.  In the portion of *Trina Solar* on which Commerce relies, the Court considered an issue different than the one presented here—whether the term "discovers" within § 1677d prohibits Commerce from investigating a potential subsidy through direct questioning—and the Court found that it did not.  *See* IDM at 13 n.72 (P.R. 473) (citing to *Trina Solar* 195 F. Supp. 3d at 1346).  Importantly, earlier in the opinion, the Court found Commerce had properly determined that further investigation was warranted for governmental assistance discovered during verification because it appeared to be a subsidy within the meaning of § 1677d.  *Trina Solar*, 195 F. Supp. 3d at 1342.  Thus, *Trina Solar was predicated* on a prior finding of an appearance of a subsidy—and thus supports OCP's position that § 1677d provides an evidentiary threshold that must be met for Commerce to invoke its investigatory powers with respect to potential subsidies not alleged in a petition.

While Commerce may undoubtedly investigate a practice it discovers during the course of a CVD proceeding that appears to be a countervailable subsidy, 19 U.S.C. § 1677d requires that the potentially countervailable nature of that practice be apparent to Commerce *prior to* the commencement of such investigation.  In this investigation, Commerce was free to scour the thousands of pages of existing record evidence in search of potential subsidies.  But the import of Section 1667d is clear:  Commerce is not empowered to engage in a baseless fishing expedition in search of some uncertain and amorphous end.

**B.**     **The Court Should Vacate Commerce's Determinations that Certain Programs Investigated Based on the Other Assistance Question Were Countervailable.**

Based on the information identified in response to Commerce's other assistance question, Mosaic filed new subsidy allegations and Commerce initiated an investigation into five additional, potential subsidy programs beyond those initially alleged in the Petition: (1) reductions in tax fines and penalties; (2) revenue exclusions from minimum tax contributions; (3) customs duty exemptions for capital goods, machinery, and equipment; (4) value added tax exemptions for capital goods, machinery, and equipment; and (5) rail transport services for LTAR.  *See* Commerce's New Subsidy Allegations Memorandum at 2–7 (P.R. 332).  Commerce ultimately countervailed three of these programs, including reductions in tax fines and penalties, which is discussed in the next section.  *See* IDM at 5–6 (P.R. 473).

It is well-established in administrative law that where an agency acts outside of its statutory authority in initiating an investigation, courts will vacate the results of those investigations.  *See* Section I.D *supra*.  Because Commerce acted in excess of its authority by seeking information on the above-listed potential programs, the Court should void Commerce's investigation of them *ab initio*, and vacate its decision to countervail three of them.

**IV.**    **Commerce's Determination that the Reductions in Tax Fines and Penalties Was *De Facto* Specific Was Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law.**

In its final determination, Commerce found that the GOM's provision of reductions on tax fines and penalties under Article 236 of Morocco's General Tax Code was a countervailable subsidy, based on a flawed determination that these reductions were *de facto* specific.[31]  *See*

---

[31] As a threshold matter, for the reasons discussed in the preceding section, Commerce's investigation into these reductions was unlawful given that *but for* the "other assistance"

NON-CONFIDENTIAL VERSION

IDM at 75 (cmt. 22) (P.R. 473).  The Moroccan tax code vests the GOM with authority to level

fines and penalties against those corporate taxpayers who fail to comply with the country's tax

requirements.[32]  GOM SQR Part 2 (Nov. 11, 2020) at Ex. S-IX-2 (P.R. 359–60; C.R. 242–43).

Where a taxpayer is confronted with such fines or penalties, Article 236 of the tax code permits

the taxpayer to apply to have those fines or penalties (*not* their underlying tax obligations)

reduced.[33]  *See* GOM IQR at Ex. VII-1, p. 393 (P.R. 204–05; C.R. 130–31).

      The GOM placed on the record evidence showing that these reductions were granted

broadly to Moroccan companies during the POI—8,761 companies across 18 distinct industries.

