## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, et al., | |
| Plaintiffs, | Consol. Court No. 21-00116 |
| v. | <u>NON-CONFIDENTIAL VERSION</u> |
| UNITED STATES, | |
| Defendant, | **Business Proprietary Information Deleted from Pages i, 4-5, 7-9, 11, 14-16, 19-21, 28-33, 48-50** |
| and | |
| OCP S.A., et al., | |
| Defendant-Intervenors. | |

## <u>THE MOSAIC COMPANY'S MEMORANDUM IN OPPOSITION TO OCP'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman

WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Counsel for The Mosaic Company*

Dated: February 22, 2022

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                                                NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

RULE 56.2 STATEMENT .......................................................................................... 2

A.    Administrative Decision Under Review ...................................................... 2

B.    Issues Presented and Summary of Arguments ............................................ 2

STATEMENT OF FACTS ......................................................................................... 4

STANDARD OF REVIEW ........................................................................................ 5

ARGUMENT ............................................................................................................. 7

I.    Commerce's Decision to Initiate the CVD Investigation Based on Its Finding of
      Sufficient Domestic Industry Support for the Petitions is Supported By Substantial
      Evidence and Otherwise in Accordance with Law .................................................. 7

      A.    Substantial evidence supports Commerce's finding that the Petitions
            establish sufficient industry support under § 1671a(c)(4)(A)(i) and (ii),
            notwithstanding the purported opposition of [                    ] .............. 9

      B.    Commerce properly excluded so-called "bulk blenders" from the domestic
            industry support calculation ........................................................................ 20

      C.    Commerce had no obligation to "poll" the domestic industry when the
            Petition established adequate industry support ............................................ 34

II.   The Aspects of Commerce's Mining Rights for LTAR Benefit Calculation
      Challenged by OCP are Supported By Substantial Evidence and Otherwise in
      Accordance with Law ............................................................................................. 36

      A.    Commerce's exclusion of HQ, support, and debt costs from the OCP cost
            build-up is supported by substantial evidence and otherwise in accordance
            with law ....................................................................................................... 37

      B.    Commerce's profit calculations are supported by substantial evidence and
            otherwise in accordance with law ............................................................... 55

      C.    Commerce's use of a North African price in its benchmark is supported by
            substantial evidence and otherwise in accordance with law ....................... 65

III.  Commerce's Investigation of "Other Assistance" is Reasonable and in Accordance
      with Law ................................................................................................................ 66

IV.   Commerce's Determination that the GOM's Reductions in Tax Fines and Penalties
      Program is De Facto Specific is Reasonable, Supported by Substantial Evidence,
      and Otherwise in Accordance With Law ............................................................... 72

V.    OCP's Claim Regarding Commerce's Initiation of an Investigation into the GOM's
      Provision of Phosphogypsum Waste Disposal Services is Moot ............................ 82

      CONCLUSION .......................................................................................................... 84

## TABLE OF AUTHORITIES

<div align="right">Pages(s)</div>

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................. 5

19 U.S.C. § 1671a(c)(1)(A)(ii) ............................................................... 9

19 U.S.C. § 1671a(c)(1)(B) .................................................................. 36

19 U.S.C. § 1671a(c)(4)(A) ............................................. 9, 10, 12, 13, 16

19 U.S.C. § 1671a(c)(4)(B) .................................................................. 14

19 U.S.C. § 1671a(c)(4)(B)(ii) ............................................................. 15

19 U.S.C. § 1671a(c)(4)(D)(i) .............................................................. 34

19 U.S.C. § 1677(5)(D)(ii) .................................................................. 78

19 U.S.C. § 1677(5)(E)(iv) .............................................................. 37, 42

19 U.S.C. § 1677(5A)(D)(iii)(I) ............................................................ 73

19 U.S.C. § 1677b(a) .......................................................................... 42

19 U.S.C. § 1677d ......................................................................... 67, 68

19 U.S.C. § 1677m(d) .................................................................... 53, 54

19 U.S.C. § 1677m(e) ......................................................................... 52

19 U.S.C. § 1677m(e)(3), (5) .............................................................. 52

28 U.S.C. § 2637(d) ......................................................................... 6, 81

**Regulations**

19 C.F.R. § 351.203(e) ....................................................................... 16

19 C.F.R. § 351.203(e)(1) ........................................................ 11, 13, 32

19 C.F.R. § 351.203(e)(3) ................................................................... 16

19 C.F.R. § 351.509(a)(1) ................................................................... 78

19 C.F.R. § 351.511(a)(2) ................................................................... 37

19 C.F.R. § 351.511(a)(2)(iii) ......................................................... 37, 38

**Cases**

*Allegheny Ludlum Corp. v. United States*, 25 CIT 816 (2001) ..................... 69

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ..................................... 83

*Am. Tubular Prod., LLC v. United States,* 36 ITRD 1073 (CIT 2014),
*aff'd in part,* 847 F.3d 1354 (Fed. Cir. 2017) ............................................................ 52

*Brother Indus. (USA), Inc. v. United States,* 16 CIT 789,
801 F. Supp. 751 (1992) .......................................................................... 24

*Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 636 F. Supp. 961
(1986), *aff'd,* 810 F.2d 1137 (Fed. Cir. 1987) ........................................... 12

*Changzhou Trina Solar Energy Co. v. United States,* 195 F. Supp. 3d 1334
(CIT 2016) ................................................................................... 67, 69, 70

*Changzhou Wujin Fine Chem. Factory Co. v. United States,* 701 F.3d 1367
(Fed. Cir. 2012) ........................................................................................ 6

*Church of Scientology of Cal. v. United States,* 506 U.S. 9 (1992) .................... 83

*Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196,
704 F. Supp. 1075 (1988) ........................................................................ 15

*Corus Staal BV v. United States,* 502 F.3d 1370 (Fed. Cir. 2007) ..................... 6

*Deacero S.A.P.I. de C.V. v. United States,* 996 F.3d 1283 (Fed. Cir. 2021) ..................... 5

*Downhole Pipe & Equip., L.P. v. United States,* 776 F.3d 1369 (Fed. Cir. 2015) ....... 5, 81

*Eurodif S.A. v. United States,* 411 F.3d 1355 (Fed. Cir.), *aff'd on reh'g,*
423 F.3d 1275 (Fed. Cir. 2005) ................................................ 13, 14, 25

*Fujitsu Ltd. v. United States,* 23 CIT 46, 36 F. Supp. 2d 394 (1999) ...................... 18, 35

*Gerber Food (Yunnan) Co. v. United States,* 31 CIT 921,
491 F. Supp. 2d 1326 (2007) ................................................................... 52

*Giorgio Foods, Inc. v. United States,* 785 F.3d 595 (Fed. Cir. 2015) .................... 9

*Guangdong Wireking Housewares & Hardware Co. v. United States,* 37 CIT 319,
900 F. Supp. 2d 1362 (2013), *aff'd,* 745 F.3d 1194 (Fed. Cir. 2014) ............................ 43

*Guizhou Tyre Co. v. United States,* 523 F. Supp. 3d 1312 (CIT 2021) ................... 68, 72

*Hung Vuong Corp. v. United States,* 483 F. Supp. 3d 1321 (CIT 2020) ........................ 52

*Jiangsu Zhongji Lamination Materials Co. v. United States,*
405 F. Supp. 3d 1317 (CIT 2019) ............................................................ 67, 70, 71

*Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927 (Fed. Cir. 1984) .................. 5

*Maverick Tube Corp. v. United States,* 857 F.3d 1353 (Fed. Cir. 2017) ....................... 53

*Mitsubishi Heavy Indus., Ltd. v. United States,* 21 CIT 1227,
986 F. Supp. 1428 (1997) ........................................................................ 35

*Mitsubishi Heavy Indus., Ltd. v. United States,* 275 F.3d 1056 (Fed. Cir. 2001) ............. 6

*Nan Ya Plastics Corp. v. United States,* 810 F.3d 1333 (Fed. Cir. 2016) ................ 17, 50

*Nat'l Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771,
696 F. Supp. 642 (1988) ...................................................................... 6, 25

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998)........................................ 83

*NSK Ltd. v. United States*, 481 F.3d 1355 (Fed. Cir. 2007)........................................... 53

*NTN Bearing Corp. of Am. v. United States*, 15 CIT 75, 757 F. Supp. 1425
(1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) ..................................... 11, 16, 18, 19, 35

*Pokarna Engineered Stone Ltd. v. United States,* No. 20-00127,
Slip Op. 21-138 (CIT Oct. 7, 2021)...................................................................... *passim*

*Rhone Poulenc, Inc. v. United States*, 13 CIT 218, 710 F. Supp. 341 (1989),
*aff'd*, 899 F.2d 1185 (Fed. Cir. 1990) ............................................................................ 6

*Royal Thai Gov't v. United States*, 436 F.3d 1330 (Fed. Cir. 2006)............................... 80

*Steffel v. Thompson*, 415 U.S. 452 (1974)..................................................................... 83

*Star Pipe Prod. v. United States*, 981 F.3d 1067 (Fed. Cir. 2020) ................................ 83

*United States v. Rodgers*, 461 U.S. 677 (1983) ............................................................ 36

*USEC Inc. v. United States*, 27 CIT 489, 259 F. Supp. 2d 1310 (2003).................... 5, 33

*Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298
(CIT 2015).................................................................................................................. 43

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308 (Int'l Trade
Admin. proposed Feb. 27, 1996) .................................................................................. 13

Antidumping Duty Investigation Initiation Checklist, Attachment II, *Certain
Corrosion Inhibitors from the People's Republic of China*, Case No. A-570-122
(Feb. 25, 2020)..................................................................................................... 17, 23

Antidumping Duty Investigation Initiation Checklist, Attachment II, *Mattresses
from Serbia*, Case No. A-801-002 (Apr. 20, 2020)................................................ 17, 35

*Bottom Mount Combination Refrigerator-Freezers From the Republic of Korea:
Preliminary Negative Countervailing Duty Determination and Alignment of Final
Determination With Final Antidumping Determination*, 76 Fed. Reg. 55,044
(Int'l Trade Admin. Sept. 6, 2011) ............................................................................... 74

*Certain Cold-Rolled Steel Flat Products From the Republic of Korea:
Preliminary Results of Countervailing Duty Administrative Review; 2017*,
84 Fed. Reg. 60,377 (Int'l Trade Admin. Nov. 8, 2019), and accompanying
Issues and Decision Memorandum ............................................................................... 81

*Certain Corrosion-Resistant Steel Products From the Republic of Korea:
Final Results and Partial Rescission of Countervailing Duty Administrative
Review; 2015-2016*, 84 Fed. Reg. 11,749 (Int'l Trade Admin. Mar. 28, 2019),
and accompanying Issues and Decision Memorandum................................................ 80

*Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (Int'l Trade Admin. July 14, 2008), and accompanying Issues and Decision Memorandum ............. 61

*Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578 (Int'l Trade Admin. Jan. 9, 2008) ...................................................................... 45

*Certain Quartz Surface Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23,767 (Int'l Trade Admin. May 23, 2019), and accompanying Issues and Decision Memorandum ........................ 25

*Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Investigation Determination and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Int'l Trade Admin. Nov. 8, 2017), and accompanying Issues and Decision Memorandum ........................................................ 44

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Int'l Trade Admin. Aug. 9, 2018), and accompanying Issues and Decision Memorandum ................... 74, 75

*Certain Uncoated Groundwood Paper From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 83 Fed. Reg. 2,133 (Int'l Trade Admin. Jan. 16, 2018), and accompanying Decision Memorandum .......................................... 76

*Certain Uncoated Paper From Indonesia: Final Results of Countervailing Duty Administrative Review; 2015-2016*, 83 Fed. Reg. 52,383 (Int'l Trade Admin. Oct. 17, 2018), and accompanying Issues and Decision Memorandum ........................ 60

*Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Int'l Trade Admin. Oct. 25, 2007), and accompanying Issues and Decision Memorandum ................................................ 46, 60

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 81 Fed. Reg. 49,935 (Int'l Trade Admin. July 29, 2016), and accompanying Issues and Decision Memorandum ...................................................................... 58, 59

*Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (Int'l Trade Admin. June 2, 2016), and accompanying Issues and Decision Memorandum............... 80

*Countervailing Duties,* 63 Fed. Reg. 65,348, 65,378 (Int'l Trade Admin. Nov. 25, 1998) ........................................................................................... 39

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Int'l Trade Admin. Mar. 11, 2005), and accompanying Issues and Decision Memorandum .............................................................. 80

*Forged Steel Fittings From India and the Republic of Korea: Initiation of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 64,265 (Int'l Trade Admin. Nov. 21, 2019) ................................................................................................. 11, 33

*Fresh Garlic From the People's Republic of China: Preliminary Results, Preliminary Rescission, and Final Rescission, In Part, of the Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,400 (Int'l Trade Admin. Jan. 15, 2020), and accompanying Issues and Decision Memorandum ......................... 30

*Initiation of Antidumping Investigations: Certain Preserved Mushrooms From Chile, India, Indonesia, and the People's Republic of China*, 63 Fed. Reg. 5,360 (Int'l Trade Admin. Feb. 2, 1998)................................................................................................. 35

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Int'l Trade Admin. Nov. 6, 2015), and accompanying Issues and Decision Memorandum ....................................................... 38

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Forged Stainless Steel Flanges from India*, 58 Fed. Reg. 68,853 (Int'l Trade Admin. Dec. 29, 1993)............................................................................................................. 15

*Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 8,909 (Int'l Trade Admin. Feb. 23, 1998)................................................................................................. 15

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,448 (Int'l Trade Admin. Dec. 12, 2005), and accompanying Issues and Decision Memorandum ................... 44, 58

*Preliminary Affirmative Countervailing Duty Determination; Certain Fresh Atlantic Groundfish From Canada*, 51 Fed. Reg. 1,010 (Int'l Trade Admin. Jan. 9, 1986).......... 14

*Preliminary Negative Countervailing Duty Determination: Low-Fuming Brazing Copper Rod and Wire From South Africa*, 50 Fed. Reg. 21,328 (Int'l Trade Admin. May 23, 1985)............................................................................................................ 14

*Silicon Metal From Australia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 37,843 (Int'l Trade Admin. Aug. 14, 2017), and accompanying Preliminary Decision Memorandum ...................................................... 74

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg. 26,907 (Int'l Trade Admin. June 12, 2017), and accompanying Issues and Decision Memorandum...................................................................................... 79

*Supercalendered Paper From Canada: Final Results of Countervailing Duty Expedited Review*, 82 Fed. Reg. 18,896 (Int'l Trade Admin. Apr. 24, 2017), and accompanying Issues and Decision Memorandum ............................................74, 75, 77

*Sweaters Wholly or in Chief Weight of Man-Made Fiber From Taiwan, Final
Results of Changed Circumstances Antidumping Duty Administrative Review*,
58 Fed. Reg. 32,644, 32,650 (Int'l Trade Admin. June 11, 1993)................................. 15

**Other**

S. Rep. No. 96-249 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381 ........................... 71, 72

Uruguay Round Agreements Act, Statement of Administrative Action,
H.R. Doc. No. 103-316 (1994) ............................................................................. *passim*

U.S. Const. art. III, § 2 .............................................................................................. 83

## INTRODUCTION

Plaintiff and Consolidated Defendant-Intervenor, The Mosaic Company ("Mosaic"), respectfully submits this response in opposition to the Rule 56.2 motion for judgment upon the agency record filed on October 15, 2021, by Consolidated Plaintiff and Defendant-Intervenor, OCP S.A. ("OCP"). *See* OCP's Rule 56.2 Mot. for J. Upon the Agency R. (Oct. 15, 2021), ECF No. 53 ("OCP Brief").

OCP challenges several aspects of the final determination of the U.S. Department of Commerce ("Commerce" or the "Department") in the countervailing duty ("CVD") investigation of phosphate fertilizers from Morocco. *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Int'l Trade Admin. Feb. 16, 2021), P.R. No. 480, ECF No. 14-4 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. No. 473, ECF No. 14-5 ("Final IDM"). Specifically, OCP challenges: (1) Commerce's initiation of the CVD investigation based on its finding that the Petitions demonstrated sufficient domestic industry support; (2) Commerce's finding that the Government of Morocco's ("GOM") provision of mining rights for less than adequate remuneration ("LTAR") conferred a benefit on OCP; (3) Commerce's investigation of "other assistance" that the GOM provided to OCP; (4) Commerce's finding that the GOM's Reduction in Tax Fines and Penalties program is *de facto* specific; and (5) Commerce's initiation of an investigation into the GOM's provision of phosphogypsum waste disposal services to OCP.

As demonstrated below, Commerce's determinations with respect to the first four issues are reasonable, supported by substantial evidence, and otherwise in accordance with law, and OCP's fifth claim is moot. Accordingly, Mosaic respectfully requests that the Court deny OCP's motion in its entirety.

## RULE 56.2 STATEMENT

### A.  Administrative Decision Under Review

The administrative determination under review is the final determination by Commerce in the CVD investigation of phosphate fertilizers from the Kingdom of Morocco. *Final Determination*, Final IDM. The countervailing duty order on phosphate fertilizers from the Kingdom of Morocco was signed on April 1, 2021, and published in the Federal Register on April 7, 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Int'l Trade Admin. Apr. 7, 2021), P.R. No. 492, ECF No. 14-6.

### B.  Issues Presented and Summary of Arguments

> **1.  Whether Commerce's initiation of the CVD investigation based on a finding of sufficient domestic industry support is supported by substantial evidence and in accordance with law.**

Yes. Commerce's reliance on the domestic industry support calculation in the Petitions is supported by substantial evidence and otherwise in accordance with law, notwithstanding OCP's unsupported arguments about opposition to the Petitions and an alleged need to account for "bulk blenders" in the industry support calculation. Because the Petitions provided substantial evidence showing sufficient industry support, Commerce was not required to poll the industry, contrary to OCP's argument.

> **2.  Whether OCP fails to demonstrate that Commerce's calculation of the benefit conferred by the GOM's provision of mining rights for LTAR is unsupported by substantial evidence and otherwise not in accordance with law.**

Yes. OCP errs in arguing that section 773(b)(3)(B) of the Tariff Act of 1930, as amended (the "Act"), which concerns the calculation of cost of production in antidumping proceedings, applies to Commerce's mining rights for LTAR analysis. Commerce reasonably exercised its

discretion under the Act and its regulations in excluding OCP's headquarters ("HQ"), support, and debt costs in the mining cost build-up because record evidence did not show that those costs were relevant to OCP's phosphate mining and production activities. Moreover, Commerce reasonably used OCP's own profit rate, rather than a surrogate rate, in calculating the "government price" of phosphate rock, and it was not required to adjust the numerator or denominator in that profit rate calculation. Commerce also reasonably included a North African phosphate rock price in its benchmark price calculation.

> **3.      Whether Commerce's investigation of "other assistance" that the GOM provided to OCP is in accordance with law.**

Yes. Commerce's investigation of "other assistance" is consistent with the statute and legislative history, and this Court has previously upheld the same practice that OCP challenges here.

> **4.      Whether Commerce's finding that the Reduction in Tax Fines and Penalties program is *de facto* specific is supported by substantial evidence and in accordance with law.**

Yes. Commerce reasonably followed its prior approach to analyzing the *de facto* specificity of tax programs and found that the number of subsidy recipients is "limited" within the meaning of section 771(5A)(D)(iii)(I) of the Act because the record evidence showed that 8,761 companies obtained reductions in tax fines and penalties out of a total of 262,165 corporate income taxpayers (*i.e.*, 3.3 percent of Moroccan corporate taxpayers) during the period of investigation ("POI").

