# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| THE MOSAIC COMPANY, et al.,    ) | |
|       ) | |
|       Plaintiffs,  ) | **Before: Timothy C. Stanceu, Judge** |
|       ) | |
|     v.  ) | **Consol. Case No. 21-00116** |
|       ) | |
| UNITED STATES,  ) | <u>**NON-CONFIDENTIAL VERSION**</u> |
|       ) | |
|       Defendant,  ) | **Business Proprietary Information** |
|       ) | **removed from pages 5, 9, 14, 19-23,** |
|       ) | **43, 45-51, 58, and Exhibit 2** |
|    and  ) | |
|       ) | |
| OCP S.A., et al.,  ) | |
|       ) | |
|       Defendant-Intervenors.) | |

## <u>RESPONSE BRIEF OF CONSOLIDATED PLAINTIFF AND DEFENDANT-INTERVENOR OCP S.A.</u>

William R. Isasi
Alexander D. Chinoy
Micaela McMurrough
Elisa S. Solomon
Rishi R. Gupta
Cynthia C. Galvez
Jordan B. Bakst

**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

*Counsel to OCP S.A.*

Dated: February 22, 2022

# TABLE OF CONTENTS

RULE 56.2(C) STATEMENT ......................................................................... 1

I.       Administrative Determination Under Review. ................................... 1

II.      Issues Presented. ................................................................................ 2

STATEMENT OF FACTS ............................................................................. 3

I.       Commerce Evaluated OCP's Mining Rights Using a World Benchmark Price for Phosphate Rock. .................................................................................. 3

II.      Commerce Determined that VAT Refunds Were Not a Countervailable Subsidy. ............. 5

III.     Commerce Determined That VAT Exemptions for Capital Goods, Machinery, and Equipment Were Not a Countervailable Subsidy. ............................ 7

SUMMARY OF THE ARGUMENT ............................................................. 7

I.       Commerce's Inclusion of Egyptian Prices in the World Benchmark Price Calculation for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law. .................................................. 7

II.      Commerce's Determination Not to Add International Delivery Charges into the World Benchmark Price for Phosphate Rock Is Supported by Substantial Evidence And Otherwise in Accordance with Law. .......................... 9

III.     Commerce Correctly Determined that VAT Refunds Are Not Countervailable. ............. 11

IV.      Commerce Correctly Determined that VAT Exemptions Are Not Countervailable. ....... 13

STANDARD OF REVIEW .......................................................................... 14

ARGUMENT ............................................................................................... 15

I.       Commerce's Inclusion of Egyptian Prices in the World Benchmark Price Calculation for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law. ................................................ 15

         A.       Commerce Properly Included the Two Prices for Egyptian Rock in Its LTAR Analysis for Mining Rights. ........................ 16

         B.       Mosaic Incorrectly Asserts that the Egyptian Prices Included in the Benchmark Are for Phosphate Rock That Is Not Comparable to OCP's Phosphate Rock. .................................................. 18

II.     Commerce's Determination Not to Add International Delivery Charges into the World Benchmark Price for Phosphate Rock Is Supported by Substantial Evidence And Otherwise in Accordance with Law. ......................................................... 24

        A.      Mosaic Incorrectly Argues that Transportation Costs Similar to International Delivery Charges Were Included in the Constructed Government Price. .............................................................. 26

        B.      Mosaic Is Incorrect to Argue that Commerce's Regulations and Practice Support Inclusion of International Delivery Charges in the Benchmark Price. ..................................................................... 29

III.    Commerce Correctly Determined that VAT Refunds Are Not Countervailable. ............. 39

        A.      Mosaic Incorrectly Argues that the GOM Acted *Ultra Vires* When It Provided OCP and Its Affiliates the VAT Refund Payments. .............................. 43

        B.      Contrary to Mosaic's Claims, the Amount of the VAT Refunds at Issue Is Supported by Substantial Evidence. ................................................ 49

IV.     Commerce Correctly Determined that VAT Exemptions Are Not Countervailable. ....... 52

        A.      Mosaic's Arguments Regarding VAT Exemptions Are Procedurally Incorrect. ..................................................................... 53

        B.      Mosaic's Arguments Regarding VAT Exemptions Mischaracterize the Record Evidence and Commerce's Practice. ......................................... 54

CONCLUSION ............................................................................. 59

Exhibit 1 ..................................................................................... i

Exhibit 2 ................................................................................... iii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ancientree Cabinet Co. v. United States*,
    532 F. Supp. 3d 1241 (CIT 2021)..................................................................23, 58

*Beijing Tianhai Indus. Co. v. United States*,
    52 F. Supp. 3d 1351 (CIT 2015)..................................................................38

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................55

*Bomont Indus. v. United States*,
    733 F. Supp. 1507 (CIT 1990)..................................................................51

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    61 F. Supp. 3d 1306 (CIT 2015)..................................................................29

*Calgon Carbon Corp. v. United States*,
    190 F. Supp. 3d 1224 (CIT 2016)..................................................................23

*Casa de Cambio Comdiv S.A., de C.V. v. United States*,
    291 F.3d 1356 (Fed. Cir. 2002)..................................................................54

*Conley v. Gibson*,
    355 U.S. 41 (1957)..................................................................54

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938)..................................................................15

*Delverde, SrL v. United States*,
    202 F.3d 1360 (Fed. Cir. 2000)..................................................................43

*Downhole Pipe & Equip. LP v. United States*,
    887 F. Supp. 2d 1311 (CIT 2012)..................................................................23, 58

*Hung Vuong Corp. v. United States*,
    483 F. Supp. 3d 1321(CIT 2020)..................................................................51

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
    498 F. Supp. 3d 1345 (CIT 2021)..................................................................58

*Imperial Sugar Co. v. United States*,
    181 F. Supp. 3d 1284 (CIT 2016)..................................................................15

*Kimble v. United States*,
142 S. Ct. 98 (2021).................................................................................54

*Kimble v. United States*,
991 F.3d 1238 (Fed. Cir. 2021).................................................................54

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)............................................................................30

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017).................................................................29

*Maverick Tube Corp. v. United States*,
273 F. Supp. 3d 1293 (CIT 2017)..............................................................39

*NTN Bearing Corp. of Am. v. United States*,
972 F.2d 1355 (Fed. Cir. 1992).................................................................15

*NTN Bearing Corp. of Am. v. United States*,
757 F. Supp. 1425 (CIT 1991)..................................................................15

*Nucor Corp. v. United States*,
927 F.3d 1243 (Fed. Cir. 2019).................................................................39

*Nucor Corp. v. United States*,
286 F. Supp. 3d 1364 (CIT 2018)..............................................................39

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990).................................................................29

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006)...................................................................1

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005).................................................................15

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951)...............................................................................15

*Valeo North Am., Inc. v. United States*,
404 F. Supp. 3d 1303 (CIT 2019)..............................................................15

*Worldwide Door Components, Inc. v. United States*,
537 F. Supp. 3d 1403 (CIT 2021)..............................................................23

*Zhaoqing Tifo New Fibre Co. v. United States*,
256 F. Supp. 3d 1314 (CIT 2017)..............................................................54

**Statutes**

19 U.S.C. § 1516a ............................................................................................ 14, 54

19 U.S.C. § 1677 ................................................................................................. *passim*

**Regulations**

19 C.F.R. § 351.102 .................................................................................................. 42

19 C.F.R. § 351.510 ......................................................................... 42, 52, 56, 57, 58

19 C.F.R. § 351.511 ............................................................................................. *passim*

19 C.F.R. § 351.519 ............................................................................................. 52, 53

**Administrative Materials**

*Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed*
    *Presses from Indonesia:  Final Affirmative Countervailing Duty*
    *Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010) ...................................... 31, 32

*Certain Quartz Surface Products from the Republic of Turkey: Final Affirmative*
    *Countervailing Duty Determination and Final Affirmative Determination of*
    *Critical Circumstances, n Part*, 85 Fed. Reg. 25,400 (May 1, 2020) ......................... 45, 57, 58

*Certain Softwood Lumber Products from Canada:  Final Affirmative*
    *Countervailing Duty Determination, and Final Negative Determination of*
    *Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017) ................................. 32

*Certain Softwood Lumber Products from Canada: Preliminary Affirmative*
    *Countervailing Duty Determination, and Alignment of Final Determination*
    *with Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28,
    2017) ....................................................................................................... 31

*Certain Uncoated Groundwood Paper from Canada:  Final Affirmative*
    *Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018) ............................ 24

*Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty*
    *Determination*, 72 Fed. Reg. 60,642 (Oct. 25, 2007) ............................................ 26, 32, 35, 36

*Common Alloy Aluminum Sheet from the Republic of Turkey:  Final Affirmative*
    *Countervailing Duty Determination and Final Affirmative Determination of*
    *Critical Circumstances, in Part*, 86 Fed. Reg. 13,315 (Mar. 8, 2021) .................................. 59

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products*
    *from the Russian Federation:  Final Affirmative Countervailing Duty*
    *Determination and Final Negative Critical Circumstances Determination*, 81
    Fed. Reg. 49,935 (July 29, 2016) ....................................................................... 32, 37

*Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination:  Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Aug. 16, 2006)..............................................32

*Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from India*, 71 Fed. Reg. 7,534 (Feb. 13, 2006) ..............................................................................................................53

*Frozen Shrimp from Indonesia:  Final Countervailing Duty Determination*, 78 Fed. Reg. 50,383 (Aug. 19, 2013).............................................................45

*Frozen Shrimp from Thailand:  Final Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Aug. 19, 2013)............................................45, 46, 57, 58, 59

*Granular Polytetrafluoroethylene Resin from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Jan. 25, 2022) ................................................................................................................35

*Granular Polytetrafluoroethylene Resin from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 86 Fed. Reg. 35,476 (July 6, 2021) ................................................................................34, 35

*Melamine from Trinidad and Tobago:  Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015) ...................................48

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,448 (Dec. 12, 2005) ................................................................................................................32

*Notice of Preliminary Affirmative Countervailing Duty Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 7,524 (Feb. 13, 2006)..........................32

*Notice of Preliminary Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 33,088 (June 7, 2005) ................................................................................................................32

*Oil Country Tubular Goods from the Republic of Turkey:  Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 24,842 (May 10, 2021) ...........................................................59

*Oil Country Tubular Goods from the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review, Rescission in Part, and Intent to Rescind in Part*, 86 Fed. Reg. 7,069 (Jan. 26, 2021) ...............................59

*Phosphate Fertilizers from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Feb. 16, 2021) ……………………………………31, 37

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:*
*Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021).............................................1

*Prestressed Concrete Steel Wire Strand from the Republic of Turkey: Final*
*Affirmative Countervailing Duty Determination and Final Negative Critical*
*Circumstances Determination*, 85 Fed. Reg. 80,005 (Dec. 11, 2020)..............................57, 58

*Silicon Metal from Australia:  Final Affirmative Countervailing Duty*
*Determination*, 83 Fed. Reg. 9,834 (Mar. 8, 2018) .....................................................32, 33, 37

*Silicon Metal from Brazil:  Final Countervailing Duty Determination*, 83 Fed.
Reg. 9,838 (Mar. 8, 2018).......................................................................................................45

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019)........................................................................................29

OCP S.A. ("OCP"), in its role as Defendant-Intervenor in the above-captioned

consolidated action, respectfully submits this response to The Mosaic Company's ("Mosaic")

Rule 56.2 motion for judgment on the agency record. *See* The Mosaic Company's Mem. in

Supp. of R. 56.2 Mot. for J. Upon the Agency Record (Oct. 15, 2021), ECF No. 52 ("Mosaic's

Br."). For the reasons set forth below, OCP respectfully submits that the Court should deny

Mosaic's motion in its entirety.

## RULE 56.2(C) STATEMENT

### I.    Administrative Determination Under Review.

In its Complaint, Mosaic challenges specific aspects of the U.S. Department of

Commerce ("Commerce")'s determination in the countervailing duty ("CVD") investigation of

phosphate fertilizers from the Kingdom of Morocco ("Morocco").[1] *See Phosphate Fertilizers*

*from the Kingdom of Morocco:  Final Affirmative CVD Determination*, 86 Fed. Reg. 9,482 (Feb.

16, 2021) ("*Final Determination*") (P.R. 480), and accompanying Issues and Decision

Memorandum ("IDM") (P.R. 473); *Phosphate Fertilizers from the Kingdom of Morocco and the*

*Russian Federation:  Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021) ("*CVD*

*Order*") (P.R. 492).  Issues *not* raised by Mosaic in its Complaint have been waived, and

respectfully are not properly before the Court, even if now addressed in Mosaic's Rule 56.2

Brief. *See* Argument Sections III and IV *infra* (detailing Mosaic's waivers and the impact on the

Court's review).

---

[1] Count Five of Mosaic's Complaint alleges that Commerce improperly determined not to
countervail phosphogypsum byproduct disposal on both an LTAR and a revenue forgone theory.
*See* Mosaic's Complaint (May 12, 2021) at ¶¶ 35–36, ECF No. 12.  However, Mosaic failed to
raise any arguments in support of Count Five in its opening brief.  Accordingly, Mosaic has
waived these arguments. *See, e.g.*, *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312,
1319 (Fed. Cir. 2006) ("Our law is well established that arguments not raised in the opening brief
are waived.") (citations omitted).

II.     **Issues Presented.**

1.   **Did Commerce err by including, in the calculation of a world benchmark price for phosphate rock, two prices for Egyptian phosphate rock that Commerce determined was comparable to rock produced by OCP?**  No.  The record evidence conclusively establishes that the Egyptian rock was comparable to OCP's rock based on phosphate content and thus, Commerce properly included prices for this Egyptian rock in the benchmark price calculation.

2.   **Did Commerce err by not adding international freight, import duties, and value added tax ("VAT") into the benchmark price for phosphate rock used to measure the adequacy of remuneration for the right to mine phosphate ore?**  No.  To ensure an apples-to-apples comparison to the constructed government price, which did not include such charges, Commerce correctly did not add these charges to the benchmark price.  Inclusion of such costs would materially distort the comparison, and be contrary to Commerce's well-established practice and inconsistent with applicable law.

3.   **Did Commerce err by determining that VAT refund payments to OCP and some of its affiliates were not countervailable?**  No.  As an initial matter, Mosaic did not challenge Commerce's determination that the MAD 20.5 billion VAT refund received by OCP and its affiliates was not a financial contribution under CVD law, and the Court should affirm Commerce's determination that the refund was not countervailable on this ground alone, mooting Mosaic's challenge to the benefit determination.  Beyond this, Mosaic's wholly unsubstantiated argument should be rejected because Moroccan law and substantial record evidence demonstrate that OCP and its affiliates, together with hundreds of other companies in Morocco, were fully entitled to VAT refunds.

4.   **Did Commerce err in determining that the Government of Morocco ("GOM")'s provision of VAT exemptions for imported capital goods, machinery, and equipment was not countervailable?**  No.  As an initial matter, Mosaic waived any challenge to Commerce's determination that the VAT exemptions provided to OCP and its affiliates did not provide a financial contribution because it failed to include such a claim in its Complaint, and the Court should affirm Commerce's determination on this ground alone.  Beyond this, Mosaic's challenge to the determination must be rejected because Mosaic mischaracterizes record evidence and well-established agency practice, which conclusively establish that such exemptions are not countervailable because these exemptions had no effect on OCP's and its affiliates' ultimate tax liability.[2]

---

[2] As detailed in its opening brief, OCP maintains as a threshold matter that Commerce had no legal authority to examine programs such as these VAT exemptions, which were alleged as a result of the agency's "other assistance" question.  *See* OCP S.A.'s Mem. in Supp. of R. 56.2

## STATEMENT OF FACTS

Below, OCP provides the relevant legal and factual background for the issues raised in

Mosaic's appeal of Commerce's *Final Determination*.[3]

**I.     Commerce Evaluated OCP's Mining Rights Using a World Benchmark Price for Phosphate Rock.**

Commerce measured the adequacy of the remuneration OCP paid to the GOM for the

right to mine phosphate ore using its hierarchical "three-tier methodology" codified in 19 C.F.R.

