**UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| THE MOSAIC COMPANY, et al., | |
| Plaintiffs, | |
| v. | Consol. Court No. 21-00116 |
| UNITED STATES, | **NON-CONFIDENTIAL VERSION** |
| Defendant, | Business Proprietary Information Deleted from Pages 2-5, 7, 10, 27-30, and 36 |
| and | |
| OCP S.A., et al., | |
| Defendant-Intervenors. | |

**THE MOSAIC COMPANY'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR
JUDGMENT UPON THE AGENCY RECORD**

David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman

WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Dated: April 13, 2022

*Counsel for The Mosaic Company*

Reply Brief
Consol. Court No. 21-00116

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

I.  Defendants Fail to Rebut Mosaic's Arguments that Commerce Unreasonably
    Refused to Exclude Egyptian Prices from the World Market Benchmark for
    Phosphate Rock ....................................................................................... 2

II. Defendants Fail to Rebut Mosaic's Demonstration that Commerce Unreasonably
    Refused to Adjust the World Market Benchmark for Phosphate Rock to Include
    Freight, Import Duties, and VAT ................................................................ 8

    A.  Defendants effectively concede that OCP's phosphate rock price is on a
        delivered basis, but then mischaracterize Commerce's treatment of delivery
        costs as balanced ............................................................................ 10

    B.  Defendants fail to rebut the relevance of 19 C.F.R. § 351.511(a)(2)(iv) ............ 11

    C.  Defendants fail to show that Commerce's decision is consistent with its prior
        practice ........................................................................................ 13

III. The Department's Finding That the MAD 20.5 billion VAT Refund Payment to OCP
     Does Not Confer a Benefit Is Unsupported by Substantial Evidence and Is Otherwise
     Not in Accordance with Law ..................................................................... 21

    A.  Defendants' argument that Mosaic waived its challenge to Commerce's findings
        regarding the MAD 20.5 billion VAT payment to OCP is without merit .......... 21

    B.  Defendants fail to identify a reasonable basis for Commerce's determination
        that the 20.5 billion MAD VAT refund was part of the normal operation of
        Morocco's VAT regime ....................................................................... 23

IV. The Department's Finding That OCP's Investment-Contingent VAT Exemptions for
    Capital Goods, Machinery, and Equipment Is Not Countervailable Is Unsupported
    by Substantial Evidence and Is Otherwise Not in Accordance with Law ................. 31

    A.  Mosaic did not waive any aspect of its challenge to Commerce's determination
        that OCP's VAT Exemptions were not countervailable ................................ 31

    B.  Defendants fail to identify a reasonable basis for Commerce's determination
        that the VAT exemptions for capital goods and equipment do not provide a
        countervailable benefit ..................................................................... 35

CONCLUSION ................................................................................................. 38

Reply Brief
Consol. Court No. 21-00116

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)..............................................................................22

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................23, 26

19 U.S.C. § 1677(5)........................................................................................34

19 U.S.C. § 1677(5)(A)-(B).................................................................. 22-23, 31

19 U.S.C. § 1677(5)(D)(ii)..............................................................................33

**Regulations and Rules**

19 C.F.R. § 351.307........................................................................................30

19 C.F.R. § 351.505(a)(1)...............................................................................36

19 C.F.R. § 351.510(a)(1)...............................................................................33

19 C.F.R. § 351.510(b) ............................................................................. 35-36

19 C.F.R. § 351.511(a)(2)(iii)............................................................................4

19 C.F.R. § 351.511(a)(2)(iv) ................................................... 1, 8-9, 11-13

19 C.F.R. § 351.519(a)(4)...............................................................................29

USCIT Rule 8(a) .................................................................................... 31-32

USCIT Rule 8(f) .................................................................................... 31-32

**Cases**

*Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241 (CIT 2021) ......................3

*Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351 (CIT 2015) ............12

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ...............................26

*Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15 (D.D.C. 2007)...............................32

*Milecrest Corp. v. United States*, 264 F. Supp. 3d 1353 (CIT 2017) ......................... 31-32

*Mundry v. Great Am. Ins. Co.*, 369 F.2d 678 (2d Cir. 1966) ...................................... 34-35

*PNC Financial Services Grp, Inc. v. C.I.R.*, 503 F.3d 119 (2007) .................................28

*Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383 (6th Cir. 2016) .............................................32

*Shijiazhuang Goodman Trading Co. v. United States*, 172 F. Supp. 3d 1363 (CIT 2016)  8

*Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890 (D. Minn. 2014).....................32

*United States v. F.A.G. Bearings, Ltd.*, 598 F. Supp. 401 (CIT 1984) .............................31

*Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314 (CIT 2017) ..........33

**Administrative Materials**

*Certain Frozen Warmwater Shrimp From Indonesia: Negative Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,349 (Dep't Commerce June 4, 2013), and accompanying Preliminary Decision Memorandum.......................................................................... 37-38

*Certain Frozen Warmwater Shrimp From Thailand: Final Negative Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013), and accompanying Issues and Decision Memorandum...........................................................37

*Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce Apr. 28, 2017), and accompanying Preliminary Decision Memorandum.......................................................................................................17

*Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying Issues and Decision Memorandum............................................................................17

*Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and accompanying Issues and Decision Memorandum................................................. 9, 14-17

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination,* 81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying Issues and Decision Memorandum..................................................... 19-20

*Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from India*, 71 Fed. Reg. 7,534 (Dep't Commerce Feb. 13, 2006), and accompanying Issues and Decision Memorandum...........................................................29

*Granular Polytetrafluoroethylene Resin From The Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022), and accompanying Issues and Decision Memorandum...........................................................18

*Melamine From Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Dep't Commerce Nov. 6, 2015), and accompanying Issues and Decision Memorandum.............................................. 26-27, 37

*Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 73,448 (Dep't Commerce Dec. 12, 2005), and accompanying Issues and Decision Memorandum ..................................................................17

*Phosphate Fertilizers From The Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum.....................................................................18

*Preliminary Negative Countervailing Duty Determination: Carbon and Certain Alloy
Steel Wire Rod From Turkey*, 67 Fed. Reg. 5,976 (Dep't Commerce Feb. 8, 2002).........33

*Preliminary Results of Countervailing Duty Administrative Review: Certain
Softwood Lumber Products From Canada*, 70 Fed. Reg. 33,088
(Dep't Commerce June 7, 2005), and accompanying Preliminary Decision
Memorandum.......................................................................................................17

*Silicon Metal From Australia: Final Affirmative Countervailing Duty
Determination*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018), and
accompanying Issues and Decision Memorandum........................................... 9, 13, 17-19

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission
of Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051 (Dep't Commerce July
26, 2019), and accompanying Issues and Decision Memorandum...................................35

*Welded Line Pipe From the Republic of Turkey: Final Results of Countervailing Duty Administrative
Review; 2015*, 83 Fed. Reg. 34,113 (Dep't Commerce July 19, 2018), and accompanying Issues and
Decision Memorandum..................................................................................35

*Wire Decking From the People's Republic of China: Preliminary Affirmative  Countervailing Duty
Determination and Alignment of Final Countervailing Duty  Determination with Final Antidumping
Duty Determination*, 74 Fed. Reg. 57,629 (Dep't Commerce Nov. 9, 2009), and accompanying
Preliminary Decision Memorandum....................................................................33

## INTRODUCTION

Plaintiff and Consolidated Defendant-Intervenor, The Mosaic Company ("Mosaic"), respectfully submits this reply in support of its Rule 56.2 motion for judgment upon the agency record challenging certain aspects of the U.S. Department of Commerce's final countervailing duty determination in *Phosphate Fertilizers from Morocco*. *See* The Mosaic Company's Memorandum in Support of Rule 56.2 Motion for Judgment on the Agency Record (Oct. 15, 2022), ECF No. 55 ("Mosaic Br."); *see also Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), P.R. No. 480, ECF No. 14-4 ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. No. 473, ECF No. 14-5 ("Final IDM").

This reply addresses arguments made by Defendant, the United States ("Defendant"), and Defendant-Intervenor OCP S.A. ("OCP") (collectively, "Defendants") in their response briefs. *See* Defendant's Opposition to Plaintiffs' Motions for Judgment Upon the Administrative Record (Feb. 22, 2022), ECF No. 72 ("Def.'s Resp. Br. "); Response Brief of Consolidated Plaintiff and Defendant-Intervenor OCP S.A. (Feb. 23, 2022), ECF No. 75 ("OCP Resp. Br."). As demonstrated below, Defendants fail to rebut Mosaic's arguments that the following elements of the *Final Determination* are unreasonable and unsupported by substantial evidence:

(1) Commerce's refusal to exclude prices for low-quality Egyptian phosphate rock from the world market benchmark price it calculated to measure subsidies provided by the Government of Morocco's ("GOM") provision of phosphate mining rights for less than adequate remuneration ("LTAR");

(2) Commerce's refusal to adjust the world market benchmark price to reflect delivery costs, resulting in an imbalanced comparison between a government price inclusive of delivery costs and a benchmark that excluded them;

(3) Commerce's determination that the MAD 20.5 billion VAT refund payment to OCP does not confer a benefit;

BUSINESS PROPRIETARY
INFORMATION DELETED

Reply Brief
Consol. Court No. 21-00116

NON-CONFIDENTIAL VERSION

(4) Commerce's determination that VAT exemptions OCP obtained for imported capital goods, machinery, and equipment are not countervailable.

Accordingly, Mosaic respectfully requests that the Court grant its motion for judgment on the agency record and remand these issues to Commerce for redetermination consistent with the Court's opinion.

