C-714-001
Remand
Slip Op. No. 23-134
POI:  01/01/2019 – 12/31/2019
**Public Document**
E&C/OVIII:  Team

***The Mosaic Company v. United States, OCP S.A.,***
**Consol. Court No. 21-00116, Slip Op. 23-134 (CIT September 14, 2023)**
**Phosphate Fertilizers from the Kingdom of Morocco**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.      SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*The Mosaic Company, v. United States*, *OCP S.A.* Consol. Court No. 21-00116, Slip Op. 23-134

(CIT September 14, 2023) (*Remand Order*).  These draft results of redetermination concern the

final determination of the countervailing duty (CVD) investigation on phosphate fertilizers from

the Kingdom of Morocco (Morocco).[1]  In its *Remand Order*, the CIT directed Commerce to:  (1)

either accept OCP S.A. (OCP)'s selling, general, and administrative (SG&A) cost allocation

methodology or show that it is unreasonable in light of an alternative methodology; (2)

reconsider and explain the methodology used to determine OCP's profit rate, and address any

inconsistency between the inclusion of SG&A in the profit rate calculation and its exclusion in

OCP's tier-three cost of production (COP) buildup; and (3) reconsider its specificity

determination with regard to the tax fine and penalty reduction program.[2]

---

[1] *See Phosphate Fertilizers from the Kingdom of Morocco:  Final Affirmative Countervailing Duty Determination*, 86 FR 9482 (February 16, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation:  Countervailing Duty Orders*, 86 FR 18037 (April 7, 2021).
[2] *See Remand Order* at 23-28 and 56-63.

As set forth in detail below, consistent with the CIT's *Remand Order*, we have:  (1) revised our subsidy calculation methodology with regard to the provision of mining rights for less than adequate remuneration (LTAR) program by including OCP's reported SG&A costs in the COP buildup, and accepting its SG&A allocation method; (2) adjusted the methodology used to determine OCP's profit rate in the same COP buildup; and (3) explained our reconsideration of our specificity determination with regard to the tax fine and penalty reduction program.  Based on this analysis, we have made changes to the subsidy rates calculated for OCP in the *Final Determination*.[3]

## II.    BACKGROUND

### A.  OCP's SG&A Costs Incurred to Produce Phosphate Rock

In the investigation, Commerce determined OCP's benefit for the provision of mining rights for LTAR program by conducting a tier-three analysis under 19 CFR 351.511(a)(2)(iii).  In this analysis, Commerce examined "whether the government price is consistent with market principles"[4] by creating an estimated price for OCP's beneficiated phosphate rock using information from OCP's questionnaire responses.  Commerce then compared this price with a world benchmark price, which Commerce calculated as the average of various prices for beneficiated phosphate rock selected "from among the benchmark data submitted by the petitioner and OCP."[5]  Commerce then "multiplied the difference between the calculated per-unit cost buildup, including the production cost of the phosphate rock and the extraction taxes paid,

---

[3] *See Final Determination*, 86 FR at 9482.
[4] *See Phosphate Fertilizers from the Kingdom of Morocco:  Preliminary Affirmative Countervailing Duty Determination,* 85 FR 76522 (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM) at 12.
[5] *Id.*

and the benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated by OCP during the {period of investigation} {(POI)}."[6]

In its questionnaire responses, OCP reported Headquarters (HQ), Support and Debt costs, in its COP buildup calculation.[7]   In contrast to costs associated with phosphate rock production which may be attributed directly to OCP's production activities, HQ, Support, and Debt costs are recorded at a company-wide level.[8]   Although the record indicates these costs are related to phosphate rock production and pricing, they are not directly tied to production in OCP's accounting methodology, and thus, cannot be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production.   As a result, and to report these costs, OCP used an allocation methodology based on the proportion of each of its production sites' share of total costs and capital expenditures.

In the *Final Determination*, Commerce excluded the total of OCP's allocated HQ, Support, and Debt costs from the calculation of OCP's cost to process phosphate rock.   In the *Remand Order*, the CIT concluded that Commerce acted unreasonably in excluding all of OCP's HQ, Support, and Debt costs from its calculations.[9]   The CIT noted:

> {Commerce}'s excluding *all* SG&A expenses from the COP buildup is an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock.   In light of record evidence that OCP engaged in mining activities and incurred SG&A costs in doing so, {Commerce}'s exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable.[10]

---

[6] *Id.*; *see also Final Determination* IDM at 29.
[7] *See* OCP's Letter, "OCP S.A. Section III Questionnaire Response," dated September 17, 2020 (OCP's IQR), at 83-92; *see also* OCP's Letter, "OCP S.A. Supplemental Questionnaire Response Part Three," dated November 6, 2020 (OCP's SQR), at 1-3, 8, and Exhibits MIN 2-2, 2-3, and 2-7.
[8] *See* OCP's IQR at 76-77.
[9] *See Remand Order* at 28.
[10] *Id.* at 26 (wherein the CIT refers to OCP's HQ, Support, and Debt costs as SG&A costs).

The CIT remanded this issue with instructions for Commerce to either accept OCP's HQ, Support, and Debt cost allocation method or show that it is unreasonable in light of a satisfactory alternative methodology to use instead.

### B. Calculation of OCP's Profit Rate

In the *Final Determination*, Commerce calculated a profit component for OCP as part of the tier-three COP buildup.[11]  Commerce explained its methodology that, "we calculate a profit ratio for OCP by taking OCP's 'Income Before Taxes' (Profit Before Tax) and dividing it by its 'Operating Expense' (COGS) from its 2019 unconsolidated profit and loss statement."[12]  In the *Remand Order,* the CIT concluded that Commerce's methodology was flawed for the following reasons.

First, the CIT held that Commerce inappropriately relied on its practice in *Cold Rolled Steel from Russia* to support its profit calculation methodology by stating that Commerce, "calculate{d} a profit ratio for OCP by taking OCP's 'income before taxes' (profit before tax) and dividing it by its 'operating expense' (COGS) from its 2019 unconsolidated profit and loss statement."[13]  The CIT noted that Commerce later explained that OCP's COGS was not available on the record of the proceeding and used OCP's operating expense in its place, despite acknowledging that the two figures were not equivalent.[14]  As a result, the CIT ruled that Commerce's past practice became irrelevant when Commerce used "operating expense" in place of COGS, and thus Commerce was obligated to explain its choice of methodology.[15]

---

[11] *See Final Determination* and accompanying Memorandum, "Final Determination Calculation Memorandum," at 2; *see also* OCP's IQR at Exhibit Gen-4(a)(iii).
[12] *Id.*
[13] *See Remand Order* at 33 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016) (*Cold Rolled Steel from Russia*)).
[14] *Id.* at 33-34 (citing Memorandum, "Allegations of Ministerial Errors in the Final Determination," dated March 15, 2021, at 4).
[15] *Id.* at 35-36.

Second, the CIT concluded that Commerce acted unreasonably when its selected numerator, "Income Before Tax," was not on the same basis as the denominator, which was limited to *operating* expenses only.[16]  The CIT ruled that it was unclear why Commerce declined to use OCP's reported operating income as a numerator, which would have been on the same basis as the chosen denominator "operating expense."[17]

Third, the CIT held that Commerce created a manifest inconsistency by selecting a profit rate calculation denominator, "operating expense," which included SG&A costs whereas Commerce's COP buildup *excluded* those costs.  With regard to the inconsistencies between the chosen numerator and denominator, the CIT ruled that Commerce also failed to address concerns that its methodology "failed to achieve an apples-to-apples comparison internally because the numerator is not on the same basis as the denominator."[18]

The CIT thus instructed Commerce to explain the reasonableness of its profit calculation methodology in addition to any inconsistency between the treatment of SG&A costs in that calculation and the COP buildup for the provision of mining rights for LTAR program.

