## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

|  |  |
|---|---|
| THE MOSAIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>OCP S.A,<br><br>Defendant-Intervenor. | Consol. Court No. 21-00116 NON-<br><br>NON- CONFIDENTIAL VERSION<br><br>Business Proprietary Information Deleted From Pages 1-2, 7, 9, 11-14, 16, 18, 20, 23, 25-26, 29 |

## THE MOSAIC COMPANY'S COMMENTS ON COMMERCE'S REMAND REDETERMINATION

David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
stephanie.hartmann@wilmerhale.com

Dated: February 12, 2024                    *Counsel for The Mosaic Company*

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD OF REVIEW .................................................................................. 4

III.  ARGUMENT ...................................................................................................... 5

    A.   Commerce's Decision to Include OCP's HQ/Support and Debt
        Costs in the Cost Buildup for Phosphate Rock is Unreasonable,
        Unsupported by Substantial Evidence, and Otherwise Not in
        Accordance with Law ................................................................................. 5

        1.   Commerce's Exclusion of OCP's Reported HQ/Support
            and Debt Costs in the Original Investigation Was Lawful ................. 5

        2.   Commerce's Remand Determination Fails to Fulfill
            Commerce's Statutory Obligation to Calculate the
            Benefit to OCP as Accurately as Possible ........................................ 8

        3.   For the Vast Majority of Its So-Called HQ/Support and
            Debt Costs, OCP Failed to Establish Any Connection
            with Phosphate Rock Mining and Beneficiation .............................. 10

        4.   Commerce's Remand Determination Unlawfully Departed
            from its Practice of Requiring a Demonstrated Connection
            Between Indirect Costs and Production of the Subject
            Merchandise .................................................................................... 15

    B.   Commerce's Failure to Address Mosaic's Arguments Regarding
        Alternative Allocation Methodologies for OCP's HQ/Support
        and Debt Costs Is Unreasonable, Unsupported by Substantial
        Evidence, and Unlawful ........................................................................... 20

        1.   Commerce Failed to Address Mosaic's Argument that
            OCP's Proposed Allocation Methodology Arbitrarily
            Inflated the Cost Buildup .................................................................. 21

        2.   Commerce Failed to Address Mosaic's Argument that
            OCP's Allocation Methodology for HQ/Support Costs
            Bears No Causal Relationship with the Incurrence of
            These Costs ...................................................................................... 22

        3.   Commerce Failed to Address Mosaic's Arguments
            Regarding the Allocation of Debt Costs ........................................... 24

    C.   Commerce's Decision to Continue Using Profit Before Tax as
        the Numerator of OCP's Profit Ratio is Reasonable, Supported
        by Substantial Evidence, and Otherwise in Accordance with
        Law ........................................................................................................... 26

    D.   Commerce's Determination that the Reduction in Tax Fines
        and Penalties Program is *De Facto* Specific is Reasonable,
        Supported by Substantial Evidence, and Otherwise in
        Accordance with Law ............................................................................... 28

**NON-CONFIDENTIAL VERSION**

**IV.  CONCLUSION**.......................................................................................................................... **30**

NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................4

19 U.S.C. § 1677f(i)(3)(A) ................................................................................5

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345
  (Ct. Int'l Trade 2002) ....................................................................................4

*AG der Dillinger Hüttenwerke v. United States*, 26 C.I.T. 1091
  (2002) ..........................................................................................................21

*Altx, Inc. v. United States*, 1117-18, 167 F. Supp. 2d 1353
  (Ct. Int'l Trade 2001) ...................................................................5, 22, 24, 25

*Changzhou Wujin Fine Chem. Factory Co.*, 701 F.3d 1367
  (Fed. Cir. 2012) ..............................................................................................4

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367
  (Fed. Cir. 2016) ..................................................................................4, 24, 25

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, 498 F. Supp. 3d 1345
  (Ct. Int'l Trade 2021) .................................................................................1, 8

*Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343
  (Ct. Int'l Trade 2019) .....................................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29
  (1983) .............................................................................................................4

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316
  (Fed. Cir. 2009) ........................................................................................5, 21

*Pakfood Pub. Co. v. United States*, 453 F. App'x 986
  (Fed. Cir. 2011) ............................................................................................16

*RHP Bearings Ltd. v. United States*, 288 F.3d 1334
  (Fed. Cir. 2002) ..............................................................................................4

*SKF USA Inc. v. United States*, 263 F.3d 1369
  (Fed. Cir. 2001) ..............................................................................................5

*The Mosaic Company v. United States*, Consol. Ct. No. 21-00116,
  Slip Op. 23-134 (Sept. 14, 2023) ............................................6, 7, 26, 27, 28

*The Mosaic Company v. United States*, Consol. Ct. No, 21-00117,
 Slip Op. 24-04 (Ct. Int'l Trade Jan. 19, 2024)............................................................15, 16

*The Mosaic Company v. United States*, Consol. Ct. No. 21-00117,
 Slip Op. 23-99 (Ct. Int'l Trade July 11, 2023)............................................................16, 28

*Wind Tower Trade Coalition v. United States*, 569 F. Supp. 3d 1221
 (Ct. Int'l Trade 2022)............................................................5, 22, 24, 25

*Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408
 (2010)............................................................5

**Administrative Materials**

*Alloy Magnesium from Canada: Final Results of Countervailing Duty New
 Shipper Review*, 68 Fed. Reg. 22,359 (Dep't Commerce Apr. 28, 2003),
 and accompanying Issues and Decision Memorandum............................................................29

*Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of
 Preliminary Results of Countervailing Duty Administrative Review*, 73
 Fed. Reg. 1,578, (Dep't Commerce Jan. 9, 2008)............................................................18

*Certain Pasta from Italy: Preliminary Results and Partial Recission of
 Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 45,886
 (Dep't Commerce July 18, 2023), and accompanying Preliminary
 Decision Memorandum............................................................29

*Certain Softwood Lumber Products From Canada: Final Affirmative
 Countervailing Duty Determination, and Final Negative Determination of
 Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8,
 2017), and accompanying Issues and Decision Memorandum............................................................18, 19

*Certain Softwood Lumber Products From Canada: Final Results of the
 Countervailing Duty Administrative Review, 2017-2018*, 85 Fed. Reg.
 77,163 (Dep't Commerce Dec. 1, 2020), and accompanying Issues and
 Decision Memorandum............................................................19

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of
 Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg.
 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and
 Decision Memorandum............................................................2

*Phosphate Fertilizers from Morocco: Final Affirmative CVD Determination*, 86
 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying
 Issues and Decision Memorandum............................................................ passim

NON-CONFIDENTIAL VERSION

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum............................15

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum............................................................................................16

## Legislative Materials

S. Rep. 103-412, 103d Cong., 2d Sess. (Nov. 22, 1994) ..................................................9

Statement of Administrative Action Accompanying H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ....................................................9, 30

## I.    **INTRODUCTION**

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits these comments in opposition to certain aspects and in support of certain other aspects of the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination Pursuant to Ct. Remand.  *See* Final Results of Redetermination Pursuant to Ct. Remand (Jan. 12, 2024), P.R.R. 10, ECF No. 115-1 ("Remand Determination").

