Consol. Ct. No. 21-00116                     **NON-CONFIDENTIAL VERSION**

### UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE MOSAIC COMPANY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Before: Timothy C. Stanceu, Judge** |
| ) | |
| UNITED STATES, ) | **Consol. Case No. 21-00116** |
| ) | |
| Defendant, ) | **NON-CONFIDENTIAL VERSION** |
| ) | |
| ) | |
| and ) | |
| ) | |
| OCP S.A., et al., ) | **Business Proprietary Information** |
| ) | **Removed from pages 10–13, 20–21** |
| Defendant-Intervenors.) | |
| ) | |

### CONSOLIDATED PLAINTIFF AND DEFENDANT-INTERVENOR OCP S.A.'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO COURT REMAND

William R. Isasi
Cynthia C. Galvez
Wanyu Zhang
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001-4956

Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405

*Counsel to OCP S.A.*

Dated: February 12, 2024

**NON-CONFIDENTIAL VERSION**

## <u>TABLE OF CONTENTS</u>

I.      Introduction ................................................................................................ 1

II.     Case Background .......................................................................................... 1

III.    Summary of the Argument ........................................................................... 4

IV.     The Court Should Affirm Commerce's Allocation of HQ, Support, and Debt
        Costs ............................................................................................................ 6

        A.      Commerce Fully Complied with the Court's Order to Allocate OCP's HQ,
                Support, and Debt Costs ................................................................... 6

        B.      Commerce Correctly Rejected Mosaic's Alternative Methodologies for
                Allocating HQ, Support, and Debt ..................................................... 9

V.      Commerce's Use of a Profit Rate which Includes Profits for Goods In Addition to
        Phosphate Rock Violates the Law ............................................................... 13

VI.     Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and
        Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record
        Evidence ...................................................................................................... 16

        A.      Commerce's Determination That OCP Received a Disproportionately
                Large Amount of Reductions When Compared to the Simple Average
                Amount of Reductions Received by Other Companies is Contrary to Law
                and Not Supported by Substantial Evidence ..................................... 17

        B.      Commerce's Determination That OCP Received a Disproportionately
                Large Amount of Reductions Based on its Ranking as 10th Largest
                Recipient is Not Supported by Substantial Evidence and Contrary to Law ........ 22

        C.      Commerce's Determination That OCP Received a Disproportionately
                Large Amount of Reductions Based on the Purported Fact That It Was the
                Only Entity Producing the Good That Can Be Imported is Contrary to Law
                and Not Supported by Substantial Evidence ..................................... 23

VII.    Conclusion .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
 192 F.3d 1367 (Fed. Cir. 1999) ................................................................19

*Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*,
 651 F. Supp. 3d 1348 (CIT 2023) .............................................................24

*Royal Thai Gov't v. United States*,
 436 F.3d 1330 (Fed. Cir. 2006) ................................................................19

*SolarWorld Ams., Inc. v. United States*,
 910 F.3d 1216 (Fed. Cir. 2018) ........................................................ 21–22

**Statutes**

19 U.S.C. § 1677 .................................................................................... *passim*

**Administrative Materials**

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative
 Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007) ...........................20

*Dynamic Random Access Memory Semiconductors From the Republic of Korea:
 Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg.
 2336 (Jan. 13, 2011) .................................................................................20

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70
 Fed. Reg. 12,186 (Mar. 11, 2005) ............................................................20

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round
 Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994
 U.S.C.C.A.N. 4040 ...................................................................................19

## I.      Introduction

On behalf of OCP S.A. ("OCP"), we respectfully submit the below comments on the

Final Results of Redetermination Pursuant to Court Remand ("Final Redetermination") issued by

the U.S. Department of Commerce ("Commerce") pursuant to the Court's remand order in *The*

*Mosaic Company v. United States, OCP S.A.*, Consol. Court No. 21-00116, Slip Op. 23-134 (CIT

Sept. 14, 2023) ("Remand Opinion").  While Commerce's Final Redetermination corrects certain

of the errors contained in the original Final Determination, as detailed below, significant flaws

persist.  Commerce complied with the Court's remand order to allocate a portion of OCP's HQ,

support, and debt costs to the cost of production ("COP") buildup for phosphate rock.  However,

two key elements of Commerce's Final Redetermination remain unlawful and unsupported by

substantial evidence:  both the calculation of OCP's profit rate for the constructed government

price for phosphate rock and the determination that the Government of Morocco's ("GOM")

reductions in tax fines and penalties are *de facto* specific.  Accordingly, OCP respectfully

requests that the Court sustain Commerce's Final Redetermination in part and remand it in part.

## II.     Case Background

This action arises out of Commerce's final determination in *Phosphate Fertilizers from*

*the Kingdom of Morocco: Final Affirmative CVD Determination*, 86 Fed. Reg. 9482 (Feb. 16,

2021) ("Final Determination") (P.R. 480), and accompanying IDM ("IDM") (P.R. 473).[1]  On

October 15, 2021, both OCP and The Mosaic Company ("Mosaic") submitted briefs challenging

---

[1] In these comments, documents contained in the public and confidential records of the
Investigation are identified by "P.R." and "C.R.," respectively, followed by the number assigned
to the relevant document in the administrative record index filed with the Court on June 8, 2021.
Documents on the public and confidential record of the remand proceeding are identified by
"P.R.R." and "C.R.R.," respectively, followed by the number assigned to the relevant document
in the administrative record index filed with the Court on January 26, 2024.

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

multiple aspects of Commerce's Final Determination and moving for judgment on the agency

record pursuant to USCIT Rule 56.2. *See generally* OCP S.A.'s Mem. in Supp. of R. 56.2 Mot.

for J. Upon the Agency Record (Oct. 15, 2021), ECF No. 53; The Mosaic Company's Mem. in

Supp. of R. 56.2 Mot. for J. Upon the Agency Record (Oct. 15, 2021), ECF No. 52. OCP's Rule

56.2 motion challenged, *inter alia*, three aspects of Commerce's Final Determination:

(1) Commerce's decision to exclude all of OCP's HQ, support, and debt costs from OCP's COP

buildup in calculating a benefit for the Mining Rights for less than adequate remuneration

("LTAR") program; (2) Commerce's calculation of a profit rate for phosphate rock under the

Mining Rights for LTAR program; and (3) Commerce's determination that the reductions in tax

fines and penalties are *de facto* specific.

