**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, *et al.,* ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Consol. Court No. 21-00116 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| *Defendant*, ) | |
| ) | |
| and ) | |
| ) | |
| OCP, S.A., *et al*. ) | |
| ) | |
| ) | |
| *Defendant-Intervenors*. ) | |

**<u>ORDER</u>**

Upon consideration of plaintiffs' comments regarding the remand redetermination, defendant's response thereto, and all other pertinent papers, it is hereby

ORDERED that the remand redetermination is sustained and judgment is entered in favor of the United States.

Dated: _____, 2024         _____

     New York, NY         TIMOTHY C. STANCEU, SENIOR JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

|  |  |
|---|---|
| THE MOSAIC COMPANY, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Consol. Court No. 21-00116 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| *Defendant*, ) | |
| ) | |
| and ) | |
| ) | |
| OCP, S.A., *et al.* ) | |
| ) | |
| ) | |
| *Defendant-Intervenors*. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

<table>
<tr><td></td><td>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General</td></tr>
<tr><td></td><td>PATRICIA M. McCARTHY<br>Director</td></tr>
<tr><td></td><td>L. MISHA PREHEIM<br>Assistant Director</td></tr>
<tr><td>OF COUNSEL<br>ASHLANDE GELIN<br>Attorney<br>Office of the Chief Counsel<br>  for Trade Enforcement & Compliance<br>U.S. Department of Commerce</td><td>RAVI D. SOOPRAMANIEN<br>Trial Attorney<br>U.S. Department of Justice<br>Commercial Litigation Branch<br>Civil Division<br>Ben Franklin Station<br>P.O. Box 480<br>Washington, D.C.  20044<br>Telephone: (202) 616-0856<br>E-mail:  Ravi.Soopramanien@usdoj.gov</td></tr>
<tr><td>March 13, 2024</td><td>*Attorneys for Defendant*</td></tr>
</table>

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

TABLE OF AUTHORITIES ...................................................... iii

BACKGROUND ................................................................. 2

    I.    Commerce's Final Determination ....................................... 2

    II.   The Court's Remand Order ............................................ 4

ARGUMENT ................................................................... 5

    I.    Standard Of Review .................................................. 5

    II.   Commerce's Remand Redetermination Complies With The Remand Order And Is Supported By Substantial Evidence And In Accordance With Law ...................... 5

        A.    Commerce's Determination To Accept OCP's SG&A Allocation Methodology And Include OCP's HQ Support And Debt Costs In The COP Buildup Was In Accordance With Law .............................. 6

            1.    Commerce's Decision To Accept OCP's Allocation Methodology Is Supported By Substantial Evidence And In Accordance with Law ................................................. 6

            2.    Mosaic's Claim That OCP's Cost Build-up Includes Unrelated Expenses Is Not Supported By The Record Evidence ................... 8

            3.    OCP's Allocation Methodology Is Reasonable In Light Of Mosaic's Proposed Alternative ..................................... 12

        B.    Commerce's Determination To Revise OCP's Profit Rate By Dividing Income Before Tax By Cost At The Level Of Income Before Tax Was In Accordance With Law .............................................. 15

            1.    Commerce's Methodology Provides A Valid Comparison For Calculating OCP's Profit Rate ..................................... 16

            2.    Commerce Is Not Obligated To Calculate Profit Rates Based On Estimated Figures ................................................ 18

        C.    Commerce's Specificity Determination For Reduction In Tax Fines And Penalties Program Is in Accordance With Law ......................... 21

1. Commerce's Findings On Remand ................................................. 23

2. Commerce's Findings On Remand Are Reasonable In Light Of Substantial Evidence Demonstrating That OCP Was A Disproportionate User Of The Tax Fines And Penalties Program ................................................................................................. 24

CONCLUSION ................................................................................................. 33

**TABLE OF AUTHORITIES**

**CASES**                                                                                                 **PAGE(S)**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999) ................................................................ passim

*Alberta Pork Producers' Mktg. Bd. v. United States*,
    669 F. Supp. 445 (Ct. Int'l Trade 1987)............................................................ 18

*Bethlehem Steel Corp. v. United States*,
    223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) ...................................................... 5

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) .................................................................. 19, 31

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)................................................................................... 5

*Dillinger Huttenwerke v. United States*,
    26 C.I.T. 1091 (Ct. Int'l Trade 2002)........................................................... 12, 13

*DuPont Teijin Films China Ltd. v. United States*,
    7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014)........................................................ 15

*Federal–Mogul Corp. v. United States*,
    18 CIT 785, 862 F. Supp. 384 (Ct. Int'l Trade 1994) .......................................... 19

*Fuwei Films (Shandong) Co. v. United States*,
    837 F. Supp. 2d 1347 (Ct. Int'l Trade 2012).................................................. 17, 18

*Inland Steel Indus., Inc. v. United States*,
    967 F. Supp. 1338 (Ct. Int'l Trade 1997) ........................................................ 33

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ..................................................... 5

*Mittal Steel Point Lisas v. United States*,
    548 F.3d 1375 (Fed. Cir. 2008) ................................................................ 19, 31

*Mosaic Company v. United States*,
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ..................................................... 1

*Nucor Corp. v. United States*,
    286 F. Supp. 3d 1364 (Ct. Int'l Trade 2018)...................................................... 8

*PPG Indus., Inc. v. United States*,
    781 F. Supp. 781 (Ct. Int'l Trade 1991) ........................................................ 21

*Wheatland Tube Corp. v. United States*,
    841 F. Supp. 1222 (Ct. Int'l Trade 1993) ....................................................... 8

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) .............................................................................. 5

19 U.S.C. § 1671 ................................................................................................. 31

19 U.S.C. § 1671(a)(1) ....................................................................................... 32

19 U.S.C. § 1677(5A)(D)(iii) .............................................................................. 28

19 U.S.C. § 1677(5A)(D)(iii)(I) ..................................................................... 4, 23

19 U.S.C. § 1677(5A)(D)(iii)(III) ...................................................... 6, 23, 24, 30

19 U.S.C. § 1677(5)(E) ................................................................................. 18, 20

28 U.S.C. § 2637(d) ...................................................................................... 19, 31

## REGULATIONS

19 C.F.R. § 351.309(c)(2) ................................................................................... 31

19 C.F.R. § 351.511(a)(2)(iii) ......................................................................... 2, 14

## OTHER AUTHORITIES

*Countervailing Duties; Final Rule*,
    63 Fed. Reg. 65,348 (Dep't of Commerce November 25, 1998) (*CVD Preamble*) ........... 7

*Final Negative Countervailing Duty Determination: Live Swine from Canada*,
    70 Fed. Reg. 12,186 (Dep't of Commerce Mar. 11, 2005) ............................... 27

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*,
    72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) ............................... 27

*Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of Countervailing Duty Administrative Review*,
    73 Fed. Reg. 1,578, (Dep't of Commerce Jan. 9, 2008) .................................. 11

*Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review,*
    76 Fed. Reg. 2,336 (Dep't of Commerce Jan. 13, 2011) .................................................. 28

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation,*
    81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016)............................................. 3, 4

*Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances,*
    82 Fed. Reg. 51,814 (Dep't of Commerce November 8, 2017)........................................11

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative CVD Determination,*
    86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) (Final Determination). ...... 2, 3, 4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE**

| | |
|---|---|
| THE MOSAIC COMPANY, *et al.,* ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Consol. Court No. 21-00116 |
| ) | |
| THE UNITED STATES, ) | |
| ) | |
| *Defendant*, ) | |
| ) | |
| and ) | |
| ) | |
| OCP, S.A., *et al.* ) | |
| ) | |
| ) | |
| *Defendant-Intervenors*. ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON
COMMERCE'S REMAND REDETERMINATION**

Defendant, the United States, respectfully submits these comments in support of the

Department of Commerce's (Commerce) redetermination filed in accordance with this Court's

decision and remand order in *The Mosaic Company v. United States*, Consol. Ct. No. 21-00116,

Slip Op. 23-134, 659 F. Supp. 3d 1285 (Ct. Int'l Trade Sept. 2023) (*Remand Order*).  Final

Results of Remand Redetermination Pursuant to Court Order, ECF No. 115 (Jan. 12, 2024)

(Remand Results).

