Slip Op. 25-3

UNITED STATES COURT OF INTERNATIONAL TRADE

THE MOSAIC COMPANY,

                    Plaintiff,

        v.

UNITED STATES,

                    Defendant,

        and

OCP S.A.,

                    Defendant-Intervenor.

Before: Timothy C. Stanceu, Judge

Consol. Court No. 21-00116

OPINION AND ORDER

[Sustaining in part, and remanding in part, an agency decision responding to court order in litigation arising out of a countervailing duty investigation of phosphate fertilizers from Morocco]

                                        Dated: January 8, 2025

*Stephanie E. Hartmann*, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., for plaintiff and defendant-intervenor The Mosaic Company. With her on the brief were *David J. Ross* and *Alexandra S. Maurer*.

*William R. Isasi*, Covington & Burling LLP, of Washington, D.C., for plaintiff and defendant-intervenor OCP S.A. With him on the brief were *Cynthia C. Galvez*, *Wanyu Zhang*, *Micaela McMurrough*, and *Jordan B. Bakst*.

*Ravi D. Soopramanien*, Trial Attorney, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, of Washington, D.C., for defendant. With him on the brief were *L. Misha Preheim*, Assistant Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director. Of counsel on the brief

was *Ashlande Gelin*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge:  In this consolidated action, plaintiffs The Mosaic Company ("Mosaic") and OCP S.A. ("OCP") contested the final affirmative determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") in a countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco ("Morocco") and the resulting countervailing duty order.

Before the court is the Department's "Remand Redetermination," issued in response to the court's opinion and order in *The Mosaic Company v. United States*, 47 CIT __, 659 F. Supp. 3d 1285 (2023) ("*Mosaic I*").  Final Results of Redetermination Pursuant to Court Remand (Int'l Trade Admin. Jan. 12, 2024), ECF No. 115-1 ("*Remand Redetermination*").

Mosaic, a domestic producer of phosphate fertilizer, and OCP, the only known phosphate fertilizer producer in Morocco, oppose the Remand Redetermination in part, raising different objections.  Consol. Pl. and Def.-Int. OCP S.A.'s Comments on Final Results of Redetermination Pursuant to Ct. Remand (Feb. 12, 2024), ECF Nos. 125 (conf.), 126 (public) ("OCP's Comments"); The Mosaic Co.'s Comments on Commerce's Remand Redetermination (Feb. 12, 2024), ECF Nos. 123 (public), 124 (conf.) ("Mosaic's Comments").  Defendant argues that the court should sustain the Remand Redetermination.  Def.'s Response to Pls.' Comments on Commerce's Remand Redetermination (Mar. 13, 2024), ECF No. 131 ("Def.'s Resp.").

Sustaining certain of the decisions in the Remand Redetermination and concluding that others are contrary to law, the court issues a second remand order to Commerce.

## I. Background

Background is provided in the court's previous opinion and order and is supplemented herein. *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1290–92.

### A. The Contested Decision

The Final Determination was published as *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Int'l Trade Admin. Feb. 16, 2021), P.R. Doc. 480, ECF No. 94-4 ("*Final Determination*").[1] Commerce incorporated by reference an accompanying "Issues and Decision Memorandum" in the Final Determination. *Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Phosphate Fertilizers from the Kingdom of Morocco* (Int'l Trade Admin. Feb. 8, 2021), P.R. Doc. 473, ECF No. 94-4 ("*Final I&D Mem.*"). The Final Determination concluded a countervailing duty investigation conducted with a period of investigation ("POI") of January 1, 2019

---

[1] Documents in the Joint Appendix (Apr. 27, 2022), ECF Nos. 93 (conf.), 94 (public) are cited herein as "P.R. Doc. __." Documents in the Remand Joint Appendix (Mar. 27, 2024), ECF Nos. 132 (conf.), 133 (public) are cited herein as "P.R.R. Doc. __." Citations to Joint Appendix and Remand Joint Appendix documents are to the public versions.

through December 31, 2019.  *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1291 (citation omitted).

In the Final Determination, Commerce determined that OCP benefited from six countervailable programs and issued a total countervailable subsidy rate for OCP of 19.97%.  *Final Determination*, 86 Fed. Reg. at 9,483; *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037, 18,038 (Int'l Trade Admin. Apr. 7, 2021), P.R. Doc. 492, ECF No. 94-4; *Final I&D Mem*. 5–6.  The programs and rates were as follows: (1) government loan guarantees, 0.06%; (2) the government of Morocco's provision of phosphate mining rights to OCP for less than adequate remuneration ("LTAR"), 18.42%; (3) tax incentives for export operations, 1.27%; (4) a government program providing for reductions in OCP's tax fines and penalties, 0.05%; (5) revenue exclusions for minimum tax contributions, 0.07%; and (6) customs duty exemptions for capital goods, machinery, and equipment, 0.10%.  *Final I&D Mem*. 5–6.

### B.  The Court's Previous Opinion and Order

In *Mosaic I*, the court ruled on motions for judgment on the agency record submitted by Mosaic and OCP under USCIT Rule 56.2.  Pl. The Mosaic Co.'s Rule 56.2 Mot. for J. on the Agency Rec. (Oct. 15, 2021), ECF Nos. 55 (conf.), 56 (public); Rule 56.2 Mot. for J. on the Agency Rec. of OCP S.A. (Oct. 15, 2021), ECF Nos. 53 (conf.), 54 (public).  The court directed Commerce, on remand, to reconsider two aspects of its

benefit calculation in its determination on OCP's obtaining phosphate mining rights.

