C-714-001
Remand
Slip Op 25-3
POI: 01/01/2019 – 12/31/2019
~~Business Proprietary Document~~
**Public Version**
E&C/OVIII: TEAM

*The Mosaic Company v. United States,*
**Consol. Court No. 21-116, Slip Op. 25-3 (January 8, 2025)**
*Phosphate Fertilizers from the Kingdom of Morocco*

**FINAL RESULTS OF REDERMINATION
PURSUANT TO SECOND COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the second remand opinion and order of the U.S. Court of

International Trade (the Court or CIT) in *The Mosaic Company v. United States*, Court No. 21-

00116, Slip Op. 25-3 (January 8, 2025) (*Second Remand Order*).  These final results of

redetermination concern the final results of the countervailing duty (CVD) investigation on

phosphate fertilizers (fertilizers) from the Kingdom of Morocco (Morocco),[1] as amended by

Commerce's *First Final Remand Redetermination*.[2]  In the *First Remand Order*,[3] with respect to

the phosphate mining rights for less than adequate remuneration (LTAR) program, the Court

sustained Commerce with respect to its selection of beneficiated phosphate rock world

---

[1] *See Phosphate Fertilizers from Morocco:  Final Affirmative Countervailing Duty Determination*, 86 FR 9482 (February 16, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[2] *See Final Results of Redetermination Pursuant to Court Remand:  The Mosaic Company v. United States, OCP S.A.*, Consol. Court No. 21-00116, Slip Op. 23-134, dated September 14, 2023 (*First Final Remand Redetermination*) available at https://access.trade.gov/public/FinalRemandRedetermination.aspx.
[3] *See The Mosaic Company v. United States,* 659 F. Supp. 3d. 1285 (September 14, 2023) (*First Remand Order*). The Court additionally sustained Commerce with respect to its determinations regarding the initiation of the CVD investigation, the countervailability of VAT programs, Commerce's request for the respondents to report "other forms of assistance," and Commerce's initiation of an investigation of the phosphogypsum byproduct disposal program.  The *First Remand Order* and *First Final Remand Redetermination* present background information, familiarity with which is presumed.

benchmark prices and decision not to adjust the world benchmark price of international delivery

charges, remanded Commerce to either accept OCP S.A.'s (OCP)[4] selling, general, and

administrative (SG&A) cost allocation or demonstrate that the allocation methodology was

unreasonable in light of an alternative methodology, and further remanded Commerce to

reconsider its methodology for the calculation of OCP's profit rate.  With respect to the reduction

in tax fines and penalties program, the Court remanded Commerce to reconsider its *de facto*

specificity determination under section 771(5A)(D)(iii)(I) of Tariff Act of 1930, as amended (the

Act).[5]

In the *First Final Remand Redetermination*, Commerce:  (1) reconsidered its treatment of

OCP's SG&A costs and allocation method, finding it appropriate to accept OCP's proposed

methodology for calculation of OCP's SG&A costs, and revised the calculation methodology for

the provision of phosphate mining rights for LTAR program by including OCP's reported SG&A

costs in the cost of production (COP) buildup; (2) adjusted the methodology used to determine

OCP's profit rate in OCP's phosphate mining rights for LTAR COP buildup; and (3) reconsidered

the *de facto* specificity determination with regard to the tax fines and penalties reduction

program, finding the program to have a disproportionately large use under section

771(5A)(D)(iii)(III) of the Act.[6]  On January 12, 2024, Commerce issued the *First Final Remand*

*Redetermination* pursuant to the *First Remand Order*, with a revised total *ad valorem* subsidy

rate of 7.41 percent for OCP.[7]

On January 8, 2025, the Court sustained the *First Final Remand Redetermination* with

---

[4] For clarity, we refer to OCP as the general respondent entity, and OCP S.A. and OCP Group when referring specifically to the respondent company and consolidated entity, respectively.
[5] *See First Remand Order*; *see also First Final Remand Redetermination*.
[6] *See*, generally, *First Final Remand Redetermination.*
[7] *Id.* at 33.

regard to the recalculation of a constructed profit rate for OCP's COP buildup for the provision of phosphate mining rights for LTAR, but remanded Commerce to: (1) evaluate Mosaic's alternative methodology, the SG&A allocation for OCP's COP buildup in the phosphate mining rights for LTAR program that Commerce failed to address in the *First Final Remand Redetermination*, and "reach a decision on the allocation method based on the full and fair consideration of the arguments and record evidence;" and (2) to reconsider Commerce's *de facto* specificity determination under section 771(5A)(D)(iii)(III) of the Act for any subsidy OCP received from Morocco's tax fines and penalties reduction program.[8]

    As discussed below, pursuant to the Court's *Second Remand Order*, Commerce has addressed parties' comments regarding Commerce's determination, under protest, that the reduction in tax fines and penalties program was not specific and therefore not countervailable, as well as the adjustments we made in the draft remand redetermination to OCP's methodology for OCP's phosphate rock cost of production (COP) buildup in the calculation of the benefit for the provision of phosphate mining rights for LTAR. After considering the parties' comments, we have provided further explanation regarding our analysis and consideration of the available information on the record in the Second Draft Remand Determination, and made an adjustment to our revenue-based HQ and Support cost allocation to account for OCP's [

        ] phosphate rock.[9] Based on this analysis, we calculated a revised 11.18 percent subsidy rate to OCP for the provision of phosphate mining rights for LTAR program, removed the reduction in tax fines and penalties program from OCP's total *ad valorem* subsidy rate, and

---

[8] *See Second Remand Order*.
[9] *See* Memorandum, "Draft Results of Redetermination Pursuant to Second Court Remand," dated March 20, 2025 (Second Draft Remand Redetermination).

calculated a total *ad valorem* subsidy rate of 12.68 percent.[10]

## II.    ANALYSIS

### A.  Reduction in Tax Fines and Penalties

<u>Background</u>

In the *Final Determination*, Commerce found that the Government of Morocco (GOM)'s reductions in OCP's tax fines and penalties are *de facto* specific under section 771(5A)(D)(iii)(I) of the Act.[11]  Specifically, we found that 8,761 companies obtained reductions in tax fines and penalties under Article 236(2) of the CGI[12] out of a total of 262,165 corporate income taxpayers during the period of investigation (POI).[13]  In the *First Remand Order,* the Court remanded Commerce to reconsider its specificity determination, faulting Commerce for comparing corporate taxpayers receiving penalty relief to the total amount of corporate taxpayers rather than the total amount of corporate taxpayers who incurred penalties, which the Court concluded was the appropriate group of potential recipients.[14]  The CIT additionally held that the recipients of tax penalty relief under the program could not be limited in number on an enterprise basis because there was no record evidence that eligibility or participation was limited in number on an enterprise or industry basis.[15]  The CIT held that the tax fines and penalties program was a common tax administration program available to all taxpayers, the type of program the SAA described as not specific due to having "widespread availability," a large number of users, and was not provided to or used by discrete segments of the economy.[16]  Further, the CIT concluded

---

[10] *See* Memorandum, "2nd Final Remand Redetermination Calculations for OCP S.A.," dated concurrently with this memorandum (OCP's Final Remand Calculation Memorandum).

[11] *See Final Determination* IDM at Comment 22.

[12] Code General des Impôts (CGI) or General Tax Code.

[13] *See Final Determination* IDM at Comment 22.

[14] *See First Remand Order*, 659 F. Supp 3d at 1308.

[15] *Id*.

