Consol. Ct. No. 21-00116

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

|  |  |
|---|---|
| THE MOSAIC COMPANY, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Before: Timothy C. Stanceu, Judge** |
| ) | |
| UNITED STATES, ) | **Consol. Case No. 21-00116** |
| ) | |
| Defendant, ) | **NON-CONFIDENTIAL VERSION** |
| ) | |
| ) | |
| and ) | |
| ) | **Business Proprietary Information** |
| OCP S.A., et al., ) | **Removed from pages 5-6, 10-13, 16-** |
| ) | **17, 24, 30-31** |
| Defendant-Intervenors.) | |
| ) | |

### CONSOLIDATED PLAINTIFF AND DEFENDANT-INTERVENOR OCP S.A.'S COMMENTS ON FINAL RESULTS OF REDETERMINATION PURSUANT TO SECOND COURT REMAND

William R. Isasi
Wanyu Zhang
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela McMurrough
Hardeep K. Josan
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

*Counsel to OCP S.A.*

Dated: May 29, 2025

Consol. Ct. No. 21-00116

# TABLE OF CONTENTS

I.      Introduction ........................................................................................................ 1

II.     Case Background ............................................................................................... 1

III.    Summary of the Argument ................................................................................ 4

IV.     Commerce's Revised Allocation for OCP's HQ, Support, and Debt Costs is
        Unsupported by Substantial Evidence and Otherwise Not in Accordance With
        Law ..................................................................................................................... 7

        A.      Commerce's New Revenue-Based Allocation for HQ and Support Costs
                Results in an Obviously Distorted CVD Rate for Mining Rights ........... 7

        B.      The Department's Key Reason for Switching to the New Revenue-Based
                Allocation Lacks Any Support in the Record ....................................... 14

        C.      OCP's Method for Allocating HQ and Support Costs Is Reasonable and
                Was Recently Affirmed by This Court ................................................. 19

        D.      Commerce's Offset to OCP's Debt Costs Is Unsupported by Substantial
                Evidence and Otherwise Not In Accordance With Law ........................ 23

V.      The Court Should Affirm Commerce's Determination that Reductions in Tax
        Fines and Penalties Were Not *De Facto* Specific ........................................... 26

VI.     Conclusion ...................................................................................................... 33

Consol. Ct. No. 21-00116

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)..................................................................28, 30

*Allegheny Ludlum Corp. v. United States*,
    112 F. Supp. 2d 1141 (Ct. Int'l Trade 2000) ...........................................31

*Bethlehem Steel Corp. v. United States*,
    140 F. Supp. 2d 1354 (2001) ....................................................................30

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009)................................................................20

*Hyundai Steel Co. v. United States*,
    745 F.Supp.3d 1345 (Ct. Int'l Trade 2024) ...........................................29

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024)..........................................................................27, 28

*SolarWorld Americas, Inc. v. United States*,
    910 F.3d 1216 (Fed. Cir. 2018).................................................................20

*The Mosaic Co. v. United States*,
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ....................2, 10, 12, 21, 26

*The Mosaic Co. v. United States*,
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ..........................1, 2, 26, 27, 30, 31, 32

*The Mosaic Co. v. United States*, No. 23-00246 (Ct. Int'l Trade Apr. 1, 2025),
    ECF No. 96 ...............................................7, 8, 15, 19, 24, 26, 27, 32

**Statutes**

19 C.F.R. § 351.525(b)(6)..........................................................................15

19 U.S.C. § 1677(5A)(D)(iii)(III) ....................................................3, 6, 26, 28

**Other Authorities**

*Certain Softwood Lumber Products From Canada: Final Results of the
    Countervailing Duty Administrative Review, 2017-2018*, 85 Fed. Reg. 77,163.....................25

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007) ..........................29

*Dynamic Random Access Memory Semiconductors from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2336 (Jan. 13, 2011)..........................................................................................29

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11, 2005) ...........................................................................29

*Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Apr. 15, 2021)...............9, 16

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative CVD Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ..........................................................1, 25

Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Rep. No. 103.316 (1994)................................7, 26, 27, 31, 32

Consol. Ct. No. 21-00116

## I.    Introduction

On behalf of OCP S.A. ("OCP"), we respectfully submit comments on the Final Results of Redetermination Pursuant to Second Court Remand ("Second Redetermination") issued by the U.S. Department of Commerce ("Commerce") pursuant to the Court's remand order in *The Mosaic Co. v. United States* , 744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ("*Mosaic II*"). As detailed below, significant flaws persist in Commerce's revised methodologies for allocating OCP's HQ, support, and debt costs to the cost of production ("COP") buildup for phosphate rock, but Commerce correctly determined in the Second Redetermination that the reductions in tax fines and penalties received by OCP were not specific. Accordingly, OCP respectfully requests that the Court sustain Commerce's Second Redetermination in part and remand it in part.

## II.    Case Background

This action arises out of Commerce's final determination in *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) ("Final Determination") (P.R. 480), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 473).[1] On October 15, 2021, both OCP and The Mosaic Company ("Mosaic") submitted briefs challenging multiple aspects of Commerce's Final Determination and moving for judgment on the agency record pursuant to USCIT Rule 56.2. *See generally*

---

[1] In these comments, documents contained in the public and confidential records of the Investigation are identified by "P.R." and "C.R.," respectively, followed by the number assigned to the relevant document in the administrative record index filed with the Court on June 8, 2021. Documents on the public and confidential record of the first remand proceeding are identified by "P.R.R. (First)" and "C.R.R. (First)," respectively, followed by the number assigned to the relevant document in the administrative record index filed with the Court on January 26, 2024. Documents on the public and confidential record of the second remand proceeding are identified by "P.R.R. (Second)" and "C.R.R. (Second)," respectively, followed by the number assigned to the relevant document in the administrative record index filed with the Court on May 13, 2025.

Consol. Ct. No. 21-00116

OCP S.A.'s Mem. in Supp. of R. 56.2 Mot. for J. Upon the Agency Record (Oct. 15, 2021), ECF No. 53; Mosaic's Mem. In Supp. of R. 56.2 Mot. for J. Upon the Agency Record (Oct. 15, 2021), ECF No. 52.  On September 14, 2023, the Court issued its first Remand Opinion in *The Mosaic Co. v. United States* , 659 F.Supp.3d 1285 (Ct. Int'l Trade 2023) ("*Mosaic I*").  In its first redetermination issued on January 12, 2024, Commerce included an allocated portion of OCP's HQ, support and debt costs in the COP buildup for phosphate rock and redetermined the profit rate for phosphate rock.  Final Results of Redetermination Pursuant to Court Remand (Jan. 12, 2024), ECF No. 115-1 at 9–10, 18–19 (P.R.R. (First) 10).  Commerce also concluded that the reductions in tax fines and penalties program was *de facto* specific under a different statutory provision than the one upon which Commerce previously relied.  *Id.* at 10-11 (P.R.R. (First) 10).  Parties submitted comments and replies to this Court.  *See* Consolidated Pl. and Defendant-Intervenor OCP S.A.'s Comments on Final Results of Redetermination Pursuant to Court Remand (Feb. 12, 2024), ECF No. 122, 125; The Mosaic Company's Comments on Commerce's Remand Redetermination (Feb. 12, 2024), ECF No. 121; Def.'s Resp. to Pl.'s Comments on Commerce's Remand Redetermination (Mar. 13, 2024), ECF No. 131.

