# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE TIMOTHY C. STANCEU, JUDGE

THE MOSAIC COMPANY,

   Plaintiff,

  v.

UNITED STATES,

   Defendant,

  and

OCP S.A.,

   Defendant-Intervenor.

Consol. Court No. 21-00116

**<u>NON-CONFIDENTIAL VERSION</u>**

**Business Proprietary Information Deleted from Pages 1, 5-10, 12, 14, 16-23, 26-28**

## <u>THE MOSAIC COMPANY'S COMMENTS ON COMMERCE'S REMAND REDETERMINATION</u>

David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
stephanie.hartmann@wilmerhale.com

Dated: May 29, 2025     *Counsel for The Mosaic Company*

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  STANDARD OF REVIEW ........................................................................................ 2

III. ARGUMENT ............................................................................................................. 4

     A.     Commerce's Decision to Continue Including OCP's HQ/Support and Debt Costs in the Cost Buildup for Phosphate Rock is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law ...................... 4

          1.    Commerce's Exclusion of OCP's Reported HQ/Support and Debt Costs in the Original Investigation Was Lawful ...................................................... 4

          2.    Commerce's Second Remand Determination Unlawfully Departed from its Practice of Excluding Unrelated Costs from the Cost Buildup ............ 10

     B.     Commerce's Decision to Use a Revenue-Based Allocation Methodology for HQ/Support Costs is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law ...................................................................... 12

     C.     Commerce's Decision to Adjust OCP's Reported Debt Costs to Account for Financial Income is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law ...................................................................... 15

     D.     Commerce's Rejection of Mosaic's Alternative Allocation Methodology for Debt Costs is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law ............................................................... 18

     E.     Commerce's Determination that the Reduction in Tax Fines and Penalties Program is *De Facto* Specific is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law ............................................................... 24

IV. CONCLUSION ....................................................................................................... 28

NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)........................................................................3

19 U.S.C. § 1677(5A)(D)(iii)(III)................................................................25

19 U.S.C. § 1677f(i)(3)(A) ..........................................................................4

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*,
  217 F. Supp. 2d 1345 (CIT 2002) ...........................................................3

*Altx, Inc. v. United States*,
  167 F. Supp. 2d 1353 (CIT 2001)........................................................4, 10

*Archer Daniels Midland Company v. United States*,
  Consol. Court No. 23-00239, Slip Op. 25-55 (May 6, 2025) ...........................12

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
  419 U.S. 281 (1974)..............................................................................3

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962)..............................................................................3

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
  701 F.3d 1367 (Fed. Cir. 2012)...............................................................3

*Consol. Bearings Co. v. United States*,
  412 F.3d 1266 (Fed. Cir. 2005)..............................................................12

*CS Wind Viet. Co. v. United States*,
  832 F.3d 1367 (Fed. Cir. 2016)...........................................................3, 10

*Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*,
  498 F. Supp. 3d 1345 (CIT 2021) ...........................................................2

*Jiaxing Brother Fastener Co. v. United States*,
  380 F. Supp. 3d 1343 (CIT 2019) ...........................................................3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................................3

*NMB Sing. Ltd. v. United States*,
  557 F.3d 1316 (Fed. Cir. 2009)...............................................................4

**NON-CONFIDENTIAL VERSION**

*Pakfood Pub. Co. v. United States*,
    453 F. App'x 986 (Fed. Cir. 2011) ...................................................................12

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990)......................................................................2

*RHP Bearings Ltd. v. United States*,
    288 F.3d 1334 (Fed. Cir. 2002).......................................................................3

*Rust v. Sullivan*,
    500 U.S. 173 (1991)........................................................................................3

*SKF USA Inc. v. United States*,
    263 F.3d 1369 (Fed. Cir. 2001), *aff'd*, 332 F.3d 1370 (Fed. Cir. 2003) ...........................4

*The Mosaic Company v. United States*,
    659 F.Supp.3d 1,285, 1,300 (CIT Sept. 14, 2023)......................................5, 24

*The Mosaic Company v. United States*,
    Consol. Court No. 21-00116, Slip Op. 25-3 (CIT Jan. 8, 2025) ................24, 25

*The Mosaic Company v. United States*,
    647 F.Supp.3d 1358 (CIT July 11, 2023) ...................................................11

*The Mosaic Company v. United States*,
    Consol. Court No. 21-00117, Slip Op. 24-04 (CIT Jan. 19, 2024)...........11, 12

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996) ..........................................................................3

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951).........................................................................................3

*Wind Tower Trade Coalition v. United States*,
    569 F. Supp. 3d 1221 (CIT 2022)...............................................................4, 10

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    707 F. Supp. 2d 1355 (CIT 2010), *vacated on other grounds*, 652 F.3d
    1333 (Fed. Cir. 2011)......................................................................................3

## Administrative Materials

*Alloy Magnesium from Canada: Final Results of Countervailing Duty New
    Shipper Review*, 68 Fed. Reg. 22,359 (Dep't Commerce Apr. 28, 2003),
    and accompanying Issues and Decision Memorandum ....................................26

*Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review, Partial Rescission, and Final No Shipment Determination*, 76 Fed. Reg. 41,203 (Dep't Commerce July 13, 2011) and accompanying Issues and Decision Memorandum............................................................15

*Certain Frozen Warmwater Shrimp from Thailand: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 47,551 (Dep't Commerce Sept. 16, 2009) and accompanying Issues and Decision Memorandum............................................................16

*Chlorinated Isocyanurates from Spain: Notice of Final Determination of Sales at Less Than Fair Value*, 70 Fed. Reg. 24,506 (Dep't Commerce May 10, 2005) and accompanying Issues and Decision Memorandum............................................16

*Notice of Final Determination of Sales at Less Than Fair Value: Sugar from Mexico*, 80 Fed. Reg. 57,341 (Dep't Commerce Sept. 23, 2015) and accompanying Issues and Decision Memorandum.......................................................16, 17

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum.................. *passim*

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum..........................................................................................26

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum..........................11

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum................................................................................11, 12

*Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 65,751 (Dep't Commerce Dec. 11, 2009) and accompanying Issues and Decision Memorandum....................................16

**Legislative Materials**

Statement of Administrative Action Accompanying H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ....................................................25, 26

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

## I.    **INTRODUCTION**

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic")

respectfully submits these comments in support of certain aspects of, and in opposition to other

aspects of, the U.S. Department of Commerce's ("Commerce") Final Results of Redetermination

Pursuant to Second Court Remand.  *See The Mosaic Company v. United States*, Consol. Court

No. 21-00116, Slip Op. 25-3 (Apr. 29, 2025) ("Second Remand Determination"), P.2.R.R. 8,

C.2.R.R. 6, ECF No. 148-1.

