THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, *et al.*,<br><br>    Plaintiff,<br><br>  v.<br><br>THE UNITED STATES,<br><br>    Defendant,<br><br>  and<br><br>OCP, S.A., *et al.*,<br><br>    Defendant-Intervenors. | Consol. Court No. 21-00116<br><br>NON-CONFIDENTIAL VERSION<br><br>Business Proprietary Information Removed from 14, 16, 18, 19, 21, 22, 23, 24, 25, 26, 27, 29, 30, 31 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

      BRETT A. SHUMATE
      ASSISTANT ATTORNEY GENERAL

      PATRICIA M. McCARTHY
      Director

      TARA K. HOGAN
OF COUNSEL      Assistant Director

JOSEPH GROSSMAN-TRAWICK    KRISTIN E. OLSON
Attorney         Trial Attorney
Office of the Chief Counsel for Trade  U.S. Department of Justice
  Enforcement & Compliance   Civil Division
U.S. Department of Commerce   Commercial Litigation Branch
      P.O. Box 480 | Ben Franklin Station
      Washington, D.C. 20044
      Tel: (202) 307-6299
      kristin.olson@usdoj.gov

      *Attorneys for the United States*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

BACKGROUND ................................................................................................................. 1

    I.    Commerce's Final Determination ......................................................................... 1

    II.    The Court's First Remand Order .......................................................................... 3

    III.    The Court's Second Remand Order ...................................................................... 4

ARGUMENT ....................................................................................................................... 5

    I.    Standard Of Review .............................................................................................. 5

    II.    Commerce's Remand Redetermination Complies With The Remand Order
        And Is Supported By Substantial Evidence And In Accordance With Law .......... 5

        A.    Commerce's Specificity Determination For Reduction In Tax
            Fines And Penalties Program Is Supported By Substantial
            Evidence And In Accordance With Law ...................................................... 5

        B.    Commerce's Allocation Methodology For OCP's HQ, Support,
            And Debt Costs In The COP Buildup Is Reasonable And In
            Accordance With Law .................................................................................. 8

            1.    Allocation Methodology for HQ and Support Costs .................... 13

            2.    OCP's Net Debt ........................................................................... 26

                a.    Offset of Income-Generating Line Items
                in OCP's Net Debt ....................................................... 26

                b.    Debt Allocation Methodology .................................. 28

    CONCLUSION .................................................................................................... 32

TABLE OF AUTHORITIES

Page(s)

Cases

*Bethlehem Steel Corp. v. United States*,
    223 F. Supp. 2d 1372 (Ct. Int'l Trade 2002) .............................................................. 5

*Boomerang Tube LLC v. United States*,
    856 F.3d 908 (Fed. Cir. 2017) ...................................................................................... 28

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ........................................................................................................ 5

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) ........................................................................................................ 5

*Jiaxing Bro. Fastener Co. v. United States*,
    822 F.3d 1289 (Fed. Cir. 2016) .............................................................................. 11, 15

*Jining Yongjia Trade Co. v. United States*,
    34 C.I.T. 1510 (2010) .................................................................................................... 16

*MacLean-Fogg Co. v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ........................................................... 5, 8

*Mosaic Co. v. United States*,
    No. 21-00117, 2024 WL 208136 (Ct. Int'l Trade Jan. 19, 2024) ............................ 11

*Mosaic Co. v. United States*,
    No. 23-00246, 2025 WL 974056 (Ct. Int'l Trade Apr. 1, 2025) ............................. 15

*Mosaic Company v. United States*,
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ........................................................ 3, 4

*Mosaic Company v. United States*,
    Consol. Ct. No. 21-00116, Slip Op. 25-3, 744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) .......... 1

*Qingdao Sea-Line Trading Co. v. United States*,
    766 F.3d 1378 (Fed. Cir. 2014) ................................................................................... 11

Statutes

19 U.S.C. § 1677(5A)(D)(iii)(I) ......................................................................................... 3

Administrative Determinations

Certain Softwood Lumber Products From Canada: Final Results of the Countervailing Duty
    Administrative Review, 2017-2018, 85 Fed. Reg. 77,163.  ............................................ 28

Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative CVD Determination, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) (Final Determination) (P.R. 480), and accompanying Issues and Decision Memorandum (IDM) (P.R. 473). ...................... 1

Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) and accompanying IDM. ....................................................................................................... 11

Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) and accompanying IDM. .................................................................... 11, 12

Defendant, the United States, respectfully submits this response in support of the Department of Commerce's second remand redetermination filed in accordance with this Court's decision and remand order in *The Mosaic Company v. United States*, Consol. Ct. No. 21-00116, Slip Op. 25-3, 744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) (*Second Remand Order*) (ECF No. 134). Final Results of Remand Redetermination Pursuant to Second Court Remand (ECF Nos. 147, 148) (April 29, 2025) (*Second Remand Redetermination*).

Plaintiff and consolidated defendant-intervenor The Mosaic Company (Mosaic) and consolidated plaintiff and defendant-intervenor, OCP S.A. (OCP) (collectively "plaintiffs"), filed comments concerning Commerce's remand redetermination. Mosaic Cmts., ECF Nos. 154, 154; OCP Cmts., ECF No. 152, 153. For the reasons discussed below, we respectfully request that the Court sustain Commerce's remand redetermination.

<u>BACKGROUND</u>

I.    <u>Commerce's Final Determination</u>

This case stems from challenges to the countervailing duty investigation of phosphate fertilizers from the Kingdom of Morocco. *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative CVD Determination*, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) (Final Determination) (P.R. 480)[1], and accompanying Issues and Decision Memorandum (IDM) (P.R. 473). In the final determination, Commerce made certain cost adjustments in calculating the benefit OCP received from the provision of mining rights by the Government of Morocco (GOM) for less than adequate remuneration (LTAR). *See generally* IDM at Cmts. 4-5.

---

[1] "P.R." refers to the documents in the public record of the Final Determination, ECF No. 14-1, and "C.R." refers to the documents in the confidential record of the Final Determination, ECF No. 14-2. "P.R.R." refers to documents in the public remand record, ECF No. 149-3, and "C.R.R" refers to documents in the confidential remand record, ECF No. 149-2.

Commerce also determined that the GOM's program allowing for reductions in tax fines and penalties under Article 236 of the Moroccan tax code was *de facto* specific.  IDM at 75.

In the investigation, Commerce determined that OCP's exclusive right to extract phosphate rock constituted a countervailable subsidy program because the GOM provided mining rights for LTAR.  Preliminary Decision Memorandum (PDM) (P.R. 386) at 11; IDM at 5, 20-27.  To calculate the benefit OCP received from these mining rights, Commerce conducted a tier-three analysis under 19 C.F.R. 351.511(a)(2)(iii).  PDM at 12; IDM at 23.  To evaluate "whether the government price is consistent with market principles" under 19 C.F.R. 351.511(a)(2)(iii), Commerce created an estimated price for OCP's beneficiated phosphate rock by using information from OCP's questionnaire responses.  PDM at 12; IDM at 23-25.  Because there is no market-based price for mining rights available on the record, Commerce could not conduct a benefit analysis on the mining rights *per se*.  *Id*.; IDM at 23.  Accordingly, Commerce conducted a benefit analysis based on the value of the underlying good conveyed via mining rights by comparing the actual per-unit cost buildup of OCP's beneficiated phosphate rock with a world benchmark price of phosphate rock.  *Id*.  Commerce then "multiplied the difference between the calculated per-unit cost buildup{} and the benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated by OCP during the {period of investigation (POI)}." *Id*.