GOM SQR Part 2 at S-IX-13 – S-IX-14 (P.R. 362; C.R. 245–46).  Nevertheless, Commerce

found the reductions *de facto* specific using a flawed methodology to evaluate specificity that

understated the availability of these reductions.  IDM at 75 (P.R. 473).  Additionally, the agency

failed adequately to explain its *de facto* determination and ignored the economic diversification

of the granting authority and the length of time during which the reductions had been in

operation, as required under the Statute.  For these reasons, as more fully detailed below, the

Court should reject Commerce's specificity finding as unsupported by substantial evidence, and

otherwise not in accordance with law.

---

question, the agency would not have initiated the investigation.  To the extent the Court
disagrees, however, Commerce's determination was improper as discussed in this section.

[32] Such failures to comply with Moroccan tax requirements include, for example, failing to pay
taxes owed, filing a tax declaration containing omissions or inaccuracies, and filing a tax
declaration or certain supporting documents in an untimely manner.  *See generally* GOM SQR
Part 2 at Ex. S-IX-2, arts. 43–50 (P.R. 359–60; C.R. 242–43).

[33] Under the Moroccan tax code, Articles 184–209 explain the circumstances under which fines
and penalties are imposed, which includes and expands on the circumstances provided in Law
24–86.  GOM IQR (Sept. 17, 2020) at Ex. VII-1, pp. 312–36 (P.R. 204–05; C.R. 130–31).

### A.    Commerce Used a Flawed Ratio for Evaluating Specificity.

To find that a "financial contribution" is a countervailable subsidy, the contribution must confer a "benefit to the recipient" and the subsidy has to be "specific."  *See* 19 U.S.C. § 1677(5)(A)–(B); *see also id.* § 1677(5)(D)–(E), (5A).  A subsidy is *de facto* specific when one or more of the following factors exist:  (1) the actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number; (2) an enterprise or industry is a predominant user of the subsidy; (3) an enterprise or industry receives a disproportionately large amount of the subsidy; or (4) the manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.  *See* 19 U.S.C. § 1677(5A)(D)(iii)(I)–(IV); 19 C.F.R. § 351.502(a).

In evaluating whether the actual recipients were "limited in number," Commerce utilized a simple mathematical ratio—the agency compared the number of recipients of reductions of fines and penalties to the number of *all companies that had paid taxes to GOM*, instead of those companies actually charged with fines or penalties.

$$\frac{8,761 \ companies \ receiving \ reductions \ in \ tax \ fines \ or \ penalities}{262,165 \ corporate \ tax \ filers \ in \ Morocco} = 3.3\%$$

Based on this 3.3% ratio, Commerce concluded that recipients of reduced tax fines and penalties were "limited in number" such that the reductions were *de facto* specific.  IDM at 75 (P.R. 473); 19 U.S.C. § 1677(5A)(D)(iii)(I).  Commerce's determination rested on an obviously flawed methodology and should be rejected out of hand.

Commerce's specificity ratio wrongly compared companies that received a reduction in fines or penalties against *any* company that paid taxes.  There is no more logic in this comparison than a comparison of companies receiving a reduction against all companies in Morocco.  These are separate groups of companies, confronted with different categories of obligation to the GOM.

While all companies confronted with tax fines or penalties are necessarily taxpayers, not all taxpayers are (or ever will be) confronted with tax fines or penalties.

Consequently, Commerce's calculation incorrectly lumped into the denominator wide swaths of the corporate population of Morocco—potentially hundreds of thousands of companies that have never received an assessment for fines or penalties, and thus were not capable of receiving the purported subsidy. Inclusion of all corporate tax filers in the denominator regardless of whether they were charged tax fines or penalties presumptively inflated the denominator by including companies who were irrelevant to the fine and penalty reductions in its calculation. Had Commerce properly constructed this ratio, the actual recipient rate would have necessarily been higher, and demonstrated that the program was far more widely available than Commerce concluded.