> **5.      Whether OCP's challenge to Commerce's decision to initiate an investigation of the GOM's provision of phosphogypsum waste disposal services is moot and therefore unreviewable.**

Yes. OCP's challenge is moot because Commerce declined to countervail the program, and Mosaic is no longer appealing this aspect of Commerce's final determination.

### STATEMENT OF FACTS

Consistent with Rule 81(k), the facts provided in this section are limited to those necessary to correct inaccuracies and omissions in OCP's brief. Other relevant facts specific to the five issues challenged by OCP are discussed below in the context of each argument.

### I. The Petitions and Initiation

OCP omitted several important facts regarding the demonstration of domestic industry support in the Petitions and the comments that other parties submitted prior to Commerce's initiation of the investigation. In the Petitions, Mosaic identified all known U.S. producers of the domestic like product – phosphate fertilizers – and provided data on the total volume of U.S. production, and each company's respective share of the total volume of U.S. production, in 2019. *See Phosphate Fertilizers from Morocco and Russia, Petitions for the Imposition of Countervailing Duties*, Vol. I at I-5, Exhibit I-5 (June 26, 2020), P.R. Nos. 2-8, C.R. Nos. 2-8 ("Petitions"). These data were sourced from Mosaic's production data, industry association reports, and estimates based on Mosaic's experience in the industry. *See id.* Based on these data, Mosaic accounted for [      ] percent of U.S. production of the domestic like product in 2019. *Id.* Vol. I at I-5.

[

], submitted comments [                    ] to the Petitions, but they failed to provide any information regarding the level of domestic production of phosphate fertilizers for which they allegedly account. *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce re: *Phosphate Fertilizers from Morocco*: Response to Submissions Concerning Industry Support at [   ] (July 15, 2020), P.R. No. 46, C.R. No. 18 ("Mosaic Response to Submissions Concerning Industry Support"); *Phosphate Fertilizers From the Kingdom of Morocco and the*

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                        NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

*Russian Federation: Initiation of Countervailing Duty Investigations*, 85 Fed. Reg. 44,505,

44,506-07 (Int'l Trade Admin. July 23, 2020), P.R. No. 59 ("Notice of Initiation"). As Mosaic

noted in its response to the pre-initiation comments, [


]. *See* Mosaic Response to Submissions Concerning Industry

Support at [      ]. Commerce also received pre-initiation comments from [                      ]:

International Raw Materials Ltd. ("IRM"), a U.S. importer of subject merchandise; and OCP, the

Moroccan producer of the subject merchandise. Notice of Initiation, 85 Fed. Reg. at 44,506-07.

### STANDARD OF REVIEW

In reviewing a countervailing duty determination, this Court will hold unlawful any

determination, finding, or conclusion found "to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also*

*Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (citing

*SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018)). Substantial

evidence is such "evidence that a reasonable mind might accept as adequate to support a

conclusion." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1374 (Fed. Cir.

2015) (internal quotation marks and citation omitted). "The Court's function is not to re-weigh

the evidence," *USEC Inc. v. United States*, 27 CIT 489, 495, 259 F. Supp. 2d 1310, 1317 (2003),

and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent

an administrative agency's finding from being supported by substantial evidence." *Matsushita

Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted). Absent

some showing to the contrary, Commerce is entitled to the presumption that it considered the

record evidence as a whole. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696

F. Supp. 642, 648 (1988) (holding that "the Commission is presumed to have considered all of the evidence in the record"); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001) ("In short, TKS does not provide any compelling evidence to suggest that Commerce neglected its duty to base its decision on the whole record. To the extent that TKS urges that the evidence before Commerce could be open to multiple interpretations, its argument does not require, or even allow, reversal."). This standard of review also encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

In addition, the Court "shall, where appropriate, require the exhaustion of administrative remedies" in actions arising from Commerce's countervailing duty determinations. 28 U.S.C. § 2637(d). The Court of Appeals for the Federal Circuit has held that the courts should take "a 'strict view' of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007). A party's obligation to exhaust its administrative remedies before Commerce applies both to overall issues and to individual arguments. *See Rhone Poulenc, Inc. v. United States*, 13 CIT 218, 226-27, 710 F. Supp. 341, 348 (1989), *aff'd*, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (finding appellant waived an argument it characterized as "simply another angle to an issue" raised).

## ARGUMENT

I.  **Commerce's Decision to Initiate the CVD Investigation Based on Its Finding of Sufficient Domestic Industry Support for the Petitions is Supported By Substantial Evidence and Otherwise in Accordance with Law**

In the Petitions, Mosaic – which alone accounted for more than [        ] of the domestic

production of phosphate fertilizer – provided its 2019 production data along with estimates for

that of other domestic producers from industry association reports and Mosaic's own industry

knowledge.  *See* Petitions, Vol. I at I-5 to 6, Exhibits I-5 to 8 (comprising reports by the

International Fertilizer Association ("IFA") and production data reported by The Fertilizer

Institute ("TFI")).  [                                                                    ],

submitted comments on industry support, but they did not provide any data indicating their

respective levels of domestic production of phosphate fertilizer, if any, or sales thereof.  Notice

of Initiation, 85 Fed. Reg. at 44,506-07.  [                            ] – OCP, the Moroccan producer of

the subject merchandise, and IRM, an importer of the subject merchandise – also submitted

comments on industry support.  *Id*.  Mosaic submitted comments in response, noting, among

other facts, that [

                                                                                        ].

*See id*.

In reviewing the totality of the Petitions and pre-initiation submissions, Commerce

concluded that "the petitioner demonstrated sufficient industry support with respect to the

initiation of the requested CVD investigations."  *Id*., 85 Fed. Reg. at 44,505.  Because "the

Petitions established support from domestic producers (or workers) accounting for more than 50

percent of the total production of the domestic like product," it followed that "domestic

producers (or workers) who support the Petitions account for at least 25 percent of the total

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Response Brief                          **NON-CONFIDENTIAL VERSION**
Consol. Court No. 21-00116

production of the domestic like product" and that "the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry" expressing a view. *Id.*, 85 Fed. Reg. at 44,507 (citing 19 U.S.C. § 1671a(c)(4)(A)(ii)). Commerce therefore concluded that it was "not required to take further action in order to evaluate industry support (*e.g.*, polling)." *Id.* These findings are supported by substantial evidence and otherwise in accordance with law.

OCP raises several challenges to Commerce's industry support determination, each of which is without merit. *First*, OCP argues that Commerce "was required to consider" the views of "certain domestic parties . . . in determining whether the Petition established sufficient industry support," but "refused to do so." OCP Brief at 15. As an initial matter, the "domestic parties" opposing the Petitions that OCP references are **[**

**]** failed to submit *any* evidence of production of the domestic like product in 2019 – or any explanation as to how **[**                                     **]** could account for some share of total domestic production – much less evidence of a sufficient share of production as to call into question the evidence that Mosaic provided in the Petitions. To state the obvious, if a party fails to provide evidence to support its position, Commerce cannot take that evidence into account in reaching its determinations. Consequently, Commerce's reliance on the domestic industry support calculation in the Petitions is supported by substantial evidence and otherwise in accordance with law.

*Second*, OCP argues that Commerce erred in failing to account for so-called "bulk blenders" of fertilizer products in its calculation of domestic industry support. *Id.* at 19-30. However, the record evidence demonstrates that downstream "bulk blending" cannot be equated with production of phosphate fertilizers, and Commerce's decision to exclude "bulk blenders"

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                              NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

from the domestic industry support calculation is supported by substantial evidence, including

OCP's own pre-initiation comments.

Finally, OCP contends that Commerce violated its statutory duties by declining to poll

the domestic industry or extend its deadline for assessing industry support. *Id.* at 16-17

(asserting that Commerce "cannot ignore domestic opposition based on purported evidentiary

deficiencies" and instead "must poll the industry" as part of its pre-initiation investigation).

Specifically, OCP submits that Commerce has an affirmative duty to investigate any opposition

to a countervailing duty petition as part of the industry support analysis, even when industry

support is evident on the face of the petition. *Id.* at 16. This argument disregards Commerce's

obligations under the statutory scheme. Commerce is only required to request additional

information and poll the industry when the petition does *not* establish domestic industry support.

It has no duty to poll the industry where, as here, a wealth of evidence in the administrative

record supports Commerce's affirmative industry support calculation.

A.    **Substantial evidence supports Commerce's finding that the Petitions
      establish sufficient industry support under § 1671a(c)(4)(A)(i) and (ii),
      notwithstanding the purported opposition of [                    ]**

To establish the requisite industry support, a petition must show that:

(i) the domestic producers or workers who support the petition account for
at least 25 percent of the total production of the domestic like product, and

(ii) the domestic producers or workers who support the petition account
for more than 50 percent of the production of the domestic like product
produced by that portion of the industry expressing support for or
opposition to the petition.

19 U.S.C. § 1671a(c)(4)(A). Commerce has 20 days from the date on which a petition is filed to

make an initial determination of industry support. 19 U.S.C. § 1671a(c)(1)(A)(ii); *Giorgio*

*Foods, Inc. v. United States*, 785 F.3d 595, 610 (Fed. Cir. 2015).

If a petition satisfies the metrics set forth in 19 U.S.C. § 1671a(c)(4)(A), Commerce *must* make an affirmative determination of industry support. Specifically, section 702(c)(4)(A) of the Act, 19 U.S.C. § 1671a(c)(4)(A), states that Commerce "shall" determine that a countervailing duty petition has been filed on behalf of a domestic industry if the petition satisfies both requirements of 19 U.S.C. § 1671a(c)(4)(A)(i) and (ii). Similarly, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("URAA") states that "if a petition provides *sufficient evidence* that domestic producers or workers accounting for more than fifty percent of total domestic production of the domestic like product expressly support the petition, *Commerce will determine, on the basis of evidence contained in the petition,* that the petition is filed 'by or on behalf of the domestic industry.'" Uruguay Round Trade Agreements, Statement of Administrative Action, H.R. Doc. No. 103-316, Vol. 1 at 862 (1994) (emphasis added) ("SAA"). Further, once Commerce makes the factual finding that industry support exists, it is not required to perform further pre-initiation investigation. *See Pokarna Engineered Stone Ltd. v. United States*, No. 20-00127, Slip Op. 21-138, at 10 (CIT Oct. 7, 2021) (observing that "{w}here Commerce determines that a petition has met the industry support threshold, no . . . polling is required," and the opposition "fails to identify any legal authority that would require Commerce to poll the industry upon request, despite a finding of sufficient industry support").

OCP opens with the claim that Commerce "refused to consider the opposition of domestic parties to the Petition" and "presumed that the Petition established adequate industry support." OCP Brief at 16-17. This is false; Commerce did not rely on a presumption, and it did not need to. In actuality, after analyzing the evidence set forth in the Petitions, the voluminous comments on industry support received from OCP, the comments submitted by the other

[          ] parties, and responses from Mosaic, Commerce determined on the basis of the

record evidence that the Petitions satisfied the statutory requirements for industry support. *See*

Notice of Initiation, 85 Fed. Reg. at 44,506-07.

Commerce's determination is supported by substantial evidence. The Petitions identified

all known U.S. producers of phosphate fertilizers and established that Mosaic *alone* satisfied the

requirements of § 1671a(c)(4)(A)(i) and (ii). Specifically, the Petitions: (i) identified the known

U.S. producers based on Mosaic's own knowledge and industry reports published by IFA and

TFI; and (ii) provided data on the total volume of U.S. production, and each company's

respective share of the total volume of U.S. production, of the domestic like product (*i.e.*,

phosphate fertilizers) in 2019. *See id.*, 85 Fed. Reg. at 44,506; Petitions, Vol. I at I-5. The

Petitions sourced these data from Mosaic's own production data, IFA, and TFI, with adjustments

based on Mosaic's industry experience. *See* Notice of Initiation, 85 Fed. Reg. at 44,506;

Petitions, Vol. I, Exhibit I-5. Based on these data, Mosaic accounted for [          ] percent of the

domestic industry producing phosphate fertilizers in 2019. Petitions, Vol. I at I-5.

Commerce has a well-established practice of relying on production data from trade

publications and the petitioner's industry expertise to evaluate domestic industry support. *See* 19

C.F.R. § 351.203(e)(1) ("The Secretary normally will measure production over a twelve-month

period specified by the Secretary, and may measure production based on either value or

volume."); SAA at 862; *Forged Steel Fittings From India and the Republic of Korea: Initiation

of Less-Than-Fair-Value Investigations*, 84 Fed. Reg. 64,265, 64,267 (Int'l Trade Admin. Nov.

21, 2019) (Commerce can rely on petitioner's submissions about its industry knowledge to

measure U.S. production for industry support); *NTN Bearing Corp. of Am. v. United States*, 15

CIT 75, 80, 757 F. Supp. 1425, 1430 (1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (finding that

Commerce's reliance on production data from a trade association during the review period for measure of industry support "was reasonable and proper"). Commerce's finding that the Petitions demonstrated industry support is thus supported by substantial evidence and consistent with its statutory obligations. *See Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987) ("As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology.").

OCP complains that Commerce's industry support analysis failed to "evaluate the impact" of opposition from parties that submitted letters in response the Petitions. OCP Brief at 17. OCP's argument fails for three reasons.

*First*, the entities that submitted comments in opposition to the Petitions failed to provide evidence of how they account for production of the domestic like product. Under the initiation procedures for countervailing duty investigations, section 702(c)(4)(A) of the Act, Commerce is required to determine if a petition is filed by or on behalf of the domestic industry by considering *production* of the domestic like product by supporting "domestic producers and workers." 19 U.S.C. § 1671a(c)(4)(A). Specifically, section 702(c)(4)(A) provides that Commerce "shall determine that the petition has been filed by or on behalf of the domestic industry if-- (i) the domestic producers who support the petition account for at least 25 percent *of the total production of the domestic like product*; and (ii) the domestic producers or workers who support the petition account for more than 50 percent *of the production of the domestic like product* produced by that portion of the industry expressing support for or opposition to the petition." *Id*.

(emphasis added). Although section 702(c)(5) defines "domestic producers or workers" for purposes of this subsection by reference to the definition of "interested party" in subparagraph (C) of section 771(9) of the Act – which includes manufacturers, producers, and wholesalers of the domestic like product – the statute clearly directs Commerce to evaluate the levels of domestic *production* of such parties that support or oppose the petition. *See* 19 U.S.C. § 1671a(c)(4)(A).

Commerce's regulations similarly make clear that Commerce is to determine industry support based on production. *See* 19 C.F.R. § 351.203(e)(1) (providing that Commerce "normally will measure *production* over a twelve-month period" and "may measure *production* based on either value or volume") (emphasis added). The notice of proposed rulemaking that introduced section 351.203(e)(1) of Commerce's regulations explains:

> Paragraph (e) is new and deals with the new statutory requirements regarding determinations of industry support for a petition. Paragraph (e)(1) deals with the measurement of domestic production, an important issue in light of the fact that expressions of support or opposition for a petition *are weighted according to production.*

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7,308, 7,314 (Int'l Trade Admin. proposed Feb. 27, 1996) (emphasis added).

In prior cases, Commerce has determined that "in order to be a producer, an entity must have a 'stake' in the domestic industry in question" and it has defined "having a 'stake' as undertaking the 'actual production of the domestic like product' within the United States." *Eurodif S.A. v. United States*, 411 F.3d 1355, 1359-60 (Fed. Cir.), *aff'd on reh'g*, 423 F.3d 1275 (Fed. Cir. 2005). Commerce has described a "stake" in "actual production" as "requiring that a company 'perform some important or substantial manufacturing operation,'" which includes factors such as control over the production process, control over design specifications, ownership

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

of the design, and ownership of the raw materials and manufacturing process or facilities. *Id.*,

411 F.3d at 1360-61. Additionally, section 702(c)(4)(A) of the Act excludes outright two

categories of entities from the industry support analysis. In particular, Commerce must disregard

the positions of any producers that are "{p}roducers related to foreign producers" and

"{p}roducers who are importers." 19 U.S.C. § 1671a(c)(4)(B); *see also Preliminary Affirmative

Countervailing Duty Determination; Certain Fresh Atlantic Groundfish From Canada*, 51 Fed.

Reg. 1,010, 1,011 (Int'l Trade Admin. Jan. 9, 1986); *Preliminary Negative Countervailing Duty

Determination: Low-Fuming Brazing Copper Rod and Wire From South Africa*, 50 Fed. Reg.

21,328, 21,329 (Int'l Trade Admin. May 23, 1985).

None of the entities opposing the Petitions in this case demonstrated that they are

engaged in actual production of the domestic like product within the United States. [



]. American Plant Food is a wholesaler of phosphate

fertilizers. *See* Letter from American Plant Food to Commerce re: *Phosphate Fertilizer from

Morocco and Russia*: Opposition to Countervailing Duty Petition (July 14, 2020), P.R. No. 47.

IRM is a U.S. importer of phosphate fertilizers produced in other countries. *See* Letter from

Kelley Drye & Warren LLP to Commerce re: *Phosphate Fertilizers from Morocco*: Request on

Behalf of International Raw Materials Ltd. to Poll the Domestic Industry (July 13, 2020), P.R.

No. 37. These entities are not engaged in "*the actual production of the domestic like product

within the United States.*" *Eurodif*, 411 F.3d at 1359-60 (emphasis added).

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

Moreover, there is no evidence on the record that [                                    ]

control phosphate fertilizer production in the United States or have legal ownership over raw

materials, manufacturing processes/facilities, or design processes employed by any such

producer.  *See, e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value: Static*

*Random Access Memory Semiconductors From Taiwan*, 63 Fed. Reg. 8,909, 8,918-19 (Int'l

Trade Admin. Feb. 23, 1998) (design house considered producer when it created the design,

retained ownership of the design throughout the production process, and provided manufacturing

specifications to the foundry subcontractor); *Notice of Final Determination of Sales at Less Than*

*Fair Value: Certain Forged Stainless Steel Flanges from India*, 58 Fed. Reg. 68,853, 68,856

(Int'l Trade Admin. Dec. 29, 1993)  (observing that company "bought the raw materials used to

produce the subject merchandise" and "directed or controlled the process of manufacture or

production"); *Sweaters Wholly or in Chief Weight of Man-Made Fiber From Taiwan, Final*

*Results of Changed Circumstances Antidumping Duty Administrative Review*, 58 Fed. Reg.

32,644, 32,650 (Int'l Trade Admin. June 11, 1993) (finding that company was not a "producer"

when it did not control the production of the domestic like product from raw materials).

Furthermore, as Mosaic indicated in response to [                                    ]

are importers of subject merchandise produced in Morocco and Russia, including by OCP.  *See*

Mosaic Response to Submissions Concerning Industry Support at [        ].  Thus, even if [

        ] *were* domestic producers (which they are not), Commerce would have been

authorized to disregard their purported opposition to the Petitions on that ground alone.  19

U.S.C. § 1671a(c)(4)(B)(ii) (authorizing Commerce to "disregard the position of domestic

producers of a domestic like product who are importers of the subject merchandise"); *see*

*Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1205-06, 704 F. Supp. 1075, 1085 (1988)

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Response Brief                                                    **NON-CONFIDENTIAL VERSION**
Consol. Court No. 21-00116

(upholding Commerce's decision to "exclude{} opposition from parties that were either related to the Brazilian exporters or 'those firms whose imports of FCOJ from Brazil exceed 50 percent of their total production'"); *NTN Bearing Corp.*, 15 CIT at 80 n.5, 757 F. Supp. at 1430 n.5 (observing that Commerce could have excluded alleged producers opposing the petition on the ground that they were "related to an importer of the allegedly dumped merchandise").