§ 351.511(a)(2).  In accordance with this regulation, Commerce determined it would apply a

third-tier analysis ("Tier 3"), pursuant to which it considered whether the government price

charged to OCP for mining rights was "consistent with market principles."  *Phosphate Fertilizers*

*from the Kingdom of Morocco:  Preliminary Affirmative CVD Determination*, 85 Fed. Reg.

76,522 (Nov. 30, 2020) ("*Preliminary Determination*") (P.R. 404), and accompanying

Preliminary Decision Memorandum at 12 ("PDM") (P.R. 386); *see also* IDM at 5 (P.R. 473).  To

conduct this analysis, Commerce determined a government price based on a "cost of production"

or "COP" buildup constructed from OCP's actual costs to mine phosphate ore and produce

phosphate rock (the underlying good conveyed via the mining rights) during the Period of

Investigation ("POI"), and then compared this constructed price to a world benchmark price.  *See*

PDM at 12 (P.R. 386).  Commerce based the cost of production buildup on extensive record

evidence submitted by OCP, including through OCP's response to a verification questionnaire.

---

Mot. for J. Upon the Agency Record (Oct. 15, 2021) at 10–11, 64–70, ECF No. 53 ("OCP's Br.").

[3] Pursuant to Rule 81(k) of the U.S. Court of International Trade, the factual background that follows is generally limited to facts necessary to correct inaccuracies or omissions in Mosaic's brief.

Commerce calculated a world benchmark price for phosphate rock by averaging prices contained in data submitted by both Mosaic and OCP from several third-party reporting sources that provided prices for phosphate rock produced in several countries. From these data, Commerce selected only prices for phosphate rock that it determined was comparable to OCP's phosphate rock produced during the POI, as measured by the industry-accepted standard of the phosphate content of the rock. IDM at 20 (P.R. 473); PDM at 12 & n.82 (P.R. 386); *see* Petition, Vol. II (June 26, 2020) at Ex. II-23 (Argus), Ex. II-24 (CRU) (P.R. 7; C.R. 7); OCP New Factual Information Submission (Nov. 4, 2020) at Ex. 18 (Fertecon), Ex. 21 (Profercy) ("OCP NFI") (P.R. 337; C.R. 215). Commerce determined that it would evaluate the comparability of phosphate rock based on phosphate/bone phosphate of lime ("BPL") content after determining that the data sources submitted by the parties clearly demonstrated that phosphate/BPL content has a "substantial effect on the price of phosphate rock." Prelim. Calculation Memo (Nov. 24, 2020) at 3 (P.R. 390; C.R. 256); *see* PDM at 12 (P.R. 386). Using this methodology, Commerce ultimately included certain prices for Egyptian phosphate rock in the benchmark price used in the *Final Determination* because the BPL content range of this rock was similar to the BPL content range of the phosphate rock produced by OCP during the POI. IDM at 19–20 (P.R. 473).

Commerce also declined to adjust the world benchmark to include international freight, import duties, and VAT (collectively, "international delivery charges"), over Mosaic's objections. In the *Preliminary Determination*, Commerce had determined it would limit its selection of benchmarks to those that were reported on a free (or freight) on board ("FOB") basis, which included *internal* transportation costs to the exporting port. PDM at 12 (P.R. 386); *see* Petition, Vol. II, at Ex. II-23 (Argus), Ex. II-24 (CRU) (P.R. 7; C.R. 7); OCP NFI at Ex. 18

(Fertecon), Ex. 21 (Profercy) (P.R. 337; C.R. 215).  In the *Final Determination*, Commerce determined it would not be appropriate to add international delivery charges associated with importing the phosphate rock into Morocco on top of the already-included domestic transportation costs because it determined such charges were not included in the constructed government price to which Commerce compared the world benchmark price.  IDM at 20 (P.R. 473).  Commerce also explained that its practice in other CVD proceedings where it engaged in similar LTAR analyses is not to include such international delivery charges.  *Id.*

## II.    Commerce Determined that VAT Refunds Were Not a Countervailable Subsidy.

Under the Moroccan VAT system, a company producing goods accrues excess VAT credits when it collects less VAT on its sales than it pays on its inputs.  These VAT credits can either be carried forward to offset VAT obligations in future years or be redeemed for reimbursement from the GOM.  GOM Initial Questionnaire Response (Sept. 17, 2020) at VII-8 – VII-9 ("GOM IQR") (P.R. 152; C.R. 66).  In 2018, the GOM entered into financing agreements (also referred to as "Protocols") with a number of Moroccan banks for loans to provide VAT refunds to hundreds of Moroccan companies, including OCP and its affiliates, for their accumulated VAT credits.  *See id.* at VII-7 (P.R. 152; C.R. 66); OCP Initial Questionnaire Response (Sept. 17, 2020) at App. VAT-5 ("OCP IQR") (P.R. 140; C.R. 53).  Separately, the recipient companies entered into "factoring agreements" with the banks, to pay the interest on the loans obtained by the GOM, OCP IQR at 107–10 (P.R. 130; C.R. 39), and [

].  GOM IQR at VII-10, Ex. VII-14 (P.R. 152, 206; C.R. 66, 132–33).

OCP and the GOM explained this reimbursement arrangement and the Moroccan VAT system in their initial questionnaires.  GOM IQR at VII-7 – VII-9 (P.R. 152; C.R. 66); OCP IQR at 107–10 (P.R. 130; C.R. 39).  In a supplemental questionnaire, OCP submitted copies of all of

its original VAT reimbursement claims that served as the basis for a total refund amount of

MAD 20.5 billion, as well as a chart that reconciled its claims to the refund amount.  OCP

Supplemental Questionnaire Response (Nov. 3, 2020) at 26–27, App. VAT2-1 ("OCP SQR Part

1") (P.R. 254; C.R. 149, 153–60).

In the *Preliminary Determination*, Commerce determined that the VAT refunds were not

a countervailable subsidy.  PDM at 15–16 (P.R. 386).  Not only did Commerce determine that

these refunds conferred no benefit, it also determined that the refunds were not a financial

contribution, as the GOM merely reimbursed excess VAT credits that were already owed to OCP

under Moroccan tax laws, and thus did not forgo any revenue due from OCP or its affiliates.  *Id.*

at 16 (P.R. 386).  Subsequently, Commerce conducted verification of OCP's reimbursement

claims and of OCP's and the GOM's descriptions of the Moroccan VAT reconciliation and

reimbursement system.  OCP Response to Questionnaire in Lieu of On-Site Verification (Dec.

30, 2020) at 54–67, Apps. VE-VAT–2 – VE-VAT-26 ("OCP Verification QR") (P.R. 436; C.R.

290–94); GOM Verification Questionnaire Response In Lieu of On-Site (Dec. 29, 2020) at VER-

1 – VER-4 and Exs. VER1 – VER4, VER-6 ("GOM Verification QR") (P.R. 431–32; C.R. 285–

87).  In the *Final Determination*, Commerce made no change to its determinations that the

refunds were not a financial contribution and conferred no benefit.  IDM at 6 (P.R. 473).  It

explained that the record shows that the refunds constituted repayment for a debt the GOM owed

to hundreds of companies in Morocco, including OCP and its affiliates, and that the refunds were

consistent with Moroccan law.  *Id.* at 78–80 (P.R. 473).  Citing VAT documentation and other

information, Commerce also found the refund amount of MAD 20.5 billion fully substantiated.

*Id.* at 80 (P.R. 473).

### III.     Commerce Determined That VAT Exemptions for Capital Goods, Machinery, and Equipment Were Not a Countervailable Subsidy.

OCP and its cross-owned affiliates also entered into investment agreements with the

GOM for VAT exemptions on eligible purchases of capital goods, machinery, and equipment.

*See* OCP IQR at 112–13, 184–85, App. CUSTOMS-1(a), Art. 7-I-2°, Art. 7-I-3° (P.R. 130, 141;

C.R. 39, 56) (describing the VAT exemptions).  In the *Post-Preliminary Determination*,

Commerce determined that these VAT exemptions were not countervailable because the

exemptions (1) did not constitute a financial contribution, and (2) did not provide a benefit.  *See*

Post-Preliminary Determination (Jan. 6, 2021) at 8 (P.R. 441; C.R. 296).  Commerce based its

determinations on the fact that Morocco maintains a tax-neutral VAT system through which

OCP and its affiliates incurred no change to their ultimate VAT liability with or without these

VAT exemptions.  *See id*.  In the *Final Determination*, Commerce continued to determine that

VAT exemptions did not constitute a financial contribution or confer a benefit.  *See* IDM at 81–

82 (P.R. 473).  The agency adopted its reasoning set forth in the *Post-Preliminary Determination*

and further explained that its determination not to countervail the VAT exemptions was

consistent with its practice of finding that VAT exemptions to producers are not countervailable

in countries such as Morocco with tax-neutral VAT systems for such producers.  *See id.* at 6, 82

(P.R. 473).

### <u>SUMMARY OF THE ARGUMENT</u>

### I.     Commerce's Inclusion of Egyptian Prices in the World Benchmark Price Calculation for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Mosaic incorrectly contends that Commerce should have excluded two Egyptian

phosphate rock prices from the calculation of a world benchmark price used to measure the

adequacy of remuneration for the GOM's provision of mining rights to OCP.  Mosaic's

argument is premised on the flawed assertion that the Egyptian prices are for phosphate rock that is not comparable to OCP's rock, allegedly making Commerce's reliance on these prices improper. Mosaic's Br. at 14–19. Mosaic misstates the record evidence and fails to rebut the specific and robust record evidence on which Commerce relied to determine that this Egyptian phosphate rock was comparable to OCP's rock.

Commerce evaluated whether the GOM provided OCP with mining rights for less than adequate remuneration ("LTAR") by conducting a price comparison of the underlying good conveyed via the mining rights—phosphate rock—to a world benchmark price for phosphate rock. Commerce determined what prices to include in the benchmark price calculation based on a precise industry-accepted metric: the phosphate content of the rock (*i.e.,* measured by the bone phosphate lime ("BPL") content). Commerce included in the benchmark price calculation only prices for rock with a BPL content similar to that of OCP's rock. With respect to prices from Egypt, Commerce included two Egyptian prices for rock with a BPL content range that is similar to the BPL content range of OCP's rock, and excluded one Egyptian price for rock with a BPL content range that is not similar.

Mosaic's challenge is based on two incorrect assertions: (1) that OCP's actual BPL content range was 65% to 75% and therefore the included Egyptian prices are for rock that was purportedly not comparable to OCP's rock because the Egyptian rock had BPL content ranges of 60–68% and 65.6–67.7%, and (2) that factors other than BPL content, such as the levels of carbonate and iron and end uses of the rock, demonstrate that this Egyptian rock is not comparable to OCP's rock. In fact, however, OCP submitted laboratory testing certifications prepared in the normal course of business that provided the exact BPL content of OCP's rock, substantiated the average BPL content by month of OCP's rock produced during the POI, and

conclusively established that, contrary to Mosaic's assertion, this monthly average was [

      ].  The information Mosaic cites in support of a different BPL content range for OCP's rock

is not specific to the POI and pertains to only a small subset of the phosphate rock produced by

OCP.  This general and incomplete information cannot rebut the specific and robust evidence

OCP submitted on the record.  In light of this fully substantiated average BPL content range of

[            ] for OCP's rock, Commerce properly determined that this Egyptian rock was

comparable to OCP's rock, and properly included the corresponding prices for the Egyptian rock

in the benchmark price calculation.

       To support its argument that other factors beyond BPL content demonstrate that the

Egyptian rock is not comparable to OCP's rock, Mosaic relies solely on minimal information of

a general nature about the purported carbonate and iron levels and end uses of Egyptian rock.

However, this generic information predates the POI by two years and does not relate to the

specific rock on which the challenged Egyptian prices were based.  Moreover, Mosaic failed to

provide any actual analysis of the carbonate and iron levels or the end uses of the Egyptian rock

as compared to OCP's rock produced during the POI.

       Under these circumstances, Commerce's decision to include the two challenged Egyptian

prices is fully supported by substantial evidence and otherwise in accordance with law.  The

Court should affirm Commerce's determination to include those Egyptian prices.

## II.    Commerce's Determination Not to Add International Delivery Charges into the World Benchmark Price for Phosphate Rock Is Supported by Substantial Evidence And Otherwise in Accordance with Law.

       Mosaic challenges Commerce's determination not to add international freight, import

duties, and VAT (or collectively "international delivery charges") to the benchmark price for

phosphate rock that Commerce used to measure the adequacy of remuneration for the GOM's

provision of the right to mine phosphate ore to OCP.  Mosaic's challenge should be rejected.  It

is based on mischaracterizations of the record evidence and is inconsistent with Commerce's

long-standing practice in similar cases involving the right to extract a natural resource.  Indeed, it

would be contrary to law to include international delivery charges in a benchmark to measure the

adequacy of remuneration for mining rights because such charges are not part of the prevailing

market conditions in Morocco.

As part of its LTAR analysis for mining rights, Commerce compared the benchmark

price for the good conveyed via those mining rights, *i.e.,* phosphate rock, to a constructed

government price for phosphate rock.  Commerce included in both the benchmark and the

constructed government price those costs associated with loading and transporting phosphate

rock *within* the country of production, but no costs associated with transporting phosphate rock

*internationally* to a different port.  Mosaic incorrectly argues that international delivery charges

should be added to the benchmark price because transportation costs were included in the

constructed government price.  However, Mosaic's argument ignores the fundamental distinction

between transportation charges within the country of production, which were included on both

sides of the LTAR analysis, and international transportation charges, which were excluded on

both sides of the LTAR analysis.  Commerce correctly found that in order to ensure an apples-to-

apples comparison, it should not add international delivery charges to the benchmark.

Mosaic concedes, as it must, that no regulation required Commerce to add these

international delivery charges to the benchmark price in a Tier 3 LTAR analysis, even though

Commerce is required by regulation to include such charges in LTAR analyses under Tiers 1 and

2.  Instead, Mosaic erroneously claims that it has been Commerce's practice in these

circumstances to add international delivery charges.  This assertion is wholly without support.

Mosaic fails to cite even one administrative proceeding in which Commerce added international

delivery charges to a world benchmark price in similar circumstances. To the contrary, a long line of cases establishes that Commerce's practice is *not* to add such international delivery charges to benchmarks used to measure the adequacy of remuneration for the right to extract a natural resource.

There is good reason for Commerce's longstanding practice here: adding international delivery charges would be inconsistent with 19 U.S.C. § 1677(5)(E), which requires the adequacy of remuneration to be based on the prevailing market conditions *in Morocco*. Because mining rights in Morocco are obviously not delivered internationally into Morocco, international delivery charges are not part of the prevailing market conditions in Morocco for these rights.

Because Mosaic's arguments on this issue ignore record evidence, misinterpret Commerce's regulations and long-standing practice, and are inconsistent with the law, the Court should reject Mosaic's challenge and affirm Commerce's decision not to add international delivery charges to the benchmark price for phosphate rock.