## ARGUMENT

**I.    Defendants Fail to Rebut Mosaic's Arguments that Commerce Unreasonably Refused to Exclude Egyptian Prices from the World Market Benchmark for Phosphate Rock**

In its opening brief, Mosaic demonstrated that Commerce unreasonably included prices for low-quality Egyptian phosphate rock in its calculation of a world market benchmark price. Mosaic Br. at 14-19. Commerce failed to engage with the record evidence showing that Egyptian phosphate rock is not comparable to the phosphate rock OCP produces in connection with the GOM's phosphate mining rights for LTAR program because Egyptian rock is lower-quality in terms of phosphate content (*i.e.*, BPL/$P_2O_5$ levels) and impurities. *Compare id. with* Final IDM at 19-20.

Defendants do not even dispute that Commerce did not address the argument in Mosaic's administrative case brief concerning record evidence showing that (1) phosphate rock characteristics other than BPL content affect rock quality; (2) [                              ]; and (3) Egyptian rock is low-quality, including because it contains elevated carbonate and iron impurities. *Compare* Mosaic Br. at 14-19 *and* Letter from Wilmer Cutler Pickering Hale and Dorr LLP to the Department, re: Phosphate Fertilizers from Morocco: Petitioner's Case Brief (Jan. 13, 2021), P.R. No. 448, C.R. No. 299 ("Mosaic Case Br.") at 7-10 P.R. No. 448, C.R. No. 299, *with* Def.'s Resp. Br. at 40-44 *and* OCP Resp. Br. at 23. This omission alone renders

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

NON-CONFIDENTIAL VERSION

Commerce's benchmark calculation unsupported by substantial evidence, and necessitates remand.

OCP attempts to avoid this conclusion by arguing that Commerce was not obligated to address the evidence at issue because it was immaterial. OCP Resp. Br. at 23. OCP's argument is unavailing. It cites *Ancientree Cabinet Co. v. United States*, but that case actually supports Mosaic's position. In *Ancientree Cabinet*, the court stated that "although Commerce is not required to address every piece of evidence submitted, it is required to respond to those arguments the parties make that are material to Commerce's determination." 532 F. Supp. 3d at 1241, 1252 (CIT 2021). It then remanded Commerce's antidumping financial ratio calculation because the agency failed to address an argument made by respondent Ancientree, where "Ancientree's challenge to the financial ratio calculation was material to Commerce's Final Determination because it affects Ancientree's AD duty margin." *Id.*, 532 F. Supp. 3d at 1262. Here, Mosaic's challenge to the inclusion of Egyptian prices in the benchmark is indeed material to Commerce's determination. Excluding Egyptian prices from the benchmark increases the benchmark price by 3.9 percent and increases OCP's CVD rate for the phosphate for LTAR program by 1.76 percentage points.[1] Moreover, Mosaic's arguments [

] low-quality,

high-impurity Egyptian rock featured prominently in its administrative case brief. *See* Mosaic

---

[1] Commerce used an average per-unit phosphate rock world market benchmark price of $66.96 per metric ton ("MT"). OCP Final Calculations Mem., Attachment 1, Rock Benchmark Tab, P.R. 476, C.R. 308. Removing the Egyptian prices (*i.e.*, $47.00/MT and $58.16/MT) increases the average benchmark price to $69.57/MT, or by 3.9 percent. *See id.* Using a benchmark price of 69.57/MT in the mining rights for LTAR benefit calculation results in a total benefit of [
]. *See id.*, Attachment 1, Rock LTAR Calc Tab. Dividing that benefit by OCP's total sales denominator yields an *ad valorem* subsidy rate of 20.18 percent, which is 1.76 percentage points greater than the 18.42 percent rate Commerce found in the *Final Determination*. *See id.*, Attachment 1, Benefit Tab.

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

**NON-CONFIDENTIAL VERSION**

Case Br. at 7-10, P.R. No. 448, C.R. No. 299. Yet Commerce's discussion of Egyptian rock

prices in the *Final Determination* ignores the issues Mosaic raised regarding the low BPL/$P_2O_5$

content and high impurities of Egyptian rock that make it incomparable to OCP's rock. Instead,

Commerce simply assumed that Egyptian rock is comparable to OCP's rock so long as there is [

]. *Compare* Final IDM at 19-

20, *with* Mosaic Case Br. at 7-10, P.R. No. 448, C.R. No. 299.[2]

Moreover, Defendants' attempted *post hoc* rationalizations of Commerce's decision treat

phosphate rock prices as merely a function of BPL/$P_2O_5$ levels and other qualitative factors as

irrelevant. *See* Def.'s Resp. Br. at 41-43; OCP Resp. Br. at 18, 21-23. In reality, however, the

record contains substantial evidence that qualitative factors other than BPL/$P_2O_5$ levels affect the

value of phosphate rock, as well as evidence which would have enabled Commerce to assess the

differences between Egyptian rock and OCP's rock. Mosaic presented Commerce with evidence

consisting of statements by [

]. *See* Mosaic Case Br. at 7-8, P.R. No. 448, C.R.

No. 299. In those statements, [

---

[2] Defendant argues that, to the extent that Mosaic is making an argument about an alleged failure
by Commerce to consider factors affecting comparability in accordance with its regulations, such
an argument should be rejected because 19 C.F.R. § 351.511(a)(2)(iii) does not require
Commerce to consider factors affecting comparability in a tier three benchmark analysis. Def.'s
Resp. Br. at 41. To be clear, Mosaic is not arguing that 19 C.F.R. § 351.511(a)(2)(iii) directly
imposes a requirement to consider factors affecting comparability. Rather, Mosaic argues that
Commerce unreasonably included Egyptian prices, given its stated purpose of constructing "a
world market price of *comparable* phosphate rock." PDM at 12 (emphasis added; unchanged in
final). That is, the record evidence shows that that Egyptian rock is not qualitatively comparable
to OCP's rock. In addition, Commerce failed even to engage with Mosaic's challenge based on
that evidence. It did not explain how the evidence of Egyptian rock's low quality, and [
]. could be reconciled with the agency's stated purpose of constructing a
benchmark price reflecting comparable phosphate rock.

- 4 -

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

NON-CONFIDENTIAL VERSION

]

Letter from Wilmer Cutler Pickering Hale and Dorr LLP to the Department, re: Comments on

Deficiencies and Submission of Factual Information to Rebut, Clarify, or Correct OCP's

Supplemental Questionnaire Response of November 9, 2020 (Nov. 19, 2020), P.R. No. 383, C.R.

No. 253, Exhibit 1 at 10 ("Mosaic 11/19/20 Deficiency Comments") (emphasis added); that [

], *id.*, Exhibit 1 at 4; and that [

] *id.*, Exhibit 1 at 3 (emphasis added).[3]

    Moreover, Mosaic presented Commerce with a CRU report discussing the low quality of

Egyptian phosphate rock that "makes it cheap," and which identifies the "carbonate and iron

content" as negative characteristics of Egyptian rock.  Letter from Wilmer Cutler Pickering Hale

and Dorr LLP to the Department, re: *Phosphate Fertilizers from Morocco:* Submission of

Factual Information to Rebut, Clarify, or Correct, Exhibit 1 (Nov. 16, 2020), P.R. No. 371,

("Mosaic 11/16/20 RFI Submission").  Thus, the evidence contradicts Defendants' arguments

that qualitative factors other than BPL/$P_2O_5$ levels are irrelevant, or that Commerce had no basis

to compare Egyptian rock to OCP's rock other than by reference to the BPL/$P_2O_5$ levels

indicated in the phosphate rock price data sets.

---

[3] OCP argues that Mosaic's references to these statements conflate phosphate ore with phosphate
rock.  OCP Resp. Br. at 22 n.11.  To the contrary, the statements clearly indicate that [

].

Other record evidence further contradicts Defendants' assertions that phosphate rock pricing is merely a function of BPL/$P_2O_5$ levels. For example, according to the Profercy source used by Commerce, Egyptian phosphate rock has a higher $P_2O_5$ content range than Algerian rock, yet Egyptian rock has a significantly lower price (*i.e.*, $58.16 per metric ton compared to $66.88 per ton for Algeria). Mosaic Case Br. at 9, P.R. No. 448, C.R. No. 299; *see also* Memorandum from Robert Palmer & Samuel Glickstein, Int'l Trade Compliance Analysts, through Robert Palmer, Program Manager, to File, re: OCP Calculations for the Final Determination (Feb. 8, 2021), Attachment I, Calculations Worksheet: Phosphate Rock Benchmark Prices, P.R. No. 476, C.R. No. 308, ("OCP Final Calculations Mem."). In light of evidence in the CRU report about Egyptian rock being cheap because of its low quality, it was reasonable to infer that the low quality of Egyptian rock explains the above-cited inverse relationship between BPL/$P_2O_5$ levels and prices for Egyptian and Algerian rock in the Profercy data set. *See* Mosaic Case Br. at 9, P.R. No. 448, C.R. No. 299. Commerce failed to address that argument, *see* Final IDM at 19-20, and the Court should reject Defendants' attempts to excuse that failure based on factually incorrect assertions that BPL/$P_2O_5$ levels are all that matter for purposes of constructing the benchmark.