### C.  Reduction in Tax Fines and Penalties

In the *Final Determination*, Commerce found that the Government of Morocco (GOM)'s reductions in OCP's tax fines and penalties are *de facto* specific under section 771(5A)(D)(iii)(I) of the Tariff Act of 1930, as amended (the Act).[19]  Specifically, we found that that 8,761 companies obtained reductions in tax fines and penalties under Article 236(2) of the CGI[20] out of a total of 262,165 corporate income taxpayers during the POI.[21]  In the *Remand Order,* the CIT

---

[16] *Id.* at 33.
[17] *Id.* at 34.
[18] *Id.* at 35-36 (citing OCP's Letter, "OCP S.A. Ministerial Error Comments," dated February 16, 2021).
[19] *See Final Determination* IDM at Comment 22.
[20] Code General des Impôts (CGI) or General Tax Code.
[21] *See Final Determination* IDM at Comment 22.

concluded that, in light of evidence on the record, Commerce must reconsider its specificity determination.

First, the CIT found that all Moroccan taxpayers, whether corporate, individual, or otherwise, were eligible to apply for penalty relief under this program.[22]  With this in mind, the CIT faults Commerce for comparing corporate taxpaying recipients of penalty relief to the total number of corporate taxpayers instead of the total number of corporate taxpayers who incurred penalties.  The CIT found that Commerce's comparison methodology disregarded the fact that the program was available to all taxpayers, not only corporate taxpayers, and made no attempt to compare the total number of actual users of the program to the universe or composition of the group of potential recipients.[23]

Second, the CIT found that the recipients of tax penalty relief under the program cannot accurately be described as limited in number "on an enterprise . . . basis" because there is no record evidence that either the eligibility for the program, or the actual participation in it, had anything to do with whether the recipients were "enterprises," or that the program was confined to "industries" or any members thereof.[24]

Third, the CIT stated Commerce produced an absurd result because the record evidence does not establish that the tax fines and penalties reduction program is anything other than a common, ordinary tax administration program, available to all taxpayers, under which the taxing authority may mitigate a penalty, and asserted that the SAA cautions against the overreaching and indiscriminate type of specificity finding Commerce employed.[25]  Citing the SAA, the CIT

---

[22] *See Remand Order* at 57.
[23] *Id.* at 58-59.
[24] *Id.* at 60.
[25] *Id.* at 61 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, Vol. 1 (1994) (SAA), at 929).

found, contrary to Commerce's *Final Determination*, that the tax fines and penalties reduction program had "widespread availability" to all taxpayers, had a large number of users, and there is no record evidence to show that it was "provided to or used by discrete segments of the economy."[26]  Further, the CIT found the fact that the program allowed the benefit to be granted as a matter of discretion does not support an affirmative specificity finding.[27]

Following its analysis and finding that Commerce's determination was unsupported by the record evidence and contrary to law, the CIT instructed Commerce to reconsider its specificity determination.

## III.   ANALYSIS

### A. Calculation of OCP's Costs to Produce Phosphate Rock

In light of the CIT's *Remand Order*, Commerce has accepted OCP's reported SG&A cost allocation methodology and included the resulting costs in OCP's COP buildup.[28]

When considering relevant costs in a cost buildup under a tier-three analysis, neither 19 CFR 351.511(a)(2)(iii) nor the *CVD Preamble*[29] impose specific requirements or mandate a specific approach.  Our tier-three benefit calculation in this case is based on a comparison of the actual per-unit cost buildup of OCP's beneficiated phosphate rock against a market price of phosphate rock.  The rationale behind this methodology is that we are investigating the provision of mining rights for LTAR, and for which a comparable market price is not available to make a direct comparison.  Thus, in a tier-three analysis, we find it appropriate to conduct a benefit

---

[26] *Id.* at 62-63.
[27] *Id.* at 63.
[28] *See* Memorandum, "Draft Remand Redetermination Calculations for OCP S.A.," dated November 21, 2023 (OCP Remand Calculation Memorandum).  These calculations are unchanged for the final results of redetermination.
[29] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65378 (November 25, 1998) (*CVD Preamble*).

analysis not on mining rights *per se*, but on the market value of the underlying good conveyed via the mining rights.[30]

Therefore, when performing the cost buildup, Commerce considers the relevant production costs associated with producing and pricing the phosphate rock. As a result, we instructed OCP to report all costs associated with its production and pricing of phosphate rock. OCP provided its production costs, including amounts for certain indirect costs, or SG&A, classified as HQ, Support, and Debt, which Commerce excluded from OCP's COP buildup.[31] However, we recognize, as the CIT noted, that the exclusion of OCP's HQ, Support, and Debt costs was an implied finding that OCP incurred no SG&A costs in the production of phosphate rock.[32]

In contrast to the direct costs associated with phosphate rock production which can be attributed directly to OCP's production activities, HQ and Support costs are recorded at a company-wide level. As a result, and when reporting its costs of production, OCP allocated these costs to each mining site on the basis of total site costs.[33] In addition to HQ and Support costs, OCP also incurred Debt costs which were also recorded at the company-wide level.[34] OCP notes that financing and debt costs are a routine part of its mining operations.[35]

As stated above, OCP's HQ, Support, and Debt costs are recorded on a company-wide basis. In other words, although the record indicates these costs are related to production, they are not directly tied to production in OCP's accounting methodology, and thus, cannot be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production. As

---

[30] *See Final Determination* IDM at 23.
[31] *See* OCP's IQR at 83-92; *see also* OCP's SQR at 1-3 and Exhibits MIN 2-2, 2-3 and 2-7.
[32] *See Remand Order* at 26.
[33] *See* OCP's SQR at 1-3, 8, and Exhibits MIN 2-2, 2-3 and 2-7.
[34] *Id.* at 8 and Exhibit MIN 2-7.
[35] *Id.*

a result, and in order to report these costs, OCP used an allocation methodology, which is based on the proportion of each of its production sites' share of total costs and capital expenditures.

An attempt to further segregate OCP's HQ, Support, and Debt costs in a manner inconsistent with its accounting methodology would be unreasonable. Therefore, to comply with the CIT's *Remand Order* and create a COP buildup that more fairly reflects OCP's phosphate rock production costs, we find OCP's allocation methodology reasonable and are applying it to include its HQ, Support, and Debt costs in our calculations. For the calculation of the revised subsidy rate for the provision of mining rights for LTAR program, *see* the calculation memorandum for the draft results of redetermination.[36]

### B. Calculation of OCP's Profit Rate

In response to the CIT's *Remand Order*, Commerce has modified its methodology used to calculate OCP's profit rate in the *Final Determination*. Previous cases involving a COP buildup used "Income Before Taxes" divided by "Cost of Goods Sold" to calculate a profit rate, because this calculation validly utilizes a numerator and denominator drawn from the same group of expenses.[37] Here, "Cost of Goods Sold" is not reported in OCP's financial statements, and thus, another figure must be used that similarly creates a valid comparison with the numerator of the calculation.