In 2020, Mosaic petitioned Commerce and the U.S. International Trade Commission to remedy the injury that the U.S. phosphate fertilizer industry was suffering as a result of unfairly subsidized phosphate fertilizer imports from Russia and Morocco.  After a lengthy investigation, Commerce correctly determined that OCP S.A. ("OCP"), a state-owned enterprise that enjoys a perpetual, government-granted monopoly over the exploitation of Morocco's phosphate reserves, received countervailable subsidies in the form of mining rights for LTAR.  These mining rights subsidies formed the core of the unfair trade practices Mosaic discussed in its Petitions to Commerce, and Commerce ultimately determined that OCP received significant subsidies through this program, equivalent to 18.42 percent *ad valorem*.  The size of the subsidy rate reflected both that phosphate rock is the principal raw material that OCP uses to produce the subject merchandise, and that OCP extracted over [              ] metric tons of phosphate rock during the period of investigation ("POI"), which it received effectively for free.

The statute requires Commerce to calculate the amount of the benefit that respondents receive from unfair subsidies as accurately as possible.  *See Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade 2021) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  However, Commerce abdicated its responsibility to do so in the Remand Determination, and as a result, it failed to countervail the majority of the unfair subsidies that OCP received during the POI.  In

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

particular, Commerce's uncritical acceptance in the Remand Determination of OCP's flawed and self-serving reporting of its HQ/Support and Debt costs, and its determination to include the entirety of such costs in its cost buildup, dramatically skewed the benefit calculation for the mining rights for LTAR program in favor of OCP.  This single adjustment – Commerce's inclusion in its cost buildup of **[                                        ]** corresponding to costs that have no connection to the production and pricing of phosphate rock – reduced the subsidy rate for this program by almost three quarters, from 18.42 to just 5.86 percent.  Further, Commerce utilized the same flawed approach in the first administrative review of the countervailing duty ("CVD") order; the result was to reduce the subsidy rate for this program to *zero* – as though OCP did not receive *any benefit at all* from receiving the principal raw material that it uses to produce the subject merchandise effectively for free.  *See Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum, Comment 6.

Before this Court, the Government correctly argued that OCP's allocation methodology was unreasonable. Def.'s Opp'n to Pl.'s Mot. for J. on the Admin. R. 61 ("Def. Response Br."). However, in the Remand Determination, Commerce reversed itself and claimed that the same methodology *was* reasonable, based on the exact same administrative record.  Remand Determination at 9.  To the extent that Commerce provided any rationale for its reversal of position, it was to baldly assert that it would not have been reasonable to further segregate OCP's HQ/Support and Debt costs.  *Id*.  Commerce did not explain why this was so, however. Commerce also failed to explain how its alleged inability to segregate OCP's costs – if true – could transform what it had previously found to be an unreasonable methodology into a

reasonable one.  In any event, as discussed below, Commerce's assertion was false, because it *is* in fact possible to further segregate OCP's HQ/Support and Debt costs more than OCP did.

In the Remand Determination, Commerce also impermissibly refused even to consider the extensive evidence and arguments that Mosaic had presented in opposition to OCP's flawed and self-serving reporting on the grounds that it "ha{d} not had the time to fully analyze" Mosaic's comments.  Remand Determination at 23.  This was despite the fact that Commerce sought and obtained a one-month extension of time from the Court, purportedly to "adequately address the parties' comments on the draft remand determination."  Consent Motion for Extension of Time to File Remand Results (Dec. 4, 2023), ECF No. 111 at 2.  Mosaic's comments on the draft remand determination demonstrated that Commerce *could* have further segregated OCP's HQ/Support and Debt costs, had it chosen to make the effort.  *See* Mosaic Cmts. Draft Remand Results, C.R.R. No. 3, P.R.R. No. 8 ("Mosaic Draft Remand Comments").  Commerce's failure to address Mosaic's evidence and argumentation is unlawful and necessitates a second remand for Commerce to reconsider its approach, and to ensure that it countervails the full amount of the subsidies that OCP realizes from this program, as the statute requires.

Certain other aspects of Commerce's Remand Determination – namely, Commerce's decision to continue using OCP's Profit Before Tax as the numerator of its profit ratio and Commerce's *de facto* specificity determination with respect to the Reduction in Tax Fines and Penalties program – adequately address the Court's concerns and are supported by substantial evidence and otherwise in accordance with law.  Accordingly, the Court should affirm these aspects of the Remand Determination.

## II.    STANDARD OF REVIEW

In reviewing Commerce's CVD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47 (Ct. Int'l Trade 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence.  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (citation omitted).  The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

This standard of review also encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act.  *See Changzhou Wujin Fine Chem. Factory Co.*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).  "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)).  Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (Ct. Int'l Trade 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42).  Failure to

consider an important aspect of the problem similarly renders a determination by Commerce arbitrary.  *State Farm*, 463 U.S. at 43; *see also Zhejiang DunAn Hetian Metal Co. v. United States*, 34 C.I.T. 408, 437 (2010), *vacated on other grounds*, 652 F.3d 1333 (Fed. Cir. 2011).  Agency determinations that ignore relevant statutory or regulatory language, or interpret that language contrary to its plain meaning, are also not in accordance with law.  *See SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382-83 (Fed. Cir. 2001).

Finally, Commerce is required by law to provide in its final determination "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties."  19 U.S.C. § 1677f(i)(3)(A).  While the agency need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions.  *Altx, Inc. v. United States*, 1117-18, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).  Failure to do so renders its determination unlawful. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009); *Wind Tower Trade Coalition v. United States*, 569 F. Supp. 3d 1221, 1241, 1259 (Ct. Int'l Trade 2022).

## III.  <u>ARGUMENT</u>

### A.  **Commerce's Decision to Include OCP's HQ/Support and Debt Costs in the Cost Buildup for Phosphate Rock is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law**

#### 1.  **Commerce's Exclusion of OCP's Reported HQ/Support and Debt Costs in the Original Investigation Was Lawful**

In the investigation, Commerce based its tier-three benefit calculation for OCP's phosphate mining rights on "a comparison of the actual per-unit cost buildup of OCP's beneficiated rock with a market price of phosphate rock."  IDM at 23.  Commerce reasonably decided to take into consideration only "the relevant production costs *associated with producing the phosphate rock from the minerals in the ground* as well as *the pricing of phosphate rock.*"

NON-CONFIDENTIAL VERSION

*Id.* at 24 (emphasis modified).  As part of this analysis, Commerce properly excluded OCP's reported HQ/Support and Debt costs from the cost buildup, because OCP failed to establish that these costs contributed to OCP's mining operations and that they were relevant to the pricing of phosphate rock.  *Id.*  Commerce's decision to exclude these costs was reasonable, supported by substantial evidence, and otherwise in accordance with law.

In the *Remand Order*, the Court stated that Commerce's "exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable{,}" *The Mosaic Company v. United States*, Consol. Ct. No. 21-00116, Slip Op. 23-134 (Sept. 14, 2023) ("*Remand Order*") at 26, and it instructed Commerce either to "accept OCP's SG&A cost allocation method or . . . show that it is unreasonable in light of a satisfactory alternative methodology it would use instead."  *Id.* at 28.  Thus, the Court appears to have implicitly ruled that it is reasonable and lawful to accept OCP's proposed allocation methodology.  However, this ruling was erroneous and rested on a misinterpretation of the record evidence and the approach that Commerce took in the investigation.