On September 14, 2023, the Court ruled on both OCP's and Mosaic's motions for

judgment on the agency record in the Remand Opinion.  The Court denied Mosaic's motion in

full and granted OCP's motion in part, remanding three issues back to Commerce.  The Court

ruled that Commerce's decision to exclude all of OCP's HQ, support and debt costs were "*per se*

unreasonable" in light of the record evidence demonstrating that these costs supported OCP's

phosphate rock production activities.  *See* Remand Opinion at 26.  The Court remanded,

instructing Commerce on remand to "either {} accept OCP's SG&A cost allocation method or {}

show that it is unreasonable in light of a satisfactory alternative methodology it would use

instead." *Id.* at 28.

The Court also remanded based on OCP's argument that the Department's profit rate

calculation methodology was flawed, ordering Commerce to "reconsider its method of

determining a profit rate and explain why any method it chooses is reasonable when considered

in light of the record evidence." *Id.* at 37.  With respect to Commerce's finding that the

reductions in tax fines and penalties were *de facto* specific, the Court agreed with OCP that Commerce distorted its specificity analysis by making this program seem more "limited" than it was and ordered Commerce to reconsider its finding. *Id.* at 56, 66.

On November 21, 2023, Commerce issued its Draft Results of Redetermination Pursuant to Court Remand ("Draft Redetermination"). *See generally* Draft Redetermination (Nov. 21, 2023) (P.R.R. 1). In its Draft Redetermination, Commerce allocated a portion of OCP's HQ, support, and debt costs to the COP buildup consistent with the Court's Remand Opinion. In addition, Commerce revised the denominator used in its calculation of a profit rate for the constructed government price for phosphate rock. It also continued to find the reductions in tax fines and penalties *de facto* specific, but shifted from basing its determination on recipients being "limited in number" to basing it on OCP purportedly receiving "a disproportionately large amount of the subsidy." *Id.* at 12–14 (P.R.R. 1).

On November 30, 2023, both OCP and Mosaic submitted comments to Commerce pertaining to the Draft Redetermination. *See generally* OCP's Comments on Draft Results of Redetermination Pursuant to Court Remand (Nov. 30, 2023) ("OCP Remand Comments") (P.R.R. 9; C.R.R. 4); Comments on Draft Remand Redetermination (Nov. 30, 2023) ("Mosaic Remand Comments") (P.R.R. 8; C.R.R. 3). On January 12, 2024, Commerce issued its Final Redetermination. *See generally* Final Redetermination (Jan. 12, 2024) at 30–31, ECF No. 115. Commerce's Final Redetermination left unchanged the determinations announced in the Draft Redetermination but, for the first time, included a discussion of the economic diversification of the Moroccan economy in the *de facto* specificity analysis for reductions in tax fines and penalties. Final Redetermination at 30–31. OCP now submits these comments on Commerce's Final Redetermination to the Court.

NON-CONFIDENTIAL VERSION

### III.     Summary of the Argument

In this CVD proceeding, Commerce measures the adequacy of remuneration for OCP's

mining rights based on a constructed government price for phosphate rock that includes OCP's

COP buildup for phosphate rock and an amount for profit.  Confirming that it was appropriate to

include a portion of OCP's HQ, support and debt costs in this constructed government price, the

Court instructed Commerce to accept OCP's allocation methodology for these costs or "show

that it is unreasonable in light of a satisfactory alternative methodology it would use instead."

Remand Opinion at 28.  In the Final Redetermination, Commerce correctly complied with the

Court's order by adopting OCP's method of allocating its HQ, support, and debt costs.

*First*, Commerce explained that it was reasonable to allocate these indirect costs because

they support OCP's phosphate rock production and cannot be segregated into costs related and

unrelated to phosphate rock.  *Second*, Commerce explained that OCP's method of allocating

these costs was reasonable and supported this conclusion with record evidence.  *Third*, and

consistent with this Court's Remand Opinion, Commerce correctly rejected Mosaic's arguments

against Commerce's proposed allocation of these costs.  *Fourth*, Commerce properly declined to

adopt Mosaic's alternative methods for allocating these costs because Mosaic's proposals were

contrary to the record evidence.  Accordingly, with respect to allocating HQ, support, and debt

costs, the Final Redetermination complies with the Court's order and should be affirmed.

With respect to the profit rate included in the constructed government price for phosphate

rock, the Court remanded Commerce's determination for the agency to "reconsider its method of

determining a profit rate and explain why any method it chooses is reasonable when considered

in light of the record evidence."  *Id.* at 37.  Commerce has now addressed the internal

inconsistency between the numerator and denominator of its profit rate calculation.  *See* Final

**NON-CONFIDENTIAL VERSION**

Redetermination at 9.  However, Commerce's calculation of a profit rate for phosphate rock

violates 19 U.S.C. § 1677(5)(E), which requires that, in determining whether a good was

provided for LTAR, Commerce evaluate the adequacy of remuneration "in relation to prevailing

market conditions *for the good or service being provided*."  19 U.S.C. § 1677(5)(E) (emphasis

added).  Commerce violated this requirement by selecting a company-wide profit rate for OCP

that includes profits earned on the production and sale of multiple products in addition to

phosphate rock, even though the record contains the data necessary to calculate a profit rate

specific to OCP's production of phosphate rock.  The Court should remand Commerce's profit

rate calculation and instruct Commerce to use a rock-specific profit rate, in other words, it should

instruct Commerce to use a profit rate "*for the good or service being provided*."