Plaintiffs, The Mosaic Company (Mosaic) *et. al*., and consolidated plaintiffs and

defendant-intervenors, OCP S.A. (OCP) *et. al*., filed comments concerning Commerce's remand

redetermination.  Mosaic Cmts., ECF No. 124; OCP Cmts., ECF No. 125.  For the reasons

discussed below, we respectfully request that the Court sustain Commerce's remand
redetermination and enter final judgment for the United States.

**BACKGROUND**

### I.    Commerce's Final Determination

This case stems from challenges to the countervailing duty investigation on phosphate
fertilizers from the Kingdom of Morocco. *Phosphate Fertilizers from the Kingdom of Morocco:
Final Affirmative CVD Determination*, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021)
(Final Determination) (P.R. 480), and accompanying Issues and Decision Memorandum (IDM)
(P.R. 473).  In the Final Determination, Commerce made certain cost adjustments in calculating
the benefit OCP received from the provision of mining rights by the government of Morocco
(GOM) for less than adequate remuneration (LTAR).  *See generally* IDM at Cmts. 4-5.
Commerce also determined that the GOM's program allowing for reductions in tax fines and
penalties under Article 236 of the Moroccan tax code was *de facto* specific.  IDM at 75.

In its investigation, Commerce determined that OCP's exclusive right to extract
phosphate rock constituted a countervailable subsidy program because the GOM provided these
mining rights for LTAR.  Preliminary Decision Memorandum (PDM) (P.R. 386) at 11; IDM at 5,
20-27.  To calculate the benefit OCP received from these mining rights, Commerce conducted a
tier-three analysis under 19 C.F.R. 351.511(a)(2)(iii).  PDM at 12; IDM at 23.  To evaluate
"whether the government price is consistent with market principles" under 19 C.F.R. §
351.511(a)(2)(iii), Commerce created an estimated price for OCP's beneficiated phosphate rock
by using information from OCP's questionnaire responses.  PDM at 12.  Commerce was not able
to conduct a benefit analysis on the mining rights *per se* because there is no market-based price
for mining rights available on the record.  *Id*.; IDM at 23.  Commerce instead conducted a benefit

2

analysis based on the value of the underlying good conveyed via mining rights by comparing the actual per-unit cost buildup of OCP's beneficiated phosphate rock with a world benchmark price of phosphate rock. *Id*. Commerce then "multiplied the difference between the calculated per-unit cost buildup{} and the benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated by OCP during the {period of investigation}." *Id*.

In its questionnaire responses, OCP reported that it incurred headquarters (HQ), support, and debt costs (*i.e*., selling, general, and administrative expenses (SG&A)) in its cost of production (COP) of phosphate rock. OCP Questionnaire Response, Section III (P.R. 130) at 83-92; OCP Supplemental Questionnaire Response, Part III (C.R. 232) at 1-3, 8 and Exhibits MIN2-2, MIN2-3, and 2-7. In reporting these costs, OCP used an allocation methodology based on the proportion of each of its production sites' share of total costs and capital expenditures. Commerce found that not all the SG&A expenses reported by OCP were necessarily relevant to phosphate rock production and pricing. IDM at 23-24; Remand Results at 3. As Commerce could not further segregate OCP's HQ, support, and debt costs into costs that were "relevant" or "irrelevant" to phosphate rock production, it determined to exclude OCP's allocated HQ, support, and debt costs from its cost buildup calculations. *Id*. at 24.

Commerce also included a profit component in OCP's benefit calculation to properly compare OCP's phosphate rock production to benchmark prices inclusive of profit. IDM at 27. In so doing, Commerce sought to rely on the methodology it employed in *Cold-Rolled Steel from Russia*, where it calculated a profit ratio for the provision of mining rights for LTAR by dividing a respondent entity's profit before tax by its cost of goods sold (COGS). IDM at 27 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016) (final determination), and

accompanying issues and decision memorandum at 4).  This calculation utilizes a numerator and

denominator drawn from the same group of expenses to create a valid comparison.  Remand

Results at 9.  However, because OCP did not report COGS as a line item in its 2019 financial

statements, Commerce modified its methodology and calculated OCP's profit rate by taking its

"Income Before Tax" and divided it by its "Operating Expense" (which included HQ, support,

and debt expenses) from OCP's 2019 unconsolidated profit and loss statement.  IDM at 27.

Commerce then multiplied this profit rate by OCP's total phosphate rock production costs and

added that amount to OCP's cost buildup to create a total cost inclusive of profit.  *Id*.

As for the GOM's reductions in tax fines and penalties program, Commerce determined

that it was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I), as the actual recipients of the

reductions were limited in number.  IDM at 75.  In so doing, consistent with its past practice,

Commerce compared the number of companies that used the program with the total number of

corporate tax filers and found that only 3.3 percent of Morocco's corporate taxpayers applied for

and received reductions in tax fines and penalties.  *Id*.  Therefore, because the recipients of the

subsidy were limited in number, Commerce determined that this program was countervailable.

*Id*.

## II.    **The Court's Remand Order**

In October 2021, plaintiffs and consolidated plaintiffs challenged the Final

Determination.  *See generally* ECF Nos. 51-56.  On September 14, 2023, the Court issued its

*Remand Order*, which partially sustained and partially remanded for further consideration the

Final Determination.  The Court directed Commerce on remand to: (1) either accept OCP's

SG&A cost allocation methodology or demonstrate that it is unreasonable in light of an

alternative methodology; (2) reconsider and explain the methodology used to determine OCP's

profit rate, and address any inconsistency between the inclusion of SG&A in OCP's profit rate calculation and its exclusion in OCP's COP buildup; and (3) reconsider its *de facto* specificity determination with regard to the tax fines and penalties reduction program. *Remand Order* at 23-28, 32-37, 56-63, 65-66.

On January 12, 2024, Commerce filed its Remand Results with the Court.

## ARGUMENT

### I.    Standard Of Review

"The same standard of review applies to the review of a remand determination as to the review of the original determination." *See Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d 1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the Court will sustain Commerce's redeterminations if they are "in accordance with the remand order, are supported by substantial evidence, and are otherwise in accordance with law." *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### II.    Commerce's Remand Redetermination Complies With The Remand Order And Is Supported By Substantial Evidence And In Accordance With Law

Commerce's Remand Results comply with the *Remand Order* because Commerce: (1) revised its subsidy calculation methodology with respect to the provision of mining rights for LTAR program by accepting OCP's SG&A allocation methodology and including OCP's HQ, support, and debt costs in OCP's COP buildup; (2) adjusted the methodology used to determine OCP's profit rate by changing the denominator from "Operating Expenses" to "Costs at the Level of Income Before Tax," which is inclusive of all "Operating Expenses" (*i.e.*, including HQ and support costs) and net "Financial Expenses" (inclusive of debt costs) to create an apples-to-

apples comparison with both the "Income Before Tax" numerator and the corrected COP buildup

for phosphate rock; and (3) reconsidered its *de facto* specificity finding for the tax fines and

penalties reduction program but, under respectful protest, continued to find the program *de facto*

specific based on OCP receiving a disproportionately large amount of this subsidy on an

enterprise basis under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Remand Order* at 23-28, 32-37, 56-63,

65-66; *see generally* Remand Results.