One aspect was the Department's exclusion of certain selling, general, and

administrative (collectively, "SG&A") costs incurred by OCP, specifically,

"headquarters, support and debt" costs, when performing a calculation of an estimated

price for OCP's production of "beneficiated phosphate rock," an upstream product in

the production of phosphate fertilizer. *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1301.

The second aspect was the calculation of a profit rate for OCP in that same calculation.

*Id.*, 47 CIT at __, 659 F. Supp. 3d at 1305. The court also directed Commerce to

reconsider its affirmative "specificity" determination for the government program

providing for reductions in tax fines and penalties. *Id.*, 47 CIT at __, 659 F. Supp. 3d at

1317.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including

an action contesting a final determination that Commerce issues to conclude a

countervailing duty investigation, *id.* § 1516a(a)(2)(B)(iii).[2]

---

[2] All citations to the United States Code herein are to the 2018 edition. All
citations to the Code of Federal Regulations herein are to the 2019 edition.

In reviewing a final determination, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence refers to "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. of New York v. Nat'l Lab. Rels. Bd.*, 305 U.S. 197, 229 (1938)).

## B.  The Remand Redetermination Issued in Response to *Mosaic I*

In the Remand Redetermination, Commerce included the headquarters, support and debt costs, as allocated by OCP, in its calculation of an estimated price for OCP's production of beneficiated phosphate rock and redetermined the profit rate for the benefit calculation. *Remand Redetermination* 9–10, 18–19. The changes to the LTAR determination for the provision of phosphate mining rights to OCP reduced the subsidy rate for that program from 18.42% to 5.86%. *OCP S.A. Calculations for the Final Determination* 2 (Int'l Trade Admin. Feb. 8, 2021), P.R. Doc. 475, ECF No. 94-4 ("*Final Det. Calc. Mem.*"); *Draft Remand Redetermination Calculations for OCP S.A.* 2 (Int'l Trade Admin. Nov. 21, 2023), P.R.R. Doc. 2, ECF No. 133-1 ("*Draft Remand Redetermination Calc.*"). This change reduced the total subsidy rate from 19.97% to 7.41%. *Remand Redetermination* 33.

Commerce reconsidered its specificity determination for the government

program providing for reductions in tax fines and penalties, concluding that the

program meets the specificity requirement under a different statutory provision than

the one upon which Commerce previously relied.  *Id.* at 10–11.  Commerce, therefore,

made no change to the 0.05% subsidy rate for that program.

OCP supports the Department's inclusion of the headquarters, support and debt

costs as determined by OCP, OCP's Comments 6–13, and opposes the Department's

recalculated profit rate and the Department's new determination that the tax fines and

penalties reduction program is *de facto* specific, *id.* at 13–25.  Mosaic opposes the

Department's inclusion of the headquarters, support and debt costs and, in the

alternative, argues that the Department's method overstated those costs.  Mosaic's

Comments 5–26.  Mosaic supports the Department's profit recalculation and the new

finding of *de facto* specificity for the tax fines and penalties reduction program.  *Id.* at

26–30.  Defendant "request[s] that the Court sustain Commerce's remand

redetermination and enter final judgment for the United States."  Def.'s Resp. 2.

### C.  The Benefit Calculation for the Provision of Mining Rights for Less than Adequate Remuneration

A "countervailable subsidy" may exist where a government authority provides a

financial contribution to a person, a benefit is thereby conferred, and the subsidy meets

a "specificity" requirement as defined by the Tariff Act.  19 U.S.C. § 1677(5).  "A benefit

shall normally be treated as conferred where there is a benefit to the recipient,

including—," *id.* § 1677(5)(E), ". . . in the case where goods or services are provided, if

such goods or services are provided for *less than adequate remuneration*," *id.*

§ 1677(5)(E)(iv) (emphasis added).

Commerce found that "[t]he Moroccan government, which owns all mineral

reserves, granted OCP a monopoly to mine phosphate, including during the POI."

*Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1298 (citing *Decision Memorandum for the*

*Preliminary Affirmative Determination of the Countervailing Duty Investigation of Phosphate*

*Fertilizers from the Kingdom of Morocco* 11 (Int'l Trade Admin. Nov. 23, 2020), P.R. Doc.

386, ECF No. 94-3 ("*Prelim. Decision Mem.*"); *Final I&D Mem.* 31).  Commerce found that

the government provided the phosphate mining rights for less than adequate

remuneration and thereby conferred a benefit upon OCP.  *Id.*, 47 CIT at __, 659

F. Supp. 3d at 1298–99.

The Tariff Act directs Commerce to determine the adequacy of remuneration "in

relation to *prevailing market conditions* for the good or service being provided or the

goods being purchased in the country which is subject to the investigation or review."

19 U.S.C. § 1677(5)(E)(iv) (emphasis added).  Addressing the statutory reference to

"prevailing market conditions" in the subject country, the Department's regulations

establish a hierarchy of methodologies for determining what is adequate remuneration.