[16] *Id.* at 60-61 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103.316, (SAA) at 929 (1994)).

that the fact that the program allowed the benefit to be granted as a matter of discretion does not support an affirmative specificity finding.[17]

In the *First Final Remand Redetermination*, Commerce found that the reduction in tax fines and penalties was *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act, finding that OCP's receipt of benefit was disproportionate in relation to the Moroccan economy as a whole on an enterprise basis.[18]  Commerce explained that an analysis of *de facto* specificity seeks to answer whether a program is specific based on actual distribution of benefits, despite nominally widespread availability, and the SAA's description of the original purpose of the specificity test was an initial screen mechanism to find foreign subsidies "broadly available and widely *used* throughout an economy."[19]  Commerce compared the benefit (in reductions and fines and penalties) received by OCP to the average amount of benefits received by others in Morocco, and found that OCP was a disproportionate user of the program because the value of its share in reductions was 82.87 times larger than the average amount, a methodology Commerce had employed previously in other specificity determinations under section 771(5A)(D)(iii)(III) of the Act.[20]  Commerce explained that each specificity analysis is determined by the facts and circumstance of each case, and that it had accounted for the extent of diversification of economic activities within Morocco as it informed the application of Commerce's analysis.[21]  Finally, Commerce found that OCP's contention that OCP made up a significant portion of the Moroccan economy meant its use of the program could not be disproportionate was not persuasive because neither the GOM nor OCP provided information

---

[17] *Id.* at 63.
[18] *See First Final Remand Redetermination* at 26-32.
[19] *Id.* at 27 (citing *Countervailing Duties*, 63 FR 65348, 65359 (November 25, 1998) (*1998 Final Rule*); SAA at 929).
[20] *Id.* at 28 (internal citations omitted).
[21] *Id.* at 29-31 (internal citations omitted).

demonstrating a correlation between a company's size and the amount of tax fines and penalties it incurs, and that the *1998 Final Rule* is clear that Commerce is not required by statute or regulations to examine why OCP received a disproportionate amount of subsidy benefits.[22]

In the *Second Remand Order*, the Court remanded Commerce's revised decision finding the reduction in tax fines and penalties program *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act, which the Court held was inconsistent with the guiding principles of the SAA, which intended to avoid the imposition of countervailing duties where a subsidy is spread throughout an economy, in contrast with those provided to or used by discrete sections of the economy.[23]  The Court held that under *Carlisle Tire*, programs "available to all industries and sectors," should not be considered to satisfy the specificity requirement, and that Commerce did not demonstrate how either a group consisting of all taxpayers, who are potential beneficiaries, or actual beneficiaries, *i.e.*, the taxpayers receiving penalty relief, constituted a discrete segment of the economy.[24]  The Court additionally held that Commerce failed to demonstrate that the broad availability of the program did not provide a benefit to the entire economy, thus crossing all lines of economic diversification, and Commerce did not demonstrate that OCP received preferential treatment or another atypical benefit from the GOM's administration, as Commerce cited no evidence to support its assumptions that OCP's reduction in tax fines and penalties had no relationship to its total revenue or the total taxes for which OCP is liable.[25]  Finally, the Court distinguished this program as being far less "beneficial" than other tax programs; holding that a program that may reduce a tax penalty for any taxpayer incurring one, should not be treated

---

[22] *Id.* at 32 (citing *1998 Final Rule*, 63 FR at 65359).
[23] *See Second Remand Order* at 26-27 (citing SAA at 929-930).
[24] *Id.* (citing *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 233, 564 F. Supp. 834, 838 (1983) (*Carlisle Tire*); SAA at 929-930).
[25] *Id.* at 28-29.

analogous to a benefit received under a program that "actually reduces the tax liability for a defined group of enterprises."[26]  The Court directed Commerce to reconsider its *de facto* specificity determination for OCP under the GOM's reductions in tax fines and penalties program.

Analysis

Consistent with the *Second Remand Order*, we have reconsidered our determination that the GOM's reduction in tax fines and penalties program is *de facto* specific.  The CIT held that "a program that may reduce a tax penalty for any taxpayer incurring one is not the same as a program that actually reduces the tax liability for a defined group of enterprises" and that "Commerce misinterpreted 19 U.S.C. § 1677(5A)(D)(iii)(III) and relied upon an unsupported finding that OCP received "a disproportionately large amount of the subsidy" in reaching a conclusion of *de facto* specificity…"[27]  Thus, the CIT held that our determination that OCP is a disproportionate user of the GOM's reduction in tax fines and penalties program pursuant to section 771(5A)(D)(iii)(III) of the Act was contrary to law.

On remand, we find no other basis on the record to conclude that the reduction in tax fines and penalties program is *de facto* specific to OCP.  Consequently, we find, under respectful protest,[28] that, during the POI, the reduction in tax fines and penalties program is not countervailable with respect to OCP.

---

[26] *Id.* at 29-30.

[27] *Id*. at 30.

[28] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003).  The Court held that Commerce "did not demonstrate" that "OCP received preferential treatment" through its disproportionate use of the program or that the reduction in tax fines and penalties program can be both broadly available across an economy but *used* disproportionately by an enterprise compared to other users of the program.  *See Second Remand Order* at 28-29.  We respectfully disagree with that conclusion.  However, as noted above, under protest we have conducted this remand in accordance with the Court's holding.

**B.  OCP's SG&A Costs Incurred to Produce Phosphate Rock**

<u>Background</u>

  In the underlying investigation, Commerce determined OCP's benefit for the provision of phosphate mining rights for LTAR program by conducting a tier-three market principles analysis under 19 CFR 351.511(a)(2)(iii), creating an estimated price for OCP's beneficiated phosphate rock and then comparing it with a world benchmark price.[29]  In its questionnaire responses, OCP reported Headquarters (HQ), Support, and Debt costs, in its COP buildup calculation, which are recorded at a company-wide level and which OCP reported could not be attributed directly to OCP's production activities.[30]  OCP argued the costs in question were related, but not directly tied, to phosphate rock production in OCP's accounting methodology and could not be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production.  Thus, to report these costs, OCP used an allocation methodology based on the proportion of each of its production sites' share of total costs and capital expenditures.

  In the *Final Determination*, Commerce excluded the total of OCP's allocated HQ, Support, and Debt costs from the calculation of OCP's cost to process phosphate rock.  In the *First Remand Order*, the CIT concluded that Commerce acted unreasonably in excluding all of OCP's HQ, Support, and Debt costs from its calculations.[31]  The CIT noted that excluding all SG&A expenses from the COP buildup implied that OCP incurred no SG&A expenses in the production of phosphate rock, and explained that this exclusion was unreasonable in light of

---

[29] *See Phosphate Fertilizers from the Kingdom of Morocco:  Preliminary Affirmative Countervailing Duty Determination*, 85 FR 76522 (November 30, 2020), and accompanying Preliminary Decision Memorandum at 11-13; *see also Final Determination* IDM at Comments 3 through 8.
[30] *See* OCP's Letter, "OCP S.A. Section III Questionnaire Response," dated September 17, 2020 (OCP IQR) at 76-77 and 83-92; *see also* OCP's Letter, "OCP S.A. Supplemental Questionnaire Response Part Three," dated November 6, 2020 (OCP SQR Part 3) at 1-3,8, and Appendices MIN 2-2, 2-3, and 2-7.
[31] *See First Remand Order*, 659 F. Supp. 3d at 1298.

record evidence that OCP incurred SG&A costs for mining activities.[32]  The CIT remanded this issue with instructions for Commerce to either accept OCP's HQ, Support, and Debt cost allocation method or show that it is unreasonable in light of a satisfactory alternative methodology to use instead.