This Court issued its Second Remand Opinion on January 8, 2025, again remanding the allocation of HQ, support, and debt costs.  *Mosaic II*, 744 F. Supp. 3d at 1376.  The Court reiterated that OCP SA's HQ, support, and debt costs are indirect, corporate-level expenses that support OCP SA's production of phosphate rock but are incapable of being further segmented in OCP SA's accounting system into those related and unrelated to rock production.  *See id*. at 1373–75.  For this reason, the Court affirmed Commerce's decision to employ an allocation of these costs to determine the portion for inclusion in the COP buildup for phosphate rock.  *See id.* at 1375.  While the Court suggested that Commerce's chosen allocation was reasonable, it found

Consol. Ct. No. 21-00116

it was unreasonable for the agency to decline to consider certain alternative allocation methodologies proposed by Mosaic on grounds of insufficient time.  *See id.* at 1373, 1375–76. The Court thus remanded to Commerce to "evaluate Mosaic's proposed alternative and reach a decision on the allocation method based on a full and fair consideration of the arguments and record evidence before it."  *Id.* at 1375–76.

In addition, the Court found that in determining that the reductions in tax fines and penalties program was *de facto* specific, Commerce misinterpreted 19 U.S.C. § 1677(5A)(D)(iii)(III) and relied upon an unsupported factual finding that OCP received a disproportionately large amount of the subsidy.  *Id.* at 1381. Thus, the Court directed Commerce to reconsider its *de facto* specificity determination.  *Id.*

On March 20, 2025, Commerce issued its Second Draft Redetermination.  *See generally Phosphate Fertilizers from the Kingdom of Morocco: Draft Results of Redetermination Pursuant to Second Court Remand*, (Mar. 20, 2025) ("Second Draft Redetermination") (P.R.R. (Second) 1; C.R.R. (Second) 1).  In the Second Draft Redetermination, Commerce incorrectly rejected its original allocation methodology (based on total operating costs) that the Court recently affirmed as reasonable and supported by substantial evidence in the first administrative review of this CVD proceeding.  *Id.* at 14.  With respect to OCP's debt costs, Commerce properly allocated debt costs based on capital expenditures rather than based on each production site's share of financial profit/loss, but it incorrectly offset OCP's debt costs with financial income.  *Id.* at 16. With respect to reductions in tax fines and penalties, Commerce determined under protest that this program was not *de facto* specific.  *Id.* at 3–7.

On April 3, 2025, both OCP and Mosaic submitted comments to Commerce pertaining to the Second Draft Redetermination.  *See generally Phosphate Fertilizers from the Kingdom of*

Consol. Ct. No. 21-00116

*Morocco:* OCP's Comments on Draft Results of Redetermination Pursuant to Second Court Remand (Apr. 3, 2025) ("OCP Second Remand Comments") (P.R.R. (Second) 6; C.R.R. (Second) 4); *Phosphate Fertilizers from the Kingdom of Morocco*: Mosaic Comments on Draft Second Remand Redetermination (Apr. 3, 2025) ("Mosaic Second Remand Comments") (P.R.R. (Second) 7; C.R.R. (Second) 5). On April 29, 2025, Commerce issued its final second redetermination. *See generally Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Redetermination Pursuant to Second Court Remand* (April 29, 2025) ("Second Redetermination") (P.R.R. (Second) 8; C.R.R. (Second) 6). Commerce's Second Redetermination retained its allocation methodology for OCP's HQ, support, and debt costs used in the Second Draft Redetermination but included a new adjustment in an attempt to eliminate a distortion by estimating the revenue for a large portion of OCP's rock production at its direct cost of production. Commerce left unchanged its draft redetermination with respect to reductions in tax fines and penalties. *Id.* at 4–18.

## III.    Summary of the Argument

Commerce's revised methodology of allocating OCP's HQ, support, and debt costs is significantly flawed and must be remanded because it lacks support in the record, results in an obviously distortive CVD rate for mining rights and is otherwise not in accordance with law. Notwithstanding that Commerce has a judicially affirmed methodology for allocating HQ and support costs, Commerce abandoned that methodology in the Final Redetermination and instead employed a new methodology that allocates OCP *SA's* HQ and support costs based on product revenues in the consolidated financial reporting of the OCP *Group*. Commerce argues that, despite previously endorsing the judicially affirmed, original allocation, it now finds that the revenue-based approach methodology represents "the least distortive and most representative

**Consol. Ct. No. 21-00116**

methodology." Commerce supports this assertion with mischaracterizations of the allocation

methodologies and the record evidence, and the agency is incorrect—its new revenue-based

methodology is highly distortive and cannot be affirmed.

Commerce's new allocation methodology includes a fundamental defect because it results

in a mismatch between the costs being allocated (i.e., OCP *SA's* HQ and support costs), and the

basis on which those costs are allocated (i.e., the OCP *Group's* product revenues). Allocating

OCP SA's HQ and support costs based on the consolidated revenues of the 34 companies

comprising the OCP Group unmoors the resulting CVD rate from the financial performance of

OCP SA—the respondent in this CVD proceeding—and instead ties the CVD rate to the

financial performance of a large group of affiliated companies that Commerce has never

examined. More fundamentally, Commerce fails to cite any record evidence establishing a

linkage between the level of HQ and support costs incurred by OCP SA and the revenues of the

broader OCP Group. In addition, a revenue-based methodology is inherently distortive because,

[

]. Commerce agrees that this

distortion exists but, in attempting to minimize this distortion, Commerce creates further

distortions by undervaluing the internally consumed rock, which ultimately results in an

artificially inflated CVD rate for OCP's phosphate mining rights.

Commerce's use of OCP Group revenues as the basis for allocating OCP SA's HQ and

support costs is based on a profound misunderstanding of OCP SA's business structure.

Commerce relies on a combination of mere speculation about the activities of OCP SA and

partial facts about the OCP Group to assert that OCP SA is engaged in significant activities

beyond the production activities of its chemical and mining sites, thereby finding it necessary to

adopt an allocation premised on the OCP Group's revenues.  As this Court recently noted in *The Mosaic Company v. United States*, Consol. Court No. 23-00246, Slip. Op. 25-34, (Ct. Int'l Trade Apr. 1, 2025) ("*Mosaic III*")*,* in affirming Commerce's original cost-based allocation methodology*,* the notion that OCP SA is recording significant HQ and support costs in its audited books and records on behalf of its affiliates is "mere speculation."

Commerce properly allocated OCP SA's debt costs based on capital expenditures rather than based on each production site's share of financial profit/loss.  However, considering Commerce's stated intent to construct a buildup of the costs to produce phosphate rock, Commerce unlawfully offset OCP SA's debt costs with financial income.

Regarding the reductions in tax fines and penalties, the Court found in *Mosaic II* that Commerce's specificity determination was unsupported and contrary to law.  In this Second Redetermination, Commerce determined, under protest, that the reductions in tax fines and penalties program was *not de facto* specific.  This determination of no specificity complies with the Court's order, is supported by substantial evidence and otherwise in accordance with law.

First, this determination is supported by the fact that economic activities in Morocco were largely concentrated in OCP and its consolidated companies, which Commerce is required to consider under 19 U.S.C. § 1677(5A)(D)(iii).  Second, record evidence also establishes that despite having a net taxable income of more than [            ] MAD in 2019, OCP received [

            ] of the total reductions granted to corporate taxpayers in 2019, which Commerce is required to consider based on the best reading, or even any reasonable interpretation of "disproportionately large" in 19 U.S.C. § 1677(5A)(D)(iii)(III).  Lastly, because of the widespread availability and use of reductions in tax fines and penalties, this program was not what Congress intended for Commerce to find specific under the Statement of Administrative

Consol. Ct. No. 21-00116

Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103.316 (1994)

*reprinted in* 1994 U.S.C.C.A.N 3773 ("SAA").

## IV. Commerce's Revised Allocation for OCP's HQ, Support, and Debt Costs is Unsupported by Substantial Evidence and Otherwise Not in Accordance With Law

In its Second Redetermination, Commerce rejected its prior allocation methodology for

OCP SA's HQ and support costs—an allocation methodology based on total operating costs that

this Court has affirmed as reasonable in the first administrative review of this CVD proceeding.