In 2020, Mosaic petitioned Commerce and the U.S. International Trade Commission to

remedy the injury that the U.S. phosphate fertilizer industry was suffering as a result of unfairly

subsidized phosphate fertilizer imports from Russia and Morocco.  After a lengthy investigation,

Commerce correctly determined that OCP S.A. ("OCP"), a state-owned enterprise that enjoys a

perpetual, government-granted monopoly over the exploitation of Morocco's phosphate reserves,

received countervailable subsidies in the form of mining rights for LTAR.  These mining rights

subsidies formed the core of the unfair trade practices Mosaic discussed in its Petitions to

Commerce.  On remand the second time, Commerce reconsidered its approach to benchmarking

the benefit OCP received from this program and re-calculated the subsidy rate for the program as

12.68 percent *ad valorem*.  Mosaic respectfully submits that while Commerce properly corrected

for certain errors in its benchmarking methodology, the ultimate subsidy rate continues to

understate the true amount of benefit that OCP receives from the Government of Morocco's

provision of phosphate mining rights.  The record shows that OCP extracted over **[          ]**

metric tons of phosphate rock during the period of investigation ("POI"), *see* OCP Letter,

"Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Supplemental Questionnaire

Response Part Four," dated Nov. 9, 2020 ("OCP 11/9/20 Supp QR"), Appendix MIN2-9, P.R.

355, C.R. 234, which it received effectively for free.

The statute requires Commerce to calculate the amount of the benefit that respondents receive from unfair subsidies as accurately as possible. *See Içdaş Celik Enerji Tersane ve Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1353 (CIT 2021) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Mosaic respectfully submits that Commerce took the correct approach in the original investigation when the agency excluded OCP's reported HQ/Support and Debt costs from the cost buildup, because OCP failed to substantiate that these costs are related to phosphate mining or rock beneficiation or are relevant to the pricing of phosphate rock. *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Dep't Commerce Feb. 16, 2021) ("Final Determination"), P.R. 472, and accompanying Issues and Decision Memorandum ("IDM") at 24, P.R. 473. However, having made the flawed decision to allow OCP's HQ/Support and Debt costs, Commerce correctly recognized that the allocation methodologies it used in the first remand redetermination were flawed, and it correctly made certain adjustments. Mosaic submits that Commerce's adjustments to the HQ/Support and Debt allocations are reasonable, supported by substantial evidence, and adequately address the Court's concerns. Accordingly, the Court should affirm these aspects of the Second Remand Determination.

Certain other aspects of Commerce's Remand Determination are not supported by substantial evidence and otherwise not in accordance with law – namely, Commerce's continued allocation of OCP's Debt costs based on capital expenditures, and Commerce's *de facto* specificity determination with respect to the Reduction in Tax Fines and Penalties program.

## II.    STANDARD OF REVIEW

In reviewing Commerce's CVD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the

record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47 (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence. *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (citation omitted). The substantial evidence standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

This standard of review also encompasses the "arbitrary and capricious" standard established under the Administrative Procedure Act. *See Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)). "{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002) (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). Thus, Commerce must treat like situations similarly and may not depart from a prior practice, unless "it provides a reasoned explanation for its change." *Jiaxing Brother Fastener Co. v. United States*, 380 F. Supp. 3d 1343, 1365 (CIT 2019) (citing *Rust v. Sullivan*, 500 U.S. 173, 187 (1991); *State Farm*, 463 U.S. at 42). Failure to consider an important aspect of the problem similarly renders a determination by Commerce arbitrary. *State Farm*, 463 U.S. at 43; *see also Zhejiang DunAn Hetian Metal Co. v. United States*, 707 F. Supp. 2d 1355, 1381 (CIT 2010), *vacated on other grounds*, 652 F.3d 1333 (Fed.

- 3 -

Cir. 2011).  Agency determinations that ignore relevant statutory or regulatory language, or

interpret that language contrary to its plain meaning, are also not in accordance with law.  *See*

*SKF USA Inc. v. United States*, 263 F.3d 1369, 1378, 1382-83 (Fed. Cir. 2001), *aff'd*, 332 F.3d

1370 (Fed. Cir. 2003).

Finally, Commerce is required by law to provide in its final determination "an

explanation of the basis for its determination that addresses relevant arguments{} made by

interested parties."  19 U.S.C. § 1677f(i)(3)(A).  While the agency need not address every

argument and piece of evidence, it must address significant arguments and evidence which

seriously undermines its reasoning and conclusions.  *Altx, Inc. v. United States*, 167 F. Supp. 2d

1353, 1374 (CIT 2001).  Failure to do so renders its determination unlawful.  *See NMB Sing. Ltd.*

*v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009); *Wind Tower Trade Coalition v. United*

*States*, 569 F. Supp. 3d 1221, 1241, 1259 (CIT 2022).

III.    **ARGUMENT**

A.    **Commerce's Decision to Continue Including OCP's HQ/Support and Debt**
**Costs in the Cost Buildup for Phosphate Rock is Unreasonable, Unsupported**
**by Substantial Evidence, and Otherwise Not in Accordance with Law**

1.    **Commerce's Exclusion of OCP's Reported HQ/Support and Debt**
**Costs in the Original Investigation Was Lawful**

In the investigation, Commerce based its tier-three benefit calculation for OCP's

phosphate mining rights on "a comparison of the actual per-unit cost build-up of OCP's

beneficiated rock with a market price of phosphate rock."  IDM at 23, P.R. 473.  Commerce

reasonably decided to take into consideration only "the relevant production costs *associated with*

*producing the phosphate rock from the minerals in the ground* as well as *the pricing of*

*phosphate rock*."  *Id.* at 24 (emphasis modified).  As part of this analysis, Commerce properly

excluded OCP's reported HQ/Support and Debt costs from the cost buildup, because OCP failed

**NON-CONFIDENTIAL VERSION**

to establish that these costs contributed to OCP's mining operations or were relevant to the

pricing of phosphate rock. *Id.* Specifically, Commerce found that OCP failed to provide

sufficient evidence showing "how each of these line items" recorded to OCP's HQ/Support

segment "contributed to OCP's mining operations and how these costs are relevant to the pricing

of phosphate rock." *The Mosaic Company v. United States*, 659 F.Supp.3d 1,285, 1,300 (CIT

Sept. 14, 2023) ("*First Remand Order*") (citing IDM at 24, P.R. 473). Commerce's original

decision to exclude these costs was reasonable, supported by substantial evidence, and otherwise

in accordance with law.

In the *First Remand Order*, the Court stated that Commerce's "exclusion of all SG&A

expenses from the COP buildup was *per se* unreasonable{,}" *id.*, and it instructed Commerce

either to "accept OCP's SG&A cost allocation method or . . . show that it is unreasonable in light

of a satisfactory alternative methodology it would use instead." *Id.*, 659 F.Supp.3d at 1,301.

Mosaic respectfully submits that this ruling was erroneous and rested on a misinterpretation of

the record evidence and the approach that Commerce took in the investigation. Specifically,

Mosaic disputes that Commerce's exclusion of OCP's HQ/Support and Debt costs in the original

investigation was an "implied finding" that OCP incurred no SG&A costs in the production of

phosphate rock.[1] *Id.* at 1300. In actuality, Commerce had included more than MAD [          ]

in indirect overhead costs for OCP's phosphate mines in the cost buildup. OCP Letter,

"Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Supplemental Questionnaire

Response Part Three," dated Nov. 6, 2020, ("OCP 11/6/20 Inv. SQR"), Exhibit MIN2-3, P.R.

---

[1] OCP's public financial statements – which OCP prepared in the ordinary course of business, unlike its
questionnaire responses – do not describe the HQ/Support segment as "SG&A," or suggest that they relate to
phosphate mining or rock production. Rather, the financials describe OCP's HQ or "head office" segment as
"host[ing] the corporate activities and activities of international entities," including its nearly 40 subsidiaries and
affiliates. *See* OCP Letter, "Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Section III
Questionnaire Response," dated Sept. 17, 2020 ("OCP IQR"), Appendix GEN-8(j) at 15, P.R. 130, 133, C.R. 39, 43.