In its questionnaire responses, OCP reported that it incurred headquarters (HQ), support, and debt costs (*i.e.*, selling, general, and administrative expenses (SG&A), including overhead debt expenses) in its cost of production (COP) of phosphate rock.  OCP Questionnaire Response, Section III (P.R. 130) at 83-92; OCP Supplemental Questionnaire Response, Part III (C.R. 232) at 1-3, 8 and Exhibits MIN2-2, MIN2-3, and 2-7.  In reporting these costs, OCP used an

allocation methodology based on the proportion of each of its production sites' share of total costs and capital expenditures. Commerce found that not all the SG&A expenses reported by OCP were necessarily relevant to phosphate rock production and pricing. IDM at 23-24. As Commerce could not further segregate OCP's HQ, support, and debt costs into costs that were "relevant" or "irrelevant" to phosphate rock production, it determined to exclude OCP's allocated HQ, support, and debt costs from its cost buildup calculations. IDM at 24.

Regarding the GOM's reductions in tax fines and penalties program, Commerce determined that it was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I), as the actual recipients of the reductions were limited in number. *Id*. at 75. In evaluating whether the program was *de facto* specific, consistent with its past practice, Commerce compared the number of companies that used the program with the total number of corporate tax filers and found that only 3.3 percent of Morocco's corporate taxpayers applied for and received reductions in tax fines and penalties. *Id*. Therefore, because the recipients of the subsidy were limited in number, Commerce determined that this program was countervailable. *Id*.

II.     The Court's First Remand Order

In October 2021, plaintiffs challenged the final determination. *See The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) (*First Remand Order*). In the first remand order, the Court partially sustained and partially remanded for further consideration. *Id*. The Court directed Commerce on remand to: (1) either accept OCP's SG&A cost allocation methodology or demonstrate that it is unreasonable in light of an alternative methodology; (2) reconsider and explain the methodology used to determine OCP's profit rate, and address any inconsistency between the inclusion of SG&A in OCP's profit rate calculation and its exclusion in OCP's COP buildup; and (3) reconsider its *de facto* specificity determination with regard to

the tax fines and penalties reduction program. *First Remand Order*, 659 F. Supp. 3d at 1301, 1305, 1317.

III.    The Court's Second Remand Order

On January 12, 2024, Commerce filed its first remand redetermination. Final Results of Remand Redetermination Pursuant to Court Order, ECF No. 115 (Jan. 12, 2024) (*First Remand Redetermination*). On remand, Commerce found that OCP was a disproportionate user of the tax fines and penalties program and determined that the program was *de facto* specific only using the authority provided by 19 U.S.C. § 1677(5A)(D)(iii)(III). *First Remand Redetermination* at 10-11. Additionally, Commerce revised OCP's cost buildup calculation by accepting OCP's SG&A allocation methodology and including OCP's HQ, support, and debt costs in its COP buildup calculation. *Id*. at 9.

On January 8, 2025, the Court partially sustained and partially remanded Commerce's determination. *See Second Remand Order*. As relevant to this remand, the Court directed Commerce to reconsider its *de facto* specificity finding for the reductions in tax fines and penalties program. *Id*. at 1378-81. Regarding OCP's COP buildup, the Court sustained Commerce's recalculation of a constructed profit rate but remanded for Commerce to evaluate Mosaic's proposed alternative allocation methodology for OCP's overhead HQ, support, and debt costs. *Id*. at 1376.

On April 29, 2025, Commerce filed the second remand redetermination. In the second remand redetermination, Commerce found the reduction in tax fines and penalties program is not specific, and therefore not countervailable. *Second Remand Redetermination* at 7. Further, Commerce adjusted its calculation of OCP's COP buildup with respect to the allocation

methodology used in calculating a portion of OCP's reported HQ and Support costs, and its

inclusion of certain revenue offsets within OCP's net debt. *Id*. at 10-17.

ARGUMENT

I.    <u>Standard Of Review</u>

"The same standard of review applies to the review of a remand determination as to the

review of the original determination." *Bethlehem Steel Corp. v. United States*, 223 F. Supp. 2d

1372, 1375 (Ct. Int'l Trade 2002). Accordingly, the Court will sustain Commerce's

redeterminations if they are "in accordance with the remand order, are supported by substantial

evidence, and are otherwise in accordance with law." *MacLean-Fogg Co. v. United States*, 100

F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

"Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Under this

standard, "the possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's finding from being supported by substantial evidence."

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

II.    Commerce's Remand Redetermination Complies With The Remand Order And Is
<u>Supported By Substantial Evidence And In Accordance With Law</u>

Commerce's second remand redetermination complies with the second remand order and

is supported by substantial evidence and in accordance with law.

A.    Commerce's Specificity Determination For Reduction In Tax Fines And Penalties
<u>Program Is Supported By Substantial Evidence And In Accordance With Law</u>

In the final determination, Commerce found the tax fine and penalty reduction program

*de facto* specific based on a comparison between the number of corporate taxpayer recipients of

penalty relief—8,761—and the total number of corporate taxpayers—262,165—not the total

5

number of corporate taxpayers who incurred penalties.  IDM at 75.  In the first remand order, the
Court ordered Commerce to reconsider its determination that the tax fine and penalty reduction
program is *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I).  *First Remand Order* at
1314-17.  Under respectful protest, Commerce reconsidered its finding and determined that the
reduction in tax fines and penalties program is *de facto* specific under 19 U.S.C.
§ 1677(5A)(D)(iii)(III).  *First Remand Redetermination* at 10-14.  Specifically, Commerce found
OCP was a disproportionate recipient of the benefit compared to the Moroccan economy on an
enterprise basis because the value of its share in tax reductions was 82.87 times greater than the
average reduction amount.  *Id.*

In the second remand order, the Court again remanded for Commerce to reconsider its *de
facto* specificity determination for this program.  *Second Remand Order* at 1381.  The Court held
that "Commerce cited nothing to demonstrate that the broad availability of the program does not
provide a benefit to the entire economy" and that Commerce's "finding that OCP's share was
82.87 times larger than the average amount received by other companies in Morocco… *does not
suffice to support {its} conclusion*."  *Id.* at 1380 (emphasis added).  The Court further held that
Commerce did not adequately respond to OCP's argument that the amount of benefit it received
was not disproportionate given its comparative size as an employer and share of GDP in the
Moroccan economy.  *Id.* ("Commerce cited no evidence to support its assumptions that a
company's total reduction in tax fines or penalties has no relationship to the total amount of its
revenue or to the total taxes for which it is liable.  Nor did Commerce make any attempt to
demonstrate that OCP got some preferential treatment or other atypical benefit from the
Moroccan government's administration of the widely available tax fine and penalty relief
program.").