The inconsistency and flaws of Commerce's approach to specificity are apparent when compared to the agency's approach in analyzing whether the reduction in tax fines and penalties constituted a financial contribution that conveyed a benefit, the other criteria that Commerce must analyze in determining whether there is a countervailable subsidy. *See* 19 U.S.C. § 1677(5)(B). The agency here described the financial contribution as "the GOM . . . forgoing or not collecting revenue that is otherwise due"—which in this case was not collecting fines or penalties. Post-Prelim Decision Memo at 4 (P.R. 441; C.R. 296). The *taxes* owed were unaffected by these reductions. Similarly, Commerce found that the benefit was the amount of OCP's "fines and penalties reduced," rather than any reduction in taxes owed. *See* Post-Prelim Calculations Memo (Jan. 6, 2021) at 3 (P.R. 442; C.R. 297). It was inconsistent with this approach on financial contribution and benefit for Commerce to then deviate and evaluate specificity by comparing recipients of reductions in tax fines and penalties to *all corporate*

*taxpayers*, including entities that owed no fines or penalties, rather than *penalized companies* that owed fees and penalties distinct from their tax obligations.

When OCP pointed out to Commerce the obvious error in its specificity ratio, Commerce responded:

> When analyzing *de facto* specificity for tax programs in prior cases, Commerce has compared the number of companies that used the program with the total numbers of tax filers.  In addition, Commerce has rejected OCP's argument that de facto specificity should be assessed by including only the number of companies eligible for a subsidy program in past cases.

IDM at 75 (P.R. 473).  Commerce cited two prior proceedings in support of its ratio.  *Id.* (P.R. 473) (citing Uncoated Groundwood Paper IDM at 198 (cmt. 61)); *Supercalendered Paper from Canada:  Final Results of CVD Expedited Review*, 82 Fed. Reg. 18,896 (Apr. 24, 2017), and accompanying IDM ("Supercalendered Paper IDM").  However, both cases are distinguishable and neither supports the agency's approach here.

*Uncoated Groundwood Paper from Canada* involved tax credits, which are distinct from reductions to fines and penalties.  Tax credits are a reduction in payments (taxes) owed by all taxpayers whereas fine and penalty reductions apply only to payments (fines and penalties) owed by a subset of taxpayers who, for example, failed to comply with national corporate tax requirements.  Thus, the agency's use of tax filers in the denominator in *Uncoated Groundwood Paper from Canada*, is actually an example of Commerce appropriately using entities *capable* of receiving the financial contribution in the denominator, rather than of Commerce expanding the denominator to entities *not capable* of receiving the contribution, as here.

*Supercalendered Paper from Canada* is also distinguishable because, compared to the reductions in the present case, it was much less clear which entities were capable of receiving the financial contribution or benefit and thus, should be placed in the denominator of the specificity ratio.  The responding parties argued that the entities capable of receiving the financial

contribution and benefit (i.e., a tax credit) were an amorphous group—corporate taxpayers "that had a need to hire a post-secondary graduate student." *Supercalendered Paper* IDM at 102 (cmt. 28). Here, the qualification is crystal clear, it is corporate taxpayers that were subject to tax fines or penalties during the POI. In any event, to the extent that Commerce relies on *Supercalendered Paper from Canada* for the principle that specificity should be judged based on a comparison of recipients to entities that were not capable of receiving the financial contribution or benefit, as Commerce did here, this position is wrong for the reasons discussed above.

Lastly, Commerce has in other cases at least implicitly agreed that it should limit its specificity analysis to entities capable of receiving the financial contribution and benefit. For example, in *Steel Concrete Reinforcing Bar from Turkey* ("*Rebar from Turkey*"), Commerce determined that the provision of natural gas in that case was not *de facto* specific based on analysis of data regarding the industries that *consumed* natural gas during the POR," and "industrial users' share of all natural gas *purchases* in 2014." *See Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results of Partial Rescission of CVD Administrative Review; 2014*, 82 Fed. Reg. 26,907 (June 12, 2017), and accompanying IDM at 21–22 (cmt. 3) (emphasis added). In other words, Commerce limited its analysis to industries and users that were capable of receiving the financial contribution and benefit, namely, industries and companies that used natural gas, and not all industries and companies in Turkey. *Id.*