    *Second*, the opposition of [                    ] is irrelevant unless they could argue (let alone demonstrate) that they accounted for sufficient domestic like product to affect the Petitions' industry support calculation. Here, Commerce properly discounted their opinions as they failed to establish *any* level of domestic production over the past 12 months. 19 C.F.R. § 351.203(e).[1] [      ], for example, submitted a letter stating that it "[      ] the petition," but it failed to provide any information suggesting that it had any domestic production in 2019, or somehow accounted for others' domestic production, let alone sufficient levels to undermine Commerce's industry support determination. *See* [            ].

    OCP responds that Commerce "cannot ignore domestic opposition based on purported evidentiary deficiencies," OCP Brief at 16, but Commerce did not "ignore" or decline to consider any evidence; the opposing parties simply failed to submit any evidence material to industry

---

[1] Further, while Commerce's regulations provide for the scenario where a domestic producer and workers of the same firm take opposing positions on a petition (in which case Commerce excludes production of that firm from its calculations), *see* 19 C.F.R. § 351.203(e)(3), neither the statute nor Commerce's regulations direct the agency to disregard the position of a domestic producer based on opposition by [                              ]. *See id.*; 19 U.S.C. § 1671a(c)(4)(A). *See also* SAA at 862 (explaining that section 702(c)(4)(A) recognizes that industry support for a petition may be expressed by either management or workers and was intended to give labor an equal voice with management in supporting or opposing initiation of an investigation). The fact that neither Commerce's regulations nor the SAA provide for discounting domestic production based on opposition by [                              ] is persuasive evidence that the Administration and Congress did not intend to provide equivalent treatment to such parties.

support. Commerce routinely requires parties opposing a petition to provide their production

data in order to be considered as part of the industry support analysis. For example, in *Corrosion*

*Resistant Inhibitors from China*, Suez, a party opposing the petition, "did not provide its 2019

production of the domestic like product." Antidumping Duty Investigation Initiation Checklist,

Attachment II at 8, *Certain Corrosion Inhibitors from the People's Republic of China*, Case No.

A-570-122 (Feb. 25, 2020). Commerce found that "even if it were appropriate to consider

Suez's production in the industry support calculation, we would be unable to do so because Suez

did not provide it." *Id.* Commerce rejected a similar effort in *Mattresses from Serbia*, where

certain producers "claim{ed} to identify additional producers that are not included in the

production data" provided in the petition but did not "indicate that these companies produced

mattresses during 2019 and, if so, whether they were significant producers." Antidumping Duty

Investigation Initiation Checklist, Attachment II at 13-14, *Mattresses from Serbia*, Case No. A-

801-002 (Apr. 20, 2020). Since the objecting parties "did not provide any production data for

these producers," Commerce was not required to consider their views. *Id.* at 14. Instead,

Commerce "included all relevant information received from companies that *both expressed a*

*view and provided their 2019 production data*." *Id.* (emphasis added). Here, too, Commerce

acted reasonably and fulfilled its statutory obligations in finding that the Petitions established

industry support in the absence of any contrary evidence.

OCP posits that Commerce's approach effectively imposes an evidentiary burden on

opposing parties beyond the requirements of the statute. *See* OCP Brief at 18. To the contrary, it

is well established that "the burden of creating an adequate record lies with interested parties and

not with Commerce." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337-38 (Fed. Cir.

2016) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)). Further,

Commerce fulfilled its statutory obligations in determining "on the basis of evidence contained in the petition" that the Petitions had sufficient industry support. *See* SAA at 862. Once Commerce determines that a petition has met the industry support threshold, the statute does not require it to "seek information to evaluate the impact of . . . opposition on the industry support calculation," as OCP asserts, OCP Brief at 17, or poll the domestic industry. *See Pokarna*, Slip Op. 21-138, at 10.

The authorities cited by OCP do not support its arguments. For example, in *Fujitsu Ltd. v. United States*, as here, the petitioner alone accounted for a majority of the production of the domestic like product. 23 CIT 46, 50, 36 F. Supp. 2d 394, 398 (1999). The record evidence reviewed by Commerce consisted of the petitions, the opposing party's submissions, and rebuttal comments, similar to this case. *Id.* This Court found that Commerce adequately reviewed the record evidence and affirmed its determination "that there was industry support for the petition because the petitioner, the only domestic producer of vector supercomputers, accounted for more than fifty percent of the total domestic production." *Id.* 23 CIT at 47-48, 36 F. Supp. 2d at 396.

OCP also relies on *NTN Bearing Corp.*, a pre-URAA decision, for the proposition that the agency "must investigate the depth of industry support for the petition," but that case also does not support OCP's position. OCP Brief at 16-17. Unlike here, where the Petitions established both a single domestic like product and the total quantity of U.S. production of the domestic like product, in *NTN Bearing Corp.*, an interested party filed a petition identifying one industry, but Commerce "determined that antifriction bearings actually comprise five classes or kinds of merchandise." *NTN Bearing Corp.*, 15 CIT at 76, 757 F. Supp. at 1427. While the agency began without sufficient information to determine the market share for each of these five categories, "{d}omestic producers of each of these classes or kinds surfaced both in support of

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

and in opposition to the petition." *Id.* This Court ultimately received submissions from six opposing parties but found that "the market share of the opponents to the petition did not rise above 50% of the value of total U.S. production," and thus upheld the original "determination that the petition was filed on behalf of the relevant domestic industries." *Id.* 15 CIT at 79-81, 757 F. Supp. at 1430-31. In ruling for the petitioner, the court declined to extend the domestic industry beyond those parties that submitted their production data to Commerce. The opponents complained that Commerce's "totals {were} skewed because {it} did not survey the entire domestic industry," but the court held that Commerce "need not conduct a probe of the entire industry" and noted that the "Federal Register publishes notice of initiation of petitions and any domestic manufacturers who so chose could have expressed their opposition to the petition." *Id.*

Finally, OCP complains that the opposing parties did not have sufficient time to muster evidence relevant to the industry support analysis. *See* OCP Brief at 18 (suggesting that the initiation determination "is especially troubling in light of the short window of time that non-petitioning domestic parties have to register their positions on a petition" and complaining that "non-petitioning domestic parties had less than three weeks to learn about the Petition"). This argument falls flat when considering the thousands of pages that OCP and other interested parties submitted in the days leading up to Commerce's initiation decision on July 16, 2020. *See, e.g.*, Letter from Covington & Burling LLP to Commerce re: *Phosphate Fertilizers from Morocco and Russia*: Pre-Initiation Comments on Industry Support (July 13, 2020), P.R. Nos. 38-42, C.R. Nos. 11-16 ("OCP Pre-Initiation Comments"). And, of course, parties opposing petitions in other investigations routinely provide their production data, where relevant, within the time allotted for pre-initiation comments. If [                                    ] had relevant domestic production data to provide, and if it lacked sufficient time to collect it, it could have requested

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                           NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

more time or indicated in its correspondence to Commerce that the production data offered in the

Petitions did not account for their respective shares of domestic production. Tellingly, they did

not do so. If anything, OCP's issue is with the terms of the governing statute, which sets a 20-

day time limit for Commerce's initiation decision (as noted above), not the reasonableness of

Commerce's determination in this particular case.[2]

> **B.      Commerce properly excluded so-called "bulk blenders" from the domestic
>          industry support calculation**

Having failed to show that Commerce should have considered the "impact" of opposition

from [               ] and importers, OCP next attacks Commerce's calculation of industry

support by arguing that Commerce should have accounted for mechanical "bulk blending" by

downstream businesses, such as fertilizer distributors and retailers. OCP claims that by

excluding these alleged sources of phosphate fertilizer "production," the Petitions "materially

underestimated production in the United States" of the domestic like product, thus "making it

appear as though the Petition had adequate industry support when it did not." OCP Brief at 19.

In particular, OCP asserts that the Petitions failed "to account for NPK produced by domestic

bulk blenders in its calculation of total production of the domestic like product." *Id*. However,

the materials submitted by OCP only highlight the significant distinctions between mechanical

"bulk blending" of finished fertilizers and the complex processes involved in producing

phosphate fertilizers from raw materials – starting with the mining of phosphate ore – as

described in the Petitions. The record evidence supports Commerce's finding that "bulk

blending activities do not warrant inclusion in the industry support calculation." Countervailing

---

[2] OCP further protests that "the government has a policy of *not* publicizing" petitions "prior to initiation." OCP Brief at 18. The reasons for that are well-founded. *See* SAA at 861. In any event, if the alleged opposition to the Petitions had merit, Commerce would have chosen not to issue a countervailing duty order at the conclusion of its investigation.

Duty Investigation Initiation Checklist, *Phosphate Fertilizers from the Kingdom of Morocco*,

Attachment II at 14-15 (July 16, 2020), P.R. Nos. 54-58, C.R. Nos. 20-24 ("Initiation

Checklist").

1.      OCP's argument misconstrues the scope language

Phosphate fertilizers are by their very nature a fungible commodity product, consisting of

a range of types with varying levels of phosphorous content, including monoammonium

phosphate (MAP), diammonium phosphate (DAP), triple super phosphate (TSP), and nitrogen

phosphorous potassium (NPK) fertilizers.  After a producer formulates and sells a phosphate

fertilizer product (such as MAP and DAP), downstream entities – including distributors,

retailers, and end users/farmers – will often physically mix or blend the phosphate fertilizer with

other types of fertilizer (*e.g.*, potash or urea) or other chemical substances to achieve the desired

levels of nutrient content.  This is the process that OCP refers to as "mechanical bulk blending."

*See* OCP Pre-Initiation Comments at 7-9, Exhibit 2 at 57 [


].

OCP asserts that bulk-blended NPK fertilizers produced domestically should have been

included in the domestic industry support calculation because the scope language explicitly

includes "nitrogen, phosphorous, potassium (NPK) fertilizers . . . that may or may not include

other non-phosphorous plant nutrient components{.}"  OCP Brief at 20-21.  OCP's argument

misconstrues the plain language of the scope and Petitioner's intent.  The third paragraph of the

scope, which OCP quotes in support of its argument, states in full:

> The covered merchandise also includes other fertilizer formulations
> incorporating phosphorous and non-phosphorous plant nutrient
> components, whether chemically-bonded, granulated (*e.g.*, when multiple
> components are incorporated into granules through, *e.g.*, a slurry process),

> or compounded (*e.g.*, when multiple components are compacted together under high pressure), including nitrogen, phosphate, sulfur (NPS) fertilizers, nitrogen, phosphorous, potassium (NPK) fertilizers, nitric phosphate (also known as nitrophosphate) fertilizers, ammoniated superphosphate fertilizers, and proprietary formulations thereof that may or may not include other nonphosphorous plant nutrient components. For phosphate fertilizers that contain non-phosphorous plant nutrient components, such as nitrogen, potassium, sulfur, zinc, or other non-phosphorous components, the entire article is covered, including the non-phosphorous content, provided that the phosphorous content (measured by available diphosphorous pentaoxide, chemical formula P2O5) is at least 5% by actual weight.

Initiation Checklist, Attachment I at 1. This scope language covers phosphate fertilizer formulations incorporating non-phosphorous content that are *chemically-bonded, granulated, or compounded*, including NPK fertilizers that meet those criteria. This language does not cover NPK fertilizers produced via mechanical bulk blending. OCP argues that "{b}ulk blending is one of several well-recognized methods to produce NPK fertilizers," citing the exhibits to its pre-initiation comments. OCP Brief at 21. However, while the record evidence may show that bulk blending is one way to obtain a mixture containing NPK crop nutrients, such evidence does not supersede the aforementioned scope language, which expressly covers only phosphate fertilizer formulations that are chemically-bonded, granulated, or compounded.

Elsewhere the scope states that:

> Phosphate fertilizers that are otherwise subject to this investigation are included when commingled (*i.e.*, mixed or blended) with phosphate fertilizers from sources not subject to this investigation. Phosphate fertilizers that are otherwise subject to this investigation are included when commingled with substances other than phosphate fertilizers subject to this investigation (*e.g.*, granules containing only non-phosphate fertilizers such as potash or urea). *Only the subject component of such commingled products is covered by the scope of this investigation.*

Initiation Checklist, Attachment I at 1 (emphasis added). This language would cover an NPK fertilizer mixture obtained via mechanical bulk blending, but only the phosphate fertilizer

component thereof, which is itself a finished phosphate fertilizer that has been mixed or blended with other substances.[3]

Given this scope language and the record evidence before the agency, Commerce correctly excluded downstream "bulk blenders" from the domestic industry calculation. *See* Antidumping Duty Investigation Initiation Checklist, Attachment II at 7, *Certain Corrosion Inhibitors from the People's Republic of China*, Case No. A-570-122 (Feb. 25, 2020) (finding it unnecessary to include producers of corrosion inhibitor mixes and blends in the domestic industry where only the TTA or BTA components of such blends are covered by the proposed scope of the investigation and, therefore, the domestic like product). Further, Commerce rightly observed that any "bulk blended" NPK fertilizers would "necessarily include{} the phosphate fertilizers produced in the United States that may be commingled or mechanically mixed or blended into a bulk blend that contains phosphate fertilizers." Initiation Checklist, Attachment II at 14. As those tons are already counted in U.S. producers' volume of production for 2019, counting that same product again when it is "bulk blended" by distributors, retailers, or even farmers "could result in double-counting," if not triple-counting, the same tonnage of phosphate fertilizers.[4] *Id.*

---

[3] As Mosaic explained in its response to the pre-initiation comments, this language was included in the scope in part to address potential evasion of the countervailing duty order by foreign producers' combining or mixing phosphate fertilizers with other substances. Mosaic Response to Submissions Concerning Industry Support at 8-9.

[4] Notably, the materials that OCP submitted in its pre-initiation comments describe a variety of "bulk blending" systems, including "On-Farm Blend Systems." *See* OCP Pre-Initiation Comments, Exhibit 6. Thus, the absurd result of OCP's logic would be treating farmers – the end-users of phosphate fertilizers – as U.S. producers. Further, OCP never identifies who the so-called "bulk blenders" are, and none of them submitted pre-initiation comments opposing the Petitions.

2.  The record evidence does not support inclusion of so-called "bulk blenders" as domestic producers of phosphate fertilizers

OCP contends that Commerce erred in not treating "bulk blenders" as domestic producers under the Federal Circuit's "production-related activities" test, because bulk blending involves a certain degree of capital investment and technical expertise. OCP Brief at 21-22 (citing *Eurodif*, 411 F.3d at 1360-61 and describing "the level of complexity and capital investment, employment, training and technical expertise, production processes, and type of equipment"). OCP first suggests that Commerce made a legal error in not directly applying the "sufficient production-related activities test" to so-called "bulk blenders" in its initiation decision. *Id.* at 22-23. But OCP's own authorities undermine its assertion that Commerce is required to rely on a particular test.

In *Brother Indus. (USA), Inc.* – which was an anti-circumvention case that did not involve the industry support provision in section 702(c)(4) of the Act – Commerce found that a company that manufactures products domestically but has "the situs of research, development, {and} design" abroad cannot meet the criteria of a "producer." *Brother Indus. (USA), Inc. v. United States*, 16 CIT 789, 794, 801 F. Supp. 751, 757 (1992). The Court stressed that Commerce "has discretion *to utilize any methodology reasonably suited to fulfilling the statutory goals*," but held that where the agency "elected to use the {production-related activities} analysis to determine whether or not a party is a manufacturer. . . . it must do so fairly . . . ." *Id.* 16 CIT at 795, 801 F. Supp. at 758 (emphasis added). Thus, the Court did not hold that Commerce is *required* to apply the production-related activities test. *See id.* OCP also cites *Pokarna*, but in that case, the court only held that Commerce's reliance on the "sufficient production-related activities" test was reasonable; it never suggested this test was *required*. Slip Op. 21-138, at 10-11.

Absent some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole, *Nat'l Ass'n of Mirror Mfrs.*, 12 CIT at 779, 696 F. Supp. at 648, including the evidence relating to the technical aspects and investment involved in bulk blending submitted by OCP. Commerce clearly considered factors such as the technical expertise of the process in analyzing whether phosphate fertilizers produced in the United States and "comingled or mechanically mixed or blended into a bulk blend that contains phosphate fertilizers" are fully accounted for in the Petitions' industry support calculation. *See* Initiation Checklist, Attachment II at 14-15. Commerce also found that "the record does not contain information indicating that" any of the so-called "bulk blenders" are "producers of phosphate fertilizers" and, citing the Argus NPK Analytics Report submitted by OCP, that "bulk blending activities do not warrant inclusion in the industry support calculation." *Id.* These findings are consistent with the voluminous submissions on the record describing mechanical bulk blending and distinguishing it from the complex production processes involved in making phosphate fertilizers from raw materials.

OCP misunderstands the "production-related activities" test as asking whether bulk blending has "technical features" in the abstract. Rather, the relevant question under this test is whether the features of a particular production process are the same as those employed by the producers of the particular domestic like product. *See Eurodif*, 411 F.3d at 1359-60 ("in order to be a producer, an entity must have a 'stake' in *the domestic industry in question*. Commerce then defined having a 'stake' as *undertaking the 'actual production of the domestic like product'* within the United States.") (emphasis added); *Certain Quartz Surface Products From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value,*

*and Final Affirmative Determination of Critical Circumstances*, 84 Fed. Reg. 23,767 (Int'l Trade

Admin. May 23, 2019), and accompanying Issues and Decision Memorandum at 17.

This Court recently considered and rejected arguments similar to OCP's in *Pokarna*, Slip

Op. 21-138, at 8. The court considered whether the term "producers" in section 702(c)(4)(A) of

the Act "is defined broadly so as to include fabricators for the purposes of Commerce's industry

support analysis." *Id.* at 6-7. Specifically, a company opposing initiation argued that it should

be considered part of the domestic industry because it fabricated downstream quartz products

using inputs manufactured by the producers of quartz surface products ("QSPs"). *Id.* at 12. This

Court applied the "sufficient production-related activities test" to analyze whether fabrication of

these downstream products, which are referred to as "producer-made QSPs," was sufficiently

comparable to the activities of producers of the domestic like product, original QSPs. Although

Commerce identified four technical procedures undertaken by fabricators of producer-made

QSPs, it found those procedures were not sufficiently similar to the complex processes

undertaken by the original producers of QSPs for fabricators to be counted among the domestic

industry, a finding that the court affirmed as reasonable and supported by substantial evidence.

*Id.* (affirming Commerce's finding that "fabricators did not engage *in the same complex*

*processes* as QSP slab producers") (emphasis added).

Here as well, the fact that "bulk blending" involves certain "technical activities" does not

mean that it is sufficiently similar to the complex processes undertaken by U.S. phosphate

fertilizer producers like Mosaic for so-called "bulk blenders" to warrant inclusion in the

domestic industry. OCP Brief at 24. The Petitions demonstrate that production of phosphate

fertilizers is highly complex and involves intensive chemical processes that are readily

distinguishable from mechanical bulk blending. As the Petitions explain, most major foreign and

U.S. phosphate fertilizer producers are vertically integrated such that they (or their affiliates) mine phosphate ore – the key primary input to phosphate fertilizers – in addition to performing the complex processes necessary to convert phosphate ore into phosphate fertilizers. Petitions, Vol. I at I-14. Specifically, U.S. producers mine phosphate ore; "beneficiate" it to remove impurities such as sand, clay, carbonates, organics, and iron oxide; grind the phosphate rock; and convert it to phosphoric acid by chemically reacting it with either sulfuric or nitric acid. *See id*. at I-14 to 15, Exhibit I-13. Phosphoric acid is then reacted with ammonia or other chemical substances through several complex chemical processes. *See id*.