## III.      Commerce Correctly Determined that VAT Refunds Are Not Countervailable.

Mosaic incorrectly argues that Commerce erred in determining that VAT refunds received by OCP and some of its affiliates (as well as 700+ other companies in Morocco) did not constitute a countervailable subsidy. In particular, Mosaic argues only that Commerce was incorrect to find that the refunds did not provide a benefit to these companies. As a threshold matter, however, Commerce determined that the VAT refunds were not countervailable subsidies because they constituted neither a financial contribution nor a benefit, two independent bases on which to find that the refunds were not countervailable.[4] Thus, Mosaic's failure to challenge

---

[4] For a program to be considered a countervailable subsidy, the law requires three determinations: (1) that there be a financial contribution; (2) that the financial contribution

Commerce's determination of no financial contribution renders Mosaic's challenge to the benefit

determination moot and represents a request for an impermissible advisory opinion.

Beyond being procedurally defective, Mosaic's arguments regarding the VAT refunds

also grossly mischaracterize the record evidence and should be rejected. Mosaic incorrectly

argues that Commerce failed to recognize that the GOM acted *ultra vires* when it provided 700+

companies in Morocco, including OCP and its affiliates, with payments for VAT refunds that

were past due, claiming that such payments were not part of the normal operation of Morocco's

VAT system. The sole Moroccan law to which Mosaic cites in support of its position is a law

that indicates that VAT refunds should be provided within three months of the submission of the

claim. As Commerce correctly found, however, the law says nothing about the manner of

payment for such refunds and, contrary to Mosaic's argument, does not render worthless VAT

refund claims that are paid more than three months after they are submitted. Mosaic has utterly

failed to substantiate its claim that the payments for VAT refunds were *ultra vires* and not part of

Morocco's VAT system.

In addition, Mosaic incorrectly argues that the MAD 20.5 billion amount of the refunds

for OCP and its affiliates is not supported by substantial evidence, notwithstanding

overwhelming record evidence—verified by Commerce—demonstrating that OCP was entitled

to this amount. As Commerce correctly noted, OCP submitted meticulous record evidence

including *all* of the reimbursement claims on which the MAD 20.5 billion refund amount was

based, and Commerce verified this information. In the face of this mountain of evidence,

Mosaic's argument that the MAD 20.5 billion was unsubstantiated is meritless. For all of these

---

confer a benefit; and (3) that the subsidy be specific. 19 U.S.C. § 1677(5)(A), (B). In the
absence of any of these elements, there is no countervailable subsidy.

reasons, if the Court reaches the merits of Mosaic's arguments, the Court should reject these arguments and affirm Commerce's determination that the VAT refunds were not a countervailable subsidy.

## IV.    Commerce Correctly Determined that VAT Exemptions Are Not Countervailable.

Commerce correctly determined that VAT exemptions for purchases of capital goods, machinery, and equipment were not countervailable, as they neither constituted a financial contribution nor conferred a benefit.  As an initial matter, the Court need not rule on Mosaic's arguments with respect to VAT exemptions because they are not properly before the Court. Mosaic elected to exclude from its Complaint—and, in turn, this litigation—a challenge to Commerce's determination that VAT exemptions do not provide a financial contribution. Accordingly, there exists an independent and unchallenged basis for Commerce's decision not to countervail VAT exemptions and, through its challenge only to Commerce's benefit determination, Mosaic seeks an impermissible advisory opinion from this Court  (akin to that impermissibly sought for its VAT refund argument, referenced *supra*).  If the Court nonetheless reaches the merits of Mosaic's arguments, the Court should reject them because the record evidence and established agency practice confirms that these exemptions are not countervailable.

Mosaic incorrectly argues, with respect to imported capital goods, machinery, and equipment, that Commerce's determination that the exemptions were not countervailable was invalid because Commerce failed to consider "an important aspect" of the exemptions, to wit, their contingent nature.  However, in addressing Mosaic's argument with respect to Commerce practice regarding VAT exemptions, Commerce did consider the contingent nature of these exemptions.  In any event, under well-established agency practice, the contingent nature of the exemptions was immaterial to the ultimate question of countervailability.  This is because Commerce's practice is to find exemptions not countervailable if they do not reduce a recipient's

ultimate tax liability, without regard to whether the exemptions are contingent.  Here, the

exemptions simply reduced the VAT refunds OCP sought from the GOM and did not impact

OCP's ultimate tax liability; thus, Commerce was correct in determining that the exemptions

were not countervailable, regardless of their contingent nature.

Mosaic also falsely argues that Commerce departed from its prior practice of

countervailing VAT exemptions as contingent-liability, interest free loans.  As Commerce

explained in the *Final Determination*, Mosaic cited to an outdated decision, and the agency has

recently affirmed multiple times that it no longer considers VAT exemptions to be

countervailable because they are contingent.  Lastly, Mosaic also misrepresents the factual

record in claiming that the VAT exemptions relieved OCP of an obligation to pay

[                          ] in input VAT.  This argument blatantly ignores that under

Morocco's VAT system, which is tax-neutral for producers such as OCP, OCP did not ultimately

owe this amount to the GOM.  Accordingly, the Court should reject Mosaic's arguments and

affirm Commerce's determination that the VAT exemptions were not countervailable.

## STANDARD OF REVIEW

The Court will hold unlawful a Commerce determination that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i); *see NTN Bearing Corp. of Am. v. United States*, 757 F. Supp. 1425, 1427–

33 (CIT 1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (applying the substantial evidence standard

in reviewing initiation and final determinations).  Substantial evidence "is more than a mere

scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).

Although an assessment of "substantiality of evidence must take into account whatever in

the record fairly detracts from its weight," that does not mean the Court may "displace the

{agency's} choice between two fairly conflicting views, even though the court would justifiably

have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v.*

*NLRB*, 340 U.S. 474, 488 (1951). The Court may not "reweigh" the evidence. *Imperial Sugar*

*Co. v. United States*, 181 F. Supp. 3d 1284, 1304 (CIT 2016). In addition, substantial evidence

does not require that Commerce have addressed all arguments by a party, so long as the agency's

path to its determination is "reasonably discernible." *Valeo North Am., Inc. v. United States*, 404

F. Supp. 3d 1303, 1318–19 (CIT 2019) (citing *Timken U.S. Corp. v. United States*, 421 F.3d

1350, 1354 (Fed. Cir. 2005)).

## ARGUMENT

I.     **Commerce's Inclusion of Egyptian Prices in the World Benchmark Price Calculation for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

        Mosaic incorrectly contends that, in measuring the adequacy of remuneration for the right

to mine phosphate ore, Commerce should have excluded two Egyptian phosphate rock prices

from the calculation of the world benchmark price because those prices are for rock that is not

comparable to OCP's rock. Mosaic's Br. at 14–19. This argument is meritless. Commerce

determined what prices to include in the benchmark price calculation based on a widely accepted

rock quality metric: phosphate content (*i.e.*, measured by bone phosphate lime or "BPL

content").[5] The agency included prices for phosphate rock with phosphate content that was

---

[5] The phosphate content of phosphate rock is measured through two interchangeable metrics, BPL content or phosphorus pentoxide "$P_2O_5$" content, Petition, Vol. II, at II-12, Ex. II-25 at 3 (P.R. 6; C.R. 6), and the world market pricing data submitted on the record uses both metrics. It is uncontested that $P_2O_5$ content can be converted to BPL content using a conversion factor of 2.185. Mosaic's Br. at 15; *see* Mosaic's Benchmark Submission at Ex. 8(e) at 2–3 (P.R. 261). To simplify its response to Mosaic's arguments, OCP discusses phosphate content with regard to only BPL content rather than $P_2O_5$ content throughout this brief. At **Exhibit 1**, OCP provides a list of the world benchmark FOB prices submitted on the record, each price's BPL and $P_2O_5$ content, and where the pricing data is found on the record.

similar to the phosphate content of OCP's rock in the benchmark price calculation. As discussed

below, Mosaic's own petition establishes that BPL content is the most appropriate measure of

comparability.

The central role of BPL content in the pricing of phosphate rock globally, and the BPL

content of the rock for the prices included in the benchmark price calculation and of OCP's rock

specifically, are all substantiated by detailed and robust record evidence. Moreover, this record

evidence conclusively establishes that the Egyptian prices challenged by Mosaic are for

phosphate rock with a BPL content range that was similar to the BPL content range of OCP's

rock. Under these circumstances, there can be no question that these Egyptian prices should

remain in the benchmark price calculation. The Court should affirm Commerce's determination

to include those prices as supported by substantial evidence and otherwise in accordance with

law.

> **A.      Commerce Properly Included the Two Prices for Egyptian Rock in Its LTAR Analysis for Mining Rights.**

Commerce measured the adequacy of the remuneration OCP paid for its right to mine

phosphate ore using its hierarchical "three-tier methodology" codified in 19 C.F.R.

§ 351.511(a)(2). According to this methodology, Commerce first determined that there were no

market-determined prices for mining rights available in Morocco (under Tier 1), and there were

no world market prices for such mining rights (under Tier 2). Commerce therefore conducted a

Tier 3 analysis to determine whether the government price charged to OCP for mining rights was

"consistent with market principles." PDM at 12 (P.R. 386).

Relying on its practice in Tier 3 proceedings involving a right to extract natural

resources, Commerce conducted a price comparison of the underlying good conveyed via those

rights—in this case, phosphate rock—to a world benchmark price for comparable phosphate

rock.  *See id.*; IDM at 20, 32 (P.R. 473).  Because OCP did not actually purchase phosphate rock

from the GOM, Commerce constructed a government price based on a "cost of production" or

"COP" buildup derived from record evidence of OCP's actual costs to mine phosphate ore and

produce phosphate rock including, *inter alia*, the extraction taxes OCP paid to the GOM.[6]  *See*

PDM at 12 & n.81 (P.R. 386); IDM at 23–25 (P.R. 473).

Using the industry's own standard—phosphate content/BPL content—as the metric of

comparability, Commerce then determined what phosphate rock was comparable to OCP's

phosphate rock, such that it would be appropriate to include prices for that rock in the calculation

of a world benchmark price.  Specifically, Commerce determined the BPL content range of

OCP's phosphate rock by relying on robust record evidence, which demonstrated the exact BPL

content of OCP's phosphate rock produced during the POI.  *See* Prelim. Calculation Memo at 3

(P.R. 390; C.R. 256); *see also* OCP Supplemental Questionnaire Response Part Four (Nov. 9,

2020) at Apps. MIN2-9, MIN2-10(a)–MIN2-10(h) ("OCP SQR Part 4") (P.R. 355; C.R. 234).

Next, Commerce considered world market pricing data for phosphate rock submitted by both

OCP and Mosaic that identified the phosphate content range of the rock on which the pricing

data were based.  *See* **Exhibit 1**.  Commerce then selected prices from that world market pricing

data to include in the benchmark price calculation by selecting prices for phosphate rock that had

a similar BPL content range as OCP's rock.  IDM at 20 (P.R. 473); *see* Prelim. Calculation

Memo at 3 & n.13 (P.R. 390; C.R. 256) (citing OCP SQR Part 4 at 1–2, App. MIN2-9).[7]

---

[6] As OCP explained in its opening brief, Commerce's cost of production buildup grossly understated OCP's costs incurred in the production of phosphate rock by excluding HQ, support, and debt costs, as well as by failing to use a profit rate specific to mining.  These deficiencies are addressed in OCP's initial submission and are not re-addressed here.  *See* OCP's Br. at 38–61.

[7] As OCP explained in its opening brief, Commerce improperly included phosphate rock prices from North Africa in the benchmark because those prices included OCP's own prices.  This error is addressed in OCP's initial submission and is not re-addressed here. *See* OCP's Br. at 61–64.

**Exhibit 2** graphically illustrates that Commerce included in the calculation of a benchmark price those prices for phosphate rock that fell within the BPL content range of OCP's rock produced during the POI while excluding those prices that fell either below or above OCP's range.

Commerce's determination that the two included Egyptian prices are for phosphate rock that was comparable to OCP's rock and thus should be included in the benchmark price calculation is supported by substantial record evidence demonstrating the precise BPL content range of both OCP's rock and this Egyptian rock. As discussed below, the Court should reject Mosaic's arguments to the contrary because they misstate the record evidence and rely on minimal information that is general in nature and not specific to the POI, and thus fails to rebut the robust and precise record evidence on which Commerce relied to determine that the Egyptian phosphate rock was comparable to OCP's rock.

> **B.      Mosaic Incorrectly Asserts that the Egyptian Prices Included in the Benchmark Are for Phosphate Rock That Is Not Comparable to OCP's Phosphate Rock.**

In evaluating Mosaic's argument that Commerce should not have included prices of Egyptian phosphate rock in the benchmark, it is important to note what Mosaic is *not* challenging. *First*, Mosaic does not challenge Commerce's use of phosphate/BPL content to determine comparable rock. Mosaic's Br. at 17 (asserting that "the record evidence showed that Egyptian phosphate rock is of low quality in terms of P2O5 (or BPL) . . . ."). Nor could Mosaic succeed in raising such a challenge because, as Commerce correctly noted, the pricing data Mosaic submitted on the record, along with OCP's pricing data, demonstrate conclusively that phosphate rock prices correlate directly to BPL content. PDM at 12 (P.R. 386); Prelim. Calculation Memo at 3 (P.R. 390; C.R. 256) (stating that both parties represented that the "quality of phosphate rock is measured by" BPL content and finding that BPL content has a "substantial effect on the price of phosphate rock"); *see* Petition, Vol. II, at II-13, Exs. II-23, II-

24 (P.R. 7; C.R. 7) (differentiating rock prices solely based on BPL (or $P_2O_5$) content); OCP NFI at Exs. 18–21 (P.R. 337; C.R. 215) (same). *Second*, Mosaic does not challenge that the Egyptian prices included in the benchmark price calculation are for rock with a BPL content range of 65.6% to 67.7% and 60% to 68%, respectively. Mosaic's Br. at 15. These BPL content ranges are explicitly provided in the pricing data *submitted by Mosaic*. Petition, Vol. II, at Exs. II-23, II-24 (P.R. 7; C.R. 7); OCP NFI at Exs. 18–21 (P.R. 337; C.R. 215). *Instead*, Mosaic's challenge is based on two unfounded assertions: (1) that OCP's BPL content range was actually 65% to 75% instead of [            ] such that this rock from Egypt is purportedly not comparable in terms of BPL content; and (2) that other factors beyond BPL content such as the levels of carbonate and iron in the rock, and the end uses of the rock, demonstrate that this Egyptian rock is not comparable to OCP's rock. Mosaic's Br. at 18–19. Both of these assertions mischaracterize the record evidence, are not substantiated, and must be rejected.

Mosaic's attempt to cast doubt on the BPL content range of OCP's phosphate rock produced during the POI is devoid of credibility, and seeks to manufacture a dispute where none should exist. OCP presented, and Commerce relied upon, extensive and detailed record evidence conclusively establishing that the phosphate rock OCP produced during the POI had an average BPL content range by month of [            ]. Prelim. Calculation Memorandum at 3 & n.13 (P.R. 390; C.R. 256) (citing OCP SQR Part 4 at 1–2, App. MIN2-9). Specifically, OCP submitted laboratory testing certifications prepared in the normal course of business that provide the exact BPL content of the rock OCP produced during the POI and fully substantiate the monthly averages of BPL content OCP submitted on the record. OCP SQR Part 4 at Apps. MIN2-10(a) – MIN2-10(h) (P.R. 355; C.R. 234). Commerce even verified OCP's questionnaire responses. *See Final Determination*, 86 Fed. Reg. at 9,482–83 (P.R. 480); OCP Verification QR

(P.R. 436; C.R. 289). Under these circumstances, it is clear that precise and verified record

evidence establishes that the phosphate rock OCP produced during the POI had an average BPL

content range by month of [              ].