Defendant incorrectly asserts that "{t}here is no evidence on the record showing that including Egyptian phosphate rock prices distorted Commerce's benchmark." Def.'s Resp. Br. at 42. On the contrary, as discussed above, record evidence specifically describes Egyptian rock as low-quality and compromised by its carbonate and iron content, and it shows Egyptian rock to be significantly lower-priced than other rock that has BPL/$P_2O_5$ ranges lower than those of Egyptian rock. Moreover, Commerce included a $47.00/MT price from the CRU data set for Egyptian rock with a BPL/$P_2O_5$ range of 60-68 percent that is uniquely broad compared to the

BUSINESS PROPRIETARY
INFORMATION DELETED

Reply Brief
Consol. Court No. 21-00116

NON-CONFIDENTIAL VERSION

ranges of other prices used in the benchmark. OCP Final Calculations Mem., Attachment I,

Calculations Worksheet: Phosphate Rock Benchmark Prices, P.R. 476, C.R. 308. That 60-68

percent range falls mostly below the 65.56 percent BPL (30 percent $P_2O_5$) level discussed in the

CRU report as the threshold Egyptian rock usually fails to meet. *See* Mosaic 11/16/20 RFI

Submission, P.R. No. 371, Exhibit 1 ("The low quality of Egyptian rock (usually less than 30%

P205) makes it cheap . . ."). In addition, [                    ] of that 60-68 percent range [

                                                                          ] the BPL levels

associated with any other rock price that Commerce used in its benchmark. *See* OCP Final

Calculations Mem., Attachment I, Calculations Worksheet: Phosphate Rock Benchmark Prices,

P.R. 476, C.R. 308. OCP ignores this when it misleadingly asserts that the BPL content of the

CRU Egypt price "[                    ] with" the BPL content range for OCP's rock. *See*

OCP Resp. Br. at 21.[4] Thus, given the record evidence of Egyptian rock's low quality in terms

of BPL/$P_2O_5$ and impurities, as well as the evidence of [                                        ], it

was indeed distortive for Commerce to include Egyptian prices in a benchmark expressly

designed to be composed of prices for rock comparable to that of OCP.

    As noted above, Commerce never engaged meaningfully with the evidence and

argumentation on this issue, Mosaic Br. at 18-19, and Defendants' *post hoc* rationalizations are

not a substitute for the reasoned explanation that is required of the agency at the time of the *Final*

---

[4] OCP also takes issue with the record evidence Mosaic referenced in its brief concerning the
BPL/$P_2O_5$ content ranges of OCP's phosphate rock, even though that evidence originated from
OCP's website. *See* OCP Resp. Br. at 18-20. OCP's criticism is beside the point. As the
discussion above shows, Commerce's inclusion of Egyptian rock prices in the benchmark is
unsupported by substantial evidence regardless of which OCP BPL/$P_2O_5$ content range is
considered.

Reply Brief
Consol. Court No. 21-00116

NON-CONFIDENTIAL VERSION

*Determination.*[5]  *See Shijiazhuang Goodman Trading Co. v. United States*, 172 F. Supp. 3d 1363, 1380 (CIT 2016) ("Defendant United States ('defendant') and defendant-intervenor provide rationales for the Department's applying the PRC-wide rate that go beyond that which Commerce put forth.  These rationales, therefore, are *post hoc* rationalizations rather than reasoning the Department offered. The court must judge a decision according to the reasoning the agency put forth.") (citations omitted) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962)).  The Court should therefore remand to Commerce to address the evidence in a reasoned manner, as required by law.

## II.  Defendants Fail to Rebut Mosaic's Demonstration that Commerce Unreasonably Refused to Adjust the World Market Benchmark for Phosphate Rock to Include Freight, Import Duties, and VAT

Mosaic has shown that Commerce improperly refused to include freight, customs duties, and VAT in the world market price benchmark for phosphate rock in order to arrive at a "delivered" benchmark price that is comparable to OCP's phosphate rock price, which is inclusive of transportation costs to deliver the rock to the fertilizer plant where it is consumed.  *See* Mosaic Br. at 19-26.  In light of the requirement under 19 C.F.R. § 351.511(a)(2)(iv) to include international delivery charges when conducting a tier 2 benchmark comparison of the government price to a world market benchmark price, Commerce unreasonably declined to include delivery charges here.  Although it conducted a tier 3 analysis in this case, it was in

---

[5] OCP alleges that Mosaic's challenge to the inclusion of Egyptian prices in the benchmark is not about comparability, but its impact on OCP's CVD rate, since Mosaic is not also challenging Commerce's inclusion of phosphate rock prices that are higher than Egyptian rock but which have lower BPL/ $P_2O_5$ levels.  OCP Resp. Br. at 23-24.  This criticism is misplaced.  Egyptian rock is distinctive because it is the only type of rock for which there is record evidence characterizing it as having notably low quality, and the low quality of Egyptian rock is the core of Mosaic's claim.  Moreover, OCP's criticism also ignores that 60-68 percent BPL/ $P_2O_5$ range for the CRU Egypt price is uniquely broad and extends well below the BPL/ $P_2O_5$ ranges for all non-Egyptian prices in the benchmark.

essence a variation of a tier 2 analysis – *i.e.*, a comparison of OCP's phosphate rock price to a world market benchmark price for phosphate rock.  *See id.* at 20-21.  Moreover, Commerce's refusal to adjust the phosphate rock world market benchmark price for delivery charges is not supported by *Coated Free Sheet Paper From Indonesia*, the only case the agency cited with respect to this issue.  *See* Mosaic Br. at 23-24; *see also* Final IDM at 20.  Commerce's decision is also inconsistent with its prior decisions in analogous cases, such as *Silicon Metal From Australia*.  *See* Mosaic Br. at 21-25.  Thus, Commerce's decision is unreasonable and unsupported by substantial evidence.  *See id.*

Defendants' arguments to the contrary are without merit.  First, they effectively concede that Commerce compared a phosphate rock benchmark price composed of 13 different export prices – stated on an undelivered, free (or freight) on board ("FOB") basis – to a delivered OCP phosphate rock price.  They then fail to explain how such a comparison is balanced and supported by substantial record evidence.  *See* Def.'s Resp. Br. at 47-48; OCP Resp. Br. at 26-29.  Second, they contend that 19 C.F.R. § 351.511(a)(2)(iv) is irrelevant here, but they fail to provide a logical basis for Commerce to adjust a world benchmark price for delivery charges in some cases (*i.e.*, in tier 2 analyses) but not in others (*i.e.*, in tier 3 analyses).  *See* Def.'s Resp. Br. at 45-46; OCP Resp. Br. at 26-27, 30.  Third, they argue that Commerce's decision is consistent with its prior tier 3 analyses involving natural resource rights subsidies, but they misconstrue those prior cases.  *See* Def.'s Resp. Br. at 45, 47-49; OCP Resp. Br. at 30-37.  In those cases, Commerce never compared a world benchmark price on an undelivered, FOB basis to a delivered government price, as it did here.  These points are discussed further below.

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

A. **Defendants effectively concede that OCP's phosphate rock price is on a delivered basis, but then mischaracterize Commerce's treatment of delivery costs as balanced**

Defendants effectively concede that Commerce compared the phosphate rock benchmark price to a delivered price for OCP's phosphate rock. *See* Def.'s Resp. Br. at 47 ("OCP's reported build-up costs 'include *all costs related to transportation and loading* of phosphate rock *from mining sites to factories* or ports'") (citing OCP Verification QR at 1-2, 17, P.R. 436; C.R. 289 (emphasis added)); OCP Resp. Br. at 27 (describing the OCP phosphate rock price as including "costs associated with loading and transportation of phosphate rock *within Morocco* (*e.g.*, transport of phosphate rock from the mine to a port for export or to a chemical plant for processing into fertilizer)") (italics original; underline added); *see also* OCP Final Calculations Mem., Attachment 1, Rock LTAR Calc Tab, P.R. 476, C.R. 308 (referring to OCP's phosphate rock price as "Phosphate Rock Cost (*Delivered Plant*)") (emphasis added).[6]  Defendants then assert that it was appropriate to compare OCP's delivered rock price to the benchmark price because both prices include inland transportation costs and exclude international delivery charges. *See* Def.'s Resp. Br. at 47-48 ("both the benchmark and the cost build-up are determined on a free on board basis and include domestic inland freight (transportation costs) on both sides of the comparison . . ."); OCP Resp. Br. at 27-29 (similar).  That argument does not support Commerce's determination, however.

In the *Final Determination*, Commerce did not find that any inland transportation costs that may be reflected in the FOB benchmark prices are comparable to the delivery costs reflected

---

[6] While Defendants also refer to transportation costs associated with exports reflected in OCP's price, OCP reported that [          ], or [     ] percent, of the [              ] of phosphate rock it produced during the period of investigation was for "local consumption within Morocco." OCP Supplemental Questionnaire Response Part Four (Nov. 9, 2020) at 1-2, P.R. 355; C.R. 234.

in OCP's rock price. *See* Final IDM at 20. Nor did Commerce attempt to explain how a comparison could be "apples-to-apples" when OCP's price reflects the costs of delivering phosphate rock to a fertilizer plant but the benchmark price does not, despite Mosaic having raised this issue. *Compare* Final IDM at 20, *with* Mosaic Case Br. at 10, P.R. No. 448, C.R. No. 299 (challenging Commerce's preliminary comparison of FOB benchmark prices with delivered OCP prices that include transport costs). Thus, Defendants' *post hoc* rationalization cannot substitute for a reasoned explanation by the agency.

Moreover, this rationalization baselessly assumes that any inland transportation costs reflected in the FOB export prices included in the benchmark are, in fact, comparable to OCP's delivery costs, despite the fact that the world market benchmark price is an average of 13 prices from a variety of countries including Algeria, China, and Peru. *See* OCP Final Calculations Mem., Attachment I, Calculations Worksheet: Phosphate Rock Benchmark Prices, P.R. 476, C.R. 308. No record evidence supports this assumption, and Commerce's prior tier 3 natural resource rights analyses did not involve a similar assumption, as discussed below in Section II.C.