Therefore, for the final results, we have not changed the numerator of OCP's profit calculation, "Income Before Tax," but have changed the denominator from "Operating Expenses" to "Costs at the Level of Income Before Tax." The latter figure is inclusive of all Operating Expenses (including HQ & Support Costs), and net Financial Expenses (inclusive of

---

[36] *See* OCP Remand Calculation Memorandum. These calculations are unchanged for the final results of redetermination.
[37] *See Final Determination* IDM at 27 (citing *Cold Rolled Steel from Russia* IDM at Comment 4).

debt-related costs).[38]  Thus, our denominator "Costs at the Level of Income Before Tax" is consistent with both the Profit Before Tax numerator and the corrected COP buildup for phosphate rock (which includes HQ, Support and Debt Costs).

We find that this change, which is aligned with our stated intent in the *Final Determination*, creates a valid comparison.[39]  Accordingly, to comply with the CIT's *Remand Order* and to create a valid comparison for purposes of calculating OCP's profit rate, we used the denominator, "Costs at the Level of Income Before Tax."  For the calculation of the revised subsidy rate for the provision of mining rights for LTAR program, *see* the calculation memorandum for the draft results of redetermination.[40]

### C.  Specificity Determination for Reduction in Tax Fines and Penalties

In response to the CIT's *Remand Order*, Commerce has reconsidered its *de facto* specificity finding, and finds that the reduction in tax fines and penalties program is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.

As an initial matter, Commerce respectfully disagrees with the CIT's holdings in the *Remand Order* regarding Commerce's determination that the reduction in tax fines and penalties program is *de facto* specific pursuant to section 771(5A)(D)(iii)(I) of the Act, and believes there is sufficient evidence to continue to find the program is used by a limited number of actual recipients based on the record evidence.[41]  However, in light of the CIT's *Remand Order*, and based on the following analysis, under respectful protest,[42] Commerce has determined the

---

[38] *See* OCP's IQR at Exhibit Gen-4(a)(iii); *see also* OCP Remand Calculation Memorandum.
[39] *See Final Determination* IDM at Comment 5.
[40] *See* OCP Remand Calculation Memorandum.  These calculations are unchanged for the final results of redetermination.
[41] *See Final Determination* IDM at Comment 22.
[42] *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

reduction in tax fines and penalties program is *de facto* specific under section

771(5A)(D)(iii)(III) of the Act.  We explain in detail below.

The statute requires Commerce to determine whether the program under examination is

specific under section 771(5A)(D)(iii) of the Act, whereby Commerce must analyze the

distribution of benefits among actual users to determine whether the benefits are provided on a

*de facto* specific basis.  These statutory criteria are set forth under sections 771(5A)(D)(iii)(I)

through (IV) of the Act.  Specifically, section 771(5A)(D)(iii) of the Act provides that a subsidy

is *de facto* specific if any one of the following four factors exist:

(I)  The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II)  An enterprise or industry is a predominant user of the subsidy.

(III)  An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV)  The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

As set forth under 19 CFR 351.502(a), in determining whether a subsidy is *de facto* specific,

Commerce will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially

in order of their appearance.  If a single factor warrants a finding of specificity, Commerce will

not undertake further analysis.

The statute instructs Commerce to assess predominant use and disproportionality factors.

Furthermore, the SAA explicitly states that because the weight accorded to the individual *de

facto* specificity factors is likely to differ from case to case, clause (iii) makes clear that

Commerce shall find *de facto* specificity if one or more factors exist.[43]  The CVD statute does

---

[43] *See* SAA at 931.

not mandate any specific methodology in conducting a *de facto* specificity analysis and

Commerce has discretion to apply a reasonable methodology in making a *de facto* determination

in light of the facts and circumstances of each particular case.

      The CIT contends that this program is not specific because it is *available* to all taxpayers

in Morocco.[44]  We highlight that nominal availability based on a subsidy program's eligibility

criteria speaks to an analysis of *de jure* specificity, whereas an analysis of *de facto* specificity

seeks to answer, despite nominally widespread availability, whether a program is in fact specific

based on the actual distribution of benefits.  Further, in instances such as this where a benefit is

provided to numerous and diverse entities, we attempt to determine whether an enterprise or

industry (or groups thereof) were, in fact, predominate or disproportionate users.[45]  Here, we are

analyzing whether OCP's receipt of benefits is disproportionate, under section

771(5A)(D)(iii)(III) of the Act, in relation to the Moroccan economy as a whole.  Further, we

note that although the program may be *available* to all taxpayers, this fact does not necessarily

nor automatically mean that it cannot be disproportionately *used* by certain companies.  A

subsidy program can be both broadly available across an economy but used disproportionately

by an enterprise or group of enterprises compared to others.  The SAA describes the original

purpose of the specificity test, which is to serve "as an initial screening mechanism to winnow

out only those foreign subsidies which truly are broadly available and widely *used* throughout an

economy."[46]

      As required by the statute and as directed by the SAA, Commerce has re-examined the

information on the record and used a reasonable methodology for analyzing whether OCP was a

---

[44] *See Remand Order* at 57.
[45] *See CVD Preamble*, 63 FR at 65359.
[46] *See* SAA at 929.

disproportionate user of this program consistent with its normal practice.  Specifically, based on the year OCP received benefits under this program (2019), we compared the benefits (reductions in fines and penalties) received by OCP to the average amount of benefits received by other companies in Morocco[47] that used the program, and found that OCP was a disproportionate user of this program because it received a share of reductions that was roughly 82.87 times larger than the average amount.[48]  Commerce has used this simple average approach in multiple past CVD proceedings.[49]  Moreover, the record demonstrates that of all the recipients of reductions under this program (8,761 companies), OCP was the 10th largest benefit recipient, and of the top 10 recipients, OCP is the only entity that appears to be a producer of the good that can be imported and, thus, the only entity that would fall within the purview of the statute under section 701 of the Act.  For these reasons, for these draft results of remand redetermination, we find that OCP is a disproportionate user of the reductions in tax fines and penalties program and, therefore, the program is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.

We note that in conducting this analysis, Commerce has not found that this program was used disproportionately on an industry basis.  Section 771(5A)(D)(iii)(III) of the Act states that a subsidy is *de facto* specific on a disproportionate user basis when, "an enterprise *or* {emphasis added} industry receives a disproportionately large amount of amount of the subsidy."  When conducting our *de facto* analysis, Commerce has the discretion to investigate whether an

---

[47] *See* GOM's Letter, "Supplemental Questionnaire Response of the Government of the Kingdom of Morocco – Part 2," dated November 11, 2020 (GOM's SQR 2), at S-IX-11-13.
[48] The amounts received by OCP and the other companies are business proprietary information.  *See* OCP Remand Calculation Memorandum at 3.
[49] *See, e.g.*, *Ripe Olives from Spain:  Final Results of Countervailing Duty Administrative Review, 2019*, 87 FR 13970 (March 11, 2022) (*Ripe Olives from Spain*), and accompanying IDM at Comment 3 (citing *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:  Final Affirmative Countervailing Duty Determination*, 77 FR 17410 (March 26, 2012), and accompanying IDM at Comment 4); and *Non-Oriented Electrical Steel from Taiwan:  Final Affirmative Countervailing Duty Determination*, 79 FR 61602 (October 14, 2014) (*NOES from Taiwan*), and accompanying IDM at Comment 1).

enterprise receives a disproportionately large amount of the subsidy in comparison to other enterprises; or, if the facts call for it, to investigate whether an industry receives a disproportionately large amount of the subsidy in comparison to other industries.  For this *Remand Order*, we compared whether OCP, a Moroccan enterprise, received a disproportionately large amount of the reductions in tax fines and penalties subsidy in comparison to other Moroccan enterprises.  For the reasons described in the paragraph above, we find that OCP received a disproportionately large amount of this subsidy in 2019; therefore, Commerce finds that OCP was a disproportionate user on an enterprise basis.  Commerce conducts its *de facto* specificity analysis under section 771(5A)(D)(iii)(III) of the Act on a case-by-case basis.  As the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) stated: "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case."[50]  Thus, Commerce's analysis of usage ratios in one proceeding does not necessarily inform its analysis in subsequent proceedings, and we find that the analysis we conducted, as explained above, is appropriate in this instance.[51]

## IV.   INTERESTED PARTY COMMENTS

On November 21, 2023, Commerce released its draft results of redetermination on the issues identified above.[52]  On November 30, 2023, The Mosaic Company (the petitioner), OCP, and the GOM submitted timely comments on the Draft Remand Results.[53]  No other parties filed

---

[50] *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999) (*AK Steel*).