*First*, the Court appears to have incorrectly equated what OCP termed HQ/Support and Debt costs with SG&A.  By doing so, in effect, the Court (perhaps inadvertently) went beyond its remit and inappropriately made a factual finding.  To be clear, in the original investigation, Commerce itself made no finding that OCP's purported HQ/Support and Debt costs were SG&A costs.  *See* IDM, Comment 4; Remand Determination at 3, n. 10 (citing the *Remand Order* as the source of this finding).  Furthermore, OCP's own public financial statements do not describe the HQ/Support segment as SG&A; to the contrary, the financials describe the "head office" segment as "host[ing] the corporate activities and activities of international entities."  OCP's Letter, "OCP S.A. Section III Questionnaire Response," dated Sept. 17, 2020, C.R. No. 39, P.R. No. 130 ("OCP IQR"), Appendix GEN-8(j), C.R. No. 43, P.R. No. 133 at 15.  OCP also reported

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

revenues associated with the "HQ/Support" segment.  *Id.*  By definition, this means the HQ or "head office" segment is not equivalent to, and should not be conflated with, SG&A.  The Court accepted OCP's misleading description of these costs as "SG&A," and then instructed Commerce to change its approach on the basis of this finding.

*Second*, even if OCP's HQ/Support segment was properly characterized as SG&A – which it was not – the Court's statement that Commerce had "excluded the entire amount of OCP's reported SG&A expenses from the COP buildup" and that this alleged exclusion was "an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock," *Remand Order* at 17 (emphasis in the original), is contrary to the record evidence.  In actuality, in the investigation, Commerce included more than MAD [          ] in "site indirect costs" for OCP's Gantour and Khouribga mines in the cost buildup.  OCP's Letter, "Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Supplemental Questionnaire Response Part Three," dated Nov. 6, 2020, C.R. No. 232, P.R. No. 354 ("OCP 11/6/20 Inv. SQR"), Exhibit MIN2-3.  These site-specific indirect costs cover the same categories of operating expenses (*e.g.*, purchases consumed, local taxes, personnel expenses) that OCP characterized as SG&A in its proposed allocation of HQ/Support and Debt costs.[1]  Therefore, if these categories of expenses recorded under OCP's HQ/Support segment are properly considered SG&A, then the same categories of OCP's site-specific indirect expenses must necessarily be as well.

Thus, the Court's statement that "the Department's exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable" is based on a false premise and not supported by the

---

[1] Specifically, OCP reported that these costs primarily concern "{p}urchases of services (e.g., facility management){;} {e}xternal costs (e.g., telecom, consulting, insurance, etc.){;} {p}ersonnel costs (e.g., salaries, overtime, bonuses of the workers providing the indirect services) {; and} {a}mortization of site-specific costs that are not directly allocated to one of the rock (*e.g.*, amortization for administrative building of the site)."  OCP's Letter, "Phosphate Fertilizers from the Kingdom of Morocco: Response to Questionnaire in Lieu of On-Site Verification," dated Dec. 30, 2020, C.R. No. 289, P.R. No. 436 ("OCP 12/30/20 ILOV QR") at 38.

record evidence.  Consequently, it would have been reasonable for Commerce to continue

excluding all of OCP's reported HQ/Support and Debt expenses in its Remand Redetermination,

because Commerce already has accounted for OCP's site-specific SG&A expenses that have a

documented connection to its phosphate mining and beneficiation in the cost buildup.

> **2.     Commerce's Remand Determination Fails to Fulfill Commerce's Statutory Obligation to Calculate the Benefit to OCP as Accurately as Possible**

As noted above, the CVD law requires Commerce to calculate the amount of the benefit

that respondents receive from unfair subsidies as accurately as possible.  *See Içdaş Celik Enerji*

*Tersane ve Ulasim Sanayi, A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (Ct. Int'l Trade

2021) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  In

this case, Commerce compared its cost buildup to a benchmark of phosphate rock prices charged

by other international producers of phosphate rock.  Accordingly, in order to ensure an accurate

subsidy calculation, Commerce must limit the cost buildup only to those costs that have a

demonstrated relationship to the production of phosphate rock.  Commerce should also require

respondents to document any costs they seek to include in the buildup, and to segregate and omit

irrelevant costs, because respondents have an obvious incentive to inflate their reported costs,

and thereby reduce the calculated rate for their mining rights subsidies.  However, Commerce

failed to do so in this case, resulting in a distorted and unlawful subsidy calculation.

In the antidumping context (where reporting of costs is more common), Congress

expressed concern about the potential for respondents to distort Commerce's calculations by

proposing cost allocation methodologies that they do not use in the normal course of business.

For example, the Senate Report for the Uruguay Round Agreements Act ("URAA") states that:

> in determining whether a producer's . . . records reasonably reflect
> the costs *associated with the production and sale of the product in*
> *question* {Commerce should} examine  the  recorded  production

> costs with a view to determining *as closely as possible* the costs that most accurately reflect *the resources actually used in the production of the merchandise in question*.   Particularly where allocation methodologies are used, the Committee expects Commerce to accept only those methodologies used by the exporter or producer in question in the normal course of its business . . . *Commerce should not, in any event, accept allocation methodologies that distort real costs*."

S. Rep. 103-412, 103d Cong., 2d Sess., at 75 (Nov. 22, 1994) (emphasis added).  In the Remand

Determination, this is precisely what Commerce did.  Commerce uncritically accepted OCP's

allocation methodology, which OCP does not use in the normal course of its business, *see* OCP

11/6/20 Inv. SQR at 8, Exhibit MIN2-7, and which resulted in the inclusion of [

   ] of costs wholly unrelated to phosphate mining and rock production, significantly

distorting Commerce's CVD rate calculation.

   The Statement of Administration Action for the URAA similarly states that if Commerce

"determines that costs, including financing costs, have been shifted away from production of the

subject merchandise, or the foreign like product, it will adjust costs appropriately, to ensure they

are not artificially reduced."  Statement of Administrative Action Accompanying H.R. 5110,

H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ("SAA") at 835.  This statement reflects

the fact that in the context of antidumping determinations, a respondent has an incentive to

minimize its reported costs, lest it be found to be selling below the cost of production.  But the

sentiment behind this statement of Congressional intent applies equally in CVD cases in the

opposite direction:  if a respondent in a countervailing duty investigation seeks to shift costs

toward the production of the subject merchandise in order to artificially increase its costs, and

thus reduce the benefit it receives from a countervailable subsidy, it is incumbent upon

Commerce to take action to disregard non-production-related costs or adjust the costs

appropriately.  Commerce appropriately did so in the Final Determination, before it reversed

itself in the Remand Determination and chose to do nothing to address the distortions that OCP's

allocation methodology caused.

As far as Mosaic is aware, this is the first time *ever* that Commerce has agreed to include

corporate-wide expenses unrelated to the good or service provided for LTAR in a tier three cost

buildup. The fact that Commerce has done so in spite of its explicit finding in the investigation

that it did not "have sufficient information on how each of these line items contributed to OCP's

mining operations and how these costs are relevant to the pricing of phosphate rock" makes its

decision even more unreasonable and prone to inaccuracy. IDM at 24. OCP is the entity that

possesses the documentation Commerce needed to make these findings, and it was OCP who

decided to include irrelevant expenses in its reported costs, and to submit minimal

documentation in support of its allocations, as discussed more fully below and in Mosaic's

response brief. *See* Mosaic Response Br. at 47-55.