Regarding the reductions in tax fines and penalties, the Court remanded Commerce's

specificity determination because the record evidence did not support Commerce's original

determination that these reductions were *de facto* specific based on the actual recipients being

limited.  The Court described a determination that these reductions were specific as an "absurd

result."  Remand Opinion at 61.  Notwithstanding this statement from the Court, Commerce

continues to find these reductions *de facto* specific in the Final Redetermination, but does so now

based on analysis that OCP received a disproportionately large subsidy.  Commerce identifies

three bases for finding OCP received a disproportionately large amount of the reductions.  Each

of these three bases is contrary to the law because Commerce refused to consider OCP's large

size in evaluating the proportion of reductions received by OCP, and also unsupported by

substantial record evidence because Commerce failed to consider contrary evidence and, in one

instance, failed to cite to any supporting record evidence.  The Court should again remand

Commerce's *de facto* specificity determination for reductions in tax fines and penalties.

**IV.    The Court Should Affirm Commerce's Allocation of HQ, Support, and Debt Costs**

Commerce's decision in the Final Redetermination to include an allocated portion of

OCP's HQ, support, and debt costs in the COP buildup calculation for phosphate mining rights

fully complies with the Court's remand order.  As discussed below, Commerce explained why its

selected allocation was reasonable and supported by substantial record evidence.  Commerce

also properly rejected as inconsistent with both the Court's remand and the record evidence

Mosaic's arguments opposing OCP's method of allocating of HQ, support, and debt costs.  The

Court should affirm Commerce's Final Redetermination with respect to HQ, support, and debt

costs.

**A.    Commerce Fully Complied with the Court's Order to Allocate OCP's HQ, Support, and Debt Costs**

In its Remand Opinion, the Court found that the record evidence demonstrated that

OCP's HQ, support, and debt costs are corporate-level indirect expenses incapable of being

further segregated into costs related and unrelated to phosphate rock within OCP's accounting

system.  *See* Remand Opinion at 24–27.  The Court ruled that requiring OCP to segregate these

costs into rock related and unrelated expenses would be "nonsensical," finding Commerce's

exclusion of these costs from the COP buildup for phosphate rock "*per se* unreasonable" given

ample record evidence demonstrating that OCP incurred these costs in its mining and production

of phosphate rock.  *Id.* at 26–27.  The Court instructed Commerce to "either {} accept OCP's

SG&A cost allocation method or {} show that it is unreasonable in light of a satisfactory

alternative methodology it would use instead."  *Id*. at 28.

In the Final Redetermination, Commerce complied with the Court's remand instruction

and adopted OCP's methods for allocating HQ, support, and debt costs, finding that OCP's

allocation methodologies provided a "reasonable" way to determine the portion of HQ, support,

and debt costs that should be included in the COP buildup.  Final Redetermination at 9.  Pursuant

to these methodologies, Commerce allocated OCP's HQ and support costs based on each

production site's share of total site costs,[2] and allocated OCP's debt costs based on each

production site's share of capital expenditures.  *See* Final Redetermination at 9 (explaining that

Commerce is adopting OCP's allocation methodology).

In adopting this methodology, Commerce explained that, when constructing its COP

buildup for phosphate rock, it "considers the relevant production costs associated with producing

and pricing the phosphate rock," including direct and indirect costs.  *See id.* at 8.  Commerce

noted that, in reporting all costs associated with its production and pricing of phosphate rock,

OCP reported allocated "amounts for certain indirect costs, or SG&A, classified as HQ, Support,

and Debt."  *Id.*  Commerce found that it is not possible to segregate these indirect costs further,

explaining that "although the record indicates these costs are related to production, they are not

directly tied to production in OCP's accounting methodology, and thus, cannot be reasonably

further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock production."  *Id.*

at 8–9.

Commerce correctly determined that, because the record evidence demonstrates that

these are indirect costs that cannot be further segregated, it was necessary for OCP to use an

allocation methodology to determine the portion of these costs to include in the COP buildup.

*Id.*  In this regard, Commerce recalled that the Court found that it would be "nonsensical" to

---

[2] Throughout the record of the Investigation, these costs were referred to interchangeably as "total site costs," "total operating costs," "total operating expenses," and "total direct expenses." *See, e.g.*, OCP S.A. Supplemental Questionnaire Response Part Three (Nov. 6, 2020) at App. MIN2-6 (P.R. 354; C.R. 232).  For ease of reference, OCP adopts Commerce's convention of referring to these costs as "total site costs."  Consistent with Commerce's decision to allocate HQ and support costs on the basis of total site costs exclusive of these items, OCP uses the term "total site costs" in these comments to refer to OCP's total site costs exclusive of these items.

require OCP to segregate these costs rather than allocate them.  *See id.* at 21–22 (quoting

Remand Opinion at 27–28).  Commerce also explained that the inclusion of such costs in OCP's

COP buildup would bring its approach in this proceeding in line with its approach in other

proceedings, such as *Hot-Rolled Steel from India* and *Softwood Lumber from Canada*.  *See* Final

Redetermination at 18.

With regard to OCP's HQ and support costs, Commerce determined that OCP's

allocation of these indirect costs to the production sites (based on each site's share of total site

costs) was reasonable.  *See id.* at 9.  Commerce also cited to record evidence demonstrating that

OCP incurred HQ and support costs in support of its day-to-day production operations.  *Id.* at 18-

19 & n.84 (citing to OCP Remand Comments at 3–7 (P.R.R. 9; C.R.R. 4) where OCP provided

examples of record evidence demonstrating it incurs HQ and support costs in support of day-to-

day operations).  Similarly, with regard to OCP's debt costs, Commerce found that OCP's

allocation based on each site's share of capital expenditures was reasonable.  *See* Final

Redetermination at 9.  The agency cited to record evidence demonstrating that OCP incurs

financing costs to fund its capital expenditures.  *Id.* at 19 n.84 (citing to OCP Remand Comments

at 3–7 (P.R.R. 9; C.R.R. 4) where OCP provided examples of record evidence demonstrating it

uses financing costs to fund capital expenditures).  Accordingly, Commerce correctly determined

that OCP's allocation methodologies for both HQ and support, and debt are reasonable and fully

supported by the record evidence.  *See* Final Redetermination at 9.