> ### A. Commerce's Determination To Accept OCP's SG&A Allocation Methodology And Include OCP's HQ Support And Debt Costs In The COP Buildup Was In Accordance With Law

In the *Remand Order*, the Court directed Commerce to either accept OCP's SG&A cost

allocation methodology or show that it is unreasonable in light of an alternative methodology.

*Remand Order* at 65-66. The Court held that Commerce impermissibly excluded OCP's HQ,

support, and debt costs from OCP's COP buildup. *Id*. at 23-28. The Court explained that by

excluding all OCP's SG&A expenses from the COP buildup, Commerce made an implied

finding that OCP incurred zero SG&A expenses in the process of producing phosphate rock,

when the record demonstrated otherwise. *Id*. at 26. The Court held that "{i}n light of record

evidence that OCP engaged in mining activities and incurred SG&A costs in doing so,

{Commerce}'s exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable.

*Id*. Accordingly, Commerce revised OCP's cost buildup calculation by accepting OCP's SG&A

allocation methodology and including OCP's HQ, support, and debt costs in its COP buildup

calculation. Remand Results at 9.

> ### 1. Commerce's Decision To Accept OCP's Allocation Methodology Is Supported By Substantial Evidence And In Accordance with Law

In the remand redetermination, Commerce accepted OCP's reported SG&A cost

allocation methodology and included the resulting costs in OCP's cost buildup. Remand Results

at 9, 17-19. First, Commerce clarified that when considering relevant costs in a cost buildup calculation under a tier-three analysis, neither 19 CFR 351.511(a)(2)(iii) nor the Preamble to the final rule implementing Commerce's CVD regulations, *Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Dep't of Commerce November 25, 1998) (*CVD Preamble*), imposes specific requirements or mandates a specific approach. *Id*. at 7. Commerce's tier-three benefit calculation in this case was based on a comparison of the actual per-unit cost buildup of OCP's beneficiated phosphate rock against a market price of phosphate rock. Because Commerce is investigating the provision of mining rights for LTAR, for which a comparable market price is not available to make a direct comparison, Commerce found it appropriate to conduct a benefit analysis on the market value of the underlying good conveyed via the mining rights. *Id*. Therefore, in calculating the cost buildup, Commerce instructed OCP to report all costs associated with its production and pricing of phosphate rock. OCP provided its production costs, including amounts for certain indirect costs, or SG&A, classified as HQ, support, and debt. *Id*.

On remand, Commerce recognized, as the Court held, that excluding OCP's HQ, support, and debt costs was an implied finding that OCP incurred no SG&A costs in the production of phosphate rock. Remand Results at 17. This was contrary to record information indicating that these costs are related to the production and pricing of phosphate rock, albeit in an indirect manner. *See Resp. to Questionnaire in Lieu of On-Site Verification* at 39-40, P.R. 436. (describing certain company-wide expenses relating to "purchases of services," "external costs," "personnel costs," and "amortization of equipment")) (OCP's Verification Resp.).

Moreover, Commerce explained that these costs could not reasonably be further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production. Remand Results at 3. An attempt to further segregate OCP's HQ, support, and debt costs in a manner

inconsistent with OCP's own accounting methodology would be unreasonable.  *Id*. at 9.

Therefore, to comply with the *Remand Order* and create a cost buildup that more reasonably

reflects OCP's phosphate rock production costs, Commerce found OCP's allocation

methodology reasonable and included OCP's HQ, support, and debt costs in its buildup

calculations.  *Id.  See also Nucor Corp. v. United States*, 286 F. Supp. 3d 1364, 1370 (Ct. Int'l

Trade 2018), aff'd, 927 F.3d 1243 (Fed. Cir. 2019) ("… Commerce's methodological approach

must be a 'reasonable means of effectuating the statutory purpose'...") (citations omitted).

Accordingly, because the record reasonably demonstrates that OCP incurred HQ,

support, and debt costs while mining phosphate ore and during the beneficiation of phosphate

rock for sale, and because OCP provided a reasonable explanation for why its HQ, support, and

debt costs should be accounted for in its cost buildup calculations, Commerce's determination to

accept OCP's allocation methodology and include its HQ, support, and debt costs in its cost

buildup was supported by substantial evidence and in accordance with law.  *See Wheatland Tube

Corp. v. United States*, 841 F. Supp. 1222, 1234 (Ct. Int'l Trade 1993) ("Commerce has broad

discretion to choose a methodology to satisfy the statutory mandate.").

### 2. Mosaic's Claim That OCP's Cost Build-up Includes Unrelated Expenses Is Not Supported By The Record Evidence

Mosaic makes several arguments in its remand comments that are neither supported by

the record nor precedent in an attempt to demonstrate that the Court's "ruling was erroneous and

rested on a misinterpretation of the record evidence..."  Mosaic Cmts. at 6-8.

First, Mosaic asserts that "the Court {} incorrectly equated what OCP termed

HQ/Support and Debt costs with SG&A," and that Commerce made no such finding in the

original investigation.  *Id*.  Mosaic's assertion does not negate Commerce's finding, on remand,

that OCP incurred HQ, support and debt costs in the production of phosphate rock.  Remand

Results at 18. Mosaic merely advances assertions based on its preferred interpretation of the factual record and how it believes Commerce should have treated the information before it on remand.

As an initial matter, Commerce agrees with the Court's finding that the HQ, support, and debt costs are SG&A expenses. In the remand redetermination, Commerce explained that the record demonstrates that OCP incurred HQ, support and debt costs in support of its day-to-day operations. Remand Results at 18-19 (citing OCP's Verification Resp.). Mosaic argues that OCP's "financial statements do not describe the HQ/Support segment as SG&A" and that, because OCP also reported revenues associated with this segment, it should not be conflated with SG&A. Mosaic Cmts. at 6-7. However, Commerce is not conflating these expenses; rather, Commerce is creating a COP buildup that reasonably reflects OCP's phosphate rock production costs. Remand Results at 9.

Mosaic's argument ignores the fact that the record demonstrates that OCP incurred HQ, support, and debt costs in the production of phosphate rock. Remand Results at 18. Therefore, it is appropriate to include these costs in OCP's cost buildup calculations. Further, as the Court held, it would be unreasonable to exclude them in light of information on the record. *Id*. As the Court explained in the *Remand Order*, "Commerce, having chosen to use a COP buildup to calculate the government price, was obligated to ensure that its methodology was reasonable and supported by substantial evidence {} {but} in excluding all SG&A expenses, {} failed to do so." *Remand Order* at 28. Through OCP's questionnaire response, Commerce explained that it was satisfied with the reliability of OCP's financial recording system, and that the financial recording system supports the submitted financial statements. Remand Results at 18-19. There is no information on the record demonstrating that OCP's accounting system is not credible or

reliable, as Mosaic seeks to argue.  *Id.*

Instead, Mosaic relies on *Phosphate Fertilizers From the Russian Federation*, and mischaracterizes Commerce's determination on remand not to adjust the tier-three buildup for costs unrelated to the respondents' mining of phosphate ore in that investigation as an affirmative finding by Commerce that the respondent improperly included unrelated expenses.  Mosaic Cmts. at 15-17 citing *Phosphate Fertilizers From the Russian Federation, Final Results of Redetermination Pursuant to Court Remand*, Ct. No. 21-00117, ECF No. 128 (*Phosphate Fertilizers From the Russian Federation Remand Redetermination*) ("We find no evidence that EuroChem improperly included costs not related to phosphate ore mining and phosphate rock production in its reported costs.").  However, in that remand redetermination, Commerce explained that it had "no information on the specific expenses {for} {} line items such as 'Selling Expenses,' 'Administrative Expenses,' and 'Other Expenses' ..."  *Phosphate Fertilizers From the Russian Federation Remand Redetermination* at 19.  In contrast, there is information on the record of this case that the allocated HQ, support, and debt costs OCP provided is relevant to the production of phosphate fertilizers.  *Phosphate Fertilizers From the Russian Federation* thus does not support Mosaic's contention that OCP's HQ, support and debt costs are irrelevant for purposes of Commerce's cost buildup calculations.