19 C.F.R. § 351.511(a)(2).  Under a "tier-one" analysis, Commerce compares "the

government price to a market-determined price for the good or service resulting from

actual transactions in the country in question." *Id.* § 351.511(a)(2)(i).  If there is no

usable market-determined price, Commerce applies a "tier-two" analysis, comparing

"the government price to a world market price where it is reasonable to conclude that

such price would be available to purchasers in the country in question."  *Id.*

§ 351.511(a)(2)(ii).  The preamble accompanying promulgation of § 351.511 provides

that a tier-two benchmark is inappropriate in situations "where the government is the

sole provider of a . . . service." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377–78 (Int'l

Trade Admin. Nov. 25, 1998).  Because Commerce was investigating OCP's exclusive

mining rights provided by the Moroccan government, Commerce applied a "tier-three"

analysis, under which it "will normally measure the adequacy of remuneration by

assessing whether the government price is consistent with market principles."  19 C.F.R.

§ 351.511(a)(2)(iii).

The statutory requirement to determine the adequacy of remuneration "in

relation to prevailing market conditions," 19 U.S.C. § 1677(5)(E)(iv), posed a difficulty in

the investigation because, as Commerce found, "the 'good or service' provided by the

governmental authority consists of an intangible legal right (in this case, mineral

rights)," *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1298.  "Commerce stated that, in such

situations, it may 'find it appropriate to conduct a benefit analysis not on mining rights

*per se*, but on the value of the underlying good conveyed via the mining rights.'"  *Id.*

(quoting *Final I&D Mem.* 23).  The "underlying good" that OCP mined was phosphate

ore, but another difficulty arose when Commerce found that it could not identify a global market for this good. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299. Noting that OCP, using a "beneficiation" process, converted phosphate ore into phosphate rock, an intermediate product in phosphate fertilizer production, Commerce chose to use "'phosphate rock beneficiated in 2019 to calculate the total benefit.'" *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1298–99 (citing *Prelim. Decision Mem.* 11–12; *Final I&D Mem.* 29 & n.197). To do this, Commerce calculated a per-unit "world benchmark price" for beneficiated phosphate rock by averaging various market prices submitted by Mosaic and OCP. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299. Commerce then performed a "cost buildup" for OCP's own production of beneficiated phosphate rock, in which it then incorporated a profit component. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299, 1301–02. As the court described in *Mosaic I*, "Commerce 'multiplied the difference between the calculated per-unit cost buildup, including the production cost of the phosphate rock and the extraction taxes paid, and the benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated by OCP during the POI.'" *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299 (quoting *Prelim. Decision Mem*. 12). OCP and Mosaic contested the resulting 18.42% subsidy rate, OCP maintaining "that, to the extent a benefit was conferred at all, the benefit found by Commerce was too large;" Mosaic, conversely, argued that the subsidy rate was too small. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1298.

On remand, both OCP and Mosaic contest the Department's methodology for calculating the benefit conferred, but for different reasons.  Mosaic contests the Department's decision in the Remand Redetermination to include OCP's headquarters, support and debt costs in its calculation, and alternatively, its method of doing so, but asks the court to sustain the Department's recalculation of the profit component. Mosaic's Comments 3.  OCP asks the court to sustain the Department's inclusion of the headquarters, support and debt costs in the cost of production buildup but objects to the Department's calculation of a new profit rate.  OCP's Comments 4–5.

## 1.  Valuation of Headquarters, Support and Debt Costs in the Calculation of OCP's Cost of Producing Beneficiated Phosphate Rock

In *Mosaic I,* the court held that Commerce improperly excluded the headquarters, support and debt costs from the calculation of OCP's cost of producing phosphate rock. *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1301.  Noting that these costs were reported on a corporate-wide basis, Commerce excluded them in the entirety based on its finding that not all of the costs "were necessarily directly relevant to phosphate rock production and pricing."  *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299–1300.  According to Commerce, "'to the extent that some items in OCP's HQ/support expenses in the cost build up could arguably be related to mining operations, the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations.'"  *Id.* (quoting *Final I&D Mem.* 24).

Because record evidence showed that OCP incurred SG&A expenses in the production of phosphate rock, the court rejected the Department's rationale that the costs at issue needed to be "segregated" in order to be included in the cost buildup. *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1300–01. "To perform the task of identifying SG&A expenses for its production of beneficiated phosphate rock, OCP necessarily resorted to an allocation method." *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1301 ("Defendant's argument implying that OCP could have segregated the relevant expenses is nonsensical. OCP could not place on the record 'segregated' SG&A cost data that did not exist."). The court concluded that Commerce, having chosen to use a cost of production buildup, was obligated to ensure that its methodology was reasonable and supported by substantial evidence but failed to do so. *Id.* ("On remand, Commerce either must accept OCP's SG&A cost allocation method or must show that it is unreasonable in light of a satisfactory alternative methodology it would use instead.").