In the *First Final Remand Redetermination*, Commerce noted that neither 19 CFR 351.511(a)(2)(iii) nor the *1998 Final Rule* mandate a specific approach when considering the inclusion of items in a cost buildup under a tier-three market principles analysis, and that Commerce should accordingly, under our practice, consider any relevant production costs associated with producing and pricing phosphate rock.[33]  Commerce agreed with OCP, finding that OCP's HQ, Support, and Debt costs are recorded on a company-wide basis and not directly tied to production in OCP's accounting methodology, and it was thus unreasonable to further segregate OCP's SG&A costs into costs relevant or irrelevant to phosphate rock production.  In light of that analysis, Commerce found OCP's allocation methodology reasonable.  Commerce further found that OCP reconciled and demonstrated the relevancy of its reported production costs, and that because of the lack of time to analyze the petitioner's alternative methodology, Commerce did not have a satisfactory alternative or record evidence to demonstrate that OCP's allocation methodology was unreasonable, and would thus accept OCP's SG&A cost allocation method to comply with the Court's remand.[34]

In the *Second Remand Order*, the Court held that it was appropriate for Commerce to accept OCP's methodology, *i.e.*, to the extent that the methodology included both site-specific and corporate level costs, stating that such costs were distinct and did not result in double-

---

[32] *Id.* at 26 (wherein the CIT refers to OCP's HQ, Support, and Debt cost as SG&A costs).
[33] *See First Final Remand Redetermination* at 7-8 (citing *1998 Final Rule*, 63 FR at 65378).
[34] *Id.* at 22-23.

counting direct costs, and that Commerce was correct in finding that OCP's inclusion of certain corporate-wide SG&A costs was reasonably related to its phosphate mining activities. However, the Court held that Commerce failed to address the alternative methodologies for OCP's COP buildup with respect to HQ, Support, and Debt costs, and in failing to fully consider Mosaic's contrary position on the issue, Commerce did not "evaluate Mosaic's proposed alternative and reach a decision on the allocation method based on a full and fair consideration of the arguments and record evidence."[35] The Court thus remanded OCP's COP buildup with respect to OCP's HQ, Support, and Debt costs a second time for further evaluation of Mosaic's comments.[36]

Analysis

Consistent with the Court's remand, Commerce has considered Mosaic's proposed methodology changes to OCP's cost building for the phosphate mining rights for LTAR program and, based on record evidence substantiating that the alterations would create a methodology more reflective of OCP's allocated costs, made two changes to the COP buildup in the phosphate mining rights for LTAR program, with respect to: (1) the allocation methodology used in calculating a portion of OCP's reported HQ and Support costs, and (2) the inclusion of certain revenue offsets within OCP's net Debt. These changes are discussed below. Mosaic makes one additional argument with respect to OCP's HQ and Support costs and allocation, and one with respect to OCP's Debt costs and allocation. For these additional arguments, for the reasons discussed below, we find that it is appropriate to continue using OCP's COP buildup methodology as submitted.

While the Court has addressed whether OCP's HQ, Support, and Debt costs are related to phosphate mining and rock production, and therefore appropriate to include in the COP buildup,

---

[35] See Second Remand Order at 18.
[36] Id.

in the *First Remand Order* and *Second Remand Order*, Commerce nevertheless addresses the issue to comply with the Court's remand to analyze the arguments made by Mosaic regarding alternative methodology for OCP's cost buildup.

*OCP's HQ Support Costs:  Allocation of Only Costs OCP Demonstrates are Related to Phosphate Mining and Rock Production*

In its comments to the first draft remand redetermination, Mosaic argued that OCP's methodology inflated the COP buildup, because OCP did not demonstrate that the costs are related to phosphate rock and that HQ and Support costs [

].[37]  As such, Mosaic argued that Commerce should only include HQ and Support costs for either those costs OCP has explicitly demonstrated to be related to phosphate mining rights, or in the alternative, exclude costs that the record demonstrates are not related to phosphate mining and rock production.[38]

At the outset, we note that the Court held in the *Second Remand Order* that "Mosaic's… arguments challenging the {*First Final Remand Redetermination*}, *i.e.*, an alleged lack of a connection between headquarters, support, and debt costs and phosphate mining and a contention that inclusion of these corporate-wide costs arbitrarily inflated the profit margin, fail for the reasons stated in the court's prior opinion, when it ruled that OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities."[39] Moreover, the Court agreed in the *First Remand Order* that OCP's site-specific costs and corporate-level costs are distinct, "such that including headquarters, support, and debt costs in

---

[37] *See* Mosaic's Letter, "Comments on Draft Remand Redetermination," dated November 30, 2023 (Mosaic Remand Comments) at 15-16.
[38] *Id.* at 26-27.
[39] *See Second Remand Order* at 8-9.

the cost buildup does not result in double-counting of indirect costs."[40]  As such, the Court has recognized that it is appropriate to include a portion of all corporate-wide HQ and Support costs, as Commerce did in the *First Final Remand Redetermination*.

By their nature, indirect costs cannot be directly linked to a production process, such as the production of phosphate rock.  Such expenses, which are indirect but, as Commerce noted in the *First Final Remand Redetermination*, are relevant to the OCP's phosphate rock production operations, are accounted for at the corporate, rather than operational level.[41]  As such, these expenses are not limited to supporting only phosphate rock production operations, and thus we are unable to segregate them into binary categories of "relevant" and "non-relevant" to phosphate rock production.  Therefore, in order to identify HQ and Support expenses incurred for the production of phosphate rock, resorting to an allocation methodology is necessary.  Although Commerce notes that the record indicates these costs are related to phosphate rock production, in part, they are not directly tied to such production in OCP's accounting methodology which it uses in the normal course of business.[42]  Thus, they cannot be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production based on how they are entered into OCP's books and records.

Without the ability to create a reasonable level of precision in identifying cost centers, as is the case here, and because the information reported by OCP substantiated that OCP does not allocate its HQ and Support costs by site-specific cost centers in the normal course of business such that the costs can reasonably be identified as mining and non-mining related, we find it

[40] *See First Remand Order*, 659 F. Supp. 3d at 1300-01.
[41] *See First Final Remand Redetermination* at 19.
[42] *Id.* at 19 ("Moreover, OCP demonstrated that it incurred HQ, Support and Debt Costs in the course of mining phosphate ore, and beneficiation of phosphate rock for sale and provided a reasonable explanation for why its reported HQ, Support and Debt costs should be accounted for in its COP build up calculation for the production of phosphate rock.")

12

reasonable to utilize a cost allocation that is reflective of the percentage that OCP's mining operations accounts for in comparison to OCP's overall business, rather than attempt to remove line items, or portions of line items, from OCP's allocated HQ and Support costs.[43] To that end, we have reexamined the appropriateness of the allocation methodology proposed by OCP, as discussed below.

*OCP's HQ and Support Costs:  Allocation Methodology*

In its comments to the first draft remand redetermination, Mosaic argued that OCP's HQ and Support cost allocation methodology inaccurately spreads SG&A across OCP's four mining and production sites (*i.e.*, Gantour, Khouribga, Jorf, and Safi), when OCP records HQ and Support costs that are unrelated to production, including the activities of 40 joint ventures and subsidiaries, some of which are located at OCP's HQ offices, and incurs costs and receives revenue from those subsidiaries.[44] Secondly, Mosaic claimed that OCP's HQ and Support cost allocation methodology undercounts total site costs and distorts the allocation because OCP excluded certain categories of costs (*i.e.*, raw materials, freight, amortization, and financial and non-current expenses) that are incurred at chemical sites but not raw material mining sites.[45] Mosaic argued that Commerce should allocate HQ and Support costs either based on revenue rather than the direct expenses of the operation sites, or alternatively, not exclude certain costs, to select an allocation methodology conforming to proper accounting practice and an allocation base representatives of costs.[46]

---

[43] *See* OCP's Letter, "Questionnaire in Lieu of On-Site Verification," dated December 30, 2020 (OCP ILOV SQR) dated December 30, 2020, at 6-7 and Appendix VE-MIN-4.
[44] *See* Mosaic Remand Comments at 16-18.
[45] *Id*.
[46] *Id*.

We agree that OCP's allocation, which determines the percentage of its HQ and Support costs attributable to mining by allocating costs incurred, exclusive of certain types of costs, to two mining sites and two chemical production sites, does not provide a reasonable reflection of OCP's allocated costs, particularly because OCP is excluding certain expenses for raw materials, freight, amortization, financial, and non-current expenses, some of which are [

].[47]  For example, the record substantiates that certain costs, particularly OCP's [                    ] costs, are [              ] incurred [

].[48]  Completely excluding a type of cost that is [              ] incurred [                                   ] distorts the allocation of OCP's HQ and Support costs to incorrectly distribute excess costs to OCP's mining production.