*See Mosaic III* at 13–22.[2]  In its place, Commerce utilized a revenue-based allocation for OCP

SA's HQ and support costs that allocates these costs based on product revenues reported in the

OCP Group's consolidated financial reporting.  Second Redetermination at 27 (P.R.R. (Second)

8; C.R.R. (Second) 6).  Commerce continued to allocate OCP SA's debt costs based on OCP SA's

capital expenditures over the average useful life ("AUL") but offset these costs with certain

financial income.  *Id.* at 15–16.  Commerce's allocations of HQ and support costs, and of debt

costs are significantly flawed and must be remanded because they result in an obviously

distortive CVD rate for mining rights and lacks support in the record.

### A. Commerce's New Revenue-Based Allocation for HQ and Support Costs Results in an Obviously Distorted CVD Rate for Mining Rights

In the first administrative review of this countervailing duty proceeding, Commerce

allocated OCP SA's HQ and support costs to determine the CVD rate for mining rights based on

the relative share of OCP SA's total operating costs incurred by each of OCP SA's four

production sites (*i.e.*, OCP SA's two mining sites which mine and produce phosphate rock and

---

[2] Commerce sometimes refers to total operating costs as "site costs" and "total costs."  *See, e.g.*, Second Redetermination at 8, 13, 27 (P.R.R. (Second) 8; C.R.R. (Second) 6).  OCP uses "total operating costs" in this context to refer to total operating costs exclusive of costs for raw materials, ocean freight, amortization, financial, and noncurrent expenses.

two chemical sites which produce phosphate products including fertilizers).  This Court has since

affirmed this cost-based allocation in *Mosaic III*.  *Mosaic III* at 13–22.  Notwithstanding that

Commerce has a judicially affirmed methodology for allocating HQ and support costs,

Commerce abandoned that methodology in the Second Redetermination.

Commerce has now employed a new allocation methodology that allocates OCP *SA's* HQ

and support costs across each "product family" identified in the consolidated financial reporting

of the OCP *Group* (*i.e.*, "Phosphate," "Phosphoric Acid," "Fertilizers," and "Other income") and

according to each product family's relative share of the OCP Group's revenues.  *See*

Memorandum from Joshua Nixon to The File, *2nd Remand of the Countervailing Duty*

*Investigation of Phosphate Fertilizers from the Kingdom of Morocco: 2nd Final Remand*

*Redetermination Calculations for OCP S.A.* (Apr. 29, 2025) ("Second Redetermination

Calculations") at Attach. I at Tab "Allocation of HQ Overhead" (P.R.R. (Second) 9; C.R.R.

(Second) 7–8); Letter to Sec'y Commerce from OCP S.A., *Phosphate Fertilizers from the*

*Kingdom of Morocco: OCP S.A. Section III Questionnaire Response* (Sept. 17, 2020) ("OCP

IQR") at Ex. GEN-8(j), Note 4 (P.R. 133; C.R. 45).  In making this change, Commerce found

that a revenue-based approach represents "the least distortive and most representative

methodology."  Second Redetermination at 24.  However, for three obvious reasons discussed in

detail below this revenue-based allocation is fundamentally distortive and OCP respectfully

submits cannot be affirmed by this Court.

First, as OCP explained in its comments on Commerce's Second Draft Redetermination,

this allocation based on revenues includes a fundamental defect because it results in a mismatch

between the costs being allocated (i.e., OCP *SA's* HQ and support costs), and the basis on which

those costs are allocated (i.e., the OCP *Group's* product revenues).  *See* OCP Second Remand

Consol. Ct. No. 21-00116

Comments at 7 (P.R.R. (Second) 6; C.R.R. (Second) 4).  On this basis alone, this revenue-based

allocation cannot be affirmed.

OCP SA is a single company and distinct from the OCP Group, which includes 34

different companies.  OCP IQR at Ex. GEN-8(j) p. 14 (P.R. 133; C.R. 45).  It is OCP SA, and *not*

the OCP Group that is a respondent in this investigation.  *See Phosphate Fertilizers From the*

*Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg.

18,037, 18,038 n.5 (Apr. 7, 2021) (P.R. 492) ("Commerce found the following companies to be

cross-owned with OCP S.A.: Jorf Fertilizers Company I, Jorf Fertilizers Company II, Jorf

Fertilizers Company III, Jorf Fertilizers Company IV, Jorf Fertilizers Company V, and Maroc

Phosphore.").  Allocating OCP SA's HQ and support costs based on the consolidated product

revenues of the 34 companies comprising the OCP Group unmoors the resulting CVD rate from

the financial performance of OCP SA—the respondent in this CVD proceeding—and instead ties

the CVD rate to the financial performance of a large group of affiliate companies that Commerce

has never examined.

Second, implicit in Commerce's revenue-based allocation is that HQ and support costs

are incurred in relation to revenues.  Revenues, however, rise and fall in relation to the prices for

the products that Commerce selected (*e.g.*, phosphoric acid, fertilizers, etc.) rather than either the

day-to-day or long-term costs of doing business.  In a fundamental error in its analysis,

Commerce cites no evidence whatsoever that OCP SA incurs HQ and support costs in proportion

to the prices of the OCP Group's products and the revenues so generated by the OCP Group.  In

contrast, as discussed below, the evidence supports Commerce's original allocation methodology

for HQ and support costs based on total operating costs.  *See* discussion *infra* at IV.C

**NON-CONFIDENTIAL VERSION**

Third, a revenue-based allocation inevitably under-allocates OCP SA's HQ and support costs to the OCP Group's product family that corresponds to phosphate rock (*i.e.*, "Phosphate"). As OCP explained in its comments and Commerce itself recognizes, the record establishes that [



].

*See* OCP Second Remand Comments at 8 (P.R.R. (Second) 6; C.R.R. (Second) 4); Second Redetermination at 30, 32 (P.R.R. (Second) 8; C.R.R. (Second) 6); *see also* Letter to Sec'y Commerce from OCP S.A., *Phosphate Fertilizers from the Kingdom of Morocco: Response to Questionnaire in Lieu of On-Site Verification* (Dec. 30, 2020) ("OCP ILOV QR") at 51 n.16 (P.R. 436; C.R. 289–290) ([

]).

As a result, allocating HQ and support costs based on each product's share of revenues necessarily under-allocates HQ and support costs to rock production (*i.e.*, the phosphate product family), artificially decreasing OCP's cost to produce phosphate rock and therefore the constructed government price for rock. This constructed government price for rock is compared to benchmark prices for rock to determine the CVD rate for mining rights. *See Mosaic I*, 659 F. Supp. 3d at 1305 ("In measuring what it considered to be a benefit conferred by the Moroccan government to OCP through the provision of mining rights at LTAR, Commerce estimated a world price benchmark for phosphate rock against which the government price could be compared."). The greater the benchmark price as compared to the constructed government price, the greater the CVD rate, *i.e.*, the constructed government price for rock based on OCP's costs is *inversely* related to the CVD rate. As a consequence, when Commerce artificially *decreases*

OCP's costs to produce phosphate rock (as it inevitably does through the application of a faulty revenue-based allocation methodology), Commerce artificially *inflates* the CVD rate for mining rights.

In the Second Redetermination, Commerce agreed for the first time in this remand proceeding that a distortion was inherent in its revenue-based methodology because OCP does not, [                                                                                    ].  In an effort to resolve the distortion, Commerce estimated an "[              ] revenue" for OCP's internally consumed rock at only its direct cost of production and then added this estimated "[              ] revenue" to the revenues reported in the OCP Group's consolidated financial reporting for the phosphate product family.  *See* Second Redetermination at 30–31 (P.R.R. (Second) 8; C.R.R. (Second) 6); Second Redetermination Calculations at 2, Attach. I at Tab "Allocation of HQ Overhead" (P.R.R. (Second) 9; C.R.R. (Second) 7–8).  But rather than resolving this distortion in its new revenue-based methodology, Commerce's estimation of "[              ] revenue" results in even further distortions:  Commerce (a) double-counts revenue related to this internally consumed rock; (b) fails to include any amount for HQ, support, and debt costs in calculating OCP's cost of producing this internally consumed rock; and (c) omits any amount for profit in valuing this rock; in each case reducing both the amount of HQ and support cost included in OCP's cost of producing phosphate rock and the resulting constructed government price for rock, thereby artificially inflating the CVD rate for mining rights.