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

354, C.R. 232.[2]

As far as Mosaic is aware, this is the first time in any countervailing duty proceeding that Commerce has agreed to include corporate-wide expenses unrelated to the good or service provided for LTAR in a tier three cost buildup. The fact that Commerce has done so in spite of its explicit finding in the investigation that it did not "have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock" makes its decision even more unreasonable and prone to inaccuracy. IDM at 24, P.R. 473. The record – which remains unchanged from the original investigation – shows that OCP did not substantiate the vast majority of its reported HQ/Support and Debt costs as related directly or indirectly to phosphate rock mining and beneficiation. Specifically, OCP provided documentation supporting approximately [                    ] in expenses related to phosphate mining and rock production. These costs are the personnel costs associated with [    ] employment positions, out of OCP's nearly 20,000 employees.[3] OCP 12/30/20 ILOV QR, Appendix VE-MIN-4, P.R. No. 436, C.R. 291. This amount represents [

         ] of the over [                ] in HQ/Support costs that OCP characterized in its questionnaire responses as corporate-wide "SG&A" and sought to include in the phosphate rock cost buildup.

---

[2] [

                      ]. *Compare* OCP Letter, "Phosphate Fertilizers from the Kingdom of Morocco: Response to Questionnaire in Lieu of On-Site Verification," dated Dec. 30, 2020, P.R. 436, C.R. 289 ("OCP 12/30/20 ILOV QR") at 6, *with* OCP 12/30/20 ILOV QR at 7, P.R. 436, C.R. 289.

[3] OCP failed to provide salary information for the [    ] positions associated with phosphate rock mining, which account for just [        ] of its employees; however, the costs associated with these positions can be estimated as a percentage of OCP's overall personnel costs. OCP reported that it had 19,865 employees in 2019, and MAD 9.213 billion in personnel expenses. OCP IQR, Appendix GEN-8(j), at 23, P.R. 133, C.R. 43. Therefore, each employee accounts for approximately [           ] in HQ/Support costs. Further, [    ] of the descriptions suggest that the positions are not mining-site specific. The related personnel costs for these [    ] positions should be allocated across all four of OCP's mining and chemical production sites. Therefore, the [    ] positions that OCP has documented account for no more than [            ] in HQ/Support costs that could potentially be included in the cost buildup.

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

Further, the record shows that many of the costs recorded by OCP's HQ/Support segment

are *unrelated* to phosphate mining and rock beneficiation. These are not *indirect* costs that bear

some relation to the cost basis at issue, but rather *unrelated* costs that have no relationship

whatsoever to phosphate mining or rock beneficiation. Accordingly, even if it were reasonable to

account for some portion of OCP's HQ/Support and Debt costs, it was unreasonable and unlawful

– and contrary to Commerce's own professed methodology – to include the HQ/Support and Debt

costs that are documented as *unrelated* to OCP's phosphate operations.

 OCP S.A. is a conglomerate with nearly 40 subsidiaries and affiliates, both in Morocco

and internationally. *See* OCP IQR, Appendix GEN-8(j) at 15, P.R. 133, C.R. 43. In investor

materials, OCP describes itself as "engaged in a number of non-core projects that are not directly

related to its phosphates activities." OCP IQR, Appendix BONDPURCH-1 at 23, P.R. 133, C.R.

43. These include "initiatives to improve education (including higher education programmes)

and research and development initiatives, reduce poverty, improve access to healthcare services,

increase youth employability, foster agricultural development, promote socio-cultural activities

and preserve Moroccan heritage through the OCP Foundation." *Id.* OCP records costs and

revenues associated with these "non-core" activities to its "HQ/Support" or "headquarters"

segment. *See* OCP IQR, Appendix GEN-8(j) at 15, P.R. 133, C.R. 43. The record contains many

examples of OCP expenses recorded to its HQ/Support segment that are wholly unrelated to any

production activities, as the Government has acknowledged. *See* Def. Response Br., ECF No. 79,

at 58 ("OCP all but admits that the information it submitted contains unrelated cost

information . . ."). For example, OCP's HQ/Support segment recorded [     ] in

[               ]. OCP 12/30/20

ILOV QR at 18, P.R. 436, C.R. 289. It also reported [    ] in [

        ]. *Id.* at 29. OCP reported that two of

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

the largest payments in the **[                                    ]** category were to **[**

**]** and **[                              ]**. *Id.* at 29-30.

It is unreasonable to include such expenditures in the pool of HQ/Support costs allocated to OCP's phosphate mining and rock production.  This is so not only because they have no relationship to the production of phosphate rock, but also because there is no evidence on the record that the benchmark prices that Commerce used to calculate the benefit from this program reflect such costs.  Since every extraneous dirham that Commerce includes in the cost buildup directly reduces the benefit from the mining rights program, Commerce's statutory obligation to calculate OCP's subsidy rates as accurately as possible requires Commerce to ensure it does not include such extraneous costs.

OCP's HQ/Support costs also appear to include costs associated with **[**

**]**.  As Mosaic explained in its comments on Commerce's Draft Second Remand, OCP's HQ/Support segment incurs costs for providing services to its roughly 40 subsidiaries and affiliates, OCP IQR, Appendix BONDPURCH-6 at 231, P.R. 136-139, C.R. 45-47, and OCP has incurred significant costs to fund the operations of **[**

**]**. *Id.* at 242.  None of these costs relate – directly or indirectly – to OCP's phosphate rock mining and rock production.

Commerce asserted in the First Remand Determination that "{a}n attempt to further segregate OCP's HQ, Support, and Debt costs in a manner inconsistent with its accounting methodology would be unreasonable."  *See Final Results of Redetermination Pursuant to Court Remand: The Mosaic Company v. United States*, Consol. Court No. 21-00116, Slip Op. 23-134 (Sept. 14, 2023) ("First Final Remand Redetermination") at 9.  The record does not support this finding, as OCP itself routinely reports operating expenditures and capital expenditures for its

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

"non-core" activities "that are not directly related to its phosphate activities" in investor

materials, showing that it is able to segregate costs that are unrelated to its phosphate mining and

rock production pursuant to its normal accounting methodology.  *See* OCP IQR, Appendix

CRED-30 at 112-13, P.R. 132, C.R. 51.

In the Second Remand Redetermination, Commerce modified its explanation and stated

"because the costs cannot be separated by cost center, and are considered corporate-level SG&A

expenses, we find that a standard cost accounting allocation methodology is a suitable alternative

to determine a reasonable portion of OCP's HQ, Support, and Debt costs."  Second Remand

Determination at 25.  The record does not support this finding, either.

As an initial matter, Commerce's description of the costs as "corporate-level SG&A

expenses" is unsupported by the record.  [                                    ] to fund [                    ] and

[                    ] are not SG&A expenses.  Further, it is entirely possible for Commerce to exclude

this cost center – which does not consist of either direct or indirect costs of phosphate rock

production – from the cost buildup.  The exclusion of these costs would be consistent with the

purported aim of the buildup, *i.e.*, to capture the "relevant production costs associated with

producing and pricing the phosphate rock."  IDM at 24, P.R. 473.  Further, there is no record

evidence suggesting that the benchmark prices for phosphate rock that Commerce used to

measure the benefit from OCP's mining rights subsidies reflect the costs of supporting [

] or [            ], so the inclusion of such unrelated expenses on only one side of the

cost buildup radically distorted and reduced the benefit calculation.