Accordingly, in the second remand redetermination Commerce concluded, under respectful protest, that the tax fines and penalties reduction program is *not* countervailable during the period of investigation with respect to OCP, having no other basis on the record to find it specific under 19 U.S.C. § 1677(5A)(D)(iii). *Second Remand Redetermination* at 7.

Mosaic claims that "Commerce's implementation of the Court's second remand decision is unduly proscriptive." Mosaic Cmts. at 25. It argues that Commerce's specificity finding, based on OCP's disproportionate use of the program, is "more than adequately supported by the record and {} in accordance with the plain language of the statute, as well as Congressional intent as expressed in the SAA." Mosaic Cmts. at 25-26. Specifically, Mosaic contends that because "the benefit that OCP received is nearly 100 times larger than the typical benefit amount," "{Commerce} should have found that the *amount* of the subsidy that OCP received relative to the amount received by other actual subsidy recipients – *i.e.*, roughly 100 times the amount received by the average user – is sufficiently disproportionate to show that the benefit of the subsidy program is concentrated in a 'discrete segment of the economy.'" *Id*. at 26-27 (emphasis in original). Mosaic argues that, because the "record evidence more than adequately supports Commerce's previous finding that OCP is a disproportionate user of the program," the "Court should remand again to Commerce to reconsider its conclusion that there is no basis on the record to conclude that the reduction in tax fines and penalties program is *de facto* specific to OCP." Mosaic Cmts. at 28.

Mosaic's argument fails to demonstrate any error in Commerce's determination not to countervail the program. As Commerce explained, there was no basis to find the program *de facto* specific as a disproportionate user under 19 U.S.C. § 1677(5A)(D)(iii) while complying with the second remand order. Mosaic identifies no new record evidence which would support a

finding that OCP received a disproportionately large amount of benefit under the program, given

the Court's holding that Commerce's finding that the amount of benefit OCP received was 82.87

times larger than average was *not sufficient* to support its determination that OCP was a

disproportionate user of the program under 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Second Remand*

*Order* at 1380.

Moreover, Mosaic fails to identify record evidence: (1) that OCP received "some

preferential treatment or other atypical benefit from the Moroccan government's administration

of the widely available tax fine and penalty relief program," or (2) "to support {Commerce's}

assumptions that a company's total reduction in tax fines or penalties has no relationship to the

total amount of its revenue or to the total taxes for which it is liable."  *Id*.  Commerce must

comply with the Court's second remand order, and, on remand, Commerce found that the

remand lacked the kind of evidence the Court found *could* support a *de facto* specificity finding.

Thus, Commerce determined not to countervail the program during the period of investigation.

### B.    Commerce's Allocation Methodology For OCP's HQ, Support, And Debt Costs In The COP Buildup Is Reasonable And In Accordance With Law

In the first remand redetermination, Commerce adopted OCP's cost-based allocation

methodology upon finding that OCP's HQ, support, and debt costs were recorded on a company-

wide basis and not specifically tied to production in OCP's accounting, and because Commerce

lacked time to analyze Mosaic's proposed alternative methodology.  S*econd Remand Order* at

1373-76.  In the second remand order, the Court rejected Mosaic's challenge to Commerce's

allocation of OCP's HQ, support, and debt costs in OCP's COP buildup based on "an alleged

lack of a connection between headquarters, support, and debt costs and phosphate mining and a

contention that inclusion of these corporate-wide costs arbitrarily inflated the profit margin."  *Id*.

at 1375.  The Court held that Mosaic's arguments "fail for the reasons stated in the court's prior

opinion, when it ruled that OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities." *Id*. at 1375 (citing *First Remand Order*). The Court also sustained "{Commerce}'s finding that site-specific costs and corporate-level costs are distinct, such that including headquarters, support and debt costs in the cost buildup *does not result in double-counting of indirect costs*." *Id*. at 1374 (emphasis added).

However, the Court held that Commerce failed to address Mosaic's alternative methodology for OCP's COP buildup with respect to HQ, support, and debt costs. The Court directed Commerce to "evaluate Mosaic's proposed alternative and reach a decision on the allocation method based on a full and fair consideration of the arguments and record evidence before it." *Id*. at 1381. Accordingly, upon considering the parties' comments and record evidence substantiating that certain changes would result in a methodology more reflective of OCP's allocated costs, Commerce made two changes to the COP buildup. First, Commerce allocated a portion of OCP's HQ and support costs based on the estimated percentage of OCP's revenue attributable to phosphate rock production. *Second Remand Results* at 15. Second, Commerce continued to allocate debt based on each business unit's share of capital expenditures from 2009-2019 but recalculated OCP's net debt costs to offset income-generating line items. *Id*. at 15-16.

Mosaic argues that Commerce unlawfully included alleged "unrelated" costs to OCP's phosphate mining business in OCP's overall HQ, support, and debt costs, a portion of which was then allocated to OCP's phosphate mining business. Mosaic Cmts. at 4-10. Mosaic's arguments fail for several reasons. First, this Court already sustained Commerce's use of OCP's COP buildup, which included a portion of OCP's overall HQ, support, and debt costs over Mosaic's

same challenges to the first remand redetermination. *Second Remand Order* at 1372-76 (citing

*First Remand Order* at 1300-01).

As Commerce explained:

> By their nature, indirect costs cannot be directly linked to a production process... Such expenses, which are indirect but, as Commerce noted in the {First Remand Redetermination}, are relevant to the OCP's phosphate rock production operations, are accounted for at the corporate, rather than operational level. As such, these expenses are not limited to supporting only phosphate rock production operations, and thus we are unable to segregate them into binary categories of "relevant" and "non-relevant" to phosphate rock production. Therefore, in order to identify HQ and Support expenses incurred for the production of phosphate rock, resorting to an allocation methodology is necessary.

*Second Remand Redetermination* at 12.

Further, because such costs "are not directly tied to such production in OCP's accounting

methodology which it uses in the normal course of business... they cannot be reasonably further

segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock production based on

how they are entered into OCP's books and records." *Id*. Accordingly, Commerce found it

"reasonable to utilize a cost allocation that is reflective of the percentage that OCP's mining

operations accounts for in comparison to OCP's overall business, rather than attempt to remove

line items, or portions of line items, from OCP's allocated HQ and Support costs." *Id*. at 12-13.

As the Court held, "{Commerce}'s finding, based on OCP's responses to {Commerce}'s

inquiry, that corporate costs are distinct from site-specific indirect costs is supported by record

evidence, and Commerce appropriately included headquarters, support and debt costs as indirect

costs in its cost of production calculation." *Second Remand Order* at 1375. Contrary to

Mosaic's arguments, the Court did not find Commerce's COP buildup, which allocated a portion

of OCP's overall HQ, support, and debt costs, unlawful or unreasonable. Rather, the Court

remanded for Commerce to consider Mosaic's proposed alternative allocation methodology, which Commerce did.