## B.   Commerce Failed to Adequately Explain its Specificity Finding.

In addition to the flaws in Commerce's specificity ratio, the agency also failed to adequately explain why the result of that ratio—3.3%, or 8,761 companies out of 262,165 corporate income taxpayers—supported a finding that the reductions of penalties and fines were *de facto* specific. *See* IDM at 75 (P.R. 473). The statutory language identifies specificity where "actual recipients . . . are limited in number," 19 U.S.C. § 1677(5A)(D)(iii)(I), and Commerce

provided no explanation why it considered thousands of companies spanning across the

Moroccan economy to be "limited." *Id.* Notably, if 8,761 companies across the Moroccan

economy is "limited in number," it appears that Commerce might require universal use or near

universal use of a program before it considers a program non-specific. Such a result would be

absurd and contrary to what the statute requires. *See* SAA at 930, 1994 U.S.C.C.A.N. at 4242

(stating that the function of the specificity test is to "winnow out only those foreign subsidies that

are truly broadly available and widely used throughout the economy").

Because Commerce failed to explain why it found these figures to constitute such

"limited" use, the agency's specificity finding was unreasonable and therefore unsupported by

substantial evidence. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319–20 (Fed. Cir.

2009) ("{W}hile {Commerce's} explanations do not have to be perfect, the path of

{Commerce's} decision must be reasonably discernable.") (citing *State Farm*, 463 U.S. at 43);

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (explaining that the

substantial evidence standard of review "can be translated roughly to mean 'is {the

determination} unreasonable?'").

### C.     Commerce's Specificity Determination Was Contrary to Law.

Finally, Commerce's specificity analysis was contrary to law because Commerce failed

to evaluate all the necessary factors the Statute identifies. The Statute provides that in evaluating

the specificity factors, including whether "actual recipients" are "limited in number" under

§ 1677(5A)(D)(iii)(I), Commerce "shall take into account the extent of diversification of

economic activities within the jurisdiction of the authority providing the subsidy, and the length

of time during which the subsidy program has been in operation." *Id.*

Commerce entirely failed to consider the economic diversification of the granting

authority or the length of time during which the subsidy program had been in operation, as

required by the Statute.  *See* IDM at 75 (P.R. 473).  For example, Commerce failed to consider

that the reductions applied to entities across a broad spectrum of the Moroccan economy, and

entities in the extraction industry (which includes OCP) received only a small portion of the total

reductions that were granted during the POI.  *See id.* (P.R. 473); GOM SQR Part 2 at S-IX-13

(P.R. 362; C.R. 245–46).  Instead of engaging with any of this important record evidence, as

required by the Statute, Commerce merely concluded that recipients of the reductions were

limited in number based on the number of corporate taxpayers that received the reductions out of

all potential corporate tax filers.  IDM at 75 (P.R. 473).

* * *

In sum, Commerce's specificity determination was unsupported by substantial evidence

on the record and otherwise not in accordance with law.  The Court should therefore remand this

determination to the agency.

## V.   Commerce Unlawfully Initiated an Investigation into OCP's Disposal of Phosphogypsum Byproduct.

As described above, the Petition put forth two theories that the GOM allegedly provided

OCP with countervailable subsidies related to phosphogypsum byproduct disposal—(1) the

GOM allegedly provided OCP with disposal services for less than adequate remuneration

("LTAR"), and (2) the GOM allegedly failed to collect fees and fines for exceeding the limits of

certain environmental laws relating to discharges, *i.e.*, by foregoing revenue.  *See* Petition, Vol.

II, at II-17 (P.R. 6; C.R. 6).  Although Commerce correctly refused to initiate an investigation

into this program on an LTAR theory, it unlawfully initiated an investigation on a theory of

revenue foregone, despite the Petition's failure to adequately allege each of the elements of a

countervailable subsidy.  Initiation Checklist at 15–16 (P.R. 54; C.R. 20).  Additionally, despite

77

not investigating the LTAR theory, Commerce abused its discretion by permitting Mosaic to put information on the record related to this rejected theory.