These processes – each of which requires significant technical expertise and industrial investment – include chemical bonding (where the elements are broken down and reconstituted to form ionic, covalent, or metallic bonds in a different compound); granulation (where components are suspended in aqueous or subject to decomposition); and compaction (where the formulations are exposed to high heat or pressure). For example, DAP is typically produced by combining phosphoric acid and ammonia in a reaction vessel, and then pumping the resulting slurry to a granulation plant where it is reacted with additional ammonia, cooled, granulated, and sieved. Petitions, Vol. I at I-16. NPK fertilizers are produced by reacting phosphate rock with sulfuric or nitric acid, as well as potash or another source of potassium. *See id*. at I-17. Thus, the record evidence demonstrates that so-called "bulk blenders" do not engage "in the same complex processes" as producers of phosphate fertilizers. *See Pokarna*, Slip Op. 21-138, at 12.

The evidence that OCP cites relating to the "technical aspects" of bulk blending only reinforce the significant distinctions between production of phosphate fertilizers and mechanical bulk blending of finished fertilizers. OCP describes "bulk blended NPK" as the "physical mixing of carefully sized ingredients through a *mechanical process* that results in a fertilizer that

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Response Brief                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

meets a specific nutrient ratio concentration." OCP Brief at 24 (emphasis added). Notably, [







] (emphasis added).

OCP's references to the investment cost involved in constructing bulk blending facilities

undermine its own position. OCP Brief at 24. OCP cites a presentation included as Exhibit 8 to

its pre-initiation comments that lists "Estimated Fixed Capital Investment for Various NPK

Production Processes." OCP Pre-Initiation Comments, Exhibit 8 at 4. Even if OCP is correct

that bulk blending involves a total fixed capital cost of approximately $3.48 million, this is a

mere fraction of the costs involved in the more complex methods described in the scope

language ($14.23 million for compaction, $17.06 million for steam granulation, and $26.9

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                   NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

million for chemical granulation). *Id.* Ironically, as the previous page of the exhibit explains, the entire purpose of the presentation is to highlight that "bulk blending" is "increasing" because of "*cost*" and "*simplicity*," among other factors. *Id.* Exhibit 8 at 3 (emphasis added). Further, these investment costs do not account for the significant steps preceding granulation or compaction (*i.e.*, mining, beneficiation, conversion of phosphate rock to phosphoric acid, and chemical reaction of phosphoric acid with ammonia or other chemical compounds) that are required to produce phosphate fertilizers. Thus, substantial evidence exists in the record to conclude that bulk blending – the "simpler," cheaper technique – does not involve "the same complex processes" as fertilizer production. *Pokarna*, Slip Op. 21-138, at 12.

OCP's attempt to "correct" Commerce's reliance on the Argus Report exposes the weakness in its efforts to undermine the evidence supporting Commerce's industry support determination. OCP alleges that "Commerce misconstrued the one piece of record evidence cited to support its incorrect assertion that blending was not a production process but rather a 'technique,'" claiming that the report only referred to bulk blending as a "technique" for "certain statistical reporting purposes." OCP Brief at 25. In fact, the Argus Report states [

]. OCP Pre-Initiation Comments, Exhibit 2 at 34 (emphasis added). This is because, as explained above and throughout the record, bulk blending involves the mixing of already-finished phosphate fertilizers. It was entirely reasonable for Commerce to weigh this evidence in evaluating whether so-called "bulk blenders" should be excluded from the industry support calculation. Moreover, the "statistical reporting purposes" that OCP references only further reinforce Commerce's decision here: as the Argus Report observes, [

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Response Brief                                          NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

], meaning that their inclusion in U.S. production data creates a substantial risk of double counting.[5]

Finally, OCP cites Commerce's decision on *Fresh Garlic from the People's Republic of China*, 83 Fed. Reg. 27,949 (2018), for the proposition that that "bulk blenders" do not need to meet any test for the significance of their production-related activities and investment, because "a company with no production whatsoever may qualify as a producer." OCP Brief at 23. This argument undermines OCP's claim that Commerce erred in failing to apply the "sufficient production-related activities test" in the first place. *See id.* at 22-23. Further, it confuses the *volume* of production of the domestic like product necessary to be considered a U.S. producer (and thus an "interested party") with the question of whether a company actually *produces* the domestic like product, or some other product entirely. The significance of Commerce's *Fresh Garlic* decision is, at most, that *if* the domestic like product were mechanical bulk blends (which it is not), then a producer of mechanical bulk blends could qualify as an "interested party" regardless of the volume of its production.[6] But that simply is not at issue here. The standing of

---

[5] A number of record cites in OCP's brief do not support the propositions for which they are offered. For example, OCP cites the Argus Report at page 150 as "identifying that NPK and NPS can be produced by bulk blending." OCP Brief at 24. That page provides no such information; to the contrary, it states that [

] thus substantiating the risk of double counting identified by Commerce in its decision to exclude bulk blending from the industry support calculation. OCP Pre-Initiation Comments, Exhibit 2 at 150.

[6] *Fresh Garlic From the People's Republic of China: Preliminary Results, Preliminary Rescission, and Final Rescission, In Part, of the Antidumping Duty Administrative Review; 2017-2018*, 85 Fed. Reg. 2,400 (Int'l Trade Admin. Jan. 15, 2020), and accompanying Issues and Decision Memorandum at 12 ("Commerce has consistently explained that the Act does not contemplate a minimum threshold amount of production or manufacture for a party to be considered a domestic producer. Commerce here again reiterates this explanation. The domestic standing requirements in the law are broad, and we decline to set a particular level of production that a domestic producer must reach in order to have standing.") (footnote omitted).

an otherwise valid *de minimis* producer does not speak to whether production of mechanical bulk blends qualifies as production of the domestic like product, *i.e.*, phosphate fertilizers.

In sum, Commerce's exclusion of so-called "bulk blenders" from the domestic industry support calculation is supported by substantial record evidence demonstrating that mechanical bulk blending is materially distinguishable from the complex processes involved in production of the domestic like product.

3. <u>OCP fails to show that the Petitions' calculation of domestic industry support underestimates total U.S. production of phosphate fertilizers in 2019</u>

Even if the record evidence compelled a finding that mechanical bulk blending constituted production of the domestic like product (which it does not), OCP fails to show that Commerce's reliance on the domestic industry support calculation in the Petitions was unreasonable. OCP Brief at 27. OCP's assertion that "overwhelming record evidence demonstrat{ed} that a significant quantity of NPK production was not included in the calculation of total production of the domestic like product" lacks support in OCP's brief and is belied by its own pre-initiation submissions. *Id.* In particular, OCP criticizes the Petitions' calculation of total U.S. production but misses the mark by conflating data on U.S. *production* with *consumption*. OCP claims that "Mosaic's estimate of *total* annual U.S. production of domestic like product" at "[                    ]" could not be accurate when "OCP put evidence on the record demonstrating that *total U.S. production* for bulk blended NPK fertilizer *alone* was approximately 20 million metric tons." *Id.* at 28 (emphasis added). OCP misrepresents the record evidence.

OCP's brief cites to pages 10 and 144 of the Argus Report, neither of which provides *any* figures for "total U.S. production for bulk blended NPK fertilizer." Indeed, page 10 contains

[

]. OCP Pre-Initiation Comments, Exhibit 2 at 10.  Page 144 of the Argus Report

[

]. *Id.* at 144

(emphasis added).  OCP may have intended to cite instead to page 143 of the Argus Report,

[

]. *Id.* at 143 (emphasis added).  This evidence is

not probative of the volume of U.S. production of phosphate fertilizers in calendar year 2019.

Commerce's regulations specify that "{i}n determining industry support for a petition

under section 702(c)(4) . . . the following rules will apply: (1) Measuring production.  The

Secretary normally will measure production over a twelve-month period specified by the

Secretary, and may measure production based on either value or volume."  19 C.F.R. §

351.203(e)(1).  The regulations *do not* provide for assessing domestic industry support on the

basis of [

]. Furthermore, the Argus Report data are [

]. Finally, this evidence predates the 12-

month period that Commerce specified (*i.e.*, calendar year 2019) by [                    ],

rendering the data inutile for purposes of calculating domestic industry support for the Petitions.

Thus, the math that OCP performs by comparing Mosaic's estimate of total U.S. production of

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                          NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

phosphate fertilizers in 2019 to an estimate of [

] is utterly meaningless. *See* OCP Brief at 29.

Finally, OCP seeks to dismiss the estimates for U.S. production of certain types of

phosphate fertilizers that Mosaic included in the Petitions, OCP Brief at 29-30, but, as previously

discussed, Commerce routinely relies on industry data and expertise of the petitioner to calculate

domestic industry support and is in fact encouraged to do so by the SAA. *See Forged Steel*

*Fittings From India and the Republic of Korea: Initiation of Less-Than-Fair-Value*

*Investigations*, 84 Fed. Reg. 64,265, 64,267 (Int'l Trade Admin. Nov. 21, 2019) (affirming use of

production data analysis provided by petitioner); SAA at 48 ("{I}f a petition provides sufficient

evidence that domestic producers . . . accounting for more than fifty percent of total domestic

production of the domestic like product expressly support the petition, Commerce will

determine, on the basis of evidence contained in the petition, that the petition is filed 'by or on

behalf of the domestic industry.'"). Thus, while OCP complains that the only information in the

record concerning the production of NPKs in the United States comes in the form of

"unsubstantiated estimate{s} by a Mosaic employee," it cannot point to any reliable data

undermining those estimates. OCP Brief at 30.

Moreover, OCP's disagreement with the weight that Commerce accorded the evidence of

domestic industry support set forth in the Petitions and Mosaic's supplemental filings is not

subject to this Court's review. *See USEC*, 27 CIT at 495, 259 F. Supp. 2d at 1317. As the court

explained in *Pokarna*:

> Almost all of MSI's purported explanations, however, *challenge the*
> *weight Commerce assigned to that evidence*. While Commerce could
> have reasonably reached an alternative finding (*i.e.*, Commerce could
> reasonably have found fabricators to be producers), Plaintiff fails to
> demonstrate that its preferred alternative was the one and only reasonable
> finding that could be reached on the record.

> A party's ability to point to an alternative, reasonable finding on the agency record does not provide a basis for the court to set aside an agency's determination.

*Pokarna*, Slip Op. 21-138, at 15 (emphasis added; citations omitted). Unlike in *Pokarna*, Commerce's industry support findings in the present dispute do not present a close question, and Petitioner respectfully submits that Commerce could not reasonably have reached the alternative finding that OCP is seeking. Nonetheless, even if it were a close question, the record presents a substantial range of support for Commerce's decision. The Court should therefore sustain Commerce's finding that the Petitions established sufficient domestic industry support.

## C. Commerce had no obligation to "poll" the domestic industry when the Petition established adequate industry support

Section 1671a(c)(4)(D) provides that "{i}f the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, the administering authority shall . . . poll the industry or rely on other information to determine if there is support for the petition . . . {.}" 19 U.S.C. § 1671a(c)(4)(D)(i). Thus, when Commerce *does not* have sufficient evidence of industry support, it may poll the industry or seek alternative information to establish production levels. Conversely, "{w}here Commerce determines that a petition has met the industry support threshold, no such polling is required." *Pokarna*, Slip Op. 21-138, at 10.

Proceeding from the flawed premise that "the petition fails to establish industry support for an investigation," OCP asserts that section 1671a(c)(4)(D) requires Commerce to invoke the polling process. OCP Brief at 31. However, OCP's argument assumes the very position it is required to prove – *i.e.*, that Commerce's determination that "the Petition established sufficient industry support" is not supported by substantial evidence. *Id.* at 31-32. And since Commerce

had ample evidence in the Petitions establishing industry support, acted reasonably in discounting the views of entities that failed to establish any production, and properly excluded blending techniques that fall outside the scope of domestic like product from the industry support calculation, it had no further obligation to poll the industry. *See supra* sections I.A-I.B.

OCP points to no case law imposing a requirement to poll the industry for a petition that meets the *prima facie* requirements of section 1671a(c)(4). Neither *Mitsubishi Heavy Indus., Ltd. v. United States*, 21 CIT 1227, 986 F. Supp. 1428 (1997), nor *Fujitsu*, 23 CIT 46, 36 F. Supp. 2d 394, suggests that Commerce must conduct polling for a petition with *prima facie* evidence of domestic industry support. In *NTN Bearing Corp.*, this Court in fact *rejected* the plaintiffs' argument that Commerce was required to poll the industry for additional production data. 15 CIT at 79-80, 757 F. Supp. at 1430-31. Moreover, Commerce has repeatedly determined that it is unnecessary to consider expressions of opposition from other producers when, as here, "the supporters of the petition account for over 50 percent of production of the domestic producers who have expressed an opinion." *Initiation of Antidumping Investigations: Certain Preserved Mushrooms From Chile, India, Indonesia, and the People's Republic of China*, 63 Fed. Reg. 5,360, 5,362 (Int'l Trade Admin. Feb. 2, 1998); *see also* Antidumping Duty Investigation Initiation Checklist, Attachment II at 14, *Mattresses from Serbia*, Case No. A-801-002 (Apr. 20, 2020).

To the extent that OCP faults Commerce for failing to extend its deadline for initiation pursuant to 19 U.S.C. § 1671a(c)(1)(A), this Court's precedents foreclose that argument. *First*, because the Petitions provided sufficient evidence of industry support, the possibility of a deadline extension was "irrelevant." *Pokarna*, Slip Op. 21-138, at 18. *Second*, even if OCP had established an obligation "to poll or otherwise determine industry support for the petition"

(which it has not), the decision by the agency to expand the time to analyze a petition from 20 to 40 days lies entirely at the agency's discretion. 19 U.S.C. § 1671a(c)(1)(B) ("the administering authority *may, in exceptional circumstances*, apply subparagraph (A) by substituting 'a maximum of 40 days' for '20 days'") (emphasis added); *United States v. Rodgers*, 461 U.S. 677, 705 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). Under the circumstances, Commerce's decision to initiate this investigation based on the record evidence in the Petitions and other pre-initiation submissions was supported by substantial evidence and otherwise in accordance with law.

## II. The Aspects of Commerce's Mining Rights for LTAR Benefit Calculation Challenged by OCP are Supported By Substantial Evidence and Otherwise in Accordance with Law

Commerce determined that OCP, a GOM-owned entity that enjoys a perpetual, government-granted monopoly over the exploitation of Morocco's phosphate reserves, received countervailable subsidies pursuant to the mining rights for LTAR program. Final IDM at 5. These mining rights subsidies formed the core of the unfair trade practices Mosaic discussed in its Petitions to Commerce, *see* Petitions, Vol. I at I-1, Vol. II at II-2 to 3, II-9 to 10, and Commerce ultimately determined that OCP received significant subsidies through this program, equivalent to 18.42 percent *ad valorem*. Final IDM at 5. This result reflected both the importance of phosphate ore mining to finished phosphate fertilizers and OCP's position as Morocco's government-owned monopoly phosphate champion.

OCP challenges three aspects of Commerce's calculation of the subsidy benefit the GOM conferred on OCP pursuant to the mining rights for LTAR program: (1) the exclusion of certain costs (*i.e.*, HQ, support, and debt costs) from the OCP cost build-up on the "government" side of the benefit equation; (2) the methodology for calculating a profit to include in this cost build-up;

and (3) the inclusion of a North African phosphate rock price from an industry publication in the

benchmark calculation.  *See* OCP Brief at 38.  OCP's arguments are meritless.  For the reasons

discussed below, Commerce's approaches to these issues are supported by substantial evidence

and otherwise in accordance with law.

    **A.**    **Commerce's exclusion of HQ, support, and debt costs from the OCP cost build-up is supported by substantial evidence and otherwise in accordance with law**

        1.    Commerce's methodology for determining what costs to include in the OCP cost build-up was reasonable

Section 771(5)(E)(iv) of the Act provides that a subsidy benefit shall normally be treated

as conferred where, *inter alia*, "in the case where goods or services are provided, if such goods

or services are provided for less than adequate remuneration."  19 U.S.C. § 1677(5)(E)(iv).  The

Act does not define "adequate remuneration" or otherwise prescribe how Commerce is to assess

whether goods or services have been provided for LTAR.  *See id.*  Accordingly, Commerce has

developed regulations to fill that gap.  Section 351.511 of Commerce's regulations governs the

agency's analysis of benefit in connection with the provision of goods or services, including by

providing a three-tiered hierarchy for Commerce to follow in order to determine whether goods

or services have been provided for LTAR.  *See* 19 C.F.R. § 351.511(a)(2).  Section

351.511(a)(2)(iii) provides the standard for assessing the adequacy of remuneration at Tier 3 of

the hierarchy: "If there is no world market price available to purchasers in the country in

question, the Secretary will normally measure the adequacy of remuneration by assessing

whether the government price is consistent with market principles."  19 C.F.R. §

351.511(a)(2)(iii).

In the *Final Determination*, Commerce summarized its Tier 3 methodology:

> Our benefit calculation at Tier 3 is based on a comparison of the actual per-unit cost build-up of OCP's beneficiated phosphate rock with a market price of phosphate rock. The rationale behind this methodology is that we are investigating the provision of mining rights for LTAR and we cannot find a market price of mining rights with which we can make a direct comparison. Thus, in a Tier 3 analysis, we find it appropriate to conduct a benefit analysis not on mining rights per se, but on the value of the underlying good conveyed via the mining rights. Therefore, when considering cost adjustments, we will take into consideration the *relevant production costs* associated with producing the phosphate rock from the minerals in the ground as well as *the pricing of phosphate rock.*

Final IDM at 23-24 (citation omitted). Thus, having adopted a Tier 3 approach, Commerce was required under section 351.511(a)(2)(iii) of its regulations to determine "whether the government price is consistent with market principles." *See* 19 C.F.R. § 351.511(a)(2)(iii). To answer this question, Commerce conducted "a comparison of the actual per-unit cost build-up of OCP's beneficiated phosphate rock with a market price of phosphate rock." Final IDM at 23. OCP does not challenge the validity of section 351.511(a)(2)(iii); Commerce's resort to Tier 3; or Commerce's selected methodology, under Tier 3, of comparing an OCP phosphate rock cost build-up to a phosphate rock market price benchmark. OCP does, however, contest Commerce's treatment of its costs in constructing the build-up.

In the *Final Determination*, Commerce explained its Tier 3 methodology in part by noting that "neither 19 CFR 351.511(a)(2)(iii) nor our *CVD Preamble* imposes specific requirements that we need to take into consideration all costs incurred by a respondent company." Final IDM at 23 (citation omitted). Indeed, the standard under section 351.511(a)(2)(iii) of the regulations is general in nature – *i.e.*, "whether the government price is consistent with market principles" – and does not prescribe a specific methodology (regarding costs or otherwise) for applying the standard. 19 C.F.R. § 351.511(a)(2)(iii). In fact, Commerce has previously applied this standard without conducting *any* cost build-up. *See Melamine From*

*Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg.

68,849 (Int'l Trade Admin. Nov. 6, 2015), and accompanying Issues and Decision Memorandum

at 11 (finding natural gas provided for LTAR based on the contractual arrangement between the

government and the recipient). Moreover, the *Preamble* to Commerce's regulations is also

devoid of specific rules or guidance that are applicable here, reflecting the agency's deliberately

cautious approach toward the widely varying circumstances it expected to encounter in applying

the "adequate remuneration" standard. *See Countervailing Duties,* 63 Fed. Reg. 65,348, 65,378

(Int'l Trade Admin. Nov. 25, 1998) ("*CVD Preamble*") ("Although we do not have enough

experience with the adequate remuneration standard to state when a price discrimination analysis

may be appropriate . . . ."). As the *CVD Preamble* states:

> Where the government is the sole provider of a good or service, and there
> are no world market prices available or accessible to the purchaser, we
> will assess whether the government price was set in accordance with
> market principles *through an analysis of such factors as* the government's
> price-setting philosophy, costs (including rates of return sufficient to
> ensure future operations), or possible price discrimination. *We are not
> putting these factors in any hierarchy, and we may rely on one or more of
> these factors in any particular case.* In our experience, these types of
> analyses may be necessary for such goods or services as electricity, land
> leases, or water, and *the circumstances of each case vary widely*.