The *sole* evidence discussed in Mosaic's brief in support of its assertion that OCP's

phosphate rock had a BPL content range of 65% to 75% is a generic and undated chart

describing the BPL content of OCP's rock for export sales. *See* Mosaic's Br. at 16–17 (citing

Mosaic's Benchmark Submission at Ex. 8(l)).[8] This chart was cherry-picked from OCP's

website and placed on the record by Mosaic in an apparent attempt to bolster its argument that

OCP's rock is not comparable to Egyptian rock. This generic chart with no discernable tie to

either the POI or the specific rock at issue in this investigation in no way outweighs the

laboratory testing certifications that OCP placed on the record demonstrating the precise BPL

content of the phosphate rock OCP produced during the POI. As OCP explained to Commerce,

the chart on which Mosaic relies refers only to OCP's rock *for export,* rather than *all* of OCP's

rock (either consumed internally in the production of phosphate fertilizer or exported as rock),

which was the focus of Commerce's LTAR analysis. *See* OCP Rebuttal Brief at 6 (P.R. 453;

C.R. 304) (citing to OCP SQR Part 4 at 2, App. MIN2-9 (P.R. 390; C.R. 256)).[9] Mosaic's

submission of summary information about a small subset of OCP's rock production utterly fails

---

[8] Mosaic also cites to Exhibit 1 of a November 19, 2020 Rebuttal Factual Information filing to claim incorrectly that OCP's rock has a BPL content range of 65–75%. *See* Mosaic's Br. at 19. That exhibit does not substantiate Mosaic's incorrectly asserted BPL content range for OCP's rock. Instead, the cited exhibit primarily discusses the global phosphate fertilizer industry in general and in no way purports to provide the BPL content range of OCP's phosphate rock produced during the POI.

[9] Commerce was investigating the alleged benefit the GOM provided to OCP from the right to mine phosphate ore during the POI, and Commerce's analysis therefore reasonably considered *all* phosphate rock produced by OCP during the POI not just that phosphate rock that was exported as rock.

to substantiate its assertion that the BPL content range of all of OCP's rock produced during the POI was 65% to 75%.

Using the correct and fully substantiated [        ] BPL content range for OCP's rock during the POI, Commerce properly determined that the included Egyptian prices are for rock that is comparable to OCP's rock. IDM at 20 (P.R. 473); *see* Commerce's Final Calculation Mem. (Feb. 8, 2021) at Attach. I ("RockBenchmark") (P.R. 476; C.R. 308) (citing to Petition Vol. II, Ex. II-24 (P.R. 7; C.R. 7); OCP NFI at Ex. 21 (P.R. 337; C.R. 215)). The BPL content range of this Egyptian rock *significantly overlaps* with the BPL content range of OCP's rock. One of the Egyptian prices Commerce used in the benchmark price calculation is based on Egyptian rock with a BPL content range of 60–68% and therefore [           ] with the [    ] BPL content range for OCP's rock. Petition, Vol. II, at Ex. II-24 (P.R. 7; C.R. 7). The second Egyptian price was based on phosphate rock with a BPL content range of 65.6–67.7%, and therefore [          ] the [    ] BPL content range for OCP's rock. OCP NFI at Ex. 21 (P.R. 337; C.R. 215).[10] Indeed, even under Mosaic's incorrectly asserted BPL content range for OCP's rock of 65% to 75%, Commerce's conclusion that the BPL content range of this Egyptian rock was similar to the BPL content range of OCP's rock would still stand, further demonstrating that even with Mosaic's wrong facts, their argument is meritless. Commerce's comparability finding is therefore supported by substantial evidence on the record and should be affirmed.

---

[10] Consistent with this approach, Commerce excluded several benchmark prices for rock with BPL content that did not fall in the [    ] range of OCP's rock. Notably, Commerce excluded one Egyptian price for rock that Commerce determined had a BPL content range that does not overlap with OCP's rock. *See* **Exhibits 1–2**.

Next, Mosaic incorrectly asserts that phosphate rock from Egypt is "low quality" and not comparable to OCP's rock because of factors *other than* BPL content such as the purported levels of carbonate and iron and differences in end uses for Egyptian rock. Mosaic's Br. 17–19. Mosaic provides no meaningful support for this assertion, such as an actual comparison of the carbonate and iron levels or end uses of OCP's rock consumed during the POI to the Egyptian rock, and so Mosaic never demonstrates any actual differences.[11] *See id.*

Moreover, Mosaic rests its assertions about the carbonate and iron levels and end uses of Egyptian phosphate rock on a single piece of record evidence—a 2017 CRU report issued two years before the POI. *Id.* at 17, 19. This CRU report is in no way specific to Egyptian rock produced during the POI, discusses phosphate rock in Egypt only in general terms, does not address the specific sales underlying the Egyptian prices Commerce included in the benchmark price calculation, and certainly does not offer any kind of comparative analysis between the carbonate and iron levels and end uses of Egyptian rock and OCP's rock. Indeed, because of these significant limitations in the 2017 CRU data, Commerce could not have properly relied on it as a basis for excluding the prices from Egypt from the benchmark price calculation, as Mosaic argues, especially in light of the conclusive evidence based on BPL content demonstrating that the Egyptian prices are for rock that is comparable to OCP's rock. *See Calgon Carbon Corp. v. United States*, 190 F. Supp. 3d 1224, 1236 (CIT 2016) (rejecting reliance on a generic report to impeach specific Thai data); *see also Worldwide Door Components, Inc. v. United States*, 537 F.

---

[11] Additionally, Mosaic cites to statements on the record to argue that OCP's [
      ] to try to claim a difference with lower quality Egyptian *rock*. *See* Mosaic's Br. at 16–17.
However, these generic statements about OCP's ore do not offer any comparison between OCP's
rock produced during the POI and the Egyptian rock on which the prices challenged by Mosaic
were based. In addition, Mosaic's argument conflates phosphate ore, which is mined and
extracted, with phosphate rock, which is produced from extracted phosphate ore through a six-
step beneficiation process to enrich the ore. OCP IQR at 6 (P.R. 130; C.R. 39).

Supp. 3d 1403, 1411–13 (CIT 2021) (finding Commerce erred by disregarding evidence specific to the merchandise at issue in favor of general statements).

Mosaic also asserts that Commerce failed to discuss record evidence concerning the purported levels of carbonate and iron in phosphate rock from Egypt, and as a result, the Court cannot find that Commerce's determination is supported by substantial evidence. *See* Mosaic's Br. at 19. This argument also fails. While Commerce "is required to respond to those arguments the parties make that are *material* to Commerce's determination," it is "not required to address every piece of evidence submitted." *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1252 (CIT 2021) (emphasis added); *Downhole Pipe & Equip. LP v. United States*, 887 F. Supp. 2d 1311, 1325 (CIT 2012) (similar). Given the precise and conclusive record evidence demonstrating that: (1) phosphate/BPL content is the appropriate measure of comparability (evidence that Mosaic does not dispute) and (2) the BPL content range of the Egyptian rock for the included prices [          ] the BPL content range of OCP's rock, generic evidence untethered to the POI regarding purported carbonate and iron levels and end uses was simply not material to Commerce's determination. Thus, Commerce was under no obligation to address this generic evidence explicitly in its *Final Determination*.

In the end, and notwithstanding its protests to the contrary, Mosaic's problem with these prices from Egypt are not about comparability. Mosaic's real problem with these Egyptian prices is that they are on the lower end of the range of prices for comparable rock and, therefore, their inclusion in the benchmark price calculation lowers the average benchmark price and corresponding CVD rate. Tellingly, Mosaic does not challenge Commerce's inclusion of several prices that were *higher* than the Egyptian prices during the POI, even though those prices are for

rock with a BPL content range *lower* than the BPL content range of Egyptian rock.[12]  As

Commerce correctly noted in the *Final Determination,* excluding prices from an LTAR

benchmark simply because they are low would be incorrect and is contrary to the agency's

practice.  IDM at 19 & n.128 (P.R. 473) (citing *Certain Uncoated Groundwood Paper from*

*Canada:  Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9,

2018), and accompanying IDM at 137–38).  Commerce was correct to reject Mosaic's results-

oriented argument, and the Court should affirm Commerce's determination to include the

Egyptian prices in the benchmark price calculation.

## II.     Commerce's Determination Not to Add International Delivery Charges into the World Benchmark Price for Phosphate Rock Is Supported by Substantial Evidence And Otherwise in Accordance with Law.

Mosaic challenges the benchmark price for phosphate rock that Commerce used to

determine whether the GOM provided OCP with the right to mine phosphate ore for less than

adequate remuneration.  In particular, Mosaic argues—incorrectly and in a manner inconsistent

with Commerce's longstanding practice—that Commerce should have included international

freight, import duties, and VAT in that benchmark price (collectively, "international delivery

charges").  *See, e.g.*, Mosaic's Br. at 19.  As discussed below, this argument provides no basis

for overturning Commerce's determination because adding such charges would distort the LTAR

analysis, and is supported by neither the record evidence nor Commerce's regulations and would

ultimately be inconsistent with the law given the market conditions in Morocco.  The Court

---

[12] Mosaic does not challenge Commerce's inclusion of rock prices from Algeria, Peru, Syria, and China (which generally have higher prices than the two Egyptian prices included in the benchmark), even though the BPL content range of the rock from these other countries is *lower* than the BPL content range of the rock for one of the Egyptian prices and similar to the BPL content range of the rock for the other Egyptian price included in the benchmark price calculation.  *See* **Exhibits 1–2**.

should reject Mosaic's arguments and affirm Commerce's determination not to add international delivery charges into the benchmark price.

As described in Argument Section I.A. *supra*, Commerce measured the adequacy of remuneration paid for OCP's right to mine phosphate ore using a Tier 3 analysis described in 19 C.F.R. § 351.511(a)(2)(iii), according to which the agency determined whether the government price charged to OCP for mining rights was "consistent with market principles." PDM at 12 (P.R. 386). Specifically, Commerce conducted a price comparison of the underlying good conveyed via the mining rights—in this case, phosphate rock—to a world benchmark price for phosphate rock. *See* PDM at 12 (P.R. 386); IDM at 32 (P.R. 473). Because OCP did not actually purchase phosphate rock from the GOM, Commerce constructed a government price based on a cost of production (or "COP") buildup consisting of OCP's actual costs to mine phosphate ore and produce phosphate rock including, *inter alia*, extraction taxes paid and costs to haul and transport phosphate rock within Morocco. *See* PDM at 12 (P.R. 386); IDM at 27 (P.R. 473).

With respect to the benchmark price to which OCP's cost of production buildup was compared, Commerce correctly found that it would not be appropriate to add international delivery charges because its regulations "do not require it to add delivery charges and import duties to a comparison price in a Tier 3 analysis." IDM at 20 (P.R. 473). Commerce also correctly found that the record evidence would not support adding such international delivery charges to the benchmark price here because OCP's cost of production buildup did not include such costs: adding costs associated with "importing the rock" into Morocco to the benchmark price when those costs are not part of OCP's own cost buildup would prevent an "'apples-to-apples' comparison." *Id.* Finally, Commerce, cited its determination in *CFS Paper from*

*Indonesia*, and correctly observed that it "has excluded international delivery charges from cost build-ups for the provision of natural resource rights under Tier 3 analyses in past proceedings." *Id.* (citing *Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Oct. 25, 2007), and accompanying IDM at 56 ("*CFS Paper from Indonesia*")).

The Court should uphold Commerce's decision not to add international delivery charges because that determination is not only consistent with the law, the record evidence, and the agency's regulations and practice, but also, as discussed below, correct as an analytical matter.

A.    **Mosaic Incorrectly Argues that Transportation Costs Similar to International Delivery Charges Were Included in the Constructed Government Price.**

Mosaic's argument regarding international delivery charges is premised on a fundamental misunderstanding of the record. Mosaic incorrectly asserts that Commerce's LTAR analysis for mining rights was "distort{ed}" because Commerce did not add international delivery charges to the world benchmark price for phosphate rock whereas "transportation costs" were included in the constructed government price to which the benchmark price was compared. Mosaic's Br. at 19.[13] Mosaic's argument misapprehends both the benchmark price and constructed government price for phosphate rock. Both of those prices included transportation costs *within the country of production* (*e.g.*, transportation costs to bring rock ready for export to the port),

---

[13] In making its argument, Mosaic groups international freight, customs duties, and VAT together, glossing over obvious distinctions in these charges, to argue that "international delivery charges" should be include in the benchmark price. However, Mosaic's argument focuses on international freight charges, *i.e.*, its incorrect argument that OCP reported costs for producing phosphate rock included transportation costs, and so international freight charges should be included in the benchmark price. In responding to Mosaic's arguments on this issue, we have likewise focused on freight charges.

but neither price included international transportation costs *from the port to elsewhere in the world*.[14]  OCP SQR Part 3 at App. MIN2-3.  Because the same types of transportation costs were included in both the constructed government price and benchmark price, Commerce's decision not to add international transportation costs to the benchmark did not distort the LTAR analysis.  Indeed, it is Mosaic's proposed methodology that would lead to a distorted LTAR analysis because it would lead to the inclusion of international delivery charges only in the benchmark price thereby resulting in an apples-to-oranges comparison.

    As noted above, Commerce constructed a government price for phosphate rock that was based on OCP's actual costs to produce phosphate rock.  Included among those costs were costs associated with loading and transportation of phosphate rock *within Morocco* (*e.g.*, transport of phosphate rock from the mine to a port for export or to a chemical plant for processing into fertilizer).[15]  *See* OCP Verification QR at 1–2, 17 (P.R. 436; C.R. 289).  As Commerce noted in the *Final Determination*, the cost of production OCP incurred in producing phosphate rock included:  "phosphate ore extraction, stone removal, beneficiation, and *transportation of the rock in Morocco*."  IDM at 20 (P.R. 473) (emphasis added).  However, these reported costs did not

---

[14] In making this distortion argument, Mosaic asserts only that the evidence demonstrates that "transportation costs" were included in the cost of production buildup (and, as noted above, these costs relate to transportation of phosphate rock *within Morocco*) but does not point to any record evidence that VAT and customs duties were included in the COP buildup for phosphate rock. Thus, Mosaic fails to support any argument that VAT and customs duties should be included in the benchmark to avoid distortion in the LTAR analysis.  In fact, the record evidence demonstrates that neither VAT nor customs duties were included in the COP buildup.  *See* OCP SQR Part 3 at App. MIN2-3.

[15] These transportation costs included, for example, payments for rail transport services; purchases of electrical energy for slurry pipeline operations; repair and maintenance of the components of the slurry pipeline system and loading stations at the port of exportation; rental of vehicles and machinery used in the process of loading/transport; expenses for personnel working in the pipeline system and loading stations.  OCP Verification QR at 1-2, 17 (P.R. 436; C.R. 289).

include any international freight charges for phosphate ore because OCP produced all of its

phosphate rock in Morocco from ore it mined in Morocco.  *See* OCP SQR Part 3 at 10.

Additionally, OCP confirmed through its verification questionnaire response that the cost of

production buildup did not include ocean freight costs for transporting phosphate rock.  *See* OCP

Verification QR at 17 (P.R. 436; C.R. 289).

On the benchmark side of the LTAR analysis, Commerce similarly used prices for

phosphate rock that included transportation costs to a port ready for exportation but did not

include international delivery charges.  Specifically, Commerce based the benchmark on free (or

freight) on board ("FOB") prices that reflected transportation costs to the port prior to

exportation.  PDM at 12 (P.R. 386); *see* Petition, Vol. II, at Exs. II-23 – II-24 (P.R. 7; C.R. 7);

OCP NFI at Exs. 18, 21 (P.R. 337; C.R. 215).[16]  As FOB, these prices by definition do not

include any international freight charges but they do include transportation costs within the

country of production, *i.e.*, transportation costs to the port of export.[17]

Because the constructed government price and the benchmark price both include

transportation costs *within the country of production* but do not include international freight

charges—there was no distortion in the LTAR analysis resulting from Commerce's treatment of

the various types of transportation costs.  Mosaic's argument to the contrary ignores the

fundamental distinction between transportation costs within the country of production, which

---

[16] For example, the record evidence demonstrates that the Algerian prices included in the benchmark were based on a loading location in Annaba, a port city in Algeria, and the Egyptian prices included in the benchmark were based on a loading location in Egypt of the "Red Sea and Mediterranean ports." *See* OCP NFI at Ex. 17, p. 66 (P.R. 336; C.R. 215).