## B. Defendants fail to rebut the relevance of 19 C.F.R. § 351.511(a)(2)(iv)

Defendants contend that 19 C.F.R. § 351.511(a)(2)(iv) is irrelevant in tier 3 analyses. *See* Def.'s Resp. Br. at 45-46; OCP Resp. Br. at 26-27, 30. In this context, they argue that Commerce's approach was reasonable because both the benchmark and OCP's cost build-up include domestic inland transportation costs. *See* Def.'s Resp. Br. at 47-49; OCP Resp. Br. at 26-27. That contention fails for the reasons discussed in the preceding section. Moreover, to assume that any domestic transport costs in the benchmark export prices are appropriate for comparison to OCP's delivery costs is to assert a position contrary to the decision Commerce made in promulgating 19 C.F.R. § 351.511(a)(2)(iv) – *i.e.*, that a world market benchmark price

under tier 2 must be adjusted to reflect international delivery charges the subsidy recipient would pay if it imported the product. It is illogical to posit that a world market price including international delivery adjustments is properly comparable to the subsidy recipient's price under tier 2, regardless of whether the recipient incurred international delivery charges, while also maintaining that a world market price excluding delivery costs is also properly comparable to the recipient's price under tier 3, provided that both prices reflect some domestic transport costs of whatever kind. Yet Defendants would have the Court accept these inconsistent propositions.

The same fundamental contradiction also undermines the explanation Commerce actually provided in declining to adjust the benchmark price – *i.e.*, that international delivery charges should not be added to the benchmark because OCP did not import phosphate rock. *See* Final IDM at 20. Defendants contend that, because OCP did not import rock, adjusting the benchmark price for international delivery charges would result in an imbalanced comparison between the benchmark and OCP's cost build-up. *See* Def.'s Resp. Br. at 46-47; OCP Resp. Br. at 28-29. Yet, if that were true, then 19 C.F.R. § 351.511(a)(2)(iv) would itself be unreasonable, given that it requires international delivery cost adjustments regardless of whether the subsidy recipient actually imported the good at issue. *Cf. Beijing Tianhai Industry Co. v. United States*, 52 F. Supp. 3d 1351, 1374 (CIT 2015) (finding that it is "irrelevant" to a tier 2 benchmark analysis whether a respondent actually incurred VAT and import charges, because the benchmark analysis is based on a "hypothetical firm" located in the subject country). In reality, 19 C.F.R. § 351.511(a)(2)(iv) is a reasonable exercise of Commerce's authority to develop regulations in areas left to its discretion, and Commerce failed to explain why a different approach is warranted here.

Defendants attempt to differentiate this case from a tier 2 analysis by arguing that, here, the good being provided for LTAR is not the phosphate rock itself, but rather the mining rights through which the phosphate rock is obtained. *See* Def.'s Resp. Br. at 45; OCP Resp. Br. at 38. That distinction is irrelevant in this context. All parties agree that Commerce can properly assess the extent of the GOM's mining rights subsidy by comparing OCP's built-up phosphate rock price to a world market price for phosphate rock, even though those mining rights are not commonly traded on a world market, and even though OCP did not import phosphate rock. That is because a properly constructed phosphate rock comparison will reveal the extent of mining rights subsidies. In this way, Commerce's analysis is no different from a tier 2 analysis – *i.e.*, it compared OCP's phosphate rock price to a world market price in order to determine the extent of the subsidy. In such contexts, 19 C.F.R. § 351.511(a)(2)(iv) represents Commerce's choice that the benchmark should reflect international delivery charges "a firm actually paid or would pay if it imported the product," regardless of whether actual importation occurred. Thus, Commerce's reliance on the absence of OCP phosphate rock imports cannot support its refusal to adjust the benchmark for delivery costs.

### C. Defendants fail to show that Commerce's decision is consistent with its prior practice

Defendants argue that Commerce's refusal to adjust the benchmark for delivery costs is consistent with its practice, *see* Def.'s Resp. Br. at 45, 47-49; OCP Resp. Br. at 30-37, but their arguments lack merit. As shown below, several of Commerce's tier 3 LTAR analyses cited by the parties do not compare a world market benchmark for a good to the government price for a good, as Commerce did here. Where Commerce did compare the government price for a good to a world price benchmark for that good, *i.e.*, in *Silicon Metal from Australia*, it indicated that it used delivered prices on both sides of the comparison. Moreover, in all prior tier 3 LTAR

analyses under discussion, Commerce did something it failed to do here: it took steps to ensure a

balanced treatment of delivery costs between the benchmark and government prices, either by

excluding delivery costs from both sides of the comparison, or by reflecting comparable  costs on

both sides.

Commerce cited one case, *Coated Free Sheet Paper From Indonesia*, in attempting to

support its refusal to adjust the benchmark, *see* Final IDM at 20, and Mosaic has demonstrated

that that case is inapposite.  *See* Mosaic Br. at 23-24.  In response, Defendant contends that

*Coated Free Sheet Paper From Indonesia* exemplifies Commerce's practice of excluding

international delivery charges from tier three benchmarks in cases involving the provision of

natural resource rights.  Def.'s Resp. Br. at 45.  Similarly, OCP argues that the analyses in

*Coated Free Sheet Paper From Indonesia* and this case are fundamentally the same.  *See* OCP

Resp. Br. at 34-36.  However, Defendants ignore crucial distinctions between that case and this

one.

In *Coated Free Sheet Paper From Indonesia*, Commerce explicitly stated that it was not

comparing the prices for movable goods to determine whether the government provided standing

timber (*i.e.*, stumpage) for LTAR.  *Coated Free Sheet Paper From Indonesia: Final Affirmative*

*Countervailing Duty Determination*, 72 Fed. Reg. 60,642 (Dep't Commerce Oct. 25, 2007), and

accompanying IDM, Comment 14 at 78.  ("For our analysis, we are deriving a market-based

stumpage price; *we are not comparing log prices to log prices* . . .  Therefore, the Department is

not adjusting its stumpage benchmark for movement expenses in the final determination."

(emphasis added)).  Nor did Commerce use a world market or similar benchmark composed of

prices from a variety of countries, as it did in the instant case.  Rather, Commerce used a single

country, Malaysia, as the initial source of the market benchmark because its conditions and

geographic proximity constituted a reasonable proxy for Indonesia. *Id.* at 20. It used export statistics for Malaysian logs as "a starting point from which to derive a market-based stumpage price." *Id.* at 79. To arrive at the market-based stumpage price, Commerce deducted Indonesian harvesting costs and profit from the Malaysian export price, and it did not indicate that any of the components of its calculation included transportation costs. *See id.* at 21, 73. It then compared that market-based stumpage price to the stumpage fees paid by the Indonesian respondents. *Id.* at 21.

Thus, in *Coated Free Sheet Paper From Indonesia*, Commerce compared a market-derived stumpage price to the government stumpage price to determine the benefit. It did not compare prices for movable goods, did not use a world market benchmark, and did not appear to include transportation costs in any part of the comparison. Here, by contrast, Commerce did all of those things, with the crucial problem being that it compared a delivered OCP phosphate rock price (*i.e.*, the price inclusive of transportation costs to the fertilizer plant) to an undelivered, FOB world benchmark price. Defendants effectively admit this in their briefs. *See* Section II.A, *supra*. Accordingly, Defendants are wrong to characterize *Coated Free Sheet Paper From Indonesia* as illustrative of a practice that Commerce followed in the instant case.

For the same reasons, OCP's errs in its reliance on *Coated Paper Suitable for High-Quality Print Graphics From Indonesia* and *Lined Paper Products From Indonesia*. OCP Resp. Br. at 30-31 (citing *Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-Fed Presses From Indonesia: Final Affirmative Countervailing Duty Determination*, 75 Fed. Reg. 59,209 (Dep't Commerce Sept. 27, 2010), and accompanying IDM at 6-12; *Notice of Preliminary Affirmative Countervailing Duty Determination: Certain Lined Paper Products From Indonesia*, 71 Fed. Reg. 7,524, 7531 (Dep't Commerce Feb. 13, 2006). In those cases, as

**Reply Brief**
**Consol. Court No. 21-00116**

in *Coated Free Sheet Paper From Indonesia*, Commerce compared a market stumpage price

(derived from Malaysian export statistics) to the government stumpage price to determine the

benefit and did not indicate that it was reflecting transportation costs on either side of the

comparison. *See Certain Coated Paper Suitable For High-Quality Print Graphics Using Sheet-*

*Fed Presses From Indonesia: Final Affirmative Countervailing Duty Determination*,

accompanying IDM at 11; *Notice of Final Affirmative Countervailing Duty Determination and*

*Negative Critical Circumstances Determination: Certain Lined Paper Products From Indonesia*,

71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006), and accompanying IDM at 7-8.  Thus,

none of the prior Commerce determinations involving Indonesian paper products supports

NON-CONFIDENTIAL VERSION

Commerce's decision in this case to conduct an imbalanced comparison of a delivered OCP's

phosphate rock price with an undelivered, FOB world market benchmark price.[7,8]

Defendants also err in their characterizations of *Silicon Metal From Australia*, which

Mosaic has already shown to be analogous to this case (unlike *Coated Free Sheet Paper From

Indonesia*). *See* Mosaic Br. at 21-24. Defendant contends that *Silicon Metal From Australia* "is

distinguishable because {transportation} costs appeared *on both sides of the comparison*."