[51] *See NOES from Taiwan* IDM at Comment 1.

[52] *See* Draft Results of Redetermination Pursuant to Court Remand, *The Mosaic Company v. United States, OCP S.A.*, Consol. Court No. 21-00116, Slip Op. 23-134 (CIT September 14, 2023), dated November 21, 2023 (Draft Remand Results).

[53] *See* Petitioner's Letter, "Comments on Draft Remand Redetermination," dated November 30, 2023 (Petitioner's Draft Remand Comments); OCP's Letter, "OCP's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated November 30, 2023 (OCP's Draft Remand Comments); and "Government of the Kingdom of

comments on the Draft Remand Results.  As explained below, we continue to reach the same conclusions that we reached in the Draft Remand Results.  We address each of the interested parties' comments and provide our analysis in turn.  No other interested parties filed comments on the Draft Remand Results.

### A.  Inclusion of OCP's HQ, Support, and Debt Costs

*OCP's Comments*

- Commerce correctly included an allocated portion of OCP's HQ, Support and Debt costs in the cost of production buildup.[54]
- Commerce correctly determined to use OCP's allocation methodology for its HQ, Support, and Debt costs.[55]  The CIT stated that requesting OCP to segregate these expenses would be "nonsensical" and argued that these costs must be allocated.[56]  Record evidence supports that these costs are incurred in support of day-to-day operations.[57]
- OCP correctly allocated its HQ and Support based on each site's relative proportion of total operating costs, and its Debt costs based on each production site's share of total capital expenditures during the average useful life (AUL) period.[58]
- Commerce's revised treatment of HQ, Support, and Debt costs in the Draft Redetermination correctly implements the court's remand order and is fully supported by the record evidence.[59]

*The Petitioner's Comments*

- In the investigation, Commerce properly excluded HQ, Support and Debt Costs from its tier-three cost buildup.[60]  In the *Remand Order*, however, the CIT stated that, "{Commerce's} exclusion of all SG&A expenses from the {cost of production} buildup was *per se* unreasonable{,}" and directed Commerce to either "accept OCP's SG&A cost allocation methodology or…show that it is unreasonable in light of a satisfactory alternative methodology it would use instead."[61]  In its draft remand, Commerce accepted OCP's SG&A cost allocation methodology, and its decision to do so was unreasonable, unsupported by substantial evidence, and not in accordance with law.[62]
- The CIT's direction to Commerce demonstrates a misapprehension of the purpose of

---

Morocco's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated November 30, 2023 (GOM's Draft Remand Comments).
[54] *See* OCP's Draft Remand Comments at 3-7.
[55] *Id.* at 4-5.
[56] *Id.* at 5 (citing *Remand Order* at 27).
[57] *Id.* at 5-6.
[58] *Id.* at 6.
[59] *Id.* at 6-7.
[60] *See* Petitioner's Draft Remand Comments at 3-4.
[61] *Id.* at 4 (citing *Remand Order* at 28).
[62] *Id.*

Commerce's cost buildup methodology. There is no requirement for Commerce to include SG&A expenses in a tier three benefit calculation cost buildup, and this is the first time ever that Commerce has agreed to include such expenses.[63] Commerce's decision was even more unreasonable when considering that it found in the investigation that it did not "have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock."[64]

- The CIT's reasoning is based on a misinterpretation of the record, and thus, there is no basis for Commerce to change its approach from the investigation. Commerce did not find that OCP's HQ, Support and Debt Costs could be categorized as SG&A, and OCP's own financial statements do not describe HQ, Support and Debt Costs as SG&A either.[65] In addition, OCP reported revenues associated with the HQ, Support and Debt Costs, signifying that the HQ or "head office" segment should not be conflated with SG&A costs.

- Commerce should continue to exclude OCP's reported HQ, Support and Debt Costs because Commerce has already included indirect costs in the cost build up calculation. Commerce included additional expenses in the tier-three benefit calculation cost buildup that have no relevance to the production and pricing of OCP's phosphate rock.[66]

- The record still lacks any evidence that would show how each of the line items in OCP's HQ, Support and Debt Costs are relevant to the pricing of phosphate rock, making it unreasonable for Commerce to accept the associated costs in the cost buildup. Although this is not an antidumping (AD) proceeding, the AD laws remain a relevant authority. Regarding AD calculations, the SAA states that "{c}osts shall be allocated using a method that reasonably reflects and accurately captures all of the actual costs incurred in producing and selling the product under investigation or review."[67]

- Commerce should not include costs that a respondent does not incur in producing and selling the product under investigation, as Commerce did in the Draft Remand Results. The SAA states that, "Commerce should not, in any event, accept allocation methodologies that distort real costs," and that Commerce should ensure that a respondent's costs are not artificially reduced.[68]

- The result of Commerce's inclusion of costs unrelated to phosphate mining was to drastically understate the benefit OCP enjoyed from effectively receiving the subject merchandise's main input for free.[69]

- There is no support for Commerce's conclusory assertion in the draft remand results that because OCP's HQ, Support and Debt Costs are recorded at a company-wide level, those costs cannot be further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production.[70] OCP is the company in possession of the relevant information, and because the inclusion of extraneous costs is to OCP's advantage, the

---

[63] *Id.* at 5.
[64] *Id.* at 4-5 (citing *Final Determination* IDM at 24).
[65] *Id.* at 5 (citing OCP's IQR at Appendix GEN-8(j) at 15).
[66] *Id.* at 7-8.
[67] *Id.* at 9 (citing SAA at 835).
[68] *Id.* at 9-10 (citing S. Rep. 103-412, 103d Cong., 2d Sess., at 75 (November 22, 1994)).
[69] *Id.* at 11 (citing *Final Determination* IDM at Comment 6).
[70] *Id.* at 12 (citing Draft Remand Results at 9).

burden is on OCP to demonstrate that each category of costs is relevant.  Commerce's failure to require OCP to satisfy this burden was unlawful.[71]

**Commerce's Position:**

As an initial matter, when considering relevant cost adjustments, neither 19 CFR 351.511(a)(2)(iii) nor our *CVD Preamble* directs us to undertake a cost analysis similar to what we would conduct in an AD proceeding.[72]  Our tier-three benefit calculation, in this circumstance, compares the actual per-unit cost buildup of respondents' beneficiated phosphate rock to a market price for phosphate rock.[73]  We are investigating the GOM's provision of mining rights for LTAR, for which there is no market-based price for mining rights available to compare to the price of mining rights provided by the GOM.  Thus, in this tier-three analysis, we are conducting a benefit analysis not on mining rights *per se*, but on the value of the underlying good conveyed via the mining rights.[74]

The petitioner contends that there is no requirement for Commerce to include SG&A expenses in a tier-three benefit calculation cost buildup, and that this is the "first time *ever* that Commerce has agreed to include such expenses."[75]  Regarding the former point, we again recognize the CIT's ruling that Commerce's exclusion of OCP's HQ, Support and Debt Costs from the mining rights COP buildup was "*per se* unreasonable" and that such removal was "an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock."[76]

---

[71] *Id.* at 12.
[72] *See, e.g.*, section 773(b)(3) of the Act (Calculation of Cost of Production).
[73] *See Final Determination* IDM at 12.
[74] *Id.*
[75] *See* Petitioner's Draft Remand Comments at 4-5.
[76] *See Remand Order* at 26.