If the Court affirms Commerce's Remand Determination on this issue, it will open a

gaping loophole in the CVD law that OCP and other subsidized foreign companies will use to

frustrate the law's purpose, and that will cause serious harm to Mosaic and other domestic

companies that compete with injurious, subsidized foreign imports.

### 3.   For the Vast Majority of Its So-Called HQ/Support and Debt Costs, OCP Failed to Establish Any Connection with Phosphate Rock Mining and Beneficiation

As discussed above, Commerce's goal in constructing the cost-buildup was to determine

the "actual per-unit cost buildup of OCP's beneficiated phosphate rock." Remand Determination

at 7. Yet the vast majority of OCP's reported HQ/Support and Debt costs lack any documented

connection to phosphate rock mining and beneficiation, and the evidence shows that the

HQ/Support segment contains many types of costs that are extraneous to phosphate rock mining

and beneficiation. Accordingly, even if it were reasonable to account for OCP's HQ/Support and

Debt costs, it was unreasonable and unlawful – and contrary to Commerce's own professed methodology – to include *all* of the HQ/Support and Debt costs in the cost buildup.

In the original investigation, Commerce properly rejected OCP's HQ/Support costs because it found that OCP failed to provide sufficient information showing "how each of these line items" recorded to OCP's "HQ/Support" segment "contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock."  Remand Determination at 15 (citing IDM at 24).  In the Remand Determination, Commerce completely reversed course, stating that "OCP provided documentation '*demonstrating*' {emphasis added} that its SG&A expenses included costs attributable to its phosphate mining operations."  Remand Determination at 18.  In reality, OCP provided documentation supporting approximately [                    ] in expenses related to phosphate mining and rock production, specifically the personnel costs associated with [      ] employment positions, out of OCP's nearly 20,000 employees.[2]  OCP 12/30/20 ILOV QR, Appendix VE-MIN-4 C.R. No. 291, P.R. No. 436.  This amount represents [                        ] of the over [                ] in HQ/Support costs that OCP characterized in its questionnaire responses as corporate-wide "SG&A" and sought to include in the phosphate rock cost buildup.

OCP S.A. is a conglomerate with nearly 40 subsidiaries and affiliates, both in Morocco and internationally.  *See* OCP IQR, Appendix GEN-8(j) at 15.  In investor materials, OCP describes itself as "engaged in a number of non-core projects that are not directly related to its

---

[2] OCP failed to provide salary information for the [      ] positions associated with phosphate rock mining, which account for just [        ] of its employees; however, the costs associated with these positions can be estimated as a percentage of OCP's overall personnel costs.  OCP reported that it had 19,865 employees in 2019, and MAD 9.213 billion in personnel expenses.  OCP IQR, Appendix GEN-8(j), at 23.  Therefore, each employee accounts for approximately [              ] in HQ/Support costs.  Further, [    ] of the descriptions suggest that the positions are not mining-site specific.  The related personnel costs for these [      ] positions should be allocated across all four of OCP's mining and chemical production sites.  Therefore, the [      ] positions that OCP has documented account for no more than [              ] in HQ/Support costs that could potentially be included in the cost buildup.

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

phosphates activities." OCP IQR, Appendix BONDPURCH-1 at 23. These include "initiatives to improve education (including higher education programmes) and research and development initiatives, reduce poverty, improve access to healthcare services, increase youth employability, foster agricultural development, promote socio-cultural activities and preserve Moroccan heritage through the OCP Foundation." *Id.* OCP records costs and revenues associated with these "non-core" activities to its "HQ/Support" or "headquarters" segment. *See* OCP IQR, Appendix GEN-8(j) at 15. OCP's public financial statements – which OCP prepared in the ordinary course of business, unlike its questionnaire responses – do not describe the HQ/Support segment as "SG&A," or suggest that they relate to phosphate mining or rock production. Rather, the financials describe OCP's HQ or "head office" segment as "host[ing] the corporate activities and activities of international entities," including its nearly 40 subsidiaries and affiliates. *See id*.

OCP claims that HQ/Support costs primarily concern four categories of costs: purchases of services, external costs (e.g., telecom, consulting, bank fees, and insurance), personnel costs, and amortization of equipment. However, the only HQ/Support costs that OCP has even attempted to relate to phosphate mining and rock production are the personnel costs associated with the [      ] employment positions discussed above. OCP has failed to explain or document how any of the other costs incurred by its HQ/Support segment in these four categories relate to the production or pricing of phosphate rock. Such an explanation and supporting evidence is necessary because the cost buildup already properly accounted for these four categories of costs.

[


]. *Compare* OCP 12/30/20

ILOV QR at 6, *with* OCP 12/30/20 ILOV QR at 7.

**NON-CONFIDENTIAL VERSION**

Furthermore, the record contains many examples of expenses that are wholly unrelated to any production activities, as the Government noted in its own response brief.  *See* Def. Response Br. at 58.  For example, OCP's HQ/Support segment recorded [                    ] in [

               ].  OCP 12/30/20 ILOV QR at 18.  It also reported [                    ] in [

               ].  *Id*. at 29.  OCP reported that two of the largest payments in the [                    ] category were to [

          ] and [                    ].  *Id.* at 29-30.

It is unreasonable to include such expenditures in the pool of HQ/Support expenses allocated to OCP's phosphate mining and rock production.  This is so not only because they have no relationship to the production of phosphate rock, but also because there is no evidence on the record that the benchmark prices that Commerce used to calculate the benefit from this program reflect such costs.  Since every extraneous dirham that Commerce includes in the cost buildup directly reduces the benefit from the mining rights program, Commerce's statutory obligation to calculate OCP's subsidy rates as accurately as possible requires Commerce to ensure it does not include such extraneous costs.

OCP's HQ/Support costs also appear to include costs associated with [

     ].  As Mosaic explained in its comments on Commerce's Draft Remand, [

                    ].  *See* OCP IQR, Appendices GEN-4(b)

(iii), C.R. No. No. 41, P.R. No. 134 at 101, GEN-4(c)(iii), C.R. No. 42, P.R. No. at 101, GEN-4(d)(iii), C.R. No. 43, P.R. No. 133 at 101-02, GEN-4(e)(iii), C.R. No. 43, P.R. No. 133 at

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

101, and GEN-4(f)(iii), C.R. No. 43, P.R. No. 133 at 101.  [

].  *See*, *e.g.*, OCP IQR, Appendix GEN-4(b)(iii) C.R. No.

No. 41, P.R. No. 134.  In 2019, combined, [

].  *See* Mosaic Comments Draft Remand, Attachment A.

It follows that OCP records equivalent costs and associated revenues under the HQ/Support

segment, and therefore that these costs should not be treated as SG&A and allocated to OCP's

operating sites.

Commerce asserted in the Remand Determination that "{a}n attempt to further segregate

OCP's HQ, Support, and Debt costs in a manner inconsistent with its accounting methodology

would be unreasonable."  However, Commerce provided no reasoning to support this conclusory

assertion.  In reality, it is entirely reasonable to segregate costs related to phosphate rock mining

and beneficiation from those that are not, given the purported aim of the buildup, *i.e.*, to capture

the "relevant production costs associated with producing and pricing the phosphate rock."