Commerce's decision to accept OCP's methods of allocating HQ, support, and debt costs

is consistent with the Court's instruction that Commerce "either {} accept OCP's SG&A cost

allocation method or {} show that it is unreasonable in light of a satisfactory alternative

methodology it would use instead."  Remand Opinion at 28.  Commerce explained why these

Case 1:21-cv-00116-TCS   Document 126   Filed 02/13/24   Page 12 of 29

Consol. Ct. No. 21-00116                                NON-CONFIDENTIAL VERSION

allocations are reasonable and supported by substantial record evidence, fully complying with the Court's remand order, and the Court should affirm this aspect of the Final Redetermination.

>   **B.      Commerce Correctly Rejected Mosaic's Alternative Methodologies for Allocating HQ, Support, and Debt**

During the remand proceeding, Mosaic argued that Commerce should make various adjustments to OCP's allocation methodologies for HQ, support, and debt, or in the alternative, Commerce should reject OCP's allocation methodologies and instead use methodologies proposed by Mosaic.  As discussed below, Commerce correctly rejected Mosaic's arguments because they lacked any support in the record evidence and resulted in obviously unreasonable allocation methodologies.

Notwithstanding this Court's clear statement that any attempt to segregate HQ, support and debt costs into costs that are related or unrelated to phosphate rock production would be "nonsensical," *id.* at 27, Mosaic argued during the remand proceeding that Commerce should adopt precisely that approach.  In its comments on the Draft Redetermination, Mosaic claimed that Commerce should require OCP to segregate its HQ and support costs to identify those costs "with a demonstrated connection to phosphate rock mining and production," and include only an allocated portion of those costs in the COP buildup for phosphate rock.  *See* Mosaic Remand Comments at 25 (P.R.R. 8; C.R.R. 3).  Mosaic also argued that Commerce should exclude entirely OCP's debt costs from the COP buildup, *id.* at 22 (P.R.R. 8; C.R.R. 3).  Commerce rightly rejected these arguments based on the record evidence and this Court's clear explanation that such segregation of costs would be "nonsensical" and their exclusion "*per se* unreasonable." *See* Final Redetermination at 17, 21–22 (citing Remand Opinion at 27–28).  The agency explained that OCP's accounting system is credible and reliable, and through its books and

Business Proprietary Information
Has Been Deleted

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

records OCP "demonstrated that it incurred HQ, Support and Debt costs in the course of mining

phosphate ore, and beneficiation of phosphate rock for sale."  Final Redetermination at 18–19.

For similar reasons, Commerce correctly rejected Mosaic's argument to exclude costs

from the pool of HQ, support, and debt costs that were purportedly too tangentially related to

OCP's rock production.  *See* Mosaic Remand Comments at 27 (P.R.R. 8; C.R.R. 3).  As both the

Court and Commerce have found, OCP's HQ, support, and debt costs are ***indirect*** costs; *see*

Remand Opinion at 26 (characterizing HQ, support, and debt costs as corporate-level expenses);

Final Redetermination at 19 ("We note that these are corporate indirect costs.").  Criticizing them

as not having a direct relationship to OCP's rock production simply confirms their indirect

nature.

Mosaic also argued for alternative allocation methodologies whereby Commerce would

allocate OCP's HQ and support costs on the basis of each site's share of revenues, and debt costs

based on each site's share of financial profit/loss.  Commerce correctly declined to adopt these

alternative allocation methodologies, noting that they do not represent a "satisfactory alternative"

as required by the Court's remand order.  Final Redetermination at 23.

In fact, the record evidence plainly demonstrates that Mosaic's proposed alternative

methodologies are unreasonable.  In support of its proposed alternative allocation for HQ and

support costs, Mosaic could cite to *zero* record evidence that HQ and support costs are incurred

in proportion to each site's share of revenues.[3]  Revenue is directly associated with product

prices, but there is no evidence to support that HQ and support costs are incurred in proportion to

---

[3] Mosaic points to some of the activities that HQ and support [

                              ] and then baldly asserts without citation to any record evidence that
these are [                                                    ].  *See* Mosaic Remand Comments at 28
(P.R.R. 8; C.R.R. 3).

Business Proprietary Information
Has Been Deleted

prices for the phosphate rock, [                                                          ],[4] produced at the

production sites.[5]  Conversely, and as discussed above in Section IV.A, the record evidence

demonstrates that both HQ and support costs and total site costs are incurred in support of OCP's

day-to-day operations, making total site costs a demonstrably reasonable basis on which to

allocate OCP's HQ and support costs.

 Moreover, [



                   ].  *See* OCP

Verification Response at 51 n.16 (P.R. 436; C.R. 289–290) ([



  ]).  As a result, allocating HQ and support costs based on each site's share of

revenue would necessarily under-allocate OCP's HQ and support costs to OCP's rock-producing

sites and over-allocate these costs to OCP's sites producing other products.

 Commerce also correctly declined Mosaic's request to modify OCP's methodology to

include raw materials, freight, amortization, and financial and non current expenditures within

the total site costs used to allocate HQ and support costs.  *See* Final Redetermination at 20 (citing

Mosaic Remand comments at 20 (P.R.R. 8; C.R.R. 3)) (noting that Mosaic argued that "OCP

purported to allocate HQ, Support and Debt Costs based on its own allocation methodology,

---

[4] While the record demonstrates that [

                 ].  *See* New Factual Information
(Nov. 4, 2020) at Ex. 21 (P.R. 333, 337; C.R. 211, 215)

[5] The record demonstrates that OCP's sites produce these products.  *See* OCP S.A. Section III
Questionnaire Response (Sept. 17. 2020) at 5, App. GEN-2 ("OCP IQR") (P.R. 130; C.R. 39–
40); Response to Questionnaire in Lieu of On-Site Verification (Dec. 30, 2020) at 51 ("OCP
Verification Response") (P.R. 436; C.R. 289–90).