Second, Mosaic asserts that Commerce already included certain site indirect expenses in the COP buildup, and these costs "cover the same categories of operating expenses {} that OCP characterized as SG&A in its proposed allocation of HQ/Support and Debt costs."  Mosaic Cmts. at 7.  However, Mosaic's assertion mistakenly conflates site-specific indirect expenses with corporate indirect expenses, which are two distinct types of expenses.  Remand Results at 19.  As Commerce explained in the remand redetermination, although these two types of expenses both

relate to SG&A, they are incurred at different levels of the company, such that Commerce did not include the site-specific indirect costs in the buildup. *Id*. ("We note that these are corporate indirect costs OCP incurs as opposed to the site-specific indirect costs."). Therefore, Mosaic's argument that "Commerce already has accounted for OCP's site-specific SG&A {} in the cost buildup," is incorrect.

Last, Mosaic argues that "this is the first time ever that Commerce has agreed to include corporate-wide expenses unrelated to the good or service provided for LTAR in a tier three cost buildup." Mosaic Cmts. at 10. However, in its remand redetermination Commerce cites to multiple cases that demonstrate otherwise. Remand Results at 18. In *Hot-Rolled Steel from India*, Commerce included indirect costs in the cost buildup used in the benefit analysis for the coal mining rights for LTAR program. *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578, 1,591-1,592 (Dep't of Commerce Jan. 9, 2008). Specifically, Commerce stated, "{t}o {the per unit price}, we added the operational mining costs, on a per unit basis, which consisted of materials, labor, depreciation, overhead, and royalties." *Id*. Commerce expressly considered "overhead," a common measure of indirect expenses, as part of "operational mining costs" along with materials, labor, etc. *Id*. Similarly, in *Softwood Lumber from Canada*, Commerce included certain indirect costs in a COP buildup calculation for subject merchandise. *Certain Softwood Lumber Products from Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Dep't of Commerce November 8, 2017), and accompanying issues and decision memorandum at Cmt. 24.

Therefore, this is not the first time that Commerce has included indirect expenses in a cost buildup of this nature. Mosaic's argument relies on Commerce's finding in the investigation

that "it did not 'have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock.'" Mosaic Cmts. at 10 citing IDM at 24. However, the Court found this an unreasonable and nonsensical basis for excluding OCP's HQ, support, and debt costs. As the Court explained, "OCP could not place on the record 'segregated' SG&A cost data that did not exist" and therefore resorted to an allocation method. *Remand Order* at 27 ("Defendant's argument implying that OCP could have segregated the relevant expenses is nonsensical.").

Mosaic also reasserts another argument that the Court rejected, namely that "OCP is the entity that possesses the documentation Commerce needed to make these findings, and it was OCP who decided to include irrelevant expenses in its reported costs." Mosaic Cmts. at 10. However, as the Court explained in the *Remand Order*, "doing so was not possible because OCP recorded HQ and support expenses, as well as debt costs, only at a corporate level." *Remand Order* at 26.

In sum, the record lacks sufficient evidence for Commerce to determine that OCP improperly included indirect expenses, and to reject its allocation methodology.

### 3. OCP's Allocation Methodology Is Reasonable In Light Of Mosaic's Proposed Alternative

Mosaic contends that OCP's allocation methodology is inaccurate and it provided alternatives for Commerce to consider for the first time on remand. Mosaic Cmts. at 20-21; Remand Results at 23. However, Mosaic cites to no case law or precedent that would have required Commerce to reject OCP's SG&A costs for these proposed alternatives. Mosaic Cmts. at 20-21. Rather, Mosaic frames the issue around Commerce's purported lack of time to consider its proposed alternatives on remand. Mosaic Cmts. at 21 (citing *AG der Dillinger Huttenwerke v. United States*, 26 C.I.T. 1091, 1098 (Ct. Int'l Trade 2002)). Mosaic's reliance on

*AG der Dillinger Huttenwerke* is unavailing, as Commerce properly rejected Mosaic's proposed alternatives in this case as speculative and reflective of how Mosaic believes Commerce should have interpreted the record on remand. *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1381 (Fed. Cir. 1999) ("{A}lthough the burden of production initially {is} on Commerce to establish a prima facie case for imposing a countervailing duty, the burden of production then shift{s} to the {disagreeing party} to come forward with sufficient evidence to rebut the prima facie case") (citations omitted).

Mosaic's proposed alternatives rely on several estimations of OCP's reported costs, including the reallocation of HQ and support costs on the basis of revenues, the adjustment of these expenses to include raw materials, freight, amortization, and financial and non-current expenditures, and the reallocation of debt costs based on each production site's share of financial profit/loss, which Commerce was unable to fully analyze based on the record before it, such that it was unable to determine whether they were a more accurate or reasonable means to allocate OCP's SG&A costs. Remand Results at 23. Because Commerce did not have a "satisfactory alternative" allocation methodology supported by record evidence to demonstrate that OCP's allocation methodology was unreasonable, Commerce found it appropriate to adhere to the Court's directive and accept OCP's allocation methodology. *Id.*

Contrary to Mosaic's assertion, Commerce did not act "as though its hands were tied" or "that it had no choice but to accept OCP's HQ, Support, and Debt Costs." Mosaic Cmts. at 19-20. Rather, Commerce provided a thorough analysis for why it agreed with the Court's ruling based on the record evidence and its obligation to ensure that its chosen methodology to calculate OCP's cost build was reasonable. Remand Results at 23. As the Court explained "{i}n light of record evidence that OCP engaged in mining activities and incurred SG&A costs in

13

doing so, the Department's exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable." *Remand Order* at 26.

In the remand redetermination, Commerce explained that analyses under the tier-three benchmark are performed on a case-by-case basis. Remand Results at 22. 19 C.F.R. § 351.511(a)(2)(iii) is written broadly to afford Commerce the discretion necessary to address the facts of each specific case and determine the most appropriate methodology to use. *Id.* Moreover, Commerce's regulations do not define the term "market principles," and the statute affords Commerce broad discretion in constructing a reasonable methodology for measuring the benefit of a subsidy. *Id.* Following the issuance of the draft remand for comments, Commerce considered Mosaic's proposed alternatives but did not find that OCP's allocation methodology was distorted or unreasonable for purposes of calculating OCP's cost buildup. Remand Results at 23.

Mosaic's arguments also mischaracterize the nature of Commerce's obligations to construct a tier-three benchmark. Mosaic argues that Commerce must consider certain aspects of the antidumping statute in calculating OCP's cost buildup. Mosaic Cmt. 8-10. Mosaic cites to a section in the Senate Report for the Uruguay Round Agreements Act that addresses antidumping proceedings and how Congress expected "Commerce to accept only those methodologies used by the exporter or producer in question in the normal course of its business. . . {and} should not, in any event, accept allocation methodologies that distort real costs." *Id.* However, Commerce explained that when considering relevant cost adjustments, neither 19 C.F.R. § 351.511(a)(2)(iii) nor the *CVD Preamble* directs Commerce to undertake a cost analysis similar to that undertaken in an antidumping proceeding. Remand Results at 17. Commerce also explained that OCP's reported costs were reconciled with its financial statements, and thus verified, with no

discrepancies observed.  *Id*. at 21.  *See also Phosphate Fertilizers From the Russian Federation Remand Redetermination,* at 16 ("Commerce will rely on a respondent's reported information to determine the existence and the amount of the benefit to the extent that such information is usable and verifiable.").  There is nothing on the record of this case to indicate any discrepancies or distortions have occurred, nor does Mosaic cite any record evidence to support a contrary determination.  Therefore, Mosaic's concerns regarding OCP's allocation methodology are unwarranted.