In the Remand Redetermination, Commerce reversed its decision to exclude all headquarters, support and debt costs and, further, accepted OCP's allocation of those costs for use in the cost of production calculation for beneficiated phosphate rock. *Remand Redetermination* 2, 21, 23. Commerce found that "OCP's reported costs were reconciled with its financial statements, and therefore verified, with no discrepancies observed." *Id.* at 21 (citing an OCP questionnaire response). Based on that finding, Commerce further found that "OCP has adequately reconciled and demonstrated the

relevancy of its reported production costs" and further found that "no record evidence . . . leads us to doubt the reliability or veracity of OCP's reported costs incurred to produce phosphate rock," and that "the use of OCP's reported costs is appropriate for the tier-three COP [cost of production] buildup." *Id.*

Mosaic challenges the Department's treatment of the costs at issue, raising several arguments. First, Mosaic claims the exclusion of the costs from the Department's original calculation was lawful and that the court "went beyond its remit and inappropriately made a factual finding" by improperly equating SG&A costs with headquarters, support and debt costs. Mosaic's Comments 5–6. Second, Mosaic argues that OCP's accounting methodology counted the "site-specific indirect costs" subcategory twice, once in the total costs for the "Gantour" and "Khouribga" mine sites, and a second time in the headquarters, support and debt expense columns, maintaining that those "site-specific indirect costs" should also count as SG&A expenses. *Id.* at 7. Third, Mosaic claims that OCP failed to provide substantial evidence demonstrating the connection between its headquarters, support and debt costs and phosphate mining. *Id.* at 8–20, 22–24. Fourth, Mosaic contends that including the headquarters, support and debt costs in the cost of production buildup arbitrarily inflates the profit margin. *Id.* at 21–22. Finally, Mosaic claims Commerce "unlawfully failed" to consider its proposed alternative for allocating the headquarters, support and debt costs to the production of beneficiated phosphate rock. *Id.* at 24–26.

Mosaic's first challenge is meritless. Mosaic contends that the court conflated SG&A costs with headquarters, support and debt costs in its prior opinion and order. *Id.* at 6. The pertinent references to "SG&A" costs in *Mosaic I* were not intended to state a holding on costs other than the excluded headquarters, support and debt costs that were at issue in the case at that time. *See Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1300-01. At various places, the Remand Redetermination uses the term "SG&A" to refer to these costs. *Remand Redetermination* 15–23. *Mosaic I* directed Commerce to include the excluded costs in the cost of production buildup on remand. 47 CIT at __, 659 F. Supp. 3d at 1299–1301.

Mosaic's second challenge, addressed to "site-specific indirect costs," Mosaic's Comments 7, is also unconvincing. Mosaic argues that these "site-specific indirect costs" incurred at the mine sites should be treated as the exclusive SG&A expenses related to the phosphate mining and beneficiation activities and that Commerce therefore should have excluded from the cost buildup "all of OCP's reported HQ/Support and Debt expenses . . . because Commerce already has accounted for OCP's site-specific SG&A expenses that have a documented connection to its phosphate mining and beneficiation in the cost buildup." *Id.* at 7–8.

On remand, Commerce found that OCP "provided a reasonable explanation for why its reported HQ, Support and Debt costs should be accounted for in its COP [cost of production] build up calculation for the production of phosphate rock" and found

that headquarters, support and debt costs include the "corporate indirect costs . . . as

opposed to [] site-specific indirect costs." *Remand Redetermination* 19. OCP's

headquarters, support and debt costs are incurred "in support of its day-to-day

operations" and these costs, including the corporate indirect costs, are "recorded at the

company-wide level," *id.* at 8, 18, whereas site-specific indirect expenses are incurred at

the site level, even though both levels of costs "relate to SG&A," Def.'s Resp. 10–11.

The record supports the Department's finding that site-specific costs and

corporate-level costs are distinct, such that including headquarters, support and debt

costs in the cost buildup does not result in double-counting of indirect costs. OCP

allocates costs incurred by the Gantour and Khouribga mine sites to the "phases" in its

"phosphate rock mining value chain"[3] "based on the shares of total direct costs." *OCP*

*S.A. Supplemental Questionnaire Response Part Three* 4, 8 (Nov. 6, 2020), P.R. Doc. 354, ECF

No. 94-2 ("*Supp. Questionnaire Resp. Part Three*")). The site-specific indirect costs include

"mainly" "[p]urchases of services (*e.g.*, facility management)"; "[e]xternal costs (*e.g.*,

telecom, consulting, insurance, etc.)"; "personnel costs (*e.g.*, salaries, overtime, bonuses

of the workers providing the indirect services)"; and "[a]mortization of site-specific

costs that are not directly allocated to one of the rock value chain stages (*e.g.*,

---

[3] There are "four main phases" in the "value chain": "extraction, stone removal, beneficiation, and transportation." *OCP S.A. Supplemental Questionnaire Response Part Three* 4 (Nov. 6, 2020), P.R. Doc. 354, ECF No. 94-2 ("*Supp. Questionnaire Resp. Part Three*").

amortization for administrative building of the site)." *Response to Questionnaire in Lieu of On-Site Verification* 38 (Dec. 30, 2020), P.R. Doc. 436, ECF No. 133-1 ("*OCP's in Lieu of Verification Response*"); *see also Supp. Questionnaire Resp. Part Three* 8.

"OCP also allocates a portion of two corporate-level expenses to each of its mining operations/entities: (1) headquarters . . . and support expenses, and (2) cost of debt." *Id.* The categories to which the headquarters and support expenses relate are similar to the categories of site-specific indirect costs: "[p]urchases of services (*e.g.*, IT [information technology] services, catering, accounting services, facility management)"; "[e]xternal costs (*e.g.*, telecom, consulting and advertising, bank fees, insurance)"; "[p]ersonnel costs (the salaries, overtime, bonuses of the personnel undertaking the activities in the departments listed below)"; and "[a]mortization of equipment related to headquarters and equipment that is used across functions such as IT." *OCP's in Lieu of Verification Response* 39. But this similarity does not convince the court that Mosaic is correct in its allegation of double-counting of SG&A costs.