Additionally, the record demonstrates that OCP supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified, and on which OCP based its allocation.[49]  As shown in its financial statements, OCP S.A. was the holding company of 24 fully-owned subsidiaries during the POI and reported that nine entities were consolidated with OCP S.A. in its POI financial statements due to OCP S.A.'s equity investments in the entities.[50]  OCP, as the holding company, must reasonably support these operations to some degree through its headquarters and corporate operations.  Moreover, OCP has other revenue generating business segments that are not included in OCP's cost-based allocation, with eleven percent of its revenue generated from "other products" that are not phosphate rock, phosphoric acid, or fertilizers.[51]  OCP's profit and

---

[47] *See* OCP SQR Part 3, at 8 and Appendix MIN2-7.
[48] *See* OCP ILOV SQR at 41.
[49] *See* OCP IQR at Appendix GEN-8(j).
[50] *Id.* (Note 2).
[51] *Id.* (Note 3).

loss statement for the POI also reports profit from sales of services in Morocco.[52]  OCP itself reported that the HQ and Support activities "exist to support the production operations of the larger entity," including entity-wide support functions such as [

].[53]

For these reasons, we determine that it is unreasonable to assume that these other business segments do not also incur overhead from HQ and Support costs, and OCP's HQ and Support cost-based allocation only includes the phosphate rock and fertilizer sites.

We agree with Mosaic that a revenue-based allocation is a more reasonable methodology for determining a proportion of OCP's HQ and Support costs, as revenue is a more reasonable allocation basis than cost when expenses cannot be traced to a specific product line, and we are able to account for all of OCP's identified business segments within the allocation.  OCP reports both export sales and local sales for all three of its major business segments (phosphates, phosphoric acid, and fertilizers).  Accordingly, we generated an estimated percentage of OCP's overall business attributable to phosphate rock production using the information in OCP's consolidated financial statements, reflecting the POR revenue generated for each of OCP's business segments (*i.e.*, phosphates, phosphoric acid, fertilizers, and "other"), accounting for both identified external revenue and intercompany sales.[54]

*OCP's HQ Debt Costs:  Inclusion of Certain Financial Income Line Items in OCP's Net Debt*

In its comments to the first draft remand redetermination, Mosaic argued that OCP failed to account for certain line items of financial income in its net cost of debt, including [

---

[52] *Id.* at Appendix GEN-4(a)(iii) (Statement B11).
[53] *See* OCP ILOV SQR at 39-40.
[54] For further details regarding the revised HQ and Support costs allocation by revenue, *see* OCP's Draft Remand Calculation Memorandum.

] and the record shows that these line items should be included as interest income on working capital to offset financial expenses, consistent with Commerce antidumping duty practice, which allows for interest income earned on working capital to offset financial expenses included in cost buildups.[55] Mosaic further noted that these items are [                                    ], which are accounted for separately.

While we note that Commerce's antidumping duty practice does not apply to countervailing duty analyses, we nevertheless agree that it is reasonable to offset financial expenses with short term income, as the line items can be reasonably considered a working capital reserve in short-term interest accounts. As income from interest-bearing short-term assets is used for a company's current operations, the line items can be considered readily available and fungible for OCP's cash requirements, including the payment of Debt. Here, the record substantiates through OCP's reconciliation that the incomes in question are included in OCP's short-term financial profit/loss and net Debt in the ordinary course of business, and that the actual Debt expenses incurred for OCP's working capital are offset by this income. We therefore have recalculated OCP's net Debt to include the offsets in question.

*OCP's HQ Debt Costs:  Allocation Methodology*

In its comments to the first draft remand redetermination, Mosaic argued that OCP's allocation basis for Debt costs, using each business unit's share of capital expenditures from 2009-2019, is unrelated to the use of OCP's corporate level financial funds, and that the Debt should be allocated based on each operational segment's share of financial profit and loss, rather

---

[55] *See* Mosaic Remand Comments at 23 {internal citations omitted}.

than a share of capital expenditures, which double-counts the Debt costs associated with capital expenditures.

While we agree with Mosaic that, on its face, the use of financial profit and loss is more reflective of OCP's corporate Debt costs than capital expenditures associated on a site basis, a financial profit and loss allocation is not reasonable in this instance because the record substantiates that OCP [

].[56] Any Debt allocation from the use of financial profit/loss between mining and chemical sites would therefore result in a distorted allocation with OCP's corporate Debt costs from mining [

].

We further note that OCP's consolidated financial statements do not contain financial profit/loss information by business segment or sector, such that Commerce can reasonably allocate OCP's corporate Debt costs based on reasonably available information regarding the consolidated entity.[57] While the allocation methodology provided by OCP has limitations, including lack of accounting for corporate Debt incurred in relation to subsidiaries and joint ventures, we find that OCP's current allocation is the most reasonable alternative available on the record due to the lack of other, non-distortive alternatives.

*Conclusion*

Based on the foregoing, we have revised OCP's COP buildup to allocate a proportion of OCP's HQ and Support costs to OCP's phosphate rock mining using a ratio from the segment revenue found in OCP's consolidated financial statements. We additionally recalculated OCP's

---

[56] *See*, *e.g.*, OCP SQR Part Three at Appendix MIN2-8(a).
[57] *See*, generally, OCP IQR at Appendix Gen-8(j).

net HQ Debt costs, used in OCP's HQ Debt allocation, by including offsetting income line items. The manner in which these changes were applied to OCP's COP buildup are discussed in detail in OCP's Draft Remand Calculation Memorandum.[58]

## III.     INTERESTED PARTY COMMENTS

On March 20, 2025, we released our Second Draft Remand Redetermination to interested parties.[59]  On April 3, 2025, we received comments from Mosaic and OCP.[60]

**Comment 1:     Whether the Reduction in Tax Fines and Penalties Program is *De Facto* Specific**

The following is a verbatim summary of argument submitted by Mosaic.  For further details, *see* Mosaic's Draft Remand Comments.[61]

*Mosaic's Comments*:

> In Section II, Mosaic discusses {Commerce's} finding under protest that the reduction in the tax fines and penalties program is not *de facto* specific, and therefore that this program is not countervailable.  {Commerce's} prior finding that this program is *de facto* specific because OCP is a disproportionate user of the program is more than adequately supported by the record and in accordance with the plain language of the statute as well as the legislative history.  {Commerce} reasonably relied on the information that the GOM provided, namely the total number of actual subsidy recipients and the total amount of benefits, and the record shows that OCP received a disproportionate amount of benefits under this program. {Commerce} should therefore continue to find that this program is *de facto* specific because OCP is a disproportionate user of the subsidy program.