Commerce's calculation double-counts revenue for OCP SA's internally consumed rock:  first as "[              ] revenue" that Commerce attributes to the phosphate product family (producing rock) and again by relying on the OCP Group's reported revenues for phosphoric acid and fertilizers, which are revenues for products that are derived from the rock (a major input for

these products).  *See, e.g.*, OCP IQR at Ex. GEN-8(j) at 32 (P.R. 133; C.R. 45) ("The phosphate extracted at Youssoufia and Benguerir is transported by rail to Safi, where it is processed into phosphoric acid and fertilizer.").  By failing to address this double counting, Commerce artificially attributes revenues to the phosphoric acid and fertilizers product families that stem from OCP's production of internally consumed rock.  This double counting effectively offsets the "[          ] revenue" for internally consumed rock that Commerce adds to the revenues of the phosphate product family (producing rock), artificially decreasing the HQ and support costs allocated to the phosphate product family and instead shifting those costs to the phosphoric acid and fertilizers product families.  As a result, the amount of HQ and support included in OCP's cost of producing phosphate rock and the resulting constructed government price for phosphate rock based on these costs are artificially reduced, improperly inflating OCP's CVD rate.

In addition, Commerce's estimation of an "[          ] revenue" for OCP's internally consumed rock at only its direct cost of production is obviously flawed.  Valuing this rock at only its direct cost of production assumes no amount of HQ, support, or debt costs were incurred in its production.  However, Commerce and this Court have repeatedly found that OCP necessarily incurs HQ, support, and debt costs to produce phosphate rock.  *See, e.g.*, Second Redetermination at 12 (P.R.R. (Second) 8; C.R.R. (Second) 6) ("Such expenses, which are indirect but, as Commerce noted in the *First Final Remand Redetermination*, are relevant to the OCP's phosphate rock production operations, are accounted for at the corporate, rather than operational level."); *Mosaic I*, 659 F. Supp. 3d at 1300 ("The Department's excluding *all* SGA expenses from the COP buildup is an implied finding that OCP incurred *zero* SG&A expenses in the process of producing phosphate rock. In light of record evidence that OCP engaged in mining activities and incurred SG&A costs in doing so, the Department's exclusion of all SG&A

**Consol. Ct. No. 21-00116**

expenses from the COP buildup was *per se* unreasonable."). Consequently, by undervaluing the costs associated with producing this phosphate rock, Commerce artificially reduces both the amount of HQ and support cost included in OCP's cost of producing phosphate rock and the resulting constructed government price for rock, thereby artificially inflating the CVD rate.

More fundamentally, Commerce's attempt to resolve the distortions in its revenue-based allocation methodology using cost of production for rock reveals a logical fallacy in its revenue-based approach. In the [                                                      ], Commerce substitutes revenue with OCP's cost of production for rock. But, Commerce's allocation methodology is ultimately attempting to identify the HQ and support costs to allocate to OCP's phosphate rock production to determine OCP's cost of production for rock. As an analytical matter, Commerce cannot utilize an allocation methodology intended to ascertain the cost to produce rock that requires Commerce to know in advance the cost to produce rock— including the appropriate amount of HQ and support costs to allocate to these costs. Simply put, in an attempt to eliminate the distortion in its allocation methodology, Commerce resorts to using as an input the very thing this allocation methodology is used to calculate, demonstrating the inherent logical flaw in Commerce's approach.

Finally, Commerce's estimation of an "[          ] revenue" for OCP's internally consumed rock at only its direct cost of production is also incorrect because it fails to take account of any profit generated from this internally consumed rock. OCP's internally consumed rock necessarily generates profits for OCP because this rock is incorporated into fertilizers and phosphoric acid that OCP sells on the market for a profit; Commerce cannot solve the distortion problem of its own making by simply assuming no profit from the activity. *See also* OCP IQR at

Consol. Ct. No. 21-00116

Ex. GEN-8(j) at 5 (P.R. 133; C.R. 45) (demonstrating that the OCP Group was profitable during the Period of Investigation ("POI")).

In conclusion, Commerce's new, revenue-based allocation is distortive and artificially inflates the CVD rate for mining rights. Commerce's attempt to resolve these distortions only creates further distortions. Ultimately, Commerce cannot defend its reliance on an allocation methodology containing such distortions, particularly because Commerce has available a judicially affirmed, cost-based allocation methodology that does not contain these distortions. For these reasons, this Court should invalidate Commerce's new revenue-based allocation methodology.

### B.    The Department's Key Reason for Switching to the New Revenue-Based Allocation Lacks Any Support in the Record

Beyond being distortive, Commerce's new, revenue-based allocation methodology is premised on assumptions about OCP's business structure that lack record support. Commerce made the switch to a new revenue-based allocation methodology for HQ and support costs because the agency incorrectly believes that OCP SA is engaged in significant activities beyond the production activities of its two chemical and two mining sites. The record simply does not support Commerce's speculation regarding OCP SA's business activities.

OCP SA is fundamentally a producer of phosphate products. *See* OCP IQR at Ex. GEN-2 (P.R. 130; C.R. 40) (containing OCP SA's full product list identifying every product produced and sold by OCP SA during the POI). As noted above, the original allocation methodology allocated HQ and support costs to OCP SA's two mining and two chemical sites, which contained the entirety of OCP SA's production activities during the 2019 POI.[3] Commerce

---

[3] These comments discuss OCP SA's structure in 2019, which was the POI in the challenged investigation rather than OCP SA's current structure.

applied an allocation based on the OCP Group's revenues for OCP SA's HQ and support costs

because Commerce incorrectly believes that "the record demonstrates that OCP supports other

business activities {other than chemicals and mining}, including the activities of its subsidiaries"

through its "headquarters and corporate operations."  Second Redetermination at 14 (P.R.R.

(Second) 8; C.R.R. (Second) 6).  However, as this Court just noted in the recent *Mosaic III*

opinion pertaining to the first administrative review of the CVD order—the notion that OCP SA

is recording significant HQ and support costs in its audited books and records on behalf of its

subsidiaries is "mere speculation." *Mosaic III* at 20.

The Second Redetermination is similarly speculative.  For example, after discussing that

OCP is a shareholder in some of the companies within the OCP Group, Commerce states "OCP,

as the holding company, must reasonably support these operations to some degree through its

headquarters and corporate operations."  Second Redetermination at 14 (P.R.R. (Second) 8;

C.R.R. (Second) 6).  However, the fact that OCP SA has shareholdings in other entities is not

evidence that OCP SA books HQ and support costs on behalf of those entities in its own audited

books and records.  Indeed, an assumption that ownership alone establishes shared business

expenses between distinct companies is fundamentally inconsistent with Commerce's practice

and detailed regulations for identifying reporting entities and attributing subsidies among them in

CVD proceedings.  *See, e.g.*, 19 C.F.R. § 351.525(b)(6); Letter from Katie Marksberry to the

Government of Morocco, *Investigation of Phosphate Fertilizers from Morocco: Countervailing

Duty Questionnaire* (July 28, 2020) at 36–39 (P.R. 61) (describing Commerce's criteria for the

selection of reporting entities).