In its comments on Commerce's draft remand determination, Mosaic pointed out that

OCP's reporting of its HQ/Support and Debt costs includes costs "unrelated to OCP's production

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

activities and that cannot reasonably be expected to be recovered in the sale of phosphate rock."[4] Second Remand Determination at 24, P.2.R.R. 8, C.2.R.R. 6.  Commerce did not dispute these points in the Second Remand Determination.  *See id.* at 24-25.  Indeed, the Government had previously made the same points in its briefs to this Court.  *See, e.g.*, Def. Response Br., ECF No. 79, at 58-59.  However, instead of addressing the record evidence Mosaic cited, Commerce acted as though its hands were tied and that it had no choice but to allow OCP's HQ/Support and Debt costs to be allocated in their entirety, even if it resulted in distortions to its subsidy calculation.  *See* Second Remand Determination at 24-25, P.2.R.R. 8, C.2.R.R. 6 (citing the Court's views on that "exclusion of all SG&A expenses from the COP buildup was *per se* unreasonable" and "OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities").

The Court's second remand opinion did not instruct Commerce to ignore contradictory record evidence.  Mosaic presented evidence that OCP's HQ/Support and Debt costs include *unrelated* costs that are not SG&A expenses and that can easily be segregated and excluded from the cost buildup.  *See* Mosaic Letter, "Phosphate Fertilizers from Morocco: Comments on Draft Second Remand Redetermination," dated Apr. 4, 2025 ("Mosaic Comments on Draft Second Remand") at 13-16, P.2.R.R. 7, C.2.R.R. 5.  Commerce unlawfully failed to address Mosaic's arguments and the evidence Mosaic cited, rendering its decision unsupported by substantial evidence and contrary to law.  *See CS Wind Viet. Co.*, 832 F.3d at 1373-74; *Wind Tower Trade Coalition*, 569 F. Supp. 3d at 1241, 1248-49 (*citing Altx, Inc.*, 167 F. Supp. 2d at 1374).

**2.    Commerce's Second Remand Determination Unlawfully Departed from its Practice of Excluding Unrelated Costs from the Cost Buildup**

---

[4] OCP itself has described HQ/Support costs as **[                                    ]**.  OCP 12/30/20 ILOV QR at 7, P.R. 436, C.R. 289.

**NON-CONFIDENTIAL VERSION**

Commerce's decision to allow OCP's HQ/Support and Debt costs that are *unrelated* to phosphate mining or rock beneficiation is an unreasonable departure from prior practice.  In the companion investigation of *Phosphate Fertilizers From the Russian Federation*, in a decision affirmed by this Court, Commerce stated:

> Under this "Tier Three" approach, we based our benchmark on the value of the underlying good conveyed via mining rights.  As a result of this approach, our benefit analysis *focused on the production costs of phosphate ore extracted and phosphate rock produced* by {the respondent} during the POI from the mining deposit tied to the license in question.

*Phosphate Fertilizers From the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021), and accompanying Issues and Decision Memorandum, Comment 2 (emphasis added); *The Mosaic Company v. United States*, Consol. Court No. 21-00117, Slip Op. 24-04 at 6 (CIT Jan. 19, 2024).

Commerce properly found in that case that the inclusion of "expenses *unrelated* to phosphate ore mining and beneficiation" would "skew the benefit calculation by treating the value of the good conveyed via the {Government of Russia's} mining rights as higher than it otherwise would be without those expenses."  *Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying Issues and Decision Memorandum at 39-40 (emphasis added); *see also The Mosaic Company v. United States*, 647 F.Supp.3d 1358 (CIT July 11, 2023); *The Mosaic Company v. United States*, Consol. Court No. 21-00117, *Phosphate Fertilizers From the Russian Federation*: Final Results of Redetermination Pursuant to Court Remand, ECF No. 128 at 28.  Commerce's decision in that case not to adjust the tier-three buildup for costs unrelated to the respondents' mining of phosphate ore, including selling and administrative expenses, has been affirmed twice by this Court.  *See The Mosaic*

*Company v. United States*, Consol. Court No. 21-00117, Slip Op. 24-04 (Jan. 19, 2024) at 6;

*Archer Daniels Midland Company v. United States*, Consol. Court No. 23-00239, Slip Op. 25-55

(May 6, 2025) at 19 ("While the expense sheets that JSC provided lists different expenses

incurred {}, they do not show which administrative expenses related to phosphate mining and

beneficiation and which related to {} other activities.  Without more, Commerce could not

reasonably include the expenses {} in its calculations.").

By contrast, in this case, Commerce unquestioningly accepted *all* of OCP's HQ/Support

and Debt costs in the tier-three cost buildup, including expenses that the record shows are

*unrelated* to OCP's phosphate mining and beneficiation.  Such an unexplained departure from

agency precedent is, standing alone, unlawful.  *See Pakfood Pub. Co. v. United States*, 453 F.

App'x 986, 989 (Fed. Cir. 2011) (citing *Consol. Bearings Co. v. United States*, 412 F.3d 1266,

1269 (Fed. Cir. 2005)).  Further, the unlawful inclusion of [                    ] dirhams in costs that

are unrelated to phosphate mining and rock production significantly skewed the benefit

calculation, as Commerce itself predicted in *Phosphate Fertilizers From the Russian Federation*.

*Phosphate Fertilizers From the Russian Federation: Final Results of Countervailing Duty*

*Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and

accompanying Issues and Decision Memorandum at 39-40.  Commerce failed to provide a

reasoned explanation for its departure from prior practice, rendering its decision arbitrary and

capricious and thus contrary to law.  *See Pakfood Pub. Co.*, 453 F. App'x at 989.

**B.    Commerce's Decision to Use a Revenue-Based Allocation Methodology for HQ/Support Costs is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law**

In the Second Remand Determination, Commerce properly found that OCP's proposed

allocation methodology for HQ/Support costs was distortive because OCP excluded certain site-

specific costs.  Second Remand Determination at 25-27, P.2.R.R. 8, C.2.R.R. 6.  Commerce also

found that allocating the HQ/Support costs based on OCP's consolidated revenues – instead of

OCP's arbitrary reporting of site-specific direct costs of its two mining and two chemical sites –

is more appropriate because the record demonstrates OCP's corporate management supports

other business activities, including activities of its subsidiaries. *Id.* at 27. These findings are

supported by substantial evidence.

As Commerce noted in the Draft Second Remand, the record shows that OCP, as a

holding company, supports the business activities and operations of its 24 fully-owned

subsidiaries through its headquarters and corporate operations. Department Memorandum,

"Draft Results of Redetermination Pursuant to Second Court Remand," dated Mar. 20, 2025

("Draft Second Remand Results") at 13-14, P.2.R.R. 1, C.2.R.R. 1. These activities include,

among others:

- OCP Services, which is involved in the acquisition and operation of hotel properties;

- Smesi, which is an engineering and project management company;

- La Société d'Aménagement et de Développement Vert ("SADV"), which is tasked with developing a "green" city, including building residential, health, education, leisure, and administrative infrastructure;

- La Société d'Aménagement et de Développement de Mazagan ("SAEDM"), which is responsible for real estate development projects in Morocco; and

- OCP Innovation Fund For Agriculture ("OIFFA"), which invests in agricultural entrepreneurship in Morocco.