Next, Mosaic argues that inclusion of such overhead costs was a departure from Commerce's practice.  Mosaic Cmts. at 10-12.  As Commerce explained, "Commerce has no specific regulations on how to create cost buildups for a tier three LTAR analysis in a CVD investigation.  Such an analysis is made on a case-by-case basis, based on the facts of the specific record." *Second Remand Redetermination* at 30.  Mosaic cites only the phosphate fertilizers from Russia proceedings in support of its contention that Commerce departed from its "practice." *Id*. (citing *Phosphate Fertilizers from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,479 (Dep't Commerce Feb. 16, 2021) and accompanying IDM and *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) and accompanying IDM).

As the Federal Circuit has consistently held, "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing Bro. Fastener Co. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2016) (quoting *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)).  Moreover, those cases are distinguishable from the present one.  There, the Court upheld Commerce's use of a *profit-based* allocation methodology (as opposed to the revenue-based allocation used here).  And in contrast to the Court's first remand order here, the Court sustained Commerce's related exclusion of certain selling, administrative and other expenses not directly tied to phosphate mining. *See Mosaic Co. v. United States*, No. 21-00117, 2024 WL 208136, at *3 (Ct. Int'l Trade Jan. 19, 2024), *appeal dismissed*, No. 2024-1593, 2024 WL 3875143 (Fed.

Cir. Aug. 20, 2024); *see also Archer Daniels Midland vs. United States*, Consol. Ct. No. 23-239, Slip Op. 25-55 (Ct. Int'l Trade May 6, 2025).

 Additionally, the outcome of *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review* was influenced by the risk of double-counted expenses that skewed the calculation—a risk not present in this case. Mosaic quotes *Phosphate Fertilizers from Russia* as stating, "Commerce properly found in that case that the inclusion of 'expenses *unrelated* to phosphate ore mining and beneficiation' would 'skew the benefit calculation by treating the value of the good conveyed via the {Government of Russia's} mining rights as higher than it otherwise would be without those expenses.'" Mosaic Cmts. at 11 (quoting *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying IDM at 39-40 (emphasis in original)). However, Mosaic omitted the language related to double-counted expenses. The full excerpt states: "{i}ncluding expenses unrelated to phosphate ore mining and beneficiation *and double-counted expenses* would skew the benefit calculation by treating the value of the good conveyed via the {Government of Russia}'s mining rights as higher than it otherwise would be without these expenses." *Phosphate Fertilizers from the Russian Federation: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying IDM at 39-40 (emphasis added).

 In this case, however, this Court explicitly held that such double-counting would *not* occur as a result of Commerce allocating OCP's HQ, support, and debt costs and, thus, any concern about double-counting is not present. *Second Remand Order* at 1374..

Moreover, based on this record, Commerce did not make a finding as to what costs were "related" or "unrelated"; rather, Commerce determined that because it could not specifically tie all overhead costs to specific costs centers, it was reasonable to use an allocation methodology. *Second Remand Redetermination* at 11-15. Commerce's determination is reasonable based on the unique record of this proceeding, including OCP's accounting system and financial statements, the parties' arguments, and the second remand order.

Finally, calculation of a COP buildup depends on the facts in each specific case, but to the extent Commerce's approach here differs from *Phosphate Fertilizers from Russia*, Commerce reasonably explained its approach. *See* Mosaic Cmts. at 10-12. Commerce's methodology is informed and bound by the Court's first remand order and second remand order (that allocation of OCP's overall HQ and support costs was reasonable) and the record before it which does not allow costs to be separated by cost-center. *Second Remand Redetermination* at 12-14, 24-25. Thus, Commerce's decision to allocate OCP's overall HQ, support, and debt costs in calculating OCP's COP complies with the second remand order and is supported by substantial evidence and in accordance with law.

1. Allocation Methodology for HQ and Support Costs

Commerce's use of a revenue-based allocation methodology for OCP's HQ and support costs is supported by substantial evidence and in accordance with law. As Commerce explained:

> Without the ability to create a reasonable level of precision in identifying cost centers, as is the case here, and because the information reported by OCP substantiated that OCP does not allocate its HQ and Support costs by site-specific cost centers in the normal course of business such that the costs can reasonably be identified as mining and non-mining related, we find it reasonable to utilize a cost allocation that is reflective of the percentage that OCP's mining operations accounts for in comparison to OCP's

> overall business, rather than attempt to remove line items, or
> portions of line items, from OCP's allocated HQ and Support costs.

*Second Remand Redetermination* at 12-13. Accordingly, Commerce determined that "an

allocation methodology is necessary" "to identify HQ and Support expenses incurred for the

production of phosphate rock" for such costs that are related but not directly tied to phosphate

rock production. *Id*. at 12.

Upon considering Mosaic's arguments regarding OCP's allocation of its HQ and support

costs, Commerce found OCP's methodology, "based on costs incurred on OCP's mining and

chemical sites, was distortive because OCP excluded certain of its site-specific costs." *Second

Remand Redetermination* at 25. Specifically, Commerce found that "OCP's allocation excluded

certain expenses for raw materials, freight, amortization, financial, and non-current expenses,"

and that "excluding such expenses, some of which were [

], resulted in a cost allocation not accurately representative of OCP's HQ and Support

costs." *Id*. Commerce also found that an alternative allocation methodology was more

reasonable because it accounted for revenue generated by business segments other than

phosphate mining and fertilizer production, sales for services OCP provided in Morocco, and

correctly allocated a portion of HQ and Support costs incurred by those business segments due to

OCP S.A.'s operations as the OCP Group's parent company. *Id*. at 14-15.

Commerce determined "that it is unreasonable to assume that these other {non-phosphate

mining} business segments do not also incur overhead from HQ and Support costs, and OCP's

HQ and Support cost-based allocation only includes the phosphate rock and fertilizer sites."

*Second Remand Redetermination* at 15. Accordingly, Commerce concluded that Mosaic's

proposed revenue-based allocation is "a more reasonable methodology for determining a

proportion of OCP's HQ and Support costs, as revenue is a more reasonable allocation basis than

cost when expenses cannot be traced to a specific product line, and we are able to account for all of OCP's identified business segments within the allocation." *Id*.  Thus, Commerce estimated the "percentage of OCP's overall business attributable to phosphate rock production using the information in OCP's consolidated financial statements, reflecting the POR revenue generated for each of OCP's business segments… accounting for both identified external revenue and intercompany sales." *Id*.

OCP argues that Commerce abandoned the cost-based allocation employed in the first administrative review of this proceeding, which the CIT has affirmed.  OCP Cmts. at 7-8; 19 (citing *Mosaic Co. v. United States*, No. 23-00246, 2025 WL 974056, at *1 (Ct. Int'l Trade Apr. 1, 2025) (*First Administrative Review Remand Order*)).  The fact that the Court sustained a methodology based on a record in a separate proceeding does not mean that Commerce's use of a different methodology here is unreasonable.  *See Jiaxing Bro. Fastener Co.*, 822 F.3d at 1299. Here, Commerce made its determination "on the basis of the least distortive and most representative methodology, based on the information available on *this investigation record*, which is separate and distinct from that of the first administrative review, in consideration of all parties' arguments" and this Court's remand orders.  *Second Remand Redetermination* at 24 (emphasis added).  Moreover, in the *First Administrative Review Remand Order*, "the Court held that Mosaic had failed to provide an alternative method of allocation that Mosaic believed would have been superior to OCP's proposed methodology; by contrast, in this remand Commerce has been directly instructed by the Court to consider the alternative methodology proposed by Mosaic."  *Id.* at 23-24 (citing *First Administrative Review Remand Order* at 1300-01 and *Second Remand Order* at 1376).