### A.    Commerce Should Not Have Initiated Under a Revenue Forgone Theory.

Commerce may not initiate an investigation of an alleged subsidy program unless the petition "alleges the elements necessary for the imposition" of countervailing duties.  *See* 19 U.S.C. § 1671a(b)(1).  Specifically, a petition must allege that (1) a financial contribution is made by an authority, (2) a benefit is conferred, and (3) the subsidy is specific.  *See* 19 U.S.C. § 1677(5)–(5A); *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1329–30 (CIT 2018).  A petitioner must "state and provide reasonably available evidentiary support" for each of these legal elements, *SolarWorld Ams., Inc. v. United States*, 125 F. Supp. 3d 1318, 1330 (CIT 2015), and should allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007);  *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009); *see also RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1296 (CIT 2015) (the initiation standard is "'roughly analogous to the rigor of the requirements necessary to make out a cause of action for purposes of civil litigation.'") (quoting H.R. Rep. No. 96–317, at 51 (1979)).

Here, the Petition's allegation that the GOM's foregoing of revenue for phosphogypsum byproduct disposal constituted a countervailable subsidy utterly failed to meet the applicable standard, and Commerce failed to examine the accuracy and adequacy of the Petition's allegations.  As a result, Commerce acted contrary to law when it initiated an investigation on

this purported program, and the Court should void Commerce's investigation of the purported

program *ab initio* and vacate the resulting determination.[34]

*First,* the Petition failed to plausibly allege that OCP owed the GOM any revenue.  The

Petition's theory of financial contribution is that the GOM did not collect fees or fines to which it

was entitled to under Moroccan environmental laws.  *See* Petition, Vol. II, at II-17 (P.R. 6; C.R.

6).  While the statute provides that a "financial contribution" may include "forgoing or not

collecting revenue that is otherwise due," 19 U.S.C. § 1677(5)(D)(ii), the Petition completely

failed to provide any evidence that such fees or fines were actually established in Moroccan law,

nor could it.  The environmental laws described in the Petition *do not establish any fees to be

collected* but instead indicate that such fees would have to be established through regulation at a

later date.  *See* Petition, Vol. II, at Ex. II-31 (P.R. 7; C.R. 7) (explaining that the fees for

authorized discharges under Law No. 10-95 are to be set through "normal regulatory channels");

*id.* at Ex. II-32 (P.R. 7; C.R. 7) (explaining that the "methods for calculating the amount of the

fee" under Law No. 81-12 are to be "set by decree").  The Petition failed to provide any evidence

that such regulations had ever been established, because in fact none were.[35]  Thus, the Petition

failed to plausibly allege that revenue was owed pursuant to these Moroccan environmental laws,

let alone that the GOM did not collect such revenue from OCP.

To the extent Commerce was ignorant of these deficiencies, it was put on notice of them

when Petitioner admitted that it "ha{d} been unable to find examples of permits granted, or fees

---

[34] Although Commerce ultimately concluded that the program was not used during the POI, unless Commerce's error is corrected and its investigation into the program invalidated, Commerce may unlawfully request information on byproduct disposal in any future administrative review of the CVD order.

[35] The Petition included no evidence that OCP violated any standards that would obligate it to pay fees or to pay penalties for its discharge.  Instead, the Petition evidence discussed that such regulations were slow to be implemented.  *See* Petition, Vol. II, at II-16 n.89 (P.R. 6; C.R. 6).

collected, by the GOM from any industries concerning the discharge of liquid waste off the coast

of Morocco, whether in connection with Article 37 of Law No. 81-12 or otherwise." *See*

Petitioner's SQR (July 2, 2020) at 2–3 (P.R. 18).  Commerce is required by statute to examine

the accuracy and adequacy of the evidence provided in a petition.  19 U.S.C. § 1671a(c)(1)(A)(i);

*see Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,307 (May 19, 1997).

Had Commerce followed this statutory obligation, it would have recognized this failure to

plausibly allege any financial contribution and that it could not lawfully initiate an investigation

on this purported program.