*Id.* (emphasis added).

The Act and Commerce's regulations do not mandate a cost build-up in an LTAR

analysis, let alone prescribe which cost items Commerce must include if it chooses to undertake

such a calculation. Accordingly, in the *Final Determination*, Commerce correctly observed that

there are no specific rules or guidance prescribing which costs it should account for in

constructing a cost build-up for purposes of a Tier 3 LTAR benefit analysis.

Commerce therefore had discretion to adopt a reasonable method for determining which

costs to include in the cost build-up, and it did so. As discussed above, Commerce's

unchallenged objective was to compare "the actual per-unit cost build-up of OCP's beneficiated phosphate rock with a market price of phosphate rock." Final IDM at 23. Accordingly, Commerce explained that "when considering cost adjustments, we will take into consideration the *relevant production costs* associated with producing the phosphate rock from the minerals in the ground as well as *the pricing of phosphate rock*." *Id.* at 24. Commerce also observed that, in light of the absence of specific rules or established agency practice on cost adjustments in this context, "{b}y its nature the analysis depends upon available information concerning the benchmark and the underlying good. Therefore, cost adjustments must be developed on a case-by-case basis." *Id.*

Commerce adhered to this reasonable approach in evaluating OCP's arguments regarding HQ, support, and debt costs. For the costs OCP reported under those categories, the agency cited items illustrating the types of costs OCP proposed for inclusion. *Id.* Those costs have no apparent connection with phosphate rock production and pricing: "purchases of services (*e.g.*, IT services, catering, accounting, and facility management), external fees (*e.g.*, telecommunications, consulting and advertising, bank fees, and insurance), amortization of equipment used by the entire company (*e.g.*, IT equipment)," and "interest on loans" reportedly "represent{ting} interest paid on various debts—bonds, loans, convertible debt, or lines of credit—that are broadly applicable or fund general corporate purposes." *Id.* Commerce explained that "we do not have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock," and that it also did not have sufficient information to segregate any costs that could "arguably be related to mining operations" from other costs. *Id.* (citation omitted). Accordingly, Commerce reasonably determined not to include these costs in the build-up.

  2.   OCP fails to establish that it was unlawful for Commerce to exclude HQ,
       support, and debt expenses from the cost build-up

OCP makes three arguments in challenging Commerce's exclusion of HQ, support, and

debt expenses from the cost build-up: (1) that a statutory provision pertaining to *antidumping*

proceedings supposedly requires the inclusion of these expenses in the countervailing duty, tier-

three benchmark context; (2) that Commerce's practice supposedly requires the same; and (3)

that Commerce unlawfully found that, as a factual matter, these expenses were unrelated to

phosphate rock mining and pricing.  As discussed below, each of these arguments fails.

  a.   *The statute does not require Commerce to include costs unrelated to*
       *phosphate rock production in its cost build-up*

OCP argues that section 773(b)(3)(B) of the Act applies directly to this and other

countervailing duty proceedings – *i.e.*, Commerce allegedly "lacks discretion" to exclude its HQ,

support, and debt expenses because section 773(b)(3)(B) supposedly applies to Commerce

countervailing duty proceedings.  OCP Brief at 42 (citing 19 U.S.C. § 1677b(b)(3)(B)).

According to OCP, the prefatory language in section 773(b)(3)(B), which states "{f}or purposes

of *this part*," means the calculation methodology set out in section 773(b)(3) for determining

cost of production applies not only to the antidumping-related provisions in Title 19, Chapter 4,

Subtitle IV, Part IV, but also to the countervailing duty provisions in that same Part IV, including

the subsidy benefit provisions in section 771(5)(E).  OCP Brief at 42-43.

OCP is misinterpreting the statute.  The "{f}or purposes of this part" clause in section

773(b)(3)(B) establishes that the "cost of production" methodology set out in section 773(b)(3)

also applies to the other section of Part IV that uses the term "cost of production" – namely,

section 781(d)(2)(B), which requires Commerce to calculate the "cost of production" when it

assesses whether to exclude certain "later developed merchandise" from the scope of an order.[7]

However, it does not establish that Commerce must also apply that methodology when it

calculates benefit under 19 U.S.C. § 1677(5)(E)(iv) and 19 C.F.R. § 351.511(a)(2), neither of

which contains the term "cost of production."[8]

Section 773(b)(3) is a paragraph within a larger section 773 entitled "Normal value" –

*i.e.*, the section of the statute addressing the determination of normal value in antidumping

proceedings. *See, e.g.*, 19 U.S.C. § 1677b(a). The text of section 773(b)(3) contains terms and

concepts, such as "normal value," "foreign like product," and "country other than the exporting

country," leaving no doubt that this provision concerns dumping. The legislative history also

demonstrates that Congress intended the entirety of section 773(b) to apply to antidumping, not

countervailing duty, proceedings.[9] The fact that the countervailing duty provisions of the statute

make no reference to section 773 in general – or "cost of production" in particular – further

buttresses this conclusion.

---

[7] If the term did not appear in section 781, Congress could have chosen instead to include the cost of production methodology in the "Definitions and Special Rules" paragraph of section 773(b)(2), as a new subparagraph (E).

[8] Indeed, the term "cost of production" does not appear *anywhere* in the provisions of the Act governing countervailing duty determinations – including, most importantly, in the chaussette of section 771(5)(E), which specifies how Commerce is to determine the adequacy of remuneration. *See* 19 U.S.C. § 1677(5)(E)(iv). If Congress had wanted to require Commerce to apply the section 773(b)(3) methodology in that context, it would have said so.

[9] Congress intended the entirety of section 773(b) to apply to antidumping, not countervailing duty, proceedings. *See* SAA at 831 ("Section 773(b) of the Act currently provides that Commerce will determine whether foreign market sales are at prices below cost when it has 'reasonable grounds to believe or suspect' that such sales have occurred. . . . New section 773(b) incorporates the requirements of the Agreement, which, but for a few changes, are based on the existing U.S. law. Overall, these changes provide improved criteria for determining when to exclude below-cost sales as a basis for normal value.").

Furthermore, in the context of the tier-three benchmark analysis in this case, it was reasonable for Commerce to decide whether to include particular cost items based on whether there was sufficient evidence linking them to phosphate rock mining and pricing. Just because some part of the OCP enterprise outside of its mining operations happened to incur a cost such as catering, for example, it does not follow that other phosphate rock producers also incur a similar cost, such that the cost can be assumed to be reflected in the phosphate rock prices used in the market benchmark. Thus, it was reasonable for Commerce to evaluate whether these costs should be incorporated into the build-up, and as demonstrated in greater detail Section II.A.3 below, substantial evidence supports Commerce's decision not to incorporate them.

OCP's statutory argument is also contrary to this Court's precedent recognizing that antidumping and countervailing duty proceedings involve different analyses with different criteria. *See Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1306-07 (CIT 2015); *Guangdong Wireking Housewares & Hardware Co. v. United States*, 37 CIT 319, 330 n.7, 900 F. Supp 2d 1362, 1374 n.7 (2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014) ("ADs and CVDs are separate remedies that address different anticompetitive behaviors."). Accordingly, OCP's reliance on precedent involving the application of section 773(b)(3)(B) in antidumping proceedings, *see* OCP Brief at 43, is misplaced and should be rejected as well.

>    b.  *Commerce's practice does not require it to include costs unrelated to phosphate rock production in its cost build-up*

OCP next argues that Commerce acted contrary to its practice in other CVD proceedings involving COP build-ups, which practice allegedly requires the inclusion of HQ, support, and debt costs in the build-up. *See id.* at 43-45. This argument also fails, as demonstrated below.

OCP relies on the *Softwood Lumber from Canada* ("*Lumber* V") final CVD determination in 2017, arguing that, there, Commerce "found that similar costs should be part of

the benchmark analysis because respondents incurred these costs in producing the relevant

good." *Id.* at 44 (citing *Certain Softwood Lumber Products from Canada: Final Affirmative

Countervailing Duty Determination, and Final Negative Determination of Critical

Circumstances*, 82 Fed. Reg. 51,814 (Int'l Trade Admin. Nov. 8, 2017), and accompanying

Issues and Decision Memorandum at 9-10, 71, 73 ("*Lumber V* Final IDM")).  But Commerce's

*Lumber V* final determination does not stand for the proposition that the agency will include any

cost incurred by a respondent outside of the operations involved in producing the good at issue.

Rather, Commerce included in its benefit calculation indirect and general and administrative

("G&A") costs that the respondents "must incur" to obtain the input at issue, after finding "that

the{se} reported costs were *tied to* either respondents' tenure obligations or to expenses relating

to accessing, harvesting, or hauling timber to the mills." *Lumber V* Final IDM at 73 (emphasis

added).

Commerce applied a similar rationale in the *Lumber IV* administrative review cited by

OCP.  *See* OCP Brief at 44.  In that review, Commerce included some costs and excluded others

in the benefit calculation based on the connection to the relevant production activity:

> In determining which cost adjustments to make, we have focused on those
> costs that are assumed under the timber contract (*e.g.*, the Crown tenure
> agreement), and those costs that are necessary to access the standing
> timber for harvesting, but that may differ substantially depending on the
> location of the timber.  Where such costs are incurred by harvesters in
> either the Maritimes or the subject provinces, we have included them in
> our benefit calculations.  Post-harvest activities such as scaling and
> delivering logs to mills or markets *are not included as an adjustment in
> the benefit calculations because they are not necessary to access the
> standing timber for harvesting*.

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber

Products from Canada*, 70 Fed. Reg. 73,448 (Int'l Trade Admin. Dec. 12, 2005), and

accompanying Issues and Decision Memorandum at 107 (citation omitted) (emphasis added).

Whereas Commerce included such costs that respondents "must incur" to engage in, and which were "tied to," the relevant activity in *Lumber V* (and in *Lumber IV*), the record evidence here does not show similar links with respect to HQ, support, and debt costs, as Commerce reasonably found. *See* Final IDM at 24. Notably, however, Commerce did include "site-specific overhead costs in its mining rights cost build-up," as OCP conceded in its administrative case brief. Letter from Covington & Burling LLP to the Department re: OCP Case Brief at 25 (Jan. 13, 2021), P.R. No. 450, C.R. No. 301 ("OCP Case Brief"); *see also* OCP Brief at 45. Thus, Commerce's approach in this proceeding is consistent with that of *Lumber V* and *Lumber IV*. In each case, Commerce based its decision whether to include or exclude particular costs on whether the record evidence showed sufficient links to the relevant production activity.

OCP's reliance on *Hot-Rolled Steel from India* is no more persuasive. *See* OCP Brief at 44. In the preliminary results of the *Hot-Rolled Steel from India* administrative review, to construct a cost build-up for a tier-three benchmark analysis, Commerce "added the *operational mining costs*, on a per unit basis, which consisted of materials, labor, depreciation, overhead, and royalties." *See Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578, 1,591 (Int'l Trade Admin. Jan. 9, 2008) (unchanged in final) (emphasis added). Commerce's inclusion of "operational mining costs" in *Hot-Rolled Steel from India* is fully consistent with its approach here. In both cases, Commerce only included costs that were specific to mining activity and excluded others. With respect to overhead expenses in particular, as noted above, Commerce included overhead costs that were specific to OCP's mining sites but it declined to include costs for which there was insufficient evidence of a connection to phosphate rock production and sales.

Finally, OCP criticizes Commerce's discussion of *Coated Free Sheet Paper from Indonesia*, OCP Brief at 44-45; *see also* Final IDM at 24, but this critique is unavailing. In the relevant passage from the *Final Determination*, Commerce reiterated the distinction between CVD and AD proceedings and remarked on a distinction the agency drew in *Coated Free Sheet Paper from Indonesia*:

> Again, the relevant regulation and guideline do not require us to conduct cost analysis as if we are conducting an AD proceeding. In a prior case, we made a distinction between the cost adjustments at Tier 3 for a similar calculation and the cost of goods sold (COGS).

Final IDM at 24 (citing *Coated Free Sheet Paper from Indonesia* IDM, Comment 14). In *Coated Free Sheet Paper from Indonesia*, Commerce rejected respondents' contention that an additional adjustment for G&A fees should be applied to the extraction costs at issue, finding that the source for the extraction costs was "based on 'costs of production' and not just COGS," such that an additional adjustment for G&A fees "would result in deducting these expenses twice." *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Int'l Trade Admin. Oct. 25, 2007), and accompanying Issues and Decision Memorandum at 80-81 ("*Coated Free Sheet Paper from Indonesia* IDM").[10] Commerce's reference to this prior case reflects a concern that adding costs like G&A to production costs that already include overhead costs could improperly inflate the cost build-up. As noted above, that was the case here: Commerce's cost build-up included mining site-specific overhead costs.

---

[10] As indicated above, Commerce in the *Final Determination* cited to Comment 14 of the *Coated Free Sheet Paper from Indonesia* IDM. *See* Final IDM at 24 n.163. As OCP observes, OCP Brief at 44 n.14, that citation appears to be incorrect, since Comment 16 (particularly at pages 80-81) of the *Coated Free Sheet Paper from Indonesia* IDM contains the passage corresponding to Commerce's statement in the Final IDM. However, this citation discrepancy is immaterial because Commerce's reasoning is readily discernible, as indicated by OCP's discussion of Comment 16 at page 80 of the *Coated Free Sheet Paper from Indonesia* IDM. *See* OCP Brief at 45.

OCP Brief at 45. Thus, the reference to *Coated Free Sheet Paper from Indonesia* supported Commerce's decision to exclude costs unrelated to phosphate rock production and pricing.

> 3.    <u>Commerce's factual finding that OCP's HQ, support, and debt costs were unrelated to phosphate rock mining and pricing is supported by substantial evidence and otherwise in accordance with law</u>

OCP contends that Commerce's exclusion of its HQ, support, and debt costs from the cost build-up is unsupported by substantial evidence and otherwise contrary to law because the agency allegedly ignored "robust evidence demonstrating a portion of HQ, support, and debt costs were incurred for phosphate rock production." OCP Brief at 46. To the contrary, Commerce reasonably and lawfully determined that insufficient evidence existed to warrant inclusion of those costs in the phosphate rock cost build-up.

In the *Final Determination,* Commerce summarized its reasoning for excluding the HQ, support, and debt costs as follows:

> Although OCP itemized the expenses that constitute its HQ/support costs and cost of debt into generic categories, we do not have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock. Moreover, to the extent that some items in OCP's HQ/support expenses in the cost build up could arguably be related to mining operations, the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations.

Final IDM at 24 (citation omitted). As this explanation indicates, Commerce analyzed whether the evidence related to these costs showed that they were relevant to phosphate rock production and pricing, and it found the evidence insufficient because merely grouping cost items into "generic categories" and then arithmetically allocating them to OCP's mining operations does not establish that these costs are, in fact, relevant to phosphate rock production and pricing for purposes of Commerce's benefit analysis.

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

OCP asserts that this conclusion was improper because the record allegedly "demonstrates that these costs were incurred for the mining and the production of phosphate rock," and it cites examples of excluded costs allegedly related to OCP's phosphate rock operations. OCP Brief at 46-48. OCP then contends that its method for allocating a portion of HQ, support, and debt costs to its phosphate rock operations was reasonable. *Id.* at 48-49. From these premises, OCP argues that the record was complete, and that "if Commerce determined it needed additional information, it had a duty to ask," but the agency failed to do so. *Id.* at 50. These arguments fail for the reasons discussed below.

*First*, OCP ignores Commerce's reasonable use of a "relevance" criterion to evaluate whether a cost OCP incurred outside its mining operations is properly attributed to those operations. That the larger OCP entity incurred costs that OCP categorizes as HQ, support and debt costs, and which it asserted in the investigation are attributable to its phosphate mining operations, does not establish that those costs are relevant to Commerce's analysis – whose purpose, as noted above, was to arrive at a price for phosphate rock, and by extension phosphate rock mining rights. Commerce reasonably recognized the need to evaluate whether inclusion of these costs was appropriate in light of the evidence, or lack thereof, linking those costs to phosphate rock production or mining. *See* Final IDM at 24.

Indeed, it would have been unreasonable for Commerce to have adopted OCP's preferred approach, which would include a portion of virtually *any* cost OCP incurred outside of its phosphate rock operations, no matter how remote from phosphate rock production or pricing. The risks of that approach were manifest, since OCP chose a "kitchen sink" approach of allocating all manner of costs under the "generic categories" of HQ, support, and debt costs, even if the costs had [

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

Response Brief                                                      **NON-CONFIDENTIAL VERSION**
Consol. Court No. 21-00116

]. Letter from Covington & Burling LLP to Commerce re: *Phosphate Fertilizers from the Kingdom of Morocco*: Response to Questionnaire in Lieu of On-Site Verification at 29-30 (Dec. 30, 2020), P.R. No. 436, C.R. Nos. 289-94 ("OCP Verification Resp."). If Commerce had accepted this approach, it would have improperly inflated OCP's cost build-up, and thereby distorted the benefit analysis. Accordingly, Commerce reasonably examined whether the various costs that OCP grouped into HQ, support, and debt categories had sufficient evidentiary links to phosphate rock production and pricing.

*Second*, OCP attempts to justify its preferred approach by citing cherry-picked examples of individual cost items within the [         ] larger pool of HQ, support, and debt costs. OCP Brief at 46-48. This does nothing to undermine the concerns Commerce expressed in excluding these costs. *See* Final IDM at 24. As Commerce explained, it had insufficient information to demonstrate the relevance for "each" of the cost items at issue in the HQ, support, and debt categories, and even if some of these items were arguably relevant, OCP did not present its information in a way that would allow Commerce to distinguish those costs from irrelevant costs. *Id.* By arguing once again that there are some seemingly relevant costs in these categories, OCP fails to demonstrate that the record compelled Commerce to conclude that *all* the costs are relevant, or that it was unreasonable for Commerce to find that there was insufficient information to distinguish between relevant and irrelevant costs.

Commerce's concern is well-founded. OCP seeks to inflate Commerce's cost build-up by a total of MAD [           ] in HQ, support, and debt costs (*i.e.*, MAD [           ] for HQ/support and MAD [           ] for debt). *See* OCP Brief 47-48. That total is equivalent to [     ] percent of the MAD [           ] in mining and phosphate rock production costs

BUSINESS PROPRIETARY
INFORMATION DELETED

Response Brief                                                    NON-CONFIDENTIAL VERSION
Consol. Court No. 21-00116

reported by OCP and used by Commerce in the build-up. *See* Memorandum from Robert Palmer

& Samuel Glickstein, Int'l Trade Compliance Analysts, through Robert Palmer, Program

Manager, to File, re: OCP Calculations for the Final Determination, Attachment 1, Tab

"OCPMiningCosts" (Feb. 8, 2021), P.R. Nos. 475-76, C.R. Nos. 307-08. As noted above, many

of the cost items OCP seeks to include are described in OCP's own records in ways that are

either so remote from its mining operations (*e.g.*, IT services, catering, [

]) or [

]) that it would have been unreasonable for Commerce to include them in the build-up. *See* Final

IDM at 23-24; OCP Verification Resp. at 7, 29-30. Moreover, in its agency case brief, OCP

admitted that it provided job descriptions for only "some" of "the positions that are classified in

HQ and support cost centers," OCP Case Brief at 25; in fact, it provided [            ] such job

descriptions in attempting to justify the inclusion of [        ] of dirhams in costs. OCP

Verification Resp., Appendix VE-MIN-4.