[17] FOB, or "Freight on Board," means that the "transfer of risk takes place when the goods are placed on board the ship at the port of shipment."  OCP IQR at App. GEN-8(b) (P.R. 133; C.R. 44); *Freight on Board, Black's Law Dictionary* (11th ed. 2019) (similar and equating to "free on board"); *see* Petition, Vol. II, at II-13 (P.R. 7; C.R. 7) (explaining that FOB prices do not include freight beyond the port of export).

were included on both sides of the LTAR analysis, and international freight costs, which were excluded from both sides of the LTAR analysis. In this regard, adding international freight charges to the benchmark would distort the adequacy of remuneration analysis by introducing costs on one side of the analysis that were not present on the other. This would be inconsistent with Commerce's duty to determine rates "as accurately as possible." *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1337 (CIT 2015), *aff'd sub nom*. *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

For all of these reasons, the Court should reject Mosaic's argument that Commerce was required to add international freight charges in the benchmark price.

**B.      Mosaic Is Incorrect to Argue that Commerce's Regulations and Practice Support Inclusion of International Delivery Charges in the Benchmark Price.**

Mosaic also incorrectly argues that Commerce was required "{u}nder Commerce's regulations and practice" to include international delivery charges in the benchmark price for phosphate mining rights. Mosaic's Br. at 19–21. As discussed below, this argument is at odds with the plain text of the regulation and mischaracterizes Commerce's prior decisions on this issue, which firmly establish a practice *not* to include such international delivery charges in a Tier 3 LTAR analysis of a government's provision of a right to extract natural resources. Moreover the factual predicate required under the CVD law to include such charges has not been established because international delivery charges are not part of the prevailing market conditions in Morocco. Accordingly, the Court should affirm Commerce's decision not to include these international delivery charges in the benchmark price used to measure the adequacy of remuneration for phosphate mining rights.

Mosaic concedes, as it must, that no regulation directs Commerce to add international delivery charges in these circumstances. Mosaic's Br. at 21 ("19 C.F.R. § 351.511(a)(2)(iv) does not apply to tier 3 . . . ."). In fact, 19 C.F.R. § 351.511(a)(2)(iv) explicitly directs Commerce to add "delivery charges and import duties" to a benchmark price when engaging in a Tier 1 or Tier 2 LTAR analysis but contains *no similar directive with respect to a Tier 3 analysis.* Thus, the plain meaning of the regulation makes clear that the direction to include these costs does not apply to a Tier 3 analysis. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (where there is "only one reasonable construction of a regulation," the court must apply that meaning).[18] Furthermore, as noted in the *Final Determination*, the agency's practice firmly establishes that it does *not* add international delivery charges when evaluating the adequacy of remuneration for the right to extract a natural resource under Tier 3. IDM at 20 (P.R. 473).

For example, in *Coated Paper from Indonesia*, Commerce conducted a Tier 3 LTAR analysis for stumpage (the right to harvest standing timber) that was similar to the analysis used in the present phosphate fertilizers investigation. *Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Sept. 27, 2010), and accompanying IDM at 6–12 ("*Coated Paper from Indonesia*"). Commerce used the respondent's costs to produce the good conveyed via the extraction right (*i.e.*, pulp logs) plus an amount for profit to construct a price that Commerce used to evaluate the adequacy of remuneration. In constructing this price, Commerce did not include international delivery charges. *Id.* at 10–11 (including in

---

[18] The regulation establishing a Tier 3 LTAR analysis, § 351.511(a)(2)(iii), provides that Commerce will evaluate whether "the government price is consistent with market principles" without explicitly addressing whether international delivery charges should be included in the analysis.

the constructed price costs, such as harvesting, and profit, but not international freight, customs

duties, or VAT expenses).

   *Coated Paper from Indonesia* is just one example, of many, that establishes that

Commerce has a longstanding practice, spanning more than fifteen years, of *not* including

international delivery charges in a Tier 3 analysis for the right to extract natural resources.  Many

other examples exist.[19]  In none of these cases did Commerce add international delivery charges

to a Tier 3 benchmark price used to evaluate the adequacy of remuneration for a right to extract a

natural resource.[20]

---

[19] *See, e.g.*, *Phosphate Fertilizers from the Russian Federation:  Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Feb. 16, 2021), and accompanying IDM at 25–27 ("*Phosphate Fertilizers from Russia*") (excluding freight, VAT, and import duties because the respondent "did not purchase the input, phosphate ore, . . . but rather extracted the ore from its own sites through the mining license"); *Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Apr. 28, 2017), and accompanying PDM at 54 (adjusting the respondents' costs of production to include "costs associated with harvesting and hauling these timber purchases to the sawmill" but not international delivery charges) (unchanged in final determination, *Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Nov. 8, 2017), and accompanying IDM at 62–65); *CFS Paper from Indonesia* IDM at 78–79 (finding that "ocean freight should not be deducted from or added to" the benchmark price); *Notice of Preliminary Affirmative Countervailing Duty Determination: Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 7,524, 7,531 (Feb. 13, 2006) (adjusting the benchmark to reflect Indonesian logging operation's extraction costs and profit but making no adjustment for international delivery charges) (unchanged in final determination, *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 71 Fed. Reg. 47,174 (Aug. 16, 2006), and accompanying IDM at 7–8; *Notice of Preliminary Results of Countervailing Duty Administrative Review:  Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 33,088, 33,110–11 (June 7, 2005) (listing "Hauling," "Logging Fees and Taxes," and other expenses subtracted from benchmark prices but not international delivery charges) (unchanged in final determination, *Notice of Final Results of Countervailing Duty Administrative Review*, 70 Fed. Reg. 73,448 (Dec. 12, 2005) and accompanying IDM at 12–13, 15–16).

[20] Commerce's practice of not adding international transportation expenses when using a Tier 3 LTAR analysis to evaluate a government's provision of extraction rights is particularly evident in the administrative proceedings where Commerce used both a Tier 2 analysis to evaluate some

Mosaic purports to cite administrative proceedings that support its argument, however it mischaracterizes those examples. For example, Mosaic argues that in *Silicon Metal from Australia*, Commerce "examined the respondent's per-unit quartz costs (which served as a proxy for the value of the right to mine quartz) and compared them to a benchmark consisting of a world market price for quartz, both inclusive of transportation costs." Mosaic's Br. at 21–22. However, in that proceeding, just as in the phosphate fertilizers investigation here, Commerce included *inland freight* costs in both the cost of production buildup and in the benchmark and excluded *international transportation* costs from both sides of its LTAR analysis.[21] *Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Mar. 8, 2018), and accompanying IDM at 31 ("*Silicon Metal From Australia*").

Mosaic also perplexingly cites *Cold-Rolled Steel from Russia* for the vague suggestion that Commerce's exclusion of transportation costs in an LTAR analysis due to a lack of suitable data somehow supports the inclusion of international delivery charges in the benchmark price for phosphate rock. Mosaic's Br. at 24–25 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Final Affirmative Countervailing*

---

programs and a Tier 3 analysis to evaluate other programs. In those proceedings, Commerce added international transportation costs when using a Tier 2 analysis while *not* adding those costs when using a Tier 3 analysis. *Compare Coated Paper from Indonesia* IDM at 6–12 (using a Tier 3 LTAR analysis to evaluate stumpage and adjusting the constructed price to include costs, such as harvesting, and profit), *with id.* at 43–45 (using a Tier 2 LTAR analysis to evaluate the government's prohibition on log exports and adding in ocean freight expenses).

[21] Specifically, Commerce calculated freight costs for transportation of quartz *within Western Australia* from mine to smelter. *See* Mem. from Katherine Johnson and John Anwesen to File, *Final Determination Calculations for Simcoa* (Feb. 27, 2018), at 2 & Attach. Tab QuartzTransport.ATT2.BPI (ACCESS Barcodes 3678982-01, 3678984-01); *see also* Mem. from John Anwesen to File, *Verification of the Questionnaire Responses of Simcoa Operations re: Countervailing Duty Investigation of Silicon Metal from Australia* (Nov. 8, 2017), at 2 (ACCESS Barcode 3640652-01); Letter from Jonathan Stoel to the Honorable Wilbur Ross, *New Subsidy Allegation Supplemental Questionnaire Response* (June 27, 2017), at NSAQ-12 (ACCESS Barcode 3585897-01) (discussing freight costs between the mine and the smelter).

*Duty Determination and Final Negative Critical Circumstances Determination*, 81 Fed. Reg. 49,935 (July 29, 2016), and accompanying IDM at 30 ("*Cold-Rolled Steel from Russia*")).  In *Cold-Rolled Steel from Russia*, Commerce used a *domestic* Russian benchmark price for the good conveyed via the extraction right, *i.e.*, coal.  *Cold-Rolled Steel from Russia* IDM at 30–31, 106.  The transportation charges discussed in relation to that LTAR analysis never included international delivery charges because they were based on a domestic price.

Furthermore, in *Cold-Rolled Steel from Russia,* Commerce initially constructed an imbalanced LTAR comparison that included one category of transportation charges only in the benchmark price (domestic delivery charges), while failing to include similar transportation charges in the cost of production buildup on the other side of the analysis.  However, in the final determination, Commerce acknowledged its mistake and eliminated all freight costs from both the benchmark price and cost of production buildup because it would result in an "imbalance" to include a "freight rate" in only its coal benchmark price.  *Cold-Rolled Steel from Russia* IDM at 106.  The analogy to *Cold-Rolled Steel from Russia* is clear:  international delivery charges were not included in OCP's cost of production buildup, so including such charges in the benchmark price for phosphate rock would create precisely the kind of "imbalanced" comparison Commerce recognized it must avoid in *Cold-Rolled Steel from Russia*.

Mosaic also cites to a *preliminary* determination in *Resin from Russia*, which involves an LTAR analysis pertaining to the Government of Russia's sale of natural gas.  *See* Mosaic's Br. at 25 (citing to *Granular Polytetrafluoroethylene Resin from the Russian Federation:  Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 86 Fed. Reg. 35,476 (July 6, 2021) and accompanying PDM at 30 ("*Resin from Russia*")).  In that preliminary determination, Commerce conducted a

Tier 3 analysis. In the final determination, issued after Mosaic filed its 56.2 brief in this action, the agency ultimately conducted a Tier 2 analysis.[22] Additionally, unlike the right to extract a natural resource, natural gas is a tangible good that is capable of being imported across borders and incurring international delivery charges. For both these reasons, *Resin from Russia* is inapposite and offers no support for Mosaic's position here in a case involving the valuation of a right to extract a natural resource, a right that is not capable of incurring international delivery charges.

In the *Final Determination*, Commerce relied on *CFS Paper from Indonesia*, in which it similarly rejected a petitioner's argument to include international delivery charges in a Tier 3 benchmark price used to evaluate the adequacy of remuneration for the right to harvest standing timber or "stumpage." IDM at 20 (P.R. 473). Mosaic seeks to distinguish *CFS Paper from Indonesia* by stating that in that case, "Commerce compared a market benchmark directly to the value of a right, stumpage (*i.e.*, the right to harvest timber)" while in the fertilizers investigation Commerce "compared a market benchmark to the price of a *product* derived from the right at issue . . ." and because "{p}roducts are moveable," Commerce should have included transportation costs in the benchmark. Mosaic's Br. at 23–24. Mosaic seeks to create a false distinction based merely on the calculation Commerce used in these two LTAR analyses while ignoring the fundamental point that in both, the financial contribution under investigation was *not* the government provision of a tangible good but the provision of a right to extract a natural resource, a right that is not "moveable" across borders.

---

[22] *Granular Polytetrafluoroethylene Resin from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Jan. 25, 2022), and accompanying IDM at 17–21 (using a Tier 2 LTAR analysis because exports of natural gas from Kazakhstan were available to purchasers in Russia and, as such, the prices for these exports were a viable Tier 2 benchmark).

In fact, contrary to Mosaic's argument, the analysis Commerce used in *CFS Paper from Indonesia* to evaluate the adequacy of remuneration used fundamentally the same calculation as in the fertilizers investigation. Commerce simply *ordered* that calculation differently in a way that resulted in equations that are mathematically equivalent.

In *CFS Paper from Indonesia*, Commerce determined whether the government provision of stumpage provided a benefit by:

Step 1: Determining a constructed benchmark price for stumpage by:

a. determining the benchmark price for logs; and

b. subtracting the sum of the cost of producing logs (*i.e.*, harvesting costs, etc.) plus profit.

Step 2: Subtracting from the constructed benchmark price for stumpage the extraction fee (*i.e.*, stumpage fee) paid to the Government of Indonesia.

Result: The difference of the constructed benchmark price for stumpage minus the government extraction fee was the subsidy benefit.[23]

In the phosphate fertilizers investigation, Commerce conducted the same benefit calculation, but instead subtracted these same items directly from the benchmark price using a different order of operation. Commerce calculated the benefit to OCP for mining rights by:

Step 1: Determining the benchmark price for phosphate rock.

Step 2: Subtracting from the benchmark price for phosphate rock a constructed government price for phosphate rock determined by:

a. taking the sum of the cost of producing rock plus profit; and

b. adding the extraction fee paid to the Government of Morocco.

Result: The difference of the benchmark price for phosphate rock minus the constructed government price for phosphate rock was the subsidy benefit.

---

[23] *CFS Paper from Indonesia* IDM at 19–25.

As the illustrations below demonstrate, this change in the order of operations resulted in equations that are mathematically equivalent. In both CVD proceedings, the benefit was determined by subtracting from the benchmark price the exact same items: (1) the cost of production, (2) profit, and (3) the extraction fee.

*CFS Paper from Indonesia* **LTAR Analysis**



*Phosphate Fertilizers from Morocco* **LTAR Analysis**



In any event, in the long line of Tier 3 LTAR determinations in which Commerce has not included international delivery charges in a benchmark price, there are multiple examples where "Commerce compared a market benchmark to the price of a *product* derived from the right at issue . . . ." Mosaic's Br. at 23; *see, e.g.*, *Silicon Metal from Australia* IDM at 31; *Phosphate*

*Fertilizers from Russia* IDM at 25–27.  Thus, contrary to Mosaic's argument, Commerce's

practice is not to include international delivery charges in Tier 3 LTAR analyses for the right to

extract a natural resource regardless of whether its LTAR analysis compares prices for that right

or prices for the good conveyed by that right.

Faced with Commerce's longstanding practice of *not* including international delivery

charges in a Tier 3 analysis for the right to extract natural resources, Mosaic tries to shoehorn

this proceeding into Tier 2, arguing that when Commerce uses a world market price as a

benchmark in a Tier 3 analysis, it is engaged in a "variation of a tier 2 benchmark analysis {and

so} it would be illogical for Commerce to exclude delivery charges and deviate from the rule in

19 C.F.R. § 351.511(a)(2)(iv)."  Mosaic's Br. at 21.  Mosaic is simply wrong.  The financial

contribution under investigation was the provision of the right to mine phosphate ore, and

Commerce determined that it could not conduct a Tier 2 analysis precisely because *there was no*

*world market price for the right to mine phosphate ore*.  PDM at 12 (P.R. 386).  Absent a world

market price for the right, Commerce cannot conduct a Tier 2 analysis of that right including

Mosaic's artificially conceived "variation" thereof.