Def.'s Resp. Br. at 47. OCP argues that, in that case "just as in the phosphate fertilizers

investigation here, Commerce included *inland freight costs* in both the cost of production

buildup and in the benchmark and excluded *international transportation* costs from both sides of

---

[7] The same is true for the *Softwood Lumber from Canada* cases OCP cites. *See* OCP Resp. Br. at 31 n.19. In the *Lumber V* CVD investigation, as in the Indonesian paper products cases, Commerce did not use a world benchmark price to conduct its tier 3 analyses of the Government of British Columbia's stumpage for LTAR program. Unlike the Indonesian cases, however, Commerce used a delivered price as the starting point for the stumpage benchmark, and it accordingly ensured that it accounted for B.C. respondents' delivery costs. Specifically, Commerce (i) used delivered log prices from the U.S. Pacific Northwest ("U.S. PNW") as a starting point for a tier 3 stumpage benchmark because conditions in that region were determined to be comparable to British Columbia; (ii) derived market benchmark stumpage prices by making adjustments to the U.S. log prices, including by deducting B.C. respondents' costs for hauling timber to their mills; and (iii) compared the derived market benchmark stumpage prices to government stumpage prices. *See Certain Softwood Lumber Products from Canada: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination*, 82 Fed. Reg. 19,657 (Dep't Commerce Apr. 28, 2017), and accompanying PDM at 49-50, 54; *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying IDM at 64 ("in deriving market-determined stumpage prices from U.S. log prices, we have selected prices for comparable species and made adjustments as warranted, *e.g.*, for transportation, to the U.S. PNW log price benchmarks to account for the commercial environment of the B.C. timber market."). Commerce took a similar approach in its tier 3 analysis of British Columbia stumpage in the *Lumber IV* second administrative review. *See Notice of Preliminary Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 33,088, 33,106, 33,110-11 (Dep't Commerce June 7, 2005); *Notice of Final Results of Countervailing Duty Administrative Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 73,448 (Dep't Commerce Dec. 12, 2005) and accompanying IDM at 12-13, 15-16.

NON-CONFIDENTIAL VERSION

the LTAR analysis." OCP Resp. Br. at 32. To the contrary, Defendants' characterizations

wrongly equate Commerce's balanced inclusion of transportation costs in *Silicon Metal From*

*Australia* with its imbalanced treatment of transportation costs here.

    In *Silicon Metal From Australia*, Commerce used a benchmark composed of per-unit

quartz prices of global silicon metal producers, including transportation expenses, as reported by

CRU. *See Silicon Metal From Australia: Final Affirmative Countervailing Duty Determination*,

83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018), and accompanying IDM, Comment 5 at 30.

Commerce compared the respondent's "total per-unit 2016 quartz costs, including transportation

expenses, to the average per-unit value reflected in the CRU data (including transportation

costs)." *Id.* at Comment 5 at 31. As OCP notes, Commerce used a delivered price for the

respondent (*i.e.*, including the cost of transporting the quartz from mine to smelter), OCP Resp.

Br. at 32 n.21, and all indications are that the benchmark quartz prices for global silicon metal

producers were stated on the same basis. *See Silicon Metal From Australia: Final Affirmative*

*Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (Dep't Commerce Mar. 8, 2018), and

---

[8] Defendants discuss two other Commerce cases, but neither supports Commerce's determination here. First, OCP cites Commerce's refusal to adjust the benchmark for delivery charges in its tier 3 analysis of mining rights for LTAR in *Phosphate Fertilizers From The Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying IDM at 25-27. *See* OCP Resp. Br. at 36-37. However, Mosaic is challenging that determination before the Court in a separate action. *See* Court No. 21-117, The Mosaic Company's Memorandum in Support of Rule 56.2 Motion for Judgment Upon the Agency Record (Nov. 15, 2021) at 30-35, ECF No. 50. Second, Defendants note that, after Mosaic submitted its Rule 56.2 motion, Commerce changed issued a final determination in *Granular PTFE From The Russian Federation* in which it used a tier 2 LTAR analysis, as opposed to the tier 3 analysis used in its preliminary determination and cited by Mosaic. *See* Def.'s Resp. Br. at 48-49 (citing *Granular Polytetrafluoroethylene Resin From The Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 3,764 (Dep't Commerce Jan. 25, 2022), and accompanying IDM at 21); OCP Res. Br. at 33-34 (same); *see also* Mosaic Br. at 25. Given this change, *Granular PTFE From The Russian Federation* is now inapposite.

accompanying IDM, Comment 5 at 30-31; Mem. from Katherine Johnson and John Anwesen to

File, *Final Determination Calculations for Simcoa*, Inv. No. C-602-811, Attachment 1, Tab

QuartzBenchmark.ATT1.Public (Feb. 27, 2018).  In other words, Commerce included

comparable delivery costs – as opposed to inland transportation costs of whatever kind – on both

sides of the comparison.

Here, in contrast, Commerce compared a delivered price for OCP to an undelivered, FOB

world benchmark price.  Thus, *Silicon Metal From Australia* does indeed exemplify a prior

decision from which the agency unreasonably departed in the instant case.  Mosaic presented

Commerce with transportation cost data that would have enabled it to calculate benchmark prices

on a delivered basis comparable to OCP's reported phosphate rock prices, but Commerce

unreasonably refused to implement this adjustment.  *Compare* Mosaic Case Br. at 13, P.R. No.

448, C.R. No. 299 (citing ocean freight data and freight cost calculations contained in Letter

from Wilmer Cutler Pickering Hale and Dorr LLP to the Department, re: Petitioner's Submission

of Factual Information to Measure the Adequacy of Remuneration and Other Factual

Information, Exhibits 9-11 (Nov. 4, 2020), P.R. Nos. 255-85), *with* Final IDM at 20.

Furthermore, Defendants fail to reconcile *Cold-Rolled Steel From Russia* to the instant

case.  Defendants contend that *Cold-Rolled Steel From Russia* stands for the proposition that

Commerce should avoid treating transportation costs in a way that leads to an imbalanced LTAR

comparison, and that Commerce acted accordingly in the instant case.  *See* Def.'s Resp. Br. at

48; OCP Resp. Br. at 33.  Defendants are correct as to the former point but are wrong about the

latter.  In *Cold-Rolled Steel From Russia*, Commerce used a Russian benchmark price for coking

coal that was submitted by the Government of Russia.  *Countervailing Duty Investigation of*

*Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative*

*Countervailing Duty Determination and Final Negative Critical Circumstances Determination*,

81 Fed. Reg. 49,935 (Dep't Commerce July 29, 2016), and accompanying IDM at 30.  After

initially including a respondent's transportation costs in the benchmark in post-preliminary

proceedings, Commerce reconsidered that decision in the final determination.  Commerce

identified problems with the comparability of transportation costs and the lack of suitable

alternative transportation cost data, and accordingly Commerce determined to exclude

transportation costs from both sides of the comparison:

> Vorkutaugol is the member of the Severstal Companies that acquired
> coking coal during the POI, not PAO Severstal.  As such, any freight costs
> incurred by the Severstal Companies in this regard would reflect the costs
> that Vorkutaugol incurred to transport the extracted coking coal from the
> GOR mine to its facilities. In contrast, the freight costs incorporated into
> the coal-based benchmark in the Post-Preliminary Decision Memorandum
> reflected the freight rates the Severstal Companies paid to private
> suppliers to transport concentrated coal to PAO Severstal.  Thus, the
> private freight rates utilized in the post-preliminary calculations *do not
> reflect what it would cost to transport mined coal to Vorkutaugol*{.}
> Therefore, we have determined not to include these freight rates in our
> coal-based benchmark. Further, in the absence of any other suitable freight
> rate data, and in order to avoid an imbalance in the benefit calculation, we
> have excluded freight entirely from the benefit calculation.

*Id.* at Comment 17 at 106 (citations omitted; emphasis added).  In that analysis, Commerce

carefully considered whether the transportation costs included in the post-preliminary benchmark

calculation reflected "what it would cost to transport mined coal to" the entity that received the

government-provided good.  Answering that question in the negative, Commerce then decided to

exclude transportation costs from both sides of the comparison.

NON-CONFIDENTIAL VERSION

Such careful analysis is absent in this case. Instead, Commerce compared a benchmark reflecting undelivered, FOB prices to a delivered OCP price.[9] Defendants assert, *post hoc*, that those prices are comparable because they each reflect inland transportation costs, but as discussed above, that is an unsupported assertion that Commerce did not use to explain its decision in the *Final Determination*. Even if Commerce had used that rationale, it would be inconsistent with the discerning approach it took in *Cold-Rolled Steel From Russia*. If inland coal transport costs for two affiliated Russian companies are not sufficiently comparable for purposes of a tier 3 LTAR comparison, then Commerce certainly cannot assume that any inland transport costs reflected in an average of 13 different, undelivered phosphate rock prices are comparable to OCP's delivered price.

In sum, Defendants fail to rebut Mosaic's arguments that Commerce's refusal to adjust the phosphate rock benchmark for transportation costs is unsupported by substantial evidence and otherwise not in accordance with law.

## III. The Department's Finding That the MAD 20.5 billion VAT Refund Payment to OCP Does Not Confer a Benefit Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law

### A. Defendants' argument that Mosaic waived its challenge to Commerce's findings regarding the MAD 20.5 billion VAT payment to OCP is without merit

In the *Final Determination*, Commerce erroneously found that the MAD 20.5 billion VAT refund payment to OCP does not confer a benefit. Defendants assert that Mosaic's

---

[9] In its case brief, Mosaic urged Commerce to at least adhere to its approach in *Cold-Rolled Steel From Russia* if it declined to adopt Mosaic's proposed delivery cost adjustments. Mosaic Case Br. at 13, P.R. No. 448, C.R. No. 299 ("If, for some reason, the Department erroneously declines to add freight to the phosphate rock benchmark, then it should exclude transportation costs from the calculation of OCP's mining costs. Otherwise, the Department would be conducting an imbalanced comparison in the benefit calculation of the sort that the Department sought to avoid in *Russia Cold-Rolled Steel*.").

challenge to this finding is moot because the Complaint did not expressly challenge whether

OCP received a "financial contribution."  Def.'s Resp. Br. at 89; OCP Resp. Br. at 39.  However,

Mosaic could not have waived a challenge to the financial contribution element of OCP's VAT

refund payments (*see* 19 U.S.C. § 1677(5)(A)-(B)) because Commerce limited its findings in the

*Final Determination* to the issue of benefit and did not address whether the payment constituted

a financial contribution.