Regarding the petitioner's latter point, we disagree that this is the first time that Commerce has included indirect expenses in this context.  In *Hot-Rolled Steel from India*, Commerce included indirect costs in the cost buildup used in the benefit analysis for the coal mining rights for LTAR program.[77]  Specifically, Commerce stated, "{t}o {the per unit price}, we added the operational mining costs, on a per unit basis, which consisted of materials, labor, depreciation, overhead, and royalties."[78]  Commerce expressly considered "overhead," a common measure of indirect expenses, as part of "operational mining costs" along with materials, labor, *etc.*[79]  Similarly, in *Softwood Lumber from Canada*, Commerce included certain indirect costs in a COP buildup for subject merchandise.[80]

The petitioner also argues that Commerce failed to require OCP to demonstrate that its HQ, Support and Debt costs, are necessary costs in phosphate rock production, a failure that was both negligent and unlawful.  We disagree.  As the CIT ruled, and the record reflects, OCP provided documentation "*demonstrating*" {emphasis added} that its SG&A expenses included costs attributable to its phosphate mining operations.[81]  The record of the investigation contains information demonstrating OCP incurred the HQ, Support and Debt Costs in support of its day-to-day operations.[82]  Through OCP's ILOV QR, Commerce is satisfied with the reliability of OCP's financial recording system and that the financial recording system supports the submitted

---

[77] *See Certain Hot-Rolled Carbon Steel Flat Products from India:  Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 FR 1578, 1591-92 (January 9, 2008), unchanged in *Certain Hot-Rolled Carbon Steel Flat Products from India:  Final Results of Countervailing Duty Administrative Review*, 73 FR 40295 (July 14, 2008) (*Hot-Rolled Steel from India*).
[78] *Id.*
[79] *Id.*
[80] *See Certain Softwood Lumber Products from Canada:  Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Softwood Lumber from Canada*), and accompanying IDM at Comment 24.
[81] *See Remand Order* at 26 (citing OCP's Letter, "Response to Questionnaire in Lieu of On-Site Verification," dated December 30, 2020 (OCP's ILOV QR), at 6-7; and OCP's SQR at Appendix MIN2-3 and MIN2-6).
[82] *See* OCP's ILOV QR at 6-7.

financial statements.  Here, there is no information on the record which demonstrates that OCP's accounting system is not credible or reliable.[83]  Moreover, OCP demonstrated that it incurred HQ, Support and Debt Costs in the course of mining phosphate ore, and beneficiation of phosphate rock for sale and provided a reasonable explanation for why its reported HQ, Support and Debt costs should be accounted for in its COP build up calculation for the production of phosphate rock.[84]  We note that these are corporate indirect costs OCP incurs as opposed to the site-specific indirect costs.  In short, we find no record evidence that would give support to the petitioner's assertions that OCP did not incur HQ, Support and Debt Costs related to beneficiation of phosphate rock.

### B. Alternative Allocation Methodology for OCP's HQ, Support, and Debt Costs

*The Petitioner's Comments*

- Despite its statement that HQ/Support costs concern purchases of services, external costs, personnel costs, and amortization of equipment, OCP only relates personnel costs associated with a handful of employment positions to their phosphate mining operations.[85]  OCP has otherwise failed to document how the HQ, Support and Debt Costs relate to the production or pricing of phosphate rock.
- Several large expenditures appear to be vanity projects that do not relate at all to OCP's production activities.[86]
- OCP's proposed HQ/support allocation methodology includes costs for activities unrelated to phosphate mining as part of its mine site costs, including the activities of roughly 40 joint ventures (JVs) and subsidiaries in Morocco and abroad.[87]
- These JVs and subsidiaries include acquisition and operation of hotel properties, an engineering/ project management company, a company attempting to develop a planned "green city," a real estate development company, and an agricultural entrepreneurship investment company.[88]
- These subsidiaries are all co-located at OCP's headquarters, meaning that OCP's HQ/support costs likely includes some costs relating to these affiliates.

---

[83] *See Citric Acid and Certain Citrate Salts from the People's Republic of China:  Final Affirmative Countervailing Duty Determination*, 74 FR 16836 (April 13, 2009), and accompanying IDM at Comment 18.
[84] *See* OCP's Draft Remand Comments at 3-7.
[85] *See* Petitioner's Draft Remand Comments at 15.
[86] *Id.*
[87] *Id.* at 16.
[88] *Id.* at 17.

- OCP admits that its reported HQ/support costs "relate indirectly to the general operations of the company *rather than directly to the production process.*"[89]
- It is arbitrary and unreasonable to accept OCP's apportionment of these costs on this basis, and Commerce should select an allocation basis (such as revenue) that more accurately reflects how the HQ/support costs might relate to OCP's production activities.
- OCP purported to allocate HQ, Support and Debt Costs based on its own allocation methodology, however, that methodology unreasonably omits certain categories.[90]
- Despite OCP's argument that its financing and debt costs primarily originate from loans used to fund capital improvements associated with mining operations, the evidence shows that these costs are unrelated to financing these operations.[91]
- Costs associated with capital expenditures are already allocated on the site level, so it would be illogical to allocate additional debt costs that have no known connection to phosphate mining or rock production.  As such, Commerce should exclude all of OCP's reported debt costs from the cost buildup.
- When calculating total debt cost, OCP arbitrarily excluded short-term interest income, which Commerce uses to offset financial expenses included in the cost buildup in AD cases.  By ignoring this income, Commerce has adopted an approach diametrically opposed to its practice in AD cases with no explanation.  Commerce should include the excluded income from the designated short-term interest income categories in its calculation of OCP's cost buildup, in line with its established policy regarding AD cases.[92]
- Despite OCP's claim to use debt for capital improvement purposes, these costs make up only a small portion of the costs OCP recorded, and many of these costs are effectively double-counted.  Commerce should reallocate debt costs to more accurately reflect how OCP's mining sites leverage the company's financial resources.[93]
- Commerce must make changes to the cost buildup to correct for OCP's distortions, either by only allocating HQ, Support and Debt Costs with a demonstrated connection to phosphate rock production or excluding those costs with no demonstrated connection to phosphate rock production.  Additionally, Commerce should either allocate HQ, Support and Debt Costs based on the revenues of OCP's operating unit or eliminate arbitrary distortions in OCP's buildup methodology.  Finally, Commerce should account for certain types of income and allocate its debt costs based on OCP's share of profit or loss.[94]
- Because OCP has provided cost information for only a small fraction of its personnel, the HQ/support costs should be limited to those employees.[95]
- Commerce must exclude all costs demonstrated to be unrelated to phosphate mining from the cost buildup.

---

[89] *Id.* at 19.
[90] *Id.* at 20.
[91] *Id.* at 21-22.
[92] *Id.* at 23-24.
[93] *Id.* at 25.
[94] *Id.* at 26.
[95] *Id.* at 27.