Indeed, OCP itself routinely reports operating expenditures and capital expenditures for its "non-

core" activities "that are not directly related to its phosphate activities" in investor materials,

showing that it is able to segregate costs that are unrelated to its phosphate mining and rock

production.  *See* OCP IQR, Appendix CRED-30, C.R. No. 51, P.R. No. 132 at 112-13.

Commerce also stated in the Remand Determination that "{t}he record of the

investigation contains information demonstrating OCP incurred the HQ, Support and Debt costs

in support of its day-to-day operations" and that "Commerce is satisfied with the reliability of

OCP's financial recording system" which "supports the submitted financial statements."

Remand Determination at 18-19.  This is a red herring.  Whether OCP incurred a given cost "in support of its day-to-day operations" or whether the costs can be reconciled to OCP's financial statements are not the relevant criteria for including the cost in the buildup.  To the contrary, the relevant criterion is whether OCP has provided evidence demonstrating that the cost is a "*relevant production cost*{} associated with producing the phosphate rock from the minerals in the ground as well as *the pricing of phosphate rock*."  IDM at 23-24.

In sum, it is arbitrary and unreasonable for Commerce to include the entirety of OCP's purported HQ/Support and Debt costs in the cost buildup without any evidence demonstrating that such expenses contribute to OCP's phosphate mining and rock production.

> **4.    Commerce's Remand Determination Unlawfully Departed from its Practice of Requiring a Demonstrated Connection Between Indirect Costs and Production of the Subject Merchandise**

Commerce's practice is to include indirect costs in a tier three cost buildup only when they have a demonstrated connection with the subsidized production activity.  Indeed, this is the approach that Commerce took in the companion investigation of *Phosphate Fertilizers From the Russian Federation*.  In a decision affirmed by this Court, Commerce stated:

> Under this "Tier Three" approach, we based our benchmark on the value of the underlying good conveyed via mining rights.  As a result of this approach, our benefit analysis *focused on the production costs of phosphate ore extracted and phosphate rock produced* by {the respondent} during the POI from the mining deposit tied to the license in question.

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum, Comment 2 (emphasis added); *The Mosaic Company v. United States*, Consol. Ct. No. 21-00117, Slip Op. 24-04 at 6 (Ct. Int'l Trade Jan. 19, 2024).  Commerce properly found in that case that the inclusion of "expenses *unrelated* to phosphate ore mining and

beneficiation" would "skew the benefit calculation by treating the value of the good conveyed via the {Government of Russia's} mining rights as higher than it otherwise would be without those expenses."  Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum at 39-40 (emphasis added); *see also The Mosaic Company v. United States*, Consol. Ct. No. 21-00117, Slip Op. 23-99 (CIT July 11, 2023); *Phosphate Fertilizers From the Russian Federation*, Final Results of Redetermination Pursuant to Court Remand, Ct. No. 21-00117, ECF No. 128 at 28.  Commerce's decision in that case not to adjust the tier-three buildup for costs unrelated to the respondents' mining of phosphate ore, including selling and administrative expenses, was affirmed by this Court.  *See The Mosaic Company v. United States*, Consol. Ct. No. 21-00117, Slip Op. 24-04 at 6.

By contrast, in this case, Commerce unlawfully included *all* of OCP's HQ/Support and Debt costs in the tier-three cost buildup, including expenses that are unrelated to OCP's phosphate mining and beneficiation.  Such an unexplained departure from agency precedent is, standing alone, unlawful.  *See Pakfood Pub. Co. v. United States*, 453 F. App'x 986, 989 (Fed. Cir. 2011) (citing *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005)).  Moreover, the inclusion of [                    ] dirhams in costs unrelated to phosphate mining and rock production significantly skewed the benefit calculation, as Commerce itself predicted in *Phosphate Fertilizers From the Russian Federation*.  As noted above, there is no record evidence suggesting that the benchmark prices for phosphate rock that Commerce used to measure the benefit from OCP's mining rights subsidies reflect the costs of supporting [                    ] or [                    ], so the inclusion of such expenses in the cost buildup radically distorted and reduced the benefit calculation.

NON-CONFIDENTIAL VERSION

The result was to eliminate almost three-fourths of the benefit from the mining rights program.  *Compare* Commerce Memorandum, "Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Calculations for the Final Determination," dated Feb. 8, 2021 at 2, *with* Commerce Memorandum, "Remand of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco: Draft Remand Redetermination Calculations for OCP S.A.," dated Nov. 21, 2023 at 2.  In the first administrative review of the CVD order, the result was to eliminate the benefit entirely – as though OCP did not receive *any benefit at all* from receiving the main raw material that it uses to produce the subject merchandise effectively for free.  IDM, Comment 4.  This outcome is patently unreasonable, particularly in light of Commerce's explicit finding in the original investigation that it did not "have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock."  IDM at 24.

Commerce cited two cases in the Remand Determination in support of its decision to include OCP's HQ/Support costs in the cost buildup:  *Hot-Rolled Steel From India* and *Softwood Lumber From Canada*.  Commerce asserted that these cases are examples where Commerce has included indirect expenses in a tier-three cost buildup.  Remand Determination at 18.  However, neither case involved corporate-wide expenses that were unrelated to the production of subject merchandise and unrelated to exploitation of the rights at issue.  In fact, these cases confirm Mosaic's argument that Commerce's practice is to include indirect costs in a tier three cost buildup only when they have a demonstrated connection with production of the subject merchandise.

In *Hot-Rolled Steel From India*, Commerce included in the tier-three cost buildup for coal mining rights "*operational mining costs . . .* which consisted of materials, labor,

depreciation, overhead, and royalties." *See Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578, 1,591-92 (Jan. 9, 2008) (emphasis added). However, Commerce did not include an allocation of headquarters-level SG&A costs with no documented connection to the respondent's mining operations in the buildup. Here, Commerce had already included in the cost buildup approximately MAD [          ] in "site indirect costs" for OCP's Gantour and Khouribga mines, separate and apart from the HQ/Support and Debt costs. OCP 11/6/20 Inv. SQR, Exhibit MIN2-3. These mining site-specific indirect costs include similar categories as the indirect costs that Commerce described in *Hot-Rolled Steel From India*, *i.e.*, purchases consumed, local taxes, depreciation, and personnel expenses.[3] Thus, *Hot-Rolled Steel From India* does not support Commerce's decision to include – in addition to the mining site-specific indirect costs – HQ/Support and Debt costs that have no documented connection to OCP's phosphate mining or rock production. To the contrary, *Hot-Rolled Steel From India* supports the approach that Commerce originally took in the Final Determination.

Similarly, Commerce's decisions in *Softwood Lumber From Canada* do not support the inclusion of HQ/Support and Debt costs with no connection to phosphate mining or rock production in the cost buildup. In *Softwood Lumber*, Commerce has made adjustments to the tier-three benchmark for stumpage rights to account for indirect and G&A costs that the respondents "*must* take into account . . . to access and harvest Crown timber." *See Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg.

---

[3] As explained in Section A(1), OCP reported that these costs primarily concern "{p}urchases of services (e.g., facility management){;} {e}xternal costs (e.g., telecom, consulting, insurance, etc.){;} {p}ersonnel costs (e.g., salaries, overtime, bonuses of the workers providing the indirect services) {; and} {a}mortization of site-specific costs that are not directly allocated to one of the rock (*e.g.*, amortization for administrative building of the site)." OCP 12/30/20 ILOV QR at 38.