Business Proprietary Information
Has Been Deleted

**Consol. Ct. No. 21-00116**                                    **NON-CONFIDENTIAL VERSION**

however, that methodology unreasonably omits certain categories"), at 23 (noting that Commerce's "tier-three analysis appropriately addresses the unique nature of OCP's phosphate mining and processing operations."). The record demonstrates that the inclusion of these costs would be unreasonable. For example, OCP excluded freight costs consistent with this Court's decision to affirm Commerce's exclusion of ocean freight from the rock benchmark to which the COP buildup for phosphate rock would be compared. Remand Opinion at 45. It would make no sense to include an allocated portion of HQ and support costs in the COP buildup on a basis that includes freight costs when the Court has already determined that freight costs should be excluded from the rock benchmark to which OCP's COP buildup is being compared.

Additionally, Commerce correctly rejected Mosaic's alternative allocation for debt based on financial profit/loss. Mosaic asserts that allocating debt based on financial profit/loss is a more reasonable methodology because of the underlying "assumption" in the Department's calculation "that the mining sites leverage OCP's financial resources." Mosaic Remand Comments at 31 (P.R.R. 8; C.R.R. 3). An assumption is certainly not record evidence and, in any event, Mosaic never explains why, even if such an assumption were supported by evidence, it demonstrates that debt costs should be allocated based on financial profit/loss.

Moreover, the record evidence does not demonstrate that OCP's sites benefit from OCP's debt costs in proportion to financial profit/loss. Instead, the record demonstrates that the

[

]. *See* OCP Verification Response at 19–20 (P.R.

Case 1:21-cv-00116-TCS Document 126 Filed 02/13/24 Page 16 of 29

Business Proprietary Information
Has Been Deleted

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

436; C.R. 289). Thus, as discussed above in Section IV.A, an allocation of debt costs based on capital expenditures is reasonable.

In sum, Commerce fully complied with the Court's instructions to "either {} accept OCP's SG&A cost allocation method or {} show that it is unreasonable in light of a satisfactory alternative methodology it would use instead." Remand Opinion at 28. Commerce explained that it was accepting OCP's allocation methodologies and supported its decision with substantial evidence. Mosaic's arguments to the contrary were properly rejected as they are contrary both to the Court's Remand Opinion and to the record evidence. Accordingly, the Court should affirm this aspect of the Final Redetermination.

## V.    Commerce's Use of a Profit Rate which Includes Profits for Goods In Addition to Phosphate Rock Violates the Law

In the Final Redetermination, Commerce failed to use a profit rate in the constructed government price for phosphate rock that was reasonable in light of the record evidence. The law requires Commerce to use a profit rate that is specific to the good being provided which, in this case, is phosphate rock. OCP explained how Commerce could calculate a rock-specific profit rate using record evidence regarding OCP's costs and revenues in 2019. Notwithstanding the law and this record evidence, Commerce used a profit rate that included profits for a wide range of goods in addition to phosphate rock, such as [

            ]. This Court should remand Commerce's profit rate calculation for the agency to use a profit rate specific to phosphate rock.

The law requires Commerce to measure the adequacy of remuneration "in relation to prevailing market conditions **for the good or service being provided**." 19 U.S.C. § 1677(5)(E) (emphasis added). Because there are no market prices for phosphate ore, Commerce has designated phosphate rock the "good being provided" for purposes of evaluating the adequacy of

remuneration for mining rights.  *See* IDM at 29 (P.R. 473) ("{W}e are calculating a per-unit cost of producing phosphate rock to compare against the per-unit benchmark price of phosphate rock.").  Because Commerce fails to use a profit rate that is specific to phosphate rock, the agency fails to determine the adequacy of remuneration for the good being provided and thus, Commerce violates the law.

OCP explained during the remand that, for most of its categories of rock produced in 2019, Commerce could calculate a profit rate based on the record evidence.  However, for one category of OCP's phosphate rock, certain local rock in Morocco, Commerce would have to estimate a profit rate because a revenue figure was not available from the record evidence.  *See* OCP Remand Comments at 10 (P.R.R. 9; C.R.R. 4).  In the course of the remand, OCP provided Commerce with a detailed calculation by which it could accurately estimate a profit rate for this one category of rock.  *Id.* at 7–12, App. DRR-1 (P.R.R. 9; C.R.R. 4).  Commerce refused to use the rock-specific profit rate based on a single reason—that this calculation included an estimated profit rate for some local rock.  *See* Final Redetermination at 24.  To be clear, Commerce did not analyze this estimated profit rate and determine that it was somehow inaccurate.  Commerce simply declared without record support that the use of a rock-specific profit rate that included such an estimation was "inferior" to a company-wide profit rate for products beyond rock.  *See id.*  Commerce's rejection of the rock-specific profit rate does not withstand scrutiny and is contrary to law.

As an initial matter, the use of estimates is commonplace in CVD proceedings.  In fact, the use of OCP's company-wide profit rate *is itself an estimate* because it is being used as a proxy for the profit associated with OCP's rock-producing activities.  In addition, Commerce is estimating the subsidy benefit provided to OCP through the GOM's provision of phosphate ore

mining rights based on a constructed government price for rock, not ore.  Thus, the agency cannot assert that the use of an estimate for one category of rock somehow renders a rock-specific profit rate categorically inferior to an over-broad profit rate that includes entirely different products.

In any event, Commerce is faced with an important choice that the statute requires Commerce to weigh.  Commerce failed to do so.  On the one hand, Commerce has a rock-specific rate which complies with the statutory requirement to measure the adequacy of remuneration "for the good or service being provided" that includes an estimate for one category of rock.  On the other hand, the agency has a profit rate that is not "for the good or service being provided" and thus violates the law but does not include an estimate.  At no point in the remand proceeding did Commerce grapple with this legal requirement to measure the adequacy of remuneration "for the good or service being provided."  Instead, the agency simplistically rejected the rock-specific profit rate because it included an estimate.