Accordingly, based on the available record information, Commerce determined that OCP adequately reconciled and demonstrated the relevancy of its reported production costs.  Remand Results at 23.  On this basis, Commerce found no record evidence leading it to doubt the reliability or veracity of OCP's reported costs incurred to produce phosphate rock.  *Id*.  *See also DuPont Teijin Films China Ltd. v. United States*, 7 F. Supp. 3d 1338 (Ct. Int'l Trade 2014) ("{Party} failed to demonstrate that its proposed alternative methodology was clearly less distortive than methodology chosen by Commerce.").  Therefore, the use of OCP's reported allocated costs was appropriate for Commerce's tier-three COP buildup.

## B.  Commerce's Determination To Revise OCP's Profit Rate By Dividing Income Before Tax By Cost At The Level Of Income Before Tax Was In Accordance With Law

The Court's *Remand Order* directed Commerce to reconsider and explain the methodology used to determine OCP's profit rate and to address inconsistencies in Commerce's methodology.  *Remand Order* at 32-37.  First, the Court found that Commerce acted unreasonably when its selected numerator, "Income Before Tax," was not determined on the same basis as the denominator, which was limited only to "Operating Expenses."  *Id*. at 33.  Second, the Court characterized as opaque Commerce's statement that its inadvertent reliance on

"Operating Expenses" in lieu of COGS did not affect its calculations.  *Id.* at 34.  Third, the Court held that Commerce's reliance on its prior practice in *Cold Rolled Steel from Russia* to support its profit rate methodology was improper, as OCP's COGS was not on the record.  *Id.* at 35.  In the absence of applicable precedent, the Court held that Commerce was obligated to explain the reasonableness of its profit rate methodology.  *Id*.  The Court instructed Commerce, on remand, to address the inconsistencies between the chosen numerator and denominator, so that its profit rate methodology achieved an apples-to-apples comparison.  *Id*. at 35-37.  The Court further instructed Commerce to address the inconsistency of selecting a profit rate calculation denominator, "Operating Expense," that included OCP's SG&A costs, which was a direct contradiction to the position that the very same expenses should be excluded in the cost buildup to which the profit rate would be applied.  *Id*. at 32-33.  Accordingly, Commerce revised its profit rate methodology to produce a valid comparison.  Remand Results at 9.

### 1.  Commerce's Methodology Provides A Valid Comparison For Calculating OCP's Profit Rate

In the remand redetermination, Commerce modified the methodology it used to calculate OCP's profit rate by changing the value in the denominator to "Cost at the Level of Income Before Tax."  Remand Results at 9.  As OCP did not report COGS in its financial statements, Commerce used another line item, "Profit Before Tax," to create a valid comparison with the numerator used in the calculation.  *Id*.  Commerce achieved this consistency by maintaining the numerator of OCP's profit calculation as "Income Before Tax," and changing the denominator from "Operating Expenses" to "Costs at the Level of Income Before Tax."  *Id*.  The denominator, "Costs at the Level of Income Before Tax," is drawn from the same group of

expenses and is therefore consistent with both the "Profit Before Tax" numerator and the corrected COP buildup for phosphate rock (which includes HQ, support, and debt costs).  *Id*.

OCP agrees that "Commerce has now addressed the internal inconsistency between the numerator and denominator of its profit rate calculation."  OCP Cmts. at 4-5.  However, OCP contends that Commerce violated the statute "by selecting a company-wide profit rate for OCP that includes profits earned on the production and sale of multiple products in addition to phosphate rock."  *Id*.  In its comments on the draft remand, OCP argued that Commerce should not use a company-wide profit rate for OCP because it includes profits on sales of all OCP's products in 2019 and is not specific to phosphate rock.  Remand Results at 24.  OCP provided an alternative methodology for Commerce to calculate revenue figures for each of the three categories of subject phosphate rock (*i.e.*, (i) rock sold for export, (ii) local rock sold to the Jorf Fertilizer Companies (JFCs), and (iii) local rock not sold to the JFCs).  OCP's Letter, "OCP's Comments on Draft Results of Redetermination Pursuant to Court Remand," dated November 30, 2023 (OCP's Draft Remand Comments) (C.R.R. 4) (P.R.R. 9).  As for local rock not sold to the JFCs, OCP explained that Commerce should estimate the profit rate for that category because this revenue figure was not available from the record evidence.  *Id*.  Therefore, OCP provided Commerce with a calculation by which it could estimate a profit rate for this category of phosphate rock.  *Id*.

Commerce explained in the remand redetermination that the estimated revenue figures provided by OCP to calculate the profit rate for this category of subject phosphate rock were inferior to the figures reported in OCP's financial statements, which are on the record and represent OCP's own business operations.  Remand Results at 24.  It is within Commerce's discretion to select among competing datasets, provided its selection is reasonable.  *See Fuwei*

*Films (Shandong) Co. v. United States*, 837 F. Supp. 2d 1347, 1351 (Ct. Int'l Trade 2012)

(explaining that "Commerce's {} data choice is not rendered unreasonable because an alternative

inference or conclusion could be drawn from the administrative record."); *see also Alberta Pork*

*Producers' Mktg. Bd. v. United States*, 669 F. Supp. 445, 457 (Ct. Int'l Trade 1987) ("Commerce

is not required to {} achieve perfection in its calculation {} {rather,} Commerce may use the

best evidence rule only 'as long as the information utilized is reasonably accurate.'" (citations

omitted)).  Accordingly, to comply with the *Remand Order* and create a valid comparison for

purposes of calculating OCP's profit rate, Commerce used the denominator, "Costs at the Level

of Income Before Tax," which was derived from the actual figures reported in OCP's 2019

financial statements.  *Id*.

## 2. Commerce Is Not Obligated To Calculate Profit Rates Based On Estimated Figures

The Court instructed Commerce, on remand, to address the inconsistencies between the

numerator and denominator used to calculate OCP's profit rate, such that its methodology

achieved an apples-to-apples comparison.  *Remand Order* at 37.  OCP agrees that Commerce has

achieved this consistency in its remand redetermination.  Remand Results at 24.  However, OCP

presents two new arguments advocating for a more granular methodology that utilizes rock-

specific revenue estimates.  OCP's Cmts. 13-15.  First, OCP argues that "the use of estimates is

commonplace in CVD proceedings."  *Id*.  Second, OCP relies on 19 U.S.C. § 1677(5)(E) to

argue that Commerce is required to measure the adequacy of remuneration "for the good or

service being provided," and that the only way to do so in this case is to utilize the estimates

provided by OCP.  *Id.*  OCP also presents a new argument that Commerce is statutorily barred from using "a profit rate that is not 'for the good or service being provided.'"  *Id.* at 15.

As an initial matter, the Court should decline to consider these new arguments because OCP did not raise them during the administrative proceedings, such that Commerce was deprived of an opportunity to fully develop the record and respond to them before their presentation to the Court.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (holding that companies must first raise their argument before Commerce).  OCP therefore has not exhausted its administrative remedies.  *See* 28 U.S.C. § 2637(d) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); *see also Mittal Steel Point Lisas v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*.") (emphasis in original).

Should the Court nevertheless entertain these arguments, they still fail because the statute does not require the profit rate methodology advocated by OCP.  *See Federal–Mogul Corp. v. United States*, 862 F. Supp. 384, 405 (Ct. Int'l Trade 1994) ("{Commerce} is given discretion in its choice of methodology as long as the chosen methodology is reasonable and {Commerce's} conclusions are supported by substantial evidence in the record.").