Commerce reasonably concluded from the record evidence that the corporate-level and site-level cost categories are both described by the term "SG&A" but cover different indirect costs, stemming from distinct departments, personnel, and activities. *Compare id.* at 38 (listing "site specific activities" associated with site-specific indirect costs), *with id.* at 40 (listing departments incurring costs related to headquarters and support activities). For example, site-specific personnel costs are for personnel who

"generally work at the mining site." *Id.* at 38. Corporate-level personnel costs are for employees who "clearly support OCP's mining activities" but which "are booked in HQ and support centers in OCP's accounting system"; OCP's questionnaire response clarifies that even though "some of those costs are properly associated with [] mining activities," they "are recorded in HQ/Support in the accounting system." *Id.* at 6. In summary, the Department's finding, based on OCP's responses to the Department's inquiry, that corporate costs are distinct from site-specific indirect costs is supported by record evidence, and Commerce appropriately included headquarters, support and debt costs as indirect costs in its cost of production calculation.[4]

Mosaic's third and fourth arguments challenging the Remand Redetermination, i.e., an alleged lack of a connection between headquarters, support and debt costs and phosphate mining and a contention that inclusion of these corporate-wide costs arbitrarily inflated the profit margin, fail for the reasons stated in the court's prior opinion, when it ruled that OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities. *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1300–01.

---

[4] The government states in its response brief that only OCP's company-wide costs were included in the cost buildup. Def.'s Response to Pls.' Comments on Commerce's Remand Redetermination 11 (Mar. 13, 2024), ECF No. 131. The court is not able to confirm this characterization on the basis of record evidence.

Mosaic's final argument challenging the Remand Redetermination persuades the court that a remand is required. Commerce acknowledges in the Remand Redetermination that Mosaic submitted an alternative methodology to address the cost issue in its comments on a draft version of a remand redetermination, which Commerce, for no valid reason, declined to address on the merits. Commerce responded that "[t]he petitioner's alternative methodology relies on several estimations of OCP's reported costs which we have not had the time to fully analyze and determine whether the petitioner's alternative is a more accurate or reasonable methodology to allocate OCP's SG&A costs." *Remand Redetermination* 23.

In submitting a draft remand redetermination for the consideration of the parties, Commerce solicited comments from both OCP and Mosaic as to its proposed treatment of the costs in question. Commerce agreed with, and adopted, OCP's position on the issue while maintaining that it did not have time to consider a contrary position of Mosaic on that same issue. If Commerce believed it would require additional time to prepare its Remand Redetermination, it was free to request an extension from the court for that purpose. The Department's rationale that time did not permit it to evaluate a party's comments was unreasonable *per se*. In a second remand, Commerce must evaluate Mosaic's proposed alternative and reach a decision on the allocation method based on a full and fair consideration of the arguments and record evidence before it.

### 2. Calculation of a Constructed Profit Rate for OCP

In the Final Determination, Commerce used a profit rate of 5.47% in its LTAR calculation pertaining to OCP's phosphate rock production. *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1303 (citing *Final Det. Calc. Mem.* 2; *OCP S.A. Section III Questionnaire Response* Ex. Gen-4(a)(iii) (Sept. 17, 2020), P.R. Docs. 130–42, ECF No. 94-1 ("*OCP's 2019 Profit and Loss Statement*")).  OCP contested this rate on two grounds.  First, noting that the rate was based on data pertaining to OCP's production of all products and thus was not limited to production of phosphate rock, the product being valued, OCP argued that Commerce should have used a rate proposed by OCP, which was based on the profit data for a producer of phosphate rock operating in Jordan, not Morocco.  *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1302.  Second, OCP maintained that the calculation method was affected by two errors.  *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1303.  OCP objected that Commerce included headquarters, support and debt costs in the denominator of the profit calculation even though it excluded this category of costs from the cost buildup for the phosphate rock.  *Id.*  OCP objected also that Commerce understated the profit rate by using a numerator, profit before tax, that was not on the same basis as the denominator, which was limited to operating expenses.  *Id.*

The court rejected OCP's first argument, concluding that OCP had failed to show that the Department's use of OCP's own profit data instead of data from another company outside of Morocco was unreasonable.  *Id.*  Agreeing with OCP that the profit

calculation otherwise was not shown to be reasonable in light of the errors OCP

identified, the court ordered Commerce to reconsider that calculation.  *Id*.

On remand, Commerce used a recalculated profit rate of 5.21%.  *Draft Remand

Redetermination Calc.* 2–3; *OCP's 2019 Profit and Loss Statement*.[5]  Commerce calculated

the profit rate using "Income Before Tax" as the numerator (as it had done previously)

but changed the denominator from OCP's "Operating Expenses" to its "Costs at the

Level of Income Before Tax."  *Remand Redetermination* 24.  Asserting that the changes

achieve an "apples-to-apples comparison," Commerce explained that the revised

denominator "is inclusive of all Operating Expenses (including HQ & Support Costs),

and net Financial Expenses (including debt-related costs)."  *Id*.  In comments on the

Remand Redetermination, no party objects to this change in the method of calculating

the profit rate percentage.  Nevertheless, OCP continues to object that the Department's

profit rate calculation impermissibly represents profit on a company-wide basis rather

than profit for the production of phosphate rock.  OCP's Comments 13–15.