The following is a verbatim summary of argument submitted by OCP.  For further details, *see* OCP's Draft Remand Comments.[62]

*OCP's Comments*:

> {Commerce} is required to "take into account the extent of diversification of

---

[58] *See* Memorandum, "2nd Draft Remand Redetermination Calculations for OCP S.A.," dated March 20, 2025 (OCP's Draft Remand Calculation Memorandum).
[59] *See* Second Draft Remand Redetermination.
[60] *See* Mosaic's Letter, "Comments on Draft Second Remand Redetermination," dated April 3, 2025 (Mosaic's Draft Remand Comments); *see also* OCP's Letter, "OCP's Comments on Draft Results of Redetermination Pursuant to Second Court Remand," dated April 3, 2025 (OCP's Draft Remand Comments).
[61] *See* Mosaic's Draft Remand Comments at 4-8.
[62] *See* OCP's Draft Remand Comments at 4-8.

economic activities within the jurisdiction of the authority providing the subsidy,"[63] which the CIT found in {the *Second Remand Order*} "is {an} indication that Congress did not consider a government benefit such as the one at issue here to be countervailable."[64]  To adhere to the best, or even a reasonable reading of the Act, and to conduct a meaningful analysis consistent with {the *Second Remand Order*}, {Commerce} must consider the extent of diversification of economic activities within Morocco.[65]  Specifically, economic activities in Morocco were largely concentrated in OCP and its consolidated companies, as demonstrated by the fact that OCP's annual revenue alone was equivalent to almost 5% of the country's GDP and by OCP's status as Morocco's largest corporate group by annual revenue and largest private sector employer.[66]

Second, the best reading, or even any reasonable interpretation of "disproportionately large" in {Section 771(5A)(D)(iii)(III) of the Act} requires {Commerce} to consider OCP's size relative to other companies in Morocco in determining whether the amount of the subsidy that OCP received showed that OCP "received more than its fair share" or benefited "more than would be expected" to justify a finding of *de facto* specificity.[67]  Because the Moroccan Tax Code assesses tax fines and penalties based on a percentage of taxes owed, a uniquely large taxpayer like OCP is likely to incur more tax fines and penalties, and thus more reductions in tax fines and penalties.[68]  Record evidence demonstrates that despite having a net taxable income of more than [          ] MAD in 2019, OCP received [          ] of the total reductions granted to corporate taxpayers in 2019, which is in no way disproportionately large.[69]

Lastly, the {SAA} set forth a guiding principle that CVD duties should not be imposed where "because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy."[70]  8,761 companies used the program in 2019,[71] demonstrating that the reductions at issue "benefit{ed} the country's economy at large" as the CIT emphasized in {the *Second Remand*

---

[63] *See s*ection 771(5A)(D)(iii) of the Act.

[64] *See Second Remand Order*.

[65] *See Loper Bright Enters. v Raimondo*, 144 S. Ct. 2244, 2266 (2024) (*Loper Bright*).

[66] *See* the Government of Morocco's (GOM) Letter, "Response of the Government of the Kingdom of Morocco to Commerce's Initial Questionnaire Concerning the Countervailing Duty Investigation," dated September 17, 2020 (Sept.17, 2020) (GOM IQR), at V-15 and Appendices I-1, IV-2, V-11, V-12, V-14, VI-13.

[67] *See Loper Bright*, 144 S. Ct. at 2266; *see also Hyundai Steel Co. v. United States*, 745 F.Supp.3d 1345, 1354 (CIT 2024); and *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (stating that finding "a benefit conferred on a large company might be disproportionate *merely because of the size of the company*" would "produce an untenable result").

[68] *See*, *e.g.*, GOM IQR at Appendix VII-1 (Article 186).

[69] *See* OCP IQR at Appendix GEN-1(a); *see also* the GOM's Letter, "Supplemental Questionnaire Response of the Government of the Kingdom of Morocco – Part 2," dated November 11, 2020 (GOM SQR Part 2) at S-IX-11 (Table S-IX-3).

[70] *See Second Remand Order* (citing SAA at 930).

[71] *See* GOM SQR Part 2 at S-IX-13.

*Order*}[72] and that this program was not what Congress intended for {Commerce} to find specific.

**Commerce's Position:**

Despite its disagreement with the Court's holding, Mosaic does not offer analysis nor points to record evidence that would allow Commerce to find the program specific in light of the Court's ruling. Mosaic argues that the Court's decision is erroneous because OCP's benefit was nearly 100 times larger than the typical benefit amount and demonstrates that the benefit of the subsidy program is concentrated in a "discrete segment of the economy," and that Commerce's determination to find the program not specific is "unduly proscriptive."[73] However, the Court rejected that rationale in the *Second Remand Order* and expressly concluded that Commerce's *de facto* specificity determination based on disproportionate use under section 771(5A)(D)(iii)(III) of the Act "is a decision of a type disapproved by the SAA," that there was no evidence that potential recipients of the benefit (either "all taxpayer" or "those taxpayers receiving some form of penalty relief") constituted a discrete segment of the economy, and that "Commerce misinterpreted {section 771(5A)(D)(iii)(III) of the Act} and relied upon an unsupported finding that OCP received a 'disproportionately large amount of the subsidy' in reaching a conclusion of *de facto* specificity."[74] Commerce is obligated to take action on remand that is consistent with the Court's remand order. Accordingly, under respectful protest, we continue to find that the reduction in tax fines and penalties program is not specific, and therefore not countervailable.

**Comment 2:     Commerce's Methodology for the Calculation of OCP's HQ/Support and Debt Costs in OCP's Phosphate Mining Rights for LTAR Cost Build Up**

---

[72] *See Second Remand Order*; *see also* GOM SQR Part 2 at S-IX-9 ("{T}he waiver or reduction of surcharges, fines, and penalties is a procedure open to all taxpayers…done on the basis of a claim which is not subject to any formal eligibility criteria or time limit conditions.") and S-IX-17 ("The waiver or reduction of surcharges, fines, and penalties is…a part of the Moroccan tax code that is ***available to all taxpayers*** any year and any time they incur such penalties.") (emphasis added).
[73] *See* Mosaic's Draft Remand Comments at 4-7.
[74] *Id.*; *see also Second Remand Order* at 25-30.

The following is a verbatim summary of argument submitted by Mosaic. For further details, *see* Mosaic's Draft Remand Comments.[75]

*Mosaic's Comments*:

> In Section III, Mosaic explains that {Commerce} erred in including OCP's reported HQ/support and debt costs in the cost build-up that it used to calculate the benefit that OCP received from the phosphate mining rights for {LTAR} program. {Commerce's} practice is to include indirect costs in a tier three cost build-up only when such costs have a demonstrated connection with production of the subject merchandise. OCP has failed to demonstrate that its HQ/support and debt costs are related to phosphate mining and rock production. On the contrary, the record indicates that OCP's HQ/support and debt costs include substantial costs that are plainly *unrelated* to phosphate rock production. These are not *indirect* costs of production; they are costs that are *unrelated* to OCP's phosphate production. The record contains sufficient information for {Commerce} to disaggregate the HQ/support and debt costs that are *unrelated* to OCP's phosphate operations, and it would be straightforward for {Commerce} to exclude such costs from the cost build-up. {Commerce} should do so for purposes of the final results.

> In Section IV, Mosaic addresses {Commerce's} allocation methodologies for OCP's HQ/support and debt costs. Mosaic agrees with {Commerce's} decision to allocate the HQ/support costs based on revenues. Mosaic also supports {Commerce's} decision to account for OCP's financial income in the "net cost of debt." However, Mosaic disagrees with {Commerce's} decision to continue using OCP's proposed allocation methodology for debt costs. OCP's proposed methodology allocates debt costs by share of capital expenditures despite the fact that the record shows capital expenditure is only one small way that OCP deploys its debt financed resources. {Commerce} agreed with Mosaic that an allocation based on profit and loss would more accurately reflect OCP's corporate debt costs. Therefore, for purposes of the final results, {Commerce} should revise the allocation methodology for OCP's debt costs to allocate based on OCP's profit and loss or, in the alternative, account for capital investments by OCP at the HQ/support level and by its subsidiaries and affiliates included in its consolidated financial reporting.