Under Commerce's rules for determining which affiliates must report subsidy

information in a CVD proceeding in order to attribute subsidies among affiliates, it is not

sufficient that a respondent company have any ownership stake, or even a controlling ownership stake, in an affiliate. Instead, Commerce must find more, such as that the affiliate is both controlled by the respondent and supplies an input product to the respondent for production of the downstream product produced by the respondent. *See id.* Indeed, of the 34 companies in the OCP Group, Commerce examined only 6 as reporting entities in the challenged Investigation. *See Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037, 18,038 n.5 (P.R. 492) ("Commerce found the following companies to be cross-owned with OCP S.A.: Jorf Fertilizers Company I, Jorf Fertilizers Company II, Jorf Fertilizers Company III, Jorf Fertilizers Company IV, Jorf Fertilizers Company V, and Maroc Phosphore.").

Given the obvious inconsistency between Commerce's speculation that OCP supports companies across the OCP Group and the methods by which Commerce selected just a few of these companies to be reporting entities in this CVD proceeding, Commerce is unable to meaningfully defend its new allocation methodology. Instead, Commerce simply asserts that it may adopt this new allocation methodology because "Commerce has no specific regulations on how to create cost buildups for a tier three LTAR analysis in a CVD investigation." *See* Second Redetermination at 30 (P.R.R. (Second) 8; C.R.R. (Second) 6). The simple fact that Commerce does not have such a regulation does not give the agency license to adopt a methodology that is so plainly inconsistent with Commerce's rules for attributing subsidies among affiliates.

In an attempt to support its speculation that OCP SA is booking HQ and support costs incurred on behalf of companies within the OCP Group, Commerce asserts that the record contains an "agreement" between [

]. Second Redetermination at 29 (P.R.R. (Second)

Case 1:21-cv-00116-TCS    Document 153    Filed 05/30/25    Page 21 of 38

Consol. Ct. No. 21-00116                    NON-CONFIDENTIAL VERSION

8; C.R.R. (Second) 6).  However, Commerce cites to no such agreement on the record, and in

any event, the existence of an agreement for some small amount of services between OCP and an

affiliate is not evidence that OCP is booking significant costs incurred on behalf of its affiliates

as HQ and support costs in its own books and records.  As noted above, OCP's business activities

are fundamentally mining and the production phosphate products, *not* the provision of services.

All services OCP provided in 2019 to any company comprised a mere [      ] of OCP SA's total

revenues.  *See* Letter to Sec'y Commerce from OCP S.A., *Phosphate Fertilizers from the*

*Kingdom of Morocco: OCP S.A. Supplemental Questionnaire Response* (Nov. 03, 2020) ("OCP's

SQR Part I") at Ex. GEN2-1(a) (P.R. 254; C.R. 163) (OCP's total revenues were [

                              ] of which only [                              ] derived from services).  The

existences of some small amount of business activity related to services does not provide a basis

for Commerce to assume OCP is providing substantial services to companies across the OCP

Group, nor is it a sufficient foundation for Commerce to abandon its original allocation cost-

based methodology and substitute a highly distortive revenue-based allocation.

 Commerce also attempts to support its speculation that OCP SA records HQ and support

costs it incurred on behalf of companies in the OCP Group by using selective quotes from OCP's

description of HQ and support activities.  In particular, Commerce uses OCP's statement that HQ

and support activities "exist to support the production operations of the larger entity" as evidence

that OCP SA's HQ and support costs include "entity-wide support functions."  Second

Redetermination at 14–15 (P.R.R. (Second) 8; C.R.R. (Second) 6).  However, OCP SA's fuller

response actually states that, "{h}eadquarters and support activities do not stand alone in a

business.  They exist to support the production operations of the larger entity.  Therefore, some

of those costs are properly associated with the mining activities that are detailed in the value

chain processes, but are recorded in HQ/Support in the accounting system." OCP ILOV QR at 6,
39 (P.R. 436; C.R. 289–90). OCP SA then provided a reconciliation of its reported HQ and
support costs to OCP *SA's* trial balance. *See id.* Read in the context of OCP SA's fuller response,
it is evident that the "larger entity" OCP SA references is OCP SA and *not* the OCP Group. The
record therefore provides no support for Commerce's conclusion that OCP SA is recording HQ
and support costs in its own books and records that it incurs on behalf of other companies within
the OCP Group.

      In addition to speculating that OCP SA incurs costs on behalf of companies across the
OCP Group, Commerce incorrectly asserts that OCP SA incurs costs on behalf of "other revenue
generating business segments" within OCP SA beyond the two mining and two chemical sites.
Second Redetermination at 14 (P.R.R. (Second) 8; C.R.R. (Second) 6). However, later in the
Second Remand Redetermination, Commerce disavows this point stating that it is not suggesting
OCP SA maintains distinct business segments, making Commerce's position entirely unclear. *Id.*
at 28–29. In any event, none of the evidence to which Commerce cites supports its assertion
about "other revenue generating business segments" within OCP SA.

      First, Commerce cites to information regarding the OCP *Group*'s products and activities
in support of this erroneous assertion. *Id.* at 14 n.51 (citing to the listing of "other income" in the
OCP Group's financial statement as evidence that OCP SA has other revenue generating
business segments beyond mining and chemicals). But again, the OCP Group is *not* OCP SA.
The OCP Group reports on a consolidated basis on behalf of 34 distinct companies; OCP SA is a
single company. The combined activities and products of the 34 companies comprising the OCP
Group are not coextensive with the activities and products of OCP SA, but this does not
demonstrate that OCP SA maintains business segments beyond its mining and chemical sites.

Consol. Ct. No. 21-00116

Second, Commerce cites to the profit from sales of services in Morocco recorded on OCP SA's profit and loss statement as purported evidence that OCP incurs costs on behalf of "other revenue generating business segments." *Id.* at 14, n. 52. However, the profit and loss statement does not indicate that these services were provided by "other revenue generating business segments." From early in the investigation, OCP has been clear that OCP SA organizes its business around four production sites—two mining and two chemical sites—and Commerce has identified no record evidence in support of its assertion to the contrary. *See* Letter to Sec'y Commerce from OCP SA, *Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Supplemental Questionnaire Response Part Three* (Nov. 6, 2020) ("OCP SQR Part III") at 6 (P.R. 354; C.R. 232).

In conclusion, a key reason that Commerce adopted a new revenue-based methodology for allocating OCP's HQ and support costs is that Commerce was incorrectly persuaded that OCP SA engages in significant activities beyond the production of its mining and chemicals sites, including providing services to companies across the OCP Group as part of its HQ and support activities. In the first administrative review, this Court correctly found that such a conclusion was mere speculation. It remains so here, without any support in the record of this remand proceeding. This revenue-based allocation justified based on nothing more than speculation should not be affirmed by this Court.

### C.    OCP's Method for Allocating HQ and Support Costs Is Reasonable and Was Recently Affirmed by This Court

In *Mosaic III*, the Court affirmed Commerce's use of a methodology that allocates OCP's HQ and support costs based on total operating costs. *Mosaic III* at 13–22. In its comments to Commerce, OCP explained that this cost-based allocation methodology is reasonable and supported by substantial evidence. Namely, the record demonstrates that OCP incurs both HQ

Consol. Ct. No. 21-00116

and support costs and total operating costs in support of its day-to-day operations. OCP Second Remand Comments at 12, nn.47–48 (P.R.R. (Second) 6; C.R.R. (Second) 4) (citing OCP ILOV QR at 6–7 (P.R. 436; C.R. 289); OCP SQR Part III at Exs. MIN2-3, MIN2-7 (P.R. P.R. 354; C.R.; 232–33)). The Final Redetermination utterly fails to address this evidence, fundamentally undermining Commerce's finding that its new, revenue-based allocation is "the least distortive and most representative methodology. . . ." Second Redetermination at 24 (P.R.R. (Second) 8; C.R.R. (Second) 6); *see also SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) "({T}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight, including contradictory evidence or evidence from which conflicting inferences could be drawn . . . .) (quoting *Huvis Corp. v. United States*, 570 F.3d 1347, 1351 (Fed. Cir. 2009)).