Appendix BONDPURCH-5 at 224-27, P.R. 135, C.R. 44.

Although separate legal entities, these subsidiaries are all co-located at the same address

as OCP's headquarters office: 2, Rue Al Abtal Hay Erraha, Casablanca. *See id.* at 117, 224-27.

Thus, Commerce properly found that "OCP, as a parent company, serves as a headquarters for

the company and performs the functions OCP reported itself, such as accounting, management,

**NON-CONFIDENTIAL VERSION**

marketing, banking, and insurance, partly in support of the consolidated entity."[5]  Second

Remand Determination at 28, P.2.R.R. 8, C.2.R.R. 6.

Commerce also cited evidence of an agreement between OCP and its [


].  Second Remand Determination at 29, P.2.R.R. 8, C.2.R.R. 6 (citing OCP IQR at

Appendix GEN4(a)(iii), P.R. 130-131, C.R. 39-40).  As Commerce noted, OCP reported that its

HQ/Support personnel perform functions including [

], OCP ILOV QRat 7, P.R. 436, C.R. 289, and

OCP's financial statements only report personnel costs as between OCP's [

].  OCP SQR Part 3 at Appendix MIN2-7; see

also OCP ILOV QR at Appendix VE-MIN-1.  The record contains additional examples of OCP

S.A. providing services to other subsidiaries.  *See* OCP IQR, Appendix BONDPURCH-6, at 231,

P.R. 136-139, C.R. 45-47 (summarizing agreements between OCP and its subsidiaries to provide

services and other support functions to those subsidiaries, including Phosboucraa, OCP

International SAS, OCP Africa, and others).  The record thus supports Commerce's finding that

OCP's HQ/support segment incurs costs to support the activities of its subsidiaries and affiliates

at the headquarters level.[6]

The record also shows that OCP's HQ/support segment is engaged in revenue-generating

activities, and that OCP reports revenues outside the two mining sites and two chemical sites

---

[5] OCP has described its HQ/support personnel as engaged in, among other things, [

].  OCP 12/30/20 ILOV QR at 40, P.R. 436, C.R. 289.
[6] Draft Second Remand Results at 14, P.2.R.R. 1, C.2.R.R. 1.  As Commerce stated, even if the cost of the services
themselves is not booked by OCP S.A. as HQ/Support costs, the record does not support a finding that OCP S.A.
generates no overhead as a result of selling services to subsidiaries and affiliates.  Second Remand Determination at
29, P.2.R.R. 8, C.2.R.R. 6.

included in OCP's proposed allocation methodology.  *See* OCP IQR, Appendix GEN-8(j) (Note 3), P.R. 133, C.R. 43.  Only 75 percent of OCP's reported consolidated revenue for the POI is revenue from sales of phosphates and fertilizers.  Second Remand Determination at 28, P.2.R.R. 8, C.2.R.R. 6.  As the Department noted in the draft results, fully eleven percent of OCP's revenue is derived from "other," non-phosphate activities, *see id.*, including the sale of services in Morocco.  *Id.*, Appendix GEN-4(a)(iii), Statement B11, P.R. 130-131, C.R. 39-40.  Allocating OCP's HQ/Support costs across all segments on which OCP generates revenues is reasonable and accounts for the record evidence showing OCP incurs HQ/Support costs to support its subsidiaries and non-phosphate revenue-generating business segments.

Commerce therefore concluded that a revenue-based allocation is a more reasonable methodology for allocating OCP's HQ/support costs than OCP's arbitrary methodology based on certain site-specific direct costs of its mining and chemical sites.  This decision is reasonable, supported by substantial evidence, and otherwise in accordance with law.

### C.    Commerce's Decision to Adjust OCP's Reported Debt Costs to Account for Financial Income is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law

In the Second Remand Determination, Commerce modified the total value of OCP's reported Debt costs allocated to the cost buildup to account for certain line items of financial income.  Second Remand Determination at 31.  Commerce's decision is reasonable, supported by substantial evidence, and otherwise in accordance with law.

As Commerce explained in the draft results, in antidumping proceedings, Commerce uses interest income earned on working capital to offset the same categories of financial expenses that OCP included in the Debt costs reported for its phosphate rock cost buildup.  *See, e.g.*, *Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping Duty Administrative Review, Partial Rescission, and Final No Shipment Determination*, 76 Fed. Reg. 41,203 (Dep't

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

Commerce July 13, 2011) and accompanying Issues and Decision Memorandum, Comment 4;

*see also Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty*

*Administrative Review*, 74 Fed. Reg. 65,751 (Dep't Commerce Dec. 11, 2009) and

accompanying Issues and Decision Memorandum, Comment 5; *Certain Frozen Warmwater*

*Shrimp from Thailand: Final Results and Partial Rescission of Antidumping Duty Administrative*

*Review*, 74 Fed. Reg. 47,551 (Dep't Commerce Sept. 16, 2009) and accompanying Issues and

Decision Memorandum, Comment 7; *Chlorinated Isocyanurates from Spain: Notice of Final*

*Determination of Sales at Less Than Fair Value*, 70 Fed. Reg. 24,506 (Dep't Commerce May 10,

2005) and accompanying Issues and Decision Memorandum, Comment 10.

As Commerce has stated, "Because interest-bearing, short-term assets are ready for use in

a company's current operations, and are thus readily available for day-to-day cash requirements,

{it} permits a respondent to use the interest income earned on them to offset financial expenses."

*Notice of Final Determination of Sales at Less Than Fair Value: Sugar from Mexico*, 80 Fed.

Reg. 57,341 (Dep't Commerce Sept. 23, 2015) and accompanying Issues and Decision

Memorandum, Comment 9.  While the antidumping law does not apply to this case, it was

reasonable for the Department to take a consistent approach in this case by offsetting OCP's

financial expenses with OCP's reported financial income from interest-bearing short-term

assets.[7]

Commerce's decision to recognize the offsetting financial income is also supported by

substantial evidence.  OCP's proposed allocation of Debt costs is purportedly based on its [

].  OCP 12/30/20 ILOV QR at 23-24, P.R. 436, C.R. 289; OCP 11/9/20 Supp. QR,

---

[7] OCP implicitly acknowledged the Department's longstanding practice when it [

] in the calculation of total debt costs.  OCP 12/30/20 ILOV QR at 23-24,
P.R. 436, C.R. 289.

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

Appendix MIN2-7, P.R. 354, C.R. 232.  The record shows that OCP calculated its [

] for purposes of the cost buildup by summing the following line items: [

].[8,9]  OCP 12/30/20 ILOV QR at 23-24, P.R. 436, C.R. 289.

The category of [

].  *See* OCP IQR, Appendix

GEN-1(a) at 135-146, P.R. 130-131, C.R. 39-40.

As Commerce properly found, the record shows that OCP records financial *incomes*

equivalent to [                                            ] in its financial statements.

Second Remand Determination at 31, P.2.R.R. 8, C.2.R.R. 6.  This indicates that, in the ordinary

course, OCP treats these financial incomes as short-term assets for funding cash requirements,

including paying down debt.  *Id.* (citing OCP IQR at Appendix GEN4-(a)(iii), P.R. 130-131, C.R.