OCP's contention that its proposed cost-based allocation is reasonable does not

undermine the reasonableness of Commerce's determination to use a revenue-based

methodology.  —"The possibility of drawing two equally justifiable, yet inconsistent conclusions

from the record does not prevent the agency's determination from being supported by substantial

evidence." *Jining Yongjia Trade Co. v. United States*, 34 C.I.T. 1510, 1513 (2010).  Therefore,

OCP's challenge based on the Court's holding that the cost-based allocation methodology was

reasonable in the *First Administrative Review Remand Order* is unconvincing.  This record is

different, as there is an alternative methodology, which the Court  ordered Commerce to consider

and which Commerce considered and found to be less distortive and more reasonable than

OCP's allocation methodology.  Moreover, on this record, Commerce found that OCP's

proposed allocation methodology "was distortive because OCP excluded certain of its site-

specific costs." *Second Remand Redetermination* at 25.

Next, OCP argues that to the extent Commerce determined that the cost-based allocation

methodology was distortive due to OCP's exclusion of certain costs from its total operating

costs, "{Commerce} was obligated to explain why it abandoned its prior, cost-based allocation

methodology in its entirety instead of simply adding these expenses to the total operating costs

on which OCP's cost-based allocation was based." OCP Cmts. at 20.  Commerce explained its

decision to adopt the revenue- based over the cost-based allocation methodology.  First, as OCP

acknowledges, Commerce explained that OCP's cost-based allocation "exclude{ed} certain

expenses for raw materials, freight, amortization, financial, and non-current expenses, some of

which are [                                        ]." *Second Remand Redetermination* at

14 (citing OCP's Letter, "OCP S.A. Supplemental Questionnaire Response Part Three," dated

November 6, 2020 (OCP SQR Part 3) at 8 and Appendix MIN2-7).  Moreover, Commerce

explained that while OCP allocated the percentage of HQ and Support costs to two mining sites

and two chemical production sites, Commerce found that "the record demonstrates that OCP supports other business activities, including the activities of its subsidiaries, within its corporate management beyond the mining and chemical production sites identified, and on which OCP based its allocation." *Id*. (citing OCP's Letter, "OCP S.A. Section III Questionnaire Response," dated September 17, 2020 (OCP IQR) at Appendix GEN-8(j)).

Commerce also found record evidence demonstrating that OCP, as a holding company of 24 wholly-owned subsidiaries and a company consolidated with nine entities during the POI, provides a degree of support to its subsidiaries though its headquarters and corporate operations. *Id*. (citing OCP IQR at Appendix GEN-8(j) at Note 2). Commerce also found that OCP's cost based allocation for costs OCP described as "headquarter and support costs" omitted other revenue generating business segments, such as the "eleven percent of its revenue generated from 'other products' that are not phosphate rock, phosphoric acid, or fertilizers" and from its sale of services during the POI, which is reflected in its profit and loss statement. *Id*. (citing OCP IQR at Appendix GEN-8(j) at Note 2 and Appendix GEN-4(a)(iii) (Statement B11)).

Given these pitfalls, Commerce determined the "revenue-based allocation is a *more reasonable* methodology for determining a proportion of OCP's HQ and Support costs, as revenue is a *more reasonable* allocation basis than cost when expenses cannot be traced to a specific product line, and {Commerce} {could} account for all of OCP's identified business segments within the allocation." *Id*. at 15. Thus, Commerce provided an adequate explanation based on record evidence for its decision to use the revenue-based allocation methodology.

OCP argues that ocean freight was properly excluded from its HQ and support cost buildup under its proposed cost-based allocation because: "(1) Commerce excludes ocean freight from the rock benchmark to which the cost of production buildup for phosphate rock is

compared… and (2) Commerce determined to exclude *these exact same* expenses from the total

operating expenses added directly in calculating OCP SA's constructed government price of

phosphate rock." OCP Cmts. at 21 (citations omitted) (emphasis in original). However, this is

not at issue under the revenue-based allocation Commerce employed in the second remand

redetermination, because the allocation is based on revenue rather than cost.

Even so, Commerce found OCP's allocation to be a less reasonable methodology because

it excluded ocean freight costs "as part of a broad variety of OCP's general business activities

within its cost buildup on which OCP would incur overhead, as the HQ and Support costs for

such activities cannot be directly segregated into specific parts of OCP's operations." *Second*

*Remand Redetermination* at 26. Commerce explained that "{t}he record substantiates that OCP

had export sales of both phosphate rock and fertilizers and incurred freight expenses on its export

sales; while the ocean freight costs were [                                        ], there is no

evidence on the record that [

              ], and the freight of selling finished goods is not related to the 'delivered' price of a

material input." *Id*. (citing OCP's Letter, "Questionnaire in Lieu of On-Site Verification," dated

December 30, 2020 (OCP ILOV QR) at 17-18 (reconciling OCP's billed freight to OCP S.A.'s

financial statements and demonstrating that the [                          ] OCP excluded

from its COP buildup were [                    ] in OCP S.A.'s profit and loss statement.)).

OCP argues that Commerce determined not to include freight expenses in OCP's total

COP "based on speculation that arranging this freight would have resulted in an amount for

overhead expenses being booked to OCP's HQ-level cost center rather than OCP's site-level cost

center" and that "Commerce cites no evidence to support this speculation." OCP Cmts. at 21.

This ignores Commerce's analysis, based on record evidence, that the ocean freight costs were

18

correctly treated as part of OCP's general HQ and support costs rather than as site-specific costs. *Second Remand Redetermination* at 26. Again, this argument does not undermine Commerce's determination that the revenue-based allocation methodology was reasonable.

OCP also challenges Commerce's inclusion of raw material costs in OCP's HQ and support costs, arguing that because "world market prices for raw materials are volatile," "Commerce would be assuming that OCP SA's production sites incur HQ and support costs in proportion to these raw material prices, e.g., effectively concluding that a doubling in the world market price of ammonia during 2019 would have caused the OCP SA production site that bought that ammonia to incur double the HQ and support costs." OCP Cmts. at 21-22. This argument lacks merit. The volatility in world market raw material prices does not support exclusion of associated HQ and support costs from the COP buildup. As Commerce explained:

> {W}e disagree that this provides a reason for excluding a specific expense; rather, if major expenses within the selected basis for the allocation are potentially unrepresentative of OCP's costs, the basis for the allocation (*i.e.*, OCP's mining and chemical site direct operating costs) is not viable. Furthermore, regardless of whether OCP's raw material inputs and freight expenses are "volatile external costs," it is not reasonable to assume that such functions are not supported by OCP's HQ and Support business functions and management personnel, which OCP describes as including
>
> ].