      *Second*, the Petition failed to plausibly allege a benefit was conferred.  A "benefit" is

conferred for revenue forgone in the amount of revenue the government fails to collect.  *See,*

*e.g., Certain Pasta from Italy: Final Results of the Eleventh (2006) CVD Administrative Review*,

74 Fed. Reg. 5922 (Feb. 3, 2009), and accompanying IDM at I.E.  As noted above, the Petition

did not include *any* evidence of fees having been established for violations of relevant Moroccan

environmental laws, let alone that the GOM failed to collect such fees to the benefit of OCP.

      *Third*, to be countervailable, an alleged program must be specific (*e.g.*, limited in law or

fact to an enterprise or industry (or a group thereof)), and the Petition failed to plausibly allege

that the purported program was specific.  *See* 19 U.S.C. § 1677(5A); 19 C.F.R. § 351.502.  The

Petition's allegation that the purported program "appears to be" *de facto* specific because OCP is

"the only entity dumping phosphate gypsum" did not plausibly allege specificity.  *See* Petition,

Vol. II, at II-18.  The Moroccan laws upon which the Petition based this allegation mention

nothing specific about phosphogypsum at all, and instead prohibit, *in broadly general terms*, the

disposal of discharges causing pollution of coastal, surface, or ground waters without prior

authorization.  *See id.* at Exs. II-31, II-32 (P.R. 7; C.R. 7).  The laws cover activities of any

number of companies who all could have benefitted if the GOM opted not to collect fines in

connection with this alleged program.  *See also id.* at Ex. II-38, p. xxvi (P.R. 7; C.R. 7) ("Fines

and sanctions for non-compliance with environmental standards (notably for air, water and

waste), even if stipulated in the legislation, are not applied in general, and neither are emissions

charges.").  Likewise, the Petition's cursory assertion that "OCP is a predominant user of the

subsidy" without citation to any basis for this assertion is obviously conclusory and deficient.

*See id.* at II-18 (P.R. 6; C.R. 6).

   These three deficiencies in the Petition each provided separate and distinct bases on

which Commerce should have concluded that the Petition had not plausibly alleged the existence

of a countervailable subsidy in connection with revenue forgone for byproduct disposal.

Commerce did, however, initiate an investigation on this theory and concluded that OCP "did not

use" phosphogypsum byproduct disposal services as revenue forgone.  *See* IDM at 85 (P.R. 473).

Because Commerce's practice is to seek information pertaining to programs "not used" in future

administrative reviews of CVD orders, OCP risks being burdened by questionnaires inquiring

into this unlawfully initiated purported program in the future.  *See, e.g.*, *Steel Concrete*

*Reinforcing Bar from the Republic of Turkey:  Final Affirmative CVD Determination Final*

*Affirmative Critical Circumstances Determination*, 79 Fed. Reg. 54,963 (Sep. 15, 2014), and

accompanying IDM at 20 (determining that respondents did not use Export Credits, Loans, and

Insurance from Turk Eximbank during the relevant period of investigation), *with Steel Concrete*

*Reinforcing Bar from the Republic of Turkey:  Final Results and Partial Rescission of CVD*

*Administrative Review*; 2014, 82 Fed. Reg. 26,907 (June 12, 2017), and accompanying IDM at 7

(including these same programs in a subsequent administrative review).

Therefore, OCP respectfully requests that the Court void *ab inito* the unlawful

investigation of this purported program and vacate the resulting determination (*see* discussion in

Section I.D. *supra*) explaining that the correct result following an unlawful initiation is for a

court to void such an investigation and vacate the resulting determination) and make clear that

Commerce lacks authority to seek additional information about it in any later administrative

reviews of the CVD order.

### B. Commerce Abused its Discretion by Failing to Reject Mosaic's Factual Information Relating to Phosphogypsum Byproduct Disposal for LTAR.