     *Third*, there is no legal basis to fault Commerce for the inadequacy of evidence linking

HQ, support, and debt costs to phosphate rock mining and pricing. "{T}he burden of creating an

adequate record lies with interested parties and not with Commerce." *Nan Ya Plastics Corp. v.*

*United States*, 810 F.3d at 1337-38 (quoting *QVD Food Co. v. United States*, 658 F.3d at 1324).

Furthermore, Commerce gave OCP multiple opportunities to establish the relevance of HQ,

support, and debt costs to phosphate rock production, but OCP stalled and squandered these

opportunities. Specifically:

- OCP sought and obtained three extensions of the deadline for its initial response to Section III of Commerce's countervailing duty questionnaire, dated July 28, 2020, such that OCP did not file it until September 17, 2020, Letter from Commerce to Covington & Burling LLP re: *Phosphate Fertilizers from the Kingdom of Morocco*: Third Extension of Time to File Section III Initial Questionnaire Response (Sept. 15, 2020), P.R. No. 126;

- OCP, in its initial Section III questionnaire response, referred vaguely to the "numerous other costs" it allegedly bears "in connection with its mining rights," OCP Initial Questionnaire Response at 86 (Sept. 17, 2020), P.R. Nos. 130-142, C.R. Nos. 39-58 ("OCP IQR"), thereby prompting Commerce to issue a supplemental questionnaire on October 13, 2020 because OCP's initial response did "not include details on any of these other costs," Commerce Suppl. Questionnaire to OCP at 6 (Oct. 13, 2020), P.R. No. 221, C.R. No. 145;

- OCP sought and obtained extensions of the deadline for its response to Commerce's supplemental questions regarding OCP's costs related to mining rights, such that OCP's response was not filed until November 6, 2020, less than three weeks before the November 23, 2020 deadline for Commerce's preliminary determination, Letter from Covington & Burling LLP to Commerce re: *Phosphate Fertilizers from the Kingdom of Morocco*: Extension Request for Suppl. Questionnaire Response (Oct. 20, 2020), P.R. No. 240; Memorandum to the File from Bob Palmer, Deadline Extension for Suppl. Questionnaire Response (Oct. 21, 2020), P.R. No. 241; Letter from Covington & Burling LLP to Commerce re: *Phosphate Fertilizers from the Kingdom of Morocco*: Second Extension Request for Suppl. Questionnaire Response (Oct. 28, 2020), P.R. No. 246; Memorandum to the File from Bob Palmer, Deadline Extension for Suppl. Questionnaire Response (Oct. 29, 2020), P.R. No. 249;

- OCP, in its November 6 supplemental response, chose to report a vast array of costs grouped under the HQ, support, and debt categories, and to do so with a single paragraph of explanation that failed to demonstrate links between these costs and OCP's phosphate rock production operations, despite Commerce's instructions in the supplemental questionnaire to detail and substantiate all costs for mining phosphate ore and processing it into beneficiated phosphate rock, *see* OCP Suppl. Questionnaire Response ("OCP SQR"), Part 3 at 8 (Nov. 6, 2020), P.R. No. 354, C.R. No. 232;[11] and

- OCP, in its December 30, 2020 response to Commerce's in lieu of verification ("ILOV") questionnaire, submitted additional information regarding HQ, support,

---

[11] The entirety of OCP's narrative discussion of HQ, support and debt costs is as follows:

> OCP also allocates a portion of two corporate-level expenses to each of its mining operations/entities: (1) {HQ} and support expenses, and (2) cost of debt. HQ and support costs are allocated to each entity on the basis of total operating costs (excluding raw materials, freight, amortization). Debt cost is allocated to each entity on the basis of each business unit's share of total 2009-2019 capital expenditures. See Appendix MIN2-7 (HQ and Debt Cost Allocation) for calculation of the allocation percentages. OCP allocates the HQ costs to each phase of the value chain based on shares of direct costs, and allocates debt cost to each phase of the value chain phase on the basis of shares of total amortization expenses.

OCP SQR, Part 3 at 8.

and debt costs that compounded, rather than allayed, Commerce's concerns about
the absence of any link between previously reported HQ, support, and debt costs,
and phosphate rock production., *see* Final IDM at 24.

Thus, OCP had multiple opportunities to attempt to provide sufficient information

demonstrating that the costs at issue are relevant to Commerce's phosphate rock cost build-up,

but it squandered these opportunities and, as a substantive matter, failed to demonstrate that

those costs should be included. Under these circumstances, Commerce was under no obligation

to do more.

*Fourth*, the only authority OCP cites for its contrary position is the Court's decision in

*Gerber Food (Yunnan) Co. v. United States*, 31 CIT 921, 930, 491 F. Supp. 2d 1326, 1337

(2007), *see* OCP Brief at 50, but that case provides no support for the proposition that Commerce

erred in this case. Rather, the passage from *Gerber Food (Yunnan)* that OCP quotes is merely a

restatement of the criteria in section 782(e) of the Act that must be met before Commerce may

"decline to consider information that is submitted by an interested party and is necessary to the

determination but does not meet all the applicable requirements established by" the agency. 19

U.S.C. § 1677m(e); *Gerber Food (Yunnan)*, 31 CIT at 930, 491 F. Supp. 2d at 1337. It is the

respondent's obligation, not Commerce's, to establish that the information meets all five criteria

in section 782(e) of the Act, 19 U.S.C. § 1677m(e), before Commerce is required to consider

deficient information. *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1360 (CIT

2020).

Commerce may decline to use information submitted by a respondent if the information

is so incomplete that it cannot serve as a reliable basis for reaching the applicable determination

or if the information cannot be used without undue difficulties. 19 U.S.C. § 1677m(e)(3), (5);

*see also Am. Tubular Prod., LLC v. United States*, 36 ITRD 1073 (CIT 2014), *aff'd in part*, 847

F.3d 1354 (Fed. Cir. 2017). Here, the information on the record did not satisfy the five criteria

outlined in section 782(e), particularly subparagraphs (3), concerning the completeness of the

information, and (5), concerning Commerce's ability to use the information without undue

difficulty. As Commerce explained in the *Final Determination*, OCP failed to provide sufficient

information establishing the relevance of its HQ, support, and debt costs to phosphate rock

production and pricing, and its reporting left Commerce unable to "to segregate and remove

those costs which are considered unrelated to mining operations." Final IDM at 24.

Moreover, Commerce's determination with respect to HQ, support, and debt costs is fully

consistent with section 782 of the Act. Section 782 provides that, if Commerce determines that a

response to a request for information is insufficient, it must notify the submitter and, to the extent

practicable, provide an opportunity to remedy or explain the deficiency. 19 U.S.C. § 1677m(d).

This obligation is satisfied when Commerce issues a supplemental questionnaire specifically

pointing out and requesting clarification of the person's deficient responses. *NSK Ltd. v. United

States*, 481 F.3d 1355, 1360 n.1 (Fed. Cir. 2007). If Commerce determines the response to the

supplemental questionnaire is unsatisfactory, then Commerce may, subject to 1677m(e),

disregard all or part of the original and subsequent responses. 19 U.S.C. § 1677m(d); *see also

Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) ("Borusan had

already failed to provide the information requested in Commerce's original questionnaire, and the

supplemental questionnaire notified Borusan of that defect. § 1677m(d) does not require more.").

Here (as noted above), in its supplemental questionnaire of October 13, 2020, Commerce

notified OCP that it had provided insufficient information regarding costs related to its mining

rights. Commerce Suppl. Questionnaire to OCP at 6. It was at this point that Commerce met its

obligations under section 782(d) of the Act. *See* 19 U.S.C. § 1677m(d). OCP identified HQ,

support, and debt costs for the first time in its response to this supplemental questionnaire. *See*

OCP SQR, Part 3 at 8. However, Commerce determined that it was not appropriate to include

HQ, support, and debt costs in the phosphate rock cost build-up. *See* Final IDM at 23-24;

Memorandum from Robert Palmer & Samuel Glickstein, Int'l Trade Compliance Analysts,

through Kathleen Marksberry, Program Manager, to File, re: Preliminary Determination

Calculations for OCP S.A. at 7 (Nov. 24, 2020), P.R. No. 390, C.R. No. 256. Thus, pursuant to

section 782(d), 19 U.S.C. § 1677m(d), Commerce was not obligated to request additional

information regarding these costs. Further, due to OCP's repeated extension requests, its

response to the supplemental questionnaire question regarding mining and phosphate rock costs

was submitted less than three weeks before the statutory deadline for Commerce's preliminary

determination. Therefore, it was impractical for Commerce to request that OCP provide a

second remedial response – and Commerce had no obligation to do so in any event.

Finally, OCP criticizes Commerce's discussion of debt costs in the *Final Determination*.

OCP Brief at 50-51. In relevant part, Commerce observed that,

> OCP's assertion that its finance and debt costs represent interest expenses
> on loans it has relied on for funding capital improvements associated with
> its mining operations is inconsistent with its reporting in its ILOV
> questionnaire response that "interest on loans… represents interest paid on
> various debts—bonds, loans, convertible debt, or lines of credit—that are
> broadly applicable or fund general corporate purposes." In addition, we
> note that we have not identified any prior LTAR determination that
> included corporate debt as part of a benefit calculation.

Final IDM at 24 (citation omitted). OCP does not dispute it reported that its corporate interest

costs are for debts "that are broadly applicable or fund general corporate purposes," nor is it able

to cite a prior LTAR determination where Commerce included corporate debt as part of a benefit

calculation. *See* OCP Brief at 50-51. Rather, OCP contends that Commerce "cherry-picked" its

reporting about general corporate debt expenses and ignored other evidence concerning how at

least some of its debt costs allegedly relate to investment projects for phosphate mining and

phosphate rock production. *Id.* But these assertions, and OCP's ability to arithmetically allocate

a portion of general corporate debt expenses to phosphate rock production, do not undermine

Commerce's reasonable concern that including corporate debt in the phosphate rock cost build-

up would be both distortive (because of the admittedly generalized nature of the expenses) and

unprecedented (in light of Commerce's unrefuted observation about the absence of prior LTAR

calculations including corporate debt costs).

         4.     <u>Conclusion</u>

For the reasons set forth above, the Court should reject OCP's arguments and conclude

that Commerce's exclusion of HQ, support, and debt costs is supported by substantial evidence

and otherwise in accordance with law.

**B.    Commerce's profit calculations are supported by substantial evidence and otherwise in accordance with law**

OCP challenges Commerce's use of OCP's own financial statements to calculate an

amount for profit in the mining rights for LTAR cost build-up, rather than a surrogate financial

statement OCP submitted. OCP Brief at 52-56. OCP also argues that, if Commerce's use of

OCP's financial statements is sustained, then the profit calculations are erroneous and must be

revised. *Id.* at 56-61. These arguments fail for the reasons discussed below.

         1.     <u>Commerce's selection of an OCP-specific profit rate is supported by substantial evidence and otherwise in accordance with law</u>

In the *Final Determination*, Commerce agreed with OCP that it should add an amount for

profit, but it declined to use the financial statement of Jordan Phosphates Mines Co. ("JPMC"), a

Jordanian company, which OCP had placed on the record. Commerce found that the availability

of OCP's own financial statements made it unnecessary to resort to a surrogate data source:

> In *Cold-Rolled Steel from Russia*, Commerce calculated a profit
> component using the financial statements of an Indian mining company
> because the profit rate from the Indian company was the only profit rate
> on the record for that proceeding. In this proceeding, OCP provided the
> necessary information to calculate a profit rate derived from its 2019
> unconsolidated financial statements. Thus, there is no need to resort to
> surrogate information.

Final IDM at 27 (citations and footnote omitted). Commerce further explained that "the profit

reflected in OCP's financial statements includes the profit from its sales of phosphate rock"

because "OCP reports that it both sells and uses in its chemical production process the phosphate

rock it produces." *Id.* at 27 n.183 (citing OCP IQR at GEN-3.).

Commerce's choice is reasonable in light of the record evidence. OCP fails to show that

it was unreasonable for Commerce to select (a) profit data that include profits from the good

being valued, and which comes from information from the respondent subject to the cost build-

up, over (b) a surrogate source, which inherently entails differences from the experience of the

respondent. OCP cites the general principle that Commerce has a duty to calculate "the CVD

margin as accurately as possible," OCP Brief at 55, but it ignores the valid concern about the

inherent inaccuracy of a surrogate source that is reflected in Commerce's determination. OCP

also criticizes Commerce's use of a profit rate from OCP financial data that "were not limited to

the production of phosphate rock," *id.* at 54, but this too disregards Commerce's reasonable

finding that the use of an OCP-specific profit rate that reflects both phosphate rock and other

activity is preferable to a surrogate source that inherently reflects experiences different from

those of OCP. *See* Final IDM at 27.

In this case, the record evidence shows that JPMC's financial results reflect significant

affiliated-party transactions that are inherently different from OCP's experience. In particular, as

Mosaic observed in its administrative rebuttal brief, "the available information on JPMC's

Phosphate business unit shows that its 2019 revenues and profits reflect inter-segment sales to a significant degree, but the available information does not permit the Department to adjust the Phosphate unit's data to eliminate distortions from affiliated party transactions." *See* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce re: *Phosphate Fertilizers from Morocco*: Petitioner's Rebuttal Brief at 23-24 (Jan. 19, 2021), P.R. No. 452, C.R. No. 303; Final IDM at 27 (summarizing Mosaic's rebuttal argument). Commerce did not reach the issue of JPMC's unusable segment data because it found OCP's own profit data to be usable, but the existence of these flaws undermine OCP's claim.

OCP attempts to obscure the reasonableness of Commerce's choice to use OCP's own profit rate by arguing that it was prohibited by prior practice. According to OCP, the agency's alleged practice is "to select a profit rate that is specific to the production of the good that is the subject of the COP buildup," and where the investigated producer is vertically integrated as OCP is, to reject the overall profit rate in favor of "a surrogate profit rate based on the production of only the good that is the subject of the COP buildup." OCP Brief at 52-53.

OCP's argument relies on four prior Commerce determinations, OCP Brief at 53, 55, but a review of those cases shows that they provide no support for OCP's argument.

*First*, OCP cites three Commerce determinations in an attempt to show that "Commerce's practice is to select a profit rate that is specific to the production of the good that is the subject of the COP buildup": the final results of the 2003-2004 *Softwood Lumber from Canada* CVD administrative review; the *Cold-Rolled Steel from Russia* final CVD determination; and the preliminary results of the 2015-2016 *Uncoated Paper from Indonesia* CVD administrative review. OCP Brief at 52-53. OCP's reliance on those determinations is unavailing.

In the final results of the 2003-2004 *Softwood Lumber from Canada* CVD administrative review, Commerce used a survey of major timberland tenureholders in British Columbia to calculate the profit amount for stumpage in British Columbia where the logging activities were conducted by "company crews."[12] *See Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,448 (Int'l Trade Admin. Dec. 12, 2005), and accompanying Issues and Decision Memorandum at 16, 111-112. Thus, in that review, Commerce used data drawn from large respondents in the Canadian province that provided the stumpage for LTAR program. Commerce was not presented with a choice between using profit data derived from the financial statements of British Columbia respondents and surrogate financial statements. *See id.* If anything, Commerce's use of profit data drawn from British Columbia respondents supports Commerce's decision in this case to select OCP's own profit rate over an allegedly useable surrogate profit rate from a Jordanian company.

In the *Cold-Rolled Steel from Russia* final CVD determination, Commerce included an amount for profit based on "the profit rate from an Indian coal producer" in its calculation of the "government price" for coking coal, the resource extracted pursuant to the mining rights for LTAR program at issue. *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (Int'l Trade Admin. July 29, 2016), and accompanying Issues and Decision Memorandum at 31 ("*Cold-*

---

[12] Where the logging activities were conducted by contractors, Commerce did not add any amount for profit. *Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,448 (Dec. 12, 2005), and accompanying Issues and Decision Memorandum at 111-112.

*Rolled Steel from Russia* IDM"). Commerce never indicated that the Indian coal producer's financial data were specific to the coking coal at issue in the LTAR benefit calculation, contrary to OCP's assertions about the agency's practice. *Compare id. with* OCP Brief 52-53. Nor did Commerce indicate that its use of the Indian profit information was based on a supposed policy of using only profit information specific to the good at issue in the cost build-up. *Contra* OCP Brief at 52-53, 56.

Moreover, the Indian profit information was the only source Commerce found to be useable. In its post-preliminary determination regarding mining rights in *Cold-Rolled Steel from Russia*, Commerce found that the Indian source provided the only profit rate on the record, and the petitioner subsequently argued that Commerce could use the financial statements of Vorkutaugol, a provider of coking coal concentrate and subsidiary of mandatory respondent Severstal. *See Cold-Rolled Steel from Russia* IDM at 10, 104-105. However, Commerce found that Severstal submitted those financial statements *after* it failed to provide timely responses to requests for mining cost information. Accordingly, Commerce found that "it would not be appropriate to now rely on an alternative, unverified data source of the Severstal Companies' choosing after the companies had failed to provide the requested information during the questionnaire and answer process of the investigation. Therefore, we have determined not to incorporate the cost data from Vorkutaugol's 2014 annual report into our benefit calculations." *Id.* at 103. For this reason, Commerce found it inappropriate to use Vorkutaugol's profit information. *Id.* at 107. In light of that unusable information, and contrary to OCP's contention, OCP Brief at 56, Commerce in the instant case was substantially correct in describing the Indian profit rate information in *Cold-Rolled Steel from Russia* as "the only profit rate on the record for that proceeding." Final IDM at 27. Thus, Commerce's use of an Indian surrogate profit rate in

*Cold-Rolled Steel from Russia* does not support OCP's argument that, here, Commerce was

required to use surrogate Jordanian profit information over OCP's own data because of the

allegedly superior specificity of the former.

      In *Uncoated Paper from Indonesia*, Commerce used a 1999 study of Indonesian timber

harvesting costs and profit (*i.e.*, the "*Addicted to Rent*" study) because it provided the "only

reliable and documented information" on the record, selecting that source over an article that

provided unsubstantiated figures on timber prices and costs. *Certain Uncoated Paper From*

*Indonesia: Final Results of Countervailing Duty Administrative Review; 2015-2016*, 83 Fed.

Reg. 52,383 (Int'l Trade Admin. Oct. 17, 2018), and accompanying Issues and Decision

Memorandum at 23 ("{The *Addicted to Rent Study*} provides the only reliable and documented

information available on the record to adjust the timber benchmarks for profit, and Commerce

has relied on this source in previous proceedings involving Indonesian paper products.  We agree

with the petitioners that APRIL's proposed alternative from the *Scientific Reports* is unsupported

and unreliable for use in the final results.") (citations omitted).  Notably, Commerce has used the

same *Addicted to Rent* study as a source for the profit component in multiple CVD segments

involving Indonesian stumpage for LTAR programs benefitting paper products, and critically, it

has used the same profit figure – even as Commerce has simultaneously used species-specific log

benchmark data.  *See, e.g.*, *id.* at 23 & n.127; *Coated Free Sheet Paper from Indonesia* IDM at

21-23, 81.  This further undermines OCP's assertions that Commerce's practice requires it to

select profit data that are specific to a good, as opposed to other considerations.