Mosaic similarly seeks to elide the distinction between Tier 2 and Tier 3 LTAR analyses

in attacking Commerce's position in the *Final Determination* that international delivery charges

should not be added to the benchmark price because OCP does not import phosphate rock.  IDM

at 20 (P.R. 473).  Mosaic wrongly claims it is "irrelevant whether OCP actually imported

phosphate rock" relying entirely on an opinion from the CIT analyzing a Tier 2 LTAR analysis.

Mosaic's Br. at 24 (citing to *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351,

1374 (CIT 2015)).  *Beijing Tianhai* concerned a Tier 2 analysis in which § 351.511(a)(2)(iv)

expressly directed Commerce to add delivery charges.  Again, on the face of the applicable

regulation, that direction simply does not apply where Commerce is conducting a Tier 3 analysis.[24]

Finally, Mosaic's argument that Commerce should add international delivery charges to the benchmark price ignores that Commerce is legally required to construct a benchmark in its LTAR analysis for mining rights in accordance with the prevailing market conditions in Morocco. *See* 19 U.S.C. § 1677(5)(E)(iv) (the adequacy of remuneration must be evaluated "in relation to prevailing market conditions for the good or service being provided . . . in the country {under} investigation . . . {,}" which include "price, quality, availability, transportation, and other conditions of sale."). International delivery charges are obviously not part of the market conditions in Morocco for the right to mine phosphate ore because such rights are not delivered internationally into Morocco. As such, the factual predicate required under the Statute to include these charges is absent and inclusion of such international delivery charges would be inconsistent with the Statute. *See Maverick Tube Corp. v. United States*, 273 F. Supp. 3d 1293, 1307 (CIT 2017) (in conducting an LTAR analysis, the Statute "does not direct Commerce to create a fictional model market{.}"); *Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1372 (CIT 2018), *aff'd*, 927 F.3d 1243 (Fed. Cir. 2019) (similar).

\*\*\*

Commerce's determination not to include international delivery charges in the benchmark price for phosphate rock is analytically correct, consistent with the law and Commerce's

---

[24] Moreover, pursuant to 19 C.F.R. § 351.511(a)(2)(iv), Commerce uses a world market price as a Tier 2 benchmark inclusive of delivery charges *only after* it has determined "it is reasonable to conclude that such price would be available to purchasers" in the subject country. *See* 19 C.F.R. § 351.511(a)(2)(ii). Here, by contrast, Commerce specifically determined there was *no* world market price for the right to extract phosphate ore let alone one reasonably available to purchasers in Morocco.

regulations and practice, and is supported by substantial evidence. The Court should affirm this determination.

### III.    Commerce Correctly Determined that VAT Refunds Are Not Countervailable.

Commerce found in the *Final Determination* that VAT refunds received by OCP and some of its affiliates, totaling MAD 20.5 billion, did not constitute a countervailable subsidy. Through such refunds, the GOM repaid hundreds of companies in Morocco money they were owed under Morocco's VAT system. Mosaic erroneously argues that the refunds that OCP and some of its affiliates received were not authorized under Moroccan law, and the amount of the refunds was not substantiated, thus purportedly demonstrating that the refunds were not part of "the normal operation of Morocco's VAT system." Mosaic's Br. at 26–33. Mosaic's arguments should be rejected because they are procedurally incorrect. Mosaic fails to challenge Commerce's determination that the VAT refunds did not constitute a financial contribution, which provides an independent ground for this Court to affirm Commerce's determination, demonstrating that Mosaic seeks an impermissible advisory opinion on VAT refunds. If this Court nonetheless decides to reach the merits of Mosaic's arguments, these arguments should be rejected because they are based on mischaracterizations of the verified record evidence. This record evidence establishes that through these VAT refunds, OCP and its affiliates received money they were legally owed under the Moroccan VAT system and, as a result, the refunds did not constitute a countervailable subsidy. Commerce's determination should be affirmed.

To understand the fatal defects in Mosaic's VAT refund arguments, it is helpful first to understand the Moroccan VAT system. Morocco operates a normal VAT system—akin to those considered by Commerce in many other CVD investigations—meaning the VAT is a consumption tax meant to be borne by ultimate *consumers* in Morocco, rather than *producers* such as OCP. GOM IQR at VII-2 – VII-3 (P.R. 152; C.R. 66). Moroccan companies producing

goods, including OCP and its affiliates, initially pay suppliers VAT on various inputs ("input VAT"), and when these producers pay more input VAT to their suppliers than VAT they collect from their customers ("output VAT"), it creates an imbalance—one involving an overpayment of VAT and corresponding VAT credits for producers. *See* OCP IQR at 104–06 (P.R. 130; C.R. 39); GOM IQR at VII-2, Ex. VII-1 (P.R. 204; C.R. 130). Moroccan law specifically authorizes OCP and other companies that overpay VAT to receive a refund, in the amount of these VAT credits. *See* OCP IQR at App. VAT-3, Arts. 101-3, 103-1 (P.R. 140; C.R. 53).

While companies like OCP were entitled to refunds of their VAT credits, the GOM lacked liquid funds to provide those refunds for several years. GOM Supplemental Questionnaire Response (Nov. 4, 2020) at SVI-4 – SVI-5 ("GOM SQR") (P.R. 292; C.R. 170). To meet its VAT refund obligations, the GOM entered into two agreements (financing protocols) with several banks, which permitted the GOM to start eliminating the arrears in its VAT credit refund obligations, including those that existed as to OCP, its affiliates, and over 700 other Moroccan companies. GOM IQR at VII-7, Ex. VII-9 (P.R. 152, 206; C.R. 66, 132). Through the financing protocols, the banks agreed to provide the GOM with loans and to advance the loan proceeds to the relevant companies to settle the VAT refunds they were owed (including the MAD 20.5 billion amount in VAT refunds owed to OCP and some of its affiliates), *see id.* at VII-8 (P.R. 152; C.R. 66), OCP IQR at App. VAT-5, p. 8 (P.R. 140; C.R. 53). Importantly, OCP and the hundreds of other companies receiving these refunds entered into factoring agreements with the banks to pay the interest accruing on these GOM VAT refund loans. OCP IQR at 109–10, App. VAT-6 (P.R. 130, 140; C.R. 39, 53). By securing financing for repayment of its existing VAT credit obligations, the GOM did nothing more than reimburse OCP and the 700+ other companies the VAT refunds they were already owed. Indeed, because each recipient

company was required to pay interest on the GOM's VAT refund loans, these companies ultimately received on a net basis *less* than complete VAT refunds.

Under U.S. CVD law, a countervailable subsidy exists where a program provides a financial contribution, confers a benefit, and is specific. 19 U.S.C. § 1677(5)(A)–(B). In particular, the law provides that a tax program, such as a VAT refund, provides a financial contribution to the extent that a government forgoes revenue that is otherwise due. 19 U.S.C. § 1677(5)(D)(ii). Similarly, under 19 C.F.R. § 351.510(a)(1), tax exemptions or remissions on an "indirect tax"[25] such as VAT confer a benefit only where the taxes paid "as a result of the program are less than the taxes the firm would have paid in the absence of the program."

The VAT refunds now challenged by Mosaic reimbursed only a VAT credit that was already owed to OCP and its affiliates and did not affect OCP's or its affiliates' ultimate tax liability. Accordingly, Commerce correctly found that: (i) the GOM did not forgo any revenue due from OCP or its affiliates, and (ii) these companies did not pay less taxes as a result of the refunds than they would pay in the absence of them. PDM at 16 (P.R. 386); IDM at 80 (P.R. 473). As a result, Commerce determined in the *Preliminary Determination* and adopted without change in its *Final Determination* that the VAT refunds do not constitute a financial contribution in the form of revenue forgone within the meaning of 19 U.S.C. § 1677(5)(D), and that the refunds do not confer a benefit within the meaning of 19 C.F.R. § 351.510(a) and thus are not countervailable subsidies. PDM at 16 (P.R. 386); IDM at 5 (indicating that Commerce was adopting its *Preliminary Determination* except where noted), 80 (P.R. 473). Commerce's determination is supported by substantial evidence and otherwise in accordance with law. The

---

[25] The regulations define "indirect tax" as "a sales, excise, turnover, value added, franchise, stamp, transfer, inventory, or equipment tax, a border tax, or any other tax other than a direct tax or an import charge." 19 C.F.R. § 351.102(b)(28).

record fully substantiated that the GOM simply arranged for a financing protocol to repay OCP and other Moroccan VAT credit holders the money they were already owed. This program, which required OCP and hundreds of other Moroccan VAT credit holders to pay interest on their own refunds in no way provides the recipients with a financial contribution or a benefit.

While Mosaic's arguments with respect to the VAT refunds fail on the merits for the reasons discussed below, as a threshold matter the Court need not address those merits because Mosaic is seeking an impermissible advisory opinion. To constitute a countervailable subsidy, the law requires Commerce to find that the assistance is *both* a financial contribution *and* provides a benefit. *See* 19 U.S.C. § 1677(5)(A)–(B), (5A); *Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000). Mosaic challenged only Commerce's benefit determination, *see* Mosaic's Br. at 26–33; Mosaic's Complaint at ¶¶ 31–32, and failed to challenge the determination that the VAT refunds did not constitute a financial contribution. *See* PDM at 16 (P.R. 386); IDM at 6 (P.R. 473). Consequently, the Court need not reach Mosaic's arguments on Commerce's benefit determination, as the agency's determination that the VAT refunds did not constitute a financial contribution provides an independent and unchallenged basis for its decision not to countervail the VAT refunds. Mosaic's arguments regarding Commerce's benefit determination are moot, and any decision rendered by the Court relating to these arguments would be advisory in nature.

If the Court nonetheless considers the merits of Mosaic's argument on VAT refunds, it should reject them because they are unfounded. As detailed below, Mosaic's arguments rest on a mischaracterization of both the record evidence and Moroccan VAT law. Because the record clearly establishes, contrary to Mosaic's arguments, that OCP and its affiliates received nothing

more than the VAT refunds to which they were legally entitled, the Court should affirm

Commerce's determination that the refunds were *not* countervailable.

### A. Mosaic Incorrectly Argues that the GOM Acted *Ultra Vires* When It Provided OCP and Its Affiliates the VAT Refund Payments.

Mosaic does not dispute that OCP and its affiliates had accumulated a large sum of VAT

credits and properly requested reimbursement of those VAT credits from the GOM consistent

with Moroccan law. GOM SQR at SVI-4 (P.R. 292; C.R. 170); Mosaic's Br. at 28. Nor does

Mosaic contest that the GOM therefore owed OCP and its affiliates a large VAT reimbursement

(albeit one that the GOM was late in paying because it lacked the funds to do so). GOM IQR at

VII-7 (P.R. 152; C.R. 66). Confronted with this reality, Mosaic appears to challenge OCP's

entitlement to the refund at a delayed time. According to Mosaic, the method of payment

selected by the GOM to effectuate the refunds demonstrates that they were not part of Morocco's

VAT system. Specifically, Mosaic argues that: (1) that the GOM "acted *ultra vires*" in paying its

reimbursements to OCP and its affiliates because Moroccan law did not permit "lump sum"

payments; (2) OCP's VAT credits were "worthless" under Moroccan law because the GOM

failed to redeem them in three months; and (3) [                    ] from OCP demonstrate that the

GOM provided the VAT refunds to OCP only through extraordinary intervention by

[                                              ] rather than through the VAT system. Each

of these arguments is premised on a gross mischaracterization of the record and must be rejected.

The GOM's method of providing the refunds to OCP, as well as hundreds of other companies in

Morocco, even if delayed, were consistent with Moroccan law.

As Commerce explained, IDM at 78–79 (P.R. 473), under the Moroccan VAT system, as

with most VAT systems around the world, VAT is treated as a consumption tax intended to be

passed along the value chain and ultimately borne by the final consumer, with the goal being

"tax neutrality" for producers such as OCP.  *See* GOM IQR at VII-23 (P.R. 152; C.R. 66); GOM

Verification QR at VER-1 (P.R. 431; C.R. 285); OCP Verification QR (Dec. 30, 2020) at 54–67,

Apps. VE-VAT-1 – VE-VAT-26 (P.R. 436; C.R. 290–94); *see, e.g.*, OCP IQR at App. VAT-1,

pp. 15–17 (P.R. 139; C.R. 52); *Frozen Shrimp from Thailand:  Final Countervailing Duty*

*Determination*, 78 Fed. Reg. 50,379 (Aug. 19, 2013), and accompanying IDM at 54 (*"Shrimp*

*from Thailand"*).[26]  Manufacturing and production companies like OCP and its affiliates are

essentially collecting agents that pay VAT to their input suppliers and recover it from their

customers.  *See* GOM IQR at VII-2 – VII-3, Ex. VII-1, Art. 101 (P.R. 204; C.R. 130); OCP IQR

at 104–06 (P.R. 130; C.R. 39)  Those with a net credit can seek refunds from the government.  A

reconciliation mechanism serves to offset input VAT paid against output VAT collected on a

monthly or quarterly basis—any excess input VAT is "refunded back to the producer by the

government or credited to the producer to offset against future input VAT," *Shrimp from*

*Thailand* IDM at 54, and any excess output VAT is remitted to the government.  *See* GOM IQR

at VII-3, Ex. VII-1, Art. 101 (P.R. 204; C.R. 130).  In either scenario, producers such as OCP

and its affiliates' net VAT liability is intended to be zero.  The record demonstrates that

Moroccan law requires the GOM to reimburse producers such as OCP and its affiliates for

excess VAT paid.  *Id.* at Ex. VII-1, Arts. 101, 103 (P.R. 204; C.R. 130).

---

[26] Commerce has recognized in many CVD proceedings that a normal VAT system exists where VAT is a consumption tax intended to be borne by the consumer, and under such a system programs like VAT refunds and exemptions confer no countervailable benefit.  *See, e.g.*, *Frozen Shrimp from Indonesia:  Final Countervailing Duty Determination*, 78 Fed. Reg. 50,383 (Aug. 19, 2013), and accompanying IDM at 26; *Silicon Metal from Brazil:  Final Countervailing Duty Determination*, 83 Fed. Reg. 9,838 (Mar. 8, 2018), and accompanying IDM at 18; *Certain Quartz Surface Products from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 85 Fed. Reg. 25,400 (May 1, 2020), and accompanying IDM at 10–13 ("*Quartz Surface Products from Turkey*").

Notwithstanding this evidence and in support of its meritless claim that the VAT refunds are not permitted under Moroccan law, Mosaic first incorrectly claims that "the GOM acted in an *ultra vires* manner when it entered into the two protocols" because there is "no provision under Moroccan tax law for the lump-sum payments" arranged through the protocols and that such payments were not part of the normal operation of Morocco's VAT system. Mosaic's Br. at 27–29. Commerce rightly rejected this argument because it lacked any evidentiary basis—instead finding that Mosaic, which "does not deny that the GOM owed OCP reimbursement under the Moroccan law," failed to "identify any evidence that there is a legal limitation on the method through which the GOM may pay its debts," and failed to point to any actual statutory provision that prohibited "lump-sum" payments. *See* IDM at 79 (P.R. 473).

Commerce's determination is correct. The only legal provision that Mosaic points to in support of its position—Article 103 of the Moroccan tax code—does not address at all the form that a VAT refund must take, much less prohibit "lump-sum" payments. *See* Mosaic's Br. at 28; GOM IQR at Ex. VII-1, Art. 103 (P.R. 204; C.R. 130). Instead, Article 103 explicitly authorizes refund payments. GOM IQR at Ex. VII-1, Art. 103 (P.R. 204; C.R. 130).[27] Consistent with this provision, the GOM entered into [

] *See* OCP IQR at App. VAT-5 (P.R. 140; C.R.