In support of its position that Mosaic's benefit arguments are "moot," Defendant cites

Commerce's *Preliminary Determination*, which states that "the VAT credit refunds under

Morocco's VAT regime are not countervailable, as there is not a financial contribution or benefit

provided to OCP."  Def.'s Resp. Br. at 90 (citing PDM at 16); *see also* OCP Resp. Br. at 41-42.

But in this proceeding, Mosaic appeals Commerce's *Final Determination*, not its preliminary

one.  *See* 19 U.S.C. § 1516a(a)(2)(B) (explaining that only Commerce's "final affirmative

determinations" may be contested in the CIT).  Further, Mosaic argued in its administrative case

brief that Commerce erred in finding both that the MAD 20.5 billion VAT payment was not a

financial contribution, and that it did not confer a benefit.  *See* Mosaic Case Br. at 56-59.

Commerce, however, only addressed the latter issue in the *Final Determination*.  *See* Final IDM,

Comment 23; *see also id.* at 6 (listing the "Value-Added Tax (VAT) Reform – VAT Refunds"

program as a "Program{} Determined Not to Have Conferred a Benefit"); OCP Final

Calculations Mem. at 4 (listing the "Value-Added Tax (VAT) Reform – VAT Refunds" program

as a "Program{} Determined Not Used or Does Not Confer a Benefit" and omitting the program

from the list of "Programs Unchanged from the Preliminary Determination and the Post-

Preliminary Determination").

Thus, Mosaic's Complaint properly challenged the one issue that Commerce *did* address in the *Final Determination*:  whether "the VAT refunds received by OCP and its cross-owned affiliates … confer a benefit."  Final IDM, Comment 23 at 78.  Defendant attempts to blur this distinction with a misleading parenthetical, claiming that Commerce's preliminary finding of no financial contribution was "unchanged in the final results."  Def.'s Resp. Br. at 90.  However, while Commerce's *Preliminary Determination* included a two-sentence discussion of the issue of the "financial contribution" element of the subsidy, it did not address any of Mosaic's arguments on the issue in the *Final Determination*, *see* Mosaic Case Br. at 56-59, or otherwise address the issue at all.  To the contrary, Commerce premised its decision not to countervail this program ***solely*** on the alleged lack of "benefit," *see* Final IDM, Comment 23, and it omitted the program from the list of "Programs Unchanged from the Preliminary Determination and the Post-Preliminary Determination."  OCP Final Calculations Mem. at 4.  Accordingly, Mosaic was not required to appeal, and therefore did not waive, an element of the countervailing duty analysis that Commerce did not reach in its *Final Determination*.

### B.  Defendants fail to identify a reasonable basis for Commerce's determination that the 20.5 billion MAD VAT refund was part of the normal operation of Morocco's VAT regime

Commerce unlawfully determined that the MAD 20.5 billion payment to OCP for refund of VAT does not entail the conferral of a benefit within the meaning of section 771(5)(E) of the Act.  Defendants fail to rebut the dispositive evidence detracting from this determination.  19 U.S.C. § 1516a(b)(1)(B)(i); 19 U.S.C. § 1677(5)(A)-(B).

In the *Final Determination*, Commerce determined that the two Protocols for Financing of VAT Credits with Moroccan banks that the GOM established to pay the MAD 20.5 billion to OCP (the "Protocol Scheme") were not countervailable because "VAT credits and VAT

reimbursements are permitted under Moroccan law…" Final IDM at 79.  In reaching this

conclusion, Commerce disregarded record evidence demonstrating that the MAD 20.5 billion

payment was outside the scope of both Morocco's General Tax Code (the "GTC") and any

"normal operation" of a VAT program.  As Mosaic demonstrated in its opening brief, whatever

OCP may contend to be the "inten{t}" of Moroccan tax laws, OCP Resp. Br. at 44, the Protocol

Scheme was *ultra vires*, because the GTC does not provide authority for the GOM to enter into

such agreements.  Unable to point to precedent or legal authority to the contrary, Defendants

sidestep the undisputed record evidence with a number of meritless arguments.

*First*, Defendants repeat Commerce's erroneous finding that the MAD 20.5 billion

payment could not have conferred a benefit because "Morocco operates a normal VAT system."

OCP Resp. Br. at 39; Def.'s Resp. Br. at 91 ("Morocco's VAT regime operates as a normal VAT

system").  Specifically, Defendants submit that the challenged VAT refund "reimbursed only a

VAT credit that was already owed to OCP and its affiliates," and thus, OCP and its affiliates

received only "the money they were already owed."  OCP Resp. Br. at 41-42; Def.'s Resp. Br. at

90-91.  But this argument ignores the record evidence that Mosaic cited – from the GTC itself,

the GOM's questionnaire responses, and the manner in which the GOM designed and

implemented the Protocol Scheme – which collectively demonstrate that OCP was not entitled to

a lump-sum payment for accrued credits under the Moroccan VAT system.

Moroccan law is generally structured to provide neutral VAT liability, allowing

deductions in future years for overpayment of capital expenses and assessing additional taxes

when companies collect excess VAT from consumers.  GOM Initial Questionnaire Response

("GOM IQR"), Vol. VII Narrative and Vol. VII Exhibits (Sept. 17, 2020), P.R. No. 152 & 204,

C.R. No. 66 & 130-134, at VII-3 ("The intent … is that VAT liability should be neutral with

respect to the operations of the companies subject to this tax."); *id.* Exhibit VII-1, Article 101

("The value added tax that has been charged on the elements of the price of a taxable transaction

is deductible from the value added tax applicable to this transaction.").  OCP argues that as a

result, a VAT refund cannot constitute a benefit because (i) the GTC contemplates certain VAT

refunds; and (ii) "Article 103 of the Moroccan tax code . . . does not address at all the form that a

VAT refund must take, much less prohibit 'lump-sum' payments."  OCP Resp. Br. at 45.

OCP's argument turns the GTC on its head.  In fact, Article 103 generally prohibits VAT

refunds, unless they follow specific, enumerated procedures.  Specifically, Article 103 states that

any tax credits OCP accrued "may not result in a refund, even partial, of the tax that has been

charged on a given transaction," except in one of five scenarios.  GOM IQR, Exhibit VII-1,

Article 103.  The first of these exceptions provides that, for transactions carried out under certain

suspensive arrangements, a "surplus" of VAT credits accumulated by the taxpayer may be

"reimbursed according to the conditions and modalities defined by the regulation."  *Id*.  That

regulation in turn requires that the taxpayer file an application "with the local tax office to which

the beneficiary is associated at the end of each quarter of the calendar year in respect of

transactions carried out during the previous quarter or quarters."  *Id*.  Furthermore, it provides

that "{t}he refunds of fees … shall be settled within a maximum period of three (3) months from

the filing date of the application."  *Id*.  Thus, as the GOM explained, a "valid reimbursement"

must be "liquidated with a delay of no longer than three months."  GOM IQR at VII-6.  When

such reimbursement does not transpire within three months, the credits are "accumulated" to be

set off against VAT in subsequent years.  *Id*. ("Requests for reimbursement of VAT credits that

are not liquidated within this time frame result in an accumulation of such credits.").

NON-CONFIDENTIAL VERSION

This record evidence "fairly detracts" from Commerce's finding that the MAD 20.5 billion VAT refund payment was part of the normal operation of Morocco's VAT regime. *CS Wind Viet. Co.*, 832 F.3d 1367, 1373 (Fed. Cir. 2016). Defendants do not dispute that OCP and the GOM did not follow the procedures for VAT refunds set forth in Morocco's tax laws, nor have they identified any supporting documentation or pointed to any provision of Moroccan law authorizing a lump-sum payment of outstanding VAT credits.[10] Thus, the record does not support Commerce's determination that the refund reflects the normal operation of Moroccan tax law.

In other cases involving VAT refunds, Commerce has reasonably required a party claiming eligibility for such refunds to identify the provisions of local law authorizing such reimbursements and provide supporting documentation. For example, in *Melamine From Trinidad and Tobago*, Commerce found that a VAT rebate program conferred a benefit under section 351.510(a) of its regulations because the respondents had "not provided any supporting documentation, and, … have not specified which section of the VAT Act would support" their argument that they would have been entitled to VAT rebates. *Melamine from Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Dep't Commerce Nov. 6, 2015), and accompanying IDM, Comment 6. In light of this practice, Commerce acted unlawfully in disregarding evidence that the Protocol Scheme was not authorized by any provision of the GTC. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Defendants, like

---

[10] OCP argues that it would be unreasonable to interpret the three-month time period set forth in Article 103 for the refund of VAT credits as extinguishing OCP's rights to those refunds, OCP Resp. Br. at 55, because "the intent of Article 103" is "to provide for reimbursements to ensure a neutral system." However, the three-month time period applies specifically to reimbursements of VAT credits; as GOM's responses explained, a neutral VAT system can still be achieved by setting off accumulated VAT credits from overpayment to suppliers and under-collection against future VAT liabilities. *See* GOM IQR, Exhibit VII-1, Article 101; *id.* at VII-6.

BUSINESS PROPRIETARY
INFORMATION DELETED

Reply Brief
Consol. Court No. 21-00116                                    NON-CONFIDENTIAL VERSION

Commerce, argue that *Melamine From Trinidad and Tobago* does not apply because OCP has

identified a provision in the GTC permitting VAT rebates, *see* OCP Resp. Br. at 45-46, but that

is a distinction without a difference. Just as the respondent in *Melamine From Trinidad and*

*Tobago* failed to demonstrate which provision in Trinidad's VAT act permitted the rebates they

had received, OCP cannot point to any provision in the GTC authorizing a lump-sum

reimbursement of a decade's worth of accumulated VAT credits. Furthermore, OCP cites no

authority or precedent for the broad proposition that a sovereign can convert VAT credits into a

debt that can be repaid via factoring without creating a benefit under § 351.510(a). *See* OCP

Resp. Br. 46.