- Despite arguing that "debt costs" are equivalent to "net cost of debt," OCP arbitrarily excluded certain short-term interest income from its calculation of debt costs. Commerce must correct this by adding the short-term interest into the total debt cost calculation.[96]
- To more accurately allocate OCP's debt costs, Commerce should allocate debt costs based on each operational unit's share of OCP's financial profit/loss. This would more accurately reflect the assumption that OCP's mining sites leverage its financial resources.[97]

**Commerce's Position:**

As noted above, neither 19 CFR 351.511(a)(2)(iii) nor our *CVD Preamble*[98] impose specific requirements or mandate a specific approach for a tier-three benefit comparison. Although the petitioner argues that OCP's allocation methodology arbitrarily inflates the COP buildup,[99] the CIT previously ruled that OCP provided documentation "*demonstrating*" {emphasis added} that its SG&A expenses included costs attributable to its phosphate mining operations.[100] We note that OCP's reported costs were reconciled with its financial statements, and therefore verified, with no discrepancies observed.[101]

Based on this information, we continue to find that OCP has adequately reconciled and demonstrated the relevancy of its reported production costs. On this basis, we find no record evidence that leads us to doubt the reliability or veracity of OCP's reported costs incurred to produce phosphate rock. Therefore, the use of OCP's reported costs is appropriate for the tier-three COP buildup.

The petitioner raises several other issues with the OCP's reported data. First, the petitioner argues that OCP's allocation methodology arbitrarily inflates the cost buildup and ignores that its HQ, Support and Debt Costs include costs for its own operations and subsidiaries.

---

[96] *Id.* at 30.
[97] *Id.* at 31.
[98] *See CVD Preamble*, 63 FR at 65378.
[99] *See* Petitioner's Draft Remand Comments at 15.
[100] *See Remand Order* at 26 (citing OCP's ILOV QR at 6-7; and OCP's SQR at Appendix MIN2-3 and MIN2-6).
[101] *See generally* OCP's ILOV QR.

Here we are mindful of the CIT's statement, "that OCP could have segregated the relevant expenses is *nonsensical*." {emphasis added} and that OCP "necessarily" used an allocation method to identify SG&A expenses.[102]

Analyses under tier three of the LTAR benchmark hierarchy will necessarily be done on a case-by-case basis, depending on the facts before Commerce in a given proceeding. We note that the CVD regulation at issue defining a tier-three analysis, 19 CFR 351.511(a)(2)(iii), is written broadly to afford Commerce the discretion necessary to address the facts of each specific case and determine the most appropriate methodology to use. There is nothing in the law or prior practice to suggest that Commerce must follow a required or specific methodology under a tier-three market principles analysis. Commerce's regulations do not define the term "market principles," and the statute affords Commerce wide discretion in constructing a reasonable methodology for measuring the benefit of a subsidy. In assessing whether the government price is consistent with market principles, Commerce's practice is to apply an analysis of several factors (*e.g.*, the government's price-setting philosophy, costs, including rates of return sufficient to ensure future operations, *etc.*), on a case-by-case basis. This is in line with Commerce's findings in *CFS from Indonesia*, where Commerce found that, "… by its nature, the {tier-three} analysis depends upon available information concerning the market sector at issue and, therefore, must be developed on a case-by-case basis."[103]

In explaining the nature of its operations and providing context for its costs of production, OCP noted that the production of phosphate rock necessarily involves four main phases: extraction, stone removal, beneficiation, and transportation.[104] These phases involve

---

[102] *See Remand Order* at 27-28.
[103] *See Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007), and accompanying IDM at 20.
[104] *See* OCP's SQR at Appendix MIN 2-3 and MIN2-7; *see also* OCP ILOV QR at Appendix MIN-1.

distinct and diverse activities involving multiple mining sites, processing facilities, and transportation hubs (*i.e.*, rail terminals and pipelines). Our tier-three analysis appropriately addresses the unique nature of OCP's phosphate mining and processing operations.

Additionally, we note that the CIT ordered that Commerce "either must accept OCP's SG&A cost allocation method or must show that it is unreasonable in light of a satisfactory alternative methodology it would use instead."[105] In the petitioner's comments on the Draft Remand Results, the petitioner provided, for the first time, an alternative methodology to allocate OCP's SG&A costs.[106] The petitioner's alternative methodology relies on several estimations of OCP's reported costs which we have not had the time to fully analyze and determine whether the petitioner's alternative is a more accurate or reasonable methodology to allocate OCP's SG&A costs. Therefore, because we do not have a "satisfactory alternative" or record evidence to demonstrate that OCP's allocation methodology is unreasonable, we continue to find it appropriate to adhere to the Court's directive and accept OCP's allocation methodology.

### C. OCP's Profit Rate

*OCP's Comments*

- In its *Remand Order*, the CIT noted that Commerce failed to achieve an apples-to-apples comparison in its profit rate calculation.[107] Commerce sufficiently addressed this part of the CIT's ruling, however, Commerce failed to explain why its profit rate calculation methodology was reasonable. In the Draft Remand Results, Commerce correctly used OCP's income before tax as the numerator, and costs at the level of income before tax as the denominator.
- However, the profit rate calculated represents profit on a company-wide basis, and not a profit rate specific to phosphate rock.[108] Commerce should use record evidence to approximate OCP's phosphate rock-specific profit rate. There are three types of phosphate rock: rock sold for export, rock sold to the Jorf Fertilizer Companies (JFCs), and local rock not sold to the JFCS. For the first two categories, Commerce can use

---

[105] *See Remand Order* at 28.
[106] *See* Petitioner's Draft Remand Comments at 25-31.
[107] *See* OCP's Draft Remand Comments at 8 (citing *Remand Order* at 35-36).
[108] *Id.* at 9.

record evidence and sales information to calculate rock revenue figures from which a profit rate may be derived.[109]

- There is no revenue figure available for local phosphate rock not sold to the JFCs, thus Commerce may estimate that figure by using OCP's sales information.[110]

**Commerce's Position:**

We disagree with OCP.  For these final results of redetermination, we have not changed the numerator of OCP's profit calculation, "Income Before Tax," but have changed the denominator from "Operating Expenses" to "Costs at the Level of Income Before Tax."  The latter figure is inclusive of all Operating Expenses (including HQ & Support Costs), and net Financial Expenses (including debt-related costs).[111]  Thus, use of the "Costs at the Level of Income Before Tax" denominator creates an apples-to-apples comparison with both the Profit Before Tax numerator and the corrected COP buildup for phosphate rock (which includes HQ, Support and Debt Costs).

As noted above, this change achieves our stated intent in the *Final Determination* and creates a valid comparison.[112]  The use of estimated revenue figures to calculate the profit rate, as OCP suggests, would be inferior to the above-mentioned figures reported in OCP's financial statements which are on the record and represent OCP's own business operations.  Accordingly, to comply with the CIT's *Remand Order* and to create a valid comparison for purposes of calculating OCP's profit rate, we used the denominator, "Costs at the Level of Income Before Tax."  For the calculation of the revised subsidy rate for the provision of mining rights for LTAR program, *see* the calculation memorandum for the draft results of redetermination.[113]

---

[109] *Id.* at 10.
[110] *Id.* at 11-12.
[111] *See* OCP's IQR at Exhibit Gen-4(a)(iii)*; see also* OCP Remand Calculation Memorandum.
[112] *See Final Determination* IDM at Comment 5.
[113] *See* OCP Remand Calculation Memorandum.  These calculations are unchanged for the final results of redetermination.