51,814 (Dep't Commerce Nov. 8, 2017), and accompanying Issues and Decision Memorandum,

Comment 24.  Commerce explained in the 2017 investigation that it "examined these costs at

verification and found that the reported costs were tied to either the respondents' tenure

obligations or to expenses relating to accessing, harvesting, or hauling timber to the mills."  *Id.*

By contrast, Commerce has repeatedly rejected the Canadian respondents' arguments for

adjustments to the tier-three benchmark to account for SG&A or other costs that the Canadian

respondents were *not* legally obligated to incur as a condition for accessing Crown timber, or

that were unrelated to accessing and harvesting timber.  *See, e.g.*, *Certain Softwood Lumber*

*Products From Canada: Final Results of the Countervailing Duty Administrative Review,*

*2017-2018*, 85 Fed. Reg. 77,163 (Dep't Commerce Dec. 1, 2020), and accompanying Issues and

Decision Memorandum, Comment 23.

 Thus, like *Hot-Rolled Steel From India, Softwood Lumber From Canada* supports the

approach that Commerce took in the Final Determination, not the approach that it took in the

Remand Determination.  Indeed – together with *Phosphate Fertilizers From the Russian*

*Federation* – these cases demonstrate that Commerce has an established practice of only

including indirect costs in a tier three cost buildup when they have a demonstrated connection

with the production of the subject merchandise.

 In its comments on Commerce's draft remand determination, Mosaic pointed out

numerous flaws in OCP's reporting of its HQ/Support and Debt costs, and in its allocation

methodology, including that the methodology "arbitrarily inflates the cost buildup and ignores

that its HQ, Support and Debt Costs include costs for its own operations and subsidiaries."

Remand Determination at 21.  Commerce did not dispute these points in the Remand

Determination.  *See id.*  Indeed, the Government had previously made the same points in its own

response brief.  *See, e.g.*, Def. Response Br. at 58-59.  However, instead of addressing these

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

obvious flaws in OCP's methodology in the Final Determination, Commerce acted as though its

hands were tied and that it had no choice but to accept OCP's HQ/Support and Debt costs in their

entirety, even if it resulted in distortions to its subsidy calculation.  *See* Remand Determination at

21-22 (citing the Court's views on the feasibility of segregating OCP's costs); *id.* at 23 (stating

that it did not have time to assess Mosaic's alternative allocation methodology).  This was

unreasonable and unlawful.

By proceeding in this manner – and thus uncritically accepting the distortions that OCP's

methodological choices have introduced into Commerce's benefit calculation – Commerce has

abdicated its responsibility under the statute to accurately calculate the full amount of the

subsidies that OCP received during the POI.  It has also provided a roadmap for future

respondents to manipulate Commerce's CVD calculations.  If a respondent wants to reduce or

eliminate the benefit that Commerce finds for a mining rights subsidy program, all it needs to do

is spend sufficient money on extraneous activities – such as **[                    ]**, **[**

               **]**, the **[                                        ]**, or some similar activity – and the

benefit will automatically decrease and potentially disappear.  As noted above, this is precisely

what happened in the first administrative review.  A respondent – and particularly a state-owned

respondent such as OCP that has unlimited access to subsidized phosphate ore for decades to

come – may well conclude that the expenses are worth incurring if they enable it to continue

exporting massive quantities of subsidized merchandise to the U.S. market without

countervailing duties.

**B.     Commerce's Failure to Address Mosaic's Arguments Regarding Alternative
Allocation Methodologies for OCP's HQ/Support and Debt Costs Is
Unreasonable, Unsupported by Substantial Evidence, and Unlawful**

On remand, Commerce adopted OCP's proposed allocation methodology without any

additional assessment or adjustment.  Mosaic explained in its comments on Commerce's Draft

NON-CONFIDENTIAL VERSION

Remand why OCP's proposed allocation methodology is unreasonable, and Mosaic proposed

alternative allocation methodologies to address OCP's attempt to launder costs unrelated to

phosphate rock mining or chemical production into the phosphate rock cost buildup.  Mosaic

Draft Remand Comments.  However, Commerce failed to address Mosaic's arguments and

proposed alternative allocation methodologies, stating that it did not have sufficient time to do

so, despite having requested and received a 30-day extension of time from the Court to finalize

the Remand Determination.  Remand Determination at 23.  Commerce may not excuse

deficiencies in its inquiry simply by stating that there is insufficient time to conduct a thorough

investigation.  *See AG der Dillinger Hüttenwerke v. United States*, 26 C.I.T. 1091, 1098 (2002).

Commerce's unjustified failure to address Mosaic's arguments renders the Remand

Determination unlawful and necessitates a second remand for further consideration.  *See NMB*

*Sing. Ltd.*, 557 F.3d at 1319, 1323.  Further, Commerce's conclusion that "we do not have a

'satisfactory alternative' or record evidence to demonstrate that OCP's allocation methodology is

unreasonable," Remand Determination at 23, is unsupported by the record, as detailed below.

> ### 1.    Commerce Failed to Address Mosaic's Argument that OCP's Proposed Allocation Methodology Arbitrarily Inflated the Cost Buildup

On remand, Mosaic argued that accepting OCP's proposed cost allocation methodology

would arbitrarily inflate the cost buildup, because it results in the inclusion of a wide range of

costs that are unrelated to phosphate rock mining and beneficiation.  *See* Mosaic Draft Remand

Comments at 14-21.  Commerce declined to engage with this argument, and instead merely cited

the Court's statement that OCP had provided documentation "demonstrating" that its SG&A

expenses included costs attributable to its phosphate mining operations.  *See* Remand

Determination at 21.  However, the limited documentation that OCP provided fails to establish

any connection between the vast majority of HQ/Support and Debt costs with phosphate rock

mining and beneficiation.  Accordingly, Commerce failed to provide a reasoned explanation in response to Mosaic's argument, and its determination is therefore unlawful.  *Wind Tower Trade Coalition*, 569 F. Supp. 3d at 1241, 1249 (*citing Altx, Inc.*, 167 F. Supp. 2d at 1374).

As discussed above, OCP is a conglomerate that operates nearly 40 JVs and subsidiaries engaged in business lines ranging from hotel acquisition to agricultural entrepreneurship investment.  OCP's "HQ/Support" segment is its "head office" segment that provides services to, shares facilities with, and incurs costs associated with these non-production activities.  The record contains multiple examples of HQ/Support costs that are used for activities unrelated to phosphate rock mining or chemical production, including evidence that a substantial portion of HQ/Support costs are expended for the benefit of separate legal entities.  *See* Mosaic Draft Remand Comments at 15-16.  It is unreasonable to include costs associated with such activities in the amount of HQ/Support costs to be allocated to OCP's phosphate rock mining business. Additionally, OCP seeks to allocate corporate-wide Debt costs to its mining and chemical sites despite the fact that costs associated with financing capital expenditures at the mining and chemical sites are already recorded at the site level.  *See id*. at 21-25.  On remand, Commerce had an obligation to address these arguments and evidence – which undermine its conclusion that there is no record evidence demonstrating OCP's allocation methodology is unreasonable – but it unlawfully failed to do so.  *Wind Tower Trade Coalition*, 569 F. Supp. 3d at 1241, 1248-49.