OCP respectfully submits that when these profit rate methodologies are compared to the text of the CVD law, the choice is clear; Commerce must use the rock-specific profit rate given the legal requirement to measure the adequacy of remuneration "for the good or service being provided."  Thus, this Court must remand the profit rate calculation for Commerce to use the rock-specific profit rate in its constructed government price for phosphate rock, or alternatively, to explain why this rate should not be used notwithstanding the legal requirement that the agency measure the adequacy of remuneration specifically for phosphate rock.

Consol. Ct. No. 21-00116                                    NON-CONFIDENTIAL VERSION

**VI.    Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record Evidence**

In the Investigation, Commerce found the GOM's reductions in tax fines and penalties *de facto* specific because the actual recipients of these reductions was "limited" pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I). IDM at 75 (P.R. 473). This Court explained that the record evidence "does not establish that the tax fines and penalties reduction program is anything other than a common, ordinary tax administration program, available to all taxpayers, under which the taxing authority may mitigate a penalty," Remand Opinion at 61, and that "there is no evidence of dominant or disproportionate use by any enterprise, group of enterprises, or industry." *Id.* at 63. The Court further described a finding of this program as *de facto* specific as an "absurd result." *Id.* at 61.

Notwithstanding this guidance from the Court, Commerce once again found that the reductions in tax fines and penalties are *de facto* specific in the Final Redetermination. However, instead of relying on a "limited" number of recipients to support its finding, Commerce changed its analysis to find that OCP received a disproportionately large amount of the reductions pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) on three bases: (A) a comparison of the reductions received by OCP by value to the simple average amount of reductions received by other companies; (B) the assertion that OCP was the 10th largest recipient of reductions by value; and (C) the assertion that OCP was supposedly the only entity to be a producer of the good that could be imported among the top 10 recipients of the reductions by value. As discussed below, the newly articulated bases still render an absurd result, and are both contrary to the law and unsupported by substantial record evidence.

In particular, in violation of the law, Commerce failed to consider OCP's large size within the Moroccan economy in evaluating whether OCP received a disproportionately large amount of the subsidy, as it is required to do under the statute. Commerce also failed to consider contrary evidence, and in one instance failed to cite to any record evidence in rendering its *de facto* specificity determination. Accordingly, this Court should remand this *de facto* specificity determination for reductions in tax fines and penalties to Commerce again.

A.     **Commerce's Determination That OCP Received a Disproportionately Large Amount of Reductions When Compared to the Simple Average Amount of Reductions Received by Other Companies is Contrary to Law and Not Supported by Substantial Evidence**

Commerce first found that OCP had received a disproportionately large amount of reductions in tax fines and penalties by value based on a comparison of the reductions received by OCP to the simple average amount by value of reductions received by other companies in Morocco during the period of investigation. As discussed below, Commerce is required by 19 U.S.C. § 1677(5A)(D)(iii) to evaluate disproportionality in the context of the Moroccan economy. The agency failed to do this, contrary to law, instead adopting a "simple average" comparison approach that is insufficient under the statute. This simple average evaluation of the specificity of reductions in tax fines and penalties is also not supported by the record evidence which (to the contrary) demonstrates that the amount of reductions OCP received was the result of its size rather than *de facto* specificity.

Commerce found in the Draft Redetermination that OCP received a disproportionately large amount of reductions in penalties pursuant to 19 U.S.C. § 1677(5A)(D)(iii) because OCP received reductions by value that were "roughly 82.87 times larger" than the simple average of the amount received by other companies in Morocco in 2019. Draft Redetermination at 13 (P.R.R. 1). In response, OCP explained that this simple average approach was inconsistent with

the law because it failed to take account of OCP's size in the Moroccan economy.  OCP Remand
Comments at 14–15 (P.R.R. 9; C.R.R. 4).

The record demonstrates that OCP and its consolidated companies—*which comprise the
entire Moroccan phosphate industry*—were Morocco's largest corporate group by annual
revenue in 2019, with sales equivalent to roughly *5% of Morocco's GDP*.  *Id.* (P.R.R. 9; C.R.R.
4) (citing Questionnaire Response of the Government of the Kingdom of Morocco (Sept. 17,
2020), vol. I at Ex. I-1 p. 25 ("GOM IQR") (P.R. 155; C.R. 69) (MAD 1,151.2 billion 2019 GDP
for Morocco); *id.*, vol. V at Ex. V-11 p.4 (P.R. 192; C.R. 116) (MAD 54,092 million 2019
revenue for OCP)).  Commerce brushed aside this evidence in finding that OCP's size was not
relevant to its *de facto* specificity analysis.  Final Redetermination at 30–32.  Indeed, OCP's size
within the Moroccan economy explains the difference between the amount of reductions OCP
received and the simple average of reductions received by other companies.  Commerce is not
free to ignore OCP's size within the Moroccan economy; the agency's most recent specificity
determination violates the CVD law.

Pursuant to 19 U.S.C. § 1677(5A)(D)(iii), Commerce is considering whether OCP
received a "disproportionately" large amount of reductions as compared to other companies in
Morocco.  This analysis necessarily requires a comparison of OCP to other companies in
Morocco, including questions about the diversification of the Moroccan economy.  In particular,
the law is plain in mandating that Commerce "shall take into account the diversification of
economic activities" in deciding whether a subsidy is disproportionately large.  19 U.S.C.
§ 1677(5A)(D)(iii).  The analysis of disproportionately large on an enterprise basis—as
Commerce conducted on remand—is not exempt from this requirement.  Final Redetermination
at 12–14; 19 U.S.C. § 1677(5A)(D)(iii).  The Statement of Administrative Action ("SAA") also

explains that evaluating economic diversification clarifies the context in which *de facto*

specificity should be analyzed and in no way excludes *de facto* analyses on an enterprise basis

from such an evaluation.  Statement of Administrative Action accompanying the Uruguay Round

Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994) at 931, *reprinted in* 1994 U.S.C.C.A.N.