None of OCP's arguments for the use of rock-specific revenue estimates are persuasive. As an initial matter, the only support OCP provides for its first argument, that using estimates in CVD proceedings is "commonplace," is its own company-wide profit rate and the subsidy benefit for the provision of phosphate mining rights derived from Commerce's tier-three

19

benchmark calculations.  OCP Cmts. at 14-15.  This argument is immaterial to Commerce's

lawful exercise of its discretion to select among competing datasets in this case.  Further, the text

of 19 U.S.C. § 1677(5)(E) does not support OCP's second argument, that the statute requires

Commerce to use the rock-specific revenue estimates provided by OCP.  The statute does not

specify any particular methodology for Commerce to follow in calculating profit rate ratios.

Rather, the statute provides that, in determining whether a benefit has been conferred, "the

adequacy of remuneration shall be determined in relation to prevailing market conditions for the

good or service being provided or the goods being purchased in the country which is subject to

the investigation or review."  *See* 19 U.S.C. § 1677(5)(E); *see also* Remand Results at 24.  Based

on the available record information, Commerce reasonably relied on the actual figures derived

from OCP's financial statements to calculate OCP's profit rate.

OCP's third argument, regarding Commerce's purported statutory obligation to use its

rock-specific revenue estimates, is not in accord with the *Remand Order* or the statute.

Commerce was instructed by the Court to further explain the reasonableness of its profit

methodology and any inconsistency between the treatment of SG&A costs in that calculation.

*Remand Order* at 32-33, 37.  Commerce complied with the Court's instructions by adjusting the

calculation described in the remand redetermination using OCP's own allocation methodology

and applying it to include its HQ, support and debt costs associated with the production and

pricing of phosphate rock.  Remand Results at 24.  In the remand redetermination, Commerce

divided OCP's reported "Income Before Tax" by its "Costs at Level of Income Before Tax," to

produce a reasonable profit ratio.  This profit ratio was then multiplied by OCP's total phosphate

rock production costs to produce the resulting profit figure that was later added to OCP's cost

buildup of phosphate rock.  *See* Final Calc. Memo (C.R. R. 1).  Therefore, Commerce

determined OCP's profit ratio in relation to "the good or service being purchased" in accordance with the Court's instructions and the law. This methodology is reasonable for the purpose intended, and nothing in the statute requires the more granular methodology advocated by OCP. It is within Commerce's discretion to rely on actual figures derived from OCP's financial statement in lieu of estimates provided by OCP for the first time on remand. *See PPG Indus., Inc. v. United States*, 781 F. Supp. 781, 788 (Ct. Int'l Trade 1991) ("Because Commerce is charged with the administration of the countervailing duty laws, it is afforded due deference in its reasonable interpretation of those laws").

Accordingly, Commerce complied with the *Remand Order* by creating a valid comparison for purposes of calculating OCP's profit rate by changing the profit rate denominator to "Cost At The Level Of Income Before Tax." In so doing, Commerce reasonably relied on OCP's actual revenue figures to generate OCP's profit for its COP buildup.

### C. Commerce's Specificity Determination For Reduction In Tax Fines And Penalties Program Is in Accordance With Law

The Court ordered Commerce to reconsider its *de facto* specificity determination regarding the tax fines and penalties reduction program. *Remand Order* at 63. In the Final Determination, Commerce based its *de facto* specificity determination on a comparison between the number of corporate taxpaying recipients of penalty relief – 8,761 – to the total number of corporate taxpayers – 262,165 – and not the total number of corporate taxpayers who incurred penalties. IDM at 75. The Court identified several errors with Commerce's determination. First, the Court explained that the 3.34 percent figure calculated by comparing the total number of corporate taxpaying recipients of penalty relief with the total number of corporate taxpayers was meaningless because the numerator and denominator were not logically comparable. *Remand Order* at 58-59. Specifically, the Court held that Commerce's comparison methodology

disregarded the fact that the only potential recipients of the program were those who had

incurred a tax penalty and satisfied the requirements to pay all taxes owed, a distinct and separate

universe from the denominator Commerce used (namely, the total number of corporate

taxpayers).  *Id.*  The Court held that "{b}ecause Commerce made no attempt to compare the

actual recipients to the universe or composition of the group of potential recipients, or to

ascertain whether any identifiable group of taxpayers benefited disproportionately, its

'specificity' methodology was not analytically sound."  *Id*. at 15.

 The Court explained that Commerce's comparison methodology also disregarded the fact

that the program was available to all taxpayers, not only corporate taxpayers.  *Id*. at 59-60.

Therefore, the recipients of the tax penalty relief under the program could not accurately be

described as limited in number "on an enterprise . . . basis" because there is no record evidence

that either the eligibility for the program, or the actual participation in it, had anything to do with

whether the recipients were "enterprises," or that the program was confined to "industries" or

any members thereof.  *Id*.

 Moreover, the Court held that Commerce's interpretation produced an absurd result

because "the record evidence does not establish that the tax fines and penalties reduction

program is anything other than a common, ordinary tax administration program, available to all

taxpayers, under which the taxing authority may mitigate a penalty."  *Id*. at 61.  The Court

further explained that the Statement of Administrative Action (SAA) accompanying the Uruguay

Round Agreements Act, H.R. Rep. No. 103-316 (1994) cautions against the overreaching and

indiscriminate type of specificity finding Commerce employed.  *Id*. (citing SAA at 929).

Referencing the SAA, the Court explained that contrary to Commerce's determination, the tax

fines and penalties reduction program "had 'widespread availability' to all taxpayers, had a large

number of users, (as indicated by the fact that corporate taxpayers alone accounted for 8,761 of those users and there is no record evidence to show that it was 'provided to or used by discrete segments of the economy.'" *Id*. at 62-63.  Further, the Court held that the fact that the program allowed the benefit to be granted as a matter of discretion also does not support an affirmative specificity finding. *Id*. at 63.  Accordingly, the Court ordered Commerce to reconsider its determination that the tax fine and penalty reduction program is *de facto* specific. *Id*. at 63.

On remand, Commerce reconsidered its *de facto* specificity finding and determined that the reduction in tax fines and penalties program is *de facto* specific under 19 U.S.C. § 1677 (5A)(D)(iii)(III).  Remand Results at 10-14.  As an initial matter, Commerce respectfully disagreed with the Court's holding that Commerce's determination that the reduction in tax fines and penalties program is *de facto* specific pursuant to 19 U.S.C. § 1677 (5A)(D)(iii)(I) was unsupported by substantial evidence, and found that there is sufficient evidence to continue to find the program is used by a limited number of actual recipients based on the record evidence. *Id*. at 10.  Nonetheless, in light of the *Remand Order*, and based on the analysis set forth in the remand redetermination, under respectful protest, Commerce determined that the reduction in tax fines and penalties program is *de facto* specific only using the authority provided by 19 U.S.C. § 1677(5A)(D)(iii)(III). *Id*. at 10-11.

### 1.  Commerce's Findings On Remand

The Court held that the reduction in tax fines and penalties program is not specific because it is available to all taxpayers in Morocco. *Remand Order* at 62-63.  When reevaluating this program on remand, Commerce reconsidered its specificity analysis.  Specifically, Commerce analyzed whether OCP's receipt of benefits was disproportionate, under 19 U.S.C. § 1677(5A)(D)(iii)(III), in relation to the Moroccan economy as a whole. *Id*. at 13-14.

23

Commerce compared the benefits (namely, the reductions in fines and penalties) received by OCP on the year it received benefits under this program, 2019, to the average amount of benefits received by other companies in Morocco that used the program in that period and found that OCP was a disproportionate user of this program as it received a share of reductions that was roughly 82.87 times larger than the average amount. *Id*. at 13. Commerce also found that of the 8,761 corporate recipients of reductions under this program, OCP was the 10th largest, and of these recipients, OCP was the only entity that appears to be a producer of the good that can be imported and, thus, the only entity that would fall within the purview of the statute. *Id*. Accordingly, on remand, Commerce determined that OCP is a disproportionate user of the reductions in tax fines and penalties program and that, therefore, the program is *de facto* specific under section 19 U.S.C. § 1677(5A)(D)(iii)(III). *Id*.