---

[5] Commerce designated the numbers used for its profit rate calculation, as well as the determined profit rate, as confidential.  *Draft Remand Redetermination Calc.* 2–3.  The numbers used for the profit rate calculation are available on the public record in a publicly filed financial document, "OCP S.A. General Report of the Statutory Auditors Year Ended December 31, 2019," prepared by Ernst & Young.  *OCP S.A. Section III Questionnaire Response* Ex. Gen-4(a)(iii) (Sept. 17, 2020), P.R. Docs. 130–42, ECF No. 94-1.  The equation used for the calculation is also publicly available.  *Draft Remand Redetermination Calc.* 2–3.

Rather than argue that Commerce should have used a profit rate for a producer

in Jordan, OCP now argues, as it did in its comments on the draft version of the

Remand Redetermination, that Commerce should use certain record evidence

pertaining to OCP's phosphate rock production.  *Id.* at 14.  Specifically, OCP points to

record evidence that it believes would allow Commerce to determine a profit rate based

on actual profit data for two of the three types of phosphate rock that it produced, rock

sold for export and rock sold to Jorf Fertilizers Companies ("JFC"), and that Commerce

could use an estimated profit rate for the third, which was local rock not sold to JFC.

*Id.* at 13–14; *OCP's Comments on Draft Results of Redetermination Pursuant to Court Remand*

10 (Nov. 30, 2023), P.R.R. Doc. 9, ECF No. 133-1 ("*OCP's Draft Comments*").  In support

of its position, OCP argues, as it did in contesting the Final Determination, that the

Tariff Act requires Commerce "to use a profit rate that is specific to the good being

provided which, in this case, is phosphate rock."  OCP's Comments 13 (discussing

19 U.S.C. § 1677(5)(E)).

The court previously rejected OCP's argument that the Tariff Act prohibited

Commerce from using company-wide data on OCP's production activities, reasoning

that Commerce had discretion to choose between two imperfect data bases.  *Mosaic I*,

47 CIT at __, 659 F. Supp. 3d at 1303 ("While OCP advocates use of the JPMC [Jordan

Phosphate Mines Company PLC] surrogate profit rate based on a factor of specificity to

phosphate rock production, that rate is inferior as to other factors, being derived from

business conditions of a different company in a different country.").  OCP's current

position, i.e., that Commerce should use a combination of available company profit data

that relate specifically to production of phosphate rock and an estimate where such data

are not available, raises the issue of whether OCP may present such an argument for the

first time at this stage of the proceeding.  Defendant argues that the court should not

hear the argument, maintaining that OCP failed to exhaust its administrative remedies

when it did not present the argument to Commerce during the investigation.  Def.'s

Resp. 19 (citing *Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017)).

 The court disagrees that the doctrine of exhaustion of administrative remedies

applies in this instance.  As the court recounted in *Mosaic I*, the preliminary

determination included a cost of production buildup without accounting for profit, and

accordingly OCP could not have raised in its case brief to Commerce the objection it

raises now.  *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1305.  Nevertheless, the court

declines to consider OCP's new argument for a different reason.  OCP could have, but

did not, raise this argument in its Rule 56.2 motion.  Had OCP presented its argument at

that time, defendant would have had the opportunity to present its counterarguments

and the court would have had the opportunity to rule on the issue in *Mosaic I*.  Allowing

OCP to present the argument at this stage of the litigation will require additional

proceedings upon remand, consuming time and expense that could have been avoided.

*See* USCIT Rules 1 (prescribing "the just, speedy, and inexpensive determination of

every action and proceeding") & 56.2(c) (requiring the movant to present in the Rule 56.2 brief the arguments according to which it objects to the contested agency action). Therefore, the court considers OCP's argument to have been waived.

In conclusion, the court sustains the Department's recalculation of a constructed profit rate for OCP's production of phosphate rock.

### D. The Department's Determination that a Subsidy to OCP from the Program for Relief from Tax Fines and Penalties Was *De Facto* Specific

In the Remand Redetermination, Commerce again determined that the Moroccan government's program providing for relief from tax fines and penalties was a subsidy to OCP that was *de facto* specific. *Remand Redetermination* 10. In response to the court's ruling in *Mosaic I*, which remanded for reconsideration the Department's determination that OCP received a subsidy from this program that was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I), *id.* at 5–7, Commerce did not reconsider whether that provision applied, deciding instead on remand that OCP received a subsidy that was *de facto* specific under a different provision, 19 U.S.C. § 1677(5A)(D)(iii)(III), *id.* at 10–11.

Mosaic agrees with the Department's determination on specificity. Mosaic's Comments 28–30. OCP contests the determination as "contrary to law and otherwise not supported by substantial record evidence." OCP's Comments 16. The court rules that the Department's redetermination on specificity must be set aside as unlawful.

In conducting its specificity analysis, Commerce may determine a subsidy to be *de facto* specific if any one of four factors are found:

(I)     The actual recipients of the subsidy, whether considered on an
        enterprise or industry basis, are limited in number.

(II)    An enterprise or industry is a predominant user of the subsidy.

(III)   An enterprise or industry receives a disproportionately large
        amount of the subsidy.

(IV)    The manner in which the authority providing the subsidy has
        exercised discretion in the decision to grant the subsidy indicates
        that an enterprise or industry is favored over others.