The following is a verbatim summary of argument submitted by OCP. For further details, *see* OCP's Draft Remand Comments.[76]

*OCP's Comments*:

> As an initial matter, {Commerce} has rejected in the Draft Redetermination an

---

[75] *See* Mosaic's Draft Remand Comments at 8-25.
[76] *Id.* at 4-8.

allocation methodology based on total operating costs[77] that the {Court} has just affirmed as reasonable and supported by the record evidence in the first administrative review of this CVD proceeding.[78] In contrast, {Commerce's} allocation of OCP SA's HQ and support costs based on the consolidated revenues of the OCP *Group* is distortive and unreasonable. The OCP Group is distinct from OCP SA, is not a respondent in this investigation, and reports on a consolidated basis on behalf of nearly 40 distinct legal entities.[79] Furthermore, a revenue-based allocation is distortive because it attributes all revenues for the significant quantity of OCP's rock produced for internal consumption at the mining sites to the chemical producing sites, effectively shifting HQ and support costs properly allocable to the mining sites to the chemical sites.[80] {Commerce's} purported reason for adopting this allocation— that "the record demonstrates that OCP SA supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites"[81]— is incorrect. The fact that the combined activities of the nearly 40 entities comprising the consolidated OCP Group are not coextensive with the activities of OCP SA does **not** demonstrate, as {Commerce} suggests, that OCP SA maintains business segments or product families beyond its mining and chemical operations. Moreover, a presumption that ownership alone establishes shared costs between legally distinct entities runs counter to the Department's practice and detailed rules for determining cross-owned reporting entities and attributing subsidies among them.[82] In any event, {Commerce} need not speculate about the activities OCP SA engages in, as its full product list identifying every product produced and sold by OCP SA during the {POI} is on the record and demonstrates that OCP SA is a rock and chemical producer.[83] {Commerce} should instead allocate OCP SA's HQ and support costs using OCP SA's total operating costs, both of which support OCP SA's day-to-day operations.[84]

With respect to OCP SA's debt costs, {Commerce} properly allocated debt costs based on capital expenditures rather than based on each production site's share of financial profit/loss.[85] Evidence demonstrates that OCP has used financing for

---

[77] OCP notes that {Commerce} sometimes refers to total operating costs as "site costs" and "total costs." *See*, *e.g.*, Second Draft Remand Redetermination at 8 and 13. OCP uses "total operating costs" in this context to refer to total operating costs exclusive of costs for raw materials, ocean freight, amortization, financial, and noncurrent expenses.

[78] *See The Mosaic Company v. United States*, Consol. Court No. 23-00246, Slip. Op. 25-34, (CIT April 1, 2025) (*First Administrative Review Remand Order*) at 13–22.

[79] *See* OCP IQR at Appendix GEN-8(j), p.14.

[80] The record establishes that [

                                                                                    ]. *See* OCP

ILOV QR at 51, n.16 ([
                                                    ]).

[81] *See* Second Draft Remand Redetermination at 14.

[82] *See*, *e.g.*, 19 CFR 351.525; *see also* Commerce's Letter, "Countervailing Duty Questionnaire," dated July 28, 2020, at 36-39.

[83] *See* OCP IQR at Appendix GEN-2.

[84] *See* OCP ILOV QR at 6-7; *see also* OCP SQR Part 3 at Appendices MIN2-3 and MIN2-7.

[85] *See* Second Draft Remand Redetermination at 16.

capital investment projects related to the slurry pipeline, rock storage facilities, and washing stations, all connected directly to the mining operations and the mining sites. [86] Unlike financial profit/loss, the capital-expenditures based allocation captures ten-years of OCP's capital spending and is more representative of the totality of the cost of debt incurred in any one year,[87] which represents interest paid on a series of loans/debts incurred over time, not only in the current year. However, considering Commerce's stated intent to construct a buildup of the ***costs*** to produce phosphate rock,[88] Commerce lacks any basis for offsetting OCP's debt costs with income.

**Commerce's Position:**

We continue to find that the adjustments to OCP's submitted COP buildup we made in the Second Draft Remand Redetermination are reasonable based on the available information on the record, with an additional adjustment to the revenue-based allocation of HQ and Support costs to account for revenue for OCP's [                    ] of phosphate rock [

]. At the outset, we note that the Court has recently affirmed Commerce's acceptance of OCP's COP buildup methodology in the *First Administrative Review Remand Order*, without the alterations made by Commerce in the Second Draft Remand Redetermination after consideration of Mosaic's comments.[89] However, in the *First Administrative Review Remand Order*, the Court held that Mosaic had failed to provide an alternative method of allocation that Mosaic believed would have been superior to OCP's proposed methodology; by contrast, in this remand

---

[86] *See, e.g.*, OCP IQR at Appendices BONDPURCH-1 (describing purpose of a 2014 international bond offering by OCP as raising funds for OCP to, *inter alia*, "complet{e} two slurry pipelines" to transport rock, "increas{e} the mining capacity of Khouribga and Ben Guerir"; and to "expand{} storage facilities and water-related infrastructure" at Jorf), BONDPURCH-6 at PDF pp. 380-81 (describing the purpose of the 2018 bond offered by OCP as helping OCP finance "a major investment program worth approximately 200 billion dirhams over the 2008-2025 periods") and PDF pp. 597-99 (describing OCP's investment projects including investments in washing stations and mining capacity increases), BONDPURCH-5 at PDF pp. 385, 543 (similar for OCP's 2016 bond offering), GUAR-13 (identifying several loans for OCP [                                        ]), GUAR-14 (identifying loans for OCP [                ] and [                    ] projects); *see also* OCP SQR Part (Nov. 3, 2020) at 15 (describing a loan used by OCP for a [

]), Ex. LOAN2-1 (identifying loans for OCP's

[                              ] and [                                ]).
[87] *See* OCP ILOV QR at 25.
[88] *See Final Determination* IDM at 23-24 ("{W}e will take into consideration the relevant production costs associated with producing the phosphate rock.") (emphasis in original).
[89] *See*, generally, *First Administrative Review Remand Order*.

Commerce has been directly instructed by the Court to consider the alternative methodology proposed by Mosaic.[90]  Therefore, we have made our determination on the basis of the least distortive and most representative methodology, based on the information available on this investigation record, which is separate and distinct from that of the first administrative review, in consideration of all parties' arguments.

Additionally, Mosaic continues to argue that Commerce should exclude OCP's HQ, Support, and Debt costs in entirety, or otherwise exclude certain expenses, such as [

] provided to [                                                    ] that Mosaic argues are "unrelated to OCP's production activities and that cannot reasonably be expected to be recovered in the sale of phosphate rock."[91]  As noted above with respect to the reduction in tax fines and penalties program, Commerce must respond in a manner consistent with the Court's order, and the Court has held that excluding all HQ, Support, and Debt expenses from the COP buildup "is an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock," and that "{i}n light of record evidence that OCP engaged in mining activities and incurred SG&A costs in doing so, the…exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable."[92]  The Court further held that Mosaic's "alleged lack of a connection between headquarters, support and debt costs and phosphate mining and…contention that inclusion of these corporate-wide costs arbitrarily inflated the profit margin, fail for the reasons stated in the court's prior opinion, when it ruled that OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities," and that "Commerce appropriately included headquarters, support, and direct costs as indirect costs,"

---

[90] *Id.*, 659 F. Supp. 3d at 1300-01; *see also Second Remand Order* at 18.
[91] *See* Mosaic's Draft Remand Comments at 8-16 (citing OCP ILOV QR at 18, 29-30; OCP IQR at Appendices GEN-8(j) at 14-15 and BONDPUCH-6).
[92] *See First Remand Order*, 659 F. Supp. 3d at 1300-01.

in the provision of phosphate mining rights for LTAR COP calculation.[93]  Moreover, as
Commerce explained in the Second Draft Remand Redetermination, because the costs cannot be
separated by cost center, and are considered corporate-level SG&A expenses, we find that a
standard cost accounting allocation methodology is a suitable alternative to determine a
reasonable portion of OCP's HQ, Support, and Debt costs.