Instead of evaluating the evidence cited by OCP, Commerce determined that Commerce's original, cost-based allocation methodology was less reasonable than a revenue-based methodology "because OCP excluded certain categories of costs (*i.e.*, raw materials, freight, amortization, and financial and non-current expenses)" from the total operating costs on which its allocation was premised. Second Redetermination at 13 (P.R.R. (Second) 8; C.R.R. (Second) 6). Notably, OCP explained that inclusion of these costs in the total operating costs on which OCP's HQ and support costs are allocated would be distortive. OCP Second Remand Comments at 12–14 (P.R.R. (Second) 6; C.R.R. (Second) 4). In any event, to the extent Commerce believed these exclusions were incorrect, the agency was obligated to explain why it abandoned its prior, cost-based allocation methodology in its entirety instead of simply adding these expenses to the total operating costs on which OCP's cost-based allocation was based.

For example, OCP argued that ocean freight should be excluded from any allocation of OCP's HQ and support costs based on total operating costs given that: (1) Commerce excludes ocean freight from the rock benchmark to which the cost of production buildup for phosphate rock is compared, *Mosaic I*, 659 F. Supp. 3d at 1309 ("The price data Commerce used for its benchmark were derived from actual free-on-board, not delivered, prices. Adding estimated delivery charges to the data on actual prices would not have made the data more accurate.") (citations omitted), and (2) Commerce determined to exclude *these exact same* expenses from the total operating expenses added directly in calculating OCP SA's constructed government price of phosphate rock. *See* OCP ILOV QR at 17 (P.R. 436; C.R. 289). Commerce disagreed with excluding these freight costs in the Second Redetermination based on speculation that arranging this freight would have resulted in an amount for overhead expenses being booked to OCP's HQ-level cost center rather than OCP's site-level cost center. *See* Second Redetermination at 25–26 (P.R.R. (Second) 8; C.R.R. (Second) 6). Commerce cites no evidence to support this speculation.

OCP also explained that Commerce correctly excluded raw material costs from the total operating costs on which Commerce's original cost-based allocation was based. The record demonstrates that world market prices for raw materials are volatile and the raw material costs of OCP SA's production sites experience similar volatility. *See* OCP Second Remand Comments at 14 (P.R.R. (Second) 6; C.R.R. (Second) 4) (citing OCP IQR at Ex. GEN-8(j) (P.R. 133; C.R. 45) ("The price of ammonia is volatile and consequently prices are fixed cargo by cargo or over a short period.")). By including these raw materials costs in OCP SA's total operating costs used for allocating HQ and support costs, Commerce would be assuming that OCP SA's production sites incur HQ and support costs in proportion to these raw material prices, e.g., effectively

**Consol. Ct. No. 21-00116**

concluding that a doubling in the world market price of ammonia during 2019 would have caused the OCP SA production site that bought that ammonia to incur double the HQ and support costs. That assumption defies logic and finds no support in the record evidence.

Commerce's Final Redetermination does not meaningfully engage with OCP's argument or cite to any record evidence establishing that fluctuations in world market prices of raw materials influence the degree to which OCP SA's production sites incur HQ and support costs. Instead, Commerce argues that "if major expenses within the selected basis for the allocation are potentially unrepresentative of OCP's costs, the basis for the allocation (*i.e.*, OCP's mining and chemical site direct operating costs) is not viable." *See* Second Redetermination at 27 (P.R.R. (Second) 8; C.R.R. (Second) 6). Commerce's response misses the mark.

OCP did not assert that any expenses within OCP's operating costs are "potentially unrepresentative of OCP's costs." Instead, OCP explained that HQ and support costs are not incurred in relation to the cost of raw materials. The fact that OCP SA's production sites do not incur HQ and support costs in proportion to the volatility in the world market prices for raw materials is not evidence that Commerce's original cost-based allocation is "not viable." Rather, it is evidence that Commerce correctly excluded these raw material costs from OCP's total operating costs when performing its original allocation.

Commerce also included financial expenses among the list of expenses it finds are distortive to deduct from the cost used to allocate HQ & support costs. OCP explained that that financial expenses should be excluded from the total operating costs on which Commerce allocated OCP's HQ and support costs because including them would be inconsistent with Commerce's determination to exclude *these exact same* financial expenses from the total operating costs it includes in the constructed government price for OCP's rock. OCP comments

Consol. Ct. No. 21-00116

on draft redetermination at 13; *see* OCPs SQR *Part III* at Ex. MIN2-3 (P.R. P.R. 354; C.R.; 232–33) (calculating "Total Costs" in row 91 by adding certain cost items together but *not* including financial expenses). Notably, Commerce indicates in a footnote in the Final Redetermination that it agrees these financial expenses should be excluded from an allocation based on total operating costs. Second Redetermination at 25 n.94 (P.R.R. (Second) 8; C.R.R. (Second) 6). This statement demonstrates that Commerce was incorrect to list the exclusion of financial expenses as a basis to find the original cost-based allocation methodology distortive.

In conclusion, OCP has demonstrated that allocating HQ and support costs based on total operating costs is reasonable and supported by the record evidence. Commerce has failed to establish that exclusion of the above-discussed cost items from the total operating costs on which Commerce's original allocation was based renders this allocation unreasonable or more distortive than Commerce's new revenue-based allocation. As explained above, this new revenue- based allocation includes a mismatch between the costs being allocated (i.e., OCP *SA's* HQ and support costs) and the basis on which those costs are allocated (i.e., the OCP *Group's* product revenues), ties the allocation of HQ and support to world market prices for the OCP Group's products, and improperly double-counts and undervalues OCP's internally consumed rock. In light of this, the Court should remand Commerce's allocation of HQ and support costs for reconsideration.

### D.  Commerce's Offset to OCP's Debt Costs Is Unsupported by Substantial Evidence and Otherwise Not In Accordance With Law

Commerce's Final Redetermination properly allocates OCP SA's debt costs based on each of OCP SA's four production site's relative share of OCP SA's capital expenditures over the AUL rather than on each production site's share of financial profit/loss (as advocated for by Mosaic). *Id.* at 16–17 (P.R.R. (Second) 8; C.R.R. (Second) 6). However, Commerce improperly

determined to offset OCP's debt costs with certain financial income, inflating the CVD rate by artificially reducing the amount of debt costs that it allocates to OCP's four production sites and that are ultimately included in OCP's calculated cost of producing phosphate rock.

In the first administrative review of this CVD proceeding, this Court affirmed an allocation of OCP's debt costs based on capital expenditures. *Mosaic III* at 13–22. In its comments on remand, OCP explained that financing and debt costs are an essential part of the costs of any ongoing manufacturing operation, particularly one as capital intensive as phosphate mining and rock production. OCP Second Remand Comments at 15 (P.R.R. (Second) 6; C.R.R. (Second) 4). Evidence demonstrates that OCP has used such financing for capital investment projects related to the slurry pipeline, rock storage facilities, and washing stations, all connected directly to the mining operations and the mining sites. *See id.* Thus, it is reasonable to allocate debt costs based on capital expenditures.

OCP also explained that allocating debt costs based on financial profit/loss would be unreasonable because the record evidence does not demonstrate that OCP's sites benefit from OCP's debt costs in proportion to financial profit/loss. For example, the record demonstrates that the [




]. *Id.* at 15–16 (P.R.R. (Second) 6; C.R.R. (Second) 4) (citing OCP ILOV QR at 19–20 (P.R. 436; C.R. 289)).