39-40; OCP 12/30/20 ILOV QR at 19-27, P.R. 436, C.R. 289).  The record also shows that OCP

invests a significant portion of its unused cash in [

] at banks.  *See* OCP IQR, Appendix GEN-1(a) at 135-146, P.R.

130-131, C.R. 39-40.  OCP's 2019 financial statements also indicated [

].  *See* OCP IQR, Appendix GEN-4(a)(iii) at Statement B6, P.R.

130-131, C.R. 39-40.  This evidence confirms Commerce's finding that OCP holds short-term

---

[8] Specifically, the [                          ] OCP reported in Debt costs is equivalent to the sum of the line [
]; the line [
]; and the line [                      ].  *Id.*
[9] OCP reported that [                                                                    ] and
[                                                                                      ].  *Id.* at 24.

interest bearing assets, the proceeds of which can be used to fund cash requirements and offset its financial expenses.

Commerce also found – citing evidence from OCP's bond offerings – that OCP uses bonds to [                                        ]. Second Remand Determination at 31, P.2.R.R. 8, C.2.R.R. 6 (citing OCP IQR at Appendices BONDPURCH-1, BONDPURCH-5, and BONDPURCH 6, P.R. 133, 135-139, C.R. 43-47). Taken as a whole, the record supports Commerce's conclusion that OCP's net Debt including financial income is a better reflection of OCP's actual debt obligations as a corporation and the debt costs carried by its production and revenue generation than OCP's own flawed calculation of [                    ] *Id.* at 31-32. Commerce therefore modified the calculation of OCP's Debt costs to include offsets for financial income. The Court should affirm this result as reasonable, supported by substantial evidence, and in accordance with law.

### D.    Commerce's Rejection of Mosaic's Alternative Allocation Methodology for Debt Costs is Unreasonable, Not Supported by Substantial Evidence, and Otherwise Not in Accordance with Law

In the Second Remand Determination, Commerce continued to rely on OCP's proposed allocation methodology for Debt costs, which is purportedly based on each business unit's share of capital expenditures over the average useful life ("AUL") period of 2009-2019. Second Remand Determination at 32, P.2.R.R. 8, C.2.R.R. 6. Commerce's decision is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

The record demonstrates that OCP's proposed allocation basis for its debt costs is unrelated to what OCP used the financed funds for. OCP reported that it allocated Debt costs based on each business unit's share of capital expenditures from 2009-2019. Draft Second Remand Results at 16, P.2.R.R. 1, C.2.R.R. 1. However, the record shows (i) that OCP did not issue debt solely to raise funds for capital improvements; and (ii) that OCP's capital expenditures

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

**NON-CONFIDENTIAL VERSION**

did not relate solely to the two mining sites and two chemicals sites. An OCP bond prospectus

on the record states that OCP "incurs debt *for general corporate purposes* including financing

capital expenditures, *financing acquisitions and working capital needs*." *See* OCP IQR,

Appendix BONDPURCH-1 at 59, P.R. 133, C.R. 43 (emphasis added). Similarly, in its response

in lieu of verification, OCP explained that "Interest on loans . . . represents interest paid on

various debts—bonds, loans, convertible debt, or lines of credit—*that are broadly applicable or

fund general corporate purposes*." OCP 12/30/20 ILOV QR at 19 (emphasis added), P.R. 436,

C.R. 289. Therefore, capital expenditures are only one of many ways OCP employs its debt-

financed resources.

      Further, the record also shows that OCP engages in capital expenditures on behalf of

subsidiaries and affiliates that are consolidated in its financial reporting. Thus, OCP's allocated

debt costs reflect these expenditures as well. For example, the OCP bond prospectus shows that

one of the main drivers of increases in OCP's tangible fixed assets (*i.e.*, capital expenditures) in

2016 was **[**                                                            **]**

*See* OCP IQR, Appendix BONDPURCH-6 at 218, P.R. 136-139, C.R. 45-47. Mosaic also

argued that although OCP provided very little information on what it included in its "net cost of

debt," the evidence shows that these costs are largely unrelated to capital expenditures tied to its

mining operations. In its case brief, OCP stated that its Debt costs "primarily represent interest

expenses on loans it has used to fund capital improvements associated with its mining." OCP

Letter, "Countervailing Duty Investigation of Phosphate Fertilizers from The Kingdom of

Morocco: Case Brief of OCP," dated Jan. 13, 2021 at 28, P.R. 450, C.R. 301. But OCP's own

explanations of its financial accounting clarify that this characterization is incorrect.

      Of the **[**                      **]** that OCP reported as corporate-wide Debt costs, **[**

**NON-CONFIDENTIAL VERSION**

].[10]  OCP 12/30/20 ILOV QR at 19 and 24,

P.R. 436, C.R. 289.  OCP also reported that "{i}nterest on loans that are associated with

specifically identified projects is added to the cost of those projects and is not included" [

].  *Id.* at 19, P.R. 436,

C.R. 289.  In other words, [

].  OCP's consolidated financial statement also corroborates this point, as it

states, "Borrowing costs directly attributable to the acquisition, construction or production of a

'qualifying asset' are included in the cost of the asset."  OCP IQR, Appendix GEN-8(j) at 31,

P.R. 133, C.R. 43.  Therefore, the record shows that this category of OCP's corporate-wide Debt

costs does not include capital expenditures related to its mining operations.

Thus, as the Department correctly found in the investigation, *see* IDM at 24, P.R. 473, the

record does not support a finding that OCP incurred its debt costs exclusively for capital

improvements at its mining or chemical sites.  And for this reason, Commerce's decision to

continue to allocate OCP's corporate-wide debt costs based solely on capital expenditures across

OCP's four operational segments (*i.e.*, the two mining sites and two chemicals sites) is

unreasonable and unsupported by substantial evidence.[11]

Mosaic proposed that Commerce should instead allocate OCP's Debt costs based on the

---

[10] OCP also included [

]  OCP

12/30/20 ILOV QR at 19, 24, P.R. 436, C.R. 290.[

].

[11] The record further suggests that capital expenditures make up only a small portion of the debt costs that OCP
recorded to its HQ/support segment because the bulk of phosphate-related capital expenditures may already be
included in the site-specific breakdown.  OCP reported, "Interest on loans that are associated with specifically
identified projects is added to the cost of those projects and is not included" in OCP's calculation of debt costs.
OCP 12/30/20 ILOV QR at 19, P.R. 436, C.R. 289.  This implies that the costs associated with financing certain
capital expenditures are already recorded in OCP's site specific costs.  If that is the case, then allocating debt costs
based on the sites' share of capital expenditures effectively double-counts the debt costs associated with capital
expenditures earmarked for specific projects and unreasonably distorts the allocation of such costs.

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

operational segments' share of Financial Profit/Loss or, in the alternative, based on capital

expenditures by OCP on a consolidated basis.  In the draft results, Commerce agreed with

Mosaic that use of financial profit and loss "is more reflective of OCP's corporate Debt costs

than capital expenditures associated on a site basis," but found that the record does not allow for

this approach because **[**

**]**.  Draft Second Remand Results at 16-17, P.2.R.R. 1, C.2.R.R. 1.  This finding is

contradicted at least in part by record evidence showing that **[**

**]**. For example, an OCP bond prospectus on the record noted that **[**

**]**

*See* OCP IQR, Appendix BONDPURCH-6 at 211, P.R. 136-139, C.R. 45-47.