*Second Remand Redetermination* at 26. OCP fails to explain why it was reasonable to ignore or exclude raw material costs in the cost-based methodology it provided Commerce to allocate its HQ and support costs. Moreover, again, this issue relates to the cost-based allocation methodology which Commerce did not use in the second remand redetermination.

OCP's three contentions that the revenue-based allocation is distortive are unavailing. OCP Cmts. at 8. First, OCP argues that the revenue-based allocation "results in a mismatch between the costs being allocated (i.e., OCP *SA's* HQ and support costs), and the basis on which

those costs are allocated (i.e., the OCP *Group's* product revenues)" because OCP SA is distinct from OCP Group and "{a}llocating OCP SA's HQ and support costs based on the consolidated product revenues of the 34 companies comprising the OCP Group unmoors the resulting CVD rate from the financial performance of OCP SA." *Id*. at 8-9 (emphasis in original). However, Commerce explained that "OCP S.A. is not merely 'one legal entity among the nearly 40 entities comprising the OCP Group's consolidated reporting scope,' as OCP argues; it was the holding company of 24 fully consolidated subsidiaries during the POI." *Second Remand Redetermination* at 28 (internal citation omitted). Accordingly, Commerce found it "reasonable to conclude based on record evidence that OCP, as a parent company, serves as a headquarters for the company and performs the functions OCP reported itself, such as accounting, management, marketing, banking, and insurance, partly in support of the consolidated entity." *Id*.

Additionally, Commerce found that "75 percent of OCP's reported consolidated revenue for the POI, as reported from OCP's consolidated financial statements, is revenue from phosphates and fertilizers." *Id*. Thus, under Commerce's methodology, "the vast majority of the costs are in fact allocated to what OCP has identified as OCP S.A.'s primary purpose, *i.e.*, phosphate rock and phosphate fertilizer production." *Id*.

Moreover, Commerce explained that it allocated HQ and support costs, not production costs, that OCP itself reported relate "to phosphate rock mining but cannot be tied to a specific production function or cost center." *Id*. "Allocating these costs across all segments on which OCP generates revenue does not suggest that OCP S.A. itself maintains other business segments; it suggests that OCP's headquarters provides support for the consolidated entity, which includes other revenue generating business segments." *Id*. Thus, Commerce's analysis of record

evidence is reasonable and dispels OCP's argument that the allocation based on OCP's consolidated entity is "unmoor{ed}." *See* OCP Cmts. at 9.

Second, OCP argues that Commerce's allocation is based on a flawed assumption "that HQ and support costs are incurred in relation to revenues." *Id.* The Court already held it was unreasonable to assume that no HQ and support costs were incurred on behalf of OCP's phosphate rock mining business segment. *First Remand Order* at 1300. Commerce concluded based on record evidence that "OCP, as a parent company, serves as a headquarters for the company and performs the functions OCP reported itself, such as accounting, management, marketing, banking, and insurance, partly in support of the consolidated entity." *Second Remand Redetermination* at 28. Although in the ideal world, all expenses would be recorded and kept in a manner that would obviate the need for allocation, here, Commerce had to allocate the expenses within the limitations of information that OCP submitted on the administrative record. As 75 percent of the OCP's consolidated revenue was generated from its phosphate mining and fertilizer business, the revenue-based allocation methodology allocated "the vast majority of {OCP's} costs… to what OCP has identified as OCP S.A.'s primary purpose, *i.e.*, phosphate rock and phosphate fertilizer production." *Id.* Thus, Commerce chose an allocation methodology that was the most reasonable and least distortive. OCP's argument fails to demonstrate otherwise.

Third, OCP argues that the allocation methodology "inevitably under-allocates OCP SA's HQ and support costs to the OCP Group's product family that corresponds to phosphate rock… {because} [

].” OCP Cmts. at 10-11.  Commerce addressed this concern in the second remand redetermination; Commerce agreed with OCP and "adjusted {its} allocation calculation accordingly to account for the [          ] revenue, valued at the cost of [

].” *Second Remand Redetermination* at 30-31.  OCP additionally argues that "Commerce's estimation of '[          ] revenue' results in even further distortions: Commerce (a) double-counts revenue related to this internally consumed rock; (b) fails to include any amount for HQ, support, and debt costs in calculating OCP's cost of producing this internally consumed rock; and (c) omits any amount for profit in valuing this rock; in each case reducing both the amount of HQ and support cost included in OCP's cost of producing phosphate rock and the resulting constructed government price for rock, thereby artificially inflating the CVD rate for mining rights." OCP Cmts. at 11.

OCP misunderstands Commerce's revenue allocation methodology.  To allocate the total amount of HQ and support costs reported by OCP, Commerce attributed costs based on the percentage of each of OCP's reported revenue segments in OCP's consolidated financial statements (*i.e.*, phosphates, fertilizers, phosphoric acid, and "other").  *See* OCP's Final Remand Calculation Memorandum (P.R.R. 9, C.R.R. 8).  In doing so, Commerce did not alter the total reported value of HQ and support costs, except so far as to change the allocation methodology, and, thus, could not "fail to include any amount for HQ, support, and debt costs." *Id*. Recognizing that OCP [          ] on [          ] of phosphate rock between OCP SA's [          ], Commerce valued the [

          at a transfer price by multiplying the total site-specific costs of phosphate rock incurred by OCP and the percentage of OCP's phosphate rock that was [          ]. *Id*.  In doing so, Commerce estimated OCP's [          ], with a transfer price valued at

the cost of producing the rock, the same methodology [

                                  ].  OCP IQR at Appendix BONDPURCH-6 at 211.  OCP

argues that, by not removing this revenue from the revenue OCP generated for fertilizers,

Commerce is double-counting revenue.  OCP Cmts. at 11-12.  However, Commerce cannot

double-count revenue that OCP maintains is [                                ].  *See* OCP SQR at

Exhibit MIN2-8(a).

OCP's argument that Commerce "omits any amount for profit in valuing this rock" is

also meritless.  OCP Cmts. at 11.  Commerce's methodology is: (a) revenue-based, and not

profit-based; (b) reflects OCP's own accounting and [        ] pricing practices, which do not

record a profit for [                    ] phosphate rock; and (c) is used to generate a

percentage value by which Commerce can estimate the percentage of HQ and Support costs to

allocate to OCP's phosphate mining costs, the allocated portion of which is then included *in*

*entirety* in OCP's total COP, which Commerce then uses to calculate a reasonable profit for

mining rights.  *Second Remand Redetermination* at 30-31.

OCP argues that Commerce "incorrectly believes that OCP SA is engaged in significant

activities beyond the production activities of its two chemical and two mining sites."  OCP Cmts.

at 14.  Specifically, OCP claims Commerce's determination is based on speculation that "OCP

SA incurs costs on behalf of companies across the OCP Group" and that "OCP SA incurs costs

on behalf of 'other revenue generating business segments' within OCP SA beyond the two

mining and two chemical sites."  *Id*. at 15, 18.  However, as Commerce explained:

> We are allocating SG&A and overhead costs, not production costs,
> that OCP has stated are related to phosphate rock mining but cannot
> be tied to a specific production function or cost center. Allocating
> these costs across all segments on which OCP generates revenue
> does not suggest that OCP S.A. itself maintains other business
> segments; it suggests that OCP's headquarters provides support for

the consolidated entity, which includes other revenue generating business segments. For example, OCP cites a reconciliation OCP S.A. submitted for its service during the average useful life, and notes that "the record shows that OCP S.A. booked revenues for the vast majority of its services to cost centers other than HQ and Support during the POI." The record demonstrates that the services themselves were not booked as HQ and Support costs, but fails to demonstrate that OCP S.A. did not generate overhead as a result of selling the services.