Notwithstanding Commerce's determination to reject Mosaic's allegation regarding

phosphogypsum byproduct disposal services for LTAR because it lacked sufficient evidence to

initiate, Mosaic placed on the record nearly 100 pages of material related to this rejected

allegation.  Mosaic's Benchmarking Information (Nov. 4, 2020) at 6–7, Exs. 12–18 (P.R. 255,

273–77).  OCP promptly explained that Commerce should reject the filing as contrary to its

regulations because it did not relate to the allegation under investigation.  *See* OCP's Request to

Reject Benchmarking Information (Nov. 10, 2020) at 1–5 (P.R. 357); OCP's Case Br. at 12 n.32

(P.R. 450; C.R. 301).  Commerce did not strike the information from the record and offered no

response to OCP's argument.  Commerce's failure to reject this information in violation of its

regulations was an abuse of discretion, and the Court should direct Commerce to strike Mosaic's

November 4, 2020 benchmark submission from the record.

Commerce's rules carefully regulate the nature and timing of information that may be

placed on the record of a CVD investigation, based on the kind of information submitted, in

order to ensure that parties have an equal opportunity to submit such information.  *See generally*

19 C.F.R. § 351.301.  The regulatory provision on which Mosaic purportedly relied, 19 C.F.R.

§ 351.301(c)(3), permits parties to submit factual information to measure the adequacy of

remuneration in connection with LTAR allegations.  *See* Mosaic's Benchmark Submission at 8 (P.R. 255).  However, such information must relate to an allegation within the scope of the investigation to prevent parties from flooding the record with irrelevant information concerning topics on which other parties did not have an opportunity to submit information.  As the November 4, 2020 benchmark submission was related to a subsidy allegation already rejected by Commerce, it related to allegations that were not within the scope of the investigation.  Under those circumstances, the submission could not be made under § 351.301(c)(3), since that provision permits the submission of information relevant to measure the adequacy of remuneration for an allegation actually under investigation.

Commerce should not have permitted Mosaic's belated attempt to resurrect its deficient LTAR allegation by padding the record with untimely filed information regarding byproduct disposal services.  Commerce's refusal to strike this information was an abuse of discretion.  *See Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir. 1990) ("{A}n agency's failure to follow its own binding regulations is a reversible abuse of discretion.").  In addition, by not even considering OCP's argument on this issue, Commerce acted arbitrarily and capriciously.  *See, e.g.*, *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).  The Court should therefore instruct Commerce to strike Exhibits 12 through 18 of Mosaic's November 4, 2020 Submission from the record and not to consider such information in the course of any remand.

## **CONCLUSION**

For all of these reasons, OCP respectfully requests that the Court hold Commerce's initiation determination unlawful, declare the resulting investigation void *ab initio*, vacate the resulting CVD order, and remand to Commerce to dismiss the Petition and terminate the CVD proceeding.  In the alternative, OCP requests that the Court remand to Commerce to:

(1) reconsider its calculation of a benefit for mining rights, specifically, with respect to

Commerce's exclusion of HQ, support and debt expenses in the COP buildup, calculation of a

profit rate for mining and production of phosphate rock, and inclusion of OCP's prices in the

word benchmark price for phosphate rock, (2) void *ab initio* its investigation of five potential

programs based on the "other assistance question" and vacate its determination to countervail

three of them; (3) reconsider its specificity determination regarding tax fines and penalties,

(4) void the CVD investigation regarding phosphogypsum byproduct disposal as revenue

foregone and vacate the resulting determination; and (5) strike Mosaic's benchmarking

information pertaining to byproduct disposal services for LTAR from the record.


                                                    Respectfully submitted,


  Dated:  October 15, 2021                          /s/ William R. Isasi
                                                    William R. Isasi
                                                    Alexander D. Chinoy
                                                    Micaela McMurrough
                                                    Elisa S. Solomon
                                                    Rishi R. Gupta
                                                    Cynthia C. Galvez
                                                    Jordan B. Bakst

                                                    Covington & Burling LLP
                                                    One CityCenter
                                                    850 Tenth Street, N.W.
                                                    Washington, D.C. 20001-4956

                                                    *Counsel to OCP S.A.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Memorandum of Law in Support of Consolidated Plaintiff and Defendant-Intervenor OCP S.A.'s Rule 56.2 Motion for Judgment on the Agency Record, filed October 15, 2021, contains 27,145 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum word count limitation set forth in the Court's applicable order.  (ECF No. 46).

/s/ William R. Isasi
William R. Isasi