      Next, OCP cites *Hot-Rolled Steel from India* as the Commerce determination that is

supposedly most similar to the instant case, OCP Brief at 53, but that determination too does not

support its argument.  In *Hot-Rolled Steel from India,* Commerce used information from "two

Indian mining companies" as the source for a profit component for iron ore mining which the agency added to the respondent Tata's "total per unit cost in order to account for the profit component (namely, profit earned during the mining/extraction phase) that exists in the benchmark but does not exist in the data Tata submitted to the Department." *Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 40,295 (Int'l Trade Admin. July 14, 2008), and accompanying Issues and Decision Memorandum at 73 ("*Hot-Rolled Steel from India* IDM").

OCP relies on *Hot-Rolled Steel from India* in arguing that Commerce's alleged practice is to reject "reliance on the integrated producer's overall profit rate" in favor of "a surrogate profit rate based on the production of only the good that is the subject of the COP buildup." OCP Brief at 53. That case shows no such thing. Commerce's *Hot-Rolled Steel from India* determination does not indicate that the operations of the "two Indian mining companies" were confined to the product subject to the LTAR benefit calculation. *Cf. Hot-Rolled Steel from India* IDM at 73. Most important, Commerce explained that it was using information from those two Indian companies because a profit component "does not exist in the data Tata submitted to the Department," *id.*, since "Tata is a vertically integrated producer and, thus, mining/extraction activities under the captive mining program are performed 'in-house.' As a result, Tata did not include a profit component along with the mining/extraction costs it reported to the Department." *Id.* at n.18. Here, by contrast, OCP submitted financial statements containing profit data inclusive of profits on the external sale of phosphate rock, as Commerce noted in the *Final Determination*. Final IDM at 27 n.183.

In sum, OCP fails to show that Commerce's use of a profit rate from OCP's financial statements is contrary to the agency's practice or otherwise contrary to law.

    2.  <u>Commerce's profit rate calculation is supported by substantial evidence and otherwise in accordance with law</u>

OCP contends that, if Commerce's use of OCP's financial statements is sustained, then the profit calculations contain errors in the profit ratio denominator and numerator. OCP Brief at 56-61. These arguments lack merit, and Commerce's profit ratio calculations should be sustained.

In its profit calculation arguments, OCP acknowledges that Commerce "has discretion to employ different methodologies under the Statute." OCP Brief at 58. Indeed, as demonstrated above in Section II.A.1, the Act and applicable regulations do not specify methodologies for calculating the benefit under a Tier 3 LTAR analysis, nor is Commerce's discretion constrained by the Act's antidumping provisions. This is notable because the only precedents OCP cites involve Commerce antidumping calculations. *See* OCP Brief at 60-61 (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1372 (CIT 2018); *Fuyao Glass Indus. Grp. Co. v. United States*, 27 CIT 1892, 1917-18 (2003)). Thus, the issue is whether Commerce's profit calculation in the context of this CVD investigation is reasonable. The record shows that it is.

In its administrative case brief, OCP took the position that "Appendix MIN2-6 contains operating and net income lines for each of the two OCP mining sites, but this internal calculation is not intended to (and does not) present a complete standalone profitability assessment of the mining activities," and that "generating a standalone income and profitability figure for OCP's mining operations as a standalone unit" involves "complexity." OCP Case Brief at 40-41. At the same time, OCP acknowledged that "OCP S.A.'s unconsolidated financial statements can be used to generate a profit rate that reflects all operations of the company," but it argued that OCP's profit indicators did not "offer the same level of specificity to phosphate mining as

JPMC's financial statements." *Id.* (footnote omitted). OCP also proposed a profit rate

calculation formula if Commerce were to "use OCP S.A.'s rate despite its lack of specificity to

mining," which formula was consistent with its more general argument that profit rate should be

equal to profit divided by revenues minus profits. *See id.* at 41 n.130; *see also id.* at 40; Final

IDM at 26 (summarizing OCP's profit calculation arguments).

In the *Final Determination*, Commerce explained that "we disagree with OCP's proposed

profit rate formula" – *i.e.*, that profit should be divided by revenues minus profits. Final IDM at

27. In that context, Commerce referred to *Cold-Rolled Steel from Russia*, where it is uncontested

that Commerce calculated profit by dividing profits by cost of goods sold ("COGS"). *See id.*

("In *Cold-Rolled Steel from Russia*, Commerce calculated a profit ratio for a provision of mining

rights for LTAR program by dividing a company's profit before tax by its COGS."); OCP Brief

at 59 n.24 (accord). Commerce then explained that it would calculate profit by dividing OCP's

"income before taxes" by its "operating expense." Final IDM at 27.

OCP now complains that the denominator and numerator in Commerce's profit rate

calculation were misaligned with each other and with the OCP phosphate rock cost build-up to

which the ratio was applied. OCP Brief at 56-61. OCP's overall conception of these issues is

misguided. It was not feasible to calculate an accurate profit rate for OCP's phosphate rock

operations as a stand-alone entity, as OCP itself indicated to Commerce. *See* OCP Case Brief at

40-41. Further, Commerce reasonably chose to use profit data from OCP's financial statements

that included phosphate rock profits over surrogate data, as demonstrated above in Section

II.B.1. The profit & loss table in OCP's financial statements does not include a COGS figure

that would allow Commerce to precisely mimic its approach in *Cold-Rolled Steel from Russia*,

*see* OCP IQR at Appendix GEN-4(a)(iii), and OCP does not contend otherwise. *See* OCP Brief

at 57-59.[13]

Under these circumstances, and considering that the purpose of this exercise is to arrive

at a "government price" that is comparable to the world market benchmark, it was reasonable for

Commerce to select OCP's "operating expense" figure for the profit rate denominator. Contrary

to OCP's contentions, *see* OCP Brief at 58, Commerce was not required to engage in a series of

adjustments to the "operating expense" figure in an attempt to derive a cost figure more closely

reflecting OCP's phosphate rock operations on a standalone basis, particularly where OCP itself

had warned the agency that "generating a standalone income and profitability figure for OCP's

mining operations as a standalone unit" involves "complexity." OCP Case Brief at 40-41.

Having reasonably used OCP's operating expense figure in the denominator, Commerce also

reasonably used OCP's income before taxes in the numerator, since this was consistent with its

approach in *Cold-Rolled Steel from Russia* of dividing before-tax profits by the relevant cost

figure.

In sum, Commerce's profit calculations should be sustained as supported by substantial

evidence and otherwise in accordance with law.

---

[13] In its post-final ministerial memorandum, Commerce acknowledged that it had incorrectly
equated OCP's operating expense item with COGS, but as the agency explained, "{t}his
inadvertent error in the narrative does not affect our calculations because we have used the
correct line item from the P&L statement in the calculations based on our stated intent."
Memorandum from Irene Darzenta Tzafolias, Director, Office VIII, to James Maeder, Deputy
Assistant Secretary for Antidumping and Countervailing Duty Operations re: *Countervailing
Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco*: Allegations of
Ministerial Errors in the Final Determination at 4 (Mar. 15, 2021), P.R. No. 485, C.R. No. 310.
Contrary to OCP's position, OCP Brief at 59 n.24, no remand is warranted in this regard because
Commerce has already acknowledged its inadvertent error and explained that it does not detract
from its calculations in line with its stated intent.

C.    **Commerce's use of a North African price in its benchmark is supported by substantial evidence and otherwise in accordance with law**

OCP contends that Commerce erred by including North Africa phosphate rock price data published by Argus in the phosphate rock benchmark calculation. *See* OCP Brief at 61-64. According to OCP, Argus North Africa data include OCP prices, rendering their inclusion in the benchmark circular and therefore improper. *Id.* OCP's arguments fail.

In the *Final Determination*, Commerce explained its decision to retain the Argus North Africa data in the benchmark calculation:

> We also decline OCP's request to remove Argus' price data for North Africa from the phosphate rock world price benchmark. Argus states that its North Africa phosphate rock price is "defined by sales to Europe, India and Brazil from OCP/GCT." First, the North Africa price data include non-Moroccan prices from GCT, a Tunisian company. Second, the North Africa price is an export price to Europe, India and Brazil, meaning that it is a market price that would reflect commercial realities in the world market. OCP's arguments largely pertain to Tier 1 distortion of domestic market analysis. The mere fact that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted.

Final IDM at 19 (citations omitted).

As Commerce observed, record evidence shows that the Argus North Africa data include non-Moroccan prices for a Tunisian company GCT. OCP contends that the use of those data is improperly circular in light of *U.S. Steel Corp. v. United States* and *Softwood Lumber from Canada*, OCP Brief at 62-63, but both of those cases involved the proposed use of price data in the benchmark that consisted solely of a "government" price. *See id.* Here, by contrast, the Argus North Africa data include non-Moroccan prices, such that OCP's reliance on those cases is misplaced. *See* Final IDM at 19; Petitions, Exhibit II-26 at 10. Further, as Commerce noted, the Argus North Africa data represent export prices to multiple global destinations, which

enhanced Commerce's effort to construct a world price market benchmark and which further

undermines OCP's ostensible concerns about circularity. Accordingly, Commerce's use of the

Argus North Africa data was reasonable, supported by substantial evidence, and otherwise in

accordance with law.

### III. Commerce's Investigation of "Other Assistance" is Reasonable and in Accordance with Law

In the *Final Determination*, Commerce investigated and countervailed certain subsidy

programs that OCP disclosed in response to Commerce's instruction in the initial Section III

questionnaire to report any "other forms of assistance" provided by the GOM. *See* Final IDM at

11-13; Commerce's Initial CVD Questionnaire, Section III at 46 (July 28, 2020), P.R. No. 61.

Commerce rejected OCP's arguments that its investigation of such subsidy programs is unlawful.

In particular, Commerce explained that, under section 775 of the Act, when Commerce

"discover{s} a practice which appears to be a countervailable subsidy, but was not included in

the matters alleged in the countervailing duty petition," Commerce "*shall* include the practice,

subsidy, or subsidy program in the proceeding." Final IDM at 12 (quoting 19 U.S.C. § 1677d).

The agency's regulations carve out one limited exception to this rule that is not applicable in this

case: when Commerce discovers a potential subsidy too late in a proceeding, it may defer its

analysis until a subsequent review. *Id.* (citing 19 C.F.R. § 351.311(b)(2)). Commerce explained

that the lawfulness of its question regarding "other forms of assistance" was affirmed by this

Court in *Changzhou Trina Solar Energy Co. v. United States* and is consistent with its prior

practice and the intent of the statute. *Id.* at 13. Commerce also noted that Mosaic timely filed

new subsidy allegations with respect to all five programs that OCP challenges, and Commerce

initiated investigations of these five programs pursuant to 19 U.S.C. § 1677d. *See id.*

Commerce's investigation of "other forms of assistance" that OCP reported receiving from the GOM was reasonable and otherwise in accordance with law. As the court has previously held, Commerce has broad investigative discretion under 19 U.S.C. §§ 1671a(a) and 1677d, and its longstanding practice of requesting that respondents provide information about "other forms of assistance" received during the POI is an example of Commerce reasonably exercising this broad discretion. *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1341-46 (CIT 2016). Commerce's approach also reflects its statutory mandate, pursuant to 19 U.S.C. § 1677d, to "consolidate in one investigation . . . all subsidies known by petitioning parties to the investigation or by {the Department} relating to that merchandise." 19 U.S.C. § 1677d; *see also Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1343 (CIT 2019) (holding that "because Commerce is urged to ensure 'proper aggregation of subsidization practices,' . . . Commerce is permitted to request that documentation be placed on the record so that it may determine whether subsidies discovered during the investigation are countervailable.") (citing S. Rep. No. 96-249, at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 484; 19 U.S.C. §§ 1671a(a) and 1677d).

OCP's arguments to the contrary find no support in the statute or its legislative history, and the court should reject them.

*First*, OCP argues that Commerce exceeded its statutory authority in inquiring about "other forms of assistance" and that, "{u}nder the law, Commerce must have the 'appearance' of a countervailable subsidy *before* seeking information on unspecified programs for which no allegation has been made." *See* OCP Brief at 65-66 (citing OCP's Initial Questionnaire Resp. at 146 (Sept. 17, 2020)). OCP's argument is based on a mischaracterization of the statutory framework.

OCP bases its argument on section 1677d of the Act, which states in pertinent part as

follows:

> If, in the course of a proceeding under this subtitle, the administering
> authority discovers a practice which appears to be a countervailable
> subsidy, but was not included in the matters alleged in a countervailing
> duty petition . . . , then the administering authority –
>
> > (1) shall include the practice, subsidy, or subsidy program in the
> > proceeding if the practice, subsidy, or subsidy program appears to
> > be a countervailable subsidy with respect to the merchandise which
> > is the subject of the proceeding{.}

19 U.S.C. § 1677d.  As the text of the provision makes clear, section 1677d requires Commerce

to investigate any practice that it discovers in the course of a countervailing duty proceeding that

appears to be a countervailable subsidy but was not included in a countervailing duty petition.

However, the statute does not explain how Commerce may collect information relating to such

practices, or when it may do so.  Thus, Congress has left this issue to Commerce's discretion.

In interpreting this provision, this Court has recognized that the statute "vests

{Commerce} with broad investigative discretion" and, further, that "Commerce's inquiry

concerning the full scope of governmental assistance provided by {a government} and received

by the Respondents in the production of subject merchandise {is} within the agency's

independent investigative authority pursuant to 19 U.S.C. §§ 1671a(a) and 1677d." *Guizhou

Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1339 (CIT 2021) (quoting *Changzhou Trina

Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1346 (CIT 2016)).  Moreover, the

Court has explicitly described Commerce's request that a respondent provide "information about

other forms of governmental assistance received during the POI beyond those alleged in the

petition" as an example of Commerce exercising its broad investigative discretion.  *Id.*

OCP's reliance on *Allegheny Ludlum Corp. v. United States*, 25 CIT 816 (2001) is misplaced. OCP Brief at 66-67. In that case, the court examined Commerce's decision *not* to investigate an untimely subsidy allegation made by the petitioner. *Allegheny Ludlum*, 25 CIT at 816-18. The Court held that "{a}lthough § 1677d offers a petitioner the opportunity to call Commerce's attention to a potentially countervailable subsidy that was discovered during the course of an ongoing countervailing duty investigation, it does not force Commerce to fully investigate any subsidy." *Allegheny Ludlum*, 25 CIT at 824. The court in *Allegheny Ludlum* did not address the entirely separate question of whether Commerce may request information on any "other forms of assistance" provided by a subject government that are not described in the petition. This Court specifically addressed this point in *Changzhou Trina Solar Energy Co.*, holding that, on questions of "whether Commerce reasonably exercised its own independent investigative authority, *Allegheny Ludlum* is not controlling." *Changzhou Trina Solar Energy Co.*, 195 F. Supp. 3d at 1342.

Further, in every case in which this Court has examined Commerce's authority to investigate subsidies reported in response to a question regarding "all other assistance," the court has affirmed that the agency acted within the scope of its statutory authority and rejected the arguments that OCP makes in this case. In *Changzhou Trina Solar Energy Co.*, 195 F. Supp. 3d at 1341, Chinese respondents challenged Commerce's application of AFA to subsidy programs discovered during the course of the investigation that the respondents had not reported as "other forms of assistance." The respondents argued that Commerce's inquiry into "other forms of assistance" unlawfully circumvents the petition requirements set forth in 19 U.S.C. § 1671(a) and writes out of existence the language in § 1677d that practices newly discovered during an investigation "*appear*{} to be a countervailable subsidy." *Id.* 195 F. Supp. 3d at 1341-46

(emphasis added). The court rejected these arguments, holding that Commerce has broad investigative authority under the statute and section 1677d contains no limiting language as to how the agency is to "discover" apparent subsidies during the course of an investigation. *See id.*

Similarly, in *Jiangsu Zhongji*, the court examined Commerce's decision to apply AFA to find that certain "other assistance" provided by the Government of China (GOC) was countervailable. As the court explained, Commerce had asked the GOC in its initial questionnaire if the GOC had provided "any other forms of assistance" to the subject producers, but the GOC refused to respond on the grounds that Commerce's request was "premature absent a more direct inquiry supported by credible evidence and the initiation of a discrete investigation." *See* 405 F. Supp. 3d at 1342. Zhongji then challenged Commerce's determination, arguing that Commerce had acted unlawfully because it "failed to identify any evidence that the subsidies appeared to be specific and countervailable before initiating an investigation into the programs, in violation of 19 U.S.C. § 1677d." *Id.* The court disagreed, stating *inter alia* that:

> Commerce must determine whether a program appears to be countervailable by looking at record evidence. *See* 25 CIT at 824–25. In order to make that determination, therefore, Commerce is permitted to request that information be placed on the record regarding any reported subsidies. Zhongji's argument to the contrary would permit Commerce to examine unalleged subsidies only where record evidence tangentially demonstrates that a subsidy is actually countervailable. This reading of the statute is too restrictive. Rather, because Commerce is urged to ensure "proper aggregation of subsidization practices," *see* S. Rep. No. 96-249, at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 484, and given its investigative authority under 19 U.S.C. §§ 1671a(a) and 1677d, Commerce is permitted to request that documentation be placed on the record so that it may determine whether subsidies discovered during the investigation are countervailable.

405 F. Supp. 3d at 1343. OCP's contrary interpretation of section 1677d of the Act is overly

restrictive and would impinge on Commerce's broad investigative authority to request

information about subsidies provided with respect to subject merchandise.

*Second*, OCP argues that "the fact that the law provides that Commerce will be

positioned to issue a preliminary CVD determination just slightly over two months from the date

on which it initiates an investigation demonstrates that Congress did not intend for Commerce to

review every possible form of assistance a respondent may have received from its government."

OCP Brief at 67-68 (citing 19 U.S.C. § 1671b(b)). According to OCP, "{b}y requiring evidence

of the 'appearance' of a subsidy in § 1677d, Congress also insured that a loophole would not be

created whereby Commerce could initiate an investigation on a single alleged subsidy (or even a

set of alleged subsidies), and then use unchecked investigatory powers to exponentially expand

the investigation without any evidentiary basis." *Id.* at 68.

OCP's argument turns section 1677d on its head. As the statute's legislative history

makes clear, Congress enacted section 1677d in order to help ensure that Commerce would

investigate *all* subsidies provided with respect to subject merchandise that are discovered during

the pendency of an investigation, not to limit its ability to do so. In particular, Senate Report 96-

249 describes the purpose of section 1677d as follows:

> In investigating an allegation of subsidization the administering authority
> often acquires information relating to possible subsidization of the
> merchandise or other merchandise not available to the petitioner or other
> domestic parties. These possible additional subsidy practices generally are
> not included within the ongoing investigation under current practice.
> *Rather than institute unnecessary separate investigations into such
> practices, make piecemeal determinations without proper aggregation of
> subsidization practices, and increase expenses and burdens, the bill will
> include such practices within the scope of any current investigation . . . .*
> The inclusion of such a practice should not delay the conclusion of any
> current investigation any more than absolutely necessary.

S. Rep. No. 96-249, at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 484 (emphasis added).

Thus, while OCP claims that Congress' intent in enacting section 1677d was to establish an

"evidentiary standard" meant to *limit* Commerce's investigatory powers, *see* OCP Brief at 66, in

reality Congress enacted the provision because it wanted to "avoid 'unnecessary separate'

investigations and . . . 'clearly intended that all potentially countervailable programs be

investigated and catalogued.'" *Guizhou Tyre Co.*, 523 F. Supp. 3d at 1339-40 (quoting

*Allegheny*, 112 F. Supp. 2d at 1150 n.12). Moreover, Congress did so in full recognition of the

statutory time limits for Commerce's preliminary determinations. *See* S. Rep. 96-249, at 98.

Therefore, OCP's argument regarding the limited time that Commerce would have to investigate

new subsidies fails.

For these reasons, the Court should affirm Commerce's investigation of "other forms of

assistance" that OCP reported receiving from the GOM in its initial Section III questionnaire

response as in accordance with law.