---

[27] Specifically, Article 103 states that "if the volume of the tax due does not allow the full imputation of the tax, the surplus is refunded under the conditions according to the methods defined by regulation." GOM IQR at Ex. VII-1, Art. 103 (P.R. 204; C.R. 130). Furthermore, the referenced regulations (*i.e.,* Decree n°2-06-574 of 31 December 2006) specify the conditions for VAT refunds, including how companies must make refund requests but do not impose any limitation on how the GOM provides such refunds. *Id.* at GOM IQR at VII-1, Ex. VII-2, Art. 25 (P.R. 204; C.R. 130); *see also id.* at VII-1 (P.R. 204; C.R. 130) (explaining that laws and regulations for VAT are covered by the Moroccan tax code and Decree n°2-06-574 of 31 December 2006, respectively).

53); *see also id.* at App. VAT-7 (P.R. 140; C.R. 54) ([

]).  The record thus confirms

that Moroccan law authorizes VAT refunds, and Mosaic's argument that OCP was provided a

countervailable benefit because the VAT refunds were provided through an "*ultra vires* step" is

incorrect and lacks foundation in the record evidence.  *See* Mosaic's Br. at 26.

Implicitly conceding that no actual legal prohibition existed under Moroccan law

regarding the form of the refund, Mosaic argues that Commerce in *Melamine from Trinidad and*

*Tobago* indicates that the payment of a VAT refund through a lump sum must be explicitly

authorized under Moroccan law before Commerce can find such a refund not countervailable.

Mosaic's Br. at 30–31.  Commerce correctly found that Mosaic's reliance on *Melamine from*

*Trinidad and Tobago* was misplaced because in that case, there was no legal authority adduced

for any VAT refunds at all in the country under investigation, while Moroccan law explicitly

provides for both VAT credits and refunds.  IDM at 79 (P.R. 473).[28]   Indeed, the notion that

Commerce will recognize a tax authority's actions as legal only if explicitly articulated in law

and notwithstanding general legal authority to take such action is nowhere supported in

Commerce's practice.

Second, Mosaic makes the preposterous argument that the VAT credits owed to OCP

(along with hundreds of other companies in Morocco) became "worthless" because they were

---

[28] Unlike in the present case, in *Melamine from Trinidad and Tobago*, the respondents failed to
show as a threshold matter that they were owed a VAT rebate under Trinidad and Tobago's tax
law.  *Melamine from Trinidad and Tobago:  Final Affirmative Countervailing Duty*
*Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying IDM at 25 ("*Melamine*
*from Trinidad and Tobago*"); IDM at 79 (P.R. 473).  By contrast, here, as Commerce explained,
"VAT reimbursements are permitted under Moroccan law, which the petitioner does not
dispute," IDM at 79 (P.R. 473), and the record clearly demonstrates that OCP was entitled to the
VAT refund.  *Id.* at 80 (P.R. 473); OCP SQR at 25–28, App. VAT2-1(a) – VAT2-1(b) (P.R. 254;
C.R. 149, 153–60).

not paid within three months.  *See* Mosaic's Br. at 27–28.  As Commerce correctly explained in

rejecting Mosaic's assertion, "{t}he Moroccan tax laws are silent regarding any remedy available

when the GOM fails to timely liquidate its debt.  The tax laws also do not extinguish that debt if

the reimbursement is not made timely."  *See* IDM at 80 (P.R. 473); GOM SQR at SVI-5 (P.R.

292; C.R. 170).  Specifically, Article 103 of the Moroccan tax code to which Mosaic cites in

support of its argument, Mosaic's Br. at 28, indicates that the VAT refunds "shall be settled

within a maximum period of three (3) months," a provision manifestly intending to provide

taxpayers with refunds to which they are entitled.  GOM IQR at Ex. VII-1, p. 169 (Art. 103)

(P.R. 204; C.R. 130).  Mosaic would have Commerce turn Article 103 on its head, providing

without any statutory foundation that the VAT credits become worthless if the GOM misses this

deadline.  *Id.* at VII-6, Ex. VII-1, Art. 103 (P.R. 204; C.R. 130).  The Moroccan statutory

language in no way supports this reading.  *Id.* at Ex. VII-1, Art. 103 (P.R. 204; C.R. 130).

Indeed, this reading of Article 103 is wholly inconsistent with both the intent of Article 103 (to

provide for reimbursements to ensure a neutral system) and the structure of a normal VAT

system, where the burdens of the tax are intended to fall on the ultimate consumers, rather than

on producers, much less producers unlucky enough to have their VAT refund delayed by three

months and a day.

  Third, Mosaic incorrectly argues that [

 ] demonstrates that "it was only because of the GOM's extraordinary intervention"

[

   ]—purportedly signifying that "OCP was not legally entitled to" the VAT refund.

Mosaic's Br. at 29.  Mosaic further claims that Commerce was under an obligation to address

this "critical" evidence in the *Final Determination*.  *Id.* at 30.  However, rather than reflecting

some extraordinary intervention, [                                    ], coupled with the fact that

over 700 other Moroccan companies received refunds under the same mechanism, simply reflect

the difficulty that OCP, along with those hundreds of other companies in Morocco, experienced

in redeeming their VAT credits for refunds.  As such, [              ] were certainly not "critical"

to Commerce's analysis of the countervailability of the VAT refunds.

      Mosaic does not explain how any purported intervention by the GOM would have any

bearing on OCP's entitlement to VAT refunds where this entitlement was specifically authorized

and never extinguished by Moroccan law.  Beyond this, Mosaic's argument that the VAT

refunds were developed only because of [                                  ] is belied by the fact

that, after several years of nonpayment, these refunds were provided not just to OCP but to

*hundreds* of companies in Morocco regardless of whether [

] of those other companies.  GOM IQR at VII-7, Ex. VII-9 (P.R. 152, 206; C.R. 66, 132).

Indeed, Mosaic makes no claim, nor can it, that [

].

      In any event, [

]. *See* OCP Supplemental Questionnaire Response Part 5 (Nov. 10,

2020) at App. GEN2-13(d) (P.R. 358, C.R. 238).  Nothing more.  It is unremarkable that [

] and it is unremarkable that OCP, which was to pay interest on the GOM's

loans for the refunds, [                                              ].

At best, these are [

].  Indeed, the GOM

[                    ] in the same way with the hundreds of other companies.

For all of these reasons, Mosaic's argument that the VAT refunds were contrary to Moroccan law or somehow not part of Morocco's VAT system is both procedurally improper and factually incorrect, and the Court should affirm Commerce's determination that the VAT refunds were rightly owed to OCP and thus were not a countervailable subsidy.

**B.    Contrary to Mosaic's Claims, the Amount of the VAT Refunds at Issue Is Supported by Substantial Evidence.**

Commerce correctly determined that OCP was entitled to a "full" refund amount of MAD 20.5 billion as set out in the GOM's financing protocol.  Mosaic's argument that this determination is not based on substantial evidence does not withstand even basic scrutiny.  Indeed, given the large amount of meticulous information that OCP and the GOM submitted with respect to the VAT refunds—and the fact that Commerce verified this information—Mosaic's claim is truly astounding.  Because Mosaic's argument ignores and mischaracterizes overwhelming contrary evidence, the Court should reject that argument.

As Commerce explained:  "The record contains *all* the reimbursement claims that served as the basis for the MAD 20.5 billion in refunds and OCP provided a detailed chart demonstrating how those numbers reconciled to the total refunds under the factoring agreements."  IDM at 80 (P.R. 473) (emphasis added).  In total, OCP submitted the claims for

[                    ] reimbursement requests and each of these claims included detailed information describing how relevant amounts of VAT paid and collected reconciled to the relevant amount of VAT credit declared, and each claim attached invoices to support the information declared.  *See* OCP SQR Part 1 at App. VAT2-1(a) (P.R. 254; C.R. 153).  In addition, Commerce fully verified the GOM's VAT reconciliation and reimbursement system, and also verified OCP's VAT

submissions including the reconciliation of OCP's VAT documentation to its internal accounting

system. GOM Verification QR at VER-1 – VER-4, and Exs. VER-1 – VET-4, and VER-6 (P.R.

431–32; C.R. 285–87); OCP Verification QR at 54–67, Apps. VE-VAT-2 – VE-VAT-26 (P.R.

436; C.R. 290–94). Such verified information is presumed to be accurate and complete. *See,*

*e.g.*, *Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (CIT 2020) (citing *Bomont*

*Indus. v. United States*, 733 F. Supp. 1507, 1508 (CIT 1990) ("{V}erification is like an audit,

the purpose of which is to test information provided by a party for accuracy and completeness")).

Tellingly, Mosaic does not dispute that these documents are on the record, nor does it claim that

they were somehow unreliable.

Mosaic pushes past this overwhelming record to argue that only the GOM submitted the

reimbursement claims on the record and, "the reimbursement claims on the record are not the

claims that OCP submitted in its initial VAT filings, but rather the claims submitted for purposes

of the factoring agreements." Mosaic's Br. at 31 n.2. Mosaic never raised this argument before

Commerce and raises it only in a footnote in its brief. In any event, the argument is simply

incorrect. OCP placed copies of its original VAT reimbursement applications on the record, and

this was the very evidence on which Commerce relied. OCP SQR Part 1 at 25–28, App. VAT2-

1(b) (P.R. 254; C.R. 149, 153–60); IDM at 80 n.586 (P.R. 473).[29]

Mosaic further claims that the MAD 20.5 billion amount was unsubstantiated because the

GOM [                                                                     ]. Mosaic's Br. at

31–32. In making this argument, Mosaic notes that [

---

[29] It is evident that these were copies of the original VAT applications because, for example, the documents show that [
                                                   ]. *Compare* OCP SQR Part 1 at App. VAT2-
1(b) (P.R. 254; C.R. 153–60), *with* OCP IQR at App. VAT-6 (P.R. 140; C.R. 53) (factoring
agreements [                                    ] between OCP and JFCs I to IV and various Moroccan banks).

].  *Id.*  The flaw in

Mosaic's argument is clear; the [                                                    ] does not

negate the mountain of evidence that Commerce received and information it verified through the

course of the investigation about OCP's entitlement to that refund.  Commerce has, through the

course of the CVD investigation, received and verified meticulous documentation confirming

OCP and its affiliates (1) paid vast amounts of excess accumulated input VAT and accrued VAT

credits on these amounts, OCP IQR at App. VAT-2 (P.R. 140; C.R. 53), OCP SQR Part 1 at

VAT2-2 (P.R. 254; C.R. 160), (2) filed timely reimbursement requests, GOM SQR at SVI-4

(P.R. 292; C.R. 170), and (3) [

].  OCP SQR Part 1 at 25 (P.R. 254; C.R. 149).  Given this extensive record evidence,

which Commerce verified, Mosaic's argument that the VAT refund amount was unsubstantiated

falls well short.

Lastly, Mosaic argues that Commerce's duty drawback regulations and analysis in *PET*

*Film from India* of a drawback program support countervailing OCP's VAT refund.  *See*

Mosaic's Br. at 32 (citing *Final Results of Countervailing Duty Administrative Review:*

*Polyethylene Terephthalate Film, Sheet, and Strip from India*, 71 Fed. Reg. 7,534 (Feb. 13,

2006), and accompanying IDM at 11–14 ("*PET Film from India*")).  As an initial matter, this

argument is not properly before the Court, as Mosaic also failed to raise this argument before

Commerce.  Even if it had properly raised it, the Court should reject the argument as inapposite

because drawback and VAT systems are governed by entirely different regulations;[30] beyond

this, the circumstances in which Commerce countervails the entire amount of a drawback are

clearly not present in Morocco where VAT payments, credits, and refunds are carefully and

systematically tracked by the GOM.[31]  Commerce's determination is fully supported by the

record evidence, and Mosaic's argument should be rejected.

## IV.    Commerce Correctly Determined that VAT Exemptions Are Not Countervailable.

Commerce correctly determined that VAT exemptions for purchases of capital goods,

machinery, and equipment were not countervailable, as they did not constitute a financial

contribution or confer a benefit.  *See* Post-Preliminary Determination at 8 (P.R. 441; C.R. 296);

IDM at 6, 82 (P.R. 473).  The Court should reject Mosaic's challenge because Mosaic committed

a fatal pleading waiver in its Complaint with respect to the VAT exemptions, and alternatively

because Mosaic's arguments rest on misrepresentations of both the record evidence and

Commerce's practice.  The record confirms that Commerce based its determinations on the well-

supported fact that, under Morocco's VAT system, which is tax-neutral for producers, these

exemptions did not impact OCP or its affiliates' ultimate tax liability.  Moreover, Commerce has

---

[30] *Compare* 19 C.F.R. § 351.519 (regulation for drawback programs), *with id.* § 351.510 (regulation for VAT programs).

[31] Mosaic claims that the factual circumstances in which Commerce applies the exception found in the drawback regulation at 19 C.F.R. § 351.519(a)(4) and discussed in *PET Film from India* present "analogous situations" to the VAT refunds, supporting a countervailability finding, Mosaic's Br. at 32 (citing *PET Film from India* IDM at 11–14), but Mosaic does not explain how such factual circumstances are "analogous" to the VAT refunds.  In any event, Morocco's VAT system is unlike the deficient drawback systems contemplated by the regulations and analyzed in *PET Film from India*, which lacked effective monitoring and regulating mechanisms.  *See PET Film from India* IDM at 11–13.  Morocco maintains an electronic system for tracking VAT that requires quarterly reporting and substantial invoicing documentation to support requests for VAT credit reimbursements, and conducts reviews of the requests for accuracy.  GOM Verification QR at VER-1 – VER-3 (P.R. 431; C.R. 285); OCP IQR at 110 (P.R. 130; C.R. 39); OCP SQR Part 1 at 24–25 (P.R. 254; C.R. 149); IDM at 79 (P.R. 473).

a well-established practice of finding VAT exemptions not to be countervailable under these

circumstances.  Thus, the Court should reject Mosaic's arguments to the contrary and affirm

Commerce's determination that the VAT exemptions were not countervailable.

> **A.    Mosaic's Arguments Regarding VAT Exemptions Are Procedurally Incorrect.**

While Mosaic's arguments regarding VAT exemptions lack merit, the Court need not

reach the merits of those arguments because they are not properly before the Court.  As a matter

of law, a countervailable subsidy exists when Commerce determines that three distinct

conditions are *all* met—that a program:  (i) provides a financial contribution, (ii) confers a

benefit, and (iii) is specific.  *See* 19 U.S.C. § 1677(5)(A)–(B), (5A).  In the *Final Determination*,

Commerce determined that VAT exemptions did not provide a financial contribution or confer a

benefit.  *See* Post-Preliminary Determination at 8 (P.R. 441; C.R. 296); IDM at 6, 82 (P.R. 473).

However, Mosaic's Complaint only challenges one of these determinations:  that VAT

exemptions confer no benefit.[32]

Although Mosaic's Brief now attempts to challenge *both* Commerce's financial

contribution determination and its benefit determination, *see* Mosaic's Br. at 36–37, Mosaic may

not expand the scope of its Complaint—and, in turn, this litigation—by planting a new claim into

its briefs.  *See Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314, 1327 (CIT

2017) ("The scope of any litigation is confined to the issues raised in the plaintiff's complaint.");

*Kimble v. United States*, 991 F.3d 1238, 1244 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 98 (2021)

---

[32] To obtain judgment on an agency record pursuant to Rule 56.2, a plaintiff must prepare and file a complaint providing notice with respect to each of the determinations it seeks to challenge. 19 U.S.C. § 1516a(a)(2)(A) (requiring the filing of a complaint to initiate an action challenging a CVD determination or order*); see also Bell Atlantic Corp. v. Twombl*y, 550 U.S. 544, 555 (2007) (a pleading must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'") (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

("{D}istinct claims are waived if not pled in a complaint.") (citing *Casa de Cambio Comdiv S.A., de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002)). Count Four of Mosaic's Complaint is clear, and preserves *only* a challenge to Commerce's benefit determination:

> 34.     Commerce improperly determined that the VAT exemptions that OCP obtained for imported capital goods, machinery, and equipment *did not confer a benefit* to OCP. Commerce's determination is unsupported by substantial evidence, is contrary to its prior practice regarding investment-contingent VAT exemption programs, and is otherwise not in accordance with law.