The manner in which OCP facilitated the Protocol Scheme further illustrates that the

MAD 20.5 billion lump-sum payment of VAT refunds was anything but "normal." As Mosaic

explained in its opening brief, [


]. *See* Mosaic Br. at 28-29. OCP argues that this evidence does not show special treatment

for OCP because other Moroccan companies also benefitted from the Protocol Scheme. OCP

Resp. Br. at 48 (stating that "over 700 other Moroccan companies received refunds under the

same mechanism"). [



]. Moreover, whether other companies received the same subsidy is irrelevant to

Commerce's analysis under section 351.510(a); if anything, it suggests that those companies may

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

NON-CONFIDENTIAL VERSION

have likewise received a countervailable subsidy, [

].[11]

Finally, even if the Protocol Scheme were part of the "normal operation" of Morocco's

VAT regime under the GTC (which it is not), Commerce declined to consider evidence showing

that OCP was not entitled to the full amount of VAT refund it received pursuant to the factoring

agreements. As Mosaic demonstrated in its opening brief, the record evidence shows that [

---

[11] Defendant's position that the Protocol Scheme is part of a normal VAT scheme because "{s}overeign nations routinely borrow money and pay it back" similarly collapses under its own weight. Def.'s Resp. Br. at 93. Commerce does not determine the existence of a benefit based on whether a foreign government acted consistent with its powers, and foreign governments can provide subsidies through funds borrowed from private lenders. *Cf. PNC Financial Services Grp, Inc. v. C.I.R.*, 503 F.3d 119, 120-121 (D.C. Cir. 2007).

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

NON-CONFIDENTIAL VERSION

].[12] Yet in the *Final Determination*, Commerce relied on OCP's

"reimbursement claims that served as the basis for the MAD 20.5 billion in refunds" and a chart

prepared by OCP "demonstrating how those numbers reconciled to the total refunds under the

factoring agreements," Final IDM at 80, [



].

Defendants concede that OCP's reimbursement claims [

]. They argue instead that the "large amount of meticulous

information that OCP . . . submitted" suffices as substantial evidence. OCP Resp. Br. at 49.

According to OCP, that evidence consists solely of OCP's own "reimbursement requests" with

supporting invoices and receipts, [

]. *See* OCP Resp. Br. at 49-50. Further, the "detailed chart" that

Defendants point to [

---

[12] For example, in *Polyethylene Terephthalate Film, Sheet, and Strip from India*, Commerce considered the Government of India's verification and monitoring procedures for reconciling claims (or lack thereof) dispositive, not the one-sided submissions of the importer, and declared the duty-free imports countervailable. *Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet, and Strip from India*, 71 Fed. Reg. 7,534 (Int'l Trade Admin. Feb. 13, 2006), and accompanying IDM, Comment 1. Defendant mischaracterizes Mosaic's argument as "contend{ing} that VAT refunds are akin to the remission or drawback of import charges upon export and that Commerce should have analyzed Morocco's VAT program by considering factors under 19 C.F.R. § 351.519(a)(4)," and that Mosaic waived this argument by failing to make it before Commerce. Def.'s Resp. Br. at 97. Defendant is incorrect. Mosaic is not arguing that the VAT refunds that OCP received are akin to the remission or drawback of import charges upon export under 19 C.F.R. § 351.519(a)(4). *See* Mosaic Br. at 32. Rather, Mosaic argued that the absence of a reasonable system or procedure to verify OCP's claims for VAT refunds undermines Commerce's finding that OCP is entitled to the full MAD 20.5 billion in refunds, an argument that Mosaic did make in its administrative case brief. *See* Mosaic Case Br. at 59-60.

BUSINESS PROPRIETARY
INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**                    NON-CONFIDENTIAL VERSION

]. OCP Supplemental Questionnaire Response, Appendix

VAT2-1(a) (Nov. 3, 2021), P.R. No. 254, C.R. No. 153 (emphasis added). The fact that

Commerce erroneously relied on this chart as evidence that OCP was legally entitled to the full

MAD 20.5billion in VAT refunds is a further reason that Commerce's determination is

unsupported by substantial evidence.

OCP argues that Commerce's "verification" of OCP's reimbursements requests is akin to

an audit and "presumed to be accurate and complete," OCP Resp. Br. at 50 (citing *Hung Vuong*

*Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (CIT 2020)). But Commerce's verification

process pursuant to 19 C.F.R. § 351.307, which tests the accuracy and completeness of

information submitted by the parties, [

]. GOM IQR at VII-8 [

].

Accordingly, Commerce's finding that the MAD 20.5 billion VAT refund payment did

not confer a benefit to OCP is unsupported by substantial evidence and otherwise not in

accordance with law.

- 30 -

IV.   **The Department's Finding That OCP's Investment-Contingent VAT Exemptions for Capital Goods, Machinery, and Equipment Is Not Countervailable Is Unsupported by Substantial Evidence and Is Otherwise Not in Accordance with Law**

   A.   **Mosaic did not waive any aspect of its challenge to Commerce's determination that OCP's VAT Exemptions were not countervailable**

OCP wrongly asserts that "Mosaic's {a}rguments {r}egarding VAT {e}xemptions {a}re {p}rocedurally {i}ncorrect" because Count 4 of Mosaic's Complaint challenges the Department's finding that the VAT exemptions for capital goods, machinery, and equipment (the "VAT Exemptions") conferred no benefit to OCP without separately addressing whether those VAT Exemptions provided a financial contribution.  OCP Resp. Br. 53; *see also* Def.'s Resp. Br. 89-90.  OCP and Defendant's procedural arguments are contrary to the administrative record, Mosaic's Complaint, and the liberal pleading standards of Rule 8(a) of the Rules of the Court of International Trade.  Mosaic sufficiently alleged in the Complaint that Commerce erred in finding that OCP's VAT Exemptions are not countervailable under 19 U.S.C. § 1677(5)(A)-(B), and Defendants suffer no prejudice in responding to Mosaic's claim.  Construing the Complaint "so as to do justice" under the notice pleading standard of Rule 8, this Court should reach the merits and reverse Commerce's unlawful determination.  *See* USCIT Rule 8(f) ("pleadings must be construed so as to do justice").

Rule 8(a) of the Court of International Trade, like its "identical" counterpart in the Federal Rules of Civil Procedure, establishes a notice pleading standard, requiring only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief' . . . . {sufficient} to give the defendant fair notice of . . . the plaintiff's claim." *United States v. F.A.G. Bearings, Ltd*., 598 F. Supp. 401, 404 (CIT 1984) (quoting USCIT Rule 8(a) and *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957)); *see Milecrest Corp. v. United States*, 264 F. Supp. 3d 1353, 1368 (CIT 2017) (finding that the Plaintiff "has satisfied the liberal pleading

requirements of USCIT Rule 8(a)").  The Rules "must be construed so as to do justice," USCIT

Rule 8(f), and exhort courts to avoid "elevat{ing} form over substance in violation of Rule 8's

liberal notice pleading requirements."  *Superior Edge, Inc. v. Monsanto Co*., 44 F. Supp. 3d 890,

899 (D. Minn. 2014); *cf. Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 397 (6th Cir. 2016)

(instructing courts to read complaints "holistically").

      Read "as a whole under the liberal pleading standards of Rule 8," *Lemmons v.*

*Georgetown Univ. Hosp*., 241 F.R.D. 15, 27 (D.D.C. 2007), Mosaic's Complaint  challenges the

***entirety*** of Commerce's countervailability determination.  The Complaint alleges that, "{w}ith

respect to the VAT Exemptions for Capital Goods, Machinery and Equipment program, …

Commerce erred in failing to countervail the VAT exemptions that OCP received under this

program" because "under this program, VAT exemptions for imported capital goods, machinery,

and equipment are contingent, such that the exempted VAT becomes due if certain conditions

related to investment projects are not met."  Mosaic Compl. ¶ 21 (May 12, 2021), ECF No. 12.

"Under Commerce's established practice, … VAT exemptions that are contingent upon

satisfaction of commitments made in investment agreements constitute countervailable subsidies

in the form of contingent-liability interest-free loans that convert into grants in the amount of the

VAT exemption once the contingencies no longer apply."  *Id*.  As Mosaic pointed out,

"Commerce did not address Mosaic's arguments regarding the investment-contingent nature of

the program."  *Id*. ¶ 25.  In alleging that Commerce "fail{ed} to countervail the VAT

exemptions" by refusing to consider the investment-contingent nature of the program, Mosaic

preserved its claim as to countervailability as a whole, including both benefit and financial contribution.[13]

Indeed, the question of whether the VAT Exemptions confer a benefit is inextricably intertwined with whether those exemptions provide a financial contribution. The exemption or remission of indirect taxes or import duties provides a financial contribution in the form of foregone government revenue and confers a benefit in the amount of taxes or duties foregone. *See* 19 U.S.C. § 1677(5)(D)(ii); 19 C.F.R. § 351.510(a)(1); *Wire Decking From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Countervailing Duty Determination with Final Antidumping Duty Determination*, 74 Fed. Reg. 57,629, 57,642 (Dep't Commerce Nov. 9, 2009) ("The exemptions are a financial contribution in the form of revenue forgone by the GOC and the exemptions provide a benefit to the recipients in the amount of the VAT and tariff savings." (citing 19 C.F.R. § 351.510(a)(1)); *Preliminary Negative Countervailing Duty Determination: Carbon and Certain Alloy Steel Wire Rod From Turkey*, 67 Fed. Reg. 5,976, 5,980 (Dep't Commerce Feb. 8, 2002) (determining that tax exemptions "provide a financial contribution in the form of the revenue foregone by the" government). In this case, Commerce's determination of no benefit was the basis for both its finding of no financial contribution and non-countervailability. *See* Final IDM at 81-82.