### D. Reduction in Tax Fines and Penalties

*GOM's Comments*

- Commerce incorrectly determined that the Moroccan tax authority's program for reducing penalties and tax fines was *de facto* specific, when the program is available to all taxpayers and thus not countervailable.[114]
- The CIT correctly ruled that the program was not countervailable.[115]
- Commerce's remand findings that the program was *de facto* specific were incorrect, as was its determination that OCP used the program disproportionately.[116]
- Commerce's disproportionality analysis must be determined on a case-by-case basis and must take into account OCP's size and prominence in the Moroccan economy.[117]

*OCP's Comments*

- Commerce's new *de facto* determination in the remand results fails to adequately address the concerns raised in the Court's remand order because Commerce's disproportionality finding is contrary to law and unsupported by substantial evidence.
- The statute provides that in evaluating *de facto* specificity, Commerce "shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy … ."[118]  Commerce failed to comply with this requirement.
- After the facts are considered and Commerce completes its economic diversification analysis, the size of OCP and its importance to the Moroccan economy, it is evident that OCP's share of reductions, or its ranking among recipients does not demonstrate that OCP received a disproportionally large amount of the Article 236 reductions.
- In *AK Steel*, the Federal Circuit concluded that determinations of disproportionality are not subject to rigid rules and must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case.[119]  As OCP is the largest corporate group in Morocco, it will naturally pay more taxes and receive more tax reductions due to its sheer size.[120]
- Contrary to Commerce's determination that OCP received a disproportionate benefit from the subsidy, OCP was only the tenth largest recipient of benefits through the program, despite being the largest employer in the country and representing around five percent of Morocco's gross domestic product (GDP).[121]
- Commerce's disproportionality analysis is also contrary to law because it is not consistent with its practice.  OCP's reductions amount to a very small percentage of the total

---

[114] *See* GOM's Draft Remand Comments at 3.
[115] *Id.*
[116] *Id.* at 4.
[117] *Id.* at 8.
[118] *See* OCP's Draft Remand Comments at 14 (citing section 771(5A)(D)(iii) of the Act; and SAA at 931).
[119] *Id.* at 15 (citing *AK Steel*, 192 F.3d at 1384).
[120] *Id.* at 15.
[121] *Id.* at 15-16.

reductions received by other corporate taxpayers during the POI.[122]  This stands in contrast with higher percentages that Commerce has declined to find disproportionate in other *de facto* specificity analyses.[123]

- Commerce's final reason for finding the program *de facto* specific, that OCP was the only entity among the top 10 recipients that appears to be the producer of a good that can be imported and thus within the purview of the CVD law is without basis in law or evidentiary support.
- Commerce failed to address the Court's concerns that finding these reductions specific would be absurd because the reductions are the type of program the SAA cautions Commerce against finding specific.[124]  Commerce's failure to consider the binding SAA language demonstrates that Commerce's specificity analysis is contrary to law and does not comply with the *Remand Order*.

*The Petitioner's Comments*

- The petitioner agrees with Commerce's determination that the subsidy is *de facto* specific and countervailable because the actual recipients are limited and OCP received a disproportionately large amount of the subsidy program during the POI, making the program *de facto* specific under both section 771(5A)(D)(iii)(I) and (III) of the Act.[125]
- Commerce should make no changes to its *de facto* specificity analysis in the final remand redetermination.

**Commerce's Position:**

We disagree with the GOM and OCP that this program is not *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act.  As noted above, the statute requires Commerce to determine whether the program under examination is specific under section 771(5A)(D)(iii) of the Act whereby Commerce must analyze the distribution of benefits among actual users to determine whether the benefits are provided on a *de facto*- specific basis.  In this regard, the statutory criteria are set forth under sections 771(5A)(D)(iii)(I) through (IV) of the Act.  Under section 771(5A)(D)(iii)(III) of the Act, Commerce will determine that a program is *de facto* specific if an "enterprise or industry receives a disproportionately large amount of the subsidy."

---

[122] *Id.* at 16.
[123] *Id.* (citing *AK Steel*, 192 F.3d at 1384-85; *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (CIT 2001) (*Bethlehem Steel*); and *Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141 at 1152, 1154 (CIT 2000) (*Allegheny*)).
[124] *Id.* at 17 (citing *Remand Order* at 62 (citing SAA at 930)).
[125] *See* Petitioner's Draft Remand Comments at 32.

For programs where the number of users of a subsidy is very large, Commerce must assess whether there are predominant or disproportionately larger users of the subsidy. Furthermore, the SAA explicitly states that because the weight accorded to the individual *de facto* specificity factors is likely to differ from case to case, clause (iii) makes clear that Commerce shall find *de facto* specificity if one or more factors exist. The CVD statute does not mandate any specific methodology in conducting a *de facto* specificity analysis and Commerce has discretion to apply a reasonable methodology in making a *de facto* determination in light of facts and circumstances of each particular case.

The GOM and OCP contend that this program is not specific because it is *available* to all taxpayers in Morocco.[126] As an initial matter, availability speaks to an analysis of *de jure* specificity, whereas an analysis of *de facto* specificity seeks to answer whether a program, despite nominally widespread availability, is in fact specific based on the actual distribution of benefits. Further, in instances such as this where a benefit is provided to numerous and diverse entities, we will attempt to determine whether an enterprise or industry (or groups thereof) were, in fact, predominate or disproportionate users.[127] Here, we are analyzing whether OCP's receipt of benefits is disproportionate in relation to the Moroccan economy as a whole on an enterprise basis. Further, we note that although the program may be nominally *available* to all taxpayers, this fact does not necessarily nor automatically mean that it cannot be disproportionately *used* by certain enterprises or industries. The SAA describes the original purpose of the specificity test, which is to serve "as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely *used* throughout an economy."[128] A subsidy

---

[126] *See* GOM's Draft Remand Comments at 3-4; *see also* OCP's Draft Remand Comments at 17.
[127] *See CVD Preamble*, 63 FR at 65359.
[128] *See* SAA at 929.

program can be both broadly available across an economy but used disproportionately by an enterprise or group of enterprises compared to others.

As required by the statute and as directed by the SAA, Commerce examined the information on the record and used a reasonable methodology for analyzing whether OCP was a disproportionate user of this program consistent with its normal practice. Specifically, we compared the benefits (reductions in fines and penalties) received by OCP to the average amount of benefits received by other companies in Morocco (*i.e.*, 2,563,004,998 Moroccan dirham (MAD) divided by 8,761 companies)[129] that used the program, and found that OCP was a disproportionate user of this program because it received a share of reductions that was roughly 82.87 times larger than the average amount.[130] Commerce has used this simple average approach in multiple past proceedings. For example, in *Certain Pasta from Italy*, we found that the respondent received benefits approximately 6.82 times larger than the average amount received and, thus, we found the program to be *de facto* specific on a disproportionate user basis.[131] In *Olives from Spain,* we found that the respondent received a benefit that was approximately 10.78 times larger than the average amount received and found the program under examination to be *de facto* specific on the same basis.[132] In these and other instances,[133] we have found programs to be *de facto* specific on a disproportionate user basis using the simple average approach on grounds where the respondent received more benefits than the average user less extensively than

---

[129] *See* GOM's SQR 2 at S-IX-11-13.
[130] *Id.*
[131] *See Certain Pasta from Italy:  Preliminary Results and Partial Recission of Countervailing Duty Administrative Review; 2021*, 88 FR 45886 (July 18, 2023), and accompanying PDM.
[132] *See Ripe Olives from Spain:  Preliminary Results of Countervailing Duty Administrative Review, and Partial Rescission of Review; 2021,* 88 FR 61517 (September 7, 2023), and accompanying PDM.
[133] *See, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review and Rescission of Countervailing Duty Administrative Review*, *in Part*, 82 FR 39410 (August 18, 2017), and accompanying IDM.

what the facts of this record demonstrate with respect to OCP and its use of the Reductions in Taxes and Penalties program.