### 2. Commerce Failed to Address Mosaic's Argument that OCP's Allocation Methodology for HQ/Support Costs Bears No Causal Relationship with the Incurrence of These Costs

On remand, Mosaic argued that the share of the total direct costs is not an appropriate basis for allocating HQ/Support costs because it bears no relation to how OCP incurred its HQ/Support costs.  Mosaic Draft Remand Comments at 18-19.  As Commerce acknowledged, the direct costs could be "attributed directly to OCP's production activities."  Remand

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

Determination at 8.  However, OCP concedes that the HQ/Support costs are not driven by its

sites' production activities.  According to OCP, its reported HQ/Support costs "relate indirectly

to the general operations of the company *rather than directly to the production process*{.}"  OCP

Case Br. at 33 (Jan. 13, 2021), C.R. No. 301, P.R. No. 450 (emphasis added).  OCP also

described HQ/Support costs as [                                                                      ].  OCP 12/30/20

ILOV QR at 7.  Mosaic argued that Commerce's decision to accept OCP's apportionment of

these costs using a basis that OCP itself acknowledged does not reflect how in incurred these

costs was inconsistent with accounting principles and arbitrary and unreasonable.  *See* Mosaic

Draft Remand Comments at 19.  Commerce failed to address this argument.

   In addition, Mosaic argued that when calculating each site's share of total direct costs,

OCP arbitrarily omitted certain categories of costs, namely [

                              ].  Mosaic Draft Remand Comments at 20; OCP 11/6/20

Inv. SQR, Exhibit MIN2-7.  OCP's self-serving explanation was that these categories of

expenses are booked to each site in the ordinary course.  *See id.*  However, Mosaic argued that

since these costs are also booked to the HQ/Support segment, and therefore are being allocated

across all the sites, this is not a reasoned ground for excluding them from the allocation basis.

Mosaic Draft Remand Comments at 20-21.  The likelier reason OCP excluded these costs is that

its chemical production sites disproportionately incurred these categories of costs.  For example,

[

                              ].  *Id.*  By omitting such

categories of costs, OCP successfully drove down the share of costs assigned to the chemical

production sites, while artificially inflating the share of costs assigned to the phosphate rock

mining sites.  In other words, OCP included these categories of costs in the equation when they

would *increase* the amount of costs assigned to the phosphate rock mining business, and it

excluded them when their inclusion would result in a *decrease* of such costs.  Again, Commerce failed to address these arguments.

Mosaic directed Commerce's attention to these flaws in OCP's proposed allocation methodology in its Comments on the Draft Remand Determination and proposed more reasonable alternatives.  Mosaic Draft Remand Comments at 14-31.  However, in its Remand Determination, Commerce failed to analyze any of Mosaic's arguments, or any of the evidence Mosaic identified of distortions in OCP's HQ/Support cost allocation that "fairly detracts" from Commerce's conclusion that there is no record evidence demonstrating OCP's allocation methodology is unreasonable.  These errors render the Remand Determination unsupported by substantial evidence and therefore unlawful.  *See CS Wind Viet. Co.*, 832 F.3d at 1373-74; *Wind Tower Trade Coalition*, 569 F. Supp. 3d at 1241, 1248-49 (*citing Altx, Inc.*, 167 F. Supp. 2d at 1374).

### 3.    Commerce Failed to Address Mosaic's Arguments Regarding the Allocation of Debt Costs

Mosaic also directed Commerce's attention to the flaws in OCP's proposed Debt allocation in its Comments on the Draft Remand Determination and proposed an alternative allocation methodology for OCP's Debt costs.  Mosaic Draft Remand Comments at 21-25.  For example, Mosaic argued that although OCP provided very little information on what is included in its "net cost of debt," the evidence shows that this category of costs is unrelated to capital expenditures tied to its mining operations.  *See* Mosaic Draft Remand Comments at 21-22.  Mosaic also argued that OCP's calculation of total debt cost arbitrarily excludes relevant short-term interest income and that OCP's allocation basis for debt costs fails to accurately reflect how OCP utilized its financial resources.  *Id.* at 24-25.  Commerce failed to address any of these arguments or the evidence that Mosaic identified showing that OCP's proposed allocation

NON-CONFIDENTIAL VERSION

methodology for Debt costs is unreasonable.  Commerce's failure to do so is an additional reason

that the Remand Determination is unsupported by substantial evidence and therefore unlawful.

*See CS Wind Viet. Co.*, 832 F.3d at 1373; *Wind Tower Trade Coalition*, 569 F. Supp. 3d at 1241,

1248-49 (*citing Altx, Inc.*, 167 F. Supp. 2d at 1374).

In the Remand Determination, Commerce unquestioningly accepted OCP's proposed

allocation of Debt costs on the basis of each of OCP's production sites' share of its total capital

expenditures.  *See* Remand Determination at 9.  Commerce agreed with OCP's proposed

allocation of Debt costs because "OCP notes that financing and debt costs are a routine part of its

mining operations." Remand Determination at 8.  However, Commerce erred in relying on

misleading statements by OCP that are inconsistent with its own accounting records.

In its case brief, OCP stated that its Debt costs "primarily represent interest expenses on

loans it has used to fund capital improvements associated with its mining."  OCP Case Br. at 28.

But OCP's own explanations of its financial accounting clarify that this characterization is

incorrect.  Of the [                              ] that OCP reported as corporate-wide Debt costs, [

].[4]  OCP 12/30/20 ILOV QR at 19 and 24.

OCP also reported that "{i}nterest on loans that are associated with specifically identified

projects is added to the cost of those projects and is not included" [

].  *Id.* at 19.  This is corroborated by

OCP's consolidated financial statement, which reads, "Borrowing costs directly attributable to

the acquisition, construction or production of a 'qualifying asset' are included in the cost of the

asset."  OCP IQR, Appendix GEN-8(j) at 31.  Therefore, the record shows that this category of

---

[4] OCP also included [

].

OCP's corporate-wide Debt costs does not include capital expenditures related to its mining

operations.  Thus, contrary to Commerce's finding on remand, the record evidence demonstrates

that OCP's allocation of corporate-wide Debt costs to its mining operations is unreasonable.

OCP also claimed that "the distribution of the amortization costs" is proof that some of

its corporate-wide Debt costs are "due to purchases of capital equipment for mining activities."

OCP 12/30/20 QLOV at 7-8.  However, OCP did not include **[**

**]**. *Id.*

at 23.  Further, and similar to the **[** **]**, OCP's amortization costs

related to infrastructure and other capital expenditures are recorded at the site-level and, thus,

already included in cost buildup.  *See* OCP 11/6/20 Inv. SQR at 2.  Mosaic also explained in its

Comments on the Draft Remand Determination that OCP arbitrarily **[**

**]** from its calculation of corporate-wide Debt for

purposes of the allocation, which artificially inflated the total amount of Debt to be allocated.

*See* Mosaic Draft Remand Comments at 30-31.  However, Commerce unlawfully failed to

address these arguments and evidence, which further detracts from Commerce's conclusion that

there is no "record evidence to demonstrate that OCP's allocation methodology is unreasonable."

Remand Determination at 23.