4040, 4243 ("SAA").

Yet, Commerce utterly failed to account for the diversification of economic activities in

the Draft Redetermination.  *See generally* Draft Redetermination.  After OCP noted this issue,

Commerce for the first time in the Final Redetermination responded by acknowledging that there

exists a wide diversification of economic activities in Morocco, but then stated that the economic

diversification of the Moroccan economy is "not . . . instructive" to the *de facto* specificity

analysis because the agency was conducting the analysis on an "enterprise basis," rather than on

an industry basis.  Final Redetermination at 31.

In addition to contradicting the plain language of the statute, Commerce's refusal to

consider OCP's size in evaluating whether OCP received a disproportionately large amount of

reductions is also contrary to decisions of the U.S. Court of Appeals of the Federal Circuit.  The

Federal Circuit has cautioned that finding "a benefit conferred on a large company might be

disproportionate *merely because of the size of the company*" would "produce an untenable

result."  *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (emphasis

added); *see also Royal Thai Gov't v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006).

Commerce's failure to consider OCP's size in evaluating whether OCP received a

disproportionately large amount of reductions is also contrary to the agency's practice.

Commerce has repeatedly considered the size of an enterprise or industry in deciding whether an

enterprise or industry received a disproportionately large amount of a subsidy:

Business Proprietary Information
Has Been Deleted

- In *Coated Free Sheet Paper From Korea*, Commerce measured the share of lending received by the respondent ***sectors against the sectors' share of Korea's manufacturing GDP***, and determined that the benefit they received was not disproportionately large ***compared to their "contribution" to the GDP***. *See Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007), and accompanying IDM at 18–20 (emphasis added); *see also Coated Free Sheet Paper From the Republic of Korea: Preliminary Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 17,507, 17,511–12 (Apr. 9, 2007).

- In *Live Swine From Canada*, Commerce ***compared the percentage of benefits*** the swine producers received among agricultural producers, ***to the percentage of income*** the swine producers received among the same group and found that the benefit received was not disproportionately large. *Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11, 2005), and accompanying IDM at 19.

- In *Dynamic Random Access Memory Semiconductors From Korea*, Commerce found, only after evaluating the benefit received ***relative to its size among all companies in Korea,*** that the respondent received a disproportionately large amount of the subsidy. *Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2336 (Jan. 13, 2011), and accompanying IDM at 3.

In its comments on the Draft Redetermination, OCP explained that once Commerce

considered all the relevant record evidence—including OCP's large size within the economy—it

was evident that the record evidence would not support a *de facto* specificity determination. In

response, not only did Commerce refuse to conduct the required analysis, Commerce also stated

for the first time that "neither the GOM nor OCP provided information which would draw a

correlation between a company's size and the amount of tax fines and penalties it incurs." Final

Redetermination at 32. Commerce's response demonstrates a fundamental misunderstanding of

the record evidence, which overwhelmingly demonstrates that the reductions in tax fines and

penalties OCP received were directly related to OCP's large size.

The record evidence demonstrates that the GOM granted reductions in penalties it

assessed after OCP submitted amended tax returns related to [      ] taxation categories: [

].  OCP IQR at 158–

Business Proprietary Information
Has Been Deleted

64, Exs. TAX–2–TAX-5 (P.R. 130, 141; C.R. 39, 55); OCP S.A. Supplemental Questionnaire

Response (Nov. 3, 2020) at 34 (P.R. 254; C.R. 149).  Because of OCP's size as the largest

corporate group in Morocco, *it paid significantly more of each of these taxes* than most other

companies.  In addition, the record evidence establishes that the Moroccan tax code assess

penalties when tax returns are amended based on a percentage of taxes owed.  *See, e.g.*, GOM

IQR, vol. VII at Ex. VII-1 (P.R. 204; C.R. 130) (Article 186).  Thus, contrary to Commerce's

statement in the Final Redetermination, the record evidence clearly establishes a direct

relationship between OCP's size and the amount of penalties assessed.

For a determination to be supported by substantial evidence, Commerce must consider

the entirety of the record including evidence which detracts from its decision.  *SolarWorld*

*Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018).  In the Final Redetermination,

Commerce failed to consider this contrary evidence demonstrating that OCP's reductions were

directly related to its size and role in the Moroccan economy rather than because OCP received a

disproportionately large amount of reductions.  As a result, Commerce's determination is not

supported by substantial evidence and must be remanded.

When the entirety of the record evidence is properly evaluated, it is clear that the

reductions were not specific.  OCP explained in commenting on the Draft Redetermination that

OCP received [          ]% in value of the total amount of reductions granted in 2019, a

percentage in no way fairly described as "disproportionately large."[6]  OCP Remand Comments at

---

[6] Specifically, [      ]%, calculated by dividing the reductions OCP received during the period of
investigation, [          ] Dirhams (*i.e.*, MAD) into total reductions during the period of
investigation, [          ] MAD.  *See* Supplemental Questionnaire Response of the
Government of the Kingdom of Morocco – Part 2 (Nov. 11, 2020) at S-IX-10–S-IX-11 (P.R.
359; C.R. 242) (Tables S-IX-2 & S-IX-3); *see also* Amended Final Determination Calculations
for OCP S.A. (Mar. 15, 2021) at Attachment I (P.R. 487; C.R. 312) (tab Tax Fines and
Penalties).

16 (P.R.R. 9; C.R.R. 4).  In response, Commerce indicated that it did not find this fact persuasive

because it was conducting a "distinct" *de facto* specificity analysis based on the simple average

amount received by other companies.  Final Redetermination at 29.  This response is wholly

insufficient.  Commerce must explain *why* its decision is reasonable in light of this contrary

evidence.  *SolarWorld*, 910 F.3d at 1222.  Moreover, Commerce cannot rely on this "distinct"

analysis where the analysis fails to consider the economic diversification of Morocco (including

OCP's large size within the economy) as required by law.