### 2. Commerce's Findings On Remand Are Reasonable In Light Of Substantial Evidence Demonstrating That OCP Was A Disproportionate User Of The Tax Fines And Penalties Program

OCP presents several arguments that either mischaracterize Commerce's analysis or the record evidence Commerce relied on or otherwise fail on their merits to undermine Commerce's *de facto* specificity determination. OCP Cmts. at 17-23.

First, OCP argues that "Commerce failed to consider OCP's large size within the Moroccan economy in evaluating whether OCP received a disproportionately large amount of the subsidy..." *Id*. at 20. More specifically, OCP contends that because it is so large (accounting for "roughly 5% of Morocco's GDP"), its use of the program will naturally be large, and therefore cannot be considered "disproportionate." *Id*. at 21. This argument is unpersuasive.

Neither the GOM nor OCP provided information which would draw a correlation between a company's size and the amount of tax fines and penalties it incurs. Remand Results at

24

32.  As Commerce explained in its remand redetermination, there are many reasons why a

company may incur tax fines and penalties which have nothing to do with the firm's size.  *Id*.  In

response, OCP contends "that as the largest corporate group in Morocco, it paid significantly

more of each of these taxes than most other companies."  OCP Cmts. at 20-21.  However, even if

OCP owes more taxes than most companies, as Commerce explained in the remand

redetermination, the record does not demonstrate any correlation between the size of a company

and the fines and penalties incurred under the tax fines and penalties program.  Remand Results

at 32.  Thus, OCP's argument that its large size within the economy necessarily exposes it to a

larger amount of tax fines and penalties is speculative.

OCP also cites the Federal Circuit holding in *AK Steel Corp*. and three administrative

cases to argue that Commerce has a practice of considering the size of a company in determining

whether a respondent received a disproportionate amount of a subsidy.  OCP Cmts. at 19.

However, neither *AK Steel Corp*. nor the cases cited are apposite.

In *AK Steel Corp.,* the Federal Circuit affirmed Commerce's determination to reject the

domestic producer's proposed *de facto* specificity methodology, recognizing that "{t}he {}

methodology *could* produce an untenable result, *i.e*., that a benefit conferred on a large company

*might* be disproportionate merely because of the size of the company."  *AK Steel Corp.*, 192 F.3d

at 1385 (emphasis added).  OCP relies on this statement, ignoring the fact that nothing on the

record demonstrates any correlation between OCP's size and the amount of tax fines and

penalties it incurs.  Remand Results at 32.  Moreover, Commerce did not factor OCP's

contribution to gross domestic product (GDP) in its analysis at all.

In *AK Steel Corp*., the domestic producer proffered a methodology that compared the

industry's share of benefits to its contribution to GDP of the economy.  *AK Steel Corp.*, 192 F.3d

25

at 1384 (asserting that "Korean producers contributed only 2% to GDP and received 86.6% of the benefit ({the respondent} itself received 75.7%), demonstrating the disproportionality of the benefit.")  The Federal Circuit determined that it was reasonable for Commerce to reject this methodology and rely instead on record evidence demonstrating the respondent's relative benefit to the other companies using the program.  *Id*. at 1385.  The record demonstrated that 81 out of 181 companies revalued their assets by a greater percentage than the respondent and that, while the respondent revalued its assets upward by 94.0 percent, the average increase in asset revaluation was 94.2 percent.  *Id*.  Therefore, *AK Steel Corp*. does not provide support for OCP's contention that Commerce was required to consider its overall size in its benefit analysis.

As the Federal Circuit explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case." *Id.* at 1384-85.  Accordingly, when conducting its disproportionate use analysis on remand, Commerce was not bound to any single analysis but instead needed to consider the facts and circumstances of this case.  Remand Results at 29-30.  The fundamental question Commerce needed to answer in its analysis was what portion of a program's funding an enterprise or industry received during the relevant period relative to other users of the program.  *Id*. at 29.  It was appropriate for Commerce to answer that question by examining the average level of benefits granted to OCP under the program compared to the average levels received by other users.  *Id*.  In doing so, Commerce determined that OCP's average share of the program benefits was significantly larger than that received by other enterprises.  *Id*.  Commerce's disproportionate use analysis in this case does not focus narrowly on whether one user received a larger benefit than other users.  Instead, and consistent with its past practice, Commerce's analysis examined whether OCP's benefits are disproportionate to the

26

amounts received by the average user. *Id*. As such, OCP's claims regarding OCP's relative size are irrelevant in this context.

The administrative cases cited by OCP also do not support its argument that Commerce's practice requires it to consider OCP's size within the Moroccan economy when conducting a disproportionate use analysis on an enterprise basis. OCP Cmts. at 19-20.

In these cases, Commerce performed three distinct analyses that examined and compared the benefit distribution of multiple industries based on the facts of each case. *Id*. First, in *Coated Free Sheet Paper From Korea*, Commerce conducted a *de facto* specificity analysis to determine whether sub-sectors of the manufacturing industry received a disproportionate share of the manufacturing sector loans from the Korea Development Bank. In determining whether the investigated sector received a disproportionate share of manufacturing lending, Commerce based its comparison on the other sectors' share of manufacturing GDP. *Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007), and accompanying issues and decision memorandum at 18-20.

Second, in *Live Swine From Canada*, Commerce compared the use of an agricultural program by the industry being investigated, the swine industry, to the use of the program by recipients in other agricultural industries. *Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Dep't of Commerce Mar. 11, 2005), and accompanying issues and decision memorandum at 19. Commerce concluded that because the benefit received under the program was less than the amount of the total agricultural cash receipts collected by the live swine industry, the agricultural program in question was not *de facto* specific. *Id*.

27

Third and finally, in *Dynamic Random Access Memory Semiconductors From Korea*, Commerce found that an investigated firm "received a disproportionately large share of the income tax benefits relative to its size among all companies in the Republic of Korea." *Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2,336 (Dep't of Commerce Jan. 13, 2011) and accompanying issues and decision memorandum at 3. OCP claims that "Commerce found, only after evaluating the benefit received relative to its size among all companies in Korea, that the respondent received a disproportionately large amount of the subsidy." OCP Cmts. at 20. However, this single sentence is hardly indicative of a consistent practice of Commerce relying on the size of a company within its disproportionate use analysis. Accordingly, none of the administrative cases discussed above require Commerce to conduct either of the analyses discussed therein. If anything, they underscore the fact-specific nature of Commerce's disproportionate use analysis.

As explained in the remand redetermination, Commerce conducts its *de facto* analyses under section 1677(5A)(D)(ii)(III) on a case-by-case basis, such that its analysis in one case does not necessarily inform its analysis in subsequent cases, considering the fact-specific nature of its disproportionate use analysis on an enterprise basis. Remand Results at 30; *see also AK Steel Corp.*, 192 F.3d at 1384-85. The record of this case indicates that OCP was a disproportionate user of the tax fines and penalties program because it received a share of reductions that was roughly 82.87 times larger than the average amount. Remand Results at 13, 28.

Second, OCP argues that to determine whether it received a "disproportionately" large amount of reductions, Commerce was also required to consider the diversification of the Moroccan economy. OCP Cmts. at 18 (citing 19 U.S.C. § 1677(5A)(D)(iii)).

In evaluating the specificity factors for domestic subsidies pursuant to 19 U.S.C. § 1677(5A)(D)(iii), Commerce takes into account the extent of diversification of the economic activities within the jurisdiction of the authority providing the subsidy. Remand Results at 30-31. But, according to the SAA, the additional criteria such as the extent of diversification of the economic activities and the length of time a subsidy program has been in operation serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors. *Id*. (citing SAA at 931). In other words, these are not additional indicators of whether specificity exists but rather can provide further context within which the *de facto* specificity factors are analyzed. *Id*. The SAA thus makes clear that these additional criteria are not alone determinative of specificity or the lack thereof. *Id*.