*Id.* § 1677(5A)(D)(iii). The statute directs that "[i]n evaluating the factors set forth in
subclauses (I), (II), (III), and (IV), the administering authority shall take into account the
extent of diversification of economic activities within the jurisdiction of the authority
providing the subsidy, and the length of time during which the subsidy program has
been in operation." *Id.*

In *Mosaic I*, the court ruled that "the Department's determination that the tax fine
and penalty reduction program was *de facto* specific was unsupported by the record
evidence and, in the interpretation of 19 U.S.C. § 1677(5A)(D)(iii)(I), contrary to law."
*Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1317. The court reasoned that among other
flaws, Commerce reached its finding that the "actual recipients" were "limited in
number" by illogically comparing "the number of corporate taxpaying *recipients* of
penalty relief, 8,761, to the total number of corporate *taxpayers*, 262,165, not the total
number of corporate taxpayers who incurred penalties." *Id.*, 47 CIT at __, 659 F. Supp.
3d at 1314–15. "The resulting percentage (3.34%) is essentially meaningless from the
standpoint of determining the 'specificity' of the program because the numerator and

denominator were not logically comparable." *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1315.

"The only corporate taxpayers who could have applied for relief under the program

during the POI, i.e., the 'potential' recipients, were those that had incurred a tax penalty

and had satisfied the requirement to pay all taxes they owed." *Id.* The court opined

that "[t]he 'actual recipients,' for purposes of 19 U.S.C. § 1677(5A)(D)(iii)(I), that

happened to be corporations—8,761—can scarcely be described as 'limited in number.'"

*Id*. The court reasoned, further, that Commerce disregarded the record fact that "the

program was available to all taxpayers, not only corporate ones." *Id*. In other words,

Commerce impermissibly found that the "actual recipients of the subsidy . . . are limited

in number" within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(I) without considering, or

even mentioning, the actual number of recipients. That flaw alone required the court to

rule that substantial evidence did not support the specificity finding.

In ruling that Commerce had misinterpreted 19 U.S.C. § 1677(5A)(D)(iii)(I), the

court also concluded that "the Department's interpretation produces an absurd result"

in that "[t]he record evidence does not establish that the tax fines and penalties

reduction program is anything other than a common, ordinary tax administration

program, available to all taxpayers, under which the taxing authority may mitigate a

penalty." *Id.*, 47 CIT __, 659 F. Supp. 3d at 1316.

The Department's shifting its rationale from subparagraph (I) (limited number of

actual recipients) to subparagraph (III) (receipt of disproportionately large amount of

the subsidy by an industry or enterprise) of § 1677(5A)(D)(iii) does not make its decision

any less absurd.  It is a decision of a type disapproved by the Statement of

Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act,

H.R. Rep. No. 103–316, at 929–30 (1994) ("*SAA*").  Setting forth a guiding principle, the

SAA explained that "the specificity test was intended to function as a rule of reason and

to avoid the imposition of countervailing duties in situations where, because of the

widespread availability *and use* of a subsidy, the benefit of the subsidy is spread

throughout an economy."  *SAA* 930.  The SAA contrasts such non-countervailable

subsidies with those "provided to or used by discrete segments of an economy."  *Id.*

The SAA quoted approvingly language in *Carlisle Tire & Rubber Co. v. United States*,

5 CIT 229, 233, 564 F. Supp. 834, 838 (1983), opining that "such things as public

highways and bridges, as well as a tax credit for expenditures on capital investment"

that is "available to all industries and sectors," should not be considered to satisfy the

specificity requirement.  *SAA* 929–30 (internal quotation marks omitted).

As the SAA instructs, Commerce must distinguish between subsidies that are

provided to or used by discrete segments of the economy and those that distribute a

benefit throughout the entire economy.  Subparagraph (III) of § 1677(5A)(D)(iii) must be

interpreted consistently with this guiding principle, but Commerce has not done so

here.  *See SAA* 929 (describing the specificity requirement as a "screening mechanism to

winnow out . . . broadly available and widely used" foreign subsidies and recognizing

that "all governments, including the United States, intervene in their economies to one

extent or another, and to regard all such interventions as countervailable subsidies

would produce absurd results").  Neither the group consisting of all taxpayers (the

potential beneficiaries), nor the actual beneficiaries (those taxpayers receiving some

form of penalty relief) constitute a "discrete segment of the economy."

        The statutory directive to "take into account the extent of diversification of

economic activities within the jurisdiction of the authority providing the subsidy,"

19 U.S.C. § 1677(5A)(D)(iii), is yet another indication that Congress did not consider a

government benefit such as the one at issue here to be countervailable.  The record

evidence reveals that the "authority providing the subsidy" extends the potential

benefit not only to all industries and sectors but also to all taxpayers in Morocco.[6]

Commerce cited nothing to demonstrate that the broad availability of the program does

not provide a benefit to the entire economy.  This broad scope crosses all lines of

economic "diversification."  To the extent the program confers a "benefit" upon

individual taxpayers, it also can be seen as benefiting the country's economy at large

through sound tax administration, encouraging taxpayers to satisfy their tax debts

voluntarily in return for a possible penalty reduction.

---

        [6] Commerce again found that the program was used by 8,761 companies during
the period of investigation and, further, did not accord weight to the fact that the
program was not limited to companies.  *Remand Redetermination* 27–28.