*HQ and Support Costs*

In the Second Draft Remand Redetermination, Commerce found that the methodology
OCP provided for its HQ and Support costs, based on costs incurred on OCP's mining and
chemical sites, was distortive because OCP excluded certain of its site-specific costs.  In
particular, Commerce cited the fact that OCP's allocation excluded certain expenses for raw
materials, freight, amortization, financial, and non-current expenses, finding that excluding such
expenses, some of which were [                                        ], resulted
in a cost allocation not accurately representative of OCP's HQ and Support costs.[94]

OCP argues that the inclusion of these costs, rather than the exclusion, would be
distortive to OCP's cost allocation.  First, OCP notes that Commerce has excluded ocean freight
from its phosphate rock benchmark, as well as from OCP's direct total operation expenses, and
claims that including them within OCP's HQ and Support cost allocation would be inconsistent
with the exclusion of freight for the benchmark comparison.  In the *Final Determination*, we
noted that we were excluding freight from the benchmark calculation because the underlying
analysis for the natural resource rights derives a market-based price and not a "delivered,"
comparable benchmark price, which Commerce finds to be unavailable under a tier three

---

[93] *See Second Remand Order* at 17.
[94] We agree that costs related to OCP's financial expenses, which are allocated within OCP's cost of debt, are not
appropriate to include in OCP's allocation of SG&A or overhead costs.

analysis.[95]  However, for the allocation of OCP's HQ and Support costs, we are not including the freight expenses within the total COP, but allocating general SG&A costs that OCP reports cannot be separated by business functions or cost centers.  As such, it is reasonable to include freight expenses as part of a broad variety of OCP's general business activities within its cost buildup on which OCP would incur overhead, as the HQ and Support costs for such activities cannot be directly segregated into specific parts of OCP's operations.  The record substantiates that OCP had export sales of both phosphate rock and fertilizers and incurred freight expenses on its export sales; while the ocean freight costs were [

], there is no evidence on the record that [

], and the freight of selling finished goods is not related to the "delivered" price of a material input.[96]

OCP argues that the exclusion of raw material costs was reasonable, because OCP's HQ and Support costs "benefit both the rock and chemical sites," and "{b}ecause OCP S.A.'s mining sites mine raw materials from the ground while the chemical sites purchase raw materials, an allocation based on only the cost of purchasing raw materials is distortive and would over-allocate HQ and Support costs to the chemical sites."[97]  We disagree with this assertion; excluding costs on the basis that the costs were incurred by one type of production and not the other does not increase the accuracy of the allocation.  The Court has found that it is unreasonable to conclude OCP's mining activities incurred no SG&A expenses; likewise, it is unreasonable to conclude that certain of OCP's chemical production activities did not incur

---

[95] *See Final Determination* IDM at Comment 3; *see also Coated Free Sheet Paper from Indonesia:  Final Affirmative Countervailing Duty Determination*, 72 FR 60642 (October 25, 2007), and accompanying IDM at Comment 14.
[96] *See*, *e.g.*, OCP ILOV QR at 17-18 (reconciling OCP's billed freight to OCP S.A.'s financial statements and demonstrating that the [                                    ] OCP excluded from its COP buildup were [
          ] in OCP S.A.'s profit and loss statement.
[97] *See* OCP's Draft Remand Comments at 14.

SG&A expenses.  Moreover, attributing the cost of supporting a business function that exists only for OCP's chemical activities to OCP's chemical activities is not distortive, but an accurate allocation of all of the costs incurred.  OCP further argues that the world market prices for raw materials are volatile, and OCP's raw material costs would likewise cause similar volatility in its allocation, if included.[98]  However, we disagree that this provides a reason for excluding a specific expense; rather, if major expenses within the selected basis for the allocation are potentially unrepresentative of OCP's costs, the basis for the allocation (*i.e.*, OCP's mining and chemical site direct operating costs) is not viable.  Furthermore, regardless of whether OCP's raw material inputs and freight expenses are "volatile external costs," it is not reasonable to assume that such functions are not supported by OCP's HQ and Support business functions and management personnel, which OCP describes as including [

].[99]

In lieu of the methodology proposed by OCP, in the Second Draft Remand Results, we found it appropriate to allocate revenue for OCP's headquarters based on OCP's consolidated revenue, noting that the record demonstrated OCP's corporate management supported other business activities, including the activities of its subsidiaries.

OCP argues that Commerce conflated OCP Group, which is a consolidation of 40 legal entities, with OCP S.A., and that an allocation based on OCP's consolidated revenue does not provide an apples-to-apples comparison to allocate OCP S.A.'s costs, because OCP S.A.'s HQ and Support costs include purchases of services such as IT services, catering, accounting, and facility management, external fees such as telecommunications, consulting and advertising, bank

---

[98] *Id.* (citing OCP IQR at Appendix GEN-8(j)).
[99] *Id.* at 12 (citing OCP ILOV QR at 6-7).

fees, and insurance, and personnel costs such as salaries, overtime , and bonuses for

[

].[100]  However, we disagree with this characterization; OCP S.A. is not

merely "one legal entity among the nearly 40 entities comprising the OCP Group's consolidated

reporting scope," as OCP argues; it was the holding company of 24 fully consolidated

subsidiaries during the POI.[101]

Commerce is not maintaining that a significant portion of OCP's HQ and Support costs

were *incurred* by OCP on behalf of separate entities due to the fact that the entities are located at

OCP's headquarters office, as the Court found to be "mere speculation," or is otherwise booking

costs on behalf of those entities.[102]  Rather, Commerce finds that it is reasonable to conclude

based on record evidence that OCP, as a parent company, serves as a headquarters for the

company and performs the functions OCP reported itself, such as accounting, management,

marketing, banking, and insurance, partly in support of the consolidated entity.  Moreover, 75

percent of OCP's reported consolidated revenue for the POI, as reported from OCP's

consolidated financial statements, is revenue from phosphates and fertilizers; under this

methodology, the vast majority of the costs are in fact allocated to what OCP has identified as

OCP S.A.'s primary purpose, *i.e.*, phosphate rock and phosphate fertilizer production.[103]

We are allocating SG&A and overhead costs, not production costs, that OCP has stated

are related to phosphate rock mining but cannot be tied to a specific production function or cost

center.  Allocating these costs across all segments on which OCP generates revenue does not

---

[100] *Id.*
[101] *See* OCP IQR at Appendix GEN-8(j), Note 2.
[102] *Id.* at-9 (citing *First Administrative Review Remand Order*, at 20).
[103] *See* OCP IQR at Appendix GEN-8(j), Note 4; *see also* OCP's Final Remand Calculation Memorandum.  The percentage is calculated from the total of external and intercompany sales for both phosphates and fertilizers divided by OCP's consolidated sales, including intercompany sales.

suggest that OCP S.A. itself maintains other business segments; it suggests that OCP's headquarters provides support for the consolidated entity, which includes other revenue generating business segments.  For example, OCP cites a reconciliation OCP S.A. submitted for its service during the average useful life, and notes that "the record shows that OCP S.A. booked revenues for the vast majority of its services to cost centers other than HQ and Support during the POI."[104]  The record demonstrates that the services themselves were not booked as HQ and Support costs, but fails to demonstrate that OCP S.A. did not generate overhead as a result of selling the services.

This split is further supported by other information on the record.  For example, OCP provided an agreement for the POI between OCP and its [

].  This agreement includes, amongst other functions, [

].[105]  While the agreement is clear that OCP [                                                  ], the personnel providing [              ] are [                              ].[106]  OCP's reconciliation of OCP S.A.'s financial statements only splits personnel expenses between OCP's [

].[107]  OCP's descriptions of its personnel costs include the salaries, overtimes, and bonuses of the personnel undertaking the HQ and Support cost activities, which include [

].[108]  There is no evidence that OCP accounts for the full costs incurred

---

[104] *See* OCP's Draft Remand Comments at 10 (citing OCP's Letter, "OCP S.A. Supplemental Questionnaire Response," dated November 3, 2020, at Appendix GEN2-1(a); OCP SQR Part III at Appendix MIN2-6).
[105] *See* OCP IQR at Appendix GEN4-(a)(iii).
[106] *Id.*
[107] *See* OCP SQR Part 3 at Appendix MIN2-7; *see also* OCP ILOV QR at Appendix VE-MIN-1.
[108] *See* OCP ILOV QR at 7.

by these personnel within its [                                                                ]; on the contrary,

OCP is emphatic that it cannot separate HQ and Support-related expenses into cost centers in the

ordinary course of business.