While Commerce correctly agreed to allocate OCP's debt costs based on capital expenditures, it incorrectly determined to offset these debt costs with certain financial income. In its comments on remand, OCP explained that offsetting OCP's debt costs with financial

**Consol. Ct. No. 21-00116**

income is inappropriate because Commerce has stated an intent to construct a buildup comprised

of *costs* of producing phosphate rock. *See* Final Determination (P.R. 480), and accompanying

IDM at 23–24 (P.R. 473) ("we will take into consideration the *relevant production costs*

associated with producing the phosphate rock . . . .") (emphasis in original).

 In the Second Redetermination, Commerce explained that it would nonetheless apply this

financial income offset because it believes OCP can use financial income to fund its cash

requirements. Second Redetermination at 16 (P.R.R. (Second) 8; C.R.R. (Second) 6). This

response fails to justify Commerce's actions. Having set out to ascertain the debt costs

associated with OCP's production of phosphate rock, Commerce does not establish why it is

appropriate to account for any amount of income in calculating OCP's debt costs—even if that

income might be used to offset OCP's cash requirements. In addition, as Commerce routinely

recognizes, money is fungible, and Commerce offers no explanation for why it is uses only

financial income to offset cash requirements. *See, e.g.*, *Certain Softwood Lumber Products From

Canada: Final Results of the Countervailing Duty Administrative Review, 2017-2018*, 85 Fed.

Reg. 77,163 and accompanying IDM at 66 ("Because money is fungible, the revenue from the

electricity sales benefit Resolute's overall production and sales of products."). For example,

Commerce does not offset cash requirements by OCP's revenues from the sale of its products

even though that cash could also be used by OCP to meet its cash requirements. In this context,

there is no basis for Commerce to use financial income to offset OCP's debt costs.

 Therefore, the Court should remand Commerce's decision to offset OCP's debt costs with

financial income.

Consol. Ct. No. 21-00116

V.    **The Court Should Affirm Commerce's Determination that Reductions in Tax Fines and Penalties Were Not *De Facto* Specific**

In the *Investigation Final Determination*, Commerce found reductions in tax fines and penalties under Article 236 of Morocco's General Tax Code *de facto* specific because the recipients of the subsidy were limited in number. *See* IDM at 75 (P.R. 473). Contradicting the Court's guidance in *Mosaic I*, 659 F. Supp. 3d at 1316, in its first remand redetermination, Commerce found the program *de facto* specific relying on 19 U.S.C. § 1677(5A)(D)(iii)(III), *i.e.*, OCP received a disproportionately large amount of the reductions compared to other Moroccan companies. *See Phosphate Fertilizers from the Kingdom of Morocco, Final Results of Redetermination Pursuant to Court Remand* (Jan. 22, 2024) at 14 (P.R.R. (First) 10; C.R.R. (First) 10). The Court found that Commerce's specificity determination was once again unsupported and contrary to law. *Mosaic II,* 744 F. Supp. 3d at 1379–81. The Court also remanded a similar *de facto* specificity determination for the same program in the first administrative review of this CVD proceeding. *Mosaic III* at 36–38. In this Second Redetermination, Commerce determined, under protest, that the reductions in tax fines and penalties program was not specific. Second Redetermination at 4–7. As discussed below, the determination that the reductions in tax fines and penalties program is not *de facto* specific is supported by substantial evidence and otherwise in accordance with law and should be affirmed accordingly.

In evaluating *de facto* specificity, Commerce "*shall* take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy . . . ." 19 U.S.C. § 1677(5A)(D)(iii) (emphasis added). The SAA explains that the diversification of economic activities should "inform the application of" the specificity factors, meaning it provides "a clearer context within which the de facto factors would be analyzed."

26

Consol. Ct. No. 21-00116

SAA at 931.  The Court properly noted in *Mosaic II* that the statutory directive to consider the diversification of economic activities "is yet another indication that Congress did not consider a government benefit such as the one at issue here to be countervailable."  *Mosaic II*, 744 F.Supp.3d at 1379–80.  To adhere to the best, or even a reasonable reading of the statute, and to conduct a meaningful analysis of the statutory directive consistent with *Mosaic II*, Commerce must consider the extent of diversification of economic activities within Morocco, including the concentration of economic activities in Morocco in the mining and production of phosphate products.  *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024); 19 U.S.C. § 1677(5A)(D)(iii).

Record evidence shows that, even though the GOM reported 286,490 organized enterprises and over 50 economic sectors in Morocco, *see Phosphate Fertilizers from the Kingdom of Morocco: Response of the Government of the Kingdom of Morocco to Commerce's Supplemental Questionnaire Concerning the Countervailing Duty Investigation* (Nov. 3, 2020) ("GOM SQR") at Ex. SI-6 (P.R. 297; C.R. 175), economic activities in the country were largely concentrated in OCP and its consolidated companies, which "essentially comprise the entire Moroccan phosphate industry."  *Phosphate Fertilizers from the Kingdom of Morocco: Response of the Government of the Kingdom of Morocco to Commerce's Initial Questionnaire Concerning the Countervailing Duty Investigation* (Sept. 17, 2020) ("GOM IQR"), vol. V at V-15 (P.R. 150; C.R. 64); *see* GOM SQR at SI-9 (stating that OCP SA is the only company in Morocco conducting research and exploitation of phosphates) (P.R. 287; C.R. 165).  Morocco's 2019 Gross Domestic Product ("GDP") was 1,151.2 billion MAD, but the annual revenue of OCP alone was more than 54,000 million MAD, equivalent to almost 5% of the country's GDP.  *See* GOM IQR, vol. I at Ex. I-1 p. 25 (showing Morocco's 2019 GDP as 1,151.2 billion MAD) (P.R.

Consol. Ct. No. 21-00116

155; C.R. 69); *id.*, vol. V at Ex. V-11 p.4 (showing OCP's 2019 revenue as 54,092 million MAD)

(P.R. 192; C.R. 116). In addition, OCP was Morocco's largest corporate group by annual

revenue and Morocco's largest private sector employer. *See* GOM IQR, vol. V at V-15 (P.R. 150;

C.R. 64); *id.*, vol. IV at Ex. IV-2 pp. 117–18 (P.R. 186; C.R. 109) (highlighting from a historical

perspective the importance of the mining industry in Morocco's economy, including its

contribution to 10% of the national GDP in 2016 and "its participation in tax revenues", and

showing that phosphate mining consistently contributed to more than 90% of Morocco's mining

production from 2008 to 2016). As the GOM emphasized repeatedly on the record, OCP is "a

very significant component of the Moroccan economy." *See id.* at vol. V at V-15 (P.R. 150; C.R.

64), vol. II at II-42 (P.R. 147; C.R. 61), vol. III at III-21 (P.R. 148; C.R. 62). This concentration

of economic activity in Morocco in the mining and production of phosphate products and OCP's

large size within the Moroccan economy provides context demonstrating that a higher amount of

reductions in tax fines and penalties in absolute terms does not demonstrate that OCP received a

disproportionally large amount of the reductions.

In addition, the best reading, or even any reasonable interpretation of "disproportionately

large" in 19 U.S.C. § 1677(5A)(D)(iii)(III) requires Commerce to consider OCP's size relative to

other companies in Morocco in determining whether the amount of the subsidy that OCP

received justified a finding of *de facto* specificity. *See Loper Bright Enters.*, 144 S. Ct. at 2266.

As the Federal Circuit has cautioned, finding "a benefit conferred on a large company might be

disproportionate *merely because of the size of the company*" would "produce an untenable

result." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (emphasis added).

The Court also confirmed that "{d}isproportionality requires that an enterprise or industry is

favored in some way (i.e., it receives more than its fair share)," and that Commerce must explain

**Consol. Ct. No. 21-00116**

how the respondent benefited "more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." *Hyundai Steel Co. v. United States*, 745 F.Supp.3d 1345, 1353 (Ct. Int'l Trade 2024).