    In the final results, Commerce narrowed its reasoning and found only that "{p}rofit and

loss is {} not a reasonable method for allocating financial expenses, because we cannot identify a

reasonable profit on OCP's **[**                                    **]**."  Second Remand

Determination at 32, P.2.R.R. 8, C.2.R.R. 6.  Mosaic concurs with Commerce's finding that it is

not possible to "identify a reasonable profit on OCP's **[**                        **]**," but this is

beside the point because the record shows that OCP itself **[**

**]**. *See*

OCP IQR, Appendix BONDPURCH-6 at 211, P.R. 136-139, C.R. 45-47.  Thus, the fact that

OCP does not record profit **[**                                        **]** is simply a

reflection of how OCP keeps its books and records in the ordinary course.  Commerce agreed

with Mosaic that use of financial profit and loss "is more reflective of OCP's corporate Debt

costs than capital expenditures associated on a site basis."  Draft Second Remand Results at 16-

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

17, P.2.R.R. 1, C.2.R.R. 1. Commerce's rejection of Mosaic's proposed allocation based on profit/loss is unreasonable and unsupported by substantial evidence.

Moreover, Mosaic argued in the alternative that, if Commerce continued to allocate Debt costs based on capital expenditures, then Commerce must account for OCP's capital expenditures at the headquarters level, as well as those of its consolidated subsidiaries and affiliates. Mosaic Comments on Draft Second Remand at 23-25, P.2.R.R. 7, C.2.R.R. 5. The record shows that a significant portion of OCP's capital expenditures were unrelated to OCP's four operational sites (*i.e.*, the two mining sites and two chemicals sites). An OCP bond prospectus on the record references numerous OCP Group-focused initiatives at the HQ/Support level. For example, the prospectus describes [


]. OCP IQR, Appendix BONDPURCH-6 at 184-85, P.R. 136-139, C.R. 45-47. OCP reported that costs recorded at the HQ/support level include, *inter alia*, costs associated with [


]. OCP 12/30/20 ILOV QR at 6-7. The allocation of Debt costs should therefore reflect that OCP incurred Debt costs at the HQ/Support level as well.

The OCP bond prospectus on the record also shows that [

]. *See* OCP IQR, Appendix BONDPURCH-6 at 242, P.R. 136-139, C.R. 45-47. [

]. *See* OCP IQR, [

]. The same prospectus shows that [

]*See* OCP IQR, Appendix BONDPURCH-6 at 174, P.R. 136-139, C.R. 45-47.[

- 22 -

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

**]**. *Id.* Those three figures combined **[** **]** are roughly equivalent to OCP's proposed allocation of **[** **]** of its 2019 debt costs to just the two mining sites – Gantour and Khouribga – illustrating the unreasonableness of OCP's proposed allocation methodology. OCP 11/9/20 Inv. SQR1, Exhibit MIN2-7 P.R. 354, C.R. 232. Thus, a more reasonable methodology to allocate OCP's cost of debt that is based on OCP's capital investments would account for expenditures at Phosboucraa and the HQ/Support level, which can be derived from the bond prospectus's breakout of capital expenditure "related to the industrial development program, per production site" in 2017. *See* OCP IQR, Appendix BONDPURCH-6 at 174, P.R. 136-139, C.R. 45-47.

Commerce "agree{d} that allocating OCP's Debt costs based on the capital expenditures of OCP as a consolidated entity is a more accurate reflection of OCP's incurred financial expenses, and is consistent with {its} revenue allocation using the consolidated entity." Second Remand Determination at 33, P.2.R.R. 8, C.2.R.R. 6. But Commerce nonetheless rejected Mosaic's proposed allocation based on consolidated capital expenditures because "the record does not contain POI-contemporaneous information to calculate this allocation" and "there is {no} indication on the record that OCP Group's capital expenditures remained unchanged between **[** **]** (the period for which the information is available) and the 2019 POI." *Id.* Commerce's explanation ignores that OCP's proposed allocation based on capital expenditures of just the four operational segments is also not contemporaneous with the POI, but rather extends back fully 10 years. OCP ILOV QR at 25. There is also no indication in the record that OCP's capital expenditures across the four operational segments remained unchanged between 2009 and 2019. Thus, Commerce failed to provide a reasoned explanation supported by substantial evidence for rejecting Mosaic's proposed alternative allocation, which as Commerce itself acknowledged "is a more accurate reflection of OCP's incurred financial expense."

For all these reasons, the Court should hold the Second Remand Determination unlawful and remand to Commerce again to reconsider the allocation methodology for OCP's Debt costs.

### E.    Commerce's Determination that the Reduction in Tax Fines and Penalties Program is *De Facto* Specific is Reasonable, Supported by Substantial Evidence, and Otherwise in Accordance with Law

In the underlying investigation, Commerce found that the Reduction in Tax Fines and Penalties program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act, because the record showed that the actual subsidy recipients were limited in number on an enterprise basis during the POI. IDM, Comment 22, P.R. 473. This Court disagreed, however, finding that all Moroccan taxpayers are eligible to apply for relief of tax fines and penalties under this program, and that the record evidence does not show this program is anything other than "a common, ordinary tax administration program" with "widespread availability" and a large number of users. *First Remand Order*, 659 F.Supp.3d at 1,316-17. The Court therefore instructed Commerce to reconsider its *de facto* specificity finding.

In the first remand determination, Commerce found this program to be *de facto* specific under section 771(5A)(D)(iii)(III) of the Act, because the record shows OCP received a disproportionately large amount of the subsidy during the POI. First Remand Determination at 26-32. Commerce observed that a subsidy program can be widely available throughout an economy and still be used disproportionately by an enterprise or group of enterprises, and therefore be *de facto* specific within the meaning of section 771(5A)(D)(iii)(III) of the Act. *See id.* The Court disagreed, however, and remanded a second time for reconsideration. The Court found that Commerce did not cite anything to demonstrate that the broad availability of the program does not provide a benefit to the entire economy. *The Mosaic Company v. United States*, Consol. Court No. 21-00116, Slip Op. 25-3 (CIT Jan. 8, 2025) ("*Second Remand Order*") at 27. The Court also stated that Commerce did not show that the potential or actual

beneficiaries constituted a "discrete segment of the economy." *Id.* The Court therefore held that Commerce "misinterpreted 19 U.S.C. § 1677(5A)(D)(iii)(III) and relied upon an unsupported finding that OCP received 'a disproportionately large amount of the subsidy' in reaching a conclusion of *de facto* specificity." *Id.* at 30.

In the draft and final second remand results, Commerce found that there is no other basis on the record to conclude that this program is *de facto* specific. Draft Second Remand Results at 7, P.2.R.R. 1, C.2.R.R. 1; Second Remand Determination at 7, P.2.R.R. 8, C.2.R.R. 6 ("On remand, we find no other basis on the record to conclude that the reduction in tax fines and penalties program is *de facto* specific to OCP."). Commerce therefore found, under protest, that the program is not countervailable. *Id.* at 7, 7 n.28, P.2.R.R. 8, C.2.R.R. 6. However, Mosaic respectfully submits that Commerce's implementation of the Court's second remand decision is unduly proscriptive.