*Second Remand Redetermination* at 28-29. OCP ignores Commerce's analysis of record evidence to support its finding that OCP SA incurs costs as the parent company for OCP Group and its other revenue-generating business segments.

Additionally, OCP claims that Commerce referenced, in support of its findings, an agreement between [                                        ] which is not on the record and, in OCP's view, "is not evidence that OCP is booking significant costs incurred on behalf of its affiliates as HQ and support costs in its own books and records." OCP Cmts. at 16-17. However, Commerce noted the agreement between OCP and [

] during the POI. Pursuant to the agreement, [      ] pays OCP for "[


].” *Second Remand Redetermination* at 29 (citing OCP IQR at Appendix GEN4-(a)(iii)). While OCP [                ], the personnel providing [            ] are [                    ].” *Id.* (citing OCP IQR at Appendix GEN4-(a)(iii)). However, "OCP's reconciliation of OCP S.A.'s financial statements only splits personnel expenses between OCP's [

].” *Id.* (citing OCP SQR Part 3 at Appendix MIN2-7 and OCP ILOV QR at Appendix VE-MIN-1). Further, "OCP's descriptions of its personnel costs include the salaries, overtimes, and bonuses of the personnel undertaking the HQ and Support cost activities, which include [                                        ].” *Id.* (citing

OCP ILOV QR at 7).  Accordingly, Commerce found  "no evidence that OCP accounts for the

full costs incurred by these personnel within its [                                    ]; on the

contrary, OCP is emphatic that it cannot separate HQ and Support-related expenses into cost

centers in the ordinary course of business."  *Id*. at 29-30.

      Finally, OCP cites the *First Administrative Review Remand Order* to support tits claim

that "the notion that OCP SA is recording significant HQ and support costs in its audited books

and records on behalf of its subsidiaries is 'mere speculation.'"  OCP Cmts. at 15, 19.  However,

there, the Court rejected Mosaic's argument that several of OCP's affiliates and joint entities

being *located at the same address as OCP's headquarters office*, "suggests that a significant

portion of the HQ/Support costs were incurred by separate legal entities."  *First Administrative*

*Review Remand Order* at 7 (internal quotation omitted).  The Court found Mosaic's argument to

be speculative and undermined by record "evidence that the costs at issue were recorded in

OCP's audited books and records."  *Id*.  The Court's holding is not relevant to this case.  Here,

Commerce's finding was not based on the co-location of related entities but on record evidence

that OCP supports other businesses as the holding company of 24 subsidiaries and while

consolidated with nine other entities during the POI.  *Second Remand Redetermination* at 13-15.

      As Commerce explained, "OCP has other revenue generating business segments that are

not included in OCP's cost-based allocation, with eleven percent of its revenue generated from

'other products' that are *not* phosphate rock, phosphoric acid, or fertilizers."  *Id*. (emphasis

added) (citing OCP IQR at Appendix GEN-8(j) Note 3).  Further, Commerce identified "OCP's

profit and loss statement for the POI {which} also reports profit from sales of services in

Morocco."  *Id*. (citing OCP IQR at Appendix GEN-4(a)(iii) (Statement B11)).  Finally,

Commerce stated that "OCP itself reported that the HQ and Support activities 'exist to support

the production operations of the larger entity,' including entity-wide support functions such as

[

        ]." *Id*. (citing OCP ILOV SQR at 39-40).

OCP claims Commerce used "selective quotes" "to support its speculation that OCP SA records HQ and support costs it incurred on behalf of companies in the OCP Group."  OCP Cmts. at 17.  However, Commerce's analysis of record evidence demonstrates that OCP provides support for its consolidated entities and wholly-owned subsidies during the POI.  Additionally, the Court held that "OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities."  *Second Remand Order* at 1372-76 (citing *First Remand Order* at 1300-01).  Even if OCP is correct that its statement that OCP provides support to the "larger entity" refers to OCP SA and not OCP Group, Commerce's finding is still supported by the agreement [                                        ] discussed above.  *Second Remand Redetermination* at 29-30.  Thus, Commerce's determination to use a revenue-based allocation methodology for OCP's HQ and Support costs is supported by substantial evidence.

       2.    <u>OCP's Net Debt</u>

       a.    <u>Offset of Income-Generating Line Items in OCP's Net Debt</u>

Commerce agreed with Mosaic that certain financial income line items should be offset in OCP's net Debt because "the record substantiates through OCP's reconciliation that the incomes in question are included in OCP's short-term financial profit/loss and net Debt in the ordinary course of business, and that the actual Debt expenses incurred for OCP's working capital are offset by this income."  *Second Remand Redetermination* at 16.  Commerce explained that although its antidumping duty practice does not apply to this proceeding, "it is reasonable to offset financial expenses with short term income, as the line items can be reasonably considered

a working capital reserve in short-term interest accounts." *Id*. "As income from interest-bearing short-term assets is used for a company's current operations, the line items can be considered readily available and fungible for OCP's cash requirements, including the payment of Debt." *Id*.

In its comments on the draft second remand redetermination, OCP argued that Commerce's offset of certain debt costs with financial income contravened Commerce's intent to construct a *cost* buildup. *Id*. at 31. Commerce rejected this argument, explaining that "the record shows that these costs are included in OCP's calculation of net Debt in OCP's financial statements, indicating that in the ordinary course of business, OCP treats this financial income as short-term assets for funding OCP's cash requirements, including the payment of OCP's debts." *Id*. Further, Commerce explained that "the record substantiates that OCP used bonds to [

]." *Id*. Commerce concluded that "the record indicates that the debt burden OCP is paying through its production is better reflected by OCP's *net Debt*, which reflects the actual debt obligations of OCP as a corporation and the debt costs carried by OCP's revenue generation." *Id*. at 31-32 (emphasis added). Accordingly, Commerce "{found} it appropriate to include OCP's offsetting financial revenue in its total overhead Debt costs." *Id*. at 32.

OCP argues this response "fails to justify Commerce's actions" because "Commerce does not establish why it is appropriate to account for any amount of income in calculating OCP's debt costs—even if that income might be used to offset OCP's cash requirements." OCP Cmts. at 25. This argument ignores Commerce's explanation that offsetting, rather than ignoring, OCP's debt with income generated from that debt is more reasonable because the record demonstrates that OCP's net debt better reflects its "actual debt obligations" and "the debt costs carried by OCP's revenue generation." *Second Remand Redetermination* at 31.

27

OCP also argues that because money is fungible, "Commerce offers no explanation for why it only used financial income to offset cash requirements" and "{i}n this context, there is no basis for Commerce to use financial income to offset OCP's debt costs." OCP Cmts. at 25. OCP did not raise this argument in its comments on the draft second remand redetermination; thus, the Court should not consider it now. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (holding that arguments not raised before Commerce are generally waived).

Even if OPC had preserved this argument, it fails to undermine Commerce's determination. As Commerce stated, "the record substantiates through OCP's reconciliation that the incomes in question are included in OCP's short-term financial profit/loss and net Debt in the ordinary course of business, and that the actual Debt expenses incurred for OCP's working capital are offset by this income." *Second Remand Redetermination* at 16, 31 (citing OCP IQR at Appendix GEN4-(a)(iii); see also OCP ILOV SQR at 19-27). Unlike cash generated from the sale of products (the hypothetical example OCP sets forth in its brief), which would not logically be reported with OCP's net Debt, here the relevant income was reported in OCP's net Debt in its financial statements in the ordinary course of business. *Id*.

Moreover, OCP's reference to Commerce's selection of a *sales denominator* in an unrelated proceeding does not control Commerce's treatment of net Debt or financial expenses in general nor does it undermine Commerce's allocation methodology here. OCP Cmts. at 25 (citing *Certain Softwood Lumber Products From Canada: Final Results of the Countervailing Duty Administrative Review, 2017-2018*, 85 Fed. Reg. 77,163). Thus, Commerce's adjustment to OCP's Debt costs is reasonable and in accordance with law.

b.    Debt Allocation Methodology

Consistent with the Court's second remand order, Commerce considered Mosaic's

proposed alternative methodology for allocating OCP's Debt.  *Second Remand Order* at 1375-76.  Commerce found that "{w}hile the allocation methodology provided by OCP has limitations, including lack of accounting for corporate Debt incurred in relation to subsidiaries and joint ventures… OCP's current allocation is the *most reasonable* alternative available on the record due to the lack of other, non-distortive alternatives" such as Mosaic's proposal that Commerce allocate Debt "based on each operational segment's share of financial profit and loss."  *Second Remand Redetermination* at 16-17 (emphasis added).  Specifically, Commerce explained, Mosaic's proposed allocation methodology "is not reasonable in this instance because the record substantiates that OCP [

]."  *Id*.

Under Mosaic's approach, "{a}ny Debt allocation from the use of financial profit/loss between mining and chemical sites would therefore result in a distorted allocation with OCP's corporate Debt costs from mining [

]."  *Id*. (internal citation omitted).  Further, Commerce explained that "OCP's consolidated financial statements do not contain financial profit/loss information by business segment or sector, such that Commerce can reasonably allocate OCP's corporate Debt costs based on reasonably available information regarding the consolidated entity."  *Id*. (internal citation omitted).

Mosaic challenges Commerce's Debt allocation, alleging "OCP's proposed allocation basis for its debt costs is unrelated to what OCP used the financed funds for" and "capital expenditures are only one of many ways OCP employs its debt-financed resources."  Mosaic Cmts. at 18-19.  Further, Mosaic argues that "the record shows that this category of OCP's

corporate-wide Debt costs does not include capital expenditures related to its mining operations." *Id*. at 20. These arguments are unpersuasive; Commerce's allocation methodology is necessary precisely because OCP's HQ, support, and debt costs cannot be specifically tied to a cost-center. As the Court held, it was unreasonable to assume none of these costs were incurred in related to the phosphate mining and fertilizers segments of OCP's business. *First Remand Order* at 1300-01.

Mosaic argues that Commerce should have allocated Debt based on the OCP's operational segments' share of financial profit or loss. Mosaic Cmts. at 20-21. However, Commerce found this approach not usable because OCP "[


]." *Second Remand Redetermination* at 32. In its brief, "Mosaic concurs with Commerce's finding that it is not possible to 'identify a reasonable profit on OCP's [                              ],'" but argues that "this is beside the point because the record shows that OCP itself [


]." Mosaic Cmts. at 21 (citations omitted). Mosaic contends that "the fact that OCP does not record profit [

] is simply a reflection of how OCP keeps its books and records in the ordinary course." *Id*.

Commerce addressed this argument, explaining that while "[

],
namely, [                                                                ]," "this only reflects [

]." *Second Remand Redetermination* at 32. Thus, Commerce

30

determined that Mosaic's proposed profit and loss allocation "is thus not a reasonable method for allocating financial expenses, because {Commerce} cannot identify a reasonable profit on OCP's [                                    ], which accounts for [            ] of OCP's POI phosphate rock production." *Id*. Mosaic's argument that "Commerce's rejection of {its} proposed allocation… is unreasonable and unsupported by substantial evidence" ignores the above analysis of record evidence.

Finally, Mosaic argues that Commerce failed to adequately explain its rejection of Mosaic's proposed alternative that if Commerce continued to allocate Debt based on capital expenditures at the headquarters level, Commerce must also account for such expenditures of OCP's consolidated subsidiaries and affiliates. Mosaic Cmts. at 21-23. However, Commerce adequately addressed this argument:

> While we agree that allocating OCP's Debt costs based on the capital expenditures of OCP as a consolidated entity is a more accurate reflection of OCP's incurred financial expenses, and is consistent with our revenue allocation using the consolidated entity, the record does not contain POI-contemporaneous information to calculate this allocation, nor is there any indication on the record that OCP Group's capital expenditures remained unchanged between [    ] (the period for which the information is available) and the 2019 POI. We therefore find that the current allocation provided by OCP… continues to be the most accurate information available.

*Second Remand Redetermination* at 33. Mosaic now argues that "Commerce's explanation ignores that OCP's proposed allocation based on capital expenditures of just the four operational segments is also not contemporaneous with the POI, but rather extends back fully 10 years." Mosaic Cmts. at 23. This argument is unpersuasive. As Mosaic acknowledges, Commerce relied on data inclusive of the POI (2019) and incorporated data extending back ten years, the average useful life of such assets. By contrast, Mosaic's proposal relies on data completely

exclusive of the period of investigation, based on a single bond prospectus in 2017, lacking any supporting documentation that information contained in the prospectus is indicative of OCP's capital expenditures during the POI. Commerce's determination to accept OCP's allocation methodology over Mosaic's is supported by substantial evidence. Thus, this Court should affirm Commerce's allocation of overhead Debt costs for OCP's COP buildup.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's remand redetermination and enter judgment in favor of the United States.

Respectfully submitted,

BRETT A. SHUMATE
ASSISTANT ATTORNEY GENERAL

PATRICIA M. McCARTHY
Director

s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

OF COUNSEL

JOSEPH GROSSMAN-TRAWICK
Attorney
Office of the Chief Counsel for Trade
    Enforcement & Compliance
U.S. Department of Commerce

s/ Kristin E. Olson
KRISTIN E. OLSON
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 307-6299
kristin.olson@usdoj.gov

July 14, 2025
Public version filed July 28, 2025

*Attorneys for the United States*

<u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the 10,000 word limitation authorized by the Court's scheduling order because the brief contains 9,518 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>s/ Kristin E. Olson        </u>