## IV.     Commerce's Determination that the GOM's Reductions in Tax Fines and Penalties Program is *De Facto* Specific is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance With Law

In the Final Determination, Commerce affirmed its preliminary finding that the GOM's

Reduction in Tax Fines and Penalties Program is *de facto* specific under section

771(5A)(D)(iii)(I) of the Act, 19 U.S.C. § 1677(5A)(D)(iii)(I). As Commerce stated, "{w}hen

analyzing *de facto* specificity for tax programs in prior cases, Commerce has compared the

number of companies that used the program with the total number of tax filers." Final IDM at

75. Commerce reasonably followed that approach in this case and found that the number of

subsidy recipients is "limited" within the meaning of section 771(5A)(D)(iii)(I) of the Act

because the record evidence showed that 8,761 companies obtained reductions in tax fines and

penalties out of a total of 262,165 corporate income taxpayers (*i.e.*, 3.3 percent of Moroccan

corporate taxpayers) during the POI. *Id.* OCP presents three arguments for why Commerce's

specificity finding is unsupported by substantial evidence or otherwise in accordance with law,

none of which has merit.

 *First*, OCP argues that Commerce's specificity finding is based on "an obviously flawed

methodology" because Commerce "compared the number of recipients of reductions of fines and

penalties to the number of *all companies that had paid taxes to GOM*, instead of those

companies actually charged with fines or penalties." OCP Brief at 72.[14] There is no basis in the

statute or regulations, or in Commerce's prior practice, for OCP's argument that Commerce must

analyze *de facto* specificity by reference only to the number of companies that are capable of

receiving a subsidy.

 Section 771(5A)(D)(iii)(I) of the Act provides that a subsidy may be specific as a matter

of fact, including where "{t}he actual recipients of the subsidy, whether considered on an

enterprise or industry basis, are limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I). The

statute does not prescribe how Commerce is to determine whether subsidy recipients are limited

in number. However, the SAA states that the purpose of the specificity test "is to function as an

initial screening mechanism to winnow out only those foreign subsidies which truly are broadly

available and widely used throughout an economy." *See* SAA at 929. The SAA also states that,

in determining whether the number of subsidy recipients is limited on an industry basis,

Commerce can take into account the number of industries in the economy in question. *Id.* at 931.

---

[14] Notably, OCP does not identify the number of companies there were "actually charged with fines or penalties." *See* OCP Brief at 70-75. To the best of Mosaic's knowledge, the GOM did not provide information regarding the number of taxpayers that were potentially subject to fines and penalties during the POI. Thus, because the GOM did not provide the necessary information, Commerce could not have adopted OCP's approach in any event.

Accordingly, it is reasonable and consistent with the statute and the SAA for Commerce to assess

specificity by reference to the economy as a whole, not the number of enterprises or industries

that are actually eligible for a subsidy program.

      With respect to tax programs in particular, Commerce takes into account whether a

subsidy is "broadly available and widely used throughout an economy" by reference to the total

number of corporate taxpayers in the relevant jurisdiction.  This is a well-established practice

that Commerce has followed for at least a decade.  *See, e.g.*, *Bottom Mount Combination*

*Refrigerator-Freezers From the Republic of Korea: Preliminary Negative Countervailing Duty*

*Determination and Alignment of Final Determination With Final Antidumping Determination*,

76 Fed. Reg. 55,044, 55,050 (Int'l Trade Admin. Sept. 6, 2011) (finding a tax program to be *de*

*facto* specific based on a comparison of the number of subsidy recipients and the number of

corporate taxpayers in Korea); *Supercalendered Paper From Canada: Final Results of*

*Countervailing Duty Expedited Review*, 82 Fed. Reg. 18,896 (Int'l Trade Admin. Apr. 24, 2017),

and accompanying Issues and Decision Memorandum, Comments 28-29 ("*Supercalendered*

*Paper From Canada* IDM") (finding tax programs to be *de facto* specific based on a comparison

of the number of subsidy recipients to the number of corporate taxpayers); *Silicon Metal From*

*Australia: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final*

*Determination With Final Antidumping Duty Determination*, 82 Fed. Reg. 37,843 (Int'l Trade

Admin. Aug. 14, 2017), and accompanying Preliminary Decision Memorandum at 14-16

(finding a tax program to be *de facto* specific where less than 10,000 out of approximately

1,000,000 corporate tax filers received the subsidy); *Certain Uncoated Groundwood Paper From*

*Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Int'l Trade

Admin. Aug. 9, 2018), and accompanying Issues and Decision Memorandum, Comment 61

(finding the Québec Scientific Research and Development Tax Credit program to be *de facto* specific based on a comparison of the number of subsidy recipients to the number of taxpayers in Québec).

OCP asserts that Commerce's *de facto* specificity findings in *Uncoated Groundwood Paper from Canada* and *Supercalendered Paper from Canada* are distinguishable and do not support Commerce's approach in this case. OCP is incorrect. In both of those cases, Commerce assessed whether a tax subsidy program was broadly available and widely used throughout an economy by reference to the total number of corporate tax filers. Contrary to OCP's argument, in *Uncoated Groundwood Paper from Canada*, Commerce did not use the number of tax filers in the denominator because those were the "entities *capable* of receiving the financial contribution," OCP Brief at 74, but rather as a proxy for the total number of enterprises in the economy in question. *Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Int'l Trade Admin. Aug. 9, 2018), and accompanying Issues and Decision Memorandum, Comment 61 at 198. Specifically, Commerce stated that "because . . . a program is *de facto* specific if the actual recipients of the subsidy on an enterprise basis are limited in number, Commerce reasonably takes into account the number of enterprises in the economy in question to determine whether the number of enterprises using a subsidy is actually large or small." *Id.* Commerce took the same approach in *Supercalendered Paper from Canada*. *Supercalendered Paper From Canada* IDM at 102. In those cases, Commerce did not state that it takes into account the number of enterprises in the economy in question *that were eligible* to receive the subsidy and compares that number to the number of enterprises that actually used it – which would have been the test if OCP's theory were correct, which it is not.

Further, the distinctions that OCP attempts to draw from these cases fail as a factual matter. OCP argues that *Uncoated Groundwood Paper from Canada* is distinguishable because the subsidy program at issue "involved tax credits, which are distinct from reductions to fines and penalties," and that Commerce's use of the number of tax filers is "an example of Commerce appropriately using entities *capable* of receiving the financial contribution in the denominator." OCP Brief at 74. However, the tax credit at issue in *Uncoated Groundwood Paper from Canada* – the Québec Scientific Research and Development Tax Credit – is not available to *all* tax filers. Rather, it is only available to companies with eligible research and development expenditures. *See Certain Uncoated Groundwood Paper From Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 83 Fed. Reg. 2,133 (Int'l Trade Admin. Jan. 16, 2018), and accompanying Decision Memorandum at 53. Thus, Commerce did not use the total number of tax filers in the denominator because it reflected the number of entities *capable* of receiving the subsidy, as OCP argues, but rather as a proxy for the total number of enterprises in the economy, as it did in this case.

OCP also argues that Commerce's use of the total number of tax filers in *Supercalendered Paper from Canada* is distinguishable because in that case, "it was much less clear which entities were capable of receiving the financial contribution or benefit and thus, should be placed in the denominator of the specificity ratio." OCP Brief at 74-75. That is not the reason that Commerce gave in *Supercalendered Paper from Canada* for using the number of corporate tax filers in the denominator of its *de facto* specificity analysis. Rather, Commerce explained that it was using the number of corporate tax filers as a proxy for the number of

enterprises in the economy as a whole.  *Supercalendered Paper From Canada* IDM at 102.

Further, Commerce specifically rejected the argument that OCP is making here, stating:

> Irving and the GNB both claim that the number of enterprises, as represented by the 33,000 corporate filers is not the correct basis for evaluating whether the program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.  They contend the subsidy provided under this program is based upon the number of companies that had a need to hire of a post-secondary graduate student, and, therefore, to determine whether the program is *de facto* specific, the Department should consider only the number of companies that hired post-secondary graduate students.  The respondents are in effect arguing that because they have created a program that, in fact, limits the number of potential users of the subsidy program, that instead of following our specificity test and examining the number of actual recipients "throughout an economy," we should only gauge whether the actual number of recipients is limited based on only the enterprises that have been targeted by the government as potential subsidy recipients.  The respondents have provided no legal or case support for such a departure from the specificity test.  As previously stated, to determine whether a program is not specific, the SAA explicitly states that the Department must determine that the subsidy is broadly available and widely used throughout an economy.

*Id*.  As Commerce correctly recognized, OCP's methodology would open a gaping loophole in the countervailing duty law.  For example, if the GOM wanted to subsidize OCP with impunity, it could limit eligibility for a subsidy program to companies that produce products using phosphate ore.  This would virtually ensure that all firms "capable of receiving the subsidy" would do so, and thus, under OCP's theory, guarantee a negative specificity finding.  This would effectively prevent Commerce from countervailing subsidies that are not, in fact, broadly available and widely used throughout an economy.

OCP provides no citation to supporting legal authority or past cases in which Commerce assessed specificity in the limited manner that OCP is seeking.  Instead, OCP attempts to analogize to Commerce's approach to analyzing the two other components of a subsidy: financial contribution and benefit.  *See* OCP Brief at 73.  According to OCP, because Commerce

found the GOM's reduced tax fines and penalties to be a financial contribution in the form of

foregone government revenue, and found the benefit thereof to be the amount of reduction in tax

fines and penalties, Commerce should have evaluated specificity by reference to only penalized

taxpayers. *Id.* at 73-74. OCP's analogy is inapposite. The statute and Commerce's regulations

expressly define government revenue foregone as a form of financial contribution and provide

the method for calculating the benefit of a full or partial exemption from direct taxes. *See* 19

U.S.C. § 1677(5)(D)(ii); 19 C.F.R. § 351.509(a)(1). In contrast, neither the statute nor

Commerce's regulations address how Commerce is to analyze *de facto* specificity under section

771(5A)(D)(iii)(I) of the Act. The SAA, however, provides guidance that the specificity test

functions as a screening mechanism for filtering out subsidies that are "broadly available and

widely used throughout an economy." *See* SAA at 929. Thus, it is reasonable and consistent

with the SAA's guidance for Commerce to analyze specificity under section 771(5A)(D)(iii)(I)

by reference to the total number of enterprises or industries in an economy and, for tax programs,

to use the total number of corporate tax filers for this purpose.

The only case that OCP cites in support of its argument is *Steel Concrete Reinforcing Bar

from Turkey*. OCP Brief at 75. According to OCP, in that case Commerce "at least implicitly

agreed that it should limit its specificity analysis to entities capable of receiving the financial

contribution and benefit" because "Commerce determined that the provision of natural gas in

that case was not *de facto* specific based on analysis of data regarding the industries that

*consumed* natural gas during the POR." *Id.* OCP mischaracterizes Commerce's specificity

findings in *Steel Concrete Reinforcing Bar from Turkey*.

In that case, Commerce cited evidence that 32 industries consumed natural gas in Turkey,

and the iron and steel industry accounted for 2.78 percent of natural gas purchases in 2014 and

was one of 16 industries that make up the broader "industrial sector," which accounted for 26 percent of natural gas consumption. *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2014*, 82 Fed. Reg. 26,907 (Int'l Trade Admin. June 12, 2017), and accompanying Issues and Decision Memorandum at 22. Commerce found that "{b}ased on industrial users' share of all natural gas purchases in 2014," the Government of Turkey's "provision of natural gas was not predominantly used by, and did not disproportionately benefit, industrial users within the meaning of sections 771(5A)(D)(iii)(II) and (III) of the Act." *Id.* Thus, Commerce assessed industrial users' share of natural gas purchases in the context of analyzing predominant use and disproportionality, not in the context of analyzing which enterprises of industries were eligible to receive the subsidy. Commerce found further that, "given the broad number of industries that consumed natural gas," there was no evidence indicating that the Government of Turkey "restricted its sales of natural gas to a limited number of enterprises or industries within the meaning of section 771(5A)(D)(iii)(I) of the Act." *Id.* Accordingly, Commerce also did not base its assessment of *de facto* specificity under section 771(5A)(D)(iii)(I) on the number of eligible enterprises or industries in Turkey or "implicitly agree" that it should limit its specificity analysis to eligible entities.

*Second*, OCP argues that Commerce's specificity finding in this case is unreasonable and unsupported by substantial evidence because Commerce "failed to adequately explain why the results of {the} ratio – 3.3%, or 8,761 companies out of 262,165 corporate income taxpayers – supported a finding that the reductions of penalties and fines were *de facto* specific." OCP Brief at 75. OCP asserts that "if 8,761 companies across the Moroccan economy is 'limited in number,' it appears that Commerce might require universal use or near universal use of a

program before it considers a program non-specific," which would be an "absurd" result and "contrary to what the statute requires." *Id.* at 76.

As Commerce has made clear in other cases, and as the courts have recognized, its *de facto* specificity analysis under section 771(5A)(D)(iii) of the Act is fact-intensive and case-specific. *Countervailing Duty Investigation of Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 81 Fed. Reg. 35,310 (Int'l Trade Admin. June 2, 2016), and accompanying Issues and Decision Memorandum, Comment 3. The Federal Circuit has held that Commerce is afforded latitude and is not subject to rigid rules in determining specificity (*i.e.*, numerical thresholds for what is "limited"). *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006). Commerce does not apply bright-line rules for when a number is "limited," and its approach it is not tantamount to a requirement that a subsidy be universally used in order to be non-specific.

Indeed, based on Commerce's prior practice, a number that may be "limited" in certain circumstances – based on the total number of enterprises or industries and the degree of economic diversification in a country – may not be considered "limited" in other contexts. *Compare Certain Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2015-2016*, 84 Fed. Reg. 11,749 (Int'l Trade Admin. Mar. 28, 2019), and accompanying Issues and Decision Memorandum at 6 (finding actual subsidy recipients to be "limited" in number where 1,524 out of 591,694 taxpayers used the subsidy in 2015 – or approximately 0.25 percent of total taxpayers – and 873 out of 645,061 taxpayers used the subsidy in 2016 – or approximately 0.14 percent of total taxpayers), *with Final Negative Countervailing Duty Determination: Live Swine from*

*Canada*, 70 Fed. Reg. 12,186 (Int'l Trade Admin. Mar. 11, 2005), and accompanying Issues and Decision Memorandum at 13 (finding that the number of actual subsidy recipients was not "limited" where "thousands of Canadian farmers across many different agricultural sectors received guarantees under this program").

Further, Commerce has previously found tax programs to be *de facto* specific when used by approximately 3 percent of tax filers, as it did in this case. *See, e.g.*, *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 60,377 (Int'l Trade Admin. Nov. 8, 2019), and accompanying Issues and Decision Memorandum at 16 (finding actual subsidy recipients to be "limited" in number where 316 general corporations – representing approximately 3 percent of the total general corporate tax filers – used the program). By arguing that Commerce failed to explain why it found 3.3 percent – or 8,761 companies out of 262,165 corporate taxpayers – to be "limited" in number, OCP is essentially asking this Court to reweigh the evidence, which is not the role of a reviewing court. *See Downhole Pipe*, 776 F.3d at 1376-77.

Finally, OCP argues that Commerce's specificity finding was contrary to law because Commerce "failed to evaluate all the necessary factors the Statute identifies," specifically "the economic diversification of the granting authority" and "the length of time during which the subsidy program had been in operation." OCP Brief at 76-77. OCP did not raise these arguments in its administrative case brief before Commerce. *See* OCP Case Brief at 96-98. Accordingly, OCP failed to exhaust its administrative remedies, and the Court should therefore disregard OCP's argument. *See* 28 U.S.C. § 2637(d) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies").

Regardless, the SAA states that, in reference to economic diversification and length of time, "{t}he Administration intends that these additional criteria serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors." SAA at 931. OCP fails to provide any argumentation regarding how the length of time the subsidy program has been in operation is relevant to Commerce's *de facto* specificity analysis in this case. OCP Brief at 76-77. With respect to the degree of economic diversification, OCP merely argues that entities across a broad spectrum of the economy received the subsidy and that entities in the extraction industry (which includes OCP) received only a small portion of the total reductions granted during the POI. *Id.* at 77. This evidence is not probative of the degree of economic diversification in Morocco or how that should inform Commerce's specificity analysis.

Furthermore, Commerce's specificity finding was based on an analysis of whether the actual subsidy recipients were limited in number on an *enterprise* basis, not on an industry basis, and not on the basis of predominant or disproportionate use by the extraction industry. As previously discussed, Commerce properly took into account whether the subsidy was broadly available throughout the Moroccan economy by assessing the number of subsidy recipients relative to the total number of corporate taxpayers in Morocco.

Accordingly, the Court should affirm Commerce's specificity finding as reasonable, supported by substantial evidence, and otherwise in accordance with law.

## V.    OCP's Claim Regarding Commerce's Initiation of an Investigation into the GOM's Provision of Phosphogypsum Waste Disposal Services is Moot

OCP challenges Commerce's initiation of an investigation into the GOM's provision of waste disposal services to OCP, in connection with OCP's dumping of phosphogypsum wastes into the Atlantic Ocean. OCP's challenge is moot, because Commerce declined to countervail the program, and Mosaic is no longer appealing this aspect of Commerce's final determination.

Under the U.S. Constitution, federal judicial power is limited to actual cases and controversies. U.S. Const. art. III, § 2; *see NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998). "A case becomes moot – and therefore no longer a 'Case' or 'Controversy' for purposes of Article III – 'when the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013); *Star Pipe Prod. v. United States*, 981 F.3d 1067, 1078 (Fed. Cir. 2020). Moreover, the case or controversy must exist at all stages of litigation. "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed," *Steffel v. Thompson*, 415 U.S. 452, 459 n.10 (1974), and subsequent events that make it impossible for the court to grant "effectual relief" render a case moot. *See Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12, (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

Before Commerce, Mosaic argued that the GOM provided a countervailable subsidy to OCP – specifically, the provision of waste disposal services for LTFV – by permitting OCP to dump phosphogypsum waste, a radioactive byproduct of the production of phosphate fertilizers, into the Atlantic Ocean, free of charge. *See, e.g.*, Letter from Wilmer Cutler Pickering Hale and Dorr LLP to Commerce re: Phosphate Fertilizers from Morocco: Petitioner's Case Brief at 69-72 (Jan. 13, 2021), P.R. No. 448, C.R. No. 299. In the Final Determination, Commerce found that there was no record evidence showing that the GOM "provid{ed} waste disposal services to OCP at preferential rates" and declined to countervail the program. Final IDM at 84-85. Mosaic appealed this aspect of the Final Determination in its Complaint. *See* Mosaic Compl. at 13 (May 12, 2021), ECF No. 12. However, Mosaic did not raise this issue in its Rule 56.2 motion before this Court and is no longer appealing this issue. *See* Mosaic Rule 56.2 Mot. at 1-3 (Oct. 15,

2021), ECF No. 55. Thus, there is no longer a live case or controversy with respect to

Commerce's determination not to countervail the GOM's provision of phosphogypsum waste

disposal services to OCP, and this Court cannot grant any "effectual relief" on OCP's claim that

Commerce unlawfully initiated an investigation of this program. Accordingly, OCP's claim is

moot.

## **CONCLUSION**

For the reasons discussed above, Mosaic respectfully requests that the Court reject all

arguments made by OCP and accordingly deny OCP's motion for judgment on the agency

record.

<div style="margin-left:40%">

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

</div>

Dated: February 22, 2022

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Response to Defendant-Intervenor's Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 26,595 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney)

The Mosaic Company
(Representative Of)

February 22, 2022
(Date)