Mosaic's Complaint at ¶ 34 (emphasis added).

Because Mosaic elected to exclude from its Complaint—and, in turn, this litigation—a challenge to Commerce's determination that VAT exemptions do not provide a financial contribution, there exists an independent and unchallenged basis for Commerce's decision not to countervail VAT exemptions. As a result, any decision rendered by the Court with respect to Mosaic's benefit arguments would not alter Commerce's ultimate countervailability determination and would instead be advisory in nature. Accordingly, the Court should decline to consider Mosaic's arguments with respect to VAT exemptions, and instead reject Mosaic's arguments as procedurally improper.

**B.     Mosaic's Arguments Regarding VAT Exemptions Mischaracterize the Record Evidence and Commerce's Practice.**

To the extent the Court opts to reach the merits of Mosaic's challenge with respect to VAT exemptions for imported capital goods, machinery, and equipment, it should still reject Mosaic's arguments and find Commerce's decision to be supported by substantial evidence on the record and otherwise in accordance with law. As discussed in Argument Section III *supra*, Commerce correctly found that the GOM operates a normal VAT system that is tax neutral for producers such as OCP, meaning that VAT in Morocco is a consumption tax intended to be borne by the ultimate consumers rather than producers. Companies like OCP and its cross-

owned affiliates are therefore essentially collecting agents of VAT: they pay input VAT to their suppliers that is later recovered (either directly from customers or from the government in the form of VAT credits), or are otherwise exempt from paying VAT in certain circumstances.

OCP and its affiliates were exempt from certain VAT payments because they had entered into investment agreements with the GOM providing for VAT exemptions for eligible purchases of capital goods, machinery, and equipment. *See, e.g.*, OCP IQR at 112–13, 184–85, Apps. CUSTOMS-1(a), Art. 7-I-2°, Art. 7-I-3°, CUSTOMS-2, VAT-3, Art. 123-22°, VAT-9, VAT-10 (P.R. 130, 140–141; C.R. 39, 53–54, 56–57). These exemptions, however, did *not* affect OCP's ultimate tax liability. Instead, the exemptions reduced the amount of input VAT that OCP and its affiliates remitted to input suppliers on the front end (*i.e.*, upon making a qualifying purchase), which in turn reduced the corresponding VAT credits that the GOM would have owed to OCP and its affiliates on the back end in the absence of such agreements. *See* OCP IQR at 104–05 (P.R. 130; C.R. 39).

Commerce's regulations provide that a benefit exists for purposes of a tax exemption on an indirect tax such as a VAT "to the extent that the taxes . . . paid by a firm as a result of the program are less than the taxes the firm would have paid in the absence of the program." 19 C.F.R. § 351.510(a)(1). Thus, the agency's benefit analysis focuses on whether the tax program reduces the recipient's ultimate tax liability. Here, Commerce correctly found that the exemptions did not reduce OCP's or its affiliates' ultimate tax liability because the program "reduce{d} the amount of input VAT paid, thereby reducing the amount of VAT credits OCP and its cross-owned affiliates accumulate," and the exemptions did not result in OCP or its affiliates receiving credits beyond those they earned on the input VAT paid. IDM at 81–82 (P.R. 473).

Commerce also noted that it has a practice of finding that VAT exemptions to producers do not provide a benefit when exemptions are granted in a country that, like Morocco, has a VAT system that is tax-neutral as to producers.  IDM at 82 (P.R. 473) (citing to: *Shrimp from Thailand* IDM at 54–57; *Quartz Surface Products from Turkey* IDM at 11–13; *Prestressed Concrete Steel Wire Strand from the Republic of Turkey:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 85 Fed. Reg. 80,005 (Dec. 11, 2020) and accompanying IDM at 18 ("*Steel Wire Strand from Turkey*")).  Under this practice, VAT exemptions for producers in such VAT systems are not countervailable because "the net VAT incidence to the producer is ultimately zero, with the actual VAT burden conveyed forward to the final, non-producing consumer."  This practice is consistent with 19 C.F.R. § 351.510(a)(1), which "makes no distinction between a remission of the tax and an exemption of the tax and therefore does not require the Department to apply different means by which to identify and measure benefits that arise from a VAT refund compared to a VAT exemption." *See Shrimp from Thailand* IDM at 54–55.

For all of these reasons, Commerce's determination that the VAT exemptions were not countervailable was consistent with the CVD law, its regulations, and its practice and should be affirmed by the Court.  Mosaic relies on misrepresentations of the determination, the evidence on the record, and agency practice to contend that Commerce's determination was erroneous.  The Court should reject Mosaic's arguments.

*First*, Mosaic incorrectly asserts that Commerce failed to consider the contingent nature of the VAT exemptions, which Mosaic argues is "an important aspect" of determining whether the exemptions are countervailable.  Mosaic's Br. at 35.  In determining not to treat the VAT exemption as *contingent*-liability, interest free loans, as discussed in the paragraph immediately

below, Commerce necessarily considered the contingent nature of the exemptions. In any event, the contingent nature of the exemptions was *not* in fact "an important aspect" of determining whether the exemptions were countervailable. As noted above, to analyze whether a VAT exemption constitutes a financial contribution, Commerce considers whether the government forgoes revenue otherwise due. *See* 19 U.S.C. § 1677(5)(D)(ii) (defining a financial contribution to include tax programs in which a government forgoes revenue that is otherwise due). To analyze whether a VAT exemption confers a benefit, Commerce considers whether the exemption reduces the recipient's ultimate tax liability (19 C.F.R. § 351.510(a)(1)). Whether the VAT exemptions are contingent is immaterial to both analyses and, as such, Commerce was under no obligation to explicitly analyze it as part of its determination. *See Ancientree Cabinet*, 532 F. Supp. 3d at 1252; *Downhole Pipe*, 887 F. Supp. 2d at 1325.

*Second*, Mosaic incorrectly argues that Commerce "departed from its prior practice" of countervailing VAT exemptions as contingent-liability, interest free loans. Mosaic's Br. at 36–38. In support of its argument, Mosaic cites to two proceedings, both pertaining to orders on products from Turkey: *Rebar from Turkey* and *Welded Line Pipe from Turkey*. *Id.* at 36–37. The citations are inapposite; as Commerce explained in the *Final Determination*, the agency no longer considers VAT exemptions in Turkey to be countervailable as contingent-liability, interest-free loans, and instead has aligned its approach in Turkey with its practice of not finding VAT exemptions to be countervailable. IDM at 82 (P.R. 473) (citing to: *Quartz Surface Products from Turkey* IDM at 11–13; *Steel Wire Strand from Turkey* IDM at 18; *Shrimp from Thailand* IDM at 54–57).[33] Commerce has quite recently affirmed this practice multiple times,

---

[33] Although the CIT upheld a determination that VAT exemptions in Turkey are countervailable, the court did so in a case reviewing the final results of an administrative review issued in July

and in each case found that VAT exemptions in Turkey are not countervailable.  *See* Mem. from

James Maeder to Jeffrey Kessler, *Post-Preliminary Analysis of Countervailing Duty*

*Investigation of Common Alloy Aluminum Sheet from the Republic of Turkey*, at 2 (Dec. 28,

2020) (ACCESS Barcode 4068959-01) (unchanged in final determination, *Common Alloy*

*Aluminum Sheet from the Republic of Turkey:  Final Affirmative Countervailing Duty*

*Determination and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed.

Reg. 13,315 (Mar. 8, 2021), and accompanying IDM at 2–4); *Oil Country Tubular Goods from*

*the Republic of Turkey:  Preliminary Results of Countervailing Duty Administrative Review,*

*Rescission in Part, and Intent to Rescind in Part*, 86 Fed. Reg. 7,069 (Jan. 26, 2021), and

accompanying PDM at 15–18 (unchanged in final determination, *Final Results and Partial*

*Rescission of Countervailing Duty Administrative Review; 2018*, 86 Fed. Reg. 24,842 (May 10,

2021)).  Mosaic's argument that it was inconsistent with Commerce's practice to find VAT

exemptions in Morocco not countervailable is simply wrong.

    *Lastly*, Mosaic claims that Commerce's determination that the VAT exemptions did not

convey a benefit is "irreconcilable" with record evidence that "OCP was relieved of the

obligation to pay [                                        ] in input VAT . . . ."  Mosaic's Br. at 35–36.

Mosaic's argument blatantly ignores that under Morocco's VAT system, which is tax-neutral for

producers, OCP did not ultimately owe this amount to the GOM.  *See* Argument Section III

*supra* (explaining that Morocco has a normal VAT system in which VAT is a consumption tax

---

2019, which was before Commerce aligned its treatment of VAT exemptions in Turkey with its
practice of finding such exemptions *not* countervailable. *See Içdaş Celik Enerji Tersane ve
Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1365–67 (CIT 2021) (considering a
challenge to *Steel Concrete Reinforcing Bar from the Republic of Turkey: Final Results and
Partial Rescission of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051
(July 26, 2019)).

intended to be borne by consumers rather than producers); *see, e.g.*, GOM IQR at VII-23 (P.R.

152; C.R. 66) (demonstrating that under Moroccan law, VAT liability rests with consumers, not

producers like OCP).  Contrary to Mosaic's argument, OCP was not relieved of an ultimate tax

obligation through the VAT exemptions; it never bore the tax obligation.  Accordingly, there is

nothing in the record that is "irreconcilable" with Commerce's determination that the VAT

exemptions did not convey a benefit.

## CONCLUSION

For all of these reasons, OCP respectfully requests that the Court deny Mosaic's Rule

56.2 motion for judgment on the agency record in its entirety and, if the Court does not declare

the underlying investigation void *ab initio,* as detailed in OCP's Rule 56.2 motion, sustain the

foregoing aspects of Commerce's *Final Determination*.


                                              Respectfully submitted,

 Dated:  February 22, 2022                    /s/ William R. Isasi____
                                              William R. Isasi
                                              Alexander D. Chinoy
                                              Micaela McMurrough
                                              Elisa S. Solomon
                                              Rishi R. Gupta
                                              Cynthia C. Galvez
                                              Jordan B. Bakst

                                              **COVINGTON & BURLING LLP**
                                              One CityCenter
                                              850 Tenth Street, N.W.
                                              Washington, D.C. 20001-4956

                                              *Counsel to OCP S.A.*

**Exhibit 1**

**Table of FOB[1] World Benchmark Prices on Administrative Record**

The entries below are organized from lowest to highest BPL and $P_2O_5$ content range.  All entries in gray represent prices that Commerce did not include in the world benchmark price in its *Final Determination*.

| Country (Pricing Source) | BPL Content (%)[2] | $P_2O_5$ Content (%) | Average Price 2019 (USD/MT) | Record Citation | Included in Benchmark? |
|---|---|---|---|---|---|
| Egypt (Profercy) | 59.0–61.2* | 27–28 | 48.00 | OCP NFI at Ex. 21 | No |
| Egypt (CRU) | 60–68 | 27.5–31.1* | 47.00 | Petition, Vol. II, at Ex. II-24 | Yes |
| Algeria (CRU) | 63–66 | 28.8–30.2* | 55.00 | Petition, Vol. II, at Ex. II-24 | Yes |
| Peru (CRU) | 63–68 | 28.8–31.1* | 75.00 | Petition, Vol. II, at Ex. II-24 | Yes |
| Algeria (Profercy) | 63.3–65.6* | 29–30 | 66.89 | OCP NFI at Ex. 21 | Yes |
| Syria (Profercy) | 63.3–65.6* | 29–30 | 56.98 | OCP NFI at Ex. 21 | Yes |
| China (Profercy) | 63.3–67.7* | 29–31 | 68.94 | OCP NFI at Ex. 21 | Yes |
| Algeria (Argus) | 65–68 | 29.7–31.1* | 56.25 | Petition, Vol. II, at Ex. II-23 | Yes |
| Peru (Profercy) | 65.6* | 30 | 66.97 | OCP NFI at Ex. 21 | Yes |
| Egypt (Profercy) | 65.6–67.7* | 30–31 | 58.16 | OCP NFI at Ex. 21 | Yes |
| Peru (Fertecon) | 66–68 | 30.2–31.1* | 62.00 | OCP NFI at Ex. 18 | Yes |
| Jordan (CRU) | 66–72 | 30.2–32.9* | 88.00 | Petition, Vol. II, at Ex. II-24 | Yes |

---

[1] Because Commerce determined that it would only include benchmark data reported on a "free-on-board basis" ("FOB"), PDM at 12 (P.R. 386), this chart excludes non-FOB data placed on the record.

[2] For ease of reference, this chart includes data on phosphate content using both BPL and $P_2O_5$ content.  Where necessary, OCP has converted the data using the uncontested 2.185 conversion factor submitted by Mosaic.  *See* Mosaic's Benchmark Submission (Nov. 4, 2020) at Ex. 8(e) at 3 (P.R. 261); *see also* Mosaic's Br. at 15 (using the same conversion factor).  An asterisk (*) next to any number above indicates where a value has been converted from the value submitted on record.  All converted values are rounded to the nearest tenth.

| Country (Pricing Source) | BPL Content (%)[2] | P$_2$O$_5$ Content (%) | Average Price 2019 (USD/MT) | Record Citation | Included in Benchmark? |
|---|---|---|---|---|---|
| Jordan (Argus) | 68–70 | 31.1–32.0* | 91.75 | Petition, Vol. II, at Ex. II-23 | Yes |
| North Africa (Argus) | 69 | 31.6* | 77.50 | Petition, Vol. II, at Ex. II-23 | Yes |
| Jordan (CRU) | 73–75 | 33.4–34.3* | 112.00 | Petition at Ex. II-24 | No |
| China (Fertecon) | 73–77 | 33.4–35.2* | 98.00 | OCP NFI at Ex. 18 | No |
| Jordan (Profercy) | 74.3–78.7* | 34–36 | 96.04 | OCP NFI at Ex. 21 | No |
| Togo (Profercy) | 76.5–78.7* | 35–36 | 91.07 | OCP NFI at Ex. 21 | No |
| Murmansk (Fertecon) | 78–100 | 35.7–45.8* | 130.00 | OCP NFI at Ex. 18 | No |
| Russia (Profercy) | 83.0–85.2* | 38–39 | 151.94 | OCP NFI at Ex. 21 | No |

**Exhibit 2**

**Chart of FOB[1] World Benchmark Prices on Administrative Record
Compared to OCP's Average BPL Content Range by Month**

---

[1] Because Commerce determined that it would only include benchmark data reported on a "free-on-board basis," PDM at 12 (P.R. 386), this chart excludes non-FOB data placed on the record.

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Response Brief of Consolidated

Plaintiff and Defendant-Intervenor OCP S.A., filed February 22, 2022, contains 19,856 words,

including footnotes, and excluding the table of contents, table of authorities, counsel's signature

block, and this certificate, according to the word count function of the word-processing system

used to prepare this brief, and therefore complies with the maximum word count limitation set

forth in the Court's applicable order.  (ECF No. 46).

<u>/s/ William R. Isasi</u>
William R. Isasi