---

[13] Defendants cite *Zhaoqing Tifo New Fibre Co. v. United States*, 256 F. Supp. 3d 1314 (CIT 2017) for the "general rule" that issues outside the complaint are beyond the court's jurisdiction. But *Zhaoqing* concerned the entirely different question of how to address issues raised by an intervenor that did not file a complaint, stating that "intervenors must take a case as they find it" and cannot "raise {their} own challenges to the final determination at issue." *Id.* at 1327 (internal quotation marks and citations omitted). In that case, an intervenor attempted to raise an issue regarding Commerce's selection of evidence in the administrative record that the plaintiff had not alleged or challenged. *Id.* By contrast, Mosaic is the plaintiff in this action, and it is obvious on the face of the Complaint that Mosaic challenged Commerce's countervailability determination as to the VAT Exemptions *in toto*.

Commerce's analysis focused almost exclusively on the issue of benefit, with only two conclusory sentences addressing financial contribution. *See id.* at 82; *see also* OCP S.A. Calculations for the Final Determination at 4 (listing the "VAT Exemptions for Capital Goods, Machinery, and Equipment" program as a "Program{s} Determined Not Used or Does Not Confer a Benefit"). Accordingly, by challenging Commerce's finding of no benefit, Mosaic challenged the basis for Commerce's entire finding of no countervailability.

In addition, a ruling on Commerce's finding that the VAT Exemptions do not confer a benefit would not be merely "advisory in nature," as Defendants argue. *See* OCP. Br. 54. Commerce failed to address Mosaic's arguments in its administrative case brief that OCP's VAT Exemptions are contingent upon satisfaction of conditions set forth in its investment agreements, and therefore that this program effectively provides contingent-liability interest-free loans that are convertible to grants. *See* Mosaic Case Br. at 67; Final IDM at 81-82. If the Court agrees that Commerce's finding of no benefit is unlawful because the agency improperly disregarded the time-value-of-money benefit conferred by OCP's VAT Exemptions, then Commerce would have to redo the entire analysis of non-countervailability on remand, including financial contribution.

Thus, in alleging that the VAT Exemptions are countervailable, Mosaic placed Defendants "on notice" of its challenge to each element necessary to overturn the *Final Determination*'s erroneous conclusions under 19 U.S.C. § 1677(5). *See* OCP Resp. Br. 53 n.32 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To hold otherwise would "elevate form over substance," contrary to Rule 8's liberal notice pleading requirements. Moreover, Defendants do not claim any prejudice in having to defend both the financial contribution and benefit aspects of Commerce's conclusions. *Cf. Mundry v. Great Am. Ins. Co.*,

369 F.2d 678, 682 (2d Cir. 1966) (no waiver from asserting disclaimer where opposing parties

are not "prejudiced in any meaningful way").

### B. Defendants fail to identify a reasonable basis for Commerce's determination that the VAT exemptions for capital goods and equipment do not provide a countervailable benefit

Commerce acted unreasonably in failing to consider the time-value-of-money benefit

conferred on OCP by the interest-free loan it received in the form of GOM's VAT exemption

program for capital goods and equipment.  As Mosaic explained in its opening brief, *see* Mosaic

Brief at 37-38, in other proceedings Commerce has treated exempted VAT that remains payable,

with interest, pending satisfaction of investment conditions as interest-free contingent liability

loans.  *See* 19 C.F.R. § 351.510(b) ("{A} deferral of indirect taxes or import charges will be

treated as a government-provided loan in the amount of the taxes deferred"); *Steel Concrete*

*Reinforcing Bar From the Republic of Turkey: Final Results and Partial Rescission of*

*Countervailing Duty Administrative Review; 2016*, 84 Fed. Reg. 36,051 (Dep't Commerce July

26, 2019), and accompanying IDM, Comment 6 at 36 (upholding treatment of VAT exemption

program "as a contingent-liability, interest-free loan" and finding that "the amount the

respondent would have paid during the POR, had it borrowed the full amount of the duty and

VAT exemption or reduction at the time of importation, to constitute the first benefit under the

… VAT exemption program"); *Welded Line Pipe From the Republic of Turkey: Final Results of*

*Countervailing Duty Administrative Review; 2015*, 83 Fed. Reg. 34,113 (Dep't Commerce July

19, 2018), and accompanying IDM, Comment 1.

The GOM created such an investment-contingent VAT exemption program in the 2017

revisions to the GTC, which established "VAT exemptions on investment goods if the investing

enterprise commits to investing 100 million MAD over three years."  PDM at 14.  Pursuant to

BUSINESS PROPRIETARY INFORMATION DELETED

**Reply Brief**
**Consol. Court No. 21-00116**

NON-CONFIDENTIAL VERSION

Commerce's regulations, OCP's "benefit" therefore amounts to the interest it would have paid on

comparable commercial loans between the time of the VAT exemption and when it would

otherwise have earned VAT credits.  *See* 19 C.F.R. § 351.505(a)(1) ("In the case of a loan, a

benefit exists to the extent that the amount a firm pays on the government-provided loan is less

than the amount the firm would pay on a comparable commercial loan(s) that the firm could

actually obtain on the market."); 19 C.F.R. § 351.510(b)(1) (for tax exemption, calculating "the

benefit as having been received at the time the recipient firm otherwise would be required to

pay").

Defendants concede that OCP received VAT exemptions contingent on investment

agreements, OCP Resp. Br. at 55, but nevertheless fail to account for the corresponding time-

value-of-money benefit those exemptions accrued.  Avoiding the issue of interest, OCP falls

back on its argument that the VAT exemptions "did not affect OCP's . . . ultimate tax liability"

because they "reduced the corresponding VAT credits that the GOM would have owed to OCP

and its affiliate on the back end in the absence of such agreements."  OCP Resp. Br. at 55; *id.* at

59 ("OCP was not relieved of an ultimate tax obligation through the VAT exemptions; it never

bore the tax obligation").  But that is precisely the point:  as Mosaic explained in its opening

brief, as a result of this program, OCP was able to obtain an immediate benefit in the form of an

exemption of approximately [                    ] in VAT that it otherwise would have had to pay and

wait three or more years to receive as a credit "on the back end."  *See* Mosaic Brief at 35-36; 19

C.F.R. § 351.510(b).  OCP's "ultimate tax obligation" in nominal terms has no bearing on

Mosaic's argument.

Further, Defendants fail to address the fact that the entire purpose of the GOM's

provision of VAT exemptions contingent on the satisfaction of commitments made in investment

agreements is to provide companies with a financial incentive to enter into the agreements and fulfill the commitments. As Mosaic explained in its opening brief, if the program did ***not*** confer a benefit on OCP, it would have failed to serve its purpose.

Commerce has previously recognized that such VAT exemptions can create a countervailable time-value-of-money benefit. For example, in *Shrimp from Thailand*, Commerce observed that "we have allowed the possibility, addressed in *Hot-Rolled Steel from Thailand*, *DRAMS from Korea* and other cases, that under certain circumstances a time-value-of-money (TVM) benefit could arise from the difference between a refund and an exemption." *Certain Frozen Warmwater Shrimp From Thailand: Final Negative Countervailing Duty Determination*, 78 Fed. Reg. 50,379 (Dep't Commerce Aug. 19, 2013) accompanying IDM, Comment 9; *see also Certain Frozen Warmwater Shrimp From Indonesia: Negative Preliminary Countervailing Duty Determination*, 78 Fed. Reg. 33,349 (Dep't Commerce June 4, 2013), and accompanying Preliminary Decision Memorandum at 21 (recognizing that greater than one year between exemption and credit creates a countervailable benefit); *Melamine from Trinidad and Tobago: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 68,849 (Nov. 6, 2015), and accompanying IDM, Comment 6 at 24 (noting respondents' argument that when Commerce calculates the benefit of a VAT exemption received in advance of the qualifying event for a refund, it "should measure the benefit for the VAT exemptions using the time value between the date that MHTL would have had to pay VAT, had it not been exempted under the Fiscal Incentives Act, and the date it would have received a VAT rebate for the amount paid").[14]

---

[14] Although not contested by OCP, the time-value-of-money benefit here would have exceeded the one year threshold identified in *Shrimp From Indonesia* and other cases given that the VAT exemptions on capital goods were made contingent on a three-year investment horizon. Final IDM, Comment 1 at 17.

Where, as here, a company receives an exemption from VAT that is contingent on satisfying investment conditions, Commerce should find that a benefit is conferred based on the time-value-of-money between the date of the exemption – *i.e.*, the date when the VAT would have otherwise been paid – and the date any VAT credit would otherwise have been earned. Defendants fail to address Commerce's unreasonable disregard for this benefit that OCP obtained from exemptions on capital goods, equipment, and machinery.

## **CONCLUSION**

For the reasons discussed above, Mosaic respectfully requests that the Court reject all arguments made by Defendants and grant Mosaic's motion for judgment on the agency record in its entirety.

Respectfully submitted,

/s/ Patrick J. McLain
David J. Ross
Patrick J. McLain
Stephanie E. Hartmann
Natan P.L. Tubman
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
Email: patrick.mclain@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: April 13, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Reply in Support of The Mosaic Company's Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 12,047 words.

<u>/s/ Patrick J. McLain</u>
(Signature of Attorney)

<u>Patrick J. McLain</u>
(Name of Attorney)

<u>The Mosaic Company</u>
(Representative Of)

<u>April 13, 2022</u>
(Date)