When conducting a disproportionate use analysis, Commerce is not bound by rigid rules or to any single analysis but must rather rely on the facts and circumstances of each case. The fundamental question Commerce must answer in this analysis is what portion of a program's funding an enterprise or industry received during a relevant period. For the reasons described above, it was entirely appropriate for Commerce to answer that question through an examination of the average level of benefits granted to OCP under the program compared to the average received by other users. In doing so, we determined that OCP's average share of the program benefits was significantly larger than the share received by other enterprises. For these reasons, we continue to find that OCP is a disproportionate user of the Reductions in Taxes and Penalties program and, therefore, the program is *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.[134]

We are also not convinced by OCP's argument that it received a very small percentage of the total reductions received by all corporate taxpayers during the POI.[135] OCP's comparison is distinct from the disproportionate *de facto* analysis that Commerce conducted. The use of a subsidy may appear to be small in aggregate terms but can nonetheless reflect disproportionate use when examining the relative distribution of the subsidy on an enterprise basis, such as under the simple average approach employed in Commerce's analysis. OCP is comparing the amount of the reductions provided to OCP to the total amount of the reductions disbursed/provided during the year in which they were provided, as opposed to, in conducting a *de facto* disproportionate use analysis, comparing the amount of the reductions provided to the

---

[134] *See* GOM's SQR 2 at S-IX-11-13.
[135] *See* OCP's Draft Remand Comments at 16.

respondent (or to the industry to which the respondent belongs) to the amount received by each other recipient (using the simple average approach) on an individual and/or industry bases. As described in detail, above, it is on this basis that Commerce is finding that OCP is a disproportionate user (on an enterprise basis) under section 771(5A)(D)(iii)(III) of the Act. Additionally, OCP contends that Commerce has found usage rates as high as 86.6 percent not specific in other proceedings.[136] We note that Commerce conducts its *de facto* specificity analysis under section 771(5A)(D)(iii)(III) of the Act on a case-by-case basis. As the Federal Circuit stated, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case."[137] Thus, Commerce's analysis of usage ratios in one proceeding does not necessarily inform its analysis in subsequent proceedings, and we find that the analysis we conducted, as explained above, is appropriate in this instance.[138]

The GOM and OCP also contend that Commerce did not take into account OCP's size relative to the Moroccan economy or the extent of Morocco's economic diversification. Commerce does so here. In evaluating the specificity factors for domestic subsidies, pursuant to section 771(5A)(D)(iii) of the Act, Commerce must take into account the extent of diversification of the economic activities within the jurisdiction of the authority providing the subsidy. According to the SAA, the additional criteria of the extent of diversification of the economic activities (and length of time during which the subsidy program in question has been in operation) serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors. In other words, these are not additional indicators of whether

---

[136] *Id.* (citing *AK Steel*, 192 F.3d at 1384-85; *Bethlehem Steel*, 140 F. Supp. 2d at 1369; and *Allegheny*, 112 F. Supp. 2d at 1152, 1154).
[137] *See AK Steel*, 192 F.3d at 1384-85.
[138] *See NOES from Taiwan* IDM at Comment 1.

specificity exists but rather can provide further context within which the *de facto* specificity factors are analyzed. The SAA thus makes clear that these additional criteria are not alone determinative of specificity or the lack thereof.

To determine the extent of diversification of the economic activities within a given jurisdiction, Commerce will normally consider publicly available data and information from expert third party sources, including such information as provided by interested parties in a proceeding. Available and reliable information sources necessarily vary from case to case. The GOM reports that there are 286,490 organized enterprises in over 50 economic sectors.[139] This information reflects a wide diversification of economic activities in Morocco. We note, however, that economic diversification fundamentally involves an examination of whether the number of *industries* within an economy is large or small and thus principally pertains to whether Commerce should account for this factor in determining if the number of *industries* using a subsidy is large or small. In this case, Commerce has examined disproportionate use of the subsidy on an enterprise basis, and we thus do not believe that the diversification of Morocco's economy is instructive.

Additionally, the GOM indicates that the reduction in tax fines and penalties provision was established in 1987 and subsequently became part of the Moroccan General Tax Code in 2007.[140] Accordingly, there is no reason for Commerce to believe that the program is limited by reason of it being new or otherwise being phased into existence. All the evidence on the record supports a finding that it is a well-established program, and therefore the fact that there is disproportionate usage by OCP is unrelated to the length of time in which it has existed.

---

[139] *See* GOM's Letter, "Supplemental Questionnaire Response of the Government of the Kingdom of Morocco," dated November 4, 2020, at SI-6-7 and Exhibit SI-6.
[140] *See* GOM's SQR 2 at S-IX-2 and Exhibit S-IX-2.

Finally, OCP contends that because it is so large, and therefore, makes up a significant portion of the Moroccan economy, its use will naturally be large, and therefore cannot be considered "disproportionate." This argument is unpersuasive. As described above, evidence on the record indicates that OCP received reductions under this program that are significantly (several times) greater than what the average recipient received. This fact demonstrates that OCP's purportedly "limited use" of this program, while perhaps limited relative to the total amount of reductions that has been granted during the POI, is in fact not limited as OCP has received a disproportionate amount of benefits under this program when compared to other Moroccan companies. Moreover, neither the GOM nor OCP provided information which would draw a correlation between a company's size and the amount of tax fines and penalties it incurs. There are many reasons why a company may incur tax fines and penalties which have nothing to do with the firm's size. For example, a company could operate a faulty accounting system that makes them more liable to file an incorrect tax return causing an excess of fines and/or penalties or a company is simply inattentive in filing its taxes. Further, Commerce is not required, by statute or our regulations, to examine *why* OCP received a disproportionate amount of subsidy benefits.[141] The fact that OCP is a disproportionate user is sufficient to find this program *de facto* specific, regardless of whether OCP is a large company or incurred tax fines and penalties when other companies did not. Because this is a *de facto* specificity finding, the statute and SAA require only an examination of the facts regarding the distribution of benefits under the program, which, as we explained and as the facts demonstrate, show that OCP is a disproportionate user of this program.

---

[141] *See CVD Preamble*, 63 FR at 65359.

## V.   FINAL RESULTS OF REDETERMINATION

Consistent with the *Remand Order*, we reconsidered:  (1) our treatment of OCP's SG&A costs and allocation method; (2) our calculation of OCP's profit rate; and (3) our specificity determination with regard to the tax fine and penalty reduction program.  Based on the foregoing explanations, we revised the subsidy rate calculations for mandatory respondent OCP and all others.  The revised CVD rates for the POI of January 1, 2019, through December 31, 2019, are listed in the chart below.[142]  Should the CIT sustain these final results of redetermination, we intend to issue a *Timken*[143] notice with an amended final determination, because the rates for OCP and all other producers or exporters have been revised since the *Final Determination*.[144]

| Company | Subsidy Rate in *Final Determination*[145] (percent *ad valorem*) | Subsidy Rate in Final Remand Redetermination (percent *ad valorem*) |
|---|---|---|
| OCP S.A. | 19.97 | 7.41 |
| All Others | 19.97 | 7.41 |

1/12/2024

X _____

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[142] For details on the revised calculations for these final results of redetermination, *see* the OCP Remand Calculation Memorandum.
[143] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).
[144] *See Final Determination*, 86 FR at 9482.
[145] *Id*.