For all these reasons, the Court should hold the Remand Determination unlawful and

remand to Commerce a second time to reconsider the treatment of OCP's HQ/Support and Debt

costs.

> **C.      Commerce's Decision to Continue Using Profit Before Tax as the Numerator
> of OCP's Profit Ratio is Reasonable, Supported by Substantial Evidence, and
> Otherwise in Accordance with Law**

In the *Remand Order*, the Court directed Commerce to "address the claimed

'inconsistency' between {Commerce's} apparent inclusion of SG&A expenses in the operating

expense figure used in the denominator of the profit rate calculation, and exclusion of the same from the COP buildup" and to provide further explanation of the reasonableness of its profit rate calculation methodology. *Remand Order* at 32-36. Specifically, the Court instructed Commerce to explain the reasonableness of using OCP's "Income Before Taxes" as the numerator of profit ratio and "Operating Expenses" in the denominator in light of the fact that Commerce's past practice has been to use "Profit Before Tax" in the numerator and COGS in the denominator and OCP's argument that "Operating Income" would provide a more "apples-to-apples" comparison to "Operating Expenses." *Id.* at 35-36.

On remand, Commerce modified its profit ratio methodology by changing the denominator from "Operating Expenses" to "Costs at the Level of Income Before Tax," without changing the numerator of "Income Before Taxes." Remand Determination at 9-10. Commerce calculated OCP's "Costs at the Level of Income Before Tax" by subtracting OCP's "Income Before Taxes" from its reported "Operating Revenue." *See* Final Remand Calculations at 2. Commerce explained that this change resolves the apparent inconsistency with the phosphate rock cost buildup, as "Costs at the Level of Income Before Tax" includes OCP's HQ/Support and debt costs, and it is also results in a valid, "apples-to-apples" comparison between the numerator and the denominator. *See id.*

Commerce's revised profit rate methodology is reasonable and supported by the record evidence. Commerce adequately addressed the Court's concerns regarding the claimed "inconsistency" between the profit rate calculation and the phosphate rock cost buildup, as both now account for OCP's HQ/Support and Debt costs, and the mismatch between the numerator, "Income Before Tax," and the previous denominator, "Operating Expenses." Commerce's revised profit ratio methodology is also consistent with its prior practice of using Profit Before Tax as the numerator in profit rate calculations. As Commerce explained in *Phosphate*

*Fertilizers From the Russian Federation*, using Profit Before Tax as the numerator of the profit rate calculation is consistent with the aim of its tier-three benchmark methodology, which is to isolate costs for phosphate ore mining and beneficiation activities.  *See* Phosphate Fertilizers from the Russian Federation, Final Results of Redetermination Pursuant to Court Remand, Ct. No. 21-00117, ECF No. 128, at 18; *The Mosaic Company v. United States*, Consol. Ct. No. 21-00117, Slip Op. 23-99 (CIT July 11, 2023).

Accordingly, Commerce's revised profit rate calculation is reasonable, supported by substantial evidence, and otherwise in accordance with law, and should be affirmed by this Court.

> **D.**     **Commerce's Determination that the Reduction in Tax Fines and Penalties Program is *De Facto* Specific is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law**

In the underlying investigation, Commerce found the Reduction in Tax Fines and Penalties program to be *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the record showed that the actual subsidy recipients during the POI were limited in number on an enterprise basis.  In the *Remand Order*, this Court found that all Moroccan taxpayers are eligible to apply for relief of tax fines and penalties under this program, and that the record evidence does not show this program is anything other than "a common, ordinary tax administration program" with "widespread availability" and a large number of users.  *Remand Order* at 61-63.  The Court therefore instructed Commerce to reconsider its *de facto* specificity finding for this program.

On remand, Commerce found that there continues to be sufficient record evidence to find that this program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because the actual subsidy recipients are limited in number.  Draft Remand Results at 10.  Commerce found further that the record evidence demonstrates that this program is also *de facto* specific under section 771(5A)(D)(iii)(III) of the Act, because OCP received a disproportionately large amount

of the subsidy during the POI.  Remand Determination at 28.  In doing so, Commerce reasonably

analyzed the record evidence of the amount of benefits received by OCP and the average amount

received by other companies during the POI.  *See id.*

The record of this proceeding does not contain information on the amount of benefits that

the GOM provided to individual companies other than OCP and its cross-owned affiliates under

this program.  Commerce therefore reasonably assessed whether OCP received a

disproportionate amount of the subsidy by comparing the average amount of reductions in tax

fines and penalties provided to taxpayers in Morocco during the POI to the actual amount of

benefits provided to OCP.  Commerce has taken this simple averaging approach in many other

cases.  *See, e.g.*, *Certain Pasta from Italy: Preliminary Results and Partial Recission of*

*Countervailing Duty Administrative Review; 2021*, 88 Fed. Reg. 45,886 (Dep't Commerce July

18, 2023), and accompanying Preliminary Decision Memorandum at 8-10.

As Commerce correctly found, the record shows that OCP received a total amount of

[                               ] in reductions in tax fines and penalties during the POI, an amount that is

82.87 times higher than the average amount received by other companies ([                   ]).

*See* Remand Determination at 28 (citing GOM's Letter, "Phosphate Fertilizers from the

Kingdom of Morocco: Supplemental Questionnaire Response of the Government of the

Kingdom of Morocco – Part 2," dated Nov. 11, 2020 at S-IX-11-13).  The fact that the benefit

that OCP received is over eighty times larger than the typical benefit amount is strong evidence

of disproportionality.  *See, e.g.*, *Alloy Magnesium from Canada: Final Results of Countervailing*

*Duty New Shipper Review*, 68 Fed. Reg. 22,359 (Dep't Commerce Apr. 28, 2003), and

accompanying Issues and Decision Memorandum at 14-15 (finding disproportionality where a

respondent's grant was over 90 times larger than the typical grant amount).

Commerce also properly rejected OCP's and the GOM's arguments about "widespread

**NON-CONFIDENTIAL VERSION**

availability" of the subsidy.  Remand Determination at 12.  As Commerce correctly noted, the SAA states that the specificity test is intended to serve "as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely *used* throughout an economy."  *Id.* (citing SAA at 929).  Commerce evaluates whether a subsidy program is "broadly available" pursuant to the analysis of *de jure* specificity.  A subsidy program may be broadly available throughout an economy, and thus not *de jure* specific, but be *used* disproportionately by an enterprise or group of enterprises, and therefore *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act.  *Id.*

Accordingly, Commerce's *de facto* specificity determination is reasonable, supported by substantial evidence, and otherwise in accordance with law, and should be affirmed by this Court.

## IV.    **CONCLUSION**

Mosaic respectfully requests that the Court hold that Commerce's decision to adopt OCP's allocation of HQ/Support and Debt costs is unsupported by substantial evidence and otherwise not in accordance with law and remand for further consideration of this issue, consistent with the Court's opinion.  Commerce's decision to continue using OCP's Profit Before Tax as the numerator of OCP's profit ratio and its *de facto* specificity finding related to the Reduction in Tax Fines and Penalties program are reasonable, supported by substantial evidence, and otherwise in accordance with law and should be affirmed by the Court.

**NON-CONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: February 12, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that foregoing submission complies with the Court's word limitation requirement.  The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 9,625 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney

The Mosaic Company
(Representative Of)

February 12, 2024
(Date)