In conclusion, Commerce's determination that OCP received a disproportionally large

amount of reductions in tax fines and penalties based on a simple average of reductions received

by other companies by value and without regard to OCP's size within the Moroccan economy is

in violation of the law and not supported by substantial evidence.  Accordingly, this *de facto*

specificity determination must be remanded back to Commerce.

### B. Commerce's Determination That OCP Received a Disproportionately Large Amount of Reductions Based on its Ranking as 10th Largest Recipient is Not Supported by Substantial Evidence and Contrary to Law

In the Final Redetermination, Commerce provided a second reason why it found that

OCP received a disproportionately large amount of reductions pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii)—because OCP was the 10th largest recipient of the deductions by value.

Final Redetermination at 13.  Commerce's determination on the basis of OCP's ranking is

unsupported by substantial record evidence and contrary to law.

Far from demonstrating that OCP received a disproportionately large amount of the

reductions, OCP's ranking as 10th among recipients of the reductions *contradicts* any

determination that OCP received a disproportionately large amount of the reductions.  Given that

the OCP Group is *the 1st largest corporate group in Morocco*, which comprises the entire

Moroccan phosphate industry and roughly 5% of Morocco's GDP, a *10th-place rank* among

recipients demonstrates that OCP actually *received a proportionally small amount of reductions*

relative to its size.

Furthermore, without any explanation, Commerce equates OCP's ranking among

reported recipients of the reductions with OCP receiving a "disproportionately large" amount of

the reductions.  19 U.S.C. § 1677(5A)(D)(iii) does not equate these concepts.  Indeed, this

statutory provision does not reference ranking among recipients at all.  It was incumbent on the

agency to explain why it was reasonable to equate "disproportionately large" with a 10th-place

ranking among reported recipients, and Commerce failed to provide such an explanation.

Additionally, as discussed above in Section VI.A, *supra*, the law requires the agency to

take into account the economic diversification of Morocco including OCP's large size in

rendering any disproportionately large *de facto* specificity determination pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii).  Commerce failed to do so, instead claiming for the first time in the Final

Redetermination that such an analysis was "not . . . instructive" because it was conducting its

analysis on an "enterprise basis."  Final Redetermination at 31.  Thus, Commerce's

determination that OCP received a disproportionately large amount of the reductions based on

OCP's ranking among reported recipients is also contrary to law.

> **C.   Commerce's Determination That OCP Received a Disproportionately Large Amount of Reductions Based on the Purported Fact That It Was the Only Entity Producing the Good That Can Be Imported is Contrary to Law and Not Supported by Substantial Evidence**

In the Final Redetermination, Commerce provided a third reason why it found that OCP

received a disproportionately large amount of reductions pursuant to 19 U.S.C.

§ 1677(5A)(D)(iii)—OCP was purportedly "the only entity that appears to be a producer of the

good that can be imported" among the top 10 recipients of the reductions by value.  Final

Redetermination at 13.  Commerce's determination on the basis that only OCP is producing the good that can be imported has no basis in law or the record evidence.

Once again, without any explanation whatsoever, Commerce concludes that OCP's ability to produce the good that can be imported supports a determination that OCP received a disproportionately large amount of the reductions.  19 U.S.C. § 1677(5A)(D)(iii) does not discuss the ability of an entity to produce an imported good as relevant to a *de facto* specific determination.  Thus, it was incumbent on the agency to explain why it was reasonable to interpret "disproportionately large" in this manner which it failed to do.

Moreover, as discussed above in Section VI.A, *supra*, the law requires the agency to take into account the economic diversification of Morocco, including OCP's large size, in rendering any *de facto* specificity determination that an entity has received a disproportionately large amount of a subsidy.  19 U.S.C. § 1677(5A)(D)(iii).  Yet again, Commerce failed to do so.  Final Redetermination at 30–32.  Accordingly, Commerce's determination that OCP received a disproportionately large amount of the reductions based on supposedly only OCP's ability to produce the imported good is contrary to law.

Commerce's reliance on the purported fact that only OCP produced the imported good is supported by *zero* record evidence.  Commerce claims that OCP was supposedly the only entity that produced the good that can be imported among the top 10 recipients of the reductions ***without citation to any record evidence***.  *Id.* at 13.  A determination which fails to cite to any record evidence does not meet the substantial evidence standard.  *See, e.g.*, *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 651 F. Supp. 3d 1348, 1358–59 (CIT 2023) ("Because Commerce failed to identify any record evidence on which it relied, the Court holds that Commerce's determinations are not supported by substantial evidence.").  OCP's ability to

produce a good that can be imported does not demonstrate as a factual matter receipt of a

disproportionately large amount of a subsidy.  For this reason too, Commerce's determination

that OCP received a disproportionately large subsidy based on the purported fact that only OCP

produced the imported good must be remanded.

**VII.    Conclusion**

For the reasons discussed above, OCP respectfully submits that the Court should sustain

the Final Redetermination with respect to the allocation of OCP's HQ, support, and debt costs,

and should remand the redetermination for reconsideration with respect to the profit rate used in

the constructed government price for phosphate rock and the *de facto* specificity determination

for the reductions in tax fines and penalties.

Respectfully submitted,

Dated: February 12, 2024                        /s/ William R. Isasi
                                                William R. Isasi
                                                Cynthia C. Galvez
                                                Wanyu Zhang
                                                COVINGTON & BURLING LLP
                                                One CityCenter
                                                850 Tenth Street, N.W.
                                                Washington, D.C.  20001-4956

                                                Micaela McMurrough
                                                Jordan B. Bakst
                                                COVINGTON & BURLING LLP
                                                The New York Times Building
                                                620 Eighth Avenue
                                                New York, NY  10018-1405

                                                *Counsel to OCP S.A.*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Defendant-Intervener OCP S.A's Comments on Remand Redetermination, filed on February 12, 2024, contains 7,269 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare these comments, and therefore complies with the maximum word count limitation set forth in Chamber Procedure 2(B)(1)(b).

<u>/s/ William R. Isasi</u>
William R. Isasi