In the remand redetermination, Commerce explained that the GOM reported that there are 286,490 organized enterprises in over 50 economic sectors and that the information reflected a wide diversification of economic activities in Morocco. Remand Results at 31. However, because Commerce examined disproportionate use of the subsidy in question on an enterprise basis, Commerce did not believe that the diversification of Morocco's economy was instructive to the *de facto* specific analysis. *Id*.

In its response brief, OCP merely restates Commerce's diversification analysis without providing any argument or contrary statement to explain why the diversification of the Moroccan economy was "…instructive" to Commerce's analysis as a matter of law. OCP Cmts. at 19. OCP further argues that the SAA "in no way excludes *de facto* analyses on an enterprise basis from such an evaluation." OCP Cmts. at 19. However, OCP's argument is unavailing. As indicated in the SAA, the extent of economic diversification on an enterprise or industry basis within an economy does not necessarily inform or decide whether a subsidy is *de facto* specific

based on disproportionate use. *See* SAA at 931. Instead, data surrounding the benefits received by the respondent and all other enterprises informs the analysis. Remand Results at 26-32. The crux of Commerce's analysis involves an evaluation of the amount of benefits the respondent received in proportion to the benefits received by other enterprises to determine whether the respondent received a disproportionate amount of the benefits provided under this subsidy program regardless of the extent of economic diversification present in the make-up of enterprises operating in the Moroccan economy. *Id*. at 31. Economic diversification does not inform this analysis, rather the data surrounding subsidy usage does. *Id*.

Third, OCP claims that it received a very small percentage of the total reductions received by all corporate taxpayers during the period of investigation. OCP Cmts. at 21-22. However, Commerce explained in its remand redetermination that OCP's comparison was distinct from the disproportionate *de facto* analysis that Commerce conducted. Remand Results at 29. The use of a subsidy may appear small in aggregate terms but can nonetheless reflect disproportionate use when examining the relative distribution of the subsidy on an enterprise basis, such as under the simple average approach employed in Commerce's analysis. *Id*. OCP is comparing the amount of the reductions provided to it to the total amount of the reductions issued during the year in which they were issued, as opposed to comparing the amount of the reductions provided to the respondent (or to the industry to which the respondent belongs) to the amount received by each other recipient (using the simple average approach) on an individual and/or industry bases. *Id*. It is on this latter basis that Commerce found that OCP is a disproportionate user on an enterprise basis under section §§ 1677(5A)(D)(iii)(III). *Id*.

Finally, OCP presents two new arguments that mischaracterize Commerce's findings in its Remand Results. OCP Cmts. at 22-25. As these arguments were never presented to

30

Commerce, the Court should decline to consider them because they are not exhausted. *See Boomerang Tube LLC*, 856 F.3d at 912; *Mittal Steel Point Lisas Ltd.*, 548 F.3d at 1384; 28 U.S.C. § 2637(d); and 19 C.F.R. § 351.309(c)(2).

First, OCP argues that its "ranking as 10th among recipients of the reductions contradicts any determination that OCP received a disproportionately large amount of the reductions." OCP Cmts. at 22-23. As support for this argument, OCP contends that because "the OCP Group is the largest corporate group in Morocco, which comprises the entire Moroccan phosphate industry and roughly 5 percent of Morocco's GDP, a 10th-place rank among recipients demonstrates that OCP actually received a proportionally small amount of reductions relative to its size." *Id.* Although OCP introduces multiple comparison metrics to its own assessment of the ranking, it is not clear from OCP's argument if or how it applied these same metrics to the 8,761 companies who received reductions under the program. Receipt of benefits by each company must be evaluated in comparison to what other companies received under the program and Commerce's methodology to achieve this goal was reasonably done here. Remand Results at 32.

Second, OCP contends that Commerce's statement, that "of the top 10 recipients, OCP is the only entity that appears to be a producer of the good that can be imported and, thus, the only entity that would fall within the purview of the statute under {19 U.S.C. § 1671}," unlawfully imposes an additional condition, focused on an entity's ability to produce an imported good, in Commerce's *de facto* specificity analysis. OCP Cmts. at 23-24 citing Remand Results at 13. OCP mischaracterizes Commerce's statement. Rather than imposing any additional conditions in its *de facto* specificity analysis, Commerce in that statement sought to emphasize the importance of OCP in Morocco generally, and in the Moroccan phosphate fertilizer industry.

For clarity, nothing in the statute or Commerce's practice mandates any specific

methodology in conducting a *de facto* specificity analysis.  Moreover, Commerce has the discretion to apply any reasonable methodology in making such determination in light of facts and circumstances of each particular case.  *See AK Steel Corp.*, 192 F.3d at 1367.  That being said, the function of the countervailing duty statute is to counteract any unfair advantage gained by government intervention over the manufacture, production, or export of merchandise imported into the United States.  *See* 19 U.S.C. § 1671(a)(1). Thus, the very purpose of Commerce's determinations here is to investigate phosphate fertilizers from Morocco, and it is relevant in this context that, in OCP's own words, "it comprises the entire Moroccan phosphate industry from Morocco."  OCP Cmts. at 18.  Moreover, record evidence indicates that OCP was granted exclusive mining rights to extract government-owned phosphate ore reserves in Morocco as a matter of law.  PDM at 11.  These are relevant considerations, and the Court should decline to entertain OCP's mischaracterizations of Commerce's statements as a purported departure from its *de facto* specificity analysis in this case.

In sum, Commerce complied with the statute and the SAA by examining information on the record and using a reasonable methodology to analyze whether OCP received a disproportionately large amount of the reductions in tax fines and penalties subsidy in comparison to other Moroccan enterprises.  Based on the available record information, Commerce reasonably determined that OCP was a disproportionate user of this program because it received a share of reductions that was roughly 82.87 times larger than the average amount. Remand Results at 28.  Moreover, nothing on the record indicates that there is any correlation between the size of the company and the amount of tax fines and penalties it incurs.  *Id*. at 32. Further, Commerce is not required, by statute or its regulations, "to examine *why* OCP received a disproportionate amount of subsidy benefits."  *Id*. (emphasis added).  The fact that OCP is a

disproportionate user is sufficient to find this program *de facto* specific, regardless of whether OCP is a large company or incurred tax fines and penalties when other companies did not. *See Inland Steel Indus., Inc. v. United States*, 967 F. Supp. 1338, 1351 (Ct. Int'l Trade 1997), aff'd, 188 F.3d 1349 (Fed. Cir. 1999) (This Court will sustain Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law.") Because this is a *de facto* specificity finding, the statute and SAA require only an examination of the facts regarding the distribution of benefits under the program, which, as Commerce explained and as the facts demonstrate, show that OCP is a disproportionate user of this program.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Ravi D. Soopramanien
OF COUNSEL:                          RAVI D. SOOPRAMANIEN
ASHLANDE GELIN                       Trial Attorney
Attorney                             U.S. Department of Justice
Office of the Chief Counsel          Commercial Litigation Branch
for Trade Enforcement & Compliance   Civil Division
U.S. Department of Commerce          Ben Franklin Station
                                     P.O. Box 480
                                     Washington, DC 20044
                                     Telephone:  (202) 616-0856
                                     Facsimile:  (202) 307-0972
                                     Email:  Ravi.Soopramanien@usdoj.gov

March 13, 2024                       *Attorneys for Defendant*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that Defendant's Response to Plaintiffs' Comments on Commerce's Remand Redetermination complies with the word count limitation under the Court's standard chambers procedures, and contains 9,809 words including text, footnotes, and headings.

/s/ Ravi D. Soopramanien

March 13, 2024