Commerce concluded that OCP received a share of reductions in fines or penalties that was "disproportionately large" within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III) based on its finding that OCP's share was 82.87 times larger than the average amount received by other companies in Morocco. *Remand Redetermination* 27–28. Viewed in light of the correct interpretation of 19 U.S.C. § 1677(5A)(D)(iii) and subparagraph (III) in particular, this finding does not suffice to support the Department's conclusion.

In comments on the draft version of the Remand Redetermination, OCP argued that "[c]ontrary to Commerce's determination that OCP received a disproportionate benefit from the subsidy, OCP was only the tenth largest recipient of benefits through the program, despite being the largest employer in the country and representing around five percent of Morocco's gross domestic product (GDP)." *Id.* at 25 (citing *OCP's Draft Comments* 15–16). The Remand Redetermination offers no convincing rebuttal to this argument, objecting that "neither the GOM [government of Morocco] nor OCP provided information which would draw a correlation between a company's size and the amount of tax fines and penalties it incurs." *Id.* at 32. This objection defies logic and common sense. Commerce cited no evidence to support its assumptions that a company's total reduction in tax fines or penalties has no relationship to the total amount of its revenue or to the total taxes for which it is liable. Nor did Commerce make any attempt to demonstrate that OCP got some preferential treatment or other

atypical benefit from the Moroccan government's administration of the widely available

tax fine and penalty relief program.

This case is distinguishable from *Government of Quebec v. United States*, 105 F.4th

1359 (Fed. Cir. 2024) ("*Gov't of Quebec*"), in which the Court of Appeals for the Federal

Circuit ("Court of Appeals") affirmed a *de facto* specificity finding under 19 U.S.C.

§ 1677(5A)(D)(iii)(I) arising from a tax credit program that was confined to employers

engaged in a business providing "on-the-job training" to trainees such as students or

apprentices. *Id.* at 1366, 1374–75. The tax credit program allowed businesses to "claim a

tax credit at a rate of 24% in respect to the salary or wages paid to" the trainee and the

supervisor. *Gov't of Quebec v. United States*, 46 CIT __, __, 567 F. Supp. 3d 1273, 1281

(2022) (internal quotations omitted). Commerce found the actual number of credit

recipients ("roughly 1.27%" of corporate tax filers) who received this benefit to be

limited in number on an enterprise basis. *Gov't of Quebec*, 105 F.4th at 1374 & n.9; *see*

*Gov't of Quebec v. United States*, 46 CIT at __, 567 F. Supp. 3d at 1290. Citing *Mosaic I*,

47 CIT at __, 659 F. Supp. 3d 1314, 1315 n.10, the Court of Appeals expressly

distinguished the tax credit program from the Moroccan tax fines and penalties

reduction program at issue in this case in interpreting 19 U.S.C. § 1677(5A)(D)(iii)(I).

*Gov't of Quebec*, 105 F.4th at 1375 n.10.

This case is distinguishable from the program evaluated in *Gov't of Quebec* in

another respect: the "benefit" here is not analogous to that conferred by Quebec's

program and is far less "beneficial."  While the recipients of the tax credit at issue in

*Gov't of Quebec* received beneficial business tax credits placing them in a better position

than they otherwise would have been, the taxpayers who participated in the Moroccan

program remained fully responsible for the taxes they owed.  *See Supplemental*

*Questionnaire Response of the Government of the Kingdom of Morocco – Part 2* S-IX-2

(Nov. 11, 2020), P.R. Docs. 359–64, ECF No. 94-2.  The record demonstrates that the

program is limited to mitigation of "fines and penalties" and that any benefit conferred

"is contingent upon settling the remaining tax liability in full."  *Id.*  In short, a program

that may reduce a tax penalty for any taxpayer incurring one is not the same as a

program that actually reduces the tax liability for a defined group of enterprises.

In summary, Commerce misinterpreted 19 U.S.C. § 1677(5A)(D)(iii)(III) and

relied upon an unsupported finding that OCP received "a disproportionately large

amount of the subsidy" in reaching a conclusion of *de facto* specificity for the tax fines

and penalties reduction program.

### III.  CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands the Remand

Redetermination to Commerce for consideration of Mosaic's proposed alternate method

for allocating OCP's headquarters, support and debt costs to the production of

beneficiated phosphate rock and directs Commerce to reach a decision on the allocation

method based on a full and fair consideration of the arguments and evidence before it.

The court also directs Commerce to reconsider its *de facto* specificity determination for any subsidy OCP received from Morocco's tax fines and penalties reduction program.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Final Results of Redetermination Pursuant to Court Remand (Int'l Trade Admin. Jan. 12, 2024), ECF No. 115-1, be, and hereby is, sustained in part and disallowed in part; it is further

**ORDERED** that Commerce shall issue a new determination upon remand (the "Second Remand Redetermination") that complies with this Opinion and Order; it is further

**ORDERED** that Commerce shall issue the Second Remand Redetermination within 90 days of the issuance of this Opinion and Order; it is further

**ORDERED** that plaintiff and defendant-intervenor shall have 30 days from the filing of the Second Remand Redetermination in which to submit comments to the court; and it is further

**ORDERED** that should plaintiff or defendant-intervenor submit comments, defendant shall have 15 days from the date of filing of the last comment to submit a response.

                                                               /s/ Timothy C. Stanceu
                                                              Timothy C. Stanceu
                                                              Judge

Dated: January 8, 2025
New York, New York