Finally, with respect to Commerce's use of OCP's consolidated entity revenue for the

allocation of OCP's HQ and Support costs, OCP argues that Commerce's CVD practice

considers OCP S.A.'s subsidiaries and joint ventures to be distinct legal entities, and the

assumption that ownership establishes shared costs between legally distinct entities is counter to

Commerce's regulations for determining cross-owned reporting entities and attributing subsidies

amongst them.[109]  We disagree that attributing costs across multiple entities in a COP buildup is

against Commerce's regulations; Commerce has no specific regulations on how to create cost

buildups for a tier three LTAR analysis in a CVD investigation.  Such an analysis is made on a

case-by-case basis, based on the facts of the specific record.  The COP buildup employed in a tier

three analysis is the valuation of the cost of producing a product, plus a reasonable amount of

profit, not a subsidy attribution under section 351.525 of Commerce's regulations.[110]

OCP additionally argues that Commerce's revenue-based allocation is distorted because

[

                                                                ], thus under-allocating OCP's HQ and Support

costs to rock-producing sites.[111]  We agree with OCP that it is reasonable to account for

[

                                                        ], and, for the final remand redetermination, have adjusted our

---

[109] *See* OCP's Draft Remand Comments at 9.
[110] We note, however, that 19 CFR 351.525(b)(6)(iii) in fact attributes subsidies of holding or parent companies to the consolidated sales of the holding company and its subsidiaries, which is precisely how we have allocated the *headquarter* costs of OCP S.A., the holding company of OCP Group.
[111] *See* OCP's Draft Remand Comments at 8 (citing OCP ILOV QR at 51, note 16).

allocation calculation accordingly to account for the [          ] revenue, valued at the cost of

[                                    ].[112]  We note that this methodology, including

the adjustment, is consistent with Commerce's allocation methodology in the second

administrative review of this order.[113]

      Based on the above, we are making an adjustment to the revenue-based allocation of

OCP's HQ and Support costs, but are otherwise continuing to use the remainder of the

methodology for the calculation of HQ and Support costs attributable to OCP's phosphate

mining that Commerce determined was the most reasonable in the Second Draft Remand

Redetermination.

*Debt Costs*

      In the Second Draft Remand Redetermination, Commerce adjusted the total value of

OCP's non-site specific net Debt to offset for OCP's short-term financial expenses.  OCP argues

that Commerce's decision to offset its Debt costs with financial revenue is inconsistent with

Commerce's "stated intent to construct a buildup of the *costs* to produce phosphate rock"

(emphasis in original).[114]  However, the record shows that these costs are included in OCP's

calculation of net Debt in OCP's financial statements, indicating that in the ordinary course of

business, OCP treats this financial income as short-term assets for funding OCP's cash

requirements, including the payment of OCP's debts.[115]  Moreover, the record substantiates that

OCP used bonds to [                                    ].[116]  Therefore, the record

indicates that the debt burden OCP is paying through its production is better reflected by OCP's

---

[112] For a description of the calculation, *see* OCP's Final Remand Calculation Memorandum.
[113] *See Phosphate Fertilizers from the Kingdom of Morocco:  Final Results of Countervailing Duty Administrative Review, 2022*, 89 FR 88952 (November 12, 2024), and accompanying IDM at Comment 2B.
[114] *See* OCP's Draft Remand Comments at 16.
[115] *See* OCP IQR at Appendix GEN4-(a)(iii); *see also* OCP ILOV SQR at 19-27.
[116] *See*, *e.g.*, OCP IQR at Appendices BONDPURCH-1, BONDPURCH-5, and BONDPURCH 6.

net Debt, which reflects the actual debt obligations of OCP as a corporation and the debt costs carried by OCP's revenue generation.  Based on this information, we find it appropriate to include OCP's offsetting financial revenue in its total overhead Debt costs.

In the Second Draft Remand Redetermination, Commerce found that Mosaic's proposed allocation methodology for OCP's Debt costs (basing the allocation on OCP S.A.'s phosphate and chemicals segments' respective shares of financial profit or loss) was not usable because OCP S.A. [

].  Commerce therefore found a profit-based allocation split by segment was not reasonable.  Mosaic argues that record evidence shows that [

], namely, [

]."[117]  However, we note that this only reflects [

].  Profit and loss is thus not a reasonable method for allocating financial expenses, because we cannot identify a reasonable profit on OCP's [

], which accounts for [          ] of OCP's POI phosphate rock production.[118]

Finally, in its comments on the Second Draft Remand Redetermination, Mosaic proposes for the first time an alternative allocation of OCP's Debt costs, based on an allocation of OCP's consolidated capital expenditures rather than OCP S.A.'s capital expenditures.[119]  According to Mosaic, OCP engages in capital expenditure on behalf of subsidiaries and affiliates, and

---

[117] *See* Mosaic's Draft Remand Comments at 23 (citing OCP IQR at Appendix BONDPURCH-6).
[118] *See* OCP SQR Part 3 at Appendix MIN2-3; *see also* OCP's Letter, "OCP S.A. Supplemental Questionnaire Response Part Four," dated November 9, 2024, at 1-2; and OCP's Final Remand Calculation Memorandum.
[119] *See* Mosaic's Draft Remand Comments at 23-25.

Commerce should account for such expenses at a headquarters-level, as record information supports the fact that OCP S.A. performed financial functions for OCP-Group focused initiatives.[120]  Mosaic therefore proposes an allocation based on a bond prospectus breakout of capital expenditure from [     ].[121]  While we agree that allocating OCP's Debt costs based on the capital expenditures of OCP as a consolidated entity is a more accurate reflection of OCP's incurred financial expenses, and is consistent with our revenue allocation using the consolidated entity, the record does not contain POI-contemporaneous information to calculate this allocation, nor is there any indication on the record that OCP Group's capital expenditures remained unchanged between [     ] (the period for which the information is available) and the 2019 POI. We therefore find that the current allocation provided by OCP, which we declined to change in the Second Draft Remand Redetermination, continues to be the most accurate information available.

Based on the analysis above, we did not make any changes from the Second Draft Remand Redetermination to OCP's Debt costs for its COP buildup.

## IV.    FINAL RESULTS OF REDETERMINATION

Consistent with the *Second Remand Order*, Commerce has reconsidered the finding of *de facto* specificity pursuant to section 771(5A)(D)(iii)(III) of the Act for the reduction in tax fines and penalties program, and re-evaluated the SG&A expenses within OCP's phosphate rock COP buildup for the provision of phosphate mining rights for LTAR program accounting for the comments provided by Mosaic in the first remand redetermination that Court found that Commerce previously failed to consider.  Based on the foregoing redeterminations, we revised the subsidy rate calculation for mandatory respondent OCP and all other companies.  The revised

---

[120] *Id.*
[121] *Id.*

CVD rates for the POI of January 1, 2019, through December 31, 2019, are listed in the chart below.[122]

| Company | Subsidy Rate in the *Final Determination*[123] (percent *ad valorem*) | Subsidy Rate in the *First Final Remand Redetermination*[124] (percent *ad valorem*) | Subsidy Rate in the **Final Results of the Second Remand** (percent *ad valorem*) |
|---|---|---|---|
| OCP S.A. | 19.97 | 7.41 | 12.68 |
| All others rate | 19.97 | 7.41 | 12.68 |

4/29/2025

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott
Deputy Assistant Secretary
 For Policy and Negotiations,
 Performing the non-exclusive functions and duties
 Of the Assistant Secretary for Enforcement and Compliance

---

[122] For details on the revised recalculations for these results of redetermination, *see* OCP's Final Remand Calculation Memorandum.
[123] *See Final Determination*, 86 FR at 9482.
[124] *See First Final Remand Redetermination* at 33.

34