Considering OCP's large size in evaluating whether OCP received a disproportionately large amount of reductions also conforms with agency practice. Commerce has previously analyzed whether the respondent received a disproportionately large amount of a subsidy by measuring the subsidy received against the respondent's size, often reflected in the respondent's contribution to GDP or income. *See, e.g.*, *Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007), and accompanying IDM at 18–20 (measuring the share of lending received by the respondent sectors *against the sectors' share of Korea's manufacturing GDP*, and finding that the benefit they received was not disproportionately large *compared to their "contribution" to the GDP*); *Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11, 2005), and accompanying IDM at 19 (comparing *the percentage of benefits* the swine producers received among agricultural producers *to the percentage of income* the swine producers received among the same group, and finding that the benefit received was not disproportionately large); *Dynamic Random Access Memory Semiconductors from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2336 (Jan. 13, 2011), and accompanying IDM at 3 (finding that the respondent received a disproportionately large amount of the subsidy after evaluating the benefit received *relative to the respondent's size among all companies in Korea*).

The amount of reductions in tax fines and penalties that OCP received was not "disproportionately large"—and in fact was disproportionately small—considering OCP's large size within the Moroccan economy. The Moroccan tax code assesses tax fines and penalties based on a percentage of taxes owed. *See, e.g.*, GOM IQR, vol. VII at Ex. VII-1 (Article 186) (P.R. 204; C.R. 130). As a result, a uniquely large taxpayer such as OCP is likely to incur more tax fines and penalties, and thus receive more reductions in such fines and penalties, compared to the average company. Despite having a net taxable income of more than [          ] MAD in 2019, *OCP IQR* at Appx. GEN-1(a) (P.R. 130; C.R. 39), being "the largest employer in the country and representing around five percent of Morocco's {GDP}," OCP was only the tenth largest recipient of reductions in tax fines and penalties, *Mosaic II*, 744 F. Supp. 3d at 1380, receiving [          ] of the total reductions received by corporate taxpayers in 2019. *See Phosphate Fertilizers from the Kingdom of Morocco: Supplemental Questionnaire Response of the Government of the Kingdom of Morocco – Part 2* (Nov. 11, 2020) ("GOM SQR – Part 2") at S-IX-11 (P.R. 359; C.R. 242) (showing that OCP received [      ]% of the reductions, calculated using the reductions that OCP received, [          ] MAD, and the reductions granted to all companies, [          ] MAD).

This miniscule percentage rebuts Mosaic's argument that OCP "could" have received a disproportionate amount of the benefit because of the GOM's exercise of discretion in granting reductions in tax fines and penalties. *See* Mosaic Second Remand Comments at 7–8 (P.R.R. (Second) 7; C.R.R. (Second) 5). This percentage also stands in stark contrast with much higher percentages that Commerce has declined to find disproportionate in other *de facto* specificity analyses. *See, e.g.*, *AK Steel*, 192 F.3d at 1384–85 (affirming Commerce's non-disproportionality finding where Korean producers "received 86.6% of the benefit" of an alleged

Case 1:21-cv-00116-TCS    Document 153    Filed 05/30/25    Page 35 of 38

Consol. Ct. No. 21-00116                          NON-CONFIDENTIAL VERSION

subsidy); *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d  1354, 1369 (2001) (sustaining

Commerce's decision that the Korean steel industry's receipt of 51% of certain discounts

awarded by the Government of Korea was not indicative of a finding of disproportionality);

*Allegheny Ludlum Corp. v. United States*, 112 F. Supp. 2d 1141, 1152, 1154  (Ct. Int'l Trade

2000) (sustaining Commerce's decision that loans made to the Belgian steel industry were not

specific because the industry did not receive a disproportionate share of loans where its share of

loans ranged between 2% and 7.77%).

Mosaic incorrectly argues that the record does not allow Commerce to evaluate whether

the GOM provided "proportionate reductions in tax penalties for any taxpayer that incurs one"

because the GOM did not provide information about [

] for the 50 largest subsidy recipients.  Mosaic's Comments on Draft Second Remand

Redetermination (Apr. 3, 2025) at 8.  Mosaic is incorrect.  The GOM provided a complete

response to the Department regarding the largest 50 recipients of reductions in tax fines and

penalties.  *See* GOM SQR – Part 2 at S-IX-11–12 (P.R. 359; C.R. 242).  That evidence

demonstrates that OCP did not receive the most, or even the second most, reductions.  Instead,

OCP received the tenth largest reductions notwithstanding that the OCP Group was by far the

largest corporate group within Morocco with revenues representing approximately 5% of the

GDP of the country.  *Id.*; *see* GOM IQR, vol. I at Ex. I-1 p.25  (P.R. 155; C.R. 69); *id.*, vol. V at

V-15 (P.R. 150; C.R. 64), Ex. V-11 p.4 (P.R. 192; C.R. 116).  Thus, contrary to Mosaic's

argument, this record evidence submitted by the GOM demonstrates that OCP did not receive a

disproportionately large amount of reductions in tax fines and penalties.

Lastly, as the Court emphasized in *Mosaic II* and in the remand opinion in the first

Administrative Review, the SAA set forth a guiding principle that CVD duties should not be

Consol. Ct. No. 21-00116

imposed where "because of the widespread availability and use of a subsidy, the benefit of the subsidy is spread throughout an economy." *Mosaic II*, 744 F. Supp. 3d at 1379 (citing SAA at 930); *Mosaic III* at 36. Cautioning that a subsidy "'available to all industries and sectors,' should not be considered to satisfy the specificity requirement," the Court directed Commerce to distinguish between subsidies that are provided to or used by discrete segments of the economy, which should be countervailed, and those that distribute a benefit throughout the entire economy, which should not be countervailed. *Mosaic II*, 744 F. Supp. 3d at 1379 (citing SAA at 929–30). Clearly, the reductions in tax fines and penalties at issue here "benefit{ed} the country's economy at large through sound tax administration," *id.* at 1380, such that 8,761 companies used the program in 2019. GOM SQR – Part 2 at S-IX-13 (P.R. 359; C.R. 242); *see id.* at S-IX-9 ("{T}he waiver or reduction of surcharges, fines, and penalties is a procedure open to all taxpayers . . . done on the basis of a claim which is not subject to any formal eligibility criteria or time limit conditions."). Consistent with *Mosaic II*, Congress did not intend for Commerce to find these types of reductions in fines and penalties—*i.e.*, those that are widely distributed through the Moroccan economy—to be "specific."

In conclusion, the determination that the tax fines and penalties program is not *de facto* specific complies with the Court's remand order, is supported by substantial evidence and otherwise in accordance with law. The Court should affirm Commerce's Final Redetermination with respect to reductions in tax fines and penalties.

Consol. Ct. No. 21-00116

## VI.    Conclusion

OCP respectfully submits that the Court should remand the Second Redetermination with respect to Commerce's methodology for allocating OCP's HQ and support costs and its decision to offset OCP's debt costs with financial income, and should sustain Commerce's finding that the reductions in tax fines and penalties program is not *de facto* specific.

Respectfully submitted,

Dated: May 29, 2025

/s/ William R. Isasi
William R. Isasi
Wanyu Zhang
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001-4956

Micaela McMurrough
Hardeep K. Josan
Jordan B. Bakst
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018-1405

*Counsel to OCP S.A.*

<u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the attached Defendant-Intervener OCP S.A's

Comments on Second Remand Redetermination, filed on May 29, 2025, contains 9,995 words,

including footnotes, and excluding the table of contents, table of authorities, counsel's signature

block, and this certificate, according to the word count function of the word-processing system

used to prepare these comments, and therefore complies with the maximum word count

limitation set forth in Chamber Procedure 2(B)(1)(b).

<u>/s/ William R. Isasi</u>
William R. Isasi