As the Court observed in the *Second Remand Order*, the SAA[12] sets forth a "guiding principle" for the specificity test, *i.e.*, that it is "intended to function as a rule of reason and to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *Second Remand Order* at 26 (citing SAA at 930). The Court held that "Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those that distribute a benefit throughout the entire economy." *Id.*

Commerce's finding that this program is *de facto* specific because OCP is a disproportionate user of the program is more than adequately supported by the record and is in accordance with the plain language of the statute, as well as Congressional intent as expressed in

---

[12] Statement of Administrative Action, Uruguay Round Trade Agreements Act of 1994, H.R. Rep. 316, 103rd Cong., 2d Sess., vol. 1 (hereinafter "SAA").

**BUSINESS PROPRIETARY INFORMATION DELETED**

**NON-CONFIDENTIAL VERSION**

the SAA.  Although this particular subsidy program may be "widely available" to all taxpayers in Morocco and have a large number of recipients, Commerce correctly found that the subsidy can still be disproportionately received by OCP, which is one of the explicit, textual bases for a finding of *de facto* specificity under the statute.  As Commerce stated in the first administrative review of this order:

> although the program may be *available* to all taxpayers, this fact does not necessarily nor automatically mean that it cannot be disproportionately *used* by certain companies.  The SAA describes the original purpose of the specificity test, which is to serve 'as an initial screening mechanism to winnow out *only those foreign subsidies which truly are* broadly available and widely *used* throughout an economy.'  A subsidy program can be both broadly available across an economy but used disproportionately by an enterprise or group of enterprises compared to others.

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), and accompanying Issues and Decision Memorandum at 48 (emphasis added).[13]

Here, the record shows that although this subsidy program may be available to companies throughout the Moroccan economy, OCP nevertheless received a benefit that was roughly 100 times greater than the average amount that other beneficiaries received.  In particular, the record shows that OCP received a total amount of **[                    ]** in reductions in tax fines and penalties during the POI, an amount that is **[        ]** times higher than the average amount received by other companies (**[                    ]**).  *See* GOM Letter, "Phosphate Fertilizers from the Kingdom of Morocco: Supplemental Questionnaire Response of the Government of the Kingdom of Morocco – Part 2," dated Nov. 11, 2020 ("GOM 11/11/20 SQR 2") at S-IX-11-13, P.R. 359, C.R. 242.  The fact that the benefit that OCP received is nearly 100 times larger than

---

[13] While the Court quoted a portion of this discussion from the SAA, its quote did not include the italicized text. This text provides critical context for understanding Congress' intent in establishing the criteria for a finding of *de facto* specificity, as it demonstrates that the default expectation is that most subsidies will not be "winnowed out" by the specificity test.

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

the typical benefit amount is strong evidence of disproportionality.  *See, e.g.*, *Alloy Magnesium from Canada: Final Results of Countervailing Duty New Shipper Review*, 68 Fed. Reg. 22,359 (Dep't Commerce Apr. 28, 2003), and accompanying Issues and Decision Memorandum at 14-15 (finding disproportionality where a respondent's grant was over 90 times larger than the typical grant amount).

Based on this record, the Department should have found that the *amount* of the subsidy that OCP received relative to the amount received by other actual subsidy recipients – *i.e.*, roughly 100 times the amount received by the average user – is sufficiently disproportionate to show that the benefit of the subsidy program is concentrated in a "discrete segment of the economy."[14]  Such a finding would accord with the Court's holdings in the second remand decision.

The Court also held that ". . . a program that may reduce a tax penalty for any taxpayer incurring one is not the same as a program that actually reduces the tax liability for a defined group of enterprises." *Second Remand Order* at 30.  However, the record shows that this program does not "reduce a tax penalty for any taxpayer incurring one."  In particular, the Government of Morocco's ("GOM") questionnaire responses indicate that the GOM exercises discretion in granting reductions in tax penalties and fines "in view of the circumstances invoked."  GOM 11/11/20 SQR 2 at S-IX-2, P.R. 359, C.R. 242.  The record also shows that [          ] received [          ] of [          ] tax penalties during the POI.  *Id.* at S-IX-4, P.R. 359, C.R. 242.  This indicates that the GOM also exercises discretion in terms of the *amount* of the waiver or reduction in tax penalties and fines granted, and therefore that an actual

---

[14] Nonetheless, Mosaic respectfully submits that a finding that a subsidy is limited to a "discrete segment of the economy" is not a prerequisite for a finding of *de facto* specificity.  To take an extreme example, if the record evidence showed that a given subsidy had been received by 10 out of 10,000 potentially eligible enterprises, the recipients would plainly be "limited in number" within the meaning of Section 771(5A)(D)(iii)(I), even if they were spread broadly across the economy (*e.g.*, an aerospace manufacturer, a farming cooperative, a retailer, etc.).

BUSINESS PROPRIETARY
INFORMATION DELETED

**NON-CONFIDENTIAL VERSION**

subsidy recipient could receive a *disproportionate* amount of the benefit, notwithstanding the widespread availability of the program.  However, while the GOM provided information on

[                                                                                    ], the GOM did not provide such information or the identities for the other 50 largest subsidy recipients.  *See id.* at S-IX-4, S-IX-11 – S-IX-12, P.R. 359, C.R. 242.  Thus, the record does not allow for analysis of whether the GOM provides equal or proportionate reductions in tax penalties for *any* taxpayer that incurs one.

Based on the record before it, Commerce had reasonably relied on the information that the GOM *did* provide, namely the total number of actual subsidy recipients and the total amount of benefits, and it compared this information to OCP's reported benefits under this program.  *See id.* at S-IX-11-13, P.R. 359, C.R. 242.  This record evidence more than adequately supports Commerce's previous finding that OCP is a disproportionate user of the program.  The Court should therefore remand again to Commerce to reconsider its conclusion that there is no basis on the record to conclude that the reduction in tax fines and penalties program is *de facto* specific to OCP.

**IV.   CONCLUSION**

Mosaic respectfully requests that the Court hold that Commerce's decision to continue using OCP's proposed allocation of Debt costs is unsupported by substantial evidence and otherwise not in accordance with law and remand for further consideration of this issue, consistent with the Court's opinion.  The Court should also remand to Commerce to reconsider its conclusion regarding *de facto* specificity of the reduction in tax fines and penalties program.  Commerce's decision to allocate OCP's HQ/Support costs based on revenues and Commerce's decision to adjust OCP's reported Debt costs to account for financial incomes are reasonable,

supported by substantial evidence, and otherwise in accordance with law and should be affirmed by the Court.

Respectfully submitted,

/s/ Stephanie E. Hartmann
David J. Ross
Stephanie E. Hartmann
Alexandra S. Maurer

Wilmer Cutler Pickering Hale and Dorr LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: stephanie.hartmann@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: May 29, 2025

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that foregoing submission complies with the Court's word limitation requirement. The word count for this submission, as computed by Wilmer Cutler Pickering Hale and Dorr LLP's word processing system, is 9,438 words.

/s/ Stephanie E. Hartmann
(Signature of Attorney)

Stephanie E. Hartmann
(Name of Attorney

The Mosaic Company
(Representative Of)

